# Exhibit 19



# KF TEA FRANCHISING LLC

# FRANCHISE AGREEMENT

**FRANCHISEE:**        **VTVC ENTERPRISES, INC.**

**FRANCHISE LOCATION:**        **3910 WAYNE AVE, #102**
                             **WICHITA FALLS, TX 76308**

**DATE OF AGREEMENT:**        **AUGUST 16, 2017**

Version 4/17/2017

# KF TEA FRANCHISING LLC

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

*Page*

| | |
|---|---|
| Preamble | 1 |
| Article I – Grant and Operation of the Franchise | 1 |
| Section 1.1 – Territory Rights | 1 |
| 1.1.1 Grant of Rights | 1 |
| 1.1.2 Territorial Exclusivity | 1 |
| 1.1.3 No Marketing Outside the Territory | 1 |
| 1.1.4 Single Location | 1 |
| 1.1.5 Products and Services Offered | 1 |
| 1.1.6 Types of Sales | 2 |
| 1.1.7 Rights We Reserve | 2 |
| 1.1.8 Guaranty | 2 |
| Section 1.2 – Site Selection and Development; Opening | 2 |
| 1.2.1 Site Selection | 2 |
| 1.2.2 No Assurance | 2 |
| 1.2.3 Lease | 3 |
| 1.2.4 Site Development | 3 |
| 1.2.5 Conditions to Opening | 4 |
| 1.2.6 Time of Opening | 4 |
| 1.2.7 Relocation | 4 |
| Section 1.3 – Supplies; Computer System | 5 |
| 1.3.1 Equipment | 5 |
| 1.3.2 Exclusive Supplies | 5 |
| 1.3.3 Other Suppliers | 5 |
| 1.3.4 Compensation from Suppliers | 5 |
| 1.3.5 Approval of Supplies and Suppliers | 6 |
| 1.3.6 Purchasing or Distribution Cooperatives | 6 |
| 1.3.7 Point of Sale, Surveillance and Computer Systems | 6 |
| 1.3.8 Electronic Communications | 6 |
| 1.3.9 Operations Data | 6 |
| Section 1.4 – Manual; System Modifications | 7 |
| 1.4.1 Manual | 7 |
| 1.4.2 System Modifications by Us | 7 |
| 1.4.3 System Modifications by You | 7 |
| Section 1.5 – Personnel; Training and Support | 7 |
| 1.5.1 Managing Owner | 7 |
| 1.5.2 Initial Training | 8 |
| 1.5.3 Opening Assistance | 8 |
| 1.5.4 Ongoing Training | 8 |

| | |
|---|---|
| 1.5.5  Replacement Managers | 8 |
| 1.5.6  Ongoing Support | 8 |
| 1.5.7  Undertakings by Your Personnel | 8 |
| 1.5.8  Employer Obligations | 9 |
| | |
| Section 1.6 – Operation of the Franchised Business | 9 |
| 1.6.1  System Standards | 9 |
| 1.6.2  Customer Service | 9 |
| 1.6.3  Staff | 9 |
| 1.6.4  Maintaining Goodwill | 9 |
| 1.6.5  Compliance with Laws | 9 |
| 1.6.6  Health and Safety Standards | 9 |
| 1.6.7  Maintaining the Premises | 10 |
| 1.6.8  Remedial Work | 10 |
| 1.6.9  Remodeling | 10 |
| 1.6.10  Use of the Premises | 10 |
| 1.6.11  Hours of Operation | 10 |
| 1.6.12  No Vending Machines | 10 |
| 1.6.13  Entity Requirements | 10 |
| 1.6.14  Franchisee Advisory Council | 10 |
| 1.6.15  Customer Evaluations | 11 |
| 1.6.16  Inspections | 11 |
| 1.6.17  Prices | 11 |
| 1.6.18  Payments to Suppliers | 11 |
| 1.6.19  Coupons, Customer Loyalty and Gift Cards and Apps | 11 |
| | |
| Section 1.7 - Advertising, Promotion and Marketing | 11 |
| 1.7.1  Signage | 11 |
| 1.7.2  Local Advertising | 12 |
| 1.7.3  National and Regional Advertising | 12 |
| 1.7.4  Marketing Fund | 12 |
| 1.7.5  Use of the Marketing Fund | 12 |
| 1.7.6  Accounting for the Marketing Fund | 13 |
| 1.7.7  Marketing Fund Entity | 13 |
| 1.7.8  Distribution of Advertising Expenditures | 13 |
| 1.7.9  Termination of Marketing Fund | 13 |
| 1.7.10  Cooperative Advertising | 13 |
| 1.7.11  Internet Advertising | 13 |
| 1.7.12  Social Media | 13 |
| | |
| Section 1.8 – Website | 13 |
| 1.8.1  System Website | 13 |
| 1.8.2  Promotion of the System Website | 14 |
| 1.8.3  Franchisee Extranet | 14 |
| | |
| Article II – Fees; Payments; Records; Inspections | 14 |
| | |
| Section 2.1 – Fees and Reports | 14 |
| 2.1.1  Initial Fee | 14 |
| 2.1.2  Training Fee | 14 |
| 2.1.3  Royalty | 14 |
| 2.1.4  Definition of Gross Sales | 14 |
| 2.1.5  Marketing Fee | 15 |

– ii –

| | |
|---|---|
| 2.1.6  Other Fees | 15 |
| 2.1.7  Inflation | 16 |
| 2.1.8  Accounting Period | 16 |
| 2.1.9  Reports | 16 |
| 2.1.10  Payment | 16 |
| 2.1.11  Interest on Late Payments | 16 |
| 2.1.12  No Setoff | 16 |
| 2.1.13  Application of Payments | 16 |
| 2.1.14  Taxes | 17 |
| | |
| Section 2.2 – Records; Inspection | 17 |
| 2.2.1  Records | 17 |
| 2.2.2  Access to Systems | 17 |
| 2.2.3  Right to Inspect | 17 |
| 2.2.4  Right to Audit | 17 |
| 2.2.5  Discrepancies | 17 |
| 2.2.6  Cost | 17 |
| 2.2.7  Survival of Inspection and Audit Rights | 17 |
| 2.2.8  Disclosure of Your Financial Information | 18 |
| | |
| Section 2.3 – Security Interest | 18 |
| 2.3.1  Grant of Security Interest | 18 |
| 2.3.2  Default | 18 |
| 2.3.3  Filings | 18 |
| 2.3.4  Grants of Security Interests to Others | 18 |
| 2.3.5  Survival | 18 |
| | |
| Article III – Proprietary Rights; Confidentiality; Noncompetition | 18 |
| | |
| Section 3.1 – Our Copyrights and Trademarks | 18 |
| 3.1.1  Our Copyrights | 18 |
| 3.1.2  Our Trademarks | 18 |
| 3.1.3  Proper Use of Marks | 19 |
| 3.1.4  Modifying the Marks | 19 |
| 3.1.5  Infringement | 19 |
| | |
| Section 3.2 – Confidentiality of Our Information | 20 |
| 3.2.1  Confidential Information | 20 |
| 3.2.2  Nondisclosure and Non-Use | 20 |
| 3.2.3  Isolated Disclosures | 21 |
| 3.2.4  Exceptions | 21 |
| 3.2.5  Disclosures Required by Law | 21 |
| 3.2.6  Return of Information | 21 |
| 3.2.7  Your Rights Under Federal Law | 21 |
| | |
| Section 3.3 – Noncompetition | 21 |
| 3.3.1  Definition of Competitive Business | 21 |
| 3.3.2  Agreement Not to Compete | 21 |
| 3.3.3  Noncompetition After Termination | 22 |
| | |
| Article IV – Transfer | 22 |
| | |
| Section 4.1 – Transfer by Us | 22 |

– iii –

Section 4.2 – Transfer by You                                                    22
    4.2.1  No Transfer Without Our Approval                       22
    4.2.2  Definition of Transfer                                22
    4.2.3  Notice of Transfer                                    23
    4.2.4  Conditions to Transfer                                23
    4.2.5  Transfer to a Company You Control                     24
    4.2.6  Transfer Upon Death or Disability                    24
    4.2.7  Operation of the Franchised Business Upon Death or Disability    24
    4.2.8  Transitional Management Costs                        25
    4.2.9  Stock Offerings                                      25

Section 4.3 – Our Right of First Refusal                                        25
    4.3.1  Notice of Third Party Offer                          25
    4.3.2  Exercise of Our Right of First Refusal               25
    4.3.3  Consequence of Nonexercise of Our Right of First Refusal    25
    4.3.4  Exceptions                                           26

Article V – Term and Termination                                                26

Section 5.1 - Term and Renewal                                                  26
    5.1.1  Initial Term                                         26
    5.1.2  Renewal                                              26
    5.1.3  Hold Over                                            27

Section 5.2 – Termination                                                       27
    5.2.1  Termination by You                                   27
    5.2.2  Termination by Us Upon Notice                        27
    5.2.3  Termination After Cure Period                        29
    5.2.4  Relationship Laws                                    29

Section 5.3 - Consequences of Termination                                       30
    5.3.1  General Consequences                                 30
    5.3.2  Right to Buy Equipment                               30

Section 5.4 – Our Option to Purchase Upon Termination                           31
    5.4.1  Exercise of Option                                   31
    5.4.2  Leasehold Rights                                     31
    5.4.3  Purchase Price                                       31
    5.4.4  Appraisal                                            31
    5.4.5  Closing                                              31

Article VI – Representations and Warranties; Indemnification; Insurance          32

Section 6.1 – Representations and Warranties                                    32
    6.1.1  Your Representations                                 32
    6.1.2  Your Representations as an Entity                    32

Section 6.2 – Indemnification                                                   33
    6.2.1  Your Indemnity                                       33
    6.2.2  Our Indemnity                                        33
    6.2.3  Notice of Claim; Survival                            33

– iv –

Section 6.3 – Insurance                                                                33
    6.3.1  Insuring the Franchised Business                              33
    6.3.2  Minimum Coverage                                              34
    6.3.3  Waiver of Subrogation                                         34
    6.3.4  Changes in Coverage Requirements                            34
    6.3.5  Negligence                                                   34
    6.3.6  Certificates of Insurance                                    34
    6.3.7  Our Remedies                                                 35
    6.3.8  No Effect on Indemnity                                        35

Article VII – Miscellaneous                                                          35

Section 7.1 – Relationship of the Parties                                            35
Section 7.2 – Reasonable Business Judgment                                           35
Section 7.3 – Injunctive Relief                                                      35
Section 7.4 – Severability                                                           35
Section 7.5 – No Waiver of Rights                                                    35
Section 7.6 – Notices                                                               35
Section 7.7 – Affiliates                                                            36
Section 7.8 – Limitation of Actions                                                 36
Section 7.9 – Waiver of Punitive Damages and Jury Trial                             36
Section 7.10 – Governing Law                                                        36
Section 7.11 – Jurisdiction                                                         36
Section 7.12 – Costs and Expenses                                                   36
Section 7.13 – Entire Agreement                                                     37

Schedule A – Franchisee Information
Schedule B –Confidentiality and Noncompetition Agreement

Version 4/17/2017

# KF TEA FRANCHISING LLC

## FRANCHISE AGREEMENT

AGREEMENT effective as of August 16, 2017, between KF TEA FRANCHISING LLC, a Delaware limited liability company (referred to in this Agreement as "we" or "us"), and VTVC ENTERPRISES, INC., a Texas corporation (referred to in this Agreement as "you" or "your company").

We and our affiliated companies have developed an integrated system (the "System") for the operation of retail shops selling a variety of oriental style brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks (the "Kung Fu Tea shops"). Kung Fu Tea shops operate under the trademark KUNG FU TEA and other trademarks, and we may create, use and license additional trademarks or substitute different trademarks in the future in conjunction with the operation of Kung Fu Tea shops (collectively, the "Marks").

You have applied for a franchise to own and operate a Kung Fu Tea shop in a defined territory (the "Franchised Business"), and we are pleased to grant such franchise to you on the terms and conditions set forth below.

Accordingly, you and we agree as follows:

## ARTICLE I – **GRANT AND OPERATION OF THE FRANCHISE**

Section 1.1 – *Territory Rights*

1.1.1 *Grant of Rights.*  We grant to you the right, and you undertake the obligation, to operate a franchised Kung Fu Tea shop in the geographic area described in Schedule A (the "Territory") in accordance with the System Standards (as defined in Section 1.4.1 below) and the terms and conditions contained in this Agreement.

1.1.2 *Territorial Exclusivity.*  Because we reserve certain rights in the Territory as described in, Section 1.1.7, your rights in the Territory are not exclusive. However, so long as you are not in default under this Agreement, we may not operate or grant others the right to operate a Kung Fu Tea shop within the Territory during the Term of this Agreement, except as set forth in Section 1.1.7.

1.1.3 *No Marketing Outside the Territory.*  You may not market or sell the Franchised Business outside of the Territory without our prior written approval, which we may withhold in our discretion.

1.1.4 *Single Location.*  You must operate your franchised Kung Fu Tea shop (the "Franchised Business") only at the location described in Schedule A (the "Site"), or if such location is not described in Schedule A, then at a location approved by us that is within the Territory.  You may not relocate the Franchised Business or operate the Franchised Business from any location other than the Site without our prior written approval in accordance with Section 1.2.7.  You do not have the right to grant subfranchises of the rights granted under this Agreement.  The grant of this franchise does not give you the right to receive additional franchises from us.

1.1.5 *Products and Services Offered.*  You must offer and sell at retail in the Franchised Business all of the products we specify.  You may not sell under the Marks or in the Franchised Business any products or offer any services we do not specify or approve.  If you desire to sell any items that we have not specified or approved, you must request our approval in accordance with Section 1.3.5, and you may not sell any such item without our written approval.  Upon notice from us given at any time, you must discontinue offering for sale any products or offering any services we may disapprove or discontinue.  In addition to our right to terminate this Agreement, we have the right to assess our then current prohibited prod-

uct fee in the event you continue offering unapproved products or services after your receipt of verbal or written notice from us advising you to cease sales of such product or service.

1.1.6  *Types of Sales.*  The primary business of Kung Fu Tea shops is the retail sale of oriental style brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks at the shop premises. You may also accept local orders in person or via e-mail, telephone, fax or similar means provided that you deliver the product so that each customer receives it fresh.  You may not sell any products from the shop premises in any manner to food wholesalers or retailers, such as convenience shops, grocery shops or others for resale.  You may not cater to parties, supply product to charities for resale or discount the sale of unsold product that is not fresh.

1.1.7  *Rights We Reserve.*  We and our affiliates retain all rights not specifically granted to you under this Agreement.  These rights include, without limitation, the right:

1.1.7.1  to establish Kung Fu Tea shops, whether franchised or company owned, anywhere outside the Territory;

1.1.7.2  to establish Kung Fu Tea shops in non-traditional venues such as airports, hotels and resorts, military installations, school and university campuses, train stations and subway stations, casinos, theme parks, sports stadiums and enclosed shopping malls, within or outside the Territory (unless your Territory is in a non-traditional venue);

1.1.7.3  to sell any products, including tea, coffee, juices and other hot and cold drinks, under the Marks and any other trademarks at grocery stores, supermarkets or other channels of distribution at any time, and directly to customers through our website; and

1.1.7.4  to acquire and operate any business under a different trademark at any location and to continue to operate that business under trademarks other than the Marks.

1.1.8  *Guaranty.*  Our grant of this franchise is made in reliance on the personal attributes of your company's owners and managers named in Schedule A.  If your company is a legal entity such as a corporation or limited liability company rather than a sole proprietorship or general partnership, then our grant of this franchise is made on the condition that each person who now or later owns or acquires, either legally or beneficially, any equity or voting interest in your company (the "Guarantor" or "Guarantors"), must execute and deliver to us a guaranty and assumption agreement in a form acceptable to us (the "Guaranty").  We may require the spouse of any or all Guarantors to sign the Guaranty in our discretion. Transfers of interest are restricted in accordance with Article IV.  Upon our request at any time, you will furnish us with a list of all holders of legal and beneficial interests in your company, together with descriptions of the type of interests owned and percentage amounts, and the names, addresses, email addresses and telephone numbers of the owners, certified as correct in the manner we specify.  If any of your company's general partners, managers, officers or directors ceases to serve as such or if any new person becomes a general partner, manager, officer or director after the date of this Agreement, you will notify us of such change within 10 days.  Any breach of a Guaranty will be deemed to be a breach of this Agreement.

Section 1.2 – *Site Selection and Development; Opening*

1.2.1  *Site Selection.*  You are solely responsible for selecting the Site for the Franchised Business.  We merely approve the Site if it is acceptable to us.

1.2.2  *No Assurance.*  You acknowledge that neither our recommendation or approval of the Site nor any information regarding the Site we communicate to you constitutes a guarantee, assurance, representation or warranty of any kind, express or implied, as to the suitability of the Site for a Kung Fu Tea

– 2 –

shop or of the successful operation or profitability of a Kung Fu Tea shop at the Site.  You acknowledge that your acceptance of the franchise is based on your own independent investigation of the suitability of the Site.

   1.2.3   *Lease*.  You must submit your proposed lease for the premises of your Kung Fu Tea shop to us for our prior written approval as to its form.  We may require that the lease or any renewal lease contain certain provisions, including the following:

      1.2.3.1.  The permitted use of the premises of the Franchised Business will be limited to the operation of a Kung Fu Tea shop.

      1.2.3.2.  You are permitted to use and install the trademarks, trade dress, signage and related features associated with the Kung Fu Tea franchise system that we may prescribe.

      1.2.3.3.  The landlord will provide us with copies of any written notice of default under the lease sent to you concurrently with the landlord's delivery of such notice to you.  Such notice must grant to us the right (but not the obligation) to cure any default under the lease (should you fail to do so) within 15 days after the expiration of the period in which you may cure the default.

      1.2.3.4.  You and the landlord will, at our request, enter into a conditional assignment of the lease, granting to us or our assignee the right to succeed to your rights and obligations under the lease in the event that this Agreement is terminated for any reason or it expires without a renewal agreement, or if you commit any breach of the lease that could lead to termination of the lease.

      1.2.3.5.  We have the right (but not the obligation), to assume the lease upon the expiration of this Agreement or its termination for any reason.  In such event, we will give the landlord notice of our assumption of the lease, the landlord will agree to recognize us as the new tenant under the lease, and we will thereafter be bound by the terms or the lease.  We will have the right to assign our interest in the lease to an approved franchisee and we will have no further liability or obligation under the lease after such assignment.  Unless and until we agree in writing to assume the lease, we will have no liability or obligation under the lease. In any event, you will be solely responsible to the landlord for all debts, payments and performance under the lease that were incurred before we or another franchisee actually takes possession of the leased premises.

      1.2.3.6.  The landlord will not accept your voluntary surrender of the Lease without prior notice to us.  You and the landlord will not renew or extend the term of the lease, nor amend, modify or alter the lease, without our written consent.  You may not assign your interest in the lease, nor sublet all or any portion of the leased premises, without our written consent.

We are not responsible for review of the lease.  You acknowledge that we have advised you to have an attorney review and evaluate the lease.  If we do not have a copy of the signed lease, you must deliver such copy to us within 14 days after it is signed by you and the lessor.  If you sublease the premises from us or our affiliate, you agree to execute our then current form of sublease and if you are an entity, have each of your owners execute our then current form of guaranty.  If we or one of our affiliates elects to assign an existing lease to you and you desire to obtain an assignment of the existing lease, unless we otherwise agree, you agree to arrange for the release of our affiliate from all obligations under the assigned lease as of the date of the assignment.

   1.2.4   *Site Development*.  Within 45 days after the date of this Agreement, you must, at your expense, complete the arrangements to lease or purchase the approved premises for the Franchised Business.  You are solely responsible, at your own expense, for obtaining any necessary financing and all required building, utility, sign, business and other permits and licenses required to operate the Franchised

Business, and for constructing all required improvements to the Site and decorating the premises of the Franchised Business in compliance with plans and specifications we have approved.  We will furnish you with mandatory and suggested specifications and layouts for a Kung Fu Tea shop, including requirements for dimensions, design, image, interior layout, décor, equipment, fixtures, furnishings and signs, which items will be supplied either by us or by suppliers we specify or approve.  You (or your lessor on your behalf) must engage an architect to prepare all required construction plans and specifications to comply with all applicable ordinances, building codes and permit requirements and with all lease or sublease requirements and restrictions, if any.  You must submit construction plans and specifications to us for approval before construction of improvements to the Site commences.  You understand that you may modify our mandatory specifications only to the extent required to comply with applicable ordinances, building codes and permit requirements, and only with our prior written approval.  In addition, you must engage a qualified interior designer and you must submit all design plans to us for our approval in advance, unless, in our discretion, we decide to supply to you our own design package for your purchase.  You must also submit to us proofs of all signage for your franchised business for our approval in accordance with Section 1.7.1 before you produce such signage.

     1.2.5  *Conditions to Opening.*  You may not begin commercial operations at the Franchised Business until:

        1.2.5.1 all of your obligations pursuant to Sections 1.2.3 and 1.2.4 are fulfilled;

        1.2.5.2 we determine that the premises have been constructed, furnished, equipped and decorated in accordance with our requirements;

        1.2.5.3 your Managing Owner has completed the initial training to our satisfaction;

        1.2.5.4 the initial franchise fee and all other amounts due to us and our affiliates have been paid in full;

        1.2.5.5 you have furnished us with certificates of insurance and copies of all insurance policies or such other evidence of insurance coverage as we reasonably request, as well as with copies of all bonds that may be required under state or local law; and

        1.2.5.6  we have given your our written approval of the opening.  We may grant or withhold such approval in our sole discretion.

     1.2.6  *Time of Opening.*  You agree to open your franchised Kung Fu Tea shop for business no later than nine months after the date of this Agreement.  You acknowledge that time is of the essence.

     1.2.7  *Relocation.*  If you need to relocate the Site, you must submit to us a written proposal identifying for our approval at least one potential Site in the Territory, in the format indicated in the Manual (as defined in Section 1.4.1), together with any other information that we request.  Following receipt of your written site proposal, we may make an on-site visit to the proposed Site at our expense if we believe that such a visit is necessary or desirable, although we are not required to make an on-site visit.  We do not charge for the initial on-site evaluation, but we may charge for each additional on-site evaluation a reasonable fee plus our reasonable costs.  In evaluating potential sites, you agree to consider our site selection criteria, which we will provide to you at your request.  We will not unreasonably withhold or delay our approval of any site that meets our standards.  Relocation will require a new build-out, renovation to the then current standards and design, lease modification, franchise agreement changes and a fee (as stated in Section 2.1.6.1)  to cover our costs and expenses.

Version 4/17/2017

Section 1.3 – *Equipment; Supplies; Computer System*

1.3.1 *Equipment.* You agree to purchase from our affiliate, Arms Global Inc., and to use and maintain in the Franchised Business the following equipment, most of which is branded with our logo:

Shaker machine
Cup sealing machine (for the plastic tops of the cups for cold drinks)
Fructose dispenser (sugar machine)
Point of Sale (POS) system
Smallwares kit

The smallwares kit consists of the following:

| | | |
|---|---|---|
| 3M Scrub Pad (Roll) | Jigger (Large/Small) | Squeeze Bottle (600/700 cc) |
| Bamboo Stir Stick (Large/Small) | Measuring Cup (100/200/5000cc) | Stainless Steel Strainer |
| Hot Pot Strainer | Microfiber Cloth | Stainless Steel Tea Filter |
| Cocktail Shaker | Mop | Stirring Spoon |
| Coffee Pot | Pitcher (2.18/2.5/5L) | Stock Pot (20qt/226 cm) |
| Colander | Plastic Container (1000/3200 cc) | Syrup Dispenser |
| Digital Timer | Powder Spoon (Large/Small) | Tea Bucket (10/12L) |
| Food Storage Container (12/22 qt) | Rice Cooker Inner Pot | Tea Cooling Bag |
| Ice Scoop | Salt and Pepper Shaker | Tea Cooling Bucket w/Cover |
| Ice Tong | Scale | Tea Filter Bag |
| Jelly Ladle | Spoon for Slush | Uniform |

You must purchase our specified model of espresso machine from our designated supplier. You must purchase your blender and juicer from suppliers we specify. We provide specifications for other equipment, including under-the-counter refrigerator, ice-maker and freezer, which you may purchase from any supplier.

1.3.2 *Exclusive Supplies.* You will sign an agreement acceptable to us with our affiliate, Arms Global Inc., simultaneously with your signing of this Agreement. You agree to purchase from our affiliate or other authorized supplier all of the tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise. In addition to our right to terminate this Agreement, we have the right to assess our then current prohibited product fee in the event you continue to purchase unapproved products after your receipt of verbal or written notice from us advising you to cease your purchase of such products.

1.3.3 *Other Suppliers.* You may buy perishables from local suppliers you select. However, we specify your supplier of milk and fruit (to maintain our uniform quality and taste). You must buy a reasonable variety of all of these products to meet the demands of your customers. You agree to use in the operation of the Franchised Business only those brands and models or types of equipment, supplies, furniture, signs and other products and services that we have designated or approved for Kung Fu Tea shops. We may require that you obtain equipment, fixtures, supplies, furniture, signs and other products and services only from our designated or approved suppliers. We may negotiate purchase agreements with suppliers for the benefit of franchisees, but we are under no obligation to do so. We are not obligated to pass on to you any discounts we receive from suppliers.

1.3.4 *Compensation from Suppliers.* We reserve the right to receive rebates, credits and other compensation from suppliers we designate or approve to provide goods or services to you based upon the purchases by you and other franchisees of goods and services from such suppliers. We may use such compensation for any purpose we deem appropriate, including to subsidize our operating costs.

1.3.5 *Approval of Supplies and Suppliers.*  If you propose to purchase any brand or model of equipment, supplies, furniture, signs or other products or services that are not then designated or approved by us, or to purchase from any supplier that is not then designated or approved by us, you must first notify us and submit to us sufficient written specifications, photographs, drawings, samples and other information we request to enable us to determine whether the proposed brand, model or supplier complies with our specifications and standards.  We will have the right to require that our representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered either to us or to a third party designated by us for review and testing.  We will use reasonable efforts to begin an investigation of the proposed supplier or product within 30 days of your request.  We will notify you within 10 days after we complete our investigation whether we approve the proposed supplier or product.  We are under no obligation to investigate or approve any supplies or supplier you request.  If we do not approve the supplies or supplier within 60 days after your request, we will be deemed to have denied your request.  We reserve the right, at our option, to re-inspect the facilities and products of any approved supplier and to revoke our approval upon the supplier's failure to continue to meet any of our then-current criteria.  We will not be required to approve any particular supplier nor to make available to you or to any prospective supplier any of our standards or specifications.

1.3.6 *Purchasing or Distribution Cooperatives.*  We may establish national or regional purchasing or distribution programs for the purchase or distribution of certain goods, materials or supplies at reduced prices.  You agree to participate in any purchasing or distribution cooperatives that we may establish for the region where your Franchised Business is located.

1.3.7 *Point of Sale, Surveillance and Computer Systems.*  You agree to install, maintain and use in the Franchised Business such computer hardware, software, point-of-sale, cash register and surveillance systems as we specify from time to time, using suppliers we specify or approve from time to time.  We may require you to incur costs to purchase, lease and license computer hardware and software and to obtain service and support, and to maintain such systems and to upgrade and make such changes to such systems as we may specify in writing.  We will manage the license with the point-of-sale provider we select for the system of Kung Fu Tea shops nationally, and you agree to pay such provider's fee for such license.  We may change the point-of-sale provider in our discretion.  You must also be equipped to accept electronic payments wirelessly from customers using their cell phones and such app as we may require, which may allow customers to accumulate reward points each time they make a purchase.  You acknowledge that we cannot estimate the future costs that other providers may charge for the computer hardware, software, or surveillance systems or their maintenance or upgrades, or additions or modifications to these systems, and that these costs may not be fully amortizable over the remaining term of this Agreement.

1.3.8 *Electronic Communications.*  You agree to maintain adequate telephone service for the Franchised Business, including a dedicated telephone line with voicemail dedicated to the Franchised Business, and a high speed Internet connection.  You agree to use in the Franchised Business only such email addresses as we authorize and you will comply with such policies as we prescribe from time to time for email use.  We have the right to establish requirements that will permit us, as often as we deem appropriate, to access your computer system and to retrieve all information relating to the Franchised Business.

1.3.9 *Operations Data.*  We will have continuing access to and use of all operations data, including specific products sold and other sales data, customer lists (including the name, address, telephone number and email address of each customer), surveillance video and all other content and data you collect or shop on your computer and surveillance system.  We will periodically establish policies with respect to the use of such content and data, and you agree to comply with such policies.

Version 4/17/2017

Section 1.4 – *Manual; System Modifications*

1.4.1 *Manual.* During the term of this Agreement, we will give you access to the confidential operations manual, training and supplemental materials that we generally furnish to franchisees from time to time for use in operating a Kung Fu Tea shop (the "Manual"), in such media as we select, whether hard copy, DVD, through the Web or otherwise. The Manual and the bulletins and other written materials we provide to you contain mandatory and suggested specifications, standards, operating procedures, policies, methods and rules ("System Standards") that we prescribe from time to time for the operation of a Kung Fu Tea shop and information relating to your other obligations under this Agreement. The Manual is and will remain at all times our sole property. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Manual except as we may specifically authorize. You further agree to keep any copy of the Manual current at all times with all updates and modifications we furnish to you, and to store each copy of the Manual in a secure location at the premises of the Franchised Business. In the event of a dispute relating to its contents, the master copy of the Manual we maintain at our principal office will control. If a copy of the Manual in your possession or under your control, or any portion of such Manual, is lost, stolen, destroyed or significantly damaged, you agree to report such loss, theft, destruction or damage immediately to us.

1.4.2 *System Modifications by Us.* We may modify or change the System Standards from time to time, and upon notice to you, we may make additions to, deletions from or revisions in the Manual to reflect such modifications or changes. Such modifications or changes may include, for example, the addition or discontinuation of products and services that you are required to sell at the Franchised Business, and may obligate you to invest additional capital in the Franchised Business ("Capital Modifications"). No modification or change that we make will alter your fundamental status and rights under this Agreement. We will not obligate you to make any Capital Modification that you cannot reasonably amortize during the remaining term of this Agreement and with respect to leasehold improvements over the remaining term of your lease, unless we agree to extend the term of this Agreement or unless such investment is necessary in order to comply with applicable laws. You agree to adopt or comply with each new or changed procedure, policy, method and requirement as promptly as practicable after notice from us, and in any event within the time period we reasonably require.

1.4.3 *System Modifications by You.* You agree not to implement any modification or change in the System Standards or in the Franchised Business without our prior written approval, which we may withhold in our discretion. If you or any of your employees makes an improvement to the System Standards or in the Franchised Business, such improvement will be our property. We will have the right to use such improvements and to offer them to our affiliates and other franchisees for their use. Any new product or technique you develop will be an improvement owned by us that we may use at our company and affiliate Kung Fu Tea shops and that we and our affiliates may authorize other franchisees to use. You assign to us all rights to such improvements and you agree to sign any documents and to require that your employees sign any documents that we may reasonably request from time to time to evidence such assignment.

Section 1.5 – *Personnel; Training and Support*

1.5.1 *Managing Owner.* If you are a sole proprietorship, we may refer to you as the "Managing Owner". If your company is a corporation, a limited liability company or a partnership, then you agree to appoint and maintain throughout the term of this Agreement a shareholder, member or partner to serve as your "Managing Owner." The Managing Owner is responsible for overseeing and supervising the operation of the Franchised Business. The Managing Owner must be an owner of an equity or voting interest in your business whom we approve. You will ensure that the Franchised Business is always actively managed by a Managing Owner who has attended and successfully completed such training as we may require from time to time. The Managing Owner will actively devote his or her full time, attention and effort to the Franchised Business and provide direct, day-to-day supervision of the operation of the Fran-

– 7 –

chised Business. The Managing Owner will ensure at all times the proper levels of customer service in accordance with the Manual and this Agreement. You may not replace the Managing Owner without our prior written approval, which we may condition on, among other things, attendance and satisfactory completion by the prospective new Managing Owner of our initial training program at your expense.

1.5.2   *Initial Training.*   Before you begin operating the Franchised Business, we will train your Managing Owner and a second person from your company in the operation of a Kung Fu Tea shop. We charge for this training in accordance with Section 2.1.2. At your request and if space is available, we will train additional personnel of your company at our then-current rate, which is $180 per day for each additional trainee as of the date of this Agreement. You must pay the compensation and travel and living expenses of all of your personnel who attend our training, regardless of whether we charge you a fee for such training. The training program consists of approximately 120 hours of training at our headquarters in New York City. We will endeavor to time the commencement of your training program so that it is completed at least 10 days before the scheduled opening of the Franchised Business.

1.5.3   *Opening Assistance.*   We will provide pre-opening and opening training, supervision and assistance at your Franchised Business by one of our trained representatives for a period in our discretion of approximately 80 hours.

1.5.4   *Ongoing Training.*   At your request, and if we agree, we will furnish additional training. We may charge our then-current fees and expenses for additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards. We do not charge for other mandatory training. Our fees and expenses will vary based on the staff, location, and type of training. If any inspection of the Franchised Business indicates noncompliance with any System Standards or if we receive negative customer feedback, we may require previously trained and experienced managers and employees to attend refresher training courses at such times and locations as we designate, and we may send our personnel to your Franchised Business for training. In such event, you agree to pay our then current fees for training and travel and living expenses for our personnel.

1.5.5   *Replacement Manager.*   If the Managing Owner does not satisfactorily complete the initial training program or if we determine that such person cannot satisfactorily complete the training program, or if the Managing Owner ceases active management of the Franchised Business ceases to act as such, then we must train, at your expense, a qualified replacement (who must be reasonably acceptable to us) within 30 days. Pending the appointment and training of a Managing Owner or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to appoint a manager for the Franchised Business and require you to pay in the manner described in Section 4.2.8.

1.5.6   *Ongoing Support.*   We will provide support and guidance from time to time, either in person, by telephone, by email or in writing, regarding the operation of the Franchised Business. We will provide regular operational reviews and advise you from time to time regarding the operation of the Franchised Business based on reports you submit to us and inspections we make, to ensure compliance with the System Standards and to recommend improvements. At your request, and if we agree, we will furnish additional on-site guidance and assistance and, in such case, we may require you to pay our then-current fees and expenses.

1.5.7   *Undertakings by Your Personnel.*   You agree to take appropriate steps to advise all of your employees and contractors of your obligations under this Agreement and to ensure compliance by all of your employees and contractors. Each manager of your Franchised Business and each person who receives training from us or otherwise has access to Confidential Information (as defined in Section 3.2.1) who has not signed the Guaranty described in Section 1.1.7 must sign a written agreement with your company substantially in the form of Schedule B to this Agreement before performing any work for the Franchised Business or otherwise having access to the Confidential Information. At our request, you will submit to us a copy of any or all such written agreements. You will ensure that each such person com-

– 8 –

plies with the terms of such agreement during the period that he or she is employed by you.  Any breach of such agreement by any such person will be deemed a breach of this Agreement.

1.5.8 *Employer Obligations*.  You will have sole authority and control over the day-to-day operations of the Franchised Business and its employees.  You will be solely responsible for recruiting and hiring the persons you employ to operate the Franchised Business.  You will also be responsible for their training, wages, taxes, benefits, safety, work schedules, work conditions, assignments, discipline and termination. You specifically agree to comply with all workplace related laws.  At no time will you or your employees be deemed to be employees of ours or of any out affiliates.  We will have no right or obligation to direct your employees.

Section 1.6 – *Operation of the Franchised Business*

1.6.1 *System Standards*.  You agree to operate the Franchised Business in strict accordance with all System Standards in effect from time to time.  You understand and acknowledge that every detail of the Franchised Business is important to you, to us and to other Kung Fu Tea shop franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect the reputation and goodwill of the Kung Fu Tea shop brand.

1.6.2 *Customer Service*.  You will provide prompt, courteous and efficient service to all customers and treat all customers with respect.  You will give prompt attention to all complaints from dissatisfied customers, if any.

1.6.3 *Staff*.  You will maintain a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards.

1.6.4 *Maintaining Goodwill*.  You will do nothing that, in our reasonable opinion, tends to discredit the Marks or the System or to bring either into disrepute, or that might diminish or affect adversely our reputation or goodwill.

1.6.5 *Compliance with Laws*.  You will comply with all applicable laws, rules and regulations in the operation of the Franchised Business and pay all taxes when due.

1.6.6 *Health and Safety Standards*. You will meet and maintain a high degree of sanitation and safety at the premises of the Franchised Business and the highest health standards and ratings applicable to the operation of the Franchised Business.  In this connection you agree as follows:

1.6.6.1 If the municipality in which the Franchised Business is located maintains a rating system for or relating to the sanitary conditions of food establishments, you must maintain the highest rating possible for the Franchised Business.  If you receive an inspection report or a warning, citation or notice that results in or may result in a lowering of such rating, you must provide us with a copy of such report, warning, citation or notice within 24 hours after you receive it. You agree to take immediate steps to restore the highest rating for the Franchised Business and to seek a reinspection or appeal as soon as possible in order to restore such rating.

1.6.6.2 If you receive an inspection report or a warning, citation, certificate or notice that requires you to repair, replace or further sanitize any item at the premises of the Franchised Business within 72 hours, you must provide us with a copy of such report, warning, citation, certificate or notice within 24 hours after you receive it.

1.6.6.3 In all cases not described in Sections 1.6.6.1 or 1.6.6.2, you will furnish us, within five days after you receive it, a copy of each inspection report, warning, citation, certificate, no-

– 9 –

tice and rating resulting from an inspection conducted by any federal, state, county or municipal agency with jurisdiction over the Franchised Business.

1.6.6.4   You will notify us within 48 hours of the occurrence of any accident or injury that may adversely affect the operation of the Franchised Business or your financial condition, or that may give rise to liability or a claim against you or us.

1.6.7   *Maintaining the Premises.*   You will at all times maintain the premises of the Franchised Business in excellent repair and condition.   You will make such additions, alterations, repairs and replacements as may be required for that purpose, including, without limitation, such periodic repainting and replacement of obsolete signs, furnishings, equipment and décor as we may reasonably direct.

1.6.8   *Remedial Work.*   If we notify you of remedial work that is necessary to correct an unhealthy or unsafe condition and you fail to commence such work in good faith or to complete such work within the period specified in our notice, we will have the right, in addition to all other remedies, but not the obligation, to enter the premises of the Franchised Business and complete the required repair or corrective work on your behalf.   We will have no liability to you for any work performed.   If we perform such work, we may require that you pay us in accordance with Section 2.1.7.5.

1.6.9   *Remodeling.*   In addition to the requirements of Sections 1.6.7 and 1.6.8, we will require you periodically to make reasonable capital expenditures to remodel, modernize and redecorate the premises of the Franchised Business so that such premises reflect the then-current image of Kung Fu Tea shops.   All remodeling, modernization and redecoration will be deemed to be Capital Modifications as defined in Section 1.4.2, and they must be done in accordance with our standards as modified from time to time and with our prior written approval.   We may require you to make additional Capital Modifications as a condition to renewal pursuant to Section 5.1.2.6.   You will complete all required Capital Modifications within the time period we reasonably require in our written notice.

1.6.10   *Use of the Premises.*   You will use the premises of the Franchised Business solely for the operation of the Franchised Business and for no other purpose or activity.

1.6.11   *Hours of Operation.*   You agree to keep the Franchised Business operating during such hours and days as we may specify from time to time or, if different, during such hours as the lease of the premises may require.

1.6.12   *No Vending Machines.*   You will refrain from installing or permitting to be installed any vending machine, game, coin-operated or similar device, unless specifically approved by us in writing in advance.

1.6.13   *Entity Requirements.*   If you are a corporation or limited liability company, such entity must be newly organized and its charter, certificate of incorporation or operating agreement must at all times provide that its activities are confined solely to operating the Franchised Business.   All certificates representing stock or other ownership interests in your company must contain a legend stating that transfer of such stock or ownership interest is limited by the provisions of this Agreement.   Upon our request, you will deliver to us copies of all organizational documents of your company, including articles of incorporation, by-laws, shareholders' agreement, limited liability company articles and operating agreement, and any certificates we may request certifying any resolution of directors.   If your company is a partnership, its activities must also be confined solely to operating the Franchised Business, which requirement must be included in your partnership agreement, if any, and you agree, upon our request, to deliver to us a copy of your partnership agreement.

1.6.14   *Franchisee Advisory Council.*   We reserve the right to create one or more "Franchisee Advisory Councils" for the purpose of fostering communication among and between franchisees and us,

– 10 –

and to advise us in establishing, modifying or discussing various policies applicable to Kung Fu Tea shop franchisees. If and when a Franchisee Advisory Council is created, we may require you to participate in its meetings and programs. A Franchisee Advisory Council may advise and make recommendations, but will not act as a policy-making board and will have no authority whatsoever. We will determine or approve the rules under which any Franchisee Advisory Council functions. We may change the rules at any time and we may dissolve any Franchisee Advisory Council at any time. We may require you to pay dues to a Franchisee Advisory Council and you will pay all costs and expenses incurred by you in connection with participation in any Franchisee Advisory Council, including the costs of transportation, lodging and meals.

1.6.15 *Customer Evaluations.* We reserve the right to institute programs for auditing customer satisfaction and other quality control measures, and to require you to pay the cost of such programs. You agree to present to your customers such evaluation forms as we periodically prescribe and to participate and request your customers to participate in any surveys performed by us or on our behalf.

1.6.16 *Inspections.* During the term of this Agreement, we or our designated representatives will also have the right, at any time during your regular business hours, without prior notice to you, to enter upon the premises of the Franchised Business to inspect the premises; observe, photograph and videotape the operations of the Franchised Business for such periods as we deem necessary; remove samples of any products, materials or supplies for review and analysis; and to interview your personnel and customers. You agree to cooperate fully with us and our representatives during all inspections, observations, photographing, videotaping, product sample removal and interviews; and to take all steps reasonably necessary to correct any deficiencies in your compliance with System Standards or this Agreement within the time we specify. Your failure to implement any corrective action we require will constitute a material breach of this Agreement and may result in termination pursuant to Section 5.2. In addition to our right to terminate this Agreement, we have the right to assess a fee equal to our then current prohibited product fee in the event you continue to be out of compliance with the System Standards after your receipt of verbal or written notice from us advising you of the nature of your default and requesting you to comply.

1.6.17 *Prices.* We reserve the right to require you to comply with reasonable and lawful restrictions on prices of specific goods or services offered and sold by the Franchised Business as required in the Manual or as we otherwise reasonably direct in writing from time to time.

1.6.18 *Payments to Suppliers.* You agree to pay all of your suppliers promptly in accordance with their payment terms and to comply in all other respect with your contractual obligations to third parties.

1.6.19 *Coupons, Customer Loyalty and Gift Cards and Apps.* You agree to honor all coupons, customer loyalty rewards and gift cards and mobile apps and similar electronic credits you receive from customers that are in a form designated or approved by us. You will not initiate any such program yourself without our prior written approval, which we may withhold in our discretion. You will distribute customer loyalty cards and sell and issue gift cards and redeem (without an offset against Royalty payments) coupons, customer loyalty cards and gift cards in accordance with procedures and policies we specify in the Manual or otherwise in writing. We will manage any customer loyalty mobile app program with the provider we select for the system of Kung Fu Tea shops nationally. Once the mobile app program is launched, you agree to pay the provider's fee for such service.

Section 1.7 - *Advertising, Promotion and Marketing*

1.7.1 *Signage.* You will post prominent signage relating to the Franchised Business in easily-seen locations both inside and outside the premises of the Franchised Business. We will prescribe or approve from time to time in writing the size, form, color scheme, content and location of all such signage.

– 11 –

You agree to display and maintain signs reflecting the current image of Kung Fu Tea shops. You also agree to post any signs we designate to reflect the fact that you are a franchisee and the fact that franchise opportunities are available to others. You agree to discontinue the use of and destroy such signs as we declare to be obsolete within the reasonable time that we specify for such destruction, which will not be less than 30 days. Because of the importance of the Kung Fu Tea shop image, you grant to us the right to enter the premises of the Franchised Business to remove and destroy unapproved or obsolete signs in the event that you have failed to do so within the time we specify.

1.7.2 *Local Advertising.* We do not require you to engage in any local advertising or to spend any minimum amount of money on local advertising or grand opening advertising. All local advertising, marketing and public relations programs and activities that you do provide must and all materials you use in programs and activities must conform to such standards and requirements as we may specify from time to time. All such materials must be clear, factual and not misleading. You agree to submit to us, before you use them, samples of all materials you intend to use that we have not prepared or previously approved. We will endeavor to deliver to you our written approval or disapproval within 15 days after our receipt of such materials, but we will not be liable for any delay. If we have not notified you of disapproval within 15 days after your submission for approval, the materials will be considered approved. We may withdraw our approval at any time. If we withdraw our approval, you will immediately cease the use, distribution and dissemination of such material. Any advertising, marketing or sales concepts, programs or materials that you propose or develop for the Franchised Business and we approve may be used by us and by our affiliates and other franchisees without any compensation to you. You agree to use all point of sale materials that we may supply to you from time to time, in the manner we prescribe.

1.7.3 *National and Regional Advertising.* We or our designee will exclusively maintain and administer any national and regional advertising, public relations and marketing programs and market research, including without limitation the System Website described in Section 1.8.1 and all programs financed by the Marketing Fund, as described below. We have the right to form, change or dissolve Franchisee Advisory Councils in accordance with Section 1.6.14 to advise us with respect to advertising, public relations and marketing programs.

1.7.4 *Marketing Fund.* We have established a public relations and advertising fund (the "Marketing Fund"), subsidized by fees paid both by Kung Fu Tea shop franchisees and by company and affiliate-owned Kung Fu Tea shops, for such advertising, promotion, marketing and public relations programs and materials as we deem necessary or appropriate. You agree to contribute to the Marketing Fund in accordance with Section 2.1.5. Kung Fu Tea shops that we or our affiliate own will not be required to contribute to the Marketing Fund.

1.7.5 *Use of the Marketing Fund.* The Marketing Fund will be used to enhance the recognition of the Marks and the patronage of Kung Fu Tea shops nationally or regionally. We or our designee will have sole discretion over all matters relating to the Marketing Fund, including without limitation the creative concepts, materials and endorsements used, and the geographic, market and media placement and allocation. The Marketing Fund may be used to pay the costs of preparing and producing video, audio and written advertising materials; administering national and regional advertising programs, and engaging advertising, promotion and marketing agencies to assist us; website development and maintenance; toll-free telephone costs; and supporting public relations, market research and other advertising, promotion and marketing activities. The Marketing Fund will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the Marketing Fund and its programs, including, without limitation, conducting market research, preparing advertising, promotion and marketing materials and collecting and accounting for contributions to the Marketing Fund. The source of the advertising may be our in-house advertising department or an outside advertising agency. If we or our affiliates provide in-house advertising department services, we or our affiliates may be compensated from the Marketing Fund provided that any compensation is reasonable.

– 12 –

1.7.6  *Accounting for the Marketing Fund.*  We will separately account for the Marketing Fund monies, but we may commingle such monies with our other monies or maintain the Marketing Fund monies in one or more separate accounts, in our discretion.  We may spend, on behalf of the Marketing Fund, in any fiscal year, an amount greater or less than the aggregate contribution of all Kung Fu Tea shops to the Marketing Fund in that year, and the Marketing Fund may borrow from us or others at reasonable interest rates to cover deficits or invest any surplus for future use.  All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs before other assets of the Marketing Fund are expended.  We will prepare annually, or cause to be prepared, a report or reports of the operations of the Marketing Fund.  We will furnish such report to you for the most recent year upon your written request.

1.7.7  *Marketing Fund Entity.*  We have the right, but not the obligation, to establish a separate entity to operate the Marketing Fund at any time.  Any such entity will have all of the rights and duties with respect to the Marketing Fund that we have under this section.  The Marketing Fund will not be deemed a trust, and we will have no fiduciary obligation to you in connection with the collection or administration of the Marketing Fund.

1.7.8  *Distribution of Advertising Expenditures.*  Although we will endeavor to use the Marketing Fund to develop advertising and marketing materials and programs and to place advertising that will benefit all Kung Fu Tea shops, we undertake no obligation to ensure that expenditures by the Marketing Fund will benefit all Kung Fu Tea shops equally nor in proportion to contributions.

1.7.9  *Termination of Marketing Fund.*  We reserve the right to defer, reduce or suspend contributions to the Marketing Fund, and, upon 30 days' prior notice to you, to suspend operations of the Marketing Fund for one or more periods of any length, and to terminate (and, if terminated, to reinstate) the Marketing Fund (and, if suspended, deferred or reduced, to reinstate such contributions).  If the Marketing Fund is terminated, all unspent monies, if any, on the date of termination will be distributed to Kung Fu Tea shops in proportion to their respective contributions to the Marketing Fund during the preceding twelve month period.

1.7.10  *Cooperative Advertising.*  We may establish and coordinate from time to time cooperative advertising, marketing and sales programs, customer satisfaction programs and other programs or activities among Kung Fu Tea shop franchisees.  These programs or activities may be on a local, regional or national basis.  You will participate in such programs and activities as we may prescribe.  Such programs and activities may (at our option) be paid for on any equitable basis by the participants.

1.7.11  *Internet Advertising.*  Any Internet advertising you do must be submitted to us in advance for our approval in the manner described in Section 1.7.2.  We may withhold our approval in our discretion.  You may not own an Internet domain name that includes any of the Marks or variations of any of the Marks.

1.7.12  *Social Media.*  You may promote the Franchised Business through social media and similar means provided that such promotion is consistent with the Manual including all guidelines we issue from time to time.  If any objectionable content is posted to a social media website, you will have 12 hours after notice from us to remove such content provided that it is capable of removal.  If you fail to remove the objectionable content  within this 12 hour period, we will have the right to terminate this Agreement.  You agree to check for social media postings of your employees from time to time to be sure that any comments they write are permitted and are consistent with our policies.

– 13 –

Section 1.8 – **Website**

1.8.1 *System Website.* We maintain one or more websites to advertise, market and promote Kung Fu Tea shops, the products sold at Kung Fu Tea shops and the Kung Fu Tea shop franchise opportunity (the "System Website"). The System Website lists the locations of Kung Fu Tea shops. We own all intellectual property and other rights in the System Website and all information it contains. We may at any time and in our sole discretion discontinue using the System Website. If we discontinue using the System Website, we may at any time and in our sole discretion resume using it.

1.8.2 *Promotion of the System Website.* All advertising, marketing and promotional materials that you develop for the Franchised Business must contain notices of the System Website's domain name in the manner we designate.

1.8.3 *Franchisee Extranet.* In addition to the System Website, we may (but we will not be obligated to) maintain a web portal, extranet or other system for all Kung Fu Tea shop franchisees that can be accessed only by means of user names and passwords and that will not be available to the general public. We may use this portal, extranet or system to provide support for franchisees and to allow for online franchise discussion groups. You agree both during and after the term of this Agreement not to disclose your user name or password to any person or entity who is not under your direct supervision and who does not have a need to know such password. You agree to inform all persons under your supervision who may have access to such password of this obligation of confidentiality. You further agree to comply with all guidelines and policies we establish from time to time for the use of this portal, extranet or system.

## ARTICLE II – **FEES; PAYMENTS; RECORDS; INSPECTIONS**

Section 2.1 – **Fees and Reports**

2.1.1 *Initial Fee.* Upon your signing of this Agreement, you will pay us an initial fee of $37,000 for a standard Kung Fu Tea shop (a "Standard Unit"). If you already own a Kung Fu Tea franchise, or if you will own a Kung Fu Tea shop in a non-traditional venue as described in Section 1.1.7.2 (a "Non-Traditional Unit"), then you will pay us an initial fee of $25,000. If you have signed a multi-unit agreement, your initial fee may be covered by the initial amount you paid under that agreement. The amount of any deposit already paid will be deducted from the initial fee. The initial fee is fully earned at the time we grant the franchise and is not refundable under any circumstances.

2.1.2 *Training Fee.* Before you begin initial training, you will pay us a training fee of $10,000. We require this fee and the initial training only for your first franchise location.

2.1.3 *Royalty.* You agree to pay us a royalty ("Royalty") in the amount of 3% of the Gross Sales (as defined below) of the Franchised Business each Accounting Period (defined below) for a Standard Unit; and 4% of such Gross Sales for a Non-Traditional Unit.

2.1.4 *Definition of Gross Sales.* As used in this Agreement, the term "Gross Sales" or "Gross Sales of the Franchised Business" means all sales made in the operation of the Franchised Business, whether collected or not, including, but not limited to, all amounts you receive at or away from the premises of the Franchised Business, whether from cash, check, credit card or credit transactions (with no deduction for credit card charges), including proceeds of any business interruption insurance policies, but excluding all federal, state or municipal sales or use taxes collected from customers for payment to the appropriate taxing authorities, and excluding actual customer refunds, adjustments and credits.

– 14 –

2.1.5 *Marketing Fee.* You agree to pay us a marketing fee in the amount of 2% of the Gross Sales of the Franchised Business each Accounting Period (the "Marketing Fee"). The Marketing Fee finances the Marketing Fund described in Section 1.7.4.

2.1.6 *Other Fees.* You agree to pay us the following fees upon the occurrence of the following events:

2.1.6.1 If you relocate the Franchised Business with our approval pursuant to Section 1.2.7, we may charge you a relocation fee of $5,000 plus any reasonable expenses we incur.

2.1.6.2 If we obtain insurance on your behalf in accordance with Section 1.3.10, you will pay us an amount equal to the premiums and related costs for the required insurance in full upon receipt of the invoice, plus a 25% service charge.

2.1.6.3 If we provide additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards in accordance with Section 1.5.5, we may charge our then-current fees and expenses or, where appropriate, the additional fee described in Section 1.5.2.

2.1.6.4 If you request and we agree to furnish additional on-site guidance or assistance in accordance with Section 1.5.6, we may require you to pay our then current fees and expenses.

2.1.6.5 If we perform work to correct an unhealthy or unsafe condition at your Kung Fu Tea shop because you fail to perform the work after we notify you pursuant to Section 1.6.8, we may require you to pay for labor and materials plus a 25% service charge and an amount sufficient to reimburse us for our actual direct costs to supervise, perform and inspect the work and procure any replacement items, including labor, materials, transportation, lodging, meals, contractor fees and other direct expenses, all of which will be due and payable upon your receipt of our invoice.

2.1.6.6 If we perform an inspection or audit that is made necessary by your failure to furnish any information we require or if an audit or inspection reveals an understatement of Gross Sales greater than 2%, then we may require you to reimburse us for the reasonable cost of such inspection or audit in accordance with Section 2.2.6.

2.1.6.7 If you transfer the Franchised Business with our consent pursuant to Section 4.2, you agree to pay us a transfer fee of $5,000.

2.1.6.8 If the Managing Owner ceases active management of the Franchised Business or if the business is not being managed properly, then pending the appointment and training of a new Managing Owner, we may appoint a manager until you appoint a trained replacement manager and we may require you to pay in the manner described in Section 4.2.8.

2.1.6.9 If you renew the franchise pursuant to Section 5.1.2, you agree to pay us our then-current renewal fee, which will not exceed the greater of $10,000 or 25% of the then-current initial franchise fee.

2.1.6.10 If any required payment you make to us is rejected by your bank because of insufficient funds, you will pay us $50 for each occurrence.

2.1.6.11 If you continue to sell or purchase an unauthorized product or service or you continue to be out of compliance with the System Standards after we have notified you to cease

– 15 –

such sales or purchase or otherwise to be in compliance with the System Standards, you will pay us our then current fee pursuant to Section 1.1.5, 1.3.2 or 1.6.16. Such fee as of the date of this Agreement is $300 per day. You acknowledge and agree that your continued sale or purchase of unauthorized products or services or your continued noncompliance with System Standards after we have notified you to cease will cause us to incur damages, the actual amount of which would be speculative and difficult to calculate. You acknowledge that $300 per day is a fair and reasonable estimate of the foreseeable damages that we are likely to incur.

    2.1.7  *Inflation.*  Fees stated in Section 2.1.6 as dollar amounts may be increased from time to time to reflect increases in the Metropolitan Area Consumer Price Index for All Urban Consumers from the date of this Agreement, as published by the U.S. Department of Labor, or a successor index.

    2.1.8  *Accounting Period.*  "Accounting Period" means the specific period that we designate from time to time in the Manual or otherwise in writing for purposes of your financial reporting and payment obligations described in this Agreement. The Accounting Period may be a calendar month or a shorter or longer time period that we select, but not shorter than one week. We may designate different Accounting Periods for different purposes.

    2.1.9  *Reports.*  You will submit a report to us within three days after the end of each Accounting Period setting forth your true and correct Gross Sales for such Accounting Period in such detail and in such manner as we require from time to time. We will have the right, upon notice to you: (i) to require you to submit to us quarterly and annual balance sheets and income statements for the Franchised Business, prepared in accordance with generally accepted accounting principles consistently applied, in the format we prescribe, and verified as correct in the manner we prescribe from time to time; and (ii) to require you to supply us with reviewed financial statements prepared annually.

    2.1.10  *Payment.*  At the time you submit each report to us after each Accounting Period, you will pay to us the amount of the Royalty owed to us based on such Gross Sales. You will pay us for all other amounts upon your receipt of our invoice. Time is of the essence with respect to all payments you are to make to us. We have the right at any time, upon reasonable notice to you, to require that you pay all sums owed to us or to any of our affiliates electronically through one or more depository transfer accounts or using such methods as we may designate in the Manual or otherwise in writing. At our request, you agree to execute such documents as we determine are necessary for us to process electronic funds transfers from your designated bank account for payment of the fees you owe to us. You will bear all costs to establish and maintain the required electronic payment system, and all bank service charges. You will comply with our procedures for electronic payment, which we may modify from time to time, including the maintenance of such minimum bank account balance as we specify from time to time.

    2.1.11  *Interest on Late Payments.*  Any payment that is not made by the date it is due will be subject to interest at the rate of 1.5% per month or the highest rate allowed by law, whichever is less. If no due date is stated, interest begins to run 10 days after billing. Your failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Section 5.2.2.4. Interest will accrue whether or not we exercise our right to terminate. You acknowledge that this subsection does not constitute our agreement to accept any payments after they are due or our commitment to extend credit to you or otherwise finance your operation of the Franchised Business.

    2.1.12  *No Setoff.*  Your obligations to make payments in accordance with this Agreement and any other agreement with us or any of our affiliates with respect to the Franchised Business are not subject to any abatement, reduction, setoff, defense or counterclaim due or alleged to be due for any past, present or future claim that you have or may have against us or any of our affiliates.

    2.1.13  *Application of Payments.*  All payments you make to us will be applied in such order as we may designate from time to time, regardless of any designation you may make with respect to the appli-

– 16 –

cation of such payments, even if you specifically make payment conditional on our acceptance of your designated application or instructions.

2.1.14 *Taxes.* In the event that we are required to collect and pay any sales or use tax from you for payment to any tax authority based on your purchase of the franchise or any items relating to the franchise, or based on any continuing payments you make to us under this Agreement, you will pay such amounts to us upon receipt of our invoice.

Section 2.2 – *Records; Inspection*

2.2.1 *Records.* You agree to maintain at your Kung Fu Tea shop full, complete and accurate records of the Franchised Business. You will maintain bookkeeping, accounting and records retention systems conforming to the requirements that we prescribe from time to time, and records relating to Franchised Business operations, employee turnover and such other records that we prescribe from time to time. You agree to maintain and to furnish to us upon request complete copies of all income, sales, value added, use and service tax returns, and employee withholding, workers' compensation and similar reports filed by you reflecting activities of the Franchised Business. You agree to preserve all records described in this Section 2.2.1 for a period of at least five years after their creation, or such longer period as may be required by law, during both the term and each renewal term of this Agreement and following the expiration or termination of this Agreement.

2.2.2 *Access to Systems.* We may use the computer and point of sale systems described in Section 1.3.7 to collect electronically the reports referred to in Section 2.1.9 and the records referred to in Section 2.2.1. We may use the content and data generated by the surveillance system described in Section 1.3.7 for any purpose, including to monitor customer service and the operation of the Franchised Business. We have the right to establish requirements that will permit us, as often as we deem appropriate, to access all cash registers, surveillance and computer terminals and your computer system and to retrieve all information relating to the Franchised Business.

2.2.3 *Right to Inspect.* During the term of this Agreement, we or our designated representatives will also have the right, at any time during your regular business hours, without prior notice to you, to enter upon the premises of the Franchised Business to inspect the books and records of the Franchised Business and take excerpts. You agree to cooperate fully with us and our representatives during all such inspections.

2.2.4 *Right to Audit.* We have the right at any time during your regular business hours, without prior notice to you, to inspect and audit the records of the Franchised Business, or to cause such records to be inspected and audited. This right includes the right to access your computer systems.

2.2.5 *Discrepancies.* If any inspection or audit demonstrates an understatement of Gross Sales, you will pay the deficiency to us within 15 days after you receive the inspection or audit report.

2.2.6 *Cost.* All inspections and audits will be at our expense; but if an inspection or audit is made necessary by your failure to furnish, or your delay in furnishing, reports, supporting records, other information or financial statements we require, or if an understatement of Gross Sales for the period of any audit or inspection is determined by any such audit or inspection to be greater than 2%, you agree, within 15 days after our request, to reimburse us for the cost of such inspection or audit, including, without limitation, legal and accounting fees, and the travel expenses, including lodging, meals and per diem charges of the inspecting or auditing personnel. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

2.2.7 *Survival of Inspection and Audit Rights.* Our rights to inspect the books and records of the Franchised Business and to take excerpts, and to audit the Franchised Business, will continue for a peri-

– 17 –

od of six months following the expiration or termination of this Agreement; but we may only inspect such books and records or perform any such audit following the expiration or termination of this Agreement upon at least 24 hours' prior notice to you.

2.2.8  *Disclosure of Your Financial Information.*  We have the right to disclose data we receive from you regarding the Franchised Business without identifying you.  If we are required by law to disclose any data we receive from you regarding the Franchised Business and such disclosure will identify you, we will notify you of the disclosure to be made and, if you request, endeavor to obtain legally binding assurance that those who receive such disclosure will be bound by an obligation of confidentiality.

Section 2.3 – *Security Interest*

2.3.1  *Grant of Security Interest.*  As security for the payment of all amounts you owe us from time to time under this Agreement and all other agreements between you and us, and your performance of all of your obligations under such agreements, you hereby grant to us a security interest in all of the assets of the Franchised Business, including, without limitation, all inventory, equipment, furniture and fixtures, as well as all proceeds from their sale and the related insurance (the "Collateral").  You warrant and represent that the security interest granted hereby is prior to all other security interests in the Collateral except bona fide purchase money security interests, or security interests held by financial institutions, if any, each of which is subject to our prior approval.  You agree not to remove the Collateral, or any portion of the Collateral, from the premises of the Franchised Business without our prior written consent.

2.3.2  *Default.*  Upon the occurrence of any event entitling us to terminate this Agreement or any other agreement between you and us, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the state in which the Franchised Business is located, including, without limitation, the right to take possession of the Collateral.

2.3.3  *Filings.*  You authorize us, without further notice to or consent by you, to file any records or other documents as we reasonably deem necessary to perfect, continue, amend (upon the assignment of this Agreement or otherwise) or terminate our security interest in the Collateral.

2.3.4  *Grants of Security Interests to Others.*  We must approve in advance and in writing any grant you make to any third party of a security interest in or encumbrance of any assets of the Franchised Business.  We will not unreasonably withhold our consent to any such grant made in connection with financing for the development or operation of the Franchised Business or equipment leasing, if such financing satisfies our requirements, which may include execution of agreements by us, you and the secured creditor, in a form satisfactory to us, making any such security interest subordinate to the one you have granted to us pursuant to this Section 2.3.

2.3.5  *Survival.*  The security interest created by this Section 2.3 will survive any termination of this Agreement and remain in effect until all of your monetary obligations to us are satisfied in full.

ARTICLE III - **PROPRIETARY RIGHTS; CONFIDENTIALITY; NONCOMPETITION**

Section 3.1 – *Our Copyrights and Trademarks*

3.1.1  *Our Copyrights.*  We and our affiliates are the sole owners of all copyrights in the Manual and all supplemental materials, and other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us.  You may not copy any such materials, nor create derivative works of any such materials, except as specifically authorized or permitted by us.

3.1.2  *Our Trademarks.*  Your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Franchised Business at and from the premises of your Kung Fu Tea shop

– 18 –

pursuant to and in compliance with this Agreement and all System Standards. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your use of the Marks and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the Franchised Business in compliance with this Agreement). You will not contest or assist others in contesting our right to use the Marks.

3.1.3  *Proper Use of the Marks.*  You may not use the Marks except as authorized under this Agreement. You understand that any use of the Marks other than as expressly authorized by this Agreement, without our prior written consent, may constitute infringement and that your right to use the Marks does not extend beyond the expiration or termination of this Agreement. You agree to use the Marks as the sole identification of the Franchised Business, except that you agree to identify yourself as the independent owner of the Franchised Business in the manner we prescribe. You may not use any Mark or any word similar to any of the Marks as part of any corporate or legal business name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you under this Agreement), or in any modified form, nor may you use any Mark in connection with the performance or sale of any unauthorized products or services or in any other manner we have not expressly authorized in writing. You may not use any Mark as part of a domain name or electronic address of a website. You agree to display the Marks prominently in the manner we prescribe at the Franchised Business and on business forms and advertising materials. You agree to give such notices of trademark registrations and our ownership of the Marks as we specify from time to time and to obtain any fictitious or assumed business name registrations required under applicable law.

3.1.4  *Modifying the Marks.*  We will have the right to modify or change the Marks from time to time upon written notice to you specifically referring to this Agreement and describing such modification or change. Such right will include the right to use a trademark that is entirely different from "Kung Fu Tea shop" and the right to require you to use one or more additional logos and marks; but we will make all such changes in the Marks only for good faith marketing, trademark or other reasons on a uniform basis for all Kung Fu Tea shop franchisees in the U.S. You agree, upon notice from us, to regard each such modified, changed, new or additional trademark as being within the definition of "Marks" under this Agreement, and to adopt and use each such trademark at your expense in accordance with the terms and conditions of this Agreement. We will not be obligated to reimburse you for any loss of revenue or expenses caused by any such modification or change.

3.1.5  *Infringement.*  You agree to notify us of any apparent infringement of any Mark or of any of our copyrights, by any third party, as soon as such apparent infringement comes to your attention, and to notify us immediately of any challenge to your use of any Mark and of any claim by any person of any rights in any Mark, and you agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have sole discretion to take such action as we deem appropriate with respect to such apparent infringement, challenge or claim and the right to control exclusively any litigation, U.S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark or our copyrights. You agree not to initiate any such action or proceeding, but to cooperate with us in any such action or proceeding and sign any and all instruments and documents, render such assistance and do such acts and things as may be necessary or advisable, in the opinion of our attorneys, to protect and maintain our interests in any litigation or any proceeding at the Patent and Trademark Office, or otherwise to protect and maintain our interests in the Marks or copyrights. In the event any sum is recovered based on our claim of infringement, we will have the exclusive right to such recovery.

– 19 –

Section 3.2 – *Confidentiality of Our Information*

3.2.1 *Confidential Information.* We possess and will continue to develop and acquire certain confidential information relating to the development and operation of Kung Fu Tea shops ("Confidential Information"). Confidential Information means information that is not generally available to the public and that has commercial value to us or to the Franchised Business, or that is personally identifiable information of customers. "Confidential Information" includes, without limitation:

3.2.1.1 product recipes, mixes and formulas;

3.2.1.2 the contents of the Manual and all supplemental materials;

3.2.1.3 the content of our training and assistance;

3.2.1.4 the System Software, its documentation and the data generated by the use of the System Software;

3.2.1.5 site selection criteria;

3.2.1.6 sales and marketing techniques;

3.2.1.7 customer lists;

3.2.1.8 planned advertising and marketing programs;

3.2.1.9 current, past and planned research, development and test programs for products, services and operations;

3.2.1.10 specifications for and suppliers of certain equipment, fixtures, furnishings, signs, materials and supplies;

3.2.1.11 the operating results and financial performance of Kung Fu Tea shops other than the Franchised Business;

3.2.1.12 the videos and images recorded by the surveillance system;

3.2.1.13 user names and passwords allowing access to protected areas on our website or computer network; and

3.2.1.14 all improvements and modifications to the System developed by you or your personnel.

You acknowledge and agree that you will not acquire any interest in any Confidential Information other than the right to use Confidential Information disclosed to you in operating the Franchised Business during the term of this Agreement.

3.2.2 *Nondisclosure and Non-Use.* At all times both during the term and after the expiration or termination of this Agreement, (i) you will keep all Confidential Information in the strictest confidence and you will not disclose any Confidential Information to any person other than your employees, agents or representatives who have a legitimate need to know such information and who are informed of this obligation of confidentiality and have signed either a Guaranty as described in Section 1.1.8 or a written agreement with your company substantially in the form of Schedule B, and (ii) you will not use any Confidential Information except for the purpose of fulfilling your obligations under this Agreement.

– 20 –

3.2.3 *Isolated Disclosures.* Notwithstanding the foregoing, we will not deem you to be in default of this Agreement as a result of isolated incidents of disclosure of Confidential Information by an employee other than an owner, provided that you have taken reasonable steps to prevent such disclosure, including but not limited to the steps a reasonable and prudent owner of confidential and proprietary information would take to prevent disclosure of such information by his employees, and further provided that you pursue all reasonable legal and equitable remedies against such employee for such disclosure of such Confidential information.

3.2.4 *Exceptions.* The obligations of confidentiality and non-use described above will not apply to information that:  (i) you can clearly show was known to you on a non-confidential basis prior to its disclosure to you by us; (ii) is or becomes generally known among Competitive Businesses (as defined in Section 3.3.1) in the U.S. other than through disclosure by you or any of your  employees, contractors, agents or representatives; or (iii) you can clearly show was received by you on a nonconfidential basis from a third party that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

3.2.5 *Disclosures Required by Law.* In the event that you become legally compelled to disclose any Confidential Information, you will (i) promptly notify us that such information is required to be disclosed, (ii) use your best efforts to obtain legally binding assurance that all those who receive disclosure of such information are bound by an obligation of confidentiality, and (iii) disclose only that portion of the Confidential Information that your legal counsel advises is legally required to be disclosed.

3.2.6 *Return of Information.* Upon our request, you will promptly return to us all Confidential Information and all copies in your possession or under your control, and you will destroy all copies on your computers, disks and other digital storage devices.

3.2.7 *Your Rights Under Federal Law.* Nothing in this Agreement is intended to prohibit you from exercising your rights under the Defending Trade Secrets Act of 2016.  You have the right to disclose our trade secrets in each of the following circumstances without incurring criminal or civil liability:

3.2.7.1  You may disclose our trade secrets (i) in confidence to a federal, state or local government entity, or to an attorney, solely for the purpose of reporting a suspected violation of law or in an investigation of a suspected violation of law, or (ii) in a legal proceeding under seal.

3.2.7.2  You may disclose our trade secrets in a complaint or other document filed in a lawsuit or other proceeding as long as the filing is made under seal.  This includes a lawsuit you may file for retaliation by us for your reporting a suspected violation of law to a government entity.  You may not otherwise disclose any trade secret or confidential information except pursuant to a court order.

Section 3.3 – *Noncompetition*

3.3.1 *Definition of Competitive Business.*  As used in this Agreement, the term "Competitive Business" means any business that sells, or grants franchises or licenses to others to operate, a retail business that sells, oriental style teas and other drinks to consumers for consumption and such sales comprise five percent or more of such business's revenues (other than a Kung Fu Tea shop operated under a franchise agreement with us or our affiliate).  The restrictions of this section will not apply to the ownership of publicly traded securities that constitute less than 1% of a class of ownership interests of the issuing company.

3.3.2 *Agreement Not to Compete.*  You agree that during the term of this Agreement and any renewal of this Agreement (and thereafter pursuant to Section 3.3.3), you will not, directly or indirectly

– 21 –

(through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect interest in a Competitive Business located or operating anywhere in the U.S. or in any other country in which a Kung Fu Tea shop operates; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located or operating; (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner; or (iv) recruit or hire any person who is our employee or the employee of any Kung Fu Tea shop (whether company or affiliate-owned or franchised) or who has been our employee or the employee of any Kung Fu Tea shop within the six-month period before such recruiting or hiring without the prior written permission of that person's employer.

3.3.3 *Noncompetition After Termination.* Upon the expiration of this Agreement, your termination of this Agreement without cause, our termination of this Agreement in accordance with its terms and conditions, or your transfer in accordance with Article IV, you and your company's owners agree for a period of two years following such expiration, termination or transfer, that you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect ownership interest in a Competitive Business located or operating within 5 miles of the Site or of any Kung Fu Tea shop anywhere in the world at the time of such expiration, termination or transfer; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for any such Competitive Business; (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner; or (iv) recruit or hire any person who is our employee or the employee of any Kung Fu Tea shop (whether company or affiliate-owned or franchised) or who has been our employee or the employee of any Kung Fu Tea shop within the six-month period before such recruiting or hiring without the prior written permission of that person's employer.

## ARTICLE IV - **TRANSFER**

### Section 4.1 – *Transfer by Us*

We may sell, assign or transfer our rights and obligations under this Agreement to any party, without the approval of or prior notice to you, provided that the buyer, assignee or transferee agrees in writing to assume all of our obligations under this Agreement. We will not be liable for obligations of the transferee arising after the date of transfer.

### Section 4.2 – *Transfer by You*

4.2.1 *No Transfer Without Our Approval.* This Agreement is personal to you. We have granted the franchise to you in reliance upon our perceptions of your (or your company's owner's) individual or collective character, skill, aptitude, business ability and financial capacity. Accordingly, you may make no Transfer (as defined below) without our prior written approval. Any purported Transfer without such approval will be a breach of this Agreement and will entitle us to terminate this Agreement as provided below. Our consent to a Transfer does not constitute a representation as to the fairness of the terms of any contract between you or your company's owners and the transferee, a guaranty of the successful operation of the Franchised Business by the transferee or a waiver of any claims we may have against you or your company's owners or of our right to demand the transferee's compliance with any of the terms or conditions of this Agreement.

4.2.2 *Definition of Transfer.* As used in this Agreement, the term "Transfer" means your (or your company's owner's) voluntary, involuntary, direct or indirect assignment, sale, gift, pledge or other disposition of: (i) any legal or beneficial ownership or voting interest in your company: (ii) this Agreement, (iii) any material asset of the Franchised Business; or (iv) the lease or ownership of the premises of the Franchised Business (unless we agree to a relocation or unless the transfer of ownership does not affect your leasehold rights and obligations). "Transfer" also includes (i) the merger or consolidation of your compa-

– 22 –

ny; (ii) the issuance of additional securities or other ownership or voting interests of your company, and (iii) the admission or departure of a partner or owner. It includes transfers resulting from proceedings under the U.S. Bankruptcy Code or any similar law, and transfers resulting from divorce. It also includes any grant of a security interest to a third party without our approval.

4.2.3 *Notice of Transfer.* You agree to notify us of any planned Transfer, and to provide us with any information we may reasonably request in order to permit us to evaluate the planned Transfer. If we do not exercise our right of first refusal under Section 4.3, we agree not to unreasonably withhold our approval of a Transfer. If we approve the Transfer, then you will be free, for 90 days following such approval, to effect the Transfer to the person or persons approved by us.

4.2.4 *Conditions to Transfer.* The following conditions will apply with respect to any Transfer except as described in Section 4.2.3:

4.2.4.1 The proposed transferee, its management and owners, must be individuals of good character with sufficient business experience, aptitude, and financial resources to operate the Franchised Business and otherwise meet our then applicable standards for a new Kung Fu Tea shop franchisee.

4.2.4.2 Neither the proposed transferee nor any of its management or owners may be a Competitive Business or perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business.

4.2.4.3 You will cure any default under this Agreement that we will have notified to you.

4.2.4.4 You will pay all fees and any other amounts then owed to us and our affiliates.

4.2.4.5 If any lease for the premises used in the business requires it, the lessor must consent to the assignment of the lease to the transferee.

4.2.4.6 You or the transferee will pay us a nonrefundable transfer fee described in Section 2.1.6.7.

4.2.4.7 We may require that the transferee or your company under ownership by the transferee, at the time of closing, enter into our then current form of franchise agreement amended to shorten the initial term to conform to the remaining term of this Agreement and to remove the requirement to pay the initial fee, and each Guarantor under the new franchise agreement will have signed our then-current form of guaranty.

4.2.4.8 You and we will execute a written agreement, in a form satisfactory to us, terminating this Agreement and acknowledging your obligations following the Transfer. We may require that the termination agreement include a general release of any claims against us and our affiliates.

4.2.4.9 You will upgrade and remodel the premises of the Franchised Business as we may require to conform to the then-current standards and specifications of a new franchised business then being established, and you will complete the upgrading and remodeling within the time specified by us.

4.2.4.10 The transferee or its designated personnel will have completed such training as we may require, to our satisfaction.

– 23 –

4.2.4.11  Each transferor will sign an agreement (in a form satisfactory to us) acknowledging a continuing obligation after such transfer to comply with the requirements of Section 3.3.3.

4.2.4.12  We will have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the Franchised Business.

4.2.4.13  If you or your owners finance any part of the sale price of the transferred interest, you or your owners will have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests are subordinate to the transferee's obligation to pay Royalties, Marketing Fees and other amounts due to us.

4.2.4.14  After our authorization of the Transfer and your compliance with all of the requirements listed above, you will give us not less than five business days' written notice of the date, time and place of the closing of such Transfer, and you will give us an opportunity to have a representative present.

4.2.4.15  If the transaction is brokered by a third-party or by one of our authorized sales representatives, you or the proposed transferee will be responsible for paying broker fees at the same commission rate that we pay such broker or sales representatives.

4.2.5  *Transfer to a Company you Control.*  Upon prior notice to us and the signing by the relevant parties of assignment documents acceptable to us, you may transfer this Agreement to an entity that conducts no business other than the Franchised Business in which you maintain management control and of which you or all of the owners of your company own and control 100% of the equity and voting power, provided that all assets of the Franchised Business are owned, and the entire Franchised Business is conducted by, a single entity.  The requirements of Sections 4.2.4.6 through 4.2.4.13 will not apply to any such transfer.  You will remain personally liable under this Agreement after such Transfer by signing a Guaranty as described in Section 1.1.7.

4.2.6  *Transfer Upon Death or Disability.*  You or your executor or other personal representative must promptly notify us in the event of your death or disability or, if your company is an entity or a partnership, the death or disability of the Managing Owner.  Any transfer upon death or disability will be subject to the same terms and conditions as those that apply to other transfers, as described in Sections 4.2.1 through 4.2.4; but you or your executor or other personal representative will have a period of 12 months in which to effect a transfer acceptable to us in the event of death, and six months in the event of disability.  The Managing Owner must be replaced in the manner described in Section 1.5.5.  As used in this Agreement, the term "disability" means a mental, emotional or physical injury, illness, incapacity, disability or impairment that is reasonably expected to prevent or actually does prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, or more than 30 days in the case of a Managing Owner.  A person's disability for purposes of this section will be determined by a licensed practicing physician selected by us upon examination of such person or, if such person refuses to be examined, then such person will automatically be deemed disabled for purposes of this section as of the date of refusal.  We will pay the cost of the examination.

4.2.7  *Operation of the Franchised Business Upon Death or Disability.*  If upon your death or disability or, if your company is an entity, the death or disability of the owner of a controlling interest in your company, the Franchised Business is not being actively managed by a Managing Owner who has attended and successfully completed such training as we may require, you or such deceased or disabled owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed 30 days from the date of death or disability, appoint a Managing Owner to operate the Franchised Business.  Such Managing Owner will be required to complete our training at your ex-

– 24 –

pense. Pending the appointment and training of a Managing Owner or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to appoint a manager for the Franchised Business.

4.2.8 *Transitional Management Costs.* In the event that we appoint a manager for the Franchised Business pursuant to Section 4.2.7 or Section 1.5.5, all funds from the operation of the Franchised Business during the management by our appointed manager will be kept in a separate account, and all expenses of the Franchised Business, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We will also have the right to charge a reasonable management fee (in addition to the Royalty and Marketing Fee payable under this Agreement) during the period that our appointed manager manages the Franchised Business. Operation of the Franchised Business during any such period will be on your behalf. We will not be liable to you or your company's owners for any debts, losses or obligations incurred by the Franchised Business or to any of your suppliers for any products, materials, supplies or services the Franchised Business purchased during any period it is managed by our appointed manager.

4.2.9 *Stock Offerings.* You agree to submit to us, for our review, all materials for an offering or exempt private placement of stock or partnership or other interests in your company or any of your affiliates that are required by federal or state law before such materials are filed with any government agency and before they are used. We may require such materials to contain a written statement, prescribed by us, indicating that we are not participating in such offering in any way. You and all other participants in the offering must fully indemnify us and our subsidiaries, affiliates, successors and assigns, and our and their respective members, managers, directors, officers, shareholders, partners, agents and representatives in connection with the offering. For each proposed offering, you will reimburse us for our reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering. You will give us written notice at least 30 days before the date that any offering or other transaction described in this Section 4.2.9 commences. Any such offering will be subject to all of the other provisions of this Section 4.2.

### Section 4.3 – *Our Right of First Refusal*

4.3.1 *Notice of Third Party Offer.* If you or any of your company's owners at any time desire to sell, assign or transfer for consideration an interest in this Agreement and the Franchised Business or an ownership interest in your company to anyone other than as described in Section 4.3.4, you will obtain and immediately submit to us a true and complete copy of a bona fide written offer from the third party that desires to acquire such interest (the "Third Party Offer"). The Third Party Offer must include the names of all owners of any entity offeror and the names of all partners of any partnership offeror or, in the case of a publicly-held entity, copies of the most current quarterly report and Form 10K. The Third Party Offer must contain details of the payment terms of the proposed sale and the source and terms of any financing of the proposed purchase price, and may not include or be contingent upon the purchase of assets other than those related to the Franchised Business.

4.3.2 *Exercise of Our Right of First Refusal.* We will have the right, exercisable by notice delivered to you or your company's selling owner or owners within 30 days after the date of our receipt of a copy of the Third Party Offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in the Third Party Offer, provided that (i) we may substitute cash for any form of payment proposed in such offer; and (ii) we will have at least 60 days after giving notice of our election to prepare for closing. If we exercise our right of first refusal, you and we will execute a written agreement, in a form satisfactory to us, acknowledging the seller's continuing obligations. We may require the seller to sign a general release of any claims against us and our affiliates.

4.3.3 *Consequence of Nonexercise of Our Right of First Refusal.* If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact

– 25 –

terms of such offer, subject to our approval of the transfer as provided in Section 4.2; but if the sale to such purchaser is not completed within 120 days after delivery of the Third Party Offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the thirty day period following either the expiration of such 120-day period or the notice to us of the material changes in the terms of the sale, either on the terms originally offered (following such 120-day period) or the modified terms (following notice to us of material changes in the terms of the sale).

4.3.4 *Exceptions.* Our right of first refusal will not apply to transfers among the current owners of your company unless the Managing Owner is transferring his or her ownership.

## ARTICLE V - **TERM AND TERMINATION**

Section 5.1 - *Term and Renewal*

5.1.1 *Initial Term.* This Agreement will be effective as of the date set forth in the opening paragraph of this Agreement. The initial term of this Agreement will expire on the date specified in Schedule A, but if no expiration date appears in Schedule A, then the initial term of this Agreement will expire 10 years after the date of this Agreement. If a current lease or sublease will expire before the expiration of this Agreement, you may attempt to obtain a replacement lease or sublease. We will have the right to approve any proposed replacement lease or sublease as otherwise provided in Section 1.2.3. If you are unable to obtain a replacement lease or sublease that meets our approval before the current lease or sublease expires, (i) you have the right to terminate this Agreement, subject to your observation of all notice provisions and post-term obligations set forth in this Agreement, or (ii) we have the right to terminate this Agreement in accordance with Section 5.2. In addition, if the current lease or sublease is terminated for any reason before it expires, we have the right to terminate this Agreement in accordance with Section 5.2.

5.1.2 *Renewal.* You will have the right to acquire a successor franchise for a term of 10 years, provided:

5.1.2.1 you will have given us notice of your desire to acquire a successor franchise ("Renewal Notice") not less than twelve months nor more than eighteen months before the end of the then-current term;

5.1.2.2 you and your affiliated companies must not be in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, or if you are in default, you have cured such default in the manner described below;

5.1.2.3 you comply with our then-current financial qualifications and training requirements for new Kung Fu Tea shop franchises;

5.1.2.4 you must not have received more than three notices of default during any 24 month period during the term of this Agreement, whether or not such defaults have been cured;

5.1.2.5 you present evidence to us that you have the right to remain in possession of the premises of the Franchised Business for the duration of the term of the successor franchise, or you obtain our approval of a new location for the Franchised Business for the duration of the successor franchise term;

5.1.2.6 to comply with our then-current standards in effect for new Kung Fu Tea shop franchises, at your cost and expense, you remodel and refurbish the premises of the Franchised Business, and you repair or replace equipment (including electronic cash register or computer

— 26 —

hardware or software systems), signs, interior and exterior decor items, fixtures, furnishings, catering or delivery vehicles, if applicable, supplies and other products and materials required for the operation of the Franchised Business as we may reasonably require, and you obtain any new or additional equipment, fixtures, supplies and other products and materials that we may reasonably require;

5.1.2.7 if we require, you execute a general release, in a form prescribed by us, of any and all claims against us and our affiliates and their respective members, managers, officers, directors, shareholders, partners, agents and employees; and

5.1.2.8 you execute our then-current standard form of franchise agreement, which agreement will supersede this Agreement in all respects; but you will not be required to pay the initial fee stated in the successor franchise agreement. Instead, you will pay us the renewal fee referred to in Section 2.1.6.9. You understand that the successor franchise agreement may contain materially different terms than this Agreement, including, but not limited to, increased fees.

If you or any of your affiliated companies is in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, we will give you notice, not more than 30 days after receipt by us of your Renewal Notice, of such default, and we will give you 30 days to cure. In the event that you fail to cure in that period, or in the event that any other condition set forth in this Section 5.1(b) is not satisfied, your right to renew will terminate.

5.1.3 *Hold Over.* If you do not sign a new franchise agreement before the term of this Agreement expires and you continue to accept the benefits of this Agreement after this Agreement expires, then at our option, we may treat this Agreement either as: (i) expired as of the date of expiration, with you then being deemed to be operating without a franchise in violation of our rights; or (ii) continued on a month-to-month basis (the "Interim Period") until either (A) both you and we sign a new franchise agreement or (B) either you or we give at least 30 days' prior written notice to the other party of your or our intention to terminate the Interim Period, in which case the Interim Period and this Agreement will terminate on the date specified in the notice. All of your obligations will remain in full force and effect during the Interim Period as if this Agreement had not expired.

Section 5.2 - *Termination*

5.2.1 *Termination by You.* You may not terminate this Agreement except in the event of our material breach of this Agreement. In the event that you claim that we have materially breached this Agreement, you will provide us with written notice of such claim within twelve months of its occurrence, specifically enumerating all alleged deficiencies and providing us with an opportunity to cure, which will in no event be less than 90 days from the date of our receipt of the notice. Your failure to give such notice will constitute a waiver of your right to terminate on the basis of such breach.

5.2.2 *Termination by Us Upon Notice.* We may terminate this Agreement upon written notice to you with immediate effect if:

5.2.2.1 you or any of your company's owners have made any material misrepresentation or omission in connection with your application for and purchase of the franchise;

5.2.2.2 your Managing Owner fails to complete the initial training to our satisfaction in accordance with Section 1.5.2;

5.2.2.3 you fail to commence operation of the Franchised Business within the time required by Section 1.2.6;

– 27 –

5.2.2.4 you are more than five days late in your payment of any amount due to us under this Agreement or to any of the suppliers of the Franchised Business and you fail to make such payment within five days after we will have notified you that such payment is past due;

5.2.2.5 you or any of your affiliates default under your lease for the premises of the Franchised Business and have not cured such default within the time required under the lease, or you lose the right to possession of the premises of the Franchised Business and have not relocated to another site approved by us;

5.2.2.6 you no longer have a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards;

5.2.2.7 you or any of your company's owners use or disclose any Confidential Information in violation of the requirements of Section 3.2;

5.2.2.8 you or any of your company's owners make any unauthorized use of the Marks or challenge or seek to challenge the validity of any of the Marks;

5.2.2.9 you fail to maintain the insurance we require and do not correct the failure within ten days after we deliver written notice of that failure to you;

5.2.2.10  you fail to maintain the highest rating possible for the Franchised Business in accordance with the terms of Section 1.6.6, or you fail to notify us in as required under Section 1.6.6, or you fail to correct in a timely manner any condition described in any inspection report or any warning, citation, certificate or notice relating to the Franchised Business;

5.2.2.11   you fail to remove any objectionable content posted to a social media website within 12 hours after we request you to remove it pursuant to Section 1.7.12;

5.2.2.12 you knowingly maintain false books or records or submit to us a report that understates the Gross Revenue of the Franchised Business three or more times during the term of this Agreement or by more than five percent on any one occasion;

5.2.2.13 a threat or danger to public health or safety results from the construction or maintenance of the premises or from the operation of the Franchised Business, or you violate any health, safety or sanitation law, ordinance or regulation and do not begin to correct such noncompliance or violation immediately, and completely correct such noncompliance or violation within 72 hours after written notice of such threat, danger, noncompliance or violation is delivered to you;

5.2.2.14 you fail for a period of 15 days after notification by appropriate authority to comply with any other law or regulation applicable to the operation of the Franchised Business;

5.2.2.15 you or any of your company's owners effect or attempt to effect a Transfer without our approval and contrary to the provisions of Article IV;

5.2.2.16 in the event of your death or disability or the death or disability of an owner of your company, this Agreement or such owner's interest is not assigned as required by Article IV;

5.2.2.17 you or any of your company's owners are or have been convicted of, or plead or have pleaded guilty or no contest to, a felony or any other crime or offense, or engage in any dishonest, deceptive or unethical conduct that may, in our opinion, adversely affect the reputation of the Franchised Business, other Kung Fu Tea shops or the goodwill associated with the Marks;

– 28 –

5.2.2.18 you fail to operate the Franchised Business for three consecutive business days, unless the Franchised Business has been closed for a purpose we have approved or because of casualty;

5.2.2.19 you fail to pay when due any federal or state income, service, sales, withholding or other taxes due in connection with the operation of the Franchised Business, unless you are contesting your liability for such taxes in good faith or you have received an extension from the applicable government agency of the time within which to make such payments;

5.2.2.20 you commit three or more defaults under this Agreement in any period of 12 consecutive months, whether or not each such default has been cured after notice was delivered to you;

5.2.2.21 your assets, property or interests or those of any of your owners are blocked under any law, rule or regulation relating to terrorist activities;

5.2.2.22 you become insolvent or make a general assignment for the benefit of creditors; or, unless prohibited by law, if a petition in bankruptcy is filed by you or filed against and consented to by you or not dismissed within 30 days; or if a proceeding for the appointment of a receiver or other custodian of your company, business or assets is filed and consented to by you; or if a receiver or other custodian (permanent or temporary) of all or any part of your business or assets is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against you; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless a bond is filed or other steps are taken to effectively stay enforcement); or if your company is dissolved;

5.2.2.23 you or any of your affiliates default under any financing agreement or arrangement with any party advancing funds to you in connection with the operation of the Franchised Business or the operation of another business under a franchise agreement with us; or

5.2.2.24 any other Kung Fu Tea shop franchise agreement now or hereafter in effect between us and you or any of your affiliates is terminated due to a breach by you or your affiliate.

5.2.3 *Termination After Cure Period.* Except as set forth in Section 5.2.2, you will have 30 days after receipt of written notice from us of a material default in which to remedy the default and provide evidence of that remedy to us. If any such default is not cured within that time, this Agreement will terminate without further notice to you effective immediately upon expiration of that time unless we notify you otherwise in writing.

5.2.4 *Relationship Laws.* Notwithstanding the provisions described in this Section 5.2, if any valid, applicable law or regulation limits our right to terminate this Agreement or requires different or longer notice periods than those set forth in this Agreement, this Section 5.2 is deemed amended to conform to the minimum notice periods or restrictions upon termination required by such law or regulation. We will not however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination of this Agreement.

– 29 –

Section 5.3 - *Consequences of Termination*

5.3.1   *General Consequences.*   Upon the expiration of this Agreement or its termination for any reason:

5.3.1.1 all rights and licenses granted to you under this Agreement will immediately terminate;

5.3.1.2 you will remit to us, within 15 days of such expiration or termination, or on such later date that the amounts due to us are determined, such Royalties and Marketing Fees, amounts owed for purchases from us, interest due and all other amounts owed to us that are then unpaid, and you will submit to us any reports and other information you may be required to submit to us with respect to the operation of the Franchised Business up to the date of expiration or termination;

5.3.1.3 you will deliver to us, within 15 days of such expiration or termination, a complete list of all customers in your possession or under your control, current as of the effective date of termination or expiration, including the name, address, telephone number and email address of each customer;

5.3.1.4 you will cease to use the Marks and the System in any way, cease referring to or identifying yourself as a Kung Fu Tea shop franchisee and remove all such identifying materials from the premises of the Franchised Business, unless we instruct you otherwise;

5.3.1.5 you will take such action as may be required to cancel all fictitious or assumed name or equivalent registrations or domain name registrations relating to your use of any Marks;

5.3.1.6 you will promptly return to us or deliver to us or otherwise dispose of as we may instruct, the Manual, and all supplemental materials, amendments, revisions and copies of the Manual (including copies stored electronically), as well as all other Confidential Information and all copies of such information in your possession or under your control, and all printed materials containing any Mark, and you will remove and destroy all copies from your computers and other electronic storage media, and you will allow us, without liability to you or to third parties, to remove all such items from the Franchised Business; and

5.3.1.7 you will assign to us or our designee all of your right, title and interest in and to your telephone numbers, websites, domain names and meta tags associated with the Mark (the "Listings") and you will notify the telephone company and all listing agencies of the termination or expiration of your right to use any of the Listings, and that you authorize the transfer of the Listings to us or our designee.

5.3.2   *Right to Buy Equipment.*   Upon the expiration of this Agreement or its termination for any reason, if we do not exercise our right to purchase the assets of the Franchised Business in accordance with Section 5.4, we will have the right, but not the obligation, to purchase some or all of the assets of the Franchised Business, including any furnishings, fixtures, equipment, signs, inventory, supplies and marketing materials and all other items bearing any Mark.   The purchase price for such fixtures and equipment will be their fair market value as agreed by you and us or, if we are unable to agree, as determined in the manner described in Section 5.4.4.  Before exercising our purchase right under this section, we will have the right to enter the premises of the Franchised Business during reasonable hours to inspect the assets.   If we elect to exercise our purchase right under this section, we will give you written notice of our intent to do so within 30 days after the expiration or termination of this Agreement.  We will have the right

– 30 –

to offset all amounts you owe to us or our affiliates against any payment due to you under this section. This provision will also apply in the event of death or disability under Section 4.2.6.

### Section 5.4 – *Our Option to Purchase Upon Termination*

5.4.1 *Exercise of Option.*  Upon our termination of this Agreement in accordance with its terms or your termination of this Agreement without cause, or upon the expiration of this Agreement, if we elect not to offer or you elect not to accept, a successor franchise, we have the option, exercisable by giving written notice to you within 60 days from the date of such termination, expiration or the expiration of our offer to you of a successor franchise, whichever is applicable, to purchase the assets of the Franchised Business from you, including the leasehold rights (subject to any rights of approval retained by the owner of the leasehold) to or ownership of the Site.  The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "Notification Date".  We have the unrestricted right to assign this option to purchase the Franchised Business.  We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise.

5.4.2 *Leasehold Rights.*  If we exercise the option described in Section 5.4.1, you agree at our election, (i) to assign your leasehold interest in the premises of the Franchised Business to us or (ii) if you are unable to assign your leasehold interest, to enter into a sublease at a fair market rental for the remainder of the lease term on the same terms (including renewal option) as the prime lease; or (iii) if you own the premises, to lease the premises to us at a reasonable commercial rent and according to terms comparable with rental terms for similar leased property in the marketplace where the Site is located.

5.4.3 *Purchase Price.*  If we exercise the option described in Section 5.4.1, the purchase price for the assets of the Franchised Business will be the fair market value of the Franchised Business, determined in a manner consistent with reasonable depreciation of the leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies.  The fair market value of the Franchised Business will include the goodwill you have developed in the market that is independent of the goodwill of the Marks and the System.  The length of the remaining term of the lease or sublease of the premises of the Franchised Business, if any, and the age and condition of the improvements, equipment, fixtures, furnishings, décor and signs will also be considered in determining the fair market value.  We may exclude from the assets purchased cash or its equivalent and any leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies that are not necessary or appropriate to the operation of the Franchised Business or that we have not approved as meeting our standards, and the purchase price will reflect such exclusions.

5.4.4 *Appraisal.*  If we and you are unable to agree on the fair market value of the Franchised Business or the Site, or the fair rental value of the premises of the Franchised Business, such fair market value or fair rental value will be determined by one independent appraiser agreed to by you and us.  If we fail to agree on an appraiser within 15 days after we exercise the option described in Section 5.4.1, then each party will name its own reputable appraiser within seven days thereafter, and the average of their determinations will be binding.  If one appraiser is chosen, then the parties will share the cost of the appraiser equally.  If two appraisers are used, each party will pay its own appraisal fees.  You and we will instruct the appraiser or appraisers to complete their appraisal within 30 days after their appointment.

5.4.5 *Closing.*  The closing of the purchase described in this section will take place not later than 90 days after the determination of the purchase price.  We will pay the purchase price at the closing, but we have the right to set off against the purchase price any and all amounts you or your company's owners owe to us.  At the closing, you agree to deliver instruments transferring to us (i) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances, with all sales and other transfer taxes paid by you; (ii) all licenses and permits of the Franchised Business that are assignable;

– 31 –

and (iii) a leasehold interest in (or unencumbered title to) the premises of the Franchised Business and the improvements to such premises.

ARTICLE VI - **REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION**

Section 6.1 - *Representations and Warranties*

6.1.1  *Your Representations.*  You represent and warrant as follows:

6.1.1.1  YOU HAVE NOT RELIED ON ANY PROMISES, REPRESENTATIONS OR AGREEMENTS NOT EXPRESSLY CONTAINED IN THIS AGREEMENT OR THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT IN MAKING YOUR DECISION TO SIGN THIS AGREEMENT.  YOU HAVE NOT RECEIVED FROM US OR OUR REPRESENTATIVES ANY PROMISES, REPRESENTATIONS OR WARRANTIES, ORAL OR WRITTEN, OTHER THAN THOSE THAT ARE EXPRESSLY CONTAINED IN THIS AGREEMENT AND THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT.  WE EXPRESSLY DISCLAIM THE MAKING OF ANY REPRESENTATION OR WARRANTY THAT IS CONTRARY TO THE CONTENTS OF THIS AGREEMENT OR THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT.

6.1.1.2  YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT, AND YOU RECOGNIZE THAT, LIKE ANY OTHER BUSINESS, AN INVESTMENT IN A KUNG FU TEA SHOP FRANCHISE INVOLVES BUSINESS RISKS AND THAT YOUR ABILITIES AND EFFORTS ARE VITAL TO THE SUCCESS OF THE VENTURE.

6.1.1.3  YOU RECEIVED THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT AT LEAST 14 DAYS (AND 10 BUSINESS DAYS) BEFORE THE EARLIER OF THE DATE ON WHICH YOU (I) SIGNED THIS AGREEMENT OR ANY RELATED AGREEMENT OR (II) PAID ANY CONSIDERATION IN CONNECTION WITH THE SALE OR PROPOSED SALE OF A KUNG FU TEA SHOP FRANCHISE.

6.1.1.4  YOU RECEIVED A COPY OF THIS AGREEMENT AND ANY RELATED AGREEMENTS AT LEAST SEVEN DAYS BEFORE THE DAY YOU SIGNED SUCH AGREEMENTS.

6.1.1.5  YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT AND HAVE HAD AMPLE OPPORTUNITY TO CONSULT WITH AN ATTORNEY AND OTHER ADVISORS OF YOUR OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.  YOU ACKNOWLEDGE THAT WE HAVE ADVISED YOU TO HAVE THIS AGREEMENT REVIEWED AND EXPLAINED TO YOU BY AN ATTORNEY.

6.1.1.6  ALL STATEMENTS YOU HAVE MADE AND ALL MATERIALS YOU HAVE SUBMITTED TO US IN CONNECTION WITH YOUR APPLICATION FOR AND PURCHASE OF THE FRANCHISE ARE ACCURATE AND COMPLETE AND, IN THAT CONNECTION, YOU HAVE MADE NO MISREPRESENTATIONS TO US OR OMITTED DISCLOSING ANY MATERIAL INFORMATION TO US.

6.1.1.7  YOU ARE UNDER NO OBLIGATION OR RESTRICTION, NOR WILL YOU ASSUME ANY OBLIGATION OR RESTRICTION, THAT WOULD IN ANY WAY INTERFERE OR BE INCONSISTENT WITH, OR PRESENT A CONFLICT OF INTEREST CONCERNING, YOUR RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

6.1.1.8  SCHEDULE A COMPLETELY AND ACCURATELY DESCRIBES ALL OF YOUR COMPANY'S OWNERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND MANAGERS AND THEIR OWNERSHIP INTERESTS AND MANAGEMENT POSITIONS IN YOUR COMPANY.

6.1.2  *Your Representations as an Entity.*  If your company is a corporation or limited liability company, you further represent and warrant as follows:

– 32 –

6.1.2.1  Your company is duly organized or formed and in good standing under the laws of the state of its formation.

6.1.2.2  Your company has the power and authority to enter into this Agreement and to perform its obligations under this Agreement.

6.1.2.3  Your company's organizational documents, operating agreement or shareholders agreement will recite that the issuance and transfer of your company's ownership interests are restricted by the terms of this Agreement, and all certificates and other documents representing your company's ownership interests will bear a legend referring to the restrictions of this Agreement.

Section 6.2 - *Indemnification*

6.2.1  *Your Indemnity.*  You will indemnify and hold us and our affiliates, and the members, managers, stockholders, directors, officers, employees and agents of our company and our affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to: (i) the failure of any of your representations, warranties or covenants set forth in this Agreement, or (ii) any act or omission of yours or anyone associated with or employed by or affiliated with you, except as described in Section 6.2.2.  We will have the right to participate in the defense, with counsel of our own choice and at our own expense, of any action that may give rise to your obligation to indemnify, and to reject any settlement that might adversely affect us.

6.2.2  *Our Indemnity.*  We will defend and indemnify and hold you and your affiliates, and the members, managers, stockholders, directors, officers, employees and agents of your company and its affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to: (i) your use of the System or any of the Marks in full compliance with the terms and conditions of this Agreement; or (ii) advertising or promotion carried out by us or by agencies or media engaged by us relating to the Kung Fu Tea shop brand, provided that you have timely notified us of each such claim or proceeding, have given us sole control of the defense and settlement, and have otherwise complied with this Agreement.

6.2.3  *Notice of Claim; Survival.*  Each party will give the other notice of any claim that may require indemnification promptly after such party learns of such claim.  The rights and obligations of the parties under this Section 6.2 will survive the expiration or termination of this Agreement.

6.3 – *Insurance*

6.3.1  *Insuring the Franchised Business.*  During the term of this Agreement and any renewal, you will obtain and maintain, at your own expense, an insurance policy or policies protecting you against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense arising or occurring upon or in connection with the operation of the Franchised Business.  Such policy or policies must

6.3.1.1  be written by an insurer licensed and admitted to write coverage the state in which the Franchised Business is located and with a rating of "A" or better as set forth in the most recent edition of Best's Key Rating Guide;

6.3.1.2  be primary coverage without right of contribution from any general liability policy or auto liability policy or from any insurance of ours;

6.3.1.3  name KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc. as additional insureds;

– 33 –

6.3.1.4  be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 (or an endorsement form with comparable wording acceptable to us; and

6.3.1.5  comply with our written requirements at the time such policies are obtained, and provide at least the types and minimum amounts of coverage specified below or as described in our written notice to you.

Your obligation to obtain and maintain such insurance will not be limited in any way by reason of any insurance that we may maintain.

6.3.2  *Minimum Coverage.*  The policies referred to in Section 6.3.1 must include at least the following:

6.3.2.1  "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance;

6.3.2.2  comprehensive general liability insurance, including products and completed operations, in an amount of not less than the following combined single limits: $2,000,000 per occurrence, $2,000,000 personal and advertising injury, $2,000,000 completed operations/products aggregate, $2,000,000 aggregate per location;

6.3.2.3  employment practices liability coverage with a limited $100,000 per occurrence and in the aggregate;

6.3.2.4  automobile liability coverage, including coverage of owned, non-owned, rented or hired vehicles with coverage in amounts not less than $1,000,000 combined single limit; and

6.3.2.5  workers' compensation insurance for statutory limits and employer's liability insurance in an amount not less than $1,000,000.

6.3.3  *Waiver of Subrogation.* You and your insurers must agree to waive their rights of subrogation against us in connection with any and all insurance that you are required to maintain under this Section 6.3.

6.3.4  *Changes in Coverage Requirements.*  Each year we may unilaterally modify the insurance minimum coverage requirements by delivery to you of written notice of the change, which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.

6.3.5  *Negligence.*  All public liability and property damage policies must contain a provision that KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc., although named as an additional insureds, will nevertheless be entitled to recover under such policies on any loss occasioned to any such company by reason of your negligence.

6.3.6  *Certificates of Insurance.*  At least ten days before you are first required to carry insurance, and thereafter at least thirty days before the expiration of any policy, you will deliver to us a certificate of insurance evidencing your compliance with this Section 6.3. Each certificate of insurance must expressly provide that we must receive at least thirty days' prior written notice in the event of material alteration to or cancellation or non-renewal of any coverage evidenced by the certificate.

– 34 –

6.3.7  *Our Remedies.*  If you fail to obtain or maintain the required insurance in accordance with this Section 6.3, we or our designee will each have the right and authority (but not the obligation) to obtain such insurance on your behalf.  Such right will be in addition to and not in lieu of any other rights or remedies available to us.  If we obtain such insurance on your behalf, we may require you to pay us the charges described in Section 2.1.7.2.

6.3.8  *No Effect on Indemnity.*  Nothing in this Section 6.3 will relieve you of liability under the indemnity provisions in Section 6.2.

## ARTICLE VII - **MISCELLANEOUS**

Section 7.1 – **Relationship of the Parties.**  You are an independent contractor and not an agent of ours.  You will have no power or authority to make any commitment or enter into any contract or agreement obligating or purporting to obligate us, and you will not hold yourself out as having such power or authority.  Nothing in this Agreement creates a fiduciary relationship between the parties.  You agree to conspicuously identify yourself in all dealings with customers, suppliers, public officials, your employees and others as the owner of an independent business under a franchise from us and to place such notices of independent ownership on such forms, business cards, stationery, advertising and other materials as we require from time to time.

Section 7.2 – **Reasonable Business Judgment.**  You acknowledge that the long-term interests of the network of Kung Fu Tea shops, and our company and its owners, taken together, require that we have the latitude to make business decisions with respect to the franchise system.  The ultimate responsibility to make decisions with respect to the System and the System Standards is vested in us because we, you and all Kung Fu Tea shop franchisees have a collective interest in working within a franchise system that can quickly adjust to changing business conditions, including changes in the competitive environment, new laws and regulations, and emerging business opportunities.  We have this right even if, at times, a particular decision adversely affects you.  We will not be required to consider your particular economic or other circumstances or to disregard our own economic or other business interest when making decisions under this Agreement.

Section 7.3 – **Injunctive Relief.**  You understand that your covenants set forth in Article III constitute essential elements of this Agreement.  If you fail to comply strictly with any such covenants, we will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against you in a court of competent jurisdiction.

Section 7.4 – **Severability.**  If any restrictive covenant in this Agreement is held to be invalid or unenforceable because its duration is too long or its scope is too broad, you and we agree that the court making such determination will have the power to reduce the duration or scope in such a manner that the remaining revised covenant will be valid and enforceable.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is prohibited by or invalid under applicable law, such prohibition or invalidity will not invalidate the remainder of such provision or the other provisions of this Agreement.

Section 7.5 – **No Waiver of Rights.**  No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.  No waiver will be binding unless contained in a writing signed by the party waiving its rights.  Any waiver is limited to the specific situation in which it is given and no waiver of any breach or default under this Agreement will be construed as a waiver of any earlier or succeeding breach or default.

Section 7.6 – **Notices.**  All notices, requests, consents and other communications required or permitted by this Agreement will be in writing and will be delivered by hand, overnight delivery service, or

– 35 –

registered or certified first class mail, to the following address, or such other address as either party, by like notice, designates with respect to its own address:

If to us:         KF Tea Franchising LLC
589 8th Ave., 17th Floor
New York, NY 10018

If to you:      The address indicated in Schedule A

Any such notice, request, consent or other communication will be deemed given and be effective upon receipt at such address.

Section 7.7 – **Affiliates.**  As used in this Agreement, the term "affiliate" of party means a company directly or indirectly controlling, controlled by or under common control with such party.  "Control" of another company, as used in this Agreement, means the ownership of or the power to vote, directly or indirectly through majority-owned companies, more than 50% of the voting stock or voting rights of such other company.

Section 7.8 – **Limitation of Actions.**  Any and all claims and actions arising out of or relating to this Agreement brought by either party against the other must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable statute of limitations; (b) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to the claim; or (c) two years after the first act or omission giving rise to the alleged claim.  Claims and actions not brought within such time period will be irrevocably barred.  Claims by us of your underreporting of sales, and claims for failure to pay monies owed or for indemnification will be subject only to the applicable statute of limitations.

Section 7.9 – **Waiver of Punitive Damages and Jury Trial.**  Except for your obligation to indemnify us for third party claims under Section 6.2, we and you each waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other party, and we and you agree that any recovery in a dispute between us will be limited to equitable relief and to the recovery of actual damages sustained.  We and you irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either of us.

Section 7.10 – **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

Section 7.11 – **Jurisdiction.**  The parties irrevocably consent to the non-exclusive jurisdiction of the federal and state courts located in the city in which our principal office is located at the time suit is filed (or a city within 25 miles of such office).  If we assign or otherwise transfer this Agreement, all legal actions between the parties will be venued exclusively in a state or federal court in the judicial district in which the assignee's or transferee's principal offices are located at the time the suit is filed.  The parties hereby waive, to the full extent permitted by law, defenses based on jurisdiction, venue and forum *non conveniens*.  The parties further consent to service of process in any action by registered mail, return receipt requested, or by any other means permitted by law.

Section 7.12 – **Costs and Expenses.**  In any legal action arising out of or pursuant to this Agreement or otherwise in connection with the relationship between us, the prevailing party will be entitled to recover its reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with the claims on which it prevailed.

– 36 –

Section 7.13 – *Entire Agreement.*  This Agreement and all related agreements executed simultaneously with this Agreement constitute the entire understanding of the parties and supersede any and all prior oral or written agreements between you and us on the matters contained in this Agreement; but nothing in this or any related agreement is intended to disclaim the representations we made in the latest franchise disclosure document that we furnished to you.  Except for changes permitted under this Agreement to be made unilaterally by us, no amendment to this Agreement will be binding unless such amendment is in writing and executed by the parties.

The parties have signed this Agreement on the dates set forth below, with effect as of the effective date as stated in the opening paragraph of this Agreement.

KF TEA FRANCHISING LLC                    VTVC ENTERPRISES, INC.

By _____        By _____
                                              VAN NGUYEN

Title _____          Title _____
              CEO                                    member

Date _____           Date _____
            9/18/2017                                 9 - 06 - 2017

Version 4/17/2017

**SCHEDULE A**

**FRANCHISEE INFORMATION**

See Sections 1.1.2, 1.1.8, 5.1.1, 6.1.1.8 and 7.6 of the Franchise Agreement

1.    Approved location (the Site):  3910 Wayne Ave, #102, Wichita Falls, TX 76308

2.    Territory:  a radius of one-half mile from the Site

3.    Agreement expiration date:  August 16, 2027

4.    Type of shop (indicate one):     Standard Unit __✓___
                                        Non-Traditional Unit: _____

5.    Address for notices (if different than 1):  VTVC Enterprises, Inc.
                                                  c/o Mr. Van Nguyen
                                                  8 Park Place Ct.
                                                  Wichita Falls, TX 76302

6.    Ownership and management of the franchisee.

      The franchisee is a Texas corporation

      The following persons are the officers, directors and officers of the Franchisee:

| Name and Address | Positions | Percentage Ownership |
|---|---|---|
| Mr. Van Nguyen 8 Park Place Ct. Wichita Falls, TX 76302 | Director and President | 100% |

Version 4/17/2017