IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| KF TEA USA INC. and KF TEA FRANCHISING LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> TEA N' BOBA ENTERPRISES LLC, TOAN VAN NGUYEN and VY NGUYEN, <br> Defendants. | Civil Action No. <br><br> **JURY TRIAL DEMANDED** |

**DECLARATION OF YI-FAN (MICHAEL) WEN IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

I, Yi-Fan (Michael) Wen, declares as follows:

1.     I am over 18 years old and I am competent to make this Declaration based upon my personal knowledge. I submit this Declaration in Support of the Motion For Temporary Restraining Order And Preliminary Injunction filed by Plaintiffs KF Tea USA Inc. ("KFTU") and KF Tea Franchising LLC ("KFTF") (collectively "Plaintiffs").

2.     I am a resident of the State of New York, and I am the Vice President of Plaintiff KFTU and Manager and Chief Sales Officer of Plaintiff KFTF and their KUNG FU TEA® branded business. I am responsible for directing the brand marketing team that forms the marketing plans, advertisements, social media and promotions for the KUNG FU TEA® brand, the sales team for the KUNG FU TEA ® brand and the franchising of the KUNG FU TEA® brand.

**A1**

3.      Plaintiff KFTU began operation of KUNG FU TEA® shops in May 2010 and continues to operate KUNG FU TEA® shops.  Plaintiff KFTF is the exclusive franchisor of KUNG FU TEA® shops, America's largest bubble tea brand with more than 325+ KUNG FU TEA® franchised shops located throughout the U.S., including 47 locations in Texas, 13 within the Dallas Fort-Worth Metropolitan Area, and internationally with locations in Canada, Cambodia, Taiwan and Japan. **Exhibit 1 (2023 Franchise Disclosure Document at Exhibit B1 (Franchisees)); Exhibit 2 (www.kungfutea.com/locations/usa).**

4.      Each KUNG FU TEA® shop is a retail shop selling bubble tea and a variety of other hot and cold beverages.  All of the teas and other beverages are prepared in accordance with recipes using Plaintiff KFTF's ingredients and other specified or authorized ingredients, and using equipment KFTF supplies or specifies. On April 30, 2018 (KUNG FU TEA®'s 8th birthday), Plaintiffs founded National Bubble Tea Day to honor the growing community of people who live and breathe bubble tea while celebrating the beverage that "has made lives bubblier." **Exhibit 3 (www.kungfutea.com).**

5.      The KUNG FU TEA® Trademarks were first used in commerce at least as early as April 30, 2010, and since then, Plaintiffs and their affiliates have been the exclusive source of the KUNG FU TEA® brand.  Plaintiffs and their affiliates have made extensive and continuous use of the KUNG FU TEA® mark in U.S. Commerce through their authorized franchisees since at least 2011, with rights accruing to Plaintiffs in connection with KUNG FU TEA® shops selling bubble tea and a variety of other hot and cold beverages.  As a result of Plaintiffs' authorized franchisees' long use, significant advertising and promotional efforts, extensive sales, and the consistently high quality of the goods and services under the KUNG FU TEA® mark, the mark has obtained national recognition and fame as an indicator of the source of

Plaintiffs' goods and services and a symbol of substantial and valuable goodwill.  *See, e.g.*,

**Exhibit 4**  ("A guide to the best bubble tea shops in the D.C. area," The Washington Post (June

14, 2017) ("Think of Kung Fu Tea as the Starbucks of bubble tea.")).

6.      Plaintiff has sought to protect its brand investments by registering its KUNG FU

TEA® Trademarks with the United States Patent and Trademark Office ("USPTO").   More

specifically, Plaintiff has federally registered and obtained certificates of registration from the

USPTO for the following KUNG FU TEA® Trademarks (collectively the "KUNG FU TEA®

Trademarks"):

| Trademark | U.S. Registration No. | Goods/Services | First Use in Commerce | Status |
|---|---|---|---|---|
| KUNG FU TEA | 4,497,687 | Int'l Class: 43 Restaurant services featuring non-alcoholic drinks, beverages, pastries, and confections | April 30, 2010 | Active (Registered, March 18, 2014) |
| KUNG FU TEA | 4,857,505 | Int'l Class: 30, 32 (Int'l Class: 30) Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea, Tea-based smoothies (Int'l Class: 32) fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea | April 30, 2010 | Active (Registered, November 24, 2015) |
| KUNG FU TEA | 5,438,824 | Int'l Class: 30 | January 1, 2016 | Active (Registered: |

3

**A3**

| | | | | |
|---|---|---|---|---|
| and Design  | | Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea; tea-based smoothies | | April 3, 2018) |
| KUNG FU TEA and Design  | 5,438,825 | Int'l Class: 32 Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea | January 1, 2016 | Active (Registered: April 3, 2018) |
| KUNG FU TEA and Design  | 5,443,929 | Int'l Class: 30 Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; tea-based smoothies | January 1, 2016 | Active (Registered: April 10, 2018) |
| KUNG FU TEA and Design  | 5,443,930 | Int'l Class: 32 Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea | January 1, 2016 | Active (Registered, April 10, 2018) |
| KUNG FU TEA and Design | 5,443,931 | Int'l Class: 43 Restaurant services featuring non-alcoholic drinks, beverages and | January 1, 2016 | Active (Registered, April 10, 2018) |

| | | | | |
|---|---|---|---|---|
|  | | confections | | |
| KUNG FU TEA | 5,588,198 | Int'l Class: 09, 16, 18, 21, 25, 30 (Int'l Class: 09) Cell phone cases; Cases for mobile phones (Int'l Class: 16) Stickers (Int'l Class: 18) Tote bags (Int'l Class: 21) Mugs; Plastic cups; Tea canisters; Water bottles sold empty (Int'l Class: 25) Headwear, namely, caps and hats; Hoodies; T-shirts (Int'l Class: 30) Tea bags | December 1, 2016 | Active (Registered, October 15, 2018) |
| KUNG FU TEA and Design  | 5,639,864 | Int'l Class: 09, 16, 18, 21, 25, 30 (Int'l Class: 09) Cell phone cases; Cases for mobile phones (Int'l Class: 16) Stickers (Int'l Class: 18) Tote bags (Int'l Class: 21) Mugs; Plastic cups; Tea canisters; Water bottles sold empty (Int'l Class: 25) | December 1, 2016 | Active (Registered, December 25, 2018) |

5

| | | Headwear, namely, caps and hats; Hoodies; T-shirts (Int'l Class: 30) Tea bags | | |
|---|---|---|---|---|
| | | | | |

Copies of the Certificates of Registration for Plaintiffs' federally registered KUNG FU TEA® Trademarks are attached as **Exhibits 5 (Reg. No. 4,497,687); 6 (Reg. No. 4,857,505); 7 (Reg. No. 5,438,824); 8 (Reg. No. 5,438,825); 9 (Reg. No. 5,443.929); 10 (Reg. No. 5,443,930); 11 (Reg. No. 5,443,931); 12 (Reg. No. 5,588,198); and 13 (Reg. No. 5,639,864).**

7.      Plaintiff KFTU is the sole owner of all right, title and interest in and to the federally registered KUNG FU TEA® Trademarks.  Plaintiffs KUNG FU TEA® Trademarks are incontestable under 15 U.S.C. §1065.  Plaintiffs filed Declarations of Incontestability for KUNG FU TEA® U.S. Registration Nos. 4,497,687 (**Exhibit 14** acknowledged by the USPTO on November 11, 2020) and 4,857,505 (**Exhibit 15** acknowledged by the USPTO on May 14, 2022).

8.      On an annual basis, Plaintiff has invested substantial time, effort and money in advertising and promoting its franchised restaurants under the KUNG FU TEA® Trademarks. Plaintiffs' marketing and advertising expenditures for its KUNG FU TEA® franchised brand have substantially increased on an annual basis.  For example, for the period 2020 to 2022, marketing and advertising expenditures for Plaintiffs' KUNG FU BOBA®  franchised brand ranged from $737,202 (2020), $1,201,558 (2021) to $1,722,137 (2022).  **Exhibit 1 (2023 Franchise Disclosure Document Exhibit D (Financial Statements and Supplementary Information))** . Such advertising and promotions includes advertisements on Plaintiff's website *www.kungfutea.com,* Google, social media, print media, point of sale displays and advertising, signs, posters, menus and direct mail to consumers.  Plaintiffs commonly advertise through

social media, print media, signs, posters, menus, and point of sale displays at their franchised restaurant locations.

9.   Example advertisements of the KUNG FU TEA® brand through Plaintiffs' website, www.kungfutea.com, and menu are attached as **Exhibits 16 and 17**.

10.   As a result of Plaintiffs' extensive use and advertising of their franchised KUNG FU TEA® shops, restaurant services and tea-based flavored beverages under the KUNG FU TEA® brand, customers throughout the U.S., including within this jurisdiction, and internationally have grown to identify Plaintiffs as the source of their franchised KUNG FU TEA® shops, restaurant services and tea-based flavored beverages under the KUNG FU TEA® brand.  Plaintiffs' franchised KUNG FU TEA® shops, restaurant services and tea-based flavored beverages under the KUNG FU TEA® brand are well known throughout the country, including within this jurisdiction, and internationally, and their network of customers and customer referrals have garnered industry-wide goodwill, reputation and recognition among businesses, families and individuals throughout the country, including within this jurisdiction.  In view of this, Plaintiffs vigorously enforce their KUNG FU TEA® Trademarks and protect their goodwill and brand.

11.   Plaintiffs have derived substantial revenue through their franchised KUNG FU TEA® shops, restaurant services and tea-based flavored beverages under the KUNG FU TEA® brand.  For example, for the period 2020 through 2023, revenues have substantially increased from 2020 ($4,712,567), 2021 ($7,539,734) and 2022 ($8,968,251). **Exhibit 1 (2023 Franchise Disclosure Document Exhibit D (Financial Statements and Supplementary Information))**.

12.   The KUNG FU TEA® shops, restaurant services and tea-based flavored beverages under the KUNG FU TEA® Trademarks have obtained national recognition and fame, including within this jurisdiction. Consumers recognize and rely upon the KUNG FU TEA® Trademarks

**A7**

to identify authentic franchised KUNG FU TEA® shops, restaurant services and tea-based beverages and to distinguish them from the restaurant services and tea-based flavored beverages of others.

13.    The KUNG FU TEA® Trademarks became well known long before Defendants recently opened their unauthorized restaurant offering tea-based flavored beverages, including Bubble Tea, using the infringing KUNG FU BOBA mark, including in their restaurant name and their website, https://kungfuboba.app.infi.us/#/, and in advertisements, social media, and promotion of such restaurant and services, including as trade dress in connection with its services, all in breach of Defendants' termination obligations under a Franchise Agreement with Plaintiffs.

14.    Plaintiff KFTF (Franchisor) entered into a Franchise Agreement (**Exhibit 18**) with VTVC Enterprises, Inc. ("VTVC"), signed by Defendant Toan Van Nguyen, the owner, Director and President of VTVC, having an effective date of August 16, 2017, to open and operate a KUNG FU TEA® shop located at 3910 Wayne Avenue #102, Wichita Falls, Texas 76308, including a license to sell a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks prepared in accordance with recipes using Plaintiff KFTF's ingredients and other specified or authorized ingredients, using equipment Plaintiff KFTF supplies or specifies.  I understand that VTVC is the predecessor of Defendant Tea N' Boba Enterprises LLC, having the same principal place of business which is the restaurant located at 3910 Wayne Avenue #102, Wichita Falls, Texas.  I also understand, on information and belief, that Mr. Nguyen is the owner of Tea N' Boba Enterprises LLC.

15.    The Franchise Agreement (**Exhibit 18 (Schedule A)** was scheduled to expire on August 16, 2027, unless terminated before then.  The Franchise Agreement gives Plaintiff KFTF

the right to terminate the agreement, effective immediately upon written notice, if VTVC fails to meet any of the requirements in Paragraph 5.2.2, including making any unauthorized use of the KUNG FU TEA® Trademarks and failing to cure within 30 days after receipt of the notice pursuant to Paragraph 5.2.3.

16.     Upon termination of the Franchise Agreement **(Exhibit 18)**, VTVC agreed to comply with post-termination obligations, including without limitation, "payment of all other amounts owed to us that are then unpaid" (Paragraph 5.3.1.2) and "cease to use the Marks and the System in any way" (Paragraph 5.3.1.4).

17.     In addition, to induce Plaintiff KFTF to enter into the Franchise Agreement **(Exhibit 18),** pursuant to Paragraph 3.3.3 Noncompetition After Termination, VTVC agreed that VTVC and its affiliates, owners or a member of the immediate family of any owner, would not compete via a Competitive Business with Plaintiff KFTF for a period of two years following termination within 5 miles of the KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308 or of any KUNG FU TEA® shop located anywhere in the world. Competitive Business is defined in Paragraph 3.3.1 as, *inter alia*, "a retail business that sells, oriental style teas and other drinks to consumers for consumption and such sales comprise five percent or more of the business's revenues."

18.     Defendant Toan Van Nguyen, as Guarantor, further entered into a Guaranty and Assumption of Obligations Agreement with Plaintiff KFTF on September 18, 2017 (**Exhibit 19**) acknowledging in Paragraph 2.4 Noncompetition, VTVC's obligations not to compete with Plaintiff KFTK under Section 3.3 of the Franchise Agreement and that he "personally agrees to comply with and be bound by all  of the Franchisee's obligations under Section 3.3 to the same extent that [VTVC] is  bound by the obligations of Section 3.3, both during and after the term of

**A9**

the Franchise Agreement."

19.     Defendant Toan Van Nguyen, as Guarantor, also acknowledged (**Exhibit 19** (Paragraph 2.5)) that if he fails to comply with any of the obligations with respect to Plaintiffs' copyrights and trademarks, confidential information and noncompetition, Plaintiffs "will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both" against Mr. Nguyen, and, in the event Plaintiffs prevail in any litigation, he will reimburse Plaintiffs "for all costs, attorneys' fees and other expenses incurred .. in connection with such litigation."

20.     As Guarantor, in Paragraph 1.1 (**Exhibit 19**), Mr. Toan Van Nguyen further "personally and unconditionally guarantees to [KFTF] and [KFTF's] successors and assigns the due, punctual and complete payment of all amounts that [VTVC] is obligated to pay to [KFTF] under the Franchise Agreement and under any modification of, amendment to or renewal of the Franchise Agreement."

21.     At all times, Plaintiff KFTF fully performed its obligations under the Franchise Agreement, including by providing to Defendants certain rights to use Plaintiffs' copyrights (¶ 3.1.1), trademarks (¶¶3.1.2 to 3.1.4) and confidential information to operate the KUNG FU TEA® shops (¶ 3.2.1) under the Franchise Agreement (**Exhibit 18**) in exchange for Defendants' promise not to compete by operating a Competitive Business that "sells, oriental style teas and other drinks to consumers for consumption and such sales comprise five percent or more of the business's revenues" (¶3.3.1) both during the agreement and for a period two years after termination of the Franchise Agreement (¶¶3.3.2 and 3.3.3).

22.     Based on an agreement reached between Plaintiff KFTF and VTVC on August 19, 2022, VTVC agreed to close its franchised store as a result of VTVC's violations of the Franchise Agreement, subject to VTVC's completion of all store closing tasks on or before

**A10**

September 18, 2022, with which deadline VTVC did not comply. Specifically, in or about October 2022, VTVC started operating another store at the approved location under the infringing name KUNG FU BOBA selling bubble tea and a variety of other hot and cold beverages using the names KUNG FU BOBA and KUNG FU TEA® without authorization from Plaintiffs.

23.   I authorized Plaintiff's counsel to send a Notice of Termination of Franchise Agreement and Cease and Desist letter to Defendant Toan Van Nguyen and VTVC on March 21, 2023. **Exhibit 20.**   Plaintiffs' cease and desist letter provided written notice to VTVC and Mr. Nguyen of the immediate termination of the Franchise Agreement and of Plaintiffs' objection to VTVC's and Mr. Nguyen's unauthorized and infringing use of the KUNG FU TEA® Trademarks.   VTVC's and Mr. Nguyen's infringement of the KUNG FU TEA® Trademarks comprised at least their use of the identical KUNG FU TEA® mark and the substantially indistinguishable KUNG FU BOBA mark in connection with the name of their unauthorized restaurant and the goods and services of their restaurant selling bubble tea and a variety of other hot and cold beverages without authorization from Plaintiffs.   VTVC and Mr. Nguyen also used the identical KUNG FU TEA® mark and the substantially indistinguishable KUNG FU BOBA mark in connection with the advertisement and promotion of their shop and the goods and services of their shop   on,   for   example,   their   Google   website   (*see,   e.g.,*   webpage https://goo.gl/maps/VTXLdxkmuWJvMjCK6)). A photograph of Defendants' shop, located at 3910 Wayne Avenue #102, Wichita Falls, Texas, using the infringing KUNG FU BOBA mark without authorization from Plaintiffs is attached (**Exhibit 21).**

24.   I authorized Plaintiffs' counsel to send a Closing Agreement (**Exhibit 22)** signed by Mr. Toan Van Nguyen on behalf of himself and VTVC on April 3, 2023, in which Mr.

**A11**

Nguyen and VTVC agreed to:  a.  pay off the $30,000 in penalties owed to KFTF pursuant to the Franchise Agreement on a payment schedule of $500 per week, such that the total payment of $30,000 is completed within fifteen months beginning April 1, 2023; b. take all necessary steps to completely close the KUNG FU BOBA shop located in Wichita Falls, Texas and involvement in the business of a retail shop, and any website related thereto, selling a bubble tea and a variety of other hot and cold beverages on or about March 31, 2023, and no later than April 20, 2023; and c. permanently cease and desist any and all current or future use of the KUNG FU TEA® trademarks, and any similar marks, such as KUNG FU BOBA.

25.     Contrary to Defendant Toan Van Nguyen's agreement, Plaintiffs have not received any payoff of the $30,000 in penalties owed by Defendants to Plaintiffs pursuant to the Franchise Agreement.

26.     Contrary to Defendant Toan Van Nguyen's agreement to permanently close  the KUNG FU BOBA shop located in Wichita Falls, Texas and stop using the KUNG FU BOBA mark,  Plaintiffs learned on or about November 22, 2023, that Defendants' unauthorized operations of the KUNG FU BOBA shop continue at the 3910 Wayne Avenue #102, Wichita Falls, Texas address and under a new website, https://kungfuboba.app.infi.us/#/, in the same line of business as Plaintiffs' KUNG FU TEA® branded business.   Examples of Defendants' infringement on their website, advertisements and promotions using the KUNG FU BOBA mark are shown in attached snapshots of Google search results for "kung fu tea" showing a recent review of Defendants' KUNG FU BOBA restaurant, Defendants' online menu that includes various tea-based beverages, including BUBBLE TEA, and Defendants' website still advertising images of KUNG FU TEA® tea-based flavored beverages for purchase (**Exhibits 23, 24, 25 and 26**).

27.     Defendants use of the KUNG FU BOBA mark is causing actual confusion in the marketplace in Google searches and customer reviews confusing Defendants' KUNG FU BOBA restaurant with Plaintiffs' KUNG FU TEA® brand. **Exhibits 27 and 28.**

28.     Since termination of the Franchise Agreement, Plaintiffs have no business relationship with Defendants, and Plaintiffs have never authorized or licensed Defendants to use the KUNG FU BOBA mark or any other confusingly similar mark to Plaintiffs' KUNG FU TEA® Trademarks for any purpose, including for restaurant services and tea-based flavored beverages.

29.     However, in violation of the Noncompetition After Termination Covenant (**Exhibit 18 ¶3.3.3**) in their Franchise Agreement with Plaintiff KFTF, Defendants are still using Plaintiffs' trade dress and advertising KUNG FU TEA® brand flavored tea-based beverages for purchase (*see, e.g.* **Exhibit 26**), and, on information and belief, are still using Plaintiffs' Confidential Information such as Plaintiffs' recipes and equipment without authorization.

30.     Defendants' violation of the Noncompetition After Termination Covenant (¶3.3.3) in their Franchise Agreement with Plaintiff KFTF by operating the unauthorized KUNG FU BOBA shop also prevents Plaintiffs from refranchising in the market and threatens the stability of Plaintiffs' entire franchise system as it sends a message to other franchisees that their noncompetition covenants can be ignored without consequence.

31.     Defendants' restaurant services and tea-based flavored beverages using the infringing KUNG FU BOBA mark are marketed to the same class of consumers, through the same channels of trade, and through the same or similar types of advertising as Plaintiffs.

32.     Plaintiffs have no control over Defendants' use of the KUNG FU BOBA mark or the quality of services advertised, promoted, and offered by Defendants in connection with the

**A13**

KUNG FU BOBA mark.

33.     Defendants use of the KUNG FU BOBA mark in connection with non-Plaintiffs restaurant services and tea-based beverages is designed to trade off the resounding consumer goodwill and reputation of the KUNG FU TEA® Trademarks and Plaintiffs' KUNG FU TEA® branded business.

34.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on December 19, 2023, in ___Flushing___ , New York.

_____
Yi-Fan (Michael) Wen

Subscribed and sworn to before me on this 19th day of December 2023.

_____
Notary Public

RICHARD LEE
Notary Public, State of New York
Reg. No. 01LE6371340
Qualified in Queens County
Commission Expires 02/26/202

4866-4698-6646, v. 1

**A14**

# Exhibit 1

# FRANCHISE DISCLOSURE DOCUMENT



KF TEA FRANCHISING LLC
A Delaware Limited Liability Company
589 8th Ave., 17th Floor
New York, NY 10018
1-855-KFT(538)-9888
info@kfteausa.com
www.kungfutea.com

We offer franchises for the operation of retail shops selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks. We also offer a multi-unit franchise under which you agree to open and operate a specified number of Kung Fu Tea shops over an agreed period of time within an agreed geographic area.

The total investment necessary to begin operation of a Kung Fu Tea franchise is $169,000 to $378,000 for a standard Kung Fu Tea shop and $184,000 to $269,500 for a non-traditional unit. This includes $59,000 to $82,000 that you must pay to us or our affiliate for a standard unit and $59,000 to $70,000 for a non-traditional unit.

If you sign a multi-unit agreement covering three units, your total initial investment will be $219,000 to $428,000 if your first unit under the agreement is a standard unit and $234,000 to $319,500 if your first unit under the agreement is a nontraditional unit. This includes $109,000 to $132,000 that you must pay to us or our affiliate if your first unit franchise under the multi-unit agreement is a standard unit and $109,000 to $120,000 if your first unit under the multi-unit agreement is a nontraditional unit. If you sign an agreement for more than three units, you would pay us or our affiliate an additional $12,500 for each unit you agree to develop after your third unit, and this amount would be added to your total initial investment.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **NOTE, HOWEVER, THAT NO GOVERNMENTAL AGENCY HAS VERIFIED THE INFORMATION CONTAINED IN THIS DOCUMENT.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact Darren Chen at KF Tea Franchising LLC, 589 8th Ave., 17th Floor, New York, NY 10018, telephone 1-855-KFT(538)-9888.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance date:  April 20, 2023, revised July 22, 2023

Version 4/20/2023 rev 7/22/2023

**How to Use This Franchise Disclosure Document**

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit A. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit D includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only KFT shop in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a KFT franchisee?** | Item 20 or Exhibit B lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

Version 4/20/2023 rev 7/22/2023

## What You Need to Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other re-strictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit A.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

Version 4/20/2023 rev 7/22/2023

### Special Risks to Consider About *This* Franchise

Certain states require that the following risks be highlighted:

1. **Out-of-State Dispute Resolution.** The franchise agreement and the multi-unit agreement require you to resolve disputes with the franchisor by litigation only in New York. Out-of-state litigation may force you to accept a less favorable settlement for disputes. It may also cost more to litigate with the franchisor in New York than in your own state.

2. **Spousal Liability.** Your spouse must sign a document that makes your spouse liable for all financial obligations under the franchise agreement even though your spouse has no ownership interest in the franchise. This guarantee will place both your and your spouse's marital and personal assets, perhaps including your house, at risk if your franchise fails.

3. **Supplier Control.** You must purchase all or nearly all of the inventory or supplies that are necessary to operate your business from the franchisor, its affiliates, or suppliers that the franchisor designates at prices the franchisor or they set. These prices may be higher than prices you could obtain elsewhere for the same or similar goods. This may reduce the anticipated profit of your franchise business.

4. **Financial Condition.** The Franchisor's financial condition as reflected in its financial statements (see Item 21) calls into question the Franchisor's financial ability to provide services and support to you.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" pages for your state (if any) to see whether your state requires other risks to be highlighted.

# KUNG FU TEA

# FRANCHISE DISCLOSURE DOCUMENT

## TABLE OF CONTENTS

**Item**                                                                                                             **Page**

| Item | | Page |
|------|---|------|
| 1 | The Franchisor and any Parents, Predecessors and Affiliates | 1 |
| 2 | Business Experience | 3 |
| 3 | Litigation | 4 |
| 4 | Bankruptcy | 5 |
| 5 | Initial Fees | 5 |
| 6 | Other Fees | 7 |
| 7 | Estimated Initial Investment | 10 |
| 8 | Restrictions on Sources of Products and Services | 17 |
| 9 | Franchisee's Obligations | 20 |
| 10 | Financing | 21 |
| 11 | Franchisor's Assistance, Advertising, Computer Systems and Training | 21 |
| 12 | Territory | 28 |
| 13 | Trademarks | 31 |
| 14 | Patents, Copyrights and Proprietary Information | 34 |
| 15 | Obligation to Participate in the Actual Operation of the Franchise Business | 35 |
| 16 | Restrictions on What the Franchisee May Sell | 36 |
| 17 | Renewal, Termination, Transfer and Dispute Resolution | 37 |
| 18 | Public Figures | 41 |
| 19 | Financial Performance Representations | 41 |

# TABLE OF CONTENTS

**Item**                                                                                                    **Page**

20       Outlets and Franchisee Information ....................................................................        42

21       Financial Statements ........................................................................................        48

22       Contracts ...........................................................................................................        48

23       Receipts..............................................................................................................        48

## EXHIBITS

A        State Administrators and Agents for Service of Process

B        List of Franchisees
         1. Franchisees
         2. Former Franchisees

C        Franchisee Organizations
         1. Franchisee Organizations We Have Created, Sponsored or Endorsed
         2. Independent Franchisee Associations

D        Financial Statements

E        Table of Contents of Manual

F        Agreements and Forms
         1. Franchise Deposit Agreement
         2. Franchise Agreement
         3. Guaranty
         4. Lease Addendum
         5. Supply Agreement
         6. Dual Concept Addendum
         7. Multi-Unit Agreement
         8. Consent to Transfer Agreement
         9. Renewal Addendum
         10. ACH Debit Application

G        State Addenda

H        State Effective Dates

I        Receipts

Version 4/20/2023 rev 7/22/2023

**A21**

**Item 1**

**THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES**

*The Franchisor*

To simplify the language in this disclosure document, "we" or "us" means KF Tea Franchising LLC, the franchisor. "You" means the person who buys the franchise, and it may refer to the owner or owners of the buyer entity. We do business under the name Kung Fu Tea. We are a Delaware limited liability company formed April 17, 2013. Our principal business address is 589 8th Ave., 17th Floor, New York, NY 10018.

Our agents for service of process are listed in Exhibit A of this disclosure document.

*The Franchise*

We offer the right to own and operate a Kung Fu Tea shop at a location that you choose and we approve. Each Kung Fu Tea shop is a retail shop selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks. All of the teas and other drinks are prepared in accordance with our recipes using our ingredients and other specified or authorized ingredients, using equipment we supply or specify. You may also offer take-out and delivery service from the shop.

The terms of the franchise are contained in our franchise agreement, a form of which is attached to this disclosure document in Exhibit F2. The franchise agreement gives you the right to operate a single Kung Fu Tea shop. The agreement includes your grant to us of a security interest in the assets of the franchised business to secure payment of your obligations to us.

In addition to single-concept Kung Fu Tea shop, we offer dual branding with TKK Fried Chicken restaurants. Dual-branded franchised businesses must sign franchise agreements and dual concept addenda with us and with our affiliate, TKK Franchising LLC, which offers TKK Fried Chicken franchises using a separate franchise disclosure document.

We also offer a multi-unit franchise granting you a defined geographic area within which you must open and operate a specified number of Kung Fu Tea shops within a specified period of time. If you participate in this program, you will sign a multi-unit agreement in the form attached in Exhibit F7, which will describe your development area and your development schedule and other obligations. The minimum number of shop franchises you must open and operate under a multi-unit agreement is three, although the agreement may cover a larger number. For each Kung Fu Tea shop you open under the multi-unit agreement, you will sign a separate franchise agreement promptly after we approve the site for the shop. Each franchise agreement after your first agreement may be different from the form of franchise agreement in this offering.

*Our Parents, Predecessors and Affiliates*

We do not have a parent company.

Our affiliate and predecessor, KF Tea USA Inc. began the operation of Kung Fu Tea shops in New York City in May 2010 and continues to operate Kung Fu Tea shops. We refer to the Kung Fu Tea shops operated by KF Tea USA Inc. as company-owned shops. KF Tea USA Inc. is a New York corporation formed January 5, 2010.

Our affiliate, KF Tea USA Inc. owns the Kung Fu Tea trademarks and licenses them to us.

KF Tea USA Inc. is the principal member of KFT Group LLC, a New York limited liability company formed July 7, 2017. KFT Group LLC was formed in order to enter into a joint venture with TKK International

Inc., which owns the TKK Fried Chicken trademarks in the U.S. TKK International Inc. is a corporation formed July 20, 1974, under the laws of Taiwan. The joint venture entity is TKK USA Inc., whose shareholders are KFT Group LLC and TKK International Inc. TKK USA Inc. is a New York corporation formed July 7, 2017.

TKK USA Inc. is the parent company of TKK Franchising LLC, which offers TKK Fried Chicken franchises in the U.S.A. TKK USA Inc. is also the parent company of TKK New York LLC, which owns and operates the "company-owned" TKK Fried Chicken restaurants. TKK New York LLC is a New York limited liability company formed September 22, 2016.

Our affiliate Arms Global Inc. purchases equipment and supplies from various sources in Asia and the U.S. and supplies them to company-owned and franchised Kung Fu Tea shops and TKK Fried Chicken restaurants. Arms Global Inc. is a New York corporation formed September 16, 2009.

Our former affiliate, Mars Holding Group Inc. granted Kung Fu Tea franchises between 2011 and 2013, but no longer offers or sells franchises. Mars Holding Group Inc. assigned these franchise agreements to us in 2014. Mars Holding Group Inc. was a Delaware corporation formed June 3, 2011. It was dissolved August 1, 2016.

The principal business address of Arms Global Inc. is 151 Fulton Ave., New Hyde Park, NY 11040. The principal business address of KF Tea USA Inc., KFT Group LLC, TKK USA Inc. and TKK Franchising LLC is 589 8th Ave., 17th Floor, New York, NY 10018.

No other affiliates offer franchises in any line of business or provide products or services to our franchisees. Neither we nor any predecessor or affiliate offers or has offered franchises in other lines of business.

***The Market***

The market for shops serving brew tea, bubble tea, coffee, juices, smoothies and other beverages to the Asian-American community is well-established.

The market for such shops serving the larger U.S. market is new and developing.

Kung Fu Tea shops are open for business all year round. They serve people of all ages and tastes who like freshly made tea, coffee and juices.

***The Competition***

We have many competitors who serve the Asian-American community and our wider customer base. Some are national and international companies. Others are small companies, usually with one location, serving their local community. Some Chinese bakeries also serve bubble tea and other beverages.

Other competitors include U.S. style chains that offer teas and coffees, including Asian chai teas. Indirect competitors include donut shops, coffee shops and restaurants. They include local companies and regional and national chains.

***Laws and Regulations***

You must comply with all federal, state and local laws and regulations protecting the health, safety and welfare of the employees and customers of a food service business, such as laws and regulations governing food preparation, handling and service, and sanitary conditions; and laws and regulations

- 2 -

governing the public posting of nutritional information; restrictions on smoking; and fire safety. You should investigate the application of these laws further.

## Item 2

## BUSINESS EXPERIENCE

**Manager and CFO – Hung-Jen (Allen) Wang**

Allen Wang has been Manager and the Chief Financial Officer of KF Tea Franchising LLC since April 30, 2013. He has also been the President of KF Tea USA Inc. since August 31, 2010, the Controller of Arms Global Inc., a position he has held since August 31, 2010; and the President of Recolte LLC, a position he has held since January 8, 2016. In addition, Mr. Wang has been Manager and the Chief Financial Officer of TKK Franchising LLC since it was formed September 20, 2018, and of TKK USA Inc. since it was formed July 7, 2017. He works in New York, NY.

**Manager and Chief Sales Officer – Yi-Fan (Michael) Wen**

Michael Wen has been Manager and the Chief Sales Officer of KF Tea Franchising LLC since April 30, 2013. He has also been Vice President of KF Tea USA Inc. since May 1, 2010, and President of Arms Global Inc. since October 30, 2009. In addition, Mr. Wen has been Manager and the Chief Sales Officer of TKK Franchising LLC since it was formed September 20, 2018, and of TKK USA Inc. since it was formed July 7, 2017. He works in New York, NY.

**Manager and Chief Marketing Officer – Jui (Ray) Chiu**

Ray Chiu has been Manager and the Chief Marketing Officer of KF Tea Franchising LLC since April 30, 2013. He has also been Vice President of KF Tea USA Inc. since May 1, 2010, and of Arms Global Inc. since October 30, 2009. In addition, Mr. Chiu has been Manager and the Chief Marketing Officer of TKK Franchising LLC since it was formed September 20, 2018, and of TKK USA Inc. since it was formed July 7, 2017. He works in New York, NY.

**Manager – Wen-Chi (Sean) Lee**

Sean Lee has been Manager in charge of research, product development and quality control at KF Tea Franchising LLC since April 30, 2013. He has also been Vice President of KF Tea USA Inc. since May 1, 2010, and of Arms Global Inc. since October 30, 2009. In addition, Mr. Lee has been Manager in charge of research, product development and quality control at TKK Franchising LLC since it was formed September 20, 2018, and at TKK USA Inc. since it was formed July 7, 2017. He works in New York, NY.

**Franchise Executive – Andrew Lee**

Andrew Lee has been a Franchise Executive at both KFT Franchising LLC and TKK Franchising LLC since December 2018. From August through November 2018, he served as project manager for KF Tea Franchising LLC. Mr. Lee established and operated Kung Fu Hibachi LLC from 2015 to 2017 based in New York. He works in New York, NY.

Version 4/20/2023 rev 7/22/2023

**A24**

**Director of Sales – Da Qun (Darren) Chen**

Darren Chen is a Director of Sales at KF Tea Franchising LLC and at TKK Franchising LLC, a position he has held at each of these companies since March 2022. From April 10, 2014, until March 2022, Mr. Chen was Franchise Account Officer for KF Tea Franchising LLC. In addition, Mr. Chen was Franchise Sales Manager at TKK Franchising LLC from its formation September 20, 2018, until March 2022.  He works in New York, NY.

**Director of Operations – Steve Luw**

Steve Luw has been a Director of Operations at KF Tea Franchising LLC and TKK Franchising LLC since December 2019. From August 2018 through November 2019, he served as the General Operating Manager for KF Tea Franchising and TKK Franchising LLC. He works in New York, NY.

**Franchise Account Officer – Tiffany Tong**

Tiffany Tong has been a Franchise Account Officer of KF Tea Franchising LLC since January 1, 2016. In addition, Ms. Tong has been a Senior Franchise Account Officer at TKK Franchising LLC since it was formed September 20, 2018. She works in New York, NY.

**Franchise Sales Officer – Jia Jie (JJ) He**

JJ He has been a Franchise Sales Officer of KF Tea Franchising LLC since January 2021. He joined KF Tea Franchising LLC as a Sales Assistant in March 2016 and held that position through December 2020. Mr. He has also been a Franchise Sales Officer of TKK Franchising LLC since January 2021. He was a Franchise Account Officer at TKK Franchising LLC from September 20, 2018, until December 2020. He works in New York, NY.

**Marketing Manager – Mai Shi**

Mai Shi has been a Marketing Manager at KF Tea Franchising LLC since June 28. 2016. In addition, Ms. Shi has been a Marketing Manager at TKK Franchising LLC since it was formed September 20, 2018. From June 2014 through June 2016, Ms. Shi worked for SML to conduct global business strategy consulting and project management for brands such as GAP, Levis and Target. She works in New York, NY.

**Franchise Sales Assistant – Karming Chan**

Karming Chan has been a Sales Assistant at KF Tea Franchising LLC since November 2020. He has also been a Franchise Account Officer at TKK Franchising LLC since it was formed September 20, 2018. Mr. Chan was a Barista at a Kung Fu Tea company-owned shop in Brooklyn, NY, from 2016 through 2019. He works in New York, NY.

## Item 3

## LITIGATION

No litigation is required to be disclosed in this item.

- 4 -

**Item 4**

**BANKRUPTCY**

No bankruptcy information is required to be disclosed in this item.

**Item 5**

**INITIAL FEES**

*Initial Franchise Fee*

The initial franchise fee for a Kung Fu Tea franchise is $37,000; except that you will pay a reduced initial fee of $25,000 if you already own a Kung Fu Tea franchise or you are purchasing a franchise for a non-traditional unit. A non-traditional unit is one located in an airport, hotel or resort, military installation, school or university campus, train station, subway station, casino, theme park, sports stadium, enclosed shopping mall or similar location that we may designate as a non-traditional unit. These initial fees are uniform to all single unit franchisees.

You pay the initial franchise fee in one lump sum when you sign the franchise agreement, less any deposit that you may have paid to us. The initial franchise fee is not refundable under any circumstances.

Before we enter into a franchise agreement with you, but after 14 days (and at least 10 business days) have passed from the date you receive this franchise disclosure document, and in order to conduct further evaluation of your qualifications to become one of our franchisees, we may ask you to enter into a franchise deposit agreement. We generally ask you to sign a franchise deposit agreement if you have not yet identified a site but you want to know that we will give you priority to become a franchisee in a geographic area that interests you. If you sign franchise deposit agreement with us, you will submit to us a $5,000 deposit which we will credit against your initial franchise fee when you sign the franchise agreement. The deposit is not refundable unless we reject your application for any reason before we commence our evaluation. Your deposit will be used to cover some of our costs in evaluating you if you do not sign a franchise agreement. The franchise deposit agreement does not confer upon you any franchise rights.

*Training Fee*

Before your initial training begins, you will pay us $12,500 to cover our costs of an initial three-week training program. If you are opening a dual-concept franchise in which your franchised Kung Fu Tea shop will also be a TKK Fried Chicken restaurant, you will pay a total initial training fee of $15,000 to cover both concepts, with this payment being paid in equal amounts of $7,500 to us and $7,500 to our affiliate, TKK Franchising LLC. We require this training only for your first franchise location. You pay this training fee in one lump sum before the training begins, which is approximately five weeks before the projected opening date of the franchised business. The training fee is not refundable.

*Equipment*

Before you open your franchised business, you must purchase certain equipment from our affiliate, Arms Global Inc. Most of this equipment is branded with the Kung Fu Tea trademarks.

The total cost of this equipment is $6,500 to $7,500. Payment to Arms Global Inc. is due in full when you place your order. This payment is not refundable.

Version 4/20/2023 rev 7/22/2023

*Initial Supplies*

You must also purchase from Arms Global Inc. an initial supply of tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise. The cost of these items is $15,000 to $25,000. This payment is not refundable.

*Development Fee*

If you sign a multi-unit agreement (covering at least three units), you will pay us a development fee for the right to open and operate multiple franchise units. The development fee will essentially be an advance payment of the initial fees of all the units you agree to open after your first unit, as reflected in the development schedule of your multi-unit agreement. The amount of the development fee will vary depending on the background and financial capabilities of the developer and the number of units stated in the development schedule. The development fee for three units is $50,000. A typical development fee for a larger number of units would be equal to $50,000 plus $12,500 for each unit you agree to develop after the third unit under the development schedule. You pay the development fee in one lump sum when you sign the multi-unit agreement. The development fee is not refundable regardless of the number of units you open.

You will also sign your first franchise agreement at the time you sign the multi-unit agreement and pay us the initial fees described above. You will pay us the $12,500 training fee only for the first shop. You will also pay $6,500 to $7,500 to Arms Global Inc. for equipment and $15,000 to $25,000 for supplies for each shop.before it opens for business. These fees are not refundable.

Based on the above numbers, as shown in the table below, if you sign a multi-unit agreement covering three units, the initial amounts you will pay to us and our affiliates are as follows:

| First unit type | Standard | Non-traditional |
|---|---|---|
| Initial fee | $25,000 to $37,000 | $25,000 |
| Initial training | $12,500 | $12,500 |
| Equipment | $6,500 to $7,500 | $6,500 to $7,500 |
| Initial inventory | $15,000 to $25,000 | $15,000 to $25,000 |
| First unit total | $59,000 to $82,000 | $59,000 to $70,000 |
| Development Fee | $50,000 | $50,000 |
| Total | $109,000 to $132,000 | $109,000 to $120,000 |

- 6 -

**Item 6**

**OTHER FEES**

*Franchise Agreement*

| Type of Fee | Amount | Date Due | Remarks |
|---|---|---|---|
| Royalty | 4% of Gross Sales | The 10th day of each calendar month with respect to Gross Sales in the prior month | "Gross Sales" includes all sales made in the franchised business (including off-premises sales), whether collected or not, but do not include sales tax. |
| Technology fee | $140 to $350 per month | The 10th day of each calendar month | Starts when you begin making Royalty payments. The current fee is $140 per month. This pays for your use of the LevelUp App, which enables customers to earn loyalty rewards. |
| Inventory of tea, coffee, packaging materials, cups and other items for resale | $2,500 to $35,000 per month, depending on sales volume | Upon delivery | We will provide a list of required purchases from us or our affiliate. The list will include all teas, coffees, packaging materials, cups and other items for resale. Exceptions include fresh fruits and certain specific items such as disposable napkins. |
| Marketing fee | 2% of Gross Sales | The 10th day of each calendar month with respect to Gross Sales in the prior month | |
| Promotions fee | 7.25% of each customer purchase using the LevelUp app | As incurred | We credit these fees toward one free drink for every twelve drinks the customer purchases using the LevelUp app, as well as merchandise in our rewards program and other promotions we do through the LevelUp app. |
| Relocation fee | $5,000 plus expenses | When billed, before relocation | Any relocation is subject to our prior approval. |
| Insurance | Our actual costs of the premium for the period of coverage plus a 25% service charge | When billed | Payable if you fail to carry required insurance and we decide to purchase it for you (although we are not obligated to do so). |

- 7 -

| Type of Fee | Amount | Date Due | Remarks |
|---|---|---|---|
| Field assistance | The then-current rate of our personnel, currently $180 per day plus expenses | When billed | We may charge a fee for on-site assistance that we provide at your request. |
| Conference fee | An amount sufficient to cover the costs of conferences | When billed | If we hold annual or other conferences for franchisees, we may charge this fee. You will cover the costs and expenses of your personnel who attend. |
| Additional training | Our then-current rate, currently $250 per day per person trained | When billed, before additional training | This is in addition to the "initial training" for two people. Additional training takes place at one of our company or affiliate locations in the New York City area. |
| Remedial work | Our actual costs and a 25% service charge on labor and materials | When billed | If you fail to correct an unhealthy or unsafe condition after we notify you, we may complete the required work on your behalf and bill you. |
| Audit | $2,000 to $5,000 | When billed | Payable if the audit is made necessary by your failure to furnish required information or if our audit shows an understatement of 2% or more for the period of the audit. |
| Transfer fee | $5,000 | At the time the transfer is consummated | This fee reimburses our reasonable costs when there is a change in ownership of your business. |
| Re-training upon transfer | $5,000 | At the time the transfer is consummated | We provide a five-day training course for the buyer of your business. |
| Management fee | Hourly fee of $20 to $50 | When billed | If on the death or disability of a controlling owner of your business the business is not being managed properly we may appoint a manager until you appoint a trained replacement manager. |
| Renewal fee | Up to the greater of $10,000 or 25% of the then-current initial fee. | | |

- 8 -

Version 4/20/2023 rev 7/22/2023

| Type of Fee | Amount | Date Due | Remarks |
|---|---|---|---|
| Unauthorized product or service fee | $300 per day of use of unauthorized products or services | If incurred | In addition to other remedies available to us. Cure must be immediate upon oral or written notification. |
| Costs and expenses to resolve customer complaints | Our reasonable costs and expenses | When billed | We may intervene to protect the brand or if we believe you have not adequately addressed or resolved any customer complaints. |
| Returned check/EFT fee | $50 for each NSF or EFT returned | As incurred | This amount is in addition to the late payment fee and interest, plus past due amounts. |
| Interest | The lesser of 1.5% per month or the highest rate allowed by law | On demand | May be charged on all past due amounts, including the monthly balance of principal and interest. If no due date is stated, interest begins to run 10 days after billing. |
| Attorneys' fees and costs | Our actual costs | As incurred | Payable if we incur costs in obtaining injunctive or other relief for the enforcement of any term of the franchise agreement because of your default under the franchise agreement. |
| Indemnification | Our actual costs | As incurred | You must reimburse us for claims against us involving your business operations, including reasonable attorneys' fees. |
| Liquidated Damages | Your average monthly royalties for the 24 months before termination multiplied by 36 or the shorter number of months remaining until the agreement expires | Within 30 days of termination | Payable if you terminate the franchise agreement before it expires or if we terminate it on the basis of your material breach. |

- 9 -

*Multi-Unit Agreement*

| Type of Fee | Amount | Date Due | Remarks |
|---|---|---|---|
| Transfer Fee | $10,000 | At the time the transfer is consummated | This fee reimburses our reasonable costs. |
| Attorneys' Fees and Costs | Our actual costs | As incurred | Payable if we seek injunctive or other relief for the enforcement of any term of the agreement because of your default under the agreement. |
| Indemnification | Our actual costs | As incurred | You have to reimburse us for claims involving your business operations. |

**General**

All fees described in this Item 6 are imposed by and payable to us and are non-refundable.

We may offer a negotiated royalty rate and marketing fee to multi-unit owners. We impose all other fees described in this Item 6 uniformly for all franchisees. We have no intention to reduce any of these fees for any prospective franchisee, although we reserve the right to do so in our sole discretion on a case–by-case basis.

Fees stated as dollar amounts may be increased from time to time to reflect increases in the Metropolitan Area Consumer Price Index for All Urban Consumers from the date of the franchise agreement, as published by the U.S. Department of Labor, or a successor index.

## Item 7

### ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

*Franchise Agreement Estimated Initial Investment*

**Standard Unit**

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Initial franchise fee *(Note 1)* | $25,000 | $37,000 | Lump sum | When you sign the franchise agreement | Us |

- 10 -

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Training fee (Note 2) | $12,500 | $12,500 | Lump sum | Before initial training begins | Us |
| Equipment from our affiliate (Note 3) | $6,500 | $7,500 | Lump sum | In advance, as incurred | Arms Global Inc. |
| Other equipment, furniture, fixtures and signage | $30,000 | $40,000 | As agreed | As incurred | Approved suppliers or other independent suppliers |
| Computers, printer, fax, and other hardware and business software (Note 4) | $2,500 | $5,000 | Lump sum | Before initial training | Approved suppliers or other independent suppliers |
| Prepaid rent and security deposit (Note 5) | $5,000 | $40,000 | As agreed | As incurred | Landlord |
| Leasehold improvements and architectural costs (Note 6) | $40,000 | $150,000 | As agreed | As incurred | Landlord and independent contractors |
| Interior design (3D rendering of shop) | $3,500 | $5,000 | As agreed | As incurred | Designer or architect |
| Initial inventory of tea, coffee, cups, menu boards, and packaging materials (Note 3) | $15,000 | $25,000 | Lump sum | In advance, as incurred | Arms Global Inc. and approved suppliers |
| Initial marketing program (Note 7) | $5,000 | $5,000 | As agreed | As incurred | Approved suppliers |
| Insurance – liability and workers compensation – initial deposit (Note 8) | $5,000 | $20,000 | As agreed | As incurred | Independent carrier |
| Travel, living expenses and salaries during initial training (Note 9) | $4,000 | $5,000 | As agreed | As incurred during training | Airlines, hotels, restaurants and others |

- 11 -

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Legal and accounting fees *(Note 10)* | $5,000 | $6,000 | As agreed | As incurred | Independent professionals |
| Additional funds – first month *(Note 11)* | $10,000 | $20,000 | As incurred | As incurred | Independent suppliers |
| Total *(Note 12)* | $169,000 | $378,000 | | | |

**Nontraditional Unit**

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Initial franchise fee *(Note 1)* | $25,000 | $25,000 | Lump sum | When you sign the franchise agreement | Us |
| Training fee *(Note 2)* | $12,500 | $12,500 | Lump sum | Before initial training begins | Us |
| Equipment from our affiliate *(Note 3)* | $6,500 | $7,500 | Lump sum | In advance, as incurred | Arms Global Inc. |
| Other equipment, furniture, fixtures and signage | $30,000 | $40,000 | As agreed | As incurred | Approved suppliers or other independent suppliers |
| Computers, printer, fax, other hardware and business software *(Note 4)* | $2,500 | $5,000 | Lump sum | Before initial training | Approved suppliers or other independent suppliers |
| Prepaid rent and security deposit *(Note 5)* | $5,000 | $40,000 | As agreed | As incurred | Landlord |
| Leasehold improvements and architectural costs *(Note 6)* | $50,000 | $75,000 | As agreed | As incurred | Landlord and independent contractors |

- 12 -

Version 4/20/2023 rev 7/22/2023

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Interior Design (3D rendering of shop) | $3,500 | $3,500 | As agreed | As incurred | Designer or architect |
| Initial inventory of tea, coffee, cups, menu boards, and packaging materials (note 3) | $15,000 | $25,000 | Lump sum | In advance, as incurred | Arms Global Inc. and approved suppliers |
| Initial marketing program *(Note 7)* | $5,000 | $5,000 | As agreed | As incurred | Approved suppliers |
| Insurance – liability and workers compensation – initial deposit *(Note 8)* | $5,000 | $5,000 | As agreed | As incurred | Independent carrier |
| Travel, living expenses and salaries during initial training *(Note 9)* | $4,000 | $5,000 | As agreed | As incurred during training | Airlines, hotels, restaurants and others |
| Legal and accounting fees *(Note 10)* | $5,000 | $6,000 | As agreed | As incurred | Independent professionals |
| Additional funds – first month *(Note 11)* | $15,000 | $15,000 | As incurred | As incurred | Independent suppliers |
| Total *(Note 12)* | $184,000 | $269,500 | | | |

*Note 1:*  The initial fee is not refundable. If you already own a franchised Kung Fu Tea shop or you a purchasing a franchise for a non-traditional unit, the initial fee will be $25,000.

*Note 2:*  We require initial training only when you open your first Kung Fu Tea shop. The initial training fee is $12,500 for a standard or a non-traditional location. If you are opening a dual-concept franchise in which your franchised Kung Fu Tea shop will also be a TKK Fried Chicken franchise, you will pay a total initial training fee of $15,000 to cover both concepts, with this payment being paid in equal amounts of $7,500 to us and $7,500 to our affiliate, TKK Franchising LLC. This fee is not refundable.

*Note 3:*  This payment is not refundable.

*Note 4:*  See Item 11 for information concerning the required computer, software and point of sale systems.

- 13 -

*Note 5:*  The actual amount you pay under the lease will vary depending on the size of the annual rent, your ability to negotiate with the landlord and the prevailing rental rates in the geographic area of the shop. The recommended size of a Kung Fu Tea shop is between 500 and 1,500 square feet.

*Note 6:*  The cost of leasehold improvements will vary as a function of (i) the size and configuration of the premises; (ii) pre-construction costs (*e.g.,* demolition of existing walls and removal of existing improvements and fixtures) based on the condition of the premises; (iii) the availability and prices of materials; (iv) prices of labor and price differences among contractors; and (v) geography and the location of the premises.

*Note 7:*  This represents the costs of activities for marketing and advertising before your franchise is open and during the grand opening phase. We will guide you through this process. All strategies and actions taken and materials used must be approved by us and must be consistent with the Kung Fu Tea style guide section of our operations manual.

*Note 8:*  See Item 8 for a description of the types of insurance you must maintain.

*Note 9:*  This covers travel, lodging and meals for selected staff for initial training in New York, as well as the salaries of employees you will have working before opening.

*Note 10:*  Your attorney should review the franchise documents and the lease, and may also assist you in forming an entity to be the franchisee.

*Note 11:*  These amounts are our estimate of the amount needed to cover your expenses for the start-up phase of your business. They include payroll; utilities and telephone service and other costs. The amounts are based on the experience of our affiliate in opening and operating its own Kung Fu Tea shops.

*Note 12:*  These figures are estimates. We cannot assure you that you will not have additional expenses in starting the franchised business. These amounts do not include any estimates for debt service.

**General**

We have prepared these estimates based on our experience and that of our management team. You should not plan to draw income from the operation during the start-up and development stage of your business, the actual duration of which will vary materially from one shop to another. You must have additional sums available, whether in cash or through a bank line of credit, or have other assets that you may liquidate or borrow against, to cover other expenses and any operating losses you may sustain, whether during your start-up and development stage or beyond. The amount of necessary reserves will vary greatly from franchisee to franchisee and will depend upon many factors, including the rate of growth and success of your business, if any.

Because the costs and the level of reserves will vary from location to location, we strongly recommend that you retain the services of an experienced accountant or financial advisor to review these figures and to develop a business plan and financial projections for your particular business before you decide whether to purchase the franchise. We also recommend that you (a) obtain independent estimates from third-party vendors, (b) research applicable regulations and their impact on your costs and operations and (c) carefully evaluate the adequacy of your total financial resources and reserves.

Version 4/20/2023 rev 7/22/2023

***No Financing***

We do not offer any financing to you, either directly or indirectly. We are unable to estimate whether you will be able to obtain financing for any or all of your investment and, if so, the terms of such financing. Neither we nor any affiliate receives payment for the placing of financing. We do not guarantee or co-sign your notes, leases or any other obligations.

***Multi-Unit Agreement Estimated Initial investment – First Unit is a Standard Unit***

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Development Fee *(Note 13)* | $50,000 for three units plus $12,500 for each unit to be developed after the third unit | $50,000 for three units plus $12,500 for each unit to be developed after the third unit | Lump sum | At signing of the Development Agreement | Us |
| Estimated initial investment for first shop (Note 14) | $169,000 | $378,000 | See Franchise Agreement table above | See Franchise Agreement table above | See Franchise Agreement table above |
| Total | $219,000 plus $12,500 for each unit to be developed after the third unit | $428,000 plus $12,500 for each unit to be developed after the third unit | | | |

- 15 -

*Multi-Unit Agreement Estimated Initial investment – First Unit is a Nontraditional Unit*

| Type of Expenditure | Amount | | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| | Low | High | | | |
| Development Fee (*Note 13*) | $50,000 for three units plus $12,500 for each unit to be developed after the third unit | $50,000 for three units plus $12,500 for each unit to be developed after the third unit | Lump sum | At signing of the Development Agreement | Us |
| Estimated initial investment for first shop (Note 14) | $184,000 | $269,500 | See Franchise Agreement table above | See Franchise Agreement table above | See Franchise Agreement table above |
| Total | $234,000 plus $12,500 for each unit to be developed after the third unit | $319,500 plus $12,500 for each unit to be developed after the third unit | | | |

*Note 13:*  If you sign a multi-unit agreement (covering at least three units), you will pay us, when you sign that agreement, a fee for the right to develop multiple franchise units (the "development fee"). The amount of the development fee will vary depending on the background and financial capabilities of the developer and the number of units stated in the development schedule. The development fee for three units is $50,000. A typical development fee for a larger number of units would be equal to $50,000 plus $12,500 for each additional agreed unit after the third unit. You pay the development fee in one lump sum when you sign the multi-unit agreement together with the initial fee for your first franchise. The development fee replaces the initial fee for each unit you agree to open after your first unit. The development fee is not refundable under any circumstances, regardless of the number of units you open.

You will sign your first franchise agreement at the time you sign the multi-unit agreement. You will pay us the $12,500 training fee only for the first unit.

*Note 14:*  Estimates of the other items that constitute your initial investment for the first Kung Fu Tea shop you open under the multi-unit agreement appear in the table above.

- 16 -

**Item 8**

**RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES**

*Required Purchases*

You must purchase most of your equipment and supplies from our affiliate, Arms Global Inc., as described in Item 5. This includes, among other things, the scanner that will enable you to accept purchases from customers who use the LevelUp app described in Item 11. We will also give you access to the LevelUp platform which enables customers to earn loyalty rewards, as described in Item 11. The technology fee described in Item 6 pays for this service. Except for the LevelUp service, we are not a supplier of any goods or services to franchisees.

Arms Global Inc. also supplies to you all of the tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise that you will use in the franchised business. You must buy a reasonable variety of these products to meet the demands of your customers. You may not purchase these items from any other supplier.

In 2022, Arms Global Inc. received $39,067,895 based on sales to our franchisees, which represented more than 99% of the total 2022 revenues of Arms Global Inc. of $39,414,218 based on the company's internal books and records.

You must purchase our specified model of Faema espresso machine only from our designated supplier, Omnipak Import or another supplier we specify. You must purchase your blender and juicer from suppliers we specify. All technology devices, apps and services that you purchase or lease and use must also comply with our requirements, which may include specific items from specific suppliers. We provide specifications for other equipment, including under-the-counter refrigerator, ice-maker and freezer, which you may purchase from any supplier.

You may buy perishables from local suppliers you select. However, we specify your suppliers of milk and fruit (to maintain our uniform quality and taste).

We do not require you to use delivery platforms and services (such as Grubhub, Uber Eats, DoorDash or Postmates). However, if you do, the services and suppliers you use must comply with our requirements.

We estimate that approximately 15% to 20% of your expenditures for leases and purchases in establishing your Kung Fu Tea shop and 25% to 35% of your expenditures in operating the shop on an ongoing basis will be for goods and services that are subject to sourcing restrictions, meaning goods and services that must be from a designated or approved supplier or otherwise meet our standards or specifications.

You may not install on or about your Kung Fu Tea shop any fixtures, furnishings, equipment, decor items, signs or other items without our written consent or that do not meet our standards and specifications.

We will provide you with our manuals, style guides and various supplemental bulletins and notices that will contain the specifications, standards and restrictions on your purchase of products and services, and a list of designated and approved suppliers.

None of our officers owns an interest in any supplier other than our affiliate Arms Global Inc.

Version 4/20/2023 rev 7/22/2023

*Rebates and Discounts*

We may derive revenue in the form of commissions or rebates that third party suppliers pay to us based on their sales of certain products to you. Rebates will not increase the price you pay for the products you purchase. We may use the rebates to subsidize some of our operating costs. We have not yet received any rebates from any supplier. We do not yet know the amount of any rebates we may receive in the future.

We may receive discounts on equipment and other items, which we are not obligated to pass on to you. We have negotiated a discount from Faema, for example, on the espresso machines. We pass this discount on to you. We may negotiate other purchase agreements with suppliers for the benefit of franchisees, but we are under no obligation to do so.

*Approval Process*

If you wish to use any item or supplier we have not previously designated or approved, you must submit to us a written request for such approval, or request the supplier to do so. We will give such approval only if, in our sole discretion, we determine that such item and supplier meet all of our standards and specifications. We have the right to require that our representatives be permitted to inspect the suppliers' facilities and that specifications, photographs and samples from the supplier be delivered, at our option, either to us or to an independent laboratory designated by us for testing. You will bear the cost of such testing but we do not charge a fee for our own testing or for supplier or product approval. We will endeavor to begin an investigation of the proposed supplier or product within 30 days of your request. We will notify you within 10 days after we complete our investigation whether we approve the proposed supplier or product.

We reserve the right to re-inspect the facilities and products of any approved supplier and to revoke our approval if the supplier fails to continue to meet any of our then-current criteria and specifications. Our supplier approval procedure does not obligate us to approve any particular supplier. We do not make our criteria for approving suppliers available to franchisees.

*Computer Equipment*

You must purchase computers with internet access and all of the software and hardware we require. See Item 11 for information concerning the required computer, software and point of sale systems.

*Lease*

You must submit to us for our approval a copy of the proposed lease for your franchised shop before it is signed. We will not approve the lease unless it permits your interest in the lease to be assigned to us or our assignee if the franchise agreement terminates or expires.

*Insurance*

You must obtain and maintain insurance policies protecting you, KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc. as additional insureds on a primary non-contributory basis to the general liability policy and the auto liability policy. The additional insureds should be listed on the certificate as follows: KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc. and their officers, directors, partners, shareholders, members, subsidiaries and affiliates, agents, employees, successors and assigns. It must be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 or an endorsement form with comparable wording acceptable to us.

The insurance must be underwritten by insurers licensed and admitted to write coverage in the state in which the franchised shop is located and with a rating of "A" or better. These policies must include

- 18 -

the coverage we require, which currently includes: (a) "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance on an actual loss sustained basis; (b) comprehensive general liability insurance, including products and completed operations in an amount of not less than the following combined single limits: $2,000,000 per occurrence, $2,000,000 personal and advertising injury, $2,000,000 completed operations/ products aggregate, $2,000,000 aggregate per location; (c) employment practices liability coverage with a limit of $100,000 per occurrence and in the aggregate; (d) automobile liability coverage, including coverage of owned, non-owned rented or hired vehicles with coverage in amounts not less than $1,000,000 combined single limit; and (e) workers' compensation insurance for statutory limits and employer's liability insurance in an amount not less than $1,000,000. You and your insurers must agree to waive rights of subrogation against us. At least 10 days before you are required to carry insurance, and after that at least 30 days before the expiration of any policy, you must deliver to us certificates of insurance evidencing the proper types and minimum amounts of required coverage, and evidence of the waiver.

If you fail to maintain the required insurance, we or our designee may obtain the insurance for you and charge you for the premium costs plus a 25% service charge for acquiring the insurance. Each year we may unilaterally modify the insurance minimum coverage requirements which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.

### Purchasing or Distribution Cooperatives

There are no purchasing or distribution cooperatives as of the date of this disclosure document. We may establish national or regional purchasing or distribution programs for the purchase or distribution of certain goods, materials or supplies at reduced prices. If a purchasing or distribution program is established for the region where your Kung Fu Tea shop business is located, you must participate in the program.

### Other

We do not provide material benefits to you or withhold material benefits from you (such as renewal rights or the right to open additional franchised Kung Fu Tea shops) based on whether or not you purchase through the sources we designate or approve. You receive the benefit of knowing that designated or approved sources and products meet our quality standards, and you may benefit from favorable prices based on volume purchases by our franchisees. On the other hand, any purchases you make of unapproved products or from unapproved suppliers in violation of the franchise agreement will entitle us to collect a fine (described in Item 6) and to terminate your franchise agreement.

If you request our assistance in purchasing any equipment or supplies, we may charge you our usual fee for such assistance.

See Item 16 for restrictions on what you may sell in the context of your franchised business.

- 19 -

**Item 9**

**FRANCHISEE'S OBLIGATIONS**

      This table lists your principal obligations under the franchise agreement. It will help you find more detailed information about your obligations in this agreement and in other items of this disclosure document.

| Obligation | Sections in the Franchise Agreement | Disclosure Document Item |
|---|---|---|
| a. Site selection and acquisition/lease | Sections 1.2.1 through 1.2.5 | Items 11 and 12 |
| b. Pre-opening purchases/leases | Sections 1.2.6 through 1.2.8, 1.3 and 1.7.1 | Items 7, 8 and 11 |
| c. Site development and other pre-opening requirements | Sections 1.2, 1.3 and 1.7 | Item 11 |
| d. Initial and ongoing training | Section 1.5 | Item 11 |
| e. Opening | Section 1.2.9 and 1.2.10 and 1.5.4 | Item 11 |
| f. Fees | Section 2.1 | Items 5 and 6 |
| g. Compliance with standards and policies/operating manual | Sections 1.3 through 1.8 | Items 8, 11 and 16 |
| h. Trademarks and proprietary information | Sections 3.1 and 3.2 | Items 13 and 14 |
| i. Restrictions on products/services offered | Sections 1.1.4, 1.3 and 1.6.1 | Item 16 |
| j. Warranty and customer service requirements | Section 1.6.2 | Item 11 |
| k. Territorial development and sales quotas | Not applicable | Item 12 |
| l. Ongoing product/service purchases | Section 1.3 | Item 8 |
| m. Maintenance, appearance and remodeling requirements | Sections 1.2.6, 1.6.6, 1.6.7 and 1.6.8 | Item 11 |

- 20 -

Version 4/20/2023 rev 7/22/2023

| Obligation | Sections in the Franchise Agreement | Disclosure Document Item |
|---|---|---|
| n. Insurance | Section 6.3 | Items 7 and 8 |
| o. Advertising | Section 1.7 | Items 7 and 11 |
| p. Indemnification | Sections 4.2.9 and 6.2 | Item 13 |
| q. Owner's participation / management / staffing | Sections 1.1.7 and 1.5 | Items 11 and 15 |
| r. Records and reports | Sections 2.1.10 and 2.2 | Item 11 |
| s. Inspections and audits | Sections 1.6.15 and 2.2 | Item 11 |
| t. Transfer | Sections 4.1 and 4.2 | Item 17 |
| u. Renewal | Section 5.1.2 | Item 17 |
| v. Post-termination obligations | Sections 3.2, 3.3.3, 5.3 and 5.4 | Item 17 |
| w. Non-competition covenants | Section 3.3 | Items 16 and 17 |
| x. Dispute resolution | Article VII | Item 17 |
| y. Other: Personal Guaranty | Section 1.1.7 | Item 15 |

**Item 10**

**FINANCING**

We do not offer direct or indirect financing. We do not guaranty your lease or any other obligation.

**Item 11**

**FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING**

**Except as listed below, we are not required to provide you with any assistance.**

*Before Opening*

Before you open your franchised business, we will provide the following assistance:

1.  We review site proposals you submit to us and approve, reject or provide comments to you regarding each proposal. We do not own locations and lease them to franchisees. But we may assign our own lease of a location to you or sublease the space to you. We review the proposed lease to be

- 21 -

sure that it allows us certain rights in the event of your default. (Franchise Agreement, Sections 1.2.1 and 1.2.2.)

2.      We provide you with our requirements for site development, including dimensions, design, image, interior layout, décor, equipment, fixtures, furnishings and signs. (Franchise Agreement, Section 1.2.7.) We may require you to use specific suppliers for the floor plan and three-dimensional rendering of your franchised Kung Fu Tea shop. We review, comment on and approve your final plans and specifications when they are satisfactory to us, and we consult with you on the construction and equipping of the franchised shop. (Franchise Agreement, Sections 1.2.6 and 1.3.)  You are responsible for construction and conforming the premises to local ordinances and building codes, and for obtaining required permits. We make a final inspection of the franchised shop after you complete its construction. We may require any corrections and modifications we deem necessary to bring the franchised shop into compliance with accepted plans, equipment, designs and specifications.

3.      We make available to you our confidential operations manual and supplementary materials, which we revise periodically. (Franchise Agreement, Section 1.4.)  The manual remains our property. As of the date of this disclosure document, the manual contains approximately 50 pages. We may modify the manual from time to time, but the modifications will not alter your status and rights under the franchise agreement. The table of contents of the manual is attached to this disclosure document as Exhibit E.

4.      We provide to you a list of our approved products, equipment and suppliers. (Franchise Agreement, Section 1.3.)

5.      We provide an initial three-week training program for your managing owner and a second person, as explained below in this Item 11. We charge a $10,000 fee for this training for two people. If you are required or wish to have additional personnel trained at a later time, we may charge our fees, currently $180 per day per person, plus reimbursement for our expenses. (Franchise Agreement, Section 1.5.3.)

6.      We provide approximately two weeks (80 hours) of on-site pre-opening and opening training, supervision and assistance at your franchised Kung Fu Tea shop. (Franchise Agreement, Sections 1.5.3 and 1.5.4.)

7.      We approve or provide you with advertising and promotional guidelines and materials for your public relations and advertising. (Franchise Agreement, Section 1.7.2.)

8.      We provide such other assistance and support as we may deem necessary or desirable to assist you with the launch of your Kung Fu Tea franchised business.

***During Operation***

During the operation of the franchised business, we will provide the following assistance:

1.      We amend and revise the manual periodically. (Franchise Agreement, Section 1.4.2.)

2.      We provide refresher courses from time to time. We do not charge for refresher courses that we require your personnel to attend, but you must pay the travel and living expenses and the salaries of your personnel. We also provide training for additional and replacement managers and other

- 22 -

employees who have not completed the initial training program, at your expense. (Franchise Agreement, Sections 1.5.5 and 1.5.7.)

3.  We conduct operational reviews and other quality control measures to ensure compliance with our standards and to recommend improvements. (Franchise Agreement, Sections 1.6.14 and 1.6.15.)

4.  We provide standards and lists of approved suppliers and distributors for your use in the acquisition of equipment, inventory, materials, supplies and furnishings for your franchised shop. (Franchise Agreement, Section 1.3.)

5.  We create, develop, and place advertising and promotional programs designed to promote and enhance all Kung Fu Tea shop businesses and, if we deem necessary, test marketing and market research activities, for the benefit of the Kung Fu Tea franchise system. We will administer the marketing fund, and cooperatives if they are formed, as described below. We will review all advertising materials you submit to us for your use in local advertising. (Franchise Agreement, Section 1.7.)

6.  We maintain a website to advertise and promote Kung Fu Tea shop businesses. Your location will be included in a list of Kung Fu Tea shop locations on the Kung Fu Tea shop website. (Franchise Agreement, Section 1.8.)

7.  Our representatives will be available at all reasonable times to you for consultation by telephone concerning all aspects of operating the franchised business, upon reasonable notice, including the institution of proper administrative, bookkeeping, accounting, inventory control, supervisory and general operating procedures for the effective operation of a franchised business. We may charge you a reasonable fee for providing on-site assistance at your request. (Franchise Agreement, Section 1.5.7.)

8.  We provide such other assistance and support as we may deem necessary or desirable to assist you in connection with the operation of the franchised business. Operations assistance may consist of advice and guidance in the form of a franchisee newsletter or internet postings on our franchisee website and other updates and written materials.

***Advertising***

*National and Regional Advertising*

We require you to pay us a marketing fee in an amount equal to 2% of the gross sales of the franchised business each month during the term of the franchise agreement as a contribution to the marketing fund. (Franchise Agreement, Section 2.1.5.)

We maintain and direct regional advertising and any national advertising we may do in the future, all of which will be financed by the marketing fund. We may establish an entity to operate the marketing fund, but we do not now have such an entity. We will account for any such fund separately from our other funds and we will not use it to defray any of our general operating expenses, except for reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the marketing fund and its programs. (Franchise Agreement, Sections 1.7.3 through 1.7.9.)

The marketing fund may be used to pay the costs of producing video, audio and written advertising materials, administering national and regional advertising and engaging advertising, promotion and advertising agencies to assist us, website development and maintenance, toll-free telephone costs, and

- 23 -

supporting public relations, market research and other advertising, promotion and marketing activities. Such advertising may use any form of media, including direct mail, print ads, radio and television. The source of the advertising may be our in-house advertising department or an outside advertising agency. If we or our affiliates provide in-house advertising department services, we or our affiliates may be reasonably compensated from the marketing fund. (Franchise Agreement, Section 1.7.5.)

Any amount of marketing fees that we do not spend in the year they accrue will be carried forward and included in the following year's marketing budget. Contributions to the marketing fund will not be used to sell additional franchises, although we may use materials resulting from such contributions on the system website (discussed below), which may advertise the Kung Fu Tea franchise opportunity. (Franchise Agreement, Section 1.7.6.)

Although we will endeavor to use the marketing fund to develop advertising programs and to place advertising that will benefit all franchisees, we cannot ensure that expenditures from the marketing fund in any geographic area are proportionate or equivalent to contributions to the fund by franchisees operating in the geographic area or that your franchised business will benefit directly or in proportion to your contribution to the fund. (Franchise Agreement, Section 1.7.8.)

Our company or affiliate owned Kung Fu Tea shop businesses will not be required to contribute to the marketing fund on the same basis as Kung Fu Tea franchisees.

Upon your request, we will provide to you an accounting of the marketing fees we collected in the prior year, showing the allocation of our advertising expenditures. Advertising receipts and expenditures are administered by us and are not audited. (Franchise Agreement, Section 1.7.6.)

Marketing funds were spent in 2022 as follows: 20% on market research, strategy and planning, 8% on updating the menu, designing and printing marketing related materials that we provide to franchisees, 42% for public relations and media placement, and 13% on promotional materials. The remaining 17% of the marketing funds were not spent in 2022 and have been carried over to 2023.

You must participate in all promotion campaigns, advertising, loyalty programs, and other programs we periodically establish or approve, whether on a national, regional or local basis. We have established a customer loyalty program using the LevelUp mobile app described below. We may charge you a technology fee of up to $350 per month to compensate us for our management of the customer loyalty program. The current fee is $140 per month, which you pay to us and we pay to LevelUp.

We have the power to form, change or dissolve advertising councils. (Franchise Agreement, Sections 1.6.13 and 1.7.3.)

*Advertising Cooperatives*

We do not require you as of the date of this disclosure document to participate in any local or regional advertising cooperatives. However, we have the right to establish and coordinate cooperative advertising and sales programs, customer satisfaction programs and similar programs from time to time among Kung Fu Tea franchisees. We may require you to participate in such programs on an equitable basis with other participants. (Franchise Agreement, Section 1.7.10.)

*Local Advertising*

We do not require you to engage in any local advertising or to spend any minimum amount of money on local advertising. (Franchise Agreement, Section 1.7.2.)

- 24 -

Version 4/20/2023 rev 7/22/2023

You may develop local advertising materials for your own use, at your own cost, following advertising criteria that we establish. We must approve the advertising materials in advance. All materials you use in local advertising, promotions and public relations must conform to our standards which are outlined in our operating manual. All such materials must be clear, factual and not misleading. You agree to submit to us, before you use them, samples of all materials you intend to use that we have not prepared or previously approved. We will endeavor to approve or disapprove the advertising materials within 15 days after we receive it from you, but we are not required to do so within this timeframe. If we have not notified you of disapproval within 15 days after your submission for approval, the materials will be considered approved. If we approve, we may withdraw our approval at any time for future use of such materials. (Franchise Agreement, Section 1.7.2.)

*Website*

We maintain a system website, and we may establish other websites, to advertise, market and promote the Kung Fu Tea shops and the Kung Fu Tea franchise opportunity. We maintain the system website. We may use the marketing fund assets to develop, maintain and update those parts of the system website that promote the Kung Fu Tea shops. (Franchise Agreement, Section 1.8.1.)

We may also maintain an extranet or portal for Kung Fu Tea franchisees where we post best practices, resource materials, training materials, financial benchmarking information and other information of value to franchisees. We may also use this portal to give you access to a customized software system for reporting and related operational functions, which we may revise and develop from time to time. (Franchise Agreement, Section 1.8.3.)

We must approve all Internet advertising you do. We will endeavor to approve or disapprove such advertising within 15 days after we receive it from you. (Franchise Agreement, Sections 1.7.2 and 1.7.11.)

*Site Selection*

You are responsible for selecting the site for your franchised business. You must independently evaluate and investigate the proposed site. (Franchise Agreement, Section 1.2.1 and 1.2.2.) We must approve the site before you enter into lease negotiations. We do not have a time limit for our approval or disapproval of the site. We may take as long as 60 days to approve the site. Our failure to agree with you on a site or to reach agreement in a timely manner can result in your inability to open the shop for business within nine months after the date of your franchise agreement, which can result in the termination of your agreement.

The site will be indicated in Schedule A of the franchise agreement. (Franchise Agreement, Section 1.1.1.)  In evaluating the site, we may inspect the site and we may consider a variety of factors, including lease obligations, demographic characteristics, traffic patterns, parking, character and attractiveness of the neighborhood, competing outlets and the proximity to other Kung Fu Tea shops.

You will be solely responsible for negotiating and complying with the terms of the lease. We must review the lease before you sign it to ensure that our minimum lease requirements have been met. (Franchise Agreement, Section 1.2.5.) We may condition our approval of the lease upon inclusion in the lease of the lease addendum in the form of Exhibit F4 to this disclosure document. We are not responsible for review of the lease for any terms other than those contained in the lease addendum. You should consult with an attorney who is experienced in reviewing retail leases.

We recommend that you sign the lease (or site purchase agreement) shortly after we sign the franchise agreement. You must a submit copy of the signed lease or site purchase agreement to us after both parties sign.

- 25 -

You may not relocate your franchised Kung Fu Tea shop without first obtaining our written consent. (Franchise Agreement, Section 1.2.11.) We will consider both the reasons for your requested relocation and the attributes of the proposed new site. Relocation will require a new build-out, renovation to the current standards and design, lease modification, franchise agreement changes and a fee to cover our costs and expenses.

***Time of Opening***

We estimate that the time from the signing of the franchise agreement or the first payment of any amount to us and the opening your franchised business will be approximately three to six months. This time may be shorter or longer depending on the time necessary to negotiate the lease and obtain financing and the permits and licenses for the construction and operation of the shop. This time may also depend on the time required to complete construction or remodeling as it may be affected by weather conditions, short-ages, delivery schedules, and other similar factors.

We may terminate the franchise agreement if you do not open the shop for business within nine months after the date of your franchise agreement. (Franchise Agreement, Sections 1.2.10 and 5.2.2.3.)

***Computer and Point of Sale Systems***

You must purchase your point of sale system from Arms Global Inc. Aside from the point of sale system, we do not specify the brand or model of computer or printers you must use, but any computer you use must be industry-standard and meet our specifications, and we may specify brands or models in the future. Your printer or printers must have the ability to print customer receipts at the point of sale and stickers for use on cups to identify the beverages being served. You may obtain the computer equipment from any vendors so long as the vendors meet our requirements. (Franchise Agreement, Section 1.3.7.)

Your systems must be Internet-connected via broadband at all times and interfaced with our system to enable us to electronically access your daily receipts figures from our headquarters at any time. In other words, we will have independent access to the information generated and stored in your cash register or computer systems. (Franchise Agreement, Section 1.3.8.)  There are no contractual limitations on our right to access this information.

We will manage the license with the point-of-sale provider we select for the system of Kung Fu Tea shops nationally. Our current point-of-sale provider is Revel (revelsystems.com). You will pay such provider its standard fee for such license, which is currently approximately $50 per month. This monthly fee includes all required updates and upgrades to the system.

You must also be equipped to accept electronic payments wirelessly from customers using their cell phones and the Kung Fu Tea LevelUp app, which allows customers to accumulate reward points each time they make a purchase. The LevelUp platform is an online service provided by SCVNGR, Inc. See www.thelevelup.com. We charge you a monthly technology fee of $140 which subsidizes your use of the LevelUp service. This monthly fee may increase to as much as $350 over the term of your franchise agree-ment. You will also pay processing fees of 2.5% per transaction to LevelUp and an additional 7.25% per transaction to us which is credited toward one free drink for every twelve drinks the customer purchases using the LevelUp app, as well as merchandise in our rewards program and other promotions we do through the LevelUp app,

We do not require that you engage any other third party vendor to maintain your computer system. But if you do, any updates or upgrades will be at your expense. The cost of maintaining, updating or up-grading your computer system or its components in addition to the point-of-sale maintenance might range

- 26 -

from nothing to as much as $2,000 in any year. It will depend on local costs of computer maintenance services in your area and technological developments that we cannot predict. We may also require upgrades in accordance with the terms of the franchise agreement. There is no limitation on the frequency or cost of such upgrades.

The cost of the required computer, point of sale system and printer is approximately $3,000.

*Training Program*

Before you sign the franchise agreement, we require you to designate the managing owner, who will supervise the operation of the business and be the primary person who will represent your company in your dealings with us. The managing owner must be an owner of an equity or voting interest in your business whom we approve. If you are a sole proprietor, you are the managing owner. (Franchise Agreement, Section 1.5.1.)

We also ask you to designate an operating manager who will devote his or her full time and attention to the management of the day-to-day operation of the business. (Franchise Agreement, Section 1.5.2. The managing owner and operating manager may be the same person.

Before you open your franchised shop for business, we require your managing owner and operating manager to attend and complete our initial three-week training program to our satisfaction. (Franchise Agreement, Section 1.5.3.)  We conduct this training at one of our company or affiliate locations in the New York City area.

We charge an initial training fee of $12,500 before you open your first Kung Fu Tea shop. You must also pay the compensation and travel, lodging and meal expenses of those who attend.

If your managing owner or the second person who attends initial training does not satisfactorily complete the initial training program or if we determine that such person cannot satisfactorily complete the training program, you will be required to designate a replacement to satisfactorily complete the training. If your Kung Fu Tea shop has been operating and your managing owner ceases active management or work at your business, then a replacement managing owner acceptable to us must be appointed and trained to our satisfaction within 30 days. (Franchise Agreement, Section 1.5.6.)

We will charge an additional fee of $180 per day per employee plus travel and living expenses for our personnel if we provide any training at your request that is not mandatory. We do not charge for training related to the introduction of new or updated products, classes, methods or procedures, or for refresher courses or other mandatory training unless we require training because your personnel are not meeting our standards. If any review indicates noncompliance with any system standards or if we receive negative customer feedback, we may require previously trained and experienced managers and employees to attend refresher training courses at such times and locations as we designate, and we may send our personnel to your franchised business for training. In these cases, we may also charge a fee, currently $180 per day per employee plus travel and living expenses for our personnel. (Franchise Agreement, Section 1.5.7.)  When we do not charge for training, you must nevertheless pay the travel and living expenses and salaries of your personnel who attend. Refresher courses will take place at one of our company or affiliate locations in the New York City area. The duration, frequency and content of refresher courses will be similar to the initial training program described below.

We conduct initial training approximately four weeks before the projected opening date of your franchise and it must be completed at least ten days before the opening date. Scheduled refresher training will be available before the opening date.

Version 4/20/2023 rev 7/22/2023

The instructors will be employees of our company or one of our affiliates with at least one year of experience in the subjects they teach and at least one year of experience working in our company or one of our affiliates.

Initial training programs will be offered at various times during the year depending on the number of new franchisees entering the system, the numbers of replacement personnel who need training, and the timing of the scheduled openings of Kung Fu Tea shops.

The instructional materials consist of our manual and other materials we prepare for this program, including videos, advertising materials and detailed protocols, checklists and reports.

The following table provides detailed information about the initial training program.

**TRAINING PROGRAM**

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Industry & products introduction | | 2 | New York City |
| Customer service | | 8 | New York City |
| Food preparation | | 54 | New York City |
| Equipment | | 3 | New York City |
| Daily operation management | | 8 | New York City |
| Inventory management | | 2 | New York City |
| Human resource management | | 1 | New York City |
| Financial management | | 2 | New York City |
| Total | | 80 | |

We may require that any or all of your managers attend refresher courses, seminars, and other training programs periodically.

**Item 12**

**TERRITORY**

*Franchise Agreement*

You will receive a territory for your franchise. The size of the territory for a standard Kung Fu Tea shop will range from a radius of 5 city blocks or one-half mile, whichever is less, in urban areas, to a radius of one mile in suburban areas. Your Territory will be delineated by counties, zip codes, boundary streets or highways, or it may be a half-mile or mile radius from your franchised shop.

The territory for a non-traditional unit will be the specific airport, hotel, resort, military installation, school or university campus, train station, subway station, casino, theme park, sports stadium enclosed shopping mall or similar location in which the shop is located; or a part of such location, such as a particular airport terminal.

Within this territory, we will not establish another Kung Fu Tea shop, whether franchised or company-owned. You maintain rights to your area even though the population increases.

- 28 -

If you purchase a franchise for a standard unit, we retain the right to establish Kung Fu Tea shops in non-traditional venues such as airports, hotels and resorts, military installations, school and university campuses, train stations and subway stations, casinos, theme parks, sports stadiums, shopping malls and similar locations that we designate as non-traditional venues, within or outside your territory. (Franchise Agreement, Section 1.1.6.2.) Because we have the right to establish Kung Fu Tea shops in non-traditional venues, your standard unit franchise will not have an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

If you sign the dual concept addendum and you become a TKK Fried Chicken franchisee at the same location as your franchised Kung Fu Tea shop, your territory will be the territory granted to you under your franchise agreement with TKK Franchising LLC. The size of the territory for standard TKK Fried Chicken unit will be equal to the lesser of: (1) a one-mile radius around the restaurant and (2) a smaller specified radius surrounding the restaurant encompassing a population (residential and workplace combined) of approximately 50,000 people. We may reduce the boundaries of the territory upon notice to you at any time if the population of the territory exceeds 50,000 people.

You may not relocate the business without first obtaining our written consent. (Franchise Agreement, Section 1.2.11.)

You may operate delivery service within your territory or arrange for such service with a third-party service provider such as Uber Eats, Grubhub, Postmates or another delivery service company prescribed or approved by us. You may also offer take-out and catering service to customers in your territory. Such sales will be included in gross sales for all purposes, including your reports, royalties and advertising fund calculations. You may not market or sell outside of your territory in any manner or do any Internet advertising without our prior written approval, which we may withhold in our discretion. You may promote the business through social media and similar means as long as such promotion is consistent with guidelines we issue from time to time.

We retain the right, without payment to you, to sell products under the KUNG FU TEA trademark to grocery shops, supermarkets and other channels of distribution at any time, and to customers anywhere through our website.

In the event that we merge with, acquire or are acquired by another company that competes with us, we and our affiliates reserve the right to offer and sell and authorize others to offer and sell competing products and services under any other names and marks while your franchise agreement is in effect.

You do not receive the right to acquire additional franchises or to establish or operate another Kung Fu Tea shop business unless you enter into a separate franchise agreement with us.

There is no minimum sales quota.

***Multi-Unit Franchise***

Under the multi-unit offering, we assign a defined geographic area within which you must develop and operate a specified number of Kung Fu Tea shops within a specified period of time. The development area may be one city, one or more counties, one or more states, or some other defined area. It will be described in Schedule A of your multi-unit agreement. For each Kung Fu Tea shop you open under the multi-unit agreement, promptly after our approval of the site for the Kung Fu Tea shop, you will sign a separate Franchise Agreement in the then-current form. We call multi-unit franchisees "developers".

- 29 -

Each developer receives a territory for the opening of Kung Fu Tea shops, although we retain certain rights in the territory, as explained below. The territory will typically be large enough to accommodate at least three Kung Fu Tea shops, based on our market studies.

Under the multi-unit agreement, we will not open or operate a Kung Fu Tea shop in your territory and we will not grant to any other person or entity the right to open or operate a Kung Fu Tea shop in your territory.

We retain certain rights in your territory. We may sell any products, including tea, coffee and any other products, under the Marks and any other trademarks to grocery stores, supermarkets and other channels of distribution at any time, and directly to customers anywhere through our website. We also retain the right to acquire and operate any business under a different trademark at any location and to continue to operate that business under trademarks other than our trademarks. In the event that we merge with, acquire or are acquired by another company that competes with us, we reserve the right to offer and sell and authorize others to offer and sell competing products and services under any other names and marks while your multi-unit agreement is in effect.

We also retain the right to establish Kung Fu Tea shops in non-traditional venues such as airports, hotels and resorts, military installations, school and university campuses, train stations and subway stations, casinos, theme parks, sports stadiums, shopping malls and similar locations that we designate as non-traditional venues, within or outside your territory. (Multi-Unit Agreement, Section 1.8.2.)

Because we have the right to establish Kung Fu Tea shops in non-traditional venues, your multi-unit franchise will not have an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

In order for you to maintain your rights in the territory under the multi-unit agreement, you must meet minimum requirements contained in Schedule B of the agreement (the development schedule). The development schedule requires that a specified minimum number of Kung Fu Tea shops be opened in each of the initial 8-month periods during the term of the agreement. The development requirements are determined based on our market studies of the territory and our discussions with you. The smallest development schedule will typically call for the development of at least three Kung Fu Tea shops over a period of two years. Your failure to adhere to the development schedule gives us the right to terminate the multi-unit agreement upon notice to you with immediate effect. (Multi-Unit Agreement, Section 5.2.1.2.) Your failure to adhere to the development schedule also gives us the right, instead of terminating the agreement, to reduce the size of your territory or reduce the number of Kung Fu Tea shops to be opened. (Multi-Unit Agreement, Section 5.3.2.1.)

Your multi-unit agreement will expire at the end of its ten-year term. (Multi-Unit Agreement, Section 5.1.)  Your territorial rights end when the multi-unit agreement expires.

You maintain rights to your territory during the term of your multi-unit agreement even if the population increases.

You do not receive the right to acquire additional territories, or to develop franchises outside of your territory, unless you enter into another multi-unit agreement or franchise agreement with us.

Version 4/20/2023 rev 7/22/2023

**Item 13**

**TRADEMARKS**

We grant you the right to operate a franchise under the name KUNG FU TEA and the logo shown on the cover of this disclosure document. You may also use our other current or future Marks in the operation of your franchise. By Marks we mean trade names, trademarks, service marks and logos used to identify your Kung Fu Tea franchised business.

Our affiliate, KF Tea USA Inc., owns the following trademarks, which are registered on the Principal Register of the United States Patent and Trademark Office ("USPTO"):

| Mark | Registration No. | Registration Date |
|---|---|---|
| KUNG FU TEA | 4,497,687 | March 18, 2014 |
| KUNG FU TEA | 4,857,505 | November 24, 2015 |
|  | 5,438,824 | April 3, 2018 |
|  | 5,438,825 | April 3, 2018 |
|  | 5,443,929 | April 10, 2018 |

- 31 -

Version 4/20/2023 rev 7/22/2023

| Mark | Registration No. | Registration Date |
|---|---|---|
|  | 5,443,930 | April 10, 2018 |
|  | 5,443,931 | April 10, 2018 |
| KUNG FU TEA | 5,588,198 | October 15, 2018 |
|  | 5,639,864 | December 25, 2018 |

KF Tea USA Inc. has filed all required affidavits and renewals.

KF Tea USA Inc. has an application pending for registration of the following trademark on the principal register of the USPTO:

Version 4/20/2023 rev 7/22/2023

| Mark | Serial No. | Filing Date |
|------|-----------|-------------|
|  KF TEA & Design | 90232281 | October 2, 2020 |
| BOBASPACE | 97318327 | March 17, 2022 |

KF Tea USA Inc. does not have a federal registration of this trademark. Therefore, our trademark does not have many legal benefits and rights as a federally-registered trademark. If our right to use the trademark is challenged, you may have to change to an alternative trademark, which may increase your expenses.

We have an exclusive license from KF Tea USA Inc. to use these trademarks to grant franchises anywhere in the U.S. for the operation of Kung Fu Tea shops. This license remains in effect for as long as we remain a part of the group of companies owned or controlled by or under common ownership and control with KF Tea USA Inc. or until the license agreement is terminated (i) by mutual consent or (ii) based on our breach of the agreement or (iii) our decision to terminate without cause.

There are no agreements currently in effect that significantly limit our right to use or license the Marks in any manner material to the franchise. We know of no infringing uses that could materially affect your use of the Marks.

There are no determinations of the U.S. Patent and Trademark Office, the Trademark Trial and Appeal Board, or any state trademark administrator or court, or any pending interference, opposition or cancellation proceedings or pending material litigation involving any of the Marks that is relevant to their ownership or use in the states in which the franchised business is to be located.

You must immediately notify us of any apparent infringement of the Marks or challenge to your use of any of the Marks or claim by any person of any rights in any of the Marks. You are not permitted to communicate with any person other than us or our designated affiliate, their counsel and your counsel involving any infringement, challenge or claim. We can take action and have the right to exclusively control any litigation or Patent and Trademark Office or other administrative or agency proceeding caused by any infringement, challenge or claim or otherwise relating to any of the Marks. You must execute any and all documents, and do what may, in our counsel's opinion, be necessary or advisable to protect our interests in any litigation or Patent and Trademark Office or other administrative or agency proceeding or to otherwise protect and maintain our interests and the interests of any other person or entity having an interest in the Marks. (Franchise Agreement, Section 3.1.5.)

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any of the Marks, provided that you give us timely notice of such claim or proceeding, you give us sole control over the defense and settlement, and you have otherwise complied with the terms of the franchise agreement. (Franchise Agreement, Section 6.2.2.)

- 33 -

Except as stated above, we are not obligated by the franchise agreement to protect any rights granted to you to use the Marks or to protect you against claims of infringement or unfair competition with respect to them. Although we are not contractually obligated to protect the Marks or your right to use them, as a matter of corporate policy, we intend to defend the Marks vigorously.

You may not use the Marks as a part of your corporate or other legal name, and you must comply with our instructions in filing and maintaining trade name or fictitious name registrations. You must execute any documents we require to protect the Marks or to maintain their continued validity and enforceability. In addition, you may not directly or indirectly contest the validity of our rights in and to the Marks. (Franchise Agreement, Sections 3.1.2 and 3.1.3.)

You may not own a domain name that includes "Kung Fu". You must use only such email addresses as we authorize, and you must comply with policies we establish from time to time for your use of email and any web portal we create. (Franchise Agreement, Sections 1.3.8, 1.7.11 and 1.8.3.)

We may require you, at your expense, to discontinue or modify your use of any of the Marks or to use one or more additional or substitute Marks if we determine that an addition or substitution will benefit the Kung Fu Tea franchise system. (Franchise Agreement, Section 3.1.4.)

## Item 14

## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

### *Patents and Copyrights*

We do not own any patents that are material to your franchised business or the Kung Fu Tea franchise system. However, our affiliate, KF Tea USA Inc., applied to the USPTO November 6, 2020, for a U.S. Design Patent entitled "Ornamental Design of Beverage Container" under Serial No. 29/757,602.

KF Tea USA Inc. also owns the "Dragon Logo" copyright, registered January 11, 2021, at the United States Copyright Office under Registration No. VA-2-230-846. Copyright protection ends the earlier of 94 years from first publication or 120 years from creation.

We or our affiliates also claim all rights and interests, including all copyrights, to the information contained in the manuals, computer programs, advertising materials, the Kung Fu Tea website and all our communications to you in writing or otherwise setting forth our standards, requirements, operating procedures or policies relating to the operation of a Kung Fu Tea franchise, as well as any revisions and additions to these materials. (Franchise Agreement, Section 3.1.1.)  We have not registered the copyrights in any of these materials.

There is no material determination of the USPTO, the United States Copyright Office or a court regarding the patent or copyright.

There are no agreements in effect that limit our right to use or license the patent or copyright in any manner material to the franchise. We know of no infringing uses that could materially affect your use of the design that is the subject of the design patent application or the work that is the subject of the copyright registration, or other copyrighted works.

- 34 -

**A55**

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any copyrights or design patents owned by us or our affiliate, provided that you give us timely notice of such claim or proceeding, you give us sole control over the defense and settlement, and you have otherwise complied with the terms of the franchise agreement. (Franchise Agreement, Section 6.2.2.)

***Proprietary Information***

Your knowledge of the operation of the franchised business, including the courses and other specifications, standards and operating procedures, is derived from information that we disclose to you. This information, including the information contained in the manuals and the information presented during training, is confidential material owned by us. Our confidential information includes our product recipes; our methods of operation; our sales and marketing techniques; our planned marketing and advertising programs; the content of our training and assistance; the contents of the Manual; the operating results and financial performance of other Kung Fu Tea franchisees; all customer lists and other information we receive from you; and user names and passwords allowing access to protected areas on our website or computer network. (Franchise Agreement, Section 3.2.1.)

We also claim ownership of all demographic data and customer lists generated by your activity as a franchisee. (Franchise Agreement, Section 3.2.1.)

You must maintain the absolute confidentiality of this proprietary information during and after the term of the franchise agreement and you cannot disclose, sell or use any such information in any other business or in any manner not specifically authorized or approved in writing by us. (Franchise Agreement, Section 3.2.2.)  You may use such information only in furtherance of the franchised business.

Each manager of your franchised business and each person who receives training from us or otherwise has access to our confidential information, and each owner of your business if you are a legal entity, must sign a written agreement that contains similar nondisclosure obligations. See Item 15.

You must notify us promptly in writing if you learn about any unauthorized use of our copyrights, design patents or proprietary information. We are not obligated to take any action but we will respond to this information as we think appropriate. (Franchise Agreement, Section 3.1.5.)

All improvements in the Kung Fu Tea shop system that you develop will become our property. We will have the sole right to protect such improvements in our name or in the name of any of our affiliates by means of copyright, patent, trade secret or trademark law. (Franchise Agreement, Section 1.4.3.)  You must promptly disclose all such improvements to us.

## Item 15

## OBLIGATION TO PARTICIPATE
## IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

Your franchise agreement will specify who will be the "managing owner" of your franchised business and who will be your "operating manager". Your operating manager must devote his or her full working time, attention and effort to the franchised business and provide direct, day-to-day supervision of the operation. The operating manager may not take on other business responsibilities that would be inconsistent with the operational requirements of the franchised business or contrary to its best interest. (Franchise Agreement, Section 1.5.2.) Your managing owner must be an owner of an equity or voting interest in your business whom we approve. Your managing owner is responsible for overseeing and supervising the operation of the franchised business, but we do not require your managing owner to devote his or her full

Version 4/20/2023 rev 7/22/2023

working time to the franchised business unless the managing owner is also the operating manager. (Franchise Agreement, Section 1.5.1.) The managing owner and operating manager may be the same person.

Before your Kung Fu Tea shop opens for business, we require that your managing owner and operating manager attend and complete our initial training program to our satisfaction. (Franchise Agreement, Section 1.5.3. See Item 11.)

If at any time your Kung Fu Tea shop is not being managed by an operating manager who has attended and completed our initial training program to our satisfaction, we are authorized, but not required, to appoint a manager to maintain operations on your behalf. (Franchise Agreement, Sections 1.5.6 and 2.1.7.8.)

Our appointment of a manager does not relieve you of your obligations under the franchise agreement. We will not be liable for any debts, losses, costs or expenses incurred during any period in which we manage the franchised business. We have the right to charge a reasonable service fee for such management services, and we may cease providing such services at any time. (Franchise Agreement, Section 4.2.8.)

Each owner of your company must sign a guaranty and assumption of obligations in a form acceptable to us. (Franchise Agreement, Section 1.1.7 and Exhibit F3 of this disclosure document.) We may also require the spouse of any signatory to sign, in our discretion. Any breach of this guaranty by any such owner or spouse will be deemed a breach of this Agreement.

Each manager of your franchised business and each person who receives training from us or otherwise has access to our confidential information who has not signed the guaranty described in the preceding paragraph must sign a written confidentiality and noncompetition agreement with your company in a form acceptable to us. Any breach of such undertaking by any such person will be deemed a breach of the franchise agreement. (Franchise Agreement, Sections 1.5.9 and 3.2.2.)

We do not impose any other restrictions on your managers.

## Item 16

## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale in your franchised business all of the products we specify, and you may not sell any products or services that we do not specify or approve. You must offer all coffee, tea and other drinks that we specify. (Franchise Agreement, Section 1.1.4.)  You must prepare and serve these products in accordance with our requirements. You must not deviate from our standards and specifications without first obtaining our written consent. Upon notice from us given at any time, you must discontinue offering for sale any items, products or services we may disapprove or discontinue.

We can, and expect to, modify our required products, standards and specifications as we deem necessary or desirable.  We have the right to add, remove or change the mix of coffee, tea and other products that you are required to offer. (Franchise Agreement, Sections 1.1.4 and 1.4.2.)  There are no limits on our right to do so except that we must act reasonably and our requirements must stay within the scope of a tea shop business.

There are no restrictions regarding customers you may service.

Version 4/20/2023 rev 7/22/2023

**Item 17**

**RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

**THE FRANCHISE RELATIONSHIP**

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| *Provision* | *Sections in the Franchise Agreement ("FA") and the Multi-Unit Agreement ("MUA")* | *Summary* |
|---|---|---|
| a. Length of the franchise term | FA: Section 5.1.1<br>MUA: Section 5.1 | FA: Ten years, or the end date of your lease if it is for a shorter period of time.<br>MUA: Ten years. |
| b. Renewal or extension of the term | FA: Section 5.1.2<br>MUA: Section 5.1 | FA: Upon expiration of the initial term, you may renew for a term equal to the term of your renewal lease, but not more than ten years. At the expiration of the second ten-year term, you may renew provided we are still offering franchises.<br>MUA: None |
| c. Requirements for you to renew or extend | FA: Sections 2.1.7.9 and 5.1.2<br>MUA: Not applicable | FA: Notify us of your desire to renew 12-18 months before the end of the term; repair and update equipment and premises; and sign a new franchise agreement which may contain materially different terms and conditions than your original contract. We may require you to sign a release. You must also pay a renewal fee, which will not exceed the greater of $10,000 or 25% of the then-current initial franchise fee. |
| d. Termination by you | FA: Sections 5.2.1 and 5.3.5.<br>MUA: Not applicable | FA: You may terminate upon 90 days' prior notice to us provided that you pay us all amounts you owe to us including liquidated damages. See Provision "i" below. You may also terminate if we materially breach the franchise agreement and fail to cure after notice from you. |
| e. Termination by us without cause | FA: Not applicable<br>MUA: Not applicable | |

- 37 -

| Provision | Sections in the Franchise Agreement ("FA") and the Multi-Unit Agreement ("MUA") | Summary |
|---|---|---|
| f. Termination by us with cause | FA: Sections 5.2.2 and 5.2.3<br><br>MUA: Section 5.2 | FA: We can terminate if you default, including if any other agreement between us and you or any of your affiliates is terminated due to a breach by you or your affiliate.<br><br>MUA: We can terminate if you default, including any default by you or any of your affiliates under a franchise agreement for a Kung Fu Tea shop, or if any such agreement is terminated for any reason. |
| g. "Cause" defined — defaults that can be cured | FA : Section 5.2.3<br><br>MUA : Section 5.2.2 | FA: You have 30 days to cure breaches other than non-curable breaches described in Provision "h" below. See also Provision "f" above.<br><br>MUA: Same as franchise agreement. |
| h. "Cause" defined — non-curable defaults | FA: Section 5.2.2<br><br>MUA: Section 5.2.1 | FA: Misrepresentation to us; failure to successfully complete training; failure to open the business within the required time; unauthorized disclosure of confidential information; unauthorized use of Marks; attempted transfer without our approval; failure to pay taxes; failure to maintain insurance; criminal conviction; bankruptcy or insolvency; abandonment of the business; default under another Kung Fu Tea franchise agreement; damage to our goodwill. Termination upon your bankruptcy may not be enforceable under federal bankruptcy law. See also Provision "f" above.<br><br>MUA: False representations to us; failure to meet the Development Schedule; disclosure of confidential information; attempted transfer without our approval; criminal conviction. See also Provision "f" above. |
| i. Your obligations on termination /non-renewal | FA: Section 5.3<br><br>MUA: Section 5.3 | FA: Obligations include complete deidentification, return of manuals and payment of amounts due. (See also Provision "r" below.) If you terminate without cause before the agreement expires, or if we terminate on the the basis of your material breach, you will pay us liquated damages equal to the average monthly Royalty you owed us during the 24 months before termination multiplied by the lesser |

Version 4/20/2023 rev 7/22/2023

| Provision | Sections in the Franchise Agreement ("FA") and the Multi-Unit Agreement ("MUA") | Summary |
|---|---|---|
| | | of 36 or the number of months in the remainder of the term. |
| | | MUA: See Provision "r" below. |
| j. Assignment of contract by us | FA: Section 4.1<br>MUA: Section 4.1 | FA: No restriction on our right to assign.<br>MUA: No restriction on our right to assign. |
| k. "Transfer" by you — defined | FA: Section 4.2.2<br>MUA: Section 4.2.2 | FA: Includes transfer of contract or assets or ownership change.<br>MUA: Transfer of rights under the multi-unit agreement or ownership change or transfer of franchises. |
| l. Our approval of a transfer by you | FA: Section 4.2<br>MUA: 4.2.1 | FA: We may withhold our approval to a transfer unless the conditions in Provision "m" below have been met.<br>MUA: Same as franchise agreement. |
| m. Conditions for our approval of the transfer | FA: Sections 2.1.7.7 and 4.2<br>MUA: Section 4.2.4 | FA: The transferee meets our criteria for Kung Fu Tea franchisees; you are in compliance; $5,000 transfer fee is paid; transferee signs new form of franchise agreement; you acknowledge continuing confidentiality and noncompete requirements; new manager is trained; we approve the terms of the transfer; you notify us of the closing.<br>MUA: The transferee meets our criteria; you are in compliance; $10,000 transfer fee is paid; you acknowledge continuing confidentiality and non-compete requirements; we approve the terms of the transfer; you notify us of the closing. |
| n. Our right of first refusal to acquire your business | FA: Section 4.3<br>MUA: Section 4.3 | FA: We can match any offer for your business.<br>MUA: We can match any offer for your business. |
| o. Our option to purchase your business | FA: Section 5.4<br>MUA: Not applicable | FA: On termination or nonrenewal, we may purchase the assets of your business at their fair market value. |

Version 4/20/2023 rev 7/22/2023

| Provision | Sections in the Franchise Agreement ("FA") and the Multi-Unit Agreement ("MUA") | Summary |
|---|---|---|
| p. Your death or disability | FA: Section 4.2.6 MUA: Section 4.2.6 | FA: The estate or personal representative must assign the franchise to an approved buyer within 12 months in the event of death, and 6 months in the event of disability. MUA: Same as franchise agreement. |
| q. Non-competition covenants during the term of the franchise | FA: Section 3.3.2 MUA: Section 3.2.2 | FA: No involvement in competing business anywhere in the U.S. or in any other country in which a Kung Fu Tea shop operates. MUA: Same as franchise agreement. |
| r. Non-competition covenants after the franchise is terminated or expires | FA : Section 3.3.3 MUA : Section 3.2.3 | FA: No competing business for two years (including after assignment) within 5 miles of any Kung Fu Tea shop business at the time the franchise is terminated or expires. MUA: Same as franchise agreement. |
| s. Modification of the franchise agreement | FA: Sections 1.4 and 7.14 MUA:  Section 7.10 | FA: No modifications generally unless signed by the parties, but the manual is subject to change. MUA: No modifications unless signed by the parties. |
| t. Integration/merger clause | FA: Section 7.14 MUA: Section 7.10 | FA: Only the terms of the signed agreements are binding (subject to applicable law). Any representations or promises outside the disclosure document and franchise agreement may not be enforceable. Nothing in this or any related agreement is intended to disclaim the express representations made in this disclosure document, its exhibits and amendments. MUA: Same as franchise agreement. |
| u. Dispute resolution by arbitration or mediation | FA: Not applicable MUA: Not applicable | FA: Neither we nor you are required to endeavor to resolve a dispute by arbitration or mediation. MUA: Same as franchise agreement. |

Version 4/20/2023 rev 7/22/2023

| Provision | Sections in the Franchise Agreement ("FA") and the Multi-Unit Agreement ("MUA") | Summary |
|---|---|---|
| v. Choice of forum | FA: Section 7.12<br><br>MUA: Section 7.8 | FA: Litigation must be in New York City except as otherwise noted in Exhibit G (subject to applicable state law).<br><br>MUA: Same as franchise agreement. |
| w. Choice of law | FA: Section 7.11<br><br>MUA: Section 7.7 | FA: New York law applies except as otherwise noted in Exhibit G (subject to applicable state law).<br><br>MUA: Same as franchise agreement. |

See the state addenda for special state disclosures. (Exhibit G.)

## Item 18

## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## Item 19

## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Darren Chen or Michael Wen at KF Tea Franchising LLC, 589 8th Ave., 17th Floor, New York, NY 10018, telephone 1-855-KFT(538)-9888, the Federal Trade Commission, and the appropriate state regulatory agencies.

Version 4/20/2023 rev 7/22/2023

**Item 20**

**OUTLETS AND FRANCHISEE INFORMATION**

**Table No. 1**
**Systemwide Outlet Summary**
**For Years 2020 to 2022**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2020 | 213 | 242 | +29 |
| | 2021 | 242 | 285 | +43 |
| | 2022 | 285 | 339 | +54 |
| Company-Owned | 2020 | 2 | 3 | +1 |
| | 2021 | 3 | 2 | -1 |
| | 2022 | 2 | 2 | 0 |
| Total Outlets | 2020 | 215 | 245 | +30 |
| | 2021 | 245 | 287 | +42 |
| | 2022 | 287 | 341 | +54 |

**Table No. 2**
**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)**
**For Years 2020 to 2022**

| State | Year | Number of Transfers |
|---|---|---|
| CA | 2020 | 0 |
| | 2021 | 2 |
| | 2022 | 2 |
| CO | 2020 | 1 |
| | 2021 | 0 |
| | 2022 | 0 |
| FL | 2020 | 0 |
| | 2021 | 2 |
| | 2022 | 0 |
| GA | 2020 | 0 |
| | 2021 | 0 |
| | 2022 | 1 |
| MD | 2020 | 0 |
| | 2021 | 4 |
| | 2022 | 0 |
| MI | 2020 | 0 |
| | 2021 | 0 |
| | 2022 | 1 |
| NY | 2020 | 2 |
| | 2021 | 1 |
| | 2022 | 1 |

Version 4/20/2023 rev 7/22/2023

**A63**

| State | Year | Number of Transfers |
|-------|------|---------------------|
| NC | 2020 | 1 |
| | 2021 | 0 |
| | 2022 | 0 |
| TX | 2020 | 1 |
| | 2021 | 3 |
| | 2022 | 4 |
| VA | 2020 | 1 |
| | 2021 | 1 |
| | 2022 | 2 |
| WA | 2020 | 1 |
| | 2021 | 0 |
| | 2022 | 0 |
| Total | 2020 | 7 |
| | 2021 | 13 |
| | 2022 | 11 |

**Table No. 3**
**Status of Franchised Outlets**
**For Years 2020 to 2022**

| State | Year | Outlets at Start of Year | Outlets Opened | Termi-nations | Nonre-newals | Reac-quired by Franchi-sor | Ceased Opera-tions – Other Rea-sons | Outlets at End of the Year |
|-------|------|-----|-----|-----|-----|-----|-----|-----|
| AL | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2021 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| AZ | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2021 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2022 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| CA | 2020 | 11 | 5 | 0 | 0 | 0 | 0 | 16 |
| | 2021 | 16 | 3 | 0 | 0 | 0 | 0 | 19 |
| | 2022 | 19 | 7 | 0 | 0 | 0 | 0 | 26 |
| CO | 2020 | 4 | 2 | 0 | 0 | 0 | 0 | 6 |
| | 2021 | 6 | 2 | 0 | 0 | 0 | 0 | 8 |
| | 2022 | 8 | 3 | 0 | 0 | 0 | 0 | 11 |
| CT | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DE | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2022 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| DC | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 0 | 1 | 0 | 0 | 0 | 1 |

- 43 -

| State | Year | Outlets at Start of Year | Outlets Opened | Termi-nations | Nonre-newals | Reac-quired by Franchi-sor | Ceased Opera-tions – Other Rea-sons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| FL | 2020 | 9 | 1 | 0 | 0 | 0 | 0 | 10 |
| | 2021 | 10 | 2 | 0 | 0 | 0 | 0 | 12 |
| | 2022 | 12 | 4 | 0 | 0 | 0 | 0 | 16 |
| GA | 2020 | 6 | 3 | 0 | 0 | 0 | 0 | 9 |
| | 2021 | 9 | 2 | 0 | 0 | 0 | 0 | 11 |
| | 2022 | 11 | 2 | 0 | 0 | 0 | 0 | 13 |
| IL | 2020 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2021 | 4 | 2 | 0 | 0 | 0 | 0 | 6 |
| | 2022 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| IN | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| | 2022 | 3 | 3 | 0 | 0 | 0 | 0 | 6 |
| KS | 2020 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2022 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| KY | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2021 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| LA | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2022 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| MD | 2020 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| | 2021 | 13 | 3 | 0 | 0 | 0 | 0 | 16 |
| | 2022 | 16 | 3 | 0 | 0 | 0 | 0 | 19 |
| MA | 2020 | 11 | 1 | 0 | 0 | 0 | 0 | 12 |
| | 2021 | 11 | 2 | 0 | 0 | 0 | 0 | 13 |
| | 2022 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| MI | 2020 | 3 | 3 | 0 | 0 | 0 | 0 | 6 |
| | 2021 | 6 | 2 | 0 | 0 | 0 | 0 | 8 |
| | 2022 | 8 | 3 | 1 | 0 | 0 | 0 | 10 |
| MN | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2022 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| MO | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| NE | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| NV | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2022 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |

Version 4/20/2023 rev 7/22/2023

| State | Year | Outlets at Start of Year | Outlets Opened | Termi-nations | Nonre-newals | Reac-quired by Franchi-sor | Ceased Opera-tions – Other Rea-sons | Outlets at End of the Year |
|-------|------|------|------|------|------|------|------|------|
| NH | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| NJ | 2020 | 10 | 1 | 0 | 0 | 0 | 0 | 11 |
|    | 2021 | 11 | 3 | 0 | 0 | 0 | 0 | 14 |
|    | 2022 | 14 | 5 | 0 | 0 | 0 | 0 | 19 |
| NM | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2021 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2022 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| NY | 2020 | 34 | 0 | 0 | 0 | 1 | 0 | 33 |
|    | 2021 | 33 | 5 | 3 | 0 | 0 | 0 | 35 |
|    | 2022 | 35 | 4 | 0 | 0 | 0 | 0 | 39 |
| NC | 2020 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
|    | 2021 | 4 | 2 | 0 | 0 | 0 | 0 | 6 |
|    | 2022 | 6 | 1 | 0 | 0 | 0 | 0 | 7 |
| OH | 2020 | 7 | 1 | 0 | 0 | 0 | 0 | 8 |
|    | 2021 | 8 | 1 | 0 | 0 | 0 | 0 | 9 |
|    | 2022 | 9 | 1 | 1 | 0 | 0 | 0 | 9 |
| OK | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
|    | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
|    | 2022 | 3 | 0 | 1 | 0 | 0 | 0 | 2 |
| OR | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2022 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| PA | 2020 | 10 | 4 | 0 | 0 | 0 | 0 | 14 |
|    | 2021 | 14 | 3 | 0 | 0 | 0 | 0 | 17 |
|    | 2022 | 17 | 5 | 0 | 0 | 0 | 0 | 22 |
| RI | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2021 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2022 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| SC | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2022 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| TN | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
|    | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2022 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| TX | 2020 | 34 | 1 | 0 | 0 | 0 | 0 | 35 |
|    | 2021 | 35 | 4 | 0 | 0 | 0 | 0 | 39 |
|    | 2022 | 39 | 4 | 3 | 0 | 0 | 0 | 40 |
| UT | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2021 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
|    | 2022 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |

Version 4/20/2023 rev 7/22/2023

| State | Year | Outlets at Start of Year | Outlets Opened | Termi-nations | Nonre-newals | Reac-quired by Franchi-sor | Ceased Opera-tions – Other Rea-sons | Outlets at End of the Year |
|-------|------|------|------|------|------|------|------|------|
| VA | 2020 | 20 | 1 | 0 | 0 | 0 | 0 | 21 |
|    | 2021 | 21 | 2 | 0 | 0 | 0 | 0 | 23 |
|    | 2022 | 23 | 9 | 0 | 0 | 0 | 0 | 32 |
| WA | 2020 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
|    | 2021 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
|    | 2022 | 4 | 1 | 1 | 0 | 0 | 0 | 4 |
| WI | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2021 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2022 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| WY | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2021 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2022 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Total | 2020 | 213 | 29 | 0 | 0 | 0 | 0 | 242 |
|    | 2021 | 242 | 46 | 3 | 0 | 0 | 0 | 285 |
|    | 2022 | 285 | 63 | 9 | 0 | 0 | 0 | 339 |

**Table No. 4**
**Status of Company-Owned Outlets**
**For Years 2020 to 2022**

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Re-acquired From Fran-chisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|-------|------|------|------|------|------|------|------|
| NY | 2020 | 2 | 0 | 1 | 0 | 0 | 3 |
|    | 2021 | 3 | 0 | 0 | 0 | 1 | 2 |
|    | 2022 | 2 | 0 | 0 | 0 | 0 | 2 |
| Total | 2020 | 2 | 0 | 1 | 0 | 0 | 3 |
|    | 2021 | 3 | 0 | 0 | 0 | 1 | 2 |
|    | 2022 | 2 | 0 | 0 | 0 | 0 | 2 |

**Table No. 5**
**Projected Openings as of December 31, 2022**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Fran-chised Outlet in the Next Fiscal Year | Projected New Company-Owned Outlet in the Next Fiscal Year |
|-------|------|------|------|
| AL | 1 | 1 | 0 |
| CA | 2 | 5 | 0 |
| CO | 1 | 2 | 0 |
| CT | 0 | 1 | 0 |
| DC | 0 | 2 | 0 |
| FL | 2 | 5 | 0 |
| GA | 0 | 2 | 0 |

- 46 -

Version 4/20/2023 rev 7/22/2023

**A67**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlet in the Next Fiscal Year | Projected New Company-Owned Outlet in the Next Fiscal Year |
|-------|------|------|------|
| IL | 1 | 4 | 0 |
| IN | 0 | 2 | 0 |
| LA | 0 | 1 | 0 |
| MD | 1 | 4 | 0 |
| ME | 1 | 1 | 0 |
| MI | 1 | 2 | 0 |
| MO | 0 | 1 | 0 |
| NM | 0 | 1 | 0 |
| NV | 0 | 1 | 0 |
| NJ | 0 | 3 | 0 |
| NY | 2 | 2 | 0 |
| OR | 0 | 1 | 0 |
| PA | 2 | 3 | 0 |
| SC | 0 | 1 | 0 |
| TN | 0 | 1 | 0 |
| TX | 1 | 3 | 0 |
| UT | 0 | 1 | 0 |
| VA | 0 | 2 | 0 |
| Total | 15 | 52 | 0 |

Exhibit B1 lists the names of all current Kung Fu Tea shop franchisees and the addresses and telephone numbers of their outlets as of the date of this disclosure document.

Exhibit B2 lists the name, city and state, and the current business telephone number (or, if unknown, the last known home telephone number) of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during our most recently completed fiscal year or who has not communicated with us within ten weeks of the issuance date of this disclosure document.  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Exhibit C1 lists, to the extent known, the names, addresses, telephone numbers, email address and Web address of each trademark-specific franchisee organization associated with the franchise system being offered which we have created, sponsored or endorsed.

Exhibit C2 lists the independent franchisee organizations that have asked to be included in this disclosure document.

During the last three fiscal years, no current or former franchisees have signed confidentiality clauses that would restrict them from discussing with you their experiences as a franchisee in our franchise system.

- 47 -

**Item 21**

**FINANCIAL STATEMENTS**

Attached to this disclosure document as Exhibit D are the audited balance sheets of KF Tea Franchising LLC as of December 31, 2022 and 2021, and the related statements of income, members' equity and cash flows for the years ended December 31, 2022, 2021 and 2020.

**Item 22**

**CONTRACTS**

Exhibit F contains copies of the following contracts:

1. Franchise Deposit Agreement
2. Franchise Agreement
3. Guaranty
4. Lease Addendum
5. Supply Agreement
6. Dual Concept Addendum
7. Multi-Unit Agreement
8. Consent to Transfer Agreement
9. Renewal Addendum
10. ACH Debit Application

**Item 23**

**RECEIPTS**

A detachable form for your use to acknowledge your receipt of this disclosure document, including all exhibits, is attached as Exhibit I at the very end of this disclosure document. You must date and sign this receipt and deliver it to us.

- 48 -

**A69**

**EXHIBIT A**

## STATE ADMINISTRATORS
## AND
## AGENTS FOR SERVICE OF PROCESS

| *State* | *State Administrator* | *Agent for Service of Process* |
|---|---|---|
| California | California Department of Financial Protection & Innovation<br>2101 Arena Boulevard<br>Sacramento, CA 95834<br>916-327-7585; 866-275-2677<br><br>One Sansome Street, #600<br>San Francisco, CA 94104-4428<br>415-972-8565<br>866-275-2677<br><br>300 S. Spring Street, Suite 15513<br>Los Angeles, CA 90013-1259<br>213-897-2085; 866-275-2677<br><br>320 West 4th Street, Suite 750<br>Los Angeles, CA 90013-2344<br>213-576-7500; 866-275-2677<br><br>1455 Frazee Road, Suite 315<br>San Diego, CA 92108<br>619-610-2093; 866-275-2677 | California Commissioner of Financial Protection & Innovation |
| Connecticut | Connecticut Department of Banking<br>Securities and Business Investments Division<br>260 Constitution Plaza<br>Hartford, CT 06103-1800<br>860-240-8109 | Banking Commissioner |
| Hawaii | Business Registration Division<br>Securities Compliance<br>Department of Commerce and Consumer Affairs<br>335 Merchant Street, Room 203<br>Honolulu, HI 96813<br>808-586-2722 | Commissioner of Securities |
| Illinois | Illinois Attorney General<br>Franchise Bureau<br>500 S. Second Street<br>Springfield, IL 62706<br>217-782-4465 | Attorney General |

Version 4/20/2023 rev 7/22/2023

| *State* | *State Administrator* | *Agent for Service of Process* |
|---|---|---|
| Indiana | Indiana Securities Division<br>Secretary of State<br>Indiana Gov't Center South, E-111<br>Indianapolis, IN 46204<br>317-232-6681 | Secretary of State |
| Maryland | Office of the Attorney General<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020<br>410-576-6360 | Securities Commissioner<br>200 St. Paul Place<br>Baltimore, MD 21202-2020 |
| Michigan | Attorney General's Office<br>Consumer Protection Division<br>525 W. Ottawa Street<br>670 Williams Building<br>Lansing, MI 48909<br>517-373-7117 | Attorney General |
| Minnesota | Minnesota Department of Commerce<br>Market Assurance Division<br>85 7th Place East, Suite 280<br>St. Paul, MN 55101-2198<br>651-539-1600 | Commissioner of Commerce |
| New York | NYS Department of Law<br>Investor Protection Bureau<br>28 Liberty Street, 21st Floor<br>New York, NY 10005<br>212-416-8222 | Secretary of State<br>New York Department of State<br>One Commerce Plaza<br>99 Washington Avenue, 6th Floor<br>Albany, NY 12231-0001 |
| North Dakota | North Dakota Securities Department<br>600 East Boulevard Avenue, Fifth Floor<br>Bismarck, North Dakota 58505-0510<br>701-328-4712 | Securities Commissioner |
| Rhode Island | Department of Business Regulation<br>1511 Pontiac Avenue, Bldg. 69-1<br>Cranston, RI 02920<br>401-462-9527 | Director, Department of Business Regulation |
| South Dakota | Division of Insurance<br>Securities Regulation<br>124 South Euclid, Suite 104<br>Pierre, SD 57501<br>605-773-3563 | Director of the Division of Insurance |

Version 4/20/2023 rev 7/22/2023

| State | State Administrator | Agent for Service of Process |
|---|---|---|
| Virginia | State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 E. Main Street, 9th Floor<br>Richmond, VA 23219<br>804-371-9051 | Clerk, State Corporation Commission<br>1300 E. Main Street, 1st Floor<br>Richmond, VA 23219<br>804-371-9733 |
| Washington | Department of Financial Institutions<br>Securities Division<br>150 Israel Road SW<br>Tumwater, WA 98501<br>360-902-8760 | Director of Financial Institutions |
| Wisconsin | Wisconsin Division of Securities<br>Department of Financial Institutions<br>P.O. Box 1768<br>Madison, WI 53701<br>608-266-8557 | Administrator<br>Division of Securities<br>Department of Financial Institutions |

- iii -

Version 4/20/2023 rev 7/22/2023

**A72**

EXHIBIT B1

**FRANCHISEES**

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| AL | Bubble Tea South LLC | Hui Chen | 116 N College Street Auburn, AL 36830 | 917-535-8859 |
| AL | BubbleT LLC | Dezheng Zue | Midcity Huntsville Phase 1 Suite 7H Huntsville, AL 35806 | 617-678-5766 |
| AL | JC Licensing LLC* | Chao Fang | 4800 Whitesburg Dr., #39 Huntsville, AL | 617-678-5766 |
| CA | JS & TS Inc | Yesook Choi | 18300 Gridley Road D2 Artesia, CA 90701 | 562-403-8848 |
| CA | GM Investment Group, LLC | Mandip Singh | 1177 N. Willow Ave, Suite 104 Clovis, CA 93611 | 559-939-3232 |
| CA | Rancho Sky Dessert | Sin Vong | 2891 Jamacha Road, Suite C El Cajon, CA 92019 | 858-380-6695 |
| CA | Boba TM LLC | Thuan Do | 9135 W. Stockton Boulevard, #140 Elk Grove, CA 91950 | 916-513-7393 |
| CA | DG Investment & Realty Corporation | Linh Giang Duong Nguyen | 729 N Placentia Avenue Fullerton, CA 92831 | 657-378-6556 |
| CA | Metta Investment Brothers LLC | Hiep Tran | 26640 Western Ave Suite N Harbor City, CA 90710 | 424-263-4623 |
| CA | ENS For Him, Inc. | Samuel Oh | 740 So. Western Ave, Unit 118 Los Angeles, CA 90005 | 213-435-2112 |
| CA | CN Food & Beverage LLC | Chinh (Jay) Nguyen | 1136 Westwood Boulevard, Los Angeles, CA 90024 | 424-273-1891 |
| CA | Viet Tasty LLC | Thuan Do | 1448 Hulsey Way Manteca, CA 95336 | 253-314-6468 |
| CA | Viet Tasty, LLC | Thuan Do | 3440 McHenry Ave, Suite D14 Modesto, CA 95355 | 253-314-6468 |
| CA | Chronicles, LLC | Andrian Sutheno | 1615 E. Plaza Blvd Unit #101 National City, CA 91950 | 626-782-3790 |
| CA | Martin Express Inc. | Thang Q. Nguyen | 2211 South Mountain Avenue Ontario, CA | 909-295-9508 |
| CA | Roshan Tea LLC | Aamir Shahzad | 38050 47th Street E, Suite C Palmdale, CA 93552 | 661-526-7726 |

Version 4/20/2023 rev 6/12/2023

**A73**

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|----------------|--------------|--------------|-------|
| CA | TWTEA Group, LLC | Yun Jen (Ryan) Chen | 318 University Avenue Palo Alto, CA 94301 | 678-900-7757 |
| CA | Kel-Tec-Innovations LLC | Kelvin Ho | 12732 Foothill Blvd, Ste #101 Rancho Cucamonga, CA 91739 | 909-503-2072 |
| CA | Dat & Dao LLC | Dao Thi Hong Nguyen | 107 E. Colton Avenue, Suite 200 Redlands, CA 92374 | 909-792-7088 |
| CA | Shtk LLC* | Hoang Tran | 1201 W. Main St., Suite 20 Ripon, CA 95336 | 209-253-0979 |
| CA | Sticky Rice Bros LLC | Souphan Keodouangkham | 3679 Central Ave, Suite B Riverside, CA 92506 | 316-461-6936 |
| CA | Datran, LLC | Dat Nguyen & Tran Nguyen | 11491 Carmel Mountain Road San Diego, CA 92128 | 858-384-6497 |
| CA | Fette Boba LLC | Harrison Tsai | 4869 Convoy St San Diego, CA 92111 | 858-384-6497 |
| CA | Tsan Lee Foods Inc. | Vincent Lee | 457 Saratoga Ave San Jose, CA 95125 | 408-668-4698 |
| CA | Friends and Family Ventures LLC | Loc Nguyen | 14 Creekside Drive, Suite 101 San Marcos, CA 92078 | 858-722-7444 |
| CA | Sky Dessert LLC | Sin Vong | Mission Plaza 9535 Mission Gorge Rd., Ste I Santee, CA 92701 | 858-380-6695 |
| CA | Viet Tasty, LLC | Thuan Do | 4663 Pacific Ave., Suite G Stockton, CA 95207 | 253-314-6468 |
| CA | Datran2 LLC | Dat Nguyen | 26487 Ynez Road, Suite G Temecula, CA 92591 | 951-595-4203 |
| CA | Viet Tasty, LLC | Thuan Do | 2220 W. Monte Vista Ave. Turlock, CA 95350 | 253-314-6468 |
| CA | JM&A Enterprises LLC* | Jenna Landau | 14825 Vesper Road Valley Center, CA 92082 (Mobile unit) | 760-975-4472 |
| CA | Shisa Enterprises, Inc | Scott Takao | 9709 Bolsa Avenue Westminster, CA 92683 | 657-212-5693 |
| CO | Denver West Tea Inc | Lan Krystle Than | 7310 W. 52nd Ave, Arvada, CO 80002 | 303-974-5672 |
| CO | Aurora Tea LLC | Kelly Choung | 12201 E. Mississippi Ave. #123A Aurora, CO 80012 | 720-235-7670 |

- ii -

**A74**

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| CO | Boulder Tea Inc. | Kelly Chuong | 1121 Broadway, Suite 102 Boulder, CO 80302 | 720-638-3470 |
| CO | Centennial Tea LLC | Kelly Chuong | 20209 E. Smokey Hill Road, Suite A2 Centennial, CO 80015 | 720-524-7379 |
| CO | KCC Restaurant Consulting LLC | Kelly Chuong | 7489 Academy Blvd. N Colorado Springs, CO 80920 | 720-638-3470 |
| CO | Denver Boba LLC | Lian Yu | 6365 E Hampden Ave., #102 Denver, CO 80222 | 720-588-8888 |
| CO | Denver Boba 2 LLC | Lian Yu | 8302 E Northfield Boulevard, Unit 1580 Denver, CO 80238 | 720-370-9999 |
| CO | Rolling Hill Tea Inc | Kelly Chuong | 13571 Grant Street, Denver, CO 80241 | 720-281-8580 |
| CO | Yu & Associates Inc. | Sung-Hsing Yu | 2608 S. Timberline Rd Ste 102 Fort Collins, CO 80525 | 720-688-8885 |
| CO | KT Tea LLC | Kelly Chuong | 9559 S University Blvd. Unit 107 Highland Ranch, CO 80126 | 720-638-3470 |
| CO | MMK Mix LLC | Minh Nhan | 8555 W Belleview Ave. Suite G21 Littleton, CO 80123 | 510-334-1900 |
| CO | Parker Tea, LLC* | Kiki Chuong | 11465 S. Parker Rd, Ste 10 Parker City, CO 80134 | 720-235-7670 |
| CT | Boba Boba LLC | Anh Le | 5 South Main Street West Hartford, CT 06107 | 860-216-2023 |
| DC | URG Inc. | Yizhou Yu | 1990 M St NW, Suite 102 Washington, DC 20007 | 202-808-9628 |
| DE | PA Bubble Tea Inc.** | Cheng Hao Gao | 93 E. Main Street Newark, DE 19711 | 856-979-3106 |
| FL | Boba Nguyen Boca LLC | Tommy Nguyen | 481 NE 20th Street Boca Raton, FL 33431 | 561-245-8647 |
| FL | Van Tho Phat Company | Thoa N. Nguyen, Si Van Le | 5645 N Atlantic Avenue, Unit 104 Cocoa Beach, FL 32931 | 321-599-6789 |
| FL | Dang Tea Co LLC | Christopher Dang | 6819 Sterling Road Davie, FL 33314 | 954-909-4238 |
| FL | Love Tea Milk LLC | Zhi Zong Wu | 701 N. Federal Highway, Retail Bay 6 Fort Lauderdale, FL 33304 | 954-999-7701 |

- iii -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| FL | Boba Tea LLC | Chi Nguyen | 9390 Ben C. Pratt Six Mile Cypress Parkway, Unit 3 Fort Myers, FL 33966 | 239-362-3207 |
| FL | Kung Fu Tea Gainesville LLC** | Ren Liu | 3102 SW 34th Street Gainesville, FL 32608 | 813-971-0099 |
| FL | Sweet Sugar Inc. | WeiWei Lian | 12630 Beach Blvd., #1 Jacksonville, FL 32246 | 505-400-5520 |
| FL | BWR Enterprises LLC | Masud Rhaman | 12098 Collegiate Way, Orlando, FL 32817 | 407-286-2055 |
| FL | H & R LL, Inc.* ** | Ren Liu | 7717 Ulmerton Rd. Largo, FL 99771 | 813-451-1692 |
| FL | H & R LL, Inc.** | Ren Liu | 7688 49th St. N Pinellas Park, FL 33781 | 813-971-0099 |
| FL | VN Tea Port Charlotte LLC | Vang Tran | 24123 Peachland Boulevard, Unit C9 Port Charlotte, FL 33954 | 941-249-4803 |
| FL | H & R LL, Inc.** | Ren Liu | 5914 Providence Rd Riverview, FL 33578 | 813-971-0099 |
| FL | H & R LL, Inc.** | Ren Liu | 5085 34th Street S Saint Petersburg, FL 33711 | 813-917-0099 |
| FL | H & R LL, Inc.** | Ren Liu | 8404 Lockwood Ridge Rd Sarasota, FL 34243 | 813-971-0099 |
| FL | H&R LL, Inc.** | Ren Liu | 401 S Dale Mabry Hwy, Tampa, FL 33609 | 813-971-0099 |
| FL | Kung Fu Tea FL, LLC** | Ren Liu | 1202 E Fowler Ave, Tampa, FL 33612 | 813-971-0099 |
| FL | H & R LL, Inc.** | Ren Liu | 1832 Bruce B Downs Blvd. Wesley Chapel, FL 33577 | 813-971-0099 |
| FL | LuVile LLC* | Tuan Le | 4587 Okeechobee Blvd., Unit 131 West Palm Beach, FL 33417 | 248-990-5984 |
| GA | Cheng Family Entrepanuer LLC | Yu-Lun Cheng | 2801 Old Dawson Road Suite 130 Albany, GA 31707 | 229-938-7158 |
| GA | PDC Star Inc. | Paul Zhang | 2/4 Park Place South Atlanta, GA 30303 | 646-266-2161 |
| GA | NK Bubble Tea LLC | Kyerence Apruebo, Niki Thongdara | 925 Battery Ave., Ste #1100, Stall 5 Atlanta, GA 30344 | 404-913-3079 |
| GA | PDC Star Inc. | Paul Zhang | 3480 Financial Center Way, M-1000 Buford, GA 30519 | 770-455-8585 |
| GA | Chen's Tea LLC | Peter Chen | 2505-K Airport Thruway Columbus, GA 31904 | 646-266-2161 |

- iv -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| GA | CP Milk Tea, LLC | Chiehmeng Chen | 5555 Whittlesey Boulevard #1740 Columbus, GA 31909 | 762-524-7405 |
| GA | Herbatat LLC | Jennifer Vann | 145 Forest Boulevard, Suite 415 Dawsonville, GA 30534 | 706-203-1172 |
| GA | PDC Star Inc. | Paul Zhang | 5280-A Buford Highway Doraville, GA 30340 | 770-455-8585 |
| GA | PDC Star Inc. | Paul Zhang | 3473 Old Norcross Rd. Suite 202 Duluth, GA 30096 | 470-395-0583 |
| GA | Moral Success Inc. | Vincent Wong | 2505 Chastain Meadows Parkway, Suite 115 Marietta, GA 30066 | 678-677-7717 |
| GA | Bowls & Bubbles, LLC | Melissa Yao Hille | 206 W. Broughton Street Savannah, GA 31401 | 912-398-2882 |
| GA | MKNK Tea Shop Dnellville LLC | Khoa Ann Dinh | 1905 Scenic Highway S #700 Snellville, GA 30078 | 470-246-5806 |
| GA | PDC Star Inc. | Paul Zhang | 1291 Old Peachtree Rd NW Suwanee, GA 30024 | 678-373-1693 |
| IL | Won Tai Group, Inc. | Anson Liu | 707 S 6th Street, Suite 107 Champaign, IL 61820 | 217-552-1668 |
| IL | Won Tai Group, Inc. | Anson Liu | 2126 B S. Archer Avenue Chicago, IL 60616 | 312-255-7331 |
| IL | Bubble Meet Mt, Inc. | Xiang Fang | 4925-D N Broadway Chicago, IL 60640 | 872-208-5955 |
| IL | Boba Milk Tea Evanston, Inc. | Ming Liu | 726 Clark Street Evanston, IL 60201 | 312-843-9884 |
| IL | ATSU LLC | Adrian Tran | 610 Milwaukee Ave. Suite 150 Glenview, IL 60025 | 952-261-4076 |
| IL | ATSU Naperville LLC* | Adrian Tran | 3108 Illinois Route 59 Suite 132 Naperville, IL 60564 | 952-261-4076 |
| IL | Do & Nay, LLC | Lendun Nay | 1643 Algonquin Road Rolling Meadows, IL 60008 | 773-892-6020 |
| IN | J & J Tea LLP | Phu Tran | 8395 116th Street, Suite 121 Fishers, IN 46038 | 317-284-1773 |
| IN | La Bell LLC | Guong B. La | 8721A US 31 S Indianapolis, IN 46227 | 317-893-4401 |
| IN | JML Ventures LLC | Kris Karlo Jumao-as | 620 W. Edison Road Mishawaka, IN 46545 | 574-400-0087 |

- v -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| IN | K&N Bubble Tea LLC | John David | 2683 E. Main St., Suite #107 Plainfield, IN 46168 | 765-301-0238 |
| IN | Won Tai Group, Inc. | Anson Liu | 135 S Chauncey Avenue West Lafayette, IN 47906 | 765-838-3513 |
| IN | J & J Boba LLC | Phu Tran | 10895 N. Michigan Road, Suite 130 Zionsville, IN 46077 | 317-344-3002 |
| KS | Kare Pharmacy of Lansing LLC | Karishma Khandelwal | 2500 S. 4th Street, Leavenworth, KS 66048 | 913-369-4230 |
| KS | Day One Tea LLC | Daewun Sin | Rosana Square 7504 W 119th St. Overland Park, KS 66213 | 913-283-9207 |
| KS | Lenguyen, LLC | Duy Nguyen | 1625 S. Rock Rd, Suite 129 Wichita, KS 62707 | 940-882-3537 |
| KY | Tran Group, LLC | Duy Tran | 5000 Shelbyville Rd Hurstbourne, KY 40207 | 502-294-6241 |
| KY | Tran Group KY, LLC | Duy Tran | 685 South Limestone Street Lexington, KY 40508 | 502-294-6241 |
| LA | Southern Tea House Baton Rouge Inc. | Lucas Le | 7584-B Bluebonnet Boulevard Baton Rouge, LA 70809 | 504-900-1717 |
| LA | MMKLAI LLC | Ann Tran | 71178 Highway 21, Suite 200 Covington, LA 70433 | 985-276-4227 |
| LA | Teavolution LLC | Michael Nguyen | 2829 Johnston Street Lafayette, LA 70506 | 337-230-6109 |
| LA | Southern Tea House Inc. | Lucas (Hung) Le | 3348 W. Esplanade Ave S Suite C Metairie, LA 70002 | 504-900-1717 |
| MD | C & Guo Inc. | Liquen Chen | 3113 St. Paul Street Baltimore, MD 21218 | 443-630-2213 |
| MD | Beverage Pro Inc. | Fanny Shen | 7101 Democracy Blvd, Unit 9210 Bethesda, MD 20817 | 301-767-0200 |
| MD | Hibachi Express Inc. | Peter Zhang & Lauren Chang | 22705 Clarksburg Road Unit #868 Clarksburg, MD 20871 | 240-307-3240 |
| MD | Bubble Lounge LLC | Cuong N. Nguyen | 7313-I Baltimore Avenue College Park, MD 20740 | 240-423-7672 |
| MD | QSR Investment Trust Inc. | Zong Cai Chen | 10100 Twin Rivers Road C-117 Columbia, MD 21044 | 410-818-0168 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| MD | C500 Enterprises LLC | Zong Chen | 9210 Baltimore National Pike Store #W3 Ellicott City, MD 21042 | 410-818-0168 |
| MD | Tealicious, Inc. | Fanny (Yi) Shen & Steve Lin | 5500 Buckeystown Pike, Unit K009 Frederick, MD 21703 | 703-828-5679 |
| MD | Tea Town II LLC | Janet Song | 6 Grand Corner Ave. Gaithersburg, MD | 630-290-7251 |
| MD | Boo Enterprises LLC | Du Wayne Boo | 2638 Chapel Lake Dr. Gambrills, MD 21054 | 410-721-6184 |
| MD | KF Tea Kentlands Inc | Zong Chen | 130 Market Street Gaithersburg, MD 20878 | 240-477-8017 |
| MD | Mycow LLC | Janet Song | 19717 Frederick Rd., Germantown, MD 20876 | 630-290-7251 |
| MD | C500 Enterprises LLC | Zong Chen | 14708 Baltimore Avenue #109 Laurel, MD 20707 | 410-818-0168 |
| MD | TF North Bethesda Inc. | Zong Chen | 11802 Rockville Pike, Unit G North Bethesda, MD 20852 | 410-818-0168 |
| MD | A & T Corporation, Inc. | Andy Phan | 7904 Honeygo Blvd Nottingham, MD 21236 | 443-433-8861 |
| MD | QSR Investment Trust Inc.* | Zong Chen | 3128 Olney Sandy Spring Road Olney, MD 20832 | 240-342-2675 |
| MD | SM Space LLC | Sunny Prasad | 10209 Grand Central Ave, #120 Owings Mills, MD 21117 | 410-440-2171 |
| MD | J&Jades, LLC | Dana Wiggins | 742 Prince Frederick Boulevard Prince Frederick, MD 20678 | 443-975-2223 |
| MD | Tea Town LLC | Ray & Janet Song | 275 N. Washington Street Suite D Rockville, MD 20850 | 240-630-0900 |
| MD | JK Holdings Group LLC | Hwan Young Kim | 8661 Colesville Rd., #B-159 Silver Spring, MD 20910 | 630-290-7251 |
| MD | York 508 Inc | Min Chen | 508 York Road Towson, MD 21204 | 443-991-5840 |
| ME | Sethinka LLC* | Sokunthea Sy Chan | 948 Forest Ave Portland, ME 04103 | 207-838-5505 |
| MA | HKS Tea LLC** | David Tang | 1 Brighton Ave Allston, MA 02134 | 617-783-3388 |
| MA | Kung Fu Tea, Inc** | David Tang | 131 Harvard Ave. Allston, MA 02134 | 617-783-3388 |

- vii -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| MA | KF Tea Boston Chinatown LLC** | David Tang | 66 Kneeland St. Boston, MA 02111 | 617-542-8838 |
| MA | KF Tea Symphony LLC** | David Tang | 334 Massachusetts Ave. Boston, MA 02115 | 617-936-3608 |
| MA | Kung Fu Tea SSP Inc.** | David Tang | 250 Granite St. Braintree, MA 02184 | 781-848-1988 |
| MA | Kung Fu Tea Cleveland Circle LLC** | David Tang | 1916 Beacon St. Brighton, MA 10940 | 845-467-4811 |
| MA | 1160 Mass Ave Inc.** | David Tang | 1160 Massachusetts Avenue Cambridge, MA 02138 | 617-783-3388 |
| MA | 43 Merrimack St. Inc.** | David Tang | 43 Merrimack Street Lowell, MA 01852 | 646-220-9991 |
| MA | KF Tea Malden LLC** | David Tang | 3 Pleasant Street Malden, MA 02148 | 781-321-1898 |
| MA | DKY Tea NM Inc.** | David Tang | 1245 Worcester St., Unit 6522 Natick, MA 01760 | 508-433-6898 |
| MA | 1 Beale St LLC** | David Tang | 1 Beale Street Quincy, MA 02170 | 646-220-9991 |
| MA | Kung Fu Tea Davis Square LLC** | David Tang | 237 Elm St. Somerville, MA 02144 | 617-616-5428 |
| MA | Moody St Tea House Inc** | David Tang | 246 Moody St Waltham, MA 02453 | 646-220-9991 |
| MI | Me and Tea LLC | Hannah Nguyen | 30754 Telegraph Road Bingham Farms, MI 48025 | 586-663-6035 |
| MI | Bubble De Light Inc. | Praveen K. Moova | #45470 Ford Road Canton, MI 48187 | 734-233-4168 |
| MI | Hayder Yasir Boba, LLC* | Hayder Jamal & Yasir Altamimi | 22001 Michigan Ave Suite 150 Dearborn, MI 48124 | 313-799-0434 |
| MI | Tea Lab Inc | Rainie Chen | 2929 Hannah Blvd. Suite 2 East Lansing, MI 48823 | 517-898-7312 |
| MI | BUBU LLC | Daniel Jiang | 5301 S. Division Ave., Suite C Grand Rapids, MI 49548 | 517-703-6800 |
| MI | Holland Bubble Tea LLC | Man Huynh | 12760 Riley Street Holland, MI 49424 | 616-796-8366 |
| MI | ZOO Boba LLC | Lam To | 5043 West Main Street, Kalamazoo, MI 49009 | 269-532-5141 |
| MI | Bubble B, LLC | Eileen Buison | 11516 Middlebelt Livonia, MI 48150 | 734-469-2140 |

- viii -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| MI | Cabalum Boba Tea LLC | Pedro Cabalum | 44325 W 12 Mile, Ste. H172 Novi, MI 48377 | 248-344-7885 |
| MI | Me & Tea LLC | Tony Nguyen | 1256 Walton Boulevard Rochester Hill, MI 48309 | 586-663-6035 |
| MI | Me & Tea LLC | Tony Nguyen | 2105 15 Mile Road Sterling Heights, MI 48310 | 586-663-6035 |
| MN | Gan Cheng LLC | Gan Lu & Ji Keng Chen | 12459 Elm Creek Boulevard N, Suite A7 Maple Grove, MN 55369 | 763-432-6158 |
| MN | Chen II LLC | Lin Wang | 507 14th Avenue SE Minneapolis, MN 55414 | 612-353-5088 |
| MN | Chen LLC | Lin Wang | 923 Washington Ave. SE Minneapolis, MN 55414 | 612-379-8886 |
| MN | Chen-Troung LLC | Le Huynh Troung & Ji Keng Chen | 2532 Nicollet Avenue Minneapolis, MN 55404 | 612-562-0985 |
| MN | D.H. Nguyen | Douglas Nguyen | 1006 N. Broadway Ave Rochester, MN 55906 | 507-319-2659 |
| MO | Day Two Tea LLC | Daewun Sin | 827 Westport Road Kansas City, MO 64113 | 816-214-8955 |
| MO | Bubble Tea West LLC | Ian Lo | 6600 Belmar Blvd. St. Louis, MO 63130 | 314-256-1395 |
| NE | Truone Phat, Inc. | Kiet Tran | 4451 N 26th Street, Suite 100 Lincoln, NE 68521 | 402-975-2400 |
| NE | Heater Dumpling CNVN, LLC | Van Nguyen | 1110 S. 71st St., Bay B Omaha, NE 68106 | 402-208-7308 |
| NH | Infinitea LLC | Peter Cuong | 655 South Willow St Manchester, NH 03103 | 229-309-9538 |
| NH | Infinitea Nashua, LLC | Cuong Trinh and Duy Nguyen | 493 Amherst Street Nashua, NH 03063 | 229-309-9538 |
| NV | JS Global LLC | Mei Yu | 3950 Las Vegas Boulevard South Las Vegas, NV 89119 | 702-592-7855 |
| NV | Boba Society LLC | Dominique Chang | 5030 Spring Mountain Rd, #8 Las Vegas, NV 89146 | 702-776-7077 |
| NV | Eastern Tea House LLC | Sammy Son | 7335 S. Rainbow Blvd Las Vegas, NV 89113 | 702-522-9555 |
| NV | Infinite Fortune Partners LLC | Rich Khumkit & Vanessa Lee | 3200 S Las Vegas Blvd, Space 7500 Las Vegas, NV 89109 | 702-464-3144 |
| NJ | PA Bubble Tea Inc** | Cheng Hao Gao | 1445-1491 Brace Road Cherry Hill, NJ 08034 | 917-226-2661 |

- ix -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| NJ | Cherry Hill Bubble Tea Inc.** | Cheng Hao Gao | 826 Haddonfield Rd. Cherry Hill, NJ 08002 | 917-226-2661 |
| NJ | PA Bubble Tea Inc** | Cheng Hao Gao | 195 Route 130 Cinnaminson, NJ 08077 | 917-266-2661 |
| NJ | Edison Food Market LLC | Ricky Qu | 1731 A Route 27 Edison, NJ 08817 | 732-248-0400 |
| NJ | MCTea LLC | Jackie Lee | 2151 Lemoine Ave. Fort Lee, NJ 07024 | 201-461-0398 |
| NJ | Tea Talk LLC | Ngan Vuong | 220 Rowan Blvd Glassboro, NJ 08028 | 856-689-3560 |
| NJ | Hello China, Inc. | Kui Sun | 536 Washington Street Hoboken, NJ 07030 | 201-222-9091 |
| NJ | PA Bubble Tea Inc** | Cheng Hao Gao | 3320 US-1, Space #KI32 Lawrenceville, NJ 08648 | 732-696-2387 |
| NJ | Jenny's Tea Café LLC | Jenny Yu | 340 Millburn Ave. Millburn, NJ 07041 | 973-467-8833 |
| NJ | Bubleetea Corporation | Winnie Yee | 375 Bloomfield Ave Montclair, NJ 07040 | 973-744-1647 |
| NJ | PA Bubble Tea Inc.** | Cheng Hao Gao | 12 Route 9 North, Unit A5 Morganville, NJ 07751 | 732-696-2387 |
| NJ | Mini Café LLC | Michael Cheong | 244 Livingston Street Northvale, NJ 07647 | 201-297-7762 |
| NJ | Tea Horse Road Capital, LLC | Tao Luo | One Garden State Plaza #9152 Paramus, NJ 07652 | 201-845-3500 |
| NJ | PA Bubble Tea Inc** | Cheng Hao Gao | 10 Schalks Crossing, Plainsboro Township, NJ | 917-226-2661 |
| NJ | Family Tea LLC | Tao Zhi | 700 E Black Horse Pike #40 Pleasantville, NJ 08232 | 609-377-5318 |
| NJ | Noodle House Inc. | Lisa Yeung | 80 Nassau Street Princeton, NJ 08542 | 609-688-0108 |
| NJ | Summit Tea Cafe, LLC | Jenny Yiu | 88 Summit Avenue Summit, NJ 07901 | 908-263-7489 |
| NJ | MB 86 Foods LLC | Mark Bautista | 1047 Stuyvesant Avenue Union, NJ 07083 | 908-416-4380 |
| NJ | Joy Hot Inc. | JIngjing Chen & Hau Yeung | 1400 Willowbrook Mall Wayne, NJ 07470 | 929-323-6736 |
| NM | Bobamochi LLC | Ronald Scott | 4410 Wyoming Boulevard NE, Suite H Albuquerque, NM 87111 | 505-721-6975 |
| NM | Ko Boba Tea, LLC | How Chi Ko | 5600 Coors Blvd., Suite B-4 Albuquerque, NM 87120 | 505-301-1042 |
| NY | ELT Group LLC | Edward Leong | 30-10 34th Street Astoria, NY 11103 | 917-714-1810 |

- x -

**A82**

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| NY | Forever Excellent Group Corp. | Emi Seki | 42-21 Bell Blvd. Bayside, NY 11361 | 718-631-0011 |
| NY | Angel Fish Corp.* | Chi Gu Kim | 1255 Broadway Brooklyn, NY 11221 | 917-484-1035 |
| NY | DKS Tea LLC | David Chan | 40 Hoyt Street Brooklyn, NY 11201 | 347-294-0232 |
| NY | H & E Wu Enterprise Inc. | Xin (Simon) Wu | 76 5th Avenue Brooklyn, NY 11217 | 917-306-8191 |
| NY | PA Bubble Tea Inc.** | Cheng Hao Gao | 806 55th Street Brooklyn, NY 11220 | 347-839-5969 |
| NY | KFT Ave U Inc. | David Cheng | 1422 Avenue U, Store #2 Brooklyn, NY 11229 | 718-819-9079 |
| NY | BE & KT 86, LLC | Chang Quan Huang | 2174 86th St. Brooklyn, NY 11214 | 718-373-2695 |
| NY | Food and Stix Two LLC | Lisa Tu | 5100 Kings Plaza, Brooklyn, NY 11234 | 917-981-5877 |
| NY | About Tea, Inc. | Min Hong Lin | 8625 5th Ave. Brooklyn, NY 11209 | 631-833-2265 |
| NY | K4 Ventures Inc. | Faheem Katel | 2298 Hempstead Turnpike East Meadow, NY 11554 | 917-498-9909 |
| NY | E & H Tea House Inc. | Wen Chang Lin | 82-02 45th Ave Elmhurst, NY 11373 | 718-809-8808 |
| NY | Ivan Bubble Tea, Inc. | Ivan Zheng | 86-12 Justice Avenue Elmhurst, NY 11373 | 718-899-1189 |
| NY | Café Grandpa LLC | Yu ("Aaron") Wu | 136-20 Roosevelt Ave. #7, Flushing, NY 11354 | 212-945-8842 |
| NY | KaraTea LLC | Danny Wang | 70-10 Austin Avenue, Store 3 Forest Hills, NY 11375 | 718-263-3631 |
| NY | Joyfy LLC | Patty Cheung | 358 N Broadway, Kiosk K2 Hicksville, NY 11801 | 516-336-9812 |
| NY | L & R Brothers LLC | Rongqiang Wang | 143 Dryden Road Ithaca, NY 14850 | 607-319-0304 |
| NY | Shake-N-Go Inc. | Teng He | 82-02 Roosevelt Ave. Jackson Heights, NY 11372 | 718-424-5888 |
| NY | Shang TT LLC | Aaron Wu | 87-52A Parsons Boulevard Jamaica, NY 11432 | 347-561-4835 |
| NY | Shang Qin Tian LLC | Mengnan Jin, Junqi Ge, Yun Wu | 251-73 Jericho Turnpike Jamaica, NY 11426 | 917-963-7769 |
| NY | SS Park 2 Inc | Sung Kyu Park | 71 Atlantic Avenue Lynbrook, NY 11563 | 516-344-5809 |
| NY | Dream Tea LLC | Chloe Shi | 125 Dolson Avenue, #23 Middletown NY 10940 | 845-467-4811 |

- xi -

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| NY | New York Shu Guo Kao Yu Inc.* | Ji Zhou | 150 W. 49th St. New York, NY 10019 | 718-559-2188 |
| NY | Top Tea Inc | James Qiu | 31 Waverly Place, Unit #5 New York, NY 10003 | 917-285-4285 |
| NY | Kongs Tea Inc. | Ri Cheng Zheng | 42 West 38th Street New York, NY 10018 | 917-388-3021 |
| NY | Tea Two Tea LLC | Kevin Wang | 73 Chrystie Street, 1st Floor New York, NY 10002 | 646-288-4936 |
| NY | Top Wise Logistics JFK Inc. | James Qiu | 28 St Marks Place New York, NY 10003 | 917-285-4285 |
| NY | Amber 32 NY Inc. | Tommy Ko | 11 West 32nd St, Stall #9 New York, NY 10001 | 212-695-5888 |
| NY | Two Zero Two Ventures Inc. | Tina Lai | 1219 1st Ave New York, NY 10065 | 917-710-8353 |
| NY | F4 Service Group LLC | Yang Cao | 9 Broadway New York, NY 10004 | 212-785-5688 |
| NY | Big Thumb Inc. | Qiao Wei Huang | 234 Canal Street, Suite #107 New York, NY 10013 | 917-855-2750 |
| NY | P & C Poke Station Inc. | Hui Qin Chen | 4053 Broadway New York, NY 10032 | 646-861-8888 |
| NY | C & N NY Inc. | Lisa Tung | 2829 W Henrietta Road Rochester, NY 14623 | 585-957-2919 |
| NY | Wasabi New York LLC | Nan Lin | 1 Richmond Terrace Staten Island, NY 10301 | 917-449-3685 |
| NY | Stony Brook Wang Inc. | Brian Wong | 1009 North Country Road Stony Brook, NY 11790 | 917-414-8569 |
| NY | NS Tea Inc | Neha Sabharwal | 408 Jericho Turnpike, Syosset, NY 11791 | 516-226-3833 |
| NY | *Carousel Tea House Inc.* | Bin Chen | 306 Hiawatha Blvd West, J209 Syracuse, NY 13204 | 917-868-8032 |
| NY | Telicious, Inc. | Xue Fang Jiang | 727 S. Crouse Ave. Syracuse, NY 13210 | 646-575-8568 |
| NY | Mike & I, LLC | Kevin Pham | 520 Lee Entrance, Suite 111 West Amherst, NY 14228 | 716-276-8402 |
| NY | Tea Horse Road Capital, LLC | Tao Luo | Suite Z215, Palisades Center 1000 Palisades Center Drive West Nyack, NY 10994 | 646-957-1040 |
| NY | Bubble Tea Inc. | Johnny Chen | 434 Hillside Ave Williston Park, NY 11596 | 718-208-8889 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| NC | BruceLee Tea LLC | Peck Chay | 966 High House Rd., Suite #124 Cary, NC 27513 | 919-650-1522 |
| NC | Idlewild Investment Group LLC | Vinh Le | 4200 South Boulevard Charlotte, NC 28209 | 704-701-4478 |
| NC | Idlewild Investment Group LLC | Khoa Nguyen & Vinh Le | 8200 Providence Rd., Ste 1000 Charlotte, NC 28277 | 704-701-4478 |
| NC | Idlewild Investment Group LLC | Vinh Le | 9605 N. Tryon St., Suite Y Charlotte, NC 28262 | 704-701-4478 |
| NC | Phan Family LLC | Tan Phan | 7821 Good Middling Drive, Unit 106 Fayetteville, NC 28304 | 910-758-9112 |
| NC | Myoung & Lee Inc | Jewel Myoung | 10251 Little Brier Creek Lane Raleigh, NC 27616 | 984-278-2781 |
| NC | Ninja Café LLC | Mandy Kwok | 5815 Samet Drive, Suite 111-113 High Point, NC 27265 | 240-712-8675 |
| OH | LVTea LLC | Vincent Liu | 7875 Montgomery Road Cincinnati, OH 45236 | 513-245-8150 |
| OH | Kenko Investment LLC | Sheng Long Yu | 11310-11314 Euclid Ave Cleveland, OH 44106 | 216-862-7690 |
| OH | Morgan & Abbey Inc | Lin Wang | 1161 Kenny Centre Mall Columbus, OH 43220 | 614-641-7595 |
| OH | Number One Tea Inc. | Morgan M. Cheng | 2202 North High Street Columbus, OH 43201 | 614-500-2421 |
| OH | Morgan & Abbey Inc. | Morgan Cheng | 7370 Sawmill Road Unit K Columbus, OH 43235 | 614-726-9365 |
| OH | TTND LLC | Dat Ly | 2630 Colonel Glenn Highway Fairborn, OH 45324 | 408-230-6162 |
| OH | Kenko Investment Kent LLC | Sheng Long Yu | 220 S Depeyster St. Kent, OH 44240 | 440-364-8899 |
| OH | Cordof3 LLC | Vincent Liu | 7892 Mason-Montgomery Road #15 Mason, OH 45040 | 513-335-7052 |
| OH | Tea Z LLC | Amir Odeh | 4038 Talmadge Road Suite 106 Toledo, OH 43623 | 734-497-7272 |
| OK | Heli Capital LLC | Mingze Li | 1915 S. Classen Blvd. Norman, OK 73071 | 325-668-7666 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| OK | Luxe & Co. LLC | Lisa Nguyen | 5956 S Yale Ave.<br>Tulsa, OK 74135 | 918-607-5052 |
| OR | Sweet Pearl HV Inc | Lu Ming Yang | 15640 SE Happy Valley Town Center Drive<br>Happy Valley, OR 97086 | 503-427-2133 |
| OR | Wander Tea Portland, LLC | Michael Wu | 2185 NW Allie Ave.<br>Hillsboro, OR 97124 | 510-898-8541 |
| OR | Sweetpearl LLC | Lu Ming Yang | 700 SW 5th Ave., Suite #1175, Portland, OR 97294<br>Portland, OR | 503-997-8282 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 1129 Old York Road<br>Abington, PA 19001 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 22 Lancaster Ave.<br>Ardmore, PA 19003 | 917-226-2661 |
| PA | PA Bubble Tea Inc.*** | Cheng Hao Gao | 588 Lancaster Avenue<br>Berwyn, PA 19312 | 484-355-5947 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 6 West State Street<br>Doylestown, PA 18901 | 917-226-2661 |
| PA | PA Bubble Tea Inc** | Cheng Hao Gao | 1045 Bustleton Pike<br>Feasterville-Trevose, PA 19053 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 160 N Gulph Rd. K103A<br>King of Prussia, PA 19406 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 1846 Fruitville Pike<br>Lancaster, PA 17601 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 4034 Veteran Highway,<br>Levittown, PA 19056 | 917-226-2661 |
| PA | PA Bubble Tea Inc.*** | Cheng Hao Gao | 650 Carnegie Blvd, Suite M1<br>Malvern, PA 19355 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 12 E. State St<br>Media, PA 19063 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 2907 Swede Road<br>Norristown, PA 19401 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 1222 Welsh Road, Suite D<br>North Wales, PA 19454 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 600 Washington Avenue<br>Philadelphia, PA 19147 | 917-226-2661 |
| PA | Philly Bubble Tea Inc.** | Chen Hao Gao | 1006 Arch Street<br>Philadelphia, PA 19107 | 267-758-2871 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 2000 Hamilton Street Suite #107<br>Philadelphia, PA 19130 | 917-226-2661 |
| PA | BNC Food LLC | Zeng Xing Li | 2222 Cottman Avenue<br>Philadelphia PA 19149 | 917-291-6859 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 2453 Grant Avenue Philadelphia, PA 19114 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 3175 John F. Kennedy Blvd. Philadelphia, PA 19104 | 917-226-2661 |
| PA | PA Bubble Tea Inc.** | Cheng Hao Gao | 4500 City Line Avenue Philadelphia, PA 19131 | 917-226-2661 |
| PA | Chen Chen Inc. | Zhong Chen | 2109 Murray Ave. Pittsburgh, PA 15217 | 419-709-6189 |
| PA | KLK Bubble Tea, Inc. | Keresty Kelly | 4812 McKnight Rd. Pittsburgh, PA 15203 [mobile location] | 724-544-6367 |
| PA | Nittany Tea LLC | Yichi Lin | 320 West Beaver Avenue State College, PA 16801 | 814-272-0442 |
| PA | PA Bubble Tea Inc** | Cheng Hao Gao | 2 West Gay Street West Chester, PA 19380 | 917-226-2661 |
| PA | York Bubble Tea Inc | Ting Pun | 2035 Springwood Road York, PA 17403 | 717-668-8337 |
| RI | JJoon Investments, Inc. | Min Cheung | 110 Waterman Street Providence, RI 02906 | 401-861-1888 |
| SC | Dan Nguyen Enterprises LLC | Bach Mai Thuy Dam | 1852 SC-160 Fort Mill, SC 29708 | 803-547-3254 |
| SC | VP Brothers LLC | Vinh Dang | 605 Haywood Road Greenville, SC 29607 | 864-906-3259 |
| SC | KHJ Group Inc. | Wei Zhu | 95 Mathew Drive Suite 1A Hilton Head, SC 29926 | 843-422-2509 |
| TN | Cha4289, LLC | Nussasi Numpituckchaikul | 50 Frazier Ave, Suite 200 Chattanooga, TN 37405 | 423-645-3263 |
| TN | Gogi Grill Inc. | Liang Ying Lin | 8851 Town and Country Cir. Knoxville, TN 37922 | 404-453-4168 |
| TX | Moma Tea LLC | Ayla Hernandez | 101 South Center Street, Suite 170 Arlington, TX 76010 | 469-396-5579 |
| TX | Artisan Tea LLC | Calvin Chang | 9070 Research Blvd. Suite #102 Austin, TX 78758 | 512-827-9193 |
| TX | The Elite Tea Corporation | Toby Kwong | 2540 Old Denton Rd, Ste 122 Carrollton, TX 75006 | 972-446-9294 |
| TX | CJ & Jing, LLC | Jing Hua Xu | 905 E. Whitestone Blvd. Suite C Cedar Park, TX 78613 | 512-736-1177 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|---|---|---|---|---|
| TX | Twenty Twenty Development Group LLC | Ting Ting Huong | 723 Texas Ave. College Station, TX 77840 | 713-517-3554 |
| TX | FF Brothers Management Inc. | Leo Xia | 25704 Northwest Freeway 290, Suite F Cypress, TX 77014 | 713-732-1185 |
| TX | Shaw Bubble Tea LLC | Jonathan Shaw | 3001 Knox St #107A Dallas, TX 75205 | 214-500-7899 |
| TX | ShengHui, Inc. | Jian Hui Sun | 2735 W. University Dr. Suite #1061 Denton, TX 76201 | 940-243-5606 |
| TX | FM99 LLC | Jia Ma | 8889 Gateway Boulevard W, #2910 El Paso, TX 79925 | 915-200-4668 |
| TX | Continuum Empire LLC | Mandy Darsey | 4946 Overton Ridge Blvd. Fort Worth, TX 76132 | 682-250-3113 |
| TX | IQBAL Family LNZ LLC | Riaz Iqbal | 2601 Preston Road Frisco, TX 75034 | 214-493-6754 |
| TX | The Elite Tea Corporation | Toby Kwong | 9292 Warren Parkway Suite 230 Frisco, TX 75035 | 469-388-1008 |
| TX | Phan & Le LLC | Steven Le | 5220 S State Highway 360, Suite 120 Grand Prairie, TX 75052-0949 | 972-522-7792 |
| TX | DELIMANJOO MEMORIAL LLC | Amy Lou | 1005 Blalock Rd, Unit G Houston, TX 77055 | 713-972-2622 |
| TX | Unlimited Rising Peak LLC | Dean (Wenpo) Chou | 1275 Eldridge Parkway Suite 195 Houston, TX 77077 | 832-932-5266 |
| TX | Evergreen Rising Peak LLC | Dean Chou | 3201 Louisiana Street, #106 Houston, TX 7706 | 281-323-1899 |
| TX | Houston Authentic Tea Group LLC | Dean Chou | 3224 Yoakum Blvd. Houston, TX 77006 | 281-888-3818 |
| TX | FF Brothers Management Inc. | Leo Xia | 3645 FM 1960, Suite #238 Houston, TX 77014 | 713-732-1185 |
| TX | United Rising Peak LLC | Dean Chou | 9889 Bellaire Blvd., #222 Houston, TX 77036 | 832-831-9288 |
| TX | KSHK Investment, LLC | Sophoat Kem; Hanmonika Khoun | 6730 Atascocita Road Humble, TX 77346 | 267-475-6200 |
| TX | Larry Nguyen, LLC | Larry Nguyen | 501 South Mason Road Katy, TX 77450 | 281-206-7339 |
| TX | HieuTea LLC | Hieu Luc | 1220 N. Midkiff Rd., Ste. G Midland, TX 79701 | 580-917-0983 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| TX | M.J. Star Tea Inc. | Jack Jiang | 6250 Highway 6, Suite B Missouri City, TX 77459 | 832-275-2563 |
| TX | MM Investment LLC | Chuong Tran | 160 E. FM 544, Suite 90 Murphy, TX 75094 | 469-298-0981 |
| TX | BLTea LLC | Bailey Tran | 2828 Highway 365, Suite #700 Nederland, TX 77627 | 409-549-2770 |
| TX | Fruitful Life LLC | Nguyen Nguyen | 22118 Market Place Drive Suite #600 New Caney, TX 77357 | 469-212-2103 |
| TX | Dat Tea Shop LLC | Trung Thanh Dang | 11200 Broadway St. Suite 1370 Pearland, TX 77584 | 346-888-7803 |
| TX | 888 Icon Tea Corporation | Toby Kwong | 2001 Coit Road Plano, TX 75075 | 214-501-3458 |
| TX | Prosperity Production LLC | Shahnewaz M. Khayer | 1151 S. Preston Road Suite 20 Prosper, TX 75078 | 214-600-0619 |
| TX | The Icon Tea Corporation | Toby Kwong | 2067 N Central Expressway, Suite 100 Richardson, TX 75080 | 972-907-1578 |
| TX | ALMIGHTEA & BOBA LLC | Dung H. Nguyen | 11020 Harlem Rd, #200 Richmond, TX 77406 | 832-275-2740 |
| TX | Commercial Construction Consulting Inc. | Oliver Nguyen | 2314 SE Military Drive, Suite 109 San Antonio, TX 78223 | 210-239-5333 |
| TX | NHEK LLC | Rattana Nhek | 5231 Broadway St Suite 101 San Antonio, TX 78209 | 210-455-0092 |
| TX | Green Paper Enterprise LLC | Oliver Nguyen | 5755 Northwest Loop 410 Suite 104 San Antonio, TX | 210-951-1944 |
| TX | PTNN LLC | Oliver Nguyen | 7211 Green Glen Drive San Antonio, TX 78255 | 210-239-5333 |
| TX | Bubble 888 LLC | Dean Chou | 13509 University Blvd. #A300 Sugar Land, TX 77479 | 281-323-1899 |
| TX | RoyalGroupMP Investment LLC* | Sophoat Kem | Texas City, TX | 938-253-4259 |
| TX | Son & Erik, LLC | Erik Dang | 3091 College Park Dr. Suite #180 The Woodlands, TX 77384 | 936-242-1552 |
| TX | ZHB LLC | Benjamin Zhu | 6611 S Broadway Avenue Suite 100 Tyler, TX 75703 | 903-714-4309 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| TX | iHeart Tea LLC | Wenjuan Yu | 3126 Pat Booker Road, Ste 108<br>Universal City, TX 78148 | 210-668-6032 |
| TX | Transsani, LLC | Donald Tran & Ben Sassani | 304 Bay Area Blvd., #200<br>Webster, TX 77598 | 713-922-1793 |
| UT | Rainbow Tea LLC | Pornthip Impunchai | 121 East 12300 South<br>Draper, UT 84020 | 801-637-6374 |
| UT | Samrithisak GD LLC | Joie Phuc | 464 S 600 E., Suite A<br>Salt Lake City, UT 84102 | 801-364-4558 |
| UT | PKK Tea LLC | Pornthip Impunchai | 9000 South 1391 West<br>West Jordan, UT 84088 | 801-637-6374 |
| VA | PK Tea LLC | Veasna (Wes) Ky | 6328 Richmond Highway<br>Alexandria, VA 22306 | 571-371-8075 |
| VA | Jam Piety LLC | Samuel Huang | 7895 Heritage Drive<br>Annandale, VA 22003 | 586-883-3802 |
| VA | Oming, Inc. | Min A. Oh | 3018 Wilson Boulevard<br>Arlington, VA 22201 | 703-528-1686 |
| VA | KF Arlington Inc | Zong Cai Chen | 4238 Wilson Blvd Level C<br>Quarter Market<br>Arlington, VA 22203 | 410-818-0168 |
| VA | Zaker Bros Inc | Faith Sabah Zaker, Majd Sabah Zaker | 43800 Central Station Drive, Suite 175<br>Ashburn, VA 20147 | 703-857-1173 |
| VA | Alfiya LLC | Eleni T. Teketele | 44110 Ashburn Shopping Plaza, Suite 186<br>Ashburn, VA 20147 | 571-291-9361 |
| VA | Ninja Café LLC | Mandy Kwok | 1200 South Main St<br>Blacksburg, VA 24060 | 540-739-3133 |
| VA | SPK Group LLC | Veasna ("Wes") Ky | 9530B Old Keene Mill Rd<br>Burke, VA 22015 | 703-372-5289 |
| VA | Jam Piety LLC | Samuel Huang | 13830 Lee Highway, Unit 5<br>Centreville, VA 20120 | 586-883-3802 |
| VA | Two Brothers LLC | Kelly Tran & Owen Wang | 1001 West Main Street<br>Charlottesville, VA 22903 | 434-202-8844 |
| VA | Charles International, LLC | Charles Traufler | 21100 Dulles Town Circle Suite #140<br>Dulles, VA 20166 | 703-430-5818 |
| VA | Jam Piety LLC | Samuel Huang | 6757 Wilson Blvd., Unit 10/11<br>Falls Church, VA 22044 | 571-830-6035 |
| VA | Hampton Teas Inc. | Feiyan Lin; Chun Mao Lin | 2040 Coliseum Drive #A13<br>Hampton, VA 23666 | 757-569-6444 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| VA | Boba Blast LLC | Michael Wu | 1645 Reservoir St., Unit 175 Harrisonburg, VA 22801 | 540-217-5182 |
| VA | HaLeYen L.L.C. | Mike Ha | 10827 W Broad Street Henrico, VA 23233 | 757-277-3176 |
| VA | ALH Holdings LLC | Christopher Hutchinson | 9457 Lorton Market Street Lorton, VA 22079 | 703-624-1442 |
| VA | We Cha Inc. | Yi Chen | 10689 Sudley Manor Drive, #104 Manassas, VA 20109 | 703-889-0005 |
| VA | LLK Enterprises, LLC | Janet Song | 1961 Chain Bridge Road Tysons Corner Center Mclean, VA 22102 | 240-630-0900 |
| VA | LLK Enterprises, LLC | Janet Song | 1961 Chain Bridge Road Tysons Corner Center, Kiosk #SKS01, McLean, VA 22102 | 571-492-9688 |
| VA | Newport News Tea Inc. | Feiyan Lin | 21 Hidenwood Shopping Center Newport News, VA 23606 | 757-223-1968 |
| VA | Splash Boba 2 LLC | Michael Wu | 520 W 21st St Norfolk, VA 23517 | 757-226-8797 |
| VA | RCHP USA Inc. | Sang Woon Lee | Hunter Woods Village Center 2280-A Hunters Woods Plaza Reston, VA 20191 | 703-362-9638 |
| VA | MML, Inc. | Michael Wong | 946 West Grace St. Richmond, VA 23220 | 804-254-1746 |
| VA | HLY L.L.C. | Mike Ha and Kevin Nguyen | 11577 W Broad Street Richmond, VA 23233 | 757-277-3176 |
| VA | SPK Group LLC | Wes Ky | 7000 Brookfield Plaza, Unit E Springfield, VA 22150 | 703-663-8661 |
| VA | Food Central LLC | Muhammad Abdel Aziz | 1475 Stafford Market Place Suite 3 Stafford, VA 22556 | 571-527-6532 |
| VA | Thong & Chhim LLC | Linda & Niroth Thong | 46950 Community Plaza Unit 104 Sterling, VA 20164 | 703-444-4686 |
| VA | Splash Boba 5 LLC | Michael Wu | 1045 Independence Boulevard Virginia Beach, VA 23455 | 757-937-1430 |
| VA | Splash Boba LLC | Michael Wu | 1949 Lynnhaven Pkwy, Unit 113 Virginia Beach, VA 23456 | 757-777-9889 |

Version 4/20/2023 rev 6/12/2023

| State | Franchisee Name | Contact Name | Shop Address | Phone |
|-------|-----------------|--------------|--------------|-------|
| VA | Newport News Tea Inc. | Lin Felyan | 4902 Courthouse St. Williamsburg, VA 23188 | 757-814-8188 |
| VA | Boba Fantasy, Inc. | Fanny (Yi) Shen | 1850 Apple Blossom Drive Unit KI 11 Winchester, VA 22601 | 703-828-5679 |
| VA | A&R Team LLC | Rosalima D. Dela Rosa | 4160 Merchant Plaza Woodbridge, VA 22192 | 571-344-8900 |
| WA | BIS Group LLC | Keyao Ma | 19723 Highway 99 N 723D Lynnwood, WA 98036 | 206-422-7744 |
| WA | 4339 Ave LLC | Keyao Ma | 4730 University Way, NE Suite 109-110 Seattle, WA 98105 | 206-422-7744 |
| WA | Max Mata Tea LLC | Huiyun ("Hillary") Zhang | 1067 Southcenter Mall, #1303 Tukwila, WA 98188 | 347-866-6230 |
| WA | LeO Tea LLC | Oliver Le | 8109 Vancouver Mall Drive, Suite D Vancouver, WA 98662 | 360-718-2160 |
| WI | SevenTea LLC | Yushen Chen | 449 State St., Unit A Madison, WI 53703 | 920-254-5193 |
| WY | T Shop LLC | Jing Liu | 2032 Dell Range Boulevard, Cheyenne WY 82009 | 307-286-6628 |

*Signed but not open as of 12/31/2022
** Multi-Unit Developer

Version 4/20/2023 rev 6/12/2023

**EXHIBIT B2**

**FORMER FRANCHISEES**

| Franchisee Name | City and State | Telephone Number |
|---|---|---|
| Kissena AZ LLC | Tempe, AZ | 602-875-9445 |
| Bubble Tea Truck LLC | Atlanta, GA | 404-789-1644 |
| Uni Tea Inc. | Syracuse, NY | 646-575-8568 |
| Independence Food Ser-vices LLC | Cincinnati, OH | 614-747-5430 |
| Milk Tea Reserve LLC | Oklahoma City, OK | 405-532-1626 |
| Yootea Sippers, LLC | Austin, TX | 832-875-4177 |
| T & T Drinks and Eatery, LLC | 11020 Harlem Road, #200 Richmond, TX 77406 | 832-275-2740 |
| VTVC Enterprises, Inc. | Wichita Falls, TX | 940-882-3537 |

The following table lists franchisees who transferred or closed one or more of their franchises in 2022 but continue to own other Kung Fu Tea franchises:

| Franchisee Name | City and State | Telephone Number | Franchises Closed or Transferred |
|---|---|---|---|
| CN Food & Bev-erage LLC | Los Angeles, CA | 424-273-1891 | Westminster, CA |
| URG Inc. | Washington, DC | 202-808-9628 | Washington, DC |
| Bubu LLC | Grand Rapids, MI | 517-703-6800 | East Lansing, MI |
| Me & Tea LLC | Rochester Hill, MI Sterling Heights, MI | 586-663-6035 | Novi, MI |
| Dat Tea Shops 99 LLC | Pearland, TX | 346-888-7803 | Houston, TX |
| 888 Icon Tea Corporation | Plano, TX | 214-501-3458 | Plano, TX |
| Janet Song | Gaithersburg, MD Germantown, MD Rockville, MD | 630-290-7251 | Tysons Corner, VA |
| Tony Nguyen | Rochester Hill, MI Sterling Heights, MI | 586-663-6035 | Novi, MI |

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Version 4/20/2023

**EXHIBIT C**

## 1. FRANCHISEE ORGANIZATIONS
## WE HAVE CREATED, SPONSORED OR ENDORSED

None as of the date of this disclosure document.

## 2. INDEPENDENT FRANCHISEE ASSOCIATIONS

None as of the date of this disclosure document.

Version 4/20/2023 rev 7/22/2023

**A94**

**EXHIBIT D**

**FINANCIAL STATEMENTS**

Version 4/20/2023 rev 7/22/2023

# KF Tea Franchising LLC

Financial Statements and
Supplementary Information

December 31, 2022

**<u>Table of Contents</u>**  **<u>Page(s)</u>**

Independent Auditors' Report                                      1-2

Financial Statements

    Balance Sheets                                                3

    Statements of Income and Members' (Deficit)                   4

    Statements of Cash Flows                                      5

Notes to Financial Statements                                    6-14

Supplementary Information

    Schedules of General and Administrative Expenses and Selling Expenses    15



<div align="center">**Independent Auditors' Report**</div>

**The Board of Directors and Members**
**KF Tea Franchising LLC**

### Opinion

We have audited the financial statements of KF Tea Franchising LLC (a Delaware Limited Liability Company), (the "Company"), which comprise the balance sheets as of December 31, 2022 and 2021, and the related statements of income and member's (deficit) and cash flows for the years ended December 31, 2022, 2021 and 2020, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of KF Tea Franchising LLC as of December 31, 2022 and 2021, and the results of its operations and cash flows for the years ended December 31, 2022, 2021 and 2020 in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audits in accordance with auditing standards generally accepted in United States of America. Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of KF Tea Franchising LLC and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Emphasis of Matter

As discussed in Note 2 to the financial statements, the Company adopted the Financial Accounting Standards Board ("FASB") Topic 842, Leases, using the effective date method retroactive for all periods presented. Our opinion is not modified with respect to this matter.

### Responsibility of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about KF Tea Franchising LLC's ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

PKF O'CONNOR DAVIES, LLP
245 Park Avenue, New York, NY 10167  I  Tel: 212.867.8000 or 212.286.2600  I  Fax: 212.286.4080  I  www.pkfod.com

PKF O'Connor Davies, LLP is a member firm of the PKF International Limited network of legally independent firms and does not accept any responsibility or liability for the actions or inactions on the part of any other individual member firm or firms.

*Auditors' Responsibility for the Audit of the Financial Statements*

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgement made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of KF Tea Franchising LLC's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about KF Tea Franchising LLC's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit findings, and certain internal control related matters that we identified during the audit.

*Report on Supplementary Information*

Our audits were conducted for the purpose of forming an opinion on the financial statements as a whole. The information on page 15 is presented for purposes of additional analysis and is not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audits of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, such information is fairly stated in all material respects in relation to the financial statements as a whole.

*PKF O'Connor Davies, LLP*

April 20, 2023

**A99**

**KF Tea Franchising LLC**

Balance Sheets

| | | December 31 | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| **ASSETS** | | | | |
| Current Assets | | | | |
| Operating cash (see note 5) | $ | 2,178,208 | $ | 1,917,038 |
| Accounts receivable | | 597,607 | | 598,079 |
| Prepaid expenses and other current assets | | 27,847 | | - |
| Due from related parties, net | | - | | 398,993 |
| Total Current Assets | | 2,803,662 | | 2,914,110 |
| | | | | |
| Security deposits | | 128,000 | | 128,000 |
| Capitalized software development costs, net | | 270,965 | | 267,144 |
| Property and equipment, net | | 4,431 | | 2,476 |
| Operating lease right-of-use asset | | 1,772,738 | | 2,378,913 |
| Other assets | | 7,297 | | 9,229 |
| | | | | |
| Total Assets | $ | 4,987,093 | $ | 5,699,872 |
| | | | | |
| | | | | |
| **LIABILITIES AND MEMBERS' (DEFICIT)** | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ | 386,433 | $ | 448,949 |
| Deferred franchise income (see note 2) | | 1,535,250 | | 1,312,858 |
| Deferred other revenue | | 136,583 | | 151,977 |
| Operating lease liability, current portion | | 620,602 | | 579,411 |
| Due to related parties, net | | 418,794 | | - |
| Total Current Liabilities | | 3,097,662 | | 2,493,195 |
| | | | | |
| Non-current Liabilities | | | | |
| Deferred franchise income (see note 2) | | 5,184,276 | | 4,670,185 |
| Operating lease liability, net of current portion | | 1,261,737 | | 1,882,339 |
| Total Liabilities | | 9,543,675 | | 9,045,719 |
| | | | | |
| Members' (deficit) | | (4,556,582) | | (3,345,847) |
| | | | | |
| | $ | 4,987,093 | $ | 5,699,872 |

See notes to financial statements

3

**A100**

**KF Tea Franchising LLC**

Statements of Income and Members' (Deficit)

| | | Year Ended December 31 | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **REVENUES** | | | |
| Franchise and training fee income | $ 1,635,017 | $ 1,278,396 | $ 889,750 |
| Royalty fee income | 4,700,115 | 4,026,901 | 2,467,310 |
| Marketing fee income | 2,580,843 | 2,182,332 | 1,314,192 |
| Other revenues | 52,276 | 52,105 | 41,315 |
| Total Revenues | 8,968,251 | 7,539,734 | 4,712,567 |
| | | | |
| **EXPENSES** | | | |
| General and administrative | 4,063,202 | 3,677,454 | 2,673,741 |
| Selling | 3,864,046 | 2,895,973 | 1,452,624 |
| Total Expenses | 7,927,248 | 6,573,427 | 4,126,365 |
| | | | |
| Gross Operating Profit | 1,041,003 | 966,307 | 586,202 |
| | | | |
| **NON-OPERATING INCOME** | | | |
| Gain on extinguishment of debt (see note 7) | - | 264,954 | 240,389 |
| Other income | - | 10,000 | 1,013 |
| | - | 274,954 | 241,402 |
| | | | |
| Income Before Provision for Local Income Taxes | 1,041,003 | 1,241,261 | 827,604 |
| | | | |
| Provision for local income taxes | 5,738 | 2,250 | 2,200 |
| | | | |
| Net Income | 1,035,265 | 1,239,011 | 825,404 |
| | | | |
| Members' distributions | (2,246,000) | (557,500) | (1,178,000) |
| | | | |
| Members' (Deficit), beginning of year | (3,345,847) | (4,027,358) | (3,674,762) |
| | | | |
| Members' (Deficit), end of year | $ (4,556,582) | $ (3,345,847) | $ (4,027,358) |

See notes to financial statements

4

**A101**

**KF Tea Franchising LLC**

Statements of Cash Flows

| | | Year Ended December 31 | | | |
|---|---|---|---|---|---|
| | | 2022 | | 2021 | 2020 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income | $ | 1,035,265 | | 1,239,011 | $ 825,404 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | | | |
| Bad debt expense | | - | | 44,973 | - |
| Amortization of the right-of-use asset | | 606,175 | | 527,988 | 251,065 |
| Depreciation and amortization | | 68,926 | | 523 | 323 |
| Gain on extinguishment of debt | | - | | (264,954) | (240,389) |
| Changes in operating accounts | | | | | |
| Accounts receivable | | 472 | | (254,742) | 12,917 |
| Prepaid expenses | | (27,847) | | - | 13,283 |
| Due to/from related parties | | 817,787 | | (506,479) | - |
| Security deposits | | - | | (60,000) | 31,667 |
| Other assets | | 1,932 | | 300 | (800) |
| Accounts payable and accrued expenses | | (62,516) | | (80,416) | 397,914 |
| Income tax payable | | - | | (3,300) | - |
| Change in operating lease liability | | (579,411) | | (445,151) | (251,065) |
| Deferred franchise and training income | | 736,483 | | 840,605 | 64,750 |
| Deferred other revenue | | (15,394) | | 49,393 | (7,498) |
| Net Cash Provided by Operating Activities | | 2,581,872 | | 1,087,751 | 1,097,571 |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Capitalized software development costs | | (71,562) | | (267,144) | - |
| Notes receivable from members - repayments | | - | | 84,600 | - |
| Notes receivable from members - issued | | - | | - | (84,600) |
| Purchase of property and equipment | | (3,140) | | (1,149) | (1,849) |
| Net Cash (Used) by Investing Activities | | (74,702) | | (183,693) | (86,449) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Proceeds from PPP loans payable | | - | | 264,954 | 240,389 |
| Distributions to members | | (2,246,000) | | (877,500) | (858,000) |
| Net Cash (Used) by Financing Activities | | (2,246,000) | | (612,546) | (617,611) |
| | | | | | |
| Net Increase in Operating Cash | | 261,170 | | 291,512 | 393,511 |
| | | | | | |
| Operating cash at beginning of year | | 1,917,038 | | 1,625,526 | 1,232,015 |
| | | | | | |
| Operating cash at end of year | $ | 2,178,208 | $ | 1,917,038 | $ 1,625,526 |
| | | | | | |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION** | | | | | |
| Cash paid during the year for income taxes | $ | 4,175 | $ | 4,658 | $ 2,200 |
| | | | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITY** | | | | | |
| Authorized accrued distributions to members | $ | - | $ | 320,000 | $ (320,000) |
| | | | | | |
| Related party notes receivable balance applied against outstanding due to related balance for same entity | $ | - | $ | - | $ 93,604 |
| | | | | | |
| Forgiveness of PPP loans payable | $ | - | | 264,954 | $ 240,389 |

See notes to financial statements

5

**A102**

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

**1.       Description of Business**

KF Tea Franchising LLC (the "Company") is a franchiser of oriental style brew tea, bubble tea, coffee,  juice, smoothies and other hot and cold drinks. The Company was formed on April 17, 2013 as a limited liability company under the laws of the State of Delaware. There were 339 franchised locations which were either operating or temporarily closed as of December 31, 2022; 285 franchised locations which were either operating or temporarily closed as of December 31, 2021; and 240 franchised locations which were either operating or temporarily closed as of December 31, 2020.

**2.       Summary of Significant Accounting Policies**

***Basis of Presentation and Use of Estimates***

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") which requires management to make  estimates and assumptions that affect certain reported amounts of assets and liabilities and disclosures at the date of the financial statements and the reported amounts of revenues and expenses during the  reporting period. Accordingly, actual results could differ from those estimates. Significant estimates reflected in the financial statements include the valuation of receivables, accounting for software development costs, and revenue recognition.

The functional and reporting currency of the Company is the U.S. Dollar.

***Change in Accounting Policy***

The Company adopted FASB Topic 842, Leases, using the effective date method with retroactive adjustments to all periods presented herein.

The Company elected the available practical expedients to account for its existing operating leases as operating leases, under the new guidance, without reassessing (a) whether the contracts contain leases under the new standard, (b) whether classification of capital leases or operating leases would be different in accordance with the new guidance, or (c) whether the unamortized initial direct costs before transition adjustments would have met the definition of initial direct costs in the new guidance at lease commencement. The most significant impact of adopting this new standard is in the accompanying balance sheet which reflected the recognition of right of use (ROU) assets and operating lease liabilities of approximately $2.9 million during 2021 (see Note 6).

***Reclassifications***

Certain prior period accounts have been reclassified to confirm to the 2022 financial statement presentation.

6

**A103**

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

2.      **Summary of Significant Accounting Policies** *(continued)*

*Revenue Recognition*

Effective January 1, 2019, the Company adopted U.S. GAAP revenue recognition guidance ("Topic 606"). The Company adopted the accounting standards update on a modified retrospective basis whereby a cumulative effect adjustment of $3,584,834 was made as a reduction to opening members' equity at January 1, 2019.

As shown on the accompanying statements of income and members' (deficit), the Company has several revenue sources derived from franchise agreements which include an initial nonrefundable deposit, nonrecurring franchise and training fees, and continuing royalty and marketing fees. The Company has concluded that each of its contracts with franchisees include multiple performance obligations, which are generally all satisfied over time.

Potential franchisees are typically requested to pay a $5,000 nonrefundable deposit to the Company before signing franchise agreements. The $5,000 is nonrefundable, even if the franchise agreement is not signed, and the store is not opened. If the store is opened, the $5,000 deposit is applied to the franchise fee described below.

Once a new franchisee has signed their respective franchise agreement, they are required to pay a nonrefundable franchise fee and a nonrefundable training fee. The initial franchise fee is $37,000, however in some cases whereby the franchisee has multiple locations or operates a non-traditional unit, the initial franchise fee is $25,000. In addition, the Company requires an up-front $10,000 training fee for first time franchisees to cover the costs of an initial three-week training program. Initial franchise fees and deposits are recognized over the length of the respective franchise agreement, as the Company considers its performance obligation to be the providing of branding and licenses, and assistance in the operations of a franchise over the term of the franchise agreement. Nonrefundable deposits received for franchise agreements are recognized in full once the Company and potential franchisee determine that no franchise agreement will be signed, and a store will not open. Unamortized revenues on franchise agreements which are not fulfilled are recognized in full when the store closes and the franchise agreement is annulled. The Company recognizes training fee revenue upon completion of the distinct performance obligation, which is the provision of training services. Such training services are generally performed over a period not exceeding one month.

Percentage royalty and marketing fees are generally based on a franchisees' gross sales, as defined in the respective franchise agreement. Royalty and marketing fee income is billed to franchisees monthly and recognized as revenue when earned.

The Company also provides franchises with consumables for use in their stores, such as menus, posters and other branded materials. Revenue is recognized upon delivery and was not material in any of the years presented. Such revenue is included within other revenues in the statements of income and members' (deficit).

**A104**

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

2. **Summary of Significant Accounting Policies** *(continued)*

*Revenue Recognition (continued)*

The Company recognizes substantially all of its revenue over time including: franchise fees over the term of the respective franchise agreements, training fees over the training period, and royalty and marketing fees on a monthly basis over the franchise agreement term.

Fees collected in advance of franchise agreements being signed and active are deferred until earned. At December 31, 2022 and 2021, deferred franchise revenue, will be amortized in operating revenue over the life of the respective franchise agreement, which are generally 10 years.

*Accounts Receivable*

Accounts receivable are stated at the amount the Company expects to collect. Management monitors the financial condition of franchisees and records provisions for estimated losses on receivables when management believes that franchisees are unable to make their required payments. While management  uses the best information available in making the determination, the ultimate recovery of recorded receivables is also dependent upon future economic events and other conditions that may be beyond its control. At December 31, 2022 and 2021, management determined an allowance for doubtful accounts was not required.

*Property and Equipment*

Property and equipment is stated at cost as of the date of acquisition. Depreciation is provided over the estimated useful lives of the respective equipment, using the straight-line method over 3 to 5 years. Depreciation expense amounted to $1,185 (2021: $523 and 2020: $323) for the year ended December 31, 2022. Accumulated depreciation amounted to $9,326 (2021: $8,141) as of December 31, 2022.

*Software Development Costs*

Costs incurred to develop a software application for the Company are capitalized and amortized, subject to periodic evaluation for impairment, over the estimated useful life of fifteen years. Costs related to the design or maintenance of the software application are expensed as incurred. Such costs were not placed into service and operational until 2022. As of December 31, 2022 and 2021, capitalized software development costs amounted to $338,706 and $267,144 respectively. Accumulated amortization amounted to $67,741 (2021: $0) as of December 31, 2022.

*Marketing and Advertising*

Costs associated with products, including advertising and other brand promotional activities, are expensed as incurred. Marketing and advertising costs amounted to approximately $1,715,000 (2021: $1,333,000 and 2020: $586,000) for the year ended December 31, 2022.

8

**A105**

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

2.      **Summary of Significant Accounting Policies** *(continued)*

*Operating Leases*

The Company leases space for its administrative offices and training facilities and determines if such arrangements meet the definition of a lease at inception. Under ASC 842, a contract is (or contains) a lease if it conveys the right to control the use of an identified asset for a period of time in exchange for consideration. Control is defined under the standard as having both the right to obtain substantially all of the economic benefits from use of the asset and the right to direct the use of the asset. Management only reassesses its determination if the terms and conditions of the contract are changed. Operating leases are included in operating lease ROU assets and operating lease liabilities on the accompanying balance sheet.

ROU assets represent the right to use an underlying asset for the lease term and lease liabilities represent the obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at the lease commencement date based on the present value of lease payments over the lease term. The leases do not provide an implicit borrowing rate. The Company uses an incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments. The operating lease ROU asset includes any lease payments made and excludes lease incentives. Lease expense for lease payments is recognized on a straight-line basis over the lease term.

The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants.

*Income Taxes*

Net income or losses of the Company are reported individually by the members for income tax purposes and, accordingly, no provision for income taxes is reflected in the financial statements. The Company is responsible to pay New York City unincorporated business tax.

*Uncertain Tax Positions*

U.S. GAAP requires an evaluation of tax positions taken by the Company and recognition of a liability in the financial statements if the Company has taken uncertain tax positions that more likely-than-not would not be sustained upon examination by the taxing authorities. As of December 31, 2022 and 2021, the Company has determined that it has no uncertain tax positions that qualify for either recognition or disclosure in the financial statements.

As of December 31, 2022, tax years since 2019 remain open to examination by most taxing authorities. There are no examinations currently in progress.

A106

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

**2.     Summary of Significant Accounting Policies** *(continued)*

*Subsequent Events*

Management has evaluated subsequent events through April 20, 2023, which is the date the financial statements were available to be issued, and has determined that there were no subsequent events or transactions which would require recognition or disclosure, other than disclosed in these financial statements.

**3.     Transactions with Related Parties**

From time to time, the Company advances funds to/borrows funds from, and enters into transactions with, related parties in the normal course of business. These related parties include members, officers and affiliates of the Company. Amounts due from (to) related parties are due on demand and non-interest bearing. As of December 31,  2022 and 2021, the net amount due (to) from related parties amounted to $(418,794) and $398,993, respectively. The net amount due from related parties at December 31, 2022 consisted of a $424,794 payable and $6,000 receivable from two separate related entities. The balance at December 31, 2021 was comprised of a $296,481 payable for rent and training fees, a $759,268 receivable for advances paid to a related entity that provides marketing services and a $74,794 payable and $11,000 receivable from two separate related entities.

*Notes Receivable from Members*

On December 31, 2020, the Company entered into loan agreements with two members totaling $84,600. The loans are non-interest bearing and matured on December 31, 2021. The loans were repaid in full in April 2021.

*Licensing Fees*

The Company has a license agreement with an entity affiliated by common control, for the exclusive use of the Kung Fu Tea trademark and business model. Pursuant the license agreement, the Company incurred an annual license fee of $1,500,000 (2021: $1,200,000 and 2020: $1,200,000) for the year ended December 31, 2022 which is included in general and administrative expenses in the accompanying statements of income and members' (deficit). The license fee agreement matures on December 31, 2023.

*Related Party Leases and Training Fees*

Effective January 1, 2021, the Company entered into two sublease agreements with two affiliated entities for space to be used to provide training to new franchisees. The combined lease payments shall be a fixed amount of $17,894 per month or $214,730 per year, subject to an annual increase of 3%. The lease terms end on December 31, 2025. (see Note 6).

10

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

**3.      Transactions with Related Parties** *(continued)*

*Related Party Leases and Training Fees (continued)*

As of December 31, 2022, amounts due for related party rent and training fees was $0 (2021: $296,481) and is netted with due from related parties on the accompanying balance sheet.

*Marketing Costs*

An entity affiliated by common control provides various marketing services to the Company. Fees incurred for marketing services amounted to $350,000 (2021: $302,892 and 2020: $70,380) for the year ended December 31, 2022 and are included in selling expenses on the accompanying statements of income and members' (deficit). As of December 31, 2022, $(424,794) (2021: $759,268) was due (to) from this affiliated entity and is included in due from related parties on the accompanying balance sheet.

**4.      Franchisee Marketing Fund**

The Company requires franchisees to pay a marketing fee during the term of the franchise agreements as a contribution to a marketing fund. The Company maintains and directs regional and national advertising, all of which are financed by the marketing fund. If the marketing  fund is terminated, any unspent monies at the date of the termination will be distributed to the franchise stores in proportion to their respective contributions to the marketing fund during the preceding twelve-month period.

**5.      Financial Instruments**

The Company, as part of its operations, carries a number of financial instruments. It is management's opinion that the Company is not exposed to significant interest, currency, credit, liquidity or other price risks arising from these financial instruments except as otherwise disclosed.

*Concentration of Credit Risk*

The Company is subject to credit risk through its accounts receivable, consisting primarily of amounts due from franchisees for marketing and royalty fee income. The financial condition of these franchisees is largely dependent upon the underlying business trends of the brands and the market conditions within the quick food and beverage industry.

This concentration of credit risk is mitigated, in part, by the large number of franchisees and the short-term nature of the marketing and royalty fee receivables.

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

**5.      Financial Instruments** *(continued)*

*Concentration of Credit Risk (continued)*

During March 2023, Signature Bank (the "Bank") has been closed by the New York Department of Financial Services, which appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. As of December 31, 2022, the Company had deposit accounts with the Bank approximating $2 million which is substantially all of the Company's total current cash and cash equivalents. In addition, in connection with a security deposit, the Company has a standby letter of credit in place with the Bank of approximately $128,000 securing obligations under its lease agreements.

As of March 12, 2023, the FDIC has taken over all deposits of the Bank and has stated that all depositors will be made whole even though they exceed the FDIC limits of $250,000. At this time, the Company expects to continue to be able to meet its payroll and supplier obligations. However, due to disruptions to the U.S. banking system caused by the recent developments involving the Bank, the Company may experience delays in its ability to transfer funds whether held with the Bank or otherwise.

*Liquidity Risk*

Liquidity risk is the risk that the Company will encounter difficulty in meeting obligations associated with financial liabilities. The Company is exposed to liquidity risk arising primarily from accounts payable and accrued expenses, due to related parties and due to franchisees.

*Interest Rate Risk*

Interest rate risk is the risk that the fair value of future cash flows of a financial instrument will fluctuate due to changes in market interest rates. The Company is not exposed to significant interest rate risk.

**6.      Commitments and Contingencies**

*Leases*

The Company rents space for its administrative offices and training facilities under lease agreements expiring through December 31, 2025. The operating costs were approximately $635,000 for the year ended December 31, 2022, $560,000 in 2021 and $250,000 in 2020.

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

6. **Commitments and Contingencies** *(continued)*

*Leases (continued)*

Information associated with the measurement of the Company's operating lease obligations as of December 31, 2022 is as follows:

| | |
|---|---|
| Weighted-average remaining lease term in years for operating lease | 2.89 |
| Weighted-average discount rate for operating leases | 1.33% |

Maturities of lease liabilities under noncancellable operating leases as of December 31, 2022, are as follows:

| | |
|---|---|
| 2023 | $    641,880 |
| 2024 | 668,084 |
| 2025 | 610,425 |
| Total Undiscounted Lease Payments | $ 1,920,389 |
| Less imputed interest | (38,050) |
| Total Lease Liabilities | $ 1,882,339 |

Supplemental cash flow information related to the operating lease was as follows for the years ended December 31:

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cash paid for amounts included in the measurements of lease liabilities | | | |
| Operating cash flows - operating leases | $    608,606 | $    477,416 | $    242,048 |
| Reductions to right-of-use asset resulting from reduction to lease liabilities | | | |
| Operating lease | $    606,175 | $    527,988 | $    251,065 |

Supplemental cash flow information related to the operating lease was as follows for the year ended December 31, 2021:

Right-of-use asset obtained in exchange for lease liabilities during 2021:
Operating lease                                         $2,906,901

13

**A110**

**KF Tea Franchising LLC**

Notes to Financial Statements
December 31, 2022

6.      **Commitments and Contingencies** *(continued)*

   *Contingencies*

   From time to time, the Company may be subject to legal proceedings or claims that arise
   in the ordinary course of business.  In the opinion of management, the amount of any
   ultimate liability with respect to  these actions will not have a material adverse effect on
   the Company's financial condition or results of operations.

7.      **Paycheck Protection Program Loan Proceeds**

   During April 2020, the Company received loan proceeds in the amount of $240,389
   under the Paycheck Protection Program (the "PPP") and on January 23, 2021, the
   Company received PPP loan proceeds in the amount of $264,954 under the Second
   Draw Provisions of the PPP as authorized by the Economic Aid to Hard-Hit Small
   Businesses, Nonprofits, and Venues Act. The PPP, established as part of the
   Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), provides for
   loans to qualifying entities for amounts up to 2.5 times the 2019 or 2020 average
   monthly payroll expenses of the qualifying entity. The PPP loans were charged an
   interest rate of 1% per annum.  All or a portion of the PPP loan principal and accrued
   interest is forgivable as long as the borrower uses the loan proceeds for eligible
   purposes, as described in the CARES Act, over a period of either eight or twenty-four
   weeks (the "Covered Period"). The amount of loan forgiveness could be reduced if the
   borrower terminates employees or reduces salaries in excess of a certain threshold
   during the Covered Period and does not qualify for certain safe harbors.

   The initial PPP loan, which included a $10,000 Economic Injury Disaster Loan Advance
   Deduction, plus interest was fully forgiven in December 2020 by the United States Small
   Business Administration ("SBA"). The second PPP loan, plus accrued interest, was fully
   forgiven in August 2021. The Company recognized the income from the forgiveness of
   PPP loans as a gain on extinguishment of debt on the accompanying statements of
   income and members' (deficit).

**A111**

**KF Tea Franchising LLC**

Schedules of General and Administrative Expenses and Selling Expenses

|  | Year Ended December 31 | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| **GENERAL AND ADMINISTRATIVE EXPENSES** | | | |
| Licensing fees | $ 1,500,000 | $ 1,200,000 | $ 1,200,000 |
| Payroll, payroll taxes and employee benefits | 1,164,436 | 973,930 | 661,093 |
| Legal and professional fees | 228,460 | 265,081 | 216,520 |
| Operating lease and related costs | 626,079 | 568,311 | 251,065 |
| Office expenses | 154,904 | 349,996 | 123,606 |
| Dues and subscriptions | 200,089 | 212,306 | 141,266 |
| Utilities | 79,304 | 33,232 | 29,264 |
| Miscellaneous expenses | 24,700 | 7,811 | 24,059 |
| Insurance | 2,109 | 10,432 | 19,913 |
| Bank charges | 1,561 | 3,311 | 1,946 |
| Equipment rental | 12,634 | 7,548 | 4,686 |
| Depreciation | 68,926 | 523 | 323 |
| Bad debt expense | - | 44,973 | - |
| Total General and Administrative Expenses | $ 4,063,202 | $ 3,677,454 | $ 2,673,741 |
| **SELLING EXPENSES** | | | |
| Payroll, payroll taxes and employee benefits | $ 1,722,137 | $ 1,201,558 | $   737,202 |
| Marketing and advertising | 1,715,374 | 1,332,952 | 586,050 |
| Travel | 329,404 | 212,478 | 82,377 |
| Commission | - | 29,929 | 46,000 |
| Meals and entertainment | 55,631 | 723 | 995 |
| Software development expense | 41,500 | 118,333 | - |
| Total Selling Expenses | $ 3,864,046 | $ 2,895,973 | $ 1,452,624 |

\* \* \* \* \*

See independent auditors' report

**A112**

**EXHIBIT E**

## TABLE OF CONTENTS OF MANUAL

**Chapter One – Introduction (4 pages)**

Importance of Confidentiality
Content Updates
History
Brand Statements
Vision & Mission & Values
Guiding Principles

**Chapter Two – Administrative (7 pages)**

Independently Owned and Operated
Technology
Franchise Support
Initial Training
Initial On-Site Assistance
Visits
Audits/Reporting
Variations Request
Communication
Franchise Advisory Council (FAC)
Validation Process
Insurance Licenses & Permit Requirements
Your Finances
Professional Advisor
Pricing Strategy
Profit and Loss (P&L) Statements
Managing Taxes
Payroll
Key Performance Indicators

**Chapter Three – Operations (23 pages)**

Hours of Operation
Product Preparation
Vendor Information
Purchasing
Accepting a Delivery
Safety and Sanitation
Health Inspections
Prerequisite Programs
Reference list of bacterium and viruses
Cleaning and Disinfecting
Kung Fu Master Impact
Prep and Food Storage
Food Employee Reporting Agreement

Version 4/20/2023 rev 7/22/2023

**A113**

Receiving and Inspection Guidelines
Inventory
Tracking
Applying your Inventory Numbers
Customer Service
Handling Dissatisfied Customers

**Chapter Four – Employment (4 pages)**

State and Federal Employment Laws
Kung Fu Master Paperwork
Kung Fu Master Policies
Incident Reporting
Uniforms
Other Topics
Staffing

**Chapter Five – Marketing (5 pages)**

Marketing Budget
Marketing Plans
Marketing Reports/Tracking
Tactics & Campaigns
Public Relations
Print Advertising
Local Store Marketing
Digital Marketing
Trademarks
Marketing Approval

**Chapter Six – Supporting Guides**

Version 4/20/2023 rev 7/22/2023

**A114**

**EXHIBIT F**

**AGREEMENTS**

**A115**

**KF TEA FRANCHISING LLC**

**FRANCHISE DEPOSIT AGREEMENT**

_____
The Applicant's Name(s)

_____
Date Submitted

_____
Desired Area

1. ***Purpose of this Agreement.*** This Agreement sets forth the terms and conditions upon which the undersigned applicant (the "Applicant") agrees to make an initial deposit to KF TEA FRANCHISING LLC, a Delaware limited liability company ("KF Tea") as part of the Applicant's application to become a Kung Fu Tea shop franchisee (the "Application").

2. ***Deposit.*** Together with this Agreement, the Applicant is submitting to KF Tea a deposit in the amount of $5,000 (the "Deposit") in the form of a check payable to KF Tea. By countersigning this Agreement, KF Tea acknowledges receipt of such check, although collection of the funds represented by the check is subject to bank processing. The purpose of the Deposit is to cover the costs of KF Tea in evaluating the Applicant's qualifications and suitability to become a Kung Fu Tea shop franchisee in a territory and at a location agreeable to both parties. In the event that the parties enter into a franchise agreement for a Kung Fu Tea shop (a "Franchise Agreement"), the Deposit will be deemed to be a partial payment of the initial fee under the Franchise Agreement.

3. ***No Refund.*** The Deposit is fully earned when paid and is nonrefundable unless KF Tea rejects the Application for any reason before commencing its evaluation.

4. ***Desired Area.*** The geographic area in which the Applicant desires to establish a franchised Kung Fu Tea shop is described above. KF Tea makes no representation or assurance that any site the Applicant finds, whether within or outside of the desired area, will be acceptable to KF Tea or will be a location at which the Applicant is likely to be successful in operating a Franchise.

5. ***No Obligation.*** Although the parties agree to evaluate a possible Franchise Agreement in good faith, nothing in this Agreement will be deemed to obligate either party to enter into a Franchise Agreement. The Applicant agrees to submit to KF Tea or its agent as soon as practicable all information and materials reasonably requested by KF Tea or its agent in order to permit KF Tea to evaluate any site proposed by the Applicant. KF Tea agrees to submit its approval or disapproval of any proposed site within 30 days after KF Tea receives all such requested information and materials.

6. ***Exclusivity.*** For a period of six months following the date of this Agreement, KF Tea agrees not to establish or grant rights to any other person or entity for a Kung Fu Tea shop within the geographic area described above with the exception of any territory KF Tea shall have granted to any person under a Kung Fu Tea franchise agreement.

7. ***Failure to Identify a Site.*** In the event that the parties, acting in good faith, fail to agree on a location within six months after the date of this Agreement, KF Tea may reject the Application without liability to the Applicant. KF Tea may also reject the Application on any other grounds in the course of its evaluation. KF Tea is not required to inform the Applicant of its reason or reasons for any rejection.

Version 4/20/2023 rev 7/22/2023

**A116**

8. ***The Applicant's Representations.*** The Applicant represents that all information submitted by the Applicant as part of the Application is true and correct, and that the financial information submitted as part of the Application fairly reflects applicant's financial position as of the date submitted.

9. ***Confidentiality.*** During the course of its evaluation of the Application, KF Tea may disclose to the Applicant certain confidential information of KF Tea. The Applicant agrees to maintain the confidentiality of such information and not to disclose any such information to anyone else, nor to use such information in the operation of any business other than a franchised Kung Fu Tea shop, both during and after the evaluation. Upon the request of KF Tea made at any time, the Applicant agrees to deliver to KF Tea or to destroy, as directed by KF Tea, all copies of such information in the Applicant's possession or under its control and to erase all copies of such information held in any electronic format.

10. ***Entire Agreement.*** This Agreement constitutes the entire understanding of the parties and supersedes any prior oral or written agreements between the parties; provided, however, that nothing in this or any related agreement is intended to disclaim the representations KF Tea made in the latest franchise disclosure document that KF Tea furnished to the Applicant.

11. ***Governing Law.*** This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to New York's conflict of laws principles.

KF TEA FRANCHISING LLC                         THE APPLICANT

By _____          _____
                                               Signature

_____             _____
Name and Title                                 Address

_____             _____
Date                                           Date

- 2 -

**A117**



# FRANCHISE AGREEMENT

**FRANCHISEE:**

**FRANCHISE LOCATION:**

**DATE OF AGREEMENT:**

Version 4/20/2023

**A118**

# KUNG FU TEA

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

| | *Page* |
|---|---|
| Preamble | 1 |
| Article I – Grant and Operation of the Franchise | 1 |
| Section 1.1 – Grant of Rights | 1 |
| 1.1.1  Grant of Rights | 1 |
| 1.1.2  Territory | 1 |
| 1.1.3  Single Site | 1 |
| 1.1.4  Products and Services Offered | 1 |
| 1.1.5  Manner of Sale | 2 |
| 1.1.6  Rights We Reserve | 2 |
| 1.1.7  Guaranty | 2 |
| Section 1.2 – Site Selection and Development; Opening | 2 |
| 1.2.1  Site Selection | 2 |
| 1.2.2  No Assurance | 2 |
| 1.2.3  Your Role as Property Owner or Tenant | 3 |
| 1.2.4  Our Role as Landlord or Lease Assignor | 3 |
| 1.2.5  Lease from a Third Party Landlord | 3 |
| 1.2.6  Purchase of the Site | 4 |
| 1.2.7  Site Development | 4 |
| 1.2.8  Menu Boards and Formats | 4 |
| 1.2.9  Conditions to Opening | 5 |
| 1.2.10  Time of Opening | 5 |
| 1.2.11  Relocation | 5 |
| Section 1.3 – Equipment; Supplies; Computer System | 5 |
| 1.3.1  Equipment | 5 |
| 1.3.2  Exclusive Supplies | 6 |
| 1.3.3  Other Suppliers | 6 |
| 1.3.4  Approval of Supplies and Suppliers | 6 |
| 1.3.5  Compensation from Suppliers | 6 |
| 1.3.6  Purchasing or Distribution Cooperatives | 6 |
| 1.3.7  Point of Sale, Surveillance and Computer Systems | 6 |
| 1.3.8  Electronic Communications | 7 |
| 1.3.9  Operations Data | 7 |
| 1.3.10  No Warranty | 7 |
| Section 1.4 – System Standards | 7 |
| 1.4.1  Manual | 7 |
| 1.4.2  System Modifications by Us | 7 |
| 1.4.3  System Modifications by You | 8 |
| Section 1.5 – Personnel; Training and Support | 8 |
| 1.5.1  Managing Owner | 8 |

1.5.2  Operating Manager                                        8
1.5.3  Initial Training                                         8
1.5.4  Opening Assistance                                       8
1.5.5  Ongoing Training                                         8
1.5.6  Replacement Manager                                      9
1.5.7  Ongoing Support                                          9
1.5.8  Conferences                                              9
1.5.9  Undertakings by Your Personnel                           9
1.5.10  Staff and Training                                      9
1.5.11  Employer Obligations                                    10

Section 1.6 – Operation of the Franchised Business              10
1.6.1  Compliance with System Standards                         10
1.6.2  Customer Service                                         10
1.6.3  Maintaining Goodwill                                     10
1.6.4  Compliance with Laws                                     10
1.6.5  Health and Safety Standards                              10
1.6.6  Maintaining the Premises                                 11
1.6.7  Remedial Work                                            11
1.6.8  Remodeling                                               11
1.6.9  Use of the Premises                                      11
1.6.10  Hours of Operation                                      11
1.6.11  Payment Cards                                           11
1.6.12  Entity Requirements                                     12
1.6.13  Franchisee Advisory Council                             12
1.6.14  Customer Evaluations                                    12
1.6.15  Inspections                                             12
1.6.16  Prices                                                  12
1.6.17  Payments to Suppliers                                   12

Section 1.7 - Advertising, Promotion and Marketing             13
1.7.1  Signage                                                  13
1.7.2  Local Advertising                                        13
1.7.3  National and Regional Advertising                        13
1.7.4  Marketing Fund                                           13
1.7.5  Use of the Marketing Fund                                13
1.7.6  Accounting for the Marketing Fund                        14
1.7.7  Marketing Fund Entity                                    14
1.7.8  Distribution of Advertising Expenditures                 14
1.7.9  Termination of Marketing Fund                            14
1.7.10  Cooperative Advertising                                 14
1.7.11  Internet Advertising                                    14
1.7.12  Social Media                                            14
1.7.13  Coupons, Customer Loyalty and Gift Cards and Apps       15
1.7.14  Advertising the Sale of Franchises                      15
1.7.15  Public Relations                                        15

Section 1.8 – Website                                           15
1.8.1  System Website                                           15
1.8.2  Promotion of the System Website                          15
1.8.3  Web Portal                                               15

Version 4/20/2023

**A120**

Article II – Fees; Payments; Records; Inspections                                   15

    Section 2.1 – Fees and Reports                                              15
        2.1.1   Initial Fee                                                15
        2.1.2   Training Fee                                               16
        2.1.3   Royalty                                                    16
        2.1.4   Definition of Gross Sales                                  16
        2.1.5   Definition of Accounting Period                           16
        2.1.6   Marketing Fee                                              16
        2.1.7   Technology Fee                                             16
        2.1.8   Other Fees                                                 16
        2.1.9   Inflation                                                  17
        2.1.10  Reports                                                    17
        2.1.11  Payment                                                    18
        2.1.12  Interest on Late Payments                                  18
        2.1.13  No Setoff                                                  18
        2.1.14  Application of Payments                                    18
        2.1.15  Taxes                                                      18
        2.1.16  Failure to Report                                          18

    Section 2.2 – Records; Inspection                                           18
        2.2.1   Records                                                    18
        2.2.2   Access to Systems                                          19
        2.2.3   Right to Inspect                                           19
        2.2.4   Right to Audit                                             19
        2.2.5   Discrepancies                                              19
        2.2.6   Cost                                                       19
        2.2.7   Survival of Inspection and Audit Rights                    19
        2.2.8   Disclosure of Your Financial Information                   19

    Section 2.3 – Security Interest                                             19
        2.3.1   Grant of Security Interest                                 19
        2.3.2   Collateral Assignment of Lease                             20
        2.3.3   Remedies                                                   20
        2.3.4   Filings                                                    20
        2.3.5   Election of Remedies                                       21
        2.3.6   Grants of Security Interests to Others                     21
        2.3.7   Survival                                                   21

Article III – Proprietary Rights; Confidentiality; Noncompetition                   21

    Section 3.1 – Our Copyrights, Design Patents and Trademarks                 21
        3.1.1   Our Copyrights and Design Patents                          21
        3.1.2   Our Trademarks                                             21
        3.1.3   Proper Use of Marks                                        21
        3.1.4   Modifying the Marks                                        22
        3.1.5   Infringement                                               22

    Section 3.2 – Confidentiality of Our Information                            22
        3.2.1   Confidential Information                                   22
        3.2.2   Nondisclosure and Non-Use                                  23
        3.2.3   Isolated Disclosures                                       23
        3.2.4   Exceptions                                                 23

– iii –

3.2.5  Disclosures Required by Law                                          23
3.2.6  Return of Information                                                24

Section 3.3 – Noncompetition                                                24
3.3.1  Definition of Competitive Business                                   24
3.3.2  Agreement Not to Compete                                             24
3.3.3  Noncompetition After Termination                                     24
3.3.4  Reasonableness of Restrictions                                       24

Article IV – Transfer                                                       24

Section 4.1 – Transfer by Us                                                24

Section 4.2 – Transfer by You                                               24
4.2.1  No Transfer Without Our Approval                                     25
4.2.2  Definition of Transfer                                               25
4.2.3  Notice of Transfer                                                   25
4.2.4  Conditions to Transfer                                               25
4.2.5  Transfer to a Company You Control                                    26
4.2.6  Transfer Upon Death or Disability                                    26
4.2.7  Operation of the Franchised Business Upon Death or Disability        27
4.2.8  Transitional Management Costs                                        27
4.2.9  Securities Offerings                                                 27

Section 4.3 – Our Right of First Refusal                                    27
4.3.1  Notice of Third Party Offer                                          27
4.3.2  Exercise of Our Right of First Refusal                              28
4.3.3  Consequence of Nonexercise of Our Right of First Refusal            28
4.3.4  Exceptions                                                           28

Article V – Term and Termination                                            28

Section 5.1 - Term and Renewal                                              28
5.1.1  Initial Term                                                         28
5.1.2  Renewal                                                              28
5.1.3  Hold Over                                                            29

Section 5.2 – Termination                                                   30
5.2.1  Termination by You                                                   30
5.2.2  Termination by Us Upon Notice                                        30
5.2.3  Termination After Cure Period                                        32
5.2.4  Relationship Laws                                                    32

Section 5.3 - Consequences of Termination                                   32
5.3.1  General Consequences                                                 32
5.3.2  Right to Purchase Assets                                             33
5.3.3  Leasehold Rights                                                     33
5.3.4  Purchase Price and Closing                                           33
5.3.5  Liquidated Damages                                                   34

Version 4/20/2023

**A122**

Article VI – Representations and Warranties; Indemnification    35

     Section 6.1 – Representations and Warranties    35
         6.1.1  Your Representations    35
         6.1.2  Your Compliance with Laws    35

     Section 6.2 – Indemnification    35
         6.2.1  Your Indemnity    35
         6.2.2  Our Indemnity    35
         6.2.3  Notice of Claim; Survival    36

     Section 6.3 – Insurance    36
         6.3.1  Insuring the Franchised Business    36
         6.3.2  Minimum Coverage    36
         6.3.3  Waiver of Subrogation    37
         6.3.4  Changes in Coverage Requirements    37
         6.3.5  Negligence    37
         6.3.6  Certificates of Insurance    37
         6.3.7  Our Remedies    37
         6.3.8  No Effect on Indemnity    37

Article VII – Miscellaneous    37

     Section 7.1 – Relationship of the Parties    37
     Section 7.2 – Reasonable Business Judgment    37
     Section 7.3 – Injunctive Relief    37
     Section 7.4 – Severability    38
     Section 7.5 – No Waiver of Rights    38
     Section 7.6 – Notices    38
     Section 7.7 – Affiliates    38
     Section 7.8 – Limitation of Actions    38
     Section 7.9 – Waiver of Punitive Damages and Jury Trial    39
     Section 7.10 – No Class Actions    39
     Section 7.11 – Governing Law    39
     Section 7.12 – Jurisdiction and Venue    39
     Section 7.13 – Costs and Expenses    39
     Section 7.14 – Entire Agreement    39

Schedule A – Franchisee Information

Version 4/20/2023

**KUNG FU TEA**

**FRANCHISE AGREEMENT**

AGREEMENT effective as of _____, 20__, between KF TEA FRANCHISING LLC, a Delaware limited liability company (referred to in this Agreement as "we" or "us"), and_____, a _____ *[indicate type of entity and state of formation]* (referred to in this Agreement as "you" or "your company").

We and our affiliated companies have developed a system (the "System") for the operation of retail shops selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks (the "Kung Fu Tea shops").

Kung Fu Tea shops operate under the trademark KUNG FU TEA and other trademarks described in our franchise disclosure document, and we may create, use and license additional trademarks or substitute different trademarks in the future in conjunction with the operation of Kung Fu Tea shops (collectively, the "Marks").

You have applied for a franchise to own and operate a Kung Fu Tea shop and we are pleased to grant such franchise to you on the terms and conditions set forth below.

Accordingly, you and we agree as follows:

ARTICLE I – **GRANT AND OPERATION OF THE FRANCHISE**

Section 1.1 – *Grant of Rights*

1.1.1   *Grant of Rights*.  We grant to you the right, and you undertake the obligation, to operate a franchised Kung Fu Tea shop (the "Franchised Business") at the location stated in Schedule A (the "Site") in accordance with the System Standards (as defined in Section 1.4.1 below) and the terms and conditions of this Agreement.

1.1.2   *Territory*.  So long as you are not in default under this Agreement, we will not operate or grant others the right to operate a Kung Fu Tea shop within the geographic area surrounding the Site as described in Schedule A (the "Territory") during the Term of this Agreement, except as set forth in Section 1.1.6.

1.1.3   *Single Site*.  You must operate the Franchised Business only at the Site, or if the Site is not described in Schedule A, then at a location approved by us in writing that is within the geographic area described in Schedule A. You may not relocate the Franchised Business or operate the Franchised Business from any location other than the Site without our prior written approval in accordance with Section 1.2.11. You do not have the right to grant subfranchises of the rights granted under this Agreement. The grant of this franchise does not give you the right to receive additional franchises from us.

1.1.4   *Products and Services Offered*.  You must offer and sell in the Franchised Business all of the products, services and menu items we specify. You may not sell under the Marks or in the Franchised Business any products, services or menu items we do not specify or approve for use with the System. If you desire to sell any products, services or menu items that we have not specified or approved, you must request our approval in accordance with Section 1.3.4, and you may not sell any such item without our written approval. All of your modifications or customizations of the products, services or menu items you offer or sell must first be approved by us and will become, in our discretion, part of the System Standards (as defined in Section 1.4.1). We may specify a new required product, service or menu item upon at least 30 days' prior notice to you. Upon oral, email or written notice from us given at any time, you must discontinue offering for sale any product, service or menu item we may disapprove or discontinue. In addition to

our right to terminate this Agreement, we have the right to assess our then current prohibited product or service fee in the event you continue offering unapproved products, services or menu items after you receive oral, email or written notice from us advising you to cease sales of such product or service.

1.1.5  *Manner of Sale*.  In addition to your service to customers on-premises at the Site, you may also offer take-out and delivery service within the Territory provided that all receipts from such sales are processed through the point-of-sale system described in Section 1.3.7. Any third-party delivery service that you use must be prescribed or approved by us. You may not sell any products to food wholesalers or retailers, such as convenience shops, grocery stores or others for resale. You may not supply product to charities or others for resale or discount the sale of unsold product that is not fresh.

1.1.6  *Rights We Reserve*.  We and our affiliates retain all rights not specifically granted to you under this Agreement. These rights include, without limitation, the right:

1.1.6.1  to establish Kung Fu Tea shops, whether franchised or company or affiliate owned, anywhere outside the Territory;

1.1.6.2  to establish Kung Fu Tea shops in non-traditional venues, such as airports, hotels and resorts, military installations, school and university campuses, train stations and subway stations, casinos, theme parks, sports stadiums and enclosed shopping malls, within or outside the Territory (but not within the Territory if the Site is located in a non-traditional venue);

1.1.6.3  to sell any products, including tea, coffee, juices and other hot and cold drinks, under the Marks and any other trademarks at grocery stores, supermarkets and other channels of distribution anywhere and at any time, and directly to customers through our website; and

1.1.6.4  to acquire and operate  or to commence and operate any business under a trademark other than the Marks at any location.

1.1.7  *Guaranty*.  Our grant of this franchise is made in reliance on the personal attributes of your company's owners and managers named in Schedule A. Each person who now or later owns or acquires, either legally or beneficially, any equity or voting interest in your company (the "Guarantor" or "Guarantors"), must execute and deliver to us a guaranty and assumption of obligations agreement in a form acceptable to us (the "Guaranty"). We may require the spouse of any or all Guarantors to sign the Guaranty in our discretion. If any owner is an entity, we have the right to have the Guaranty executed by individuals who have an indirect ownership interest in your company and their spouses, if applicable. Transfers of interest are restricted in accordance with Article IV. Upon our request at any time, you will furnish to us a list of all holders of legal and beneficial interests in your company, together with descriptions of the type of interests owned and the percentage ownership, and the names, addresses, email addresses and telephone numbers of the owners, certified as correct in the manner we specify. If any of your company's general partners, managers, officers or directors ceases to serve as such or if any new person becomes a general partner, manager, officer or director after the date of this Agreement, you will notify us of such change within 10 days. Any breach of a Guaranty will be deemed to be a breach of this Agreement.

Section 1.2 – ***Site Selection and Development; Opening***

1.2.1  *Site Selection*.  You are solely responsible for selecting the Site for the Franchised Business. We merely approve the Site if it is acceptable to us. Within 45 days after the date of this Agreement, you must, at your expense, complete the arrangements to lease or purchase the approved premises for the Franchised Business (the "Shop Premises").

1.2.2  *No Assurance*.  You acknowledge that neither our recommendation nor our approval of the Site nor any information regarding the Site we communicate to you constitutes a guarantee, assurance,

– 2 –

representation or warranty of any kind, express or implied, as to the suitability of the Site for a Kung Fu Tea shop or its successful operation or profitability. You acknowledge that your acceptance of the franchise is based on your own independent investigation of the suitability of the Site.

1.2.3   *Your Role as Property Owner or Tenant.* Except as you and we may otherwise agree in writing, each lease, purchase and loan agreement related to the development, opening and operation of the Franchised Business (i) will be entered into by and in the name of your company as tenant, purchaser or borrower and (ii) will not be entered into by or in the name of any of your affiliates or any other person or entity, as tenant, purchaser or borrower.

1.2.4   *Our Role as Landlord or Lease Assignor.* If we or any of our affiliates own the Shop Premises, we will lease the Shop Premises for the term of this Agreement (excluding renewals) at fair market value. If you sublease the Shop Premises from us or our affiliate, you agree to execute our then current form of sublease and if you are an entity, you agree to have each of your owners execute our then current form of guaranty. If we or one of our affiliates elects to assign an existing lease to you and you desire to obtain an assignment of the existing lease, unless we otherwise agree, you will arrange for our release or the release of our affiliate, as assignor, from all obligations under the assigned lease as of the date of the assignment.

1.2.5   *Lease from a Third Party Landlord.* If neither we nor any of our affiliates owns the Shop Premises and we have not assigned an existing lease to you, you must submit the proposed lease of the Shop Premises (the "Lease") to us for our prior written approval as to its form. Any Lease or Lease renewal must contain the following provisions:

1.2.5.1. The permitted use of the Shop Premises will be limited to the operation of a Kung Fu Tea shop.

1.2.5.2. You are permitted to use and install the trademarks, trade dress, signage and related features associated with the System that we may prescribe.

1.2.5.3. The landlord will provide us with copies of any written notice of default under the Lease sent to you concurrently with the landlord's delivery of such notice to you. Such notice must grant to us the right (but not the obligation) to cure any default under the Lease (should you fail to do so) within 15 days after the expiration of the period in which you may cure the default.

1.2.5.4. You and the landlord will, at our request, execute a lease addendum in a form substantially similar to the lease addendum form set forth in our then current franchise disclosure document, consenting to the Collateral Assignment of Lease contained in Section 2.3.2, of this Agreement, granting to us or our assignee the right to succeed to your rights and obligations under the Lease in the event that this Agreement is terminated for any reason or it expires without a renewal agreement, or if you commit any breach of the Lease that could lead to termination of the Lease.

1.2.5.5. The landlord will grant to us the right (but will not delegate to us the obligation), to assume the Lease upon the expiration of this Agreement or its termination for any reason. In such event, we will give the landlord notice of our assumption of the Lease, and in exchange for the landlord's agreement to recognize us as the new tenant under the Lease we will agree thereafter to be bound by the terms of the Lease. We will have the right to assign our interest in the Lease to an approved franchisee and we will have no further liability or obligation under the Lease after such assignment. Unless and until we agree in writing to assume the Lease, we will have no liability or obligation under the Lease. In any event, you will be solely responsible to the landlord for all debts, payments and other obligations under the Lease that were incurred before we or another franchisee actually takes possession of the Shop Premises.

– 3 –

1.2.5.6. The landlord will not accept your voluntary surrender of the Lease without prior notice to us. You and the landlord will not renew or extend the term of the Lease, nor amend, modify or alter the Lease, without our written consent. You may not assign your interest in the Lease nor sublet all or any portion of the Shop Premises without our written consent.

We are not responsible for reviewing and negotiating the Lease on your behalf. You acknowledge that we have advised you to have an attorney review, evaluate and negotiate the Lease. If we do not have a copy of the signed Lease, you must deliver such copy to us within 14 days after it is signed by you and the landlord. Once signed, you agree not to terminate the Lease or modify or amend any of the provisions of the Lease without our prior written consent, which we may withhold in our discretion.

1.2.6   *Purchase of the Site.*  If you propose to purchase the real property constituting the Site, the form of any purchase agreement with the seller and any related documents, and the form of any loan agreement or mortgage related to the Site must be approved by us before you sign them. If you already own the real property constituting the Site, the form of any loan agreement or mortgage related to the Site that you propose to sign on or after the date of this Agreement must be approved by us before you sign it. Our consent to such documents may be conditioned upon the inclusion of various terms and conditions, including a requirement that the lender or mortgagee will provide us with copies of any written notice of deficiency or default under the terms of the loan or mortgage sent to you concurrently with the lender's or mortgagee's delivery of such notice to you. Such notice must grant to us the right (but not the obligation) to cure any default under the loan or mortgage (should you fail to do so) within 15 days after the expiration of the period in which you may cure the default. Once the purchase contract and loan agreement or mortgage is signed, you must deliver to us a copy of the signed documents within 14 days after they are signed.

1.2.7   *Site Development.*  You are solely responsible, at your own expense, for obtaining any necessary financing and all permits and licenses required to operate the Franchised Business, and for constructing all required improvements to the Site and decorating the Shop Premises in compliance with plans and specifications we have prescribed or approved. We will furnish you with mandatory and suggested specifications and layouts for a Kung Fu Tea shop, including requirements for dimensions, design, image, interior layout, décor, equipment, fixtures, furnishings and signs, which items will be supplied either by us or by suppliers we specify or approve. You (or your landlord on your behalf) must engage an architect to prepare all required construction plans and specifications to comply with all applicable ordinances, building codes and permit requirements and with all lease or sublease requirements and restrictions, if any. You must submit construction plans and specifications to us for approval before construction of improvements to the Site commences. Such plans must include a three-dimensional rendering of the completed shop, acceptable to us, prepared by your architect or designer. We may require you to use specific suppliers for the floor plan and three-dimensional rendering of your franchised Kung Fu Tea shop. You understand that you may modify our mandatory specifications only to the extent required to comply with applicable ordinances, building codes and permit requirements, and only with our prior written approval. In addition, you must engage a qualified interior designer and you must submit all design plans to us for our approval in advance, unless, in our discretion, we decide to supply to you our own design package for your purchase. You must also submit to us proofs of all signage for the Franchised Business for our approval in accordance with Section 1.7.1 before you produce such signage.

1.2.8   *Menu Boards and Formats.*  We have the right to prescribe and subsequently vary one or more menus and menu boards and formats to be used in the Franchised Business. The menu boards and formats may include requirements concerning organization, graphics, product descriptions, illustrations and other matters related to the menu. Prescribed menu boards and formats may vary depending on the region, market size or other factors we deem to be relevant.

– 4 –

1.2.9  *Conditions to Opening.*  You may not begin commercial operations of the Franchised Business until:

1.2.9.1 all of your obligations pursuant to Sections 1.2.5, 1.2.6 and 1.2.7, as applicable, are fulfilled;

1.2.9.2 we determine that the Shop Premises have been constructed, furnished, equipped and decorated in accordance with our requirements;

1.2.9.3 the Managing Owner and Operating Manager (described in Section 1.5) have completed the initial training to our satisfaction;

1.2.9.4 the initial franchise fee and all other amounts due to us and our affiliates have been paid in full;

1.2.9.5 you have furnished us with certificates of insurance and copies of all insurance policies or such other evidence of insurance coverage as we reasonably request, as well as with copies of all bonds that may be required under state or local law; and

1.2.9.6  we have given you our written approval to open.

1.2.10  *Time of Opening.*  You agree to begin commercial operations of the Franchised Business no later than nine months after the date of this Agreement. You acknowledge that time is of the essence.

1.2.11  *Relocation.*  If you need to relocate the Site, you must submit to us a written proposal identifying for our approval at least one potential Site in the Territory, in the format we require, together with any other information we request. Following receipt of your written site proposal, we may make an on-site visit to the proposed Site at our expense if we believe that such a visit is necessary or desirable, although we are not required to make an on-site visit. We do not charge for the initial on-site evaluation, but we may charge for each additional on-site evaluation a reasonable fee plus our reasonable costs. In evaluating potential sites, you agree to consider our site selection criteria, which we will provide to you at your request. We will not unreasonably withhold or delay our approval of any site that meets our standards. Relocation will require a new build-out, renovation to the then current standards and design, lease modification, franchise agreement changes and a fee (as stated in Section 2.1.7.1) to cover our costs and expenses.

Section 1.3 – *Equipment; Supplies; Computer System*

1.3.1  *Equipment.*  You agree to purchase from our affiliate, Arms Global Inc., and to use and maintain in the Franchised Business the following equipment, most of which is branded with our logo:

Shaker machine
Cup sealing machine (for the plastic tops of the cups for cold drinks)
Fructose dispenser (sugar machine)
Point of Sale (POS) system
Smallwares kit

You must purchase our specified model of espresso machine from our designated supplier. You must purchase your blender and juicer from suppliers we specify. You must purchase from us a scanner that will enable you to accept purchases from customers using our specified rewards app on their cell phones. All technology devices, apps and services that you purchase or lease and use must also comply with our requirements, which may include specific items from specific suppliers. We provide specifications for other equipment, including under-the-counter refrigerator, ice-maker and freezer, which you may purchase from any supplier.

– 5 –

A128

1.3.2  *Exclusive Supplies.*  You will sign an agreement acceptable to us with our affiliate, Arms Global Inc., simultaneously with your signing of this Agreement. You agree to purchase from our affiliate or other authorized supplier all of the tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise.

1.3.3  *Other Suppliers.*  You may buy most perishables from local suppliers you select. However, we specify your supplier of milk and fruit (to maintain our uniform quality and taste). You must buy a reasonable variety of all of these products to meet the demands of your customers. You agree to use in the operation of the Franchised Business only those brands and models or types of equipment, supplies, furniture, signs and other products and services that we have designated or approved for Kung Fu Tea shops. We may require that you obtain equipment, fixtures, supplies, furniture, signs and other products and services only from our designated or approved suppliers. We may negotiate purchase agreements with suppliers for the benefit of franchisees, but we are under no obligation to do so. We are not obligated to pass on to you any discounts we receive from suppliers.

1.3.4  *Approval of Supplies and Suppliers.*  If you propose to purchase any brand or model of equipment, supplies, furniture, signs or other products or services other than those then designated or approved by us, or to purchase from any supplier that is not then designated or approved by us, you must first notify us and submit to us sufficient written specifications, photographs, drawings, samples and other information we request to enable us to determine whether the proposed brand, model or supplier complies with our specifications and standards. We will have the right to require that our representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered either to us or to a third party designated by us for review and testing. We will use reasonable efforts to begin an investigation of the proposed supplier or product within 30 days of your request. We will notify you within 10 days after we complete our investigation whether we approve the proposed supplier or product. We are under no obligation to investigate or approve any supplies or supplier you request. If we do not approve the supplies or supplier within 60 days after your request, we will be deemed to have denied your request. We reserve the right to revoke our approval for any reason. We will not be required to approve any particular supplier nor to make available to you or to any prospective supplier any of our standards or specifications. In addition to our right to terminate this Agreement, we have the right to assess our then current prohibited product or service fee in the event you continue to purchase unapproved products or services after your receipt of oral, email or written notice from us advising you to cease your purchase of such products or services.

1.3.5  *Compensation from Suppliers.*  We reserve the right to receive rebates, credits and other compensation from suppliers we designate or approve to provide goods or services to you based upon the purchases by you and other franchisees of goods and services from such suppliers. We may use such compensation for any purpose we deem appropriate, including to subsidize our operating costs.

1.3.6  *Purchasing or Distribution Cooperatives.*  We may establish national or regional purchasing or distribution programs for the purchase or distribution of certain goods, materials or supplies at reduced prices. You agree to participate in any purchasing or distribution cooperatives that we may establish for the region where your Franchised Business is located.

1.3.7  *Point of Sale, Surveillance and Computer Systems.*  You agree to install, maintain and use in the Franchised Business such computer hardware, software, point-of-sale, cash register and surveillance systems as we specify from time to time, using suppliers we specify or approve from time to time. We may require you to incur costs to purchase, lease and license computer hardware and software and to obtain service and support, and to maintain such systems and to upgrade and make such changes to such systems as we may specify in writing. We may manage the license with the point-of-sale provider we select for the system of Kung Fu Tea shops nationally, and you agree to pay such provider's fee for such license either to us or to the provider, as we specify. We may change the point-of-sale provider in our discretion. You must also be equipped to accept electronic payments wirelessly from customers using their cell phones

– 6 –

and such app as we may require, which may allow customers to accumulate reward points each time they make a purchase. You acknowledge that we cannot estimate the future costs that other providers may charge for the computer hardware, software, or surveillance systems or their maintenance or upgrades, or additions or modifications to these systems, and that these costs may not be fully amortizable over the remaining term of this Agreement. We have the right to charge a reasonable systems fee for software or systems modifications and enhancements specifically made for us that we license to you and other maintenance and support services that we or our affiliates furnish to you.

1.3.8 *Electronic Communications*.  You agree to maintain adequate telephone service for the Franchised Business, including a dedicated telephone line with voicemail dedicated to the Franchised Business, and a high-speed Internet connection. You agree to use in the Franchised Business only such email addresses as we authorize and you will comply with such policies as we prescribe from time to time for email use. We have the right to establish requirements that will permit us, as often as we deem appropriate, to access your computer system and to retrieve all information relating to the Franchised Business.

1.3.9 *Operations Data*.  We will have continuing access to and use of all operations data, including specific products sold and other sales data, customer lists (including the name, address, telephone number and email address of each customer), surveillance video and all other content and data you collect or store on your computer and surveillance systems. We will periodically establish policies with respect to the use of such content and data, and you agree to comply with such policies. If we determine based on this data or any other evidence that you are using in the Franchised Business raw materials for the production of food products for sale to customers from any supplier other than Arms Global Inc. without our approval, we may instruct Arms Global Inc. to begin supplying such raw materials to you in quantities generally equal to the demonstrated shortfall in your orders. We will inform you that we have so instructed Arms Global Inc., and you agree to pay Arms Global all amounts invoiced by Arms Global for such materials.

1.3.10 *No Warranty*. We disclaim all express and implied warranties concerning any approved goods, materials or services, including, without limitation, any warranties as to merchantability, fitness for a particular purpose, availability, quality, pricing or profitability.

Section 1.4 – ***System Standards***

1.4.1 *Manual*.  During the term of this Agreement, we will give you access to the confidential operations manual, training and other materials that we generally furnish to franchisees from time to time for use in operating a Kung Fu Tea shop (the "Manual"), in such media as we select, whether hard copy, through a secure Internet portal or otherwise. The Manual and the bulletins and other written materials we provide to you will contain mandatory and suggested specifications, standards, operating procedures, policies, methods and rules ("System Standards") that we prescribe from time to time for the operation of a Kung Fu Tea shop and information relating to your other obligations under this Agreement. The Manual is and will remain at all times our sole property. You acknowledge that the Manual contains confidential information that is highly valuable to us. You will protect the confidentiality of such information in accordance with Section 3.2.

1.4.2 *System Modifications by Us.*  We may modify or change the System Standards from time to time, and upon notice to you, we may make additions to, deletions from or revisions in the Manual to reflect such modifications or changes. Such modifications or changes may include, for example, the addition or discontinuation of products and services that you are required to sell at the Franchised Business and may obligate you to invest additional capital in the Franchised Business ("Capital Modifications"). No modification or change that we make will alter your rights or obligations under this Agreement. We will not obligate you to make any Capital Modification that you cannot reasonably amortize during the remaining term of this Agreement and with respect to leasehold improvements over the remaining term of the Lease unless we agree to extend the term of this Agreement or unless such investment is necessary in order to comply with applicable laws. You agree to adopt or comply with each new or changed procedure, policy, method and

– 7 –

requirement as promptly as practicable after notice from us, and in any event within the time period we reasonably require.

1.4.3  *System Modifications by You.*  You agree not to implement any modification or change in the System Standards or in the Franchised Business without our prior written approval, which we may withhold in our discretion. If you or any of your employees makes an improvement to the System Standards or in the Franchised Business, such improvement will be our property. All recipe and menu changes you submit to us for our consideration and approval will become our property. We will have the right to use such improvements and recipe and menu changes anywhere and authorize our affiliates and other franchisees to use them. You assign to us all rights to such improvements and you agree to sign any documents and to require that your employees sign any documents that we may reasonably request from time to time to evidence such assignment.

Section 1.5 – *Personnel; Training and Support*

1.5.1  *Managing Owner.*  The "Managing Owner" of your company is the person named as such in Schedule A. The Managing Owner is the primary person who will represent your company in your dealings with us and who will be responsible for overseeing and supervising the operation of the Franchised Business. The Managing Owner must be an owner of an equity interest in your business whom we approve. You agree that a shareholder, member or partner will serve as your Managing Owner throughout the term of this Agreement. You may not replace the Managing Owner without our prior written approval, which we may condition on, among other things, attendance and satisfactory completion by the prospective new Managing Owner of our initial training program at your expense.

1.5.2  *Operating Manager.* You will appoint at least one "Operating Manager". The Managing Owner and Operating Manager may be the same person. Your Operating Manager may but need not be an owner of your company. You will ensure that the day-to-day operation of the Franchised Business is always actively managed by an Operating Manager who has attended and successfully completed such training as we may require from time to time. The Operating Manager will actively devote his or her full working time, attention and effort to the Franchised Business and provide direct, day to-day supervision of the operation of the Franchised Business. The Operating Manager will ensure at all times the proper levels of customer service in accordance with the Manual and this Agreement.

1.5.3  *Initial Training.*  Before you begin operating the Franchised Business, we will train your Managing Owner and Operating Manager in the operation of a Kung Fu Tea shop. We require this training only for your first franchise location. We charge for this training in accordance with Section 2.1.2. The Managing Owner and Operating Manager must complete the initial training to our satisfaction before the Franchised Business opens. At your request and if space is available, we will train additional personnel of your company at our then-current rate. You must pay the compensation and travel and living expenses of all of your personnel who attend our training, regardless of whether we charge you a fee for such training. The training program consists of approximately 120 hours of training at our headquarters in New York City. We will endeavor to time the commencement of your training program so that it is completed at least 10 days before the scheduled opening of the Franchised Business.

1.5.4  *Opening Assistance.*  We will provide pre-opening and opening training, supervision and assistance at your Franchised Business by one of our representatives for a period in our discretion of approximately 80 hours or two weeks.

1.5.5  *Ongoing Training.*  At your request, and if we agree, we will furnish additional training. We may charge our then-current fees and expenses for additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards. We do not charge for mandatory training other than initial training except as described in this Section 1.5.5. or in Section 1.5.6. Our fees and expenses will vary based on the staff, location, and type of training. If any inspection of the Franchised

– 8 –

Business indicates noncompliance with any System Standards or if we receive negative customer feed-back, we may require previously trained and experienced managers and employees to attend refresher training courses at such times and locations as we designate, and we may send our personnel to your Franchised Business to administer the training. In such event, you agree to pay our then current fees for training and travel and living expenses for our personnel.

1.5.6  *Replacement Manager.*  If the Managing Owner or Operating Manager does not satisfactorily complete the initial training program or if we determine that such person cannot satisfactorily complete the training program, or if the Managing Owner or Operating Manager ceases to act as such, then we must train, at your expense, a qualified replacement (who must be reasonably acceptable to us) within 30 days. Pending the appointment and training of a new Managing Owner or Operating Manager or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to appoint a manager for the Franchised Business and require you to pay in the manner described in Section 4.2.8.

1.5.7  *Ongoing Support.*  We will provide support and guidance from time to time in the operation of the Franchised Business, either in person, by telephone, by email or in writing, through newsletters, franchisee group meetings or other means. We will provide regular operational reviews and advise you from time to time regarding the operation of the Franchised Business based on reports you submit to us and inspections or observations we make, to ensure compliance with the System Standards and to recommend improvements. At your request, and if we agree, we will furnish additional on-site guidance and assistance and, in such case, we may require you to pay our then-current fees and expenses. Your failure to implement any corrective action we require will constitute a material breach of this Agreement and may result in termination pursuant to Section 5.2.

1.5.8  *Conferences*. We may hold franchisee conferences from time to time to discuss ongoing changes in the industry, sales techniques, performance standards and other subjects. The Managing Owner of your company must attend these conferences. You will be responsible for the travel and living expenses of your Managing Owner and any other attendees from your company. We may charge you and other franchisees a fee sufficient to cover the reasonable costs of such conferences. These conferences will be held at a location we select.

1.5.9  *Undertakings by Your Personnel.*  You agree to take appropriate steps to advise all of your employees and contractors of your obligations under this Agreement and to ensure compliance by all of your employees and contractors with our standards and our confidentiality and noncompete requirements. Each manager of the Franchised Business and each person who receives or otherwise has access to Confidential Information (as defined in Section 3.2.1) who has not signed the Guaranty described in Section 1.1.7 must sign a written confidentiality agreement with your company in a form acceptable to us before having access to Confidential Information. At our request, you will submit to us a copy of all such written agreements. You will ensure that each such person complies with the terms of such agreement during the period that he or she is employed by you. Any breach of such agreement by any such person will be deemed a breach of this Agreement.

1.5.10  *Staff and Training.*  You will maintain a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards. You will ensure that all members of your staff receive the training and any certification we require from sources we approve, at your expense. We may require or permit you to implement, at your expense, programs for the training of some or all of your managers and other employees. Before you implement any such program, we must certify that the program meets our standards. We may require you to obtain re-certification of your training programs from time to time, and we may withhold certification if we determine, in our discretion, that your training programs do not meet our standards.

– 9 –

1.5.11  *Employer Obligations.*  You will have sole authority and control over the day-to-day operations of the Franchised Business and its employees. You will be solely responsible for recruiting and hiring the persons you employ to operate the Franchised Business. You will employ only persons of good character who will at all times conduct themselves in a competent and courteous manner in accordance with the image and reputation of the Kung Fu Tea brand. You will also be responsible for their training, wages, taxes, benefits, safety, work schedules, work conditions, assignments, discipline and termination. You agree to comply with all workplace related laws. At no time will you or your employees be deemed to be employees of ours or of any or out affiliates. We will have no right or obligation to direct your employees.

Section 1.6 – *Operation of the Franchised Business*

1.6.1  *Compliance with System Standards.*  You agree to operate the Franchised Business in strict accordance with all System Standards in effect from time to time. You understand and acknowledge that every detail of the Franchised Business is important to you, to us and to other Kung Fu Tea franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect the reputation and goodwill of the Kung Fu Tea brand.

1.6.2  *Customer Service.*  You will provide prompt, courteous and efficient service to all customers and treat all customers with respect. You will give prompt attention to all complaints from dissatisfied customers, if any, and use your best efforts to resolve such complaints as quickly as practicable, giving the customer the benefit of the doubt whenever feasible. You will provide customer service training to your employees. If we determine in our discretion that our intervention is necessary or desirable to protect the goodwill associated with the Kung Fu Tea brand, or if we believe that you have failed adequately to address or resolve any customer complaints, we may, without your consent, resolve any complaints and charge you an amount sufficient to cover our reasonable costs and expenses in resolving the customer complaints, which amount you will pay us immediately on demand.

1.6.3  *Maintaining Goodwill.*  You will do nothing that, in our reasonable opinion, might diminish or affect adversely our reputation or the goodwill of the Kung Fu Tea brand. This obligation will survive this Agreement and continue in effect after the expiration or termination of this Agreement or your transfer in accordance with Article IV.

1.6.4  *Compliance with Laws.*  You will comply with all applicable laws, rules and regulations in the operation of the Franchised Business and pay all taxes when due.

1.6.5  *Health and Safety Standards.* You will meet and maintain a high degree of sanitation and safety at the Shop Premises and the highest health standards and ratings applicable to the operation of the Franchised Business. In this connection you agree as follows:

1.6.5.1  If the municipality in which the Franchised Business is located maintains a rating system for or relating to the sanitary conditions of food establishments, you must maintain the highest rating possible for the Franchised Business. If you receive an inspection report or a warning, citation or notice that results in or may result in a lowering of such rating, you must provide us with a copy of such report, warning, citation or notice within 24 hours after you receive it. You agree to take immediate steps to restore the highest rating for the Franchised Business and to seek a reinspection or appeal as soon as possible in order to restore such rating.

1.6.5.2  If you receive an inspection report or a warning, citation, certificate or notice that requires you to repair, replace or further sanitize any item at the Shop Premises within 72 hours, you must provide us with a copy of such report, warning, citation, certificate or notice within 24 hours after you receive it.

– 10 –

1.6.5.3  In all cases not described in Sections 1.6.5.1 or 1.6.5.2, you will furnish us, within five days after you receive it, a copy of each inspection report, warning, citation, certificate, notice and rating resulting from an inspection conducted by any federal, state, county or municipal agency with jurisdiction over the Franchised Business.

1.6.5.4  You will notify us within 48 hours of the occurrence of any accident or injury that may adversely affect the operation of the Franchised Business or your financial condition, or that may give rise to liability or a claim against you or us.

1.6.6  *Maintaining the Premises.*  You will at all times maintain the Shop Premises in excellent repair and condition. You will make such additions, alterations, repairs and replacements as may be required for that purpose, including, without limitation, such periodic repainting and replacement of obsolete signs, furnishings, equipment and décor as we may reasonably direct.

1.6.7  *Remedial Work.*  If we notify you of remedial work that is necessary to correct an unhealthy or unsafe condition and you fail to commence such work in good faith or to complete such work within the period specified in our notice, we will have the right, in addition to all other remedies, but not the obligation, to enter the Shop Premises and complete the required repair or corrective work on your behalf. We will have no liability to you for any work performed. If we perform such work, we may require that you pay us in accordance with Section 2.1.7.4.

1.6.8  *Remodeling.*  In addition to the requirements of Sections 1.6.6 and 1.6.7, we will require you periodically to make reasonable capital expenditures to remodel, modernize and redecorate the Shop Premises so that such premises reflect the then-current image of Kung Fu Tea shops. All remodeling, modernization and redecoration will be deemed to be Capital Modifications as defined in Section 1.4.2, and they must be done in accordance with our standards as modified from time to time and with our prior written approval. We may require you to make additional Capital Modifications as a condition to renewal pursuant to Section 5.1.2.6. You will complete all required Capital Modifications within the time period we reasonably require in our written notice.

1.6.9  *Use of the Premises.*  You will use the Shop Premises solely for the operation of the Franchised Business. You will not use the Shop Premises for any other purpose or activity during the term of this Agreement.

1.6.10  *Hours of Operation.*  You agree to keep the Franchised Business operating during such hours and days as we may specify from time to time or, if different, during such hours as the Lease may require.

1.6.11  *Payment Cards*. You will honor all credit, charge, courtesy or cash cards or other credit devices we specify. You will also comply with the then current Payment Card Industry Data Security Standards (PCI/DSS) as those standards may be revised by the PCI Security Standards Council, LLC (see www.pcisecuritystandards.org) or successor organization, including (i) implementing (at your expense) all security requirements that the PCI Security Standards Council (or its successor) requires of a merchant that accepts payment by credit or debit cards, and (ii) participating in (at your expense) a standardized PCI/DSS compliance program that is provided by a PCI/DSS vendor, in each case, approved by us in our discretion. In the event you are unable to demonstrate full compliance, we may require you to engage the services of an approved vendor to assist you to maintain full compliance on an ongoing basis. Additionally, we may require you to use, and directly contract with, one or more approved third-party vendors for some or all of your managed firewall, other technology security compliance and card brand or government requirements related to the transmission and processing of credit card transactions and information. You will immediately notify us if you become aware of any breach, or suspected breach, of card holder data, Personally Identifiable Information (PII), confidential information, or trade secrets related to the Franchised

– 11 –

Business, whether notice is provided by your credit card processor, by law enforcement or by any other party.

1.6.12  *Entity Requirements.*  All certificates representing stock, membership or other ownership interests in your company must contain a legend stating that transfer of such stock, membership or other ownership interest is limited by the provisions of this Agreement. Your company's business must be confined to owning and operating the Franchised Business, and we may require you to include this restriction in your company's organizational documents. Upon our request, you will deliver to us copies of all organizational documents of your company, including articles of incorporation, by-laws, shareholders' agreement, limited liability company articles and operating agreement, partnership agreement, and any certificates we may request certifying any resolution of directors. Your company must remain in good standing throughout the term of this Agreement in its state of formation and, if different, in the state in which the Franchised Business is located.

1.6.13  *Franchisee Advisory Council.*  We reserve the right to create one or more "Franchisee Advisory Councils" for the purpose of fostering communication among and between franchisees and us, and to advise us in establishing, modifying or discussing various policies applicable to Kung Fu Tea franchisees. Franchisee Advisory Councils may also advise us with respect to advertising, public relations and marketing programs. If and when a Franchisee Advisory Council is created, we may require you to participate in its meetings and programs. A Franchisee Advisory Council may advise and make recommendations but will not act as a policy-making board and will have no authority whatsoever. We will determine or approve the rules under which any Franchisee Advisory Council functions. We may change the rules at any time and we may dissolve any Franchisee Advisory Council at any time. We may require you to pay dues to a Franchisee Advisory Council and you will pay all costs and expenses you incur in connection with your participation in any Franchisee Advisory Council, including the costs of transportation, lodging and meals.

1.6.14  *Customer Evaluations.*  We reserve the right to institute programs for auditing customer satisfaction and other quality control measures, and to require you to pay the cost of such programs. You agree to present to your customers such evaluation forms as we periodically prescribe and to participate and request your customers to participate in any surveys performed by us or on our behalf.

1.6.15  *Inspections.*  During the term of this Agreement, we or our designated representatives will have the right, at any time during your regular business hours, without prior notice to you, to enter upon the Shop Premises to inspect the premises; observe, photograph and videotape the operations of the Franchised Business for such periods as we deem necessary; remove samples of any products, materials or supplies for review and analysis; and to interview your personnel and customers. You agree to cooperate fully with us and our representatives during all inspections, observations, photographing, videotaping, product sample removal and interviews; and to take all steps reasonably necessary to correct any deficiencies in your compliance with System Standards or this Agreement within the time we specify. Your failure to implement any corrective action we require or your failure to pass two sequential inspections will constitute a material breach of this Agreement and may result in termination pursuant to Section 5.2. In addition to our right to terminate this Agreement, we have the right to assess a fee equal to our then current prohibited product fee in the event you continue to be out of compliance with the System Standards after your receipt of oral, email or written notice from us advising you of the nature of your default and requesting you to comply.

1.6.16  *Prices.*  We reserve the right to require you to comply with reasonable and lawful restrictions on prices of specific menu items or goods or services offered and sold by the Franchised Business as required in the Manual or as we otherwise reasonably direct in writing from time to time.

1.6.17  *Payments to Suppliers.*  You agree to pay all of your suppliers promptly in accordance with their payment terms and to comply in all other respects with your contractual obligations to third parties.

– 12 –

Section 1.7 - *Advertising, Promotion and Marketing*

1.7.1  *Signage.*  You will post prominent signage relating to the Franchised Business in easily seen locations both inside and outside the Shop Premises. We will prescribe or approve from time to time in writing the size, form, color scheme, content and location of all such signage. You agree to display and maintain signs reflecting the current image of Kung Fu Tea shops. You also agree to post any signs we designate to reflect the fact that you are a franchisee and the fact that franchise opportunities are available to others. You agree to discontinue the use of and destroy such signs as we declare to be obsolete within the reasonable time that we specify for such destruction, which will not be less than 30 days. Because of the importance of the Kung Fu Tea shop image, you grant to us the right to enter the Shop Premises to remove and destroy unapproved or obsolete signs in the event that you have failed to do so within the time we specify.

1.7.2  *Local Advertising.*  We do not require you to engage in any local advertising or to spend any minimum amount of money on local advertising or grand opening advertising. All local advertising, marketing and public relations programs and activities that you do, and all materials you use in such programs and activities, must conform to such standards and requirements as we may specify from time to time. All such materials must be clear, factual and not misleading. You agree to submit to us, before you use them, samples of all materials you intend to use that we have not prepared or previously approved. We will endeavor to deliver to you our written approval or disapproval within 15 days after our receipt of such materials, but we will not be liable for any delay. If we have not notified you of disapproval within 15 days after your submission for approval, the materials will be considered approved. We may withdraw our approval at any time. If we withdraw our approval, you will immediately cease the use, distribution and dissemination of such material. Any advertising, marketing or sales concepts, programs or materials that you propose or develop for the Franchised Business and we approve may be used by us and by our affiliates and other franchisees without any compensation to you. You agree to use all point-of-sale materials that we may supply to you from time to time, in the manner we prescribe.

1.7.3  *National and Regional Advertising.*  We or our designee will exclusively maintain and administer any national and regional advertising, public relations and marketing programs and market research, including without limitation the System Website described in Section 1.8.1 and all programs financed by the Marketing Fund, as described below. You agree to participate in all national and regional programs we specify from time to time in the manner we specify.

1.7.4  *Marketing Fund.*  We have established a public relations and advertising fund (the "Marketing Fund"), subsidized by fees paid by Kung Fu Tea franchisees, for such advertising, promotion, marketing and public relations programs and materials as we deem necessary or appropriate. You agree to contribute to the Marketing Fund in accordance with Section 2.1.6. Kung Fu Tea shops that we or our affiliate own will not be required to contribute to the Marketing Fund.

1.7.5  *Use of the Marketing Fund.*  The Marketing Fund will be used to enhance the recognition of the Marks and the patronage of Kung Fu Tea shops nationally or regionally. We or our designee will have sole discretion over all matters relating to the Marketing Fund, including without limitation the creative concepts, materials and endorsements used, and the geographic, market and media placement and allocation. The Marketing Fund may be used to pay the costs of preparing and producing video, audio and written advertising materials; administering national and regional advertising programs, and engaging advertising, promotion and marketing agencies to assist us; website development and maintenance; toll-free telephone costs; and supporting public relations, market research and other advertising, promotion and marketing activities as well as personnel costs attributable to advertising and marketing. The Marketing Fund will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the Marketing Fund and its programs, including, without limitation, conducting market research, preparing advertising, promotion and marketing materials and collecting and accounting for contributions to the

– 13 –

Marketing Fund. The Marketing Fund will not be used to sell franchises, although we may use materials financed by the Marketing Fund on the System Website (defined in Section 1.8.1), which may advertise the Kung Fu Tea franchise opportunity. The source of the advertising may be our in-house advertising department or an outside advertising agency. If we or our affiliates provide in-house advertising department services, we or our affiliates may be compensated from the Marketing Fund provided that such compensation is reasonable.

1.7.6  *Accounting for the Marketing Fund.*  We will separately account for the Marketing Fund monies, but we may commingle such monies with our other monies or maintain the Marketing Fund monies in one or more separate accounts, in our discretion. We may spend on behalf of the Marketing Fund in any fiscal year an amount greater or less than the aggregate contribution of all Kung Fu Tea shops to the Marketing Fund in that year, and the Marketing Fund may borrow from us or others at reasonable interest rates to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs before other assets of the Marketing Fund are expended. We will prepare annually, or cause to be prepared, a report or reports of the operations of the Marketing Fund. We will furnish such report to you for the most recent year upon your written request.

1.7.7  *Marketing Fund Entity.*  We have the right, but not the obligation, to establish a separate entity to operate the Marketing Fund at any time. Any such entity will have all of the rights and duties with respect to the Marketing Fund that we have under this section. The Marketing Fund will not be deemed a trust, and we will have no fiduciary obligation to you in connection with the collection or administration of the Marketing Fund.

1.7.8  *Distribution of Advertising Expenditures.*  Although we will endeavor to use the Marketing Fund to develop advertising and marketing materials and programs and to place advertising that will benefit all Kung Fu Tea shops, we undertake no obligation to ensure that expenditures by the Marketing Fund will benefit all Kung Fu Tea shops equally nor in proportion to contributions.

1.7.9  *Termination of Marketing Fund.*  We reserve the right to defer, reduce or suspend contributions to the Marketing Fund, and, upon 30 days' prior notice to you, to suspend operations of the Marketing Fund for one or more periods of any length, and to terminate (and, if terminated, to reinstate) the Marketing Fund (and, if suspended, deferred or reduced, to reinstate such contributions). If the Marketing Fund is terminated, all unspent monies, if any, on the date of termination will be distributed to Kung Fu Tea shops in proportion to their respective contributions to the Marketing Fund during the preceding twelve-month period.

1.7.10  *Cooperative Advertising.*  We may establish and coordinate from time to time cooperative advertising, marketing and sales programs, customer satisfaction programs and other programs or activities among Kung Fu Tea franchisees. These programs or activities may be on a local, regional or national basis. You will participate in such programs and activities as we may prescribe. Such programs and activities may (at our option) be paid for on any equitable basis by the participants.

1.7.11  *Internet Advertising.*  Any Internet advertising you do must be submitted to us in advance for our approval in the manner described in Section 1.7.2. We may withhold our approval in our discretion. You may not own an Internet domain name that includes any of the Marks or variations of any of the Marks.

1.7.12  *Social Media.*  You may promote the Franchised Business through social media and similar means provided that such promotion is consistent with the System Standards. If any of your employees, owners, officers, directors or managers posts objectionable content to a social media website, you will have 12 hours after notice from us to remove such content provided that it is capable of removal. If you fail to remove the objectionable content within this 12-hour period, we will have the right to terminate this Agreement. You agree to check for social media postings of your employees from time to time to be sure that any comments they write are permitted and are consistent with our policies.

– 14 –

1.7.13 *Coupons, Customer Loyalty and Gift Cards and Apps*.  You agree to participate in each gift card, customer loyalty card, mobile app and other similar program that we periodically establish or approve for use at Kung Fu Tea shops either in your area or nationally, for all franchised Kung Fu Tea shops that you or any affiliate of yours owns. You agree to timely execute and deliver such agreements and other documents as we may reasonably require to facilitate such programs. You will not initiate any such program yourself without our prior written approval, which we may withhold in our discretion. You will distribute customer loyalty cards and sell and issue gift cards and redeem (without an offset against Royalty payments) coupons, customer loyalty cards and gift cards in accordance with procedures and policies we specify in the Manual or otherwise in writing. We will manage any customer loyalty mobile app or program with the provider we select for the system of Kung Fu Tea shops in your area or nationally. You agree to pay the provider's fee for such service.

1.7.14 *Advertising the Sale of Franchises*.  We have the right to advertise the Kung Fu Tea franchise opportunity on the menu and in your Franchised Business.

1.7.15 *Public Relations*. You agree to refer all inquiries from news reporters regarding the Franchised Business or the System to the person we designate as the public relations spokesperson for the Kung Fu Tea brand. You may not discuss any aspect of the Franchised Business or the System with any news reporter without our prior written approval in each instance.

Section 1.8 – *Website*

1.8.1 *System Website*.  We maintain one or more websites to advertise, market and promote Kung Fu Tea shops, the products sold at Kung Fu Tea shops and the Kung Fu Tea franchise opportunity (the "System Website"). The System Website lists the locations of Kung Fu Tea shops. We own all intellectual property and other rights in the System Website and all information it contains.

1.8.2 *Promotion of the System Website*.  All advertising, marketing and promotional materials that you develop for the Franchised Business must promote the System Website's URL in the manner we designate.

1.8.3 *Web Portal*.  In addition to the System Website, we may (but we will not be obligated to) maintain a secure web portal, extranet or other system for all Kung Fu Tea franchisees that will not be available to the general public. We may use this portal, extranet or system to provide support for franchisees and to allow for online franchise discussion groups. You agree both during and after the term of this Agreement not to disclose our means of access to such portal to any person or entity who is not under your direct supervision and who does not have a need to have access. You agree to inform all persons under your supervision of this obligation of confidentiality. You further agree to comply with all guidelines and policies we establish from time to time for the use of this portal, extranet or system.

ARTICLE II – **FEES; PAYMENTS; RECORDS; INSPECTIONS**

Section 2.1 – *Fees and Reports*

2.1.1 *Initial Fee*.  Upon your signing of this Agreement, you will pay us an initial fee of $37,000 for a standard Kung Fu Tea shop (a "Standard Unit"). If you or your owners who have a 50% or greater ownership interest also have a 50% or greater ownership interest in another Kung Fu Tea franchise on or before the effective date of this Agreement, or if the Site described in this Agreement is in a non-traditional venue as described in Section 1.1.6.2 (a "Non-Traditional Unit"), then you will pay us an initial fee of $25,000. If you have signed a multi-unit agreement, all or a portion of your initial fee may be covered by the initial amount you paid under that agreement. The amount of any deposit already paid will be credited toward the

– 15 –

initial fee. The initial fee is fully earned at the time we grant the franchise and is not refundable under any circumstances.

2.1.2  *Training Fee*.  Before you begin initial training, you will pay us a training fee of $12,500. We require this fee and the initial training only for your first franchise location.

2.1.3  *Royalty*.  You agree to pay us a royalty ("Royalty") in the amount of 4% of the Gross Sales (as defined below) of the Franchised Business each Accounting Period (defined below).

2.1.4  *Definition of Gross Sales*.  As used in this Agreement, the term "Gross Sales" or "Gross Sales of the Franchised Business" means all sales made in the operation of the Franchised Business, whether collected or not, including, but not limited to, all amounts you receive at or away from the Shop Premises, whether from cash, check, credit or debit card (with no deduction for card company charges), near field communications (such as Apple Pay or Google Pay), proceeds of any business interruption insurance policies, and revenue from any other source. It does not include sales taxes collected from customers for payment to the appropriate taxing authorities, or amounts refunded or credited to customers.

2.1.5  *Definition of Accounting Period*.  "Accounting Period" means the specific period that we designate from time to time in the Manual or otherwise in writing for purposes of your financial reporting and payment obligations described in this Agreement. The Accounting Period may be a calendar month, but we may change the Accounting Period or designate different Accounting Periods for different purposes in our discretion as changes the System Standards pursuant to Section 1.4.2.

2.1.6  *Marketing Fee*.  You agree to pay us a marketing fee each Accounting Period in the amount of 2% of the Gross Sales of the Franchised Business each Accounting Period (the "Marketing Fee"). The Marketing Fee finances the Marketing Fund described in Section 1.7.4.

2.1.7  *Technology Fee*.  At the time you start paying the monthly Royalty, you will also pay us a monthly technology fee of $140 to $350 as we specify from time to time. The technology fee pays for your use of our customer rewards program platform and such other technology services as we may require you to use. The technology fee may be higher than $350 a month in order to cover the third-party cost of the technology if such cost exceeds $350 per month.

2.1.8  *Other Fees*.  In addition to any fees described elsewhere in this Agreement, you agree to pay us the following fees upon the occurrence of the following events:

2.1.8.1  If you relocate the Franchised Business with our approval pursuant to Section 1.2.7, we may charge you a relocation fee of $5,000 plus any reasonable expenses we incur.

2.1.8.2  If we obtain insurance on your behalf in accordance with Section 6.3.7, you will pay us an amount equal to the premiums and related costs for the required insurance in full upon receipt of the invoice, plus a 25% service charge.

2.1.8.3  If we provide additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards, or if you request and we agree to furnish additional on-site training, guidance or assistance in accordance with Sections 1.5.5 or 1.5.7, we may charge our then-current fees and expenses.

2.1.8.4  If we provide customer service in accordance with Section 1.6.2 because of your failure adequately to address or resolve any customer complaints, we may charge you our reasonable costs and expenses in resolving such complaints;

– 16 –

2.1.8.5  If we perform work to correct an unhealthy or unsafe condition at your Kung Fu Tea shop because you fail to perform the work after we notify you pursuant to Section 1.6.7, we may require you to pay for labor and materials plus a 25% service charge and an amount sufficient to reimburse us for our actual direct costs to supervise, perform and inspect the work and procure any replacement items, including labor, materials, transportation, lodging, meals, contractor fees and other direct expenses, all of which will be due and payable upon your receipt of our invoice.

2.1.8.6  If we perform an inspection or audit that is made necessary by your failure to furnish any information we require or if an audit or inspection reveals an understatement of Gross Sales greater than 2%, then we may require you to reimburse us for the reasonable cost of such inspection or audit in accordance with Section 2.2.6.

2.1.8.7  If you transfer the Franchised Business with our consent pursuant to Section 4.2, you agree to pay us a transfer fee of $5,000 plus a re-training fee of $5,000. The re-training fee is for a five-day training course that we provide to the buyer of the Franchised Business.

2.1.8.8  If the Operating Manager ceases active management of the Franchised Business or if the Franchised Business is not being managed properly, then pending the appointment and training of a new Operating Manager, we may appoint a manager until you appoint a trained re-placement manager and we may require you to pay in the manner described in Section 4.2.8.

2.1.8.9  If you renew the franchise pursuant to Section 5.1.2, you agree to pay us our then-current renewal fee, which will not exceed the greater of $10,000 or 25% of the then-current initial franchise fee.

2.1.8.10  If any required payment you make to us is rejected by your bank because of insufficient funds, you will pay us $50 for each occurrence.

2.1.8.11  If you continue to sell or purchase an unauthorized product or service or you continue to be out of compliance with the System Standards after we have notified you to cease such sales or purchases or to comply with the System Standards, you will pay us our then current fee pursuant to Section 1.1.4, 1.3.4 or 1.6.15. Such fee as of the date of this Agreement is $300 per day. You acknowledge and agree that your continued sale or purchase of unauthorized prod-ucts or services or your continued noncompliance with System Standards after we have notified you to cease will cause us to incur damages, the actual amount of which would be speculative and difficult to calculate. You acknowledge that $300 per day from the date you receive our notice is a fair and reasonable estimate of the foreseeable damages that we are likely to incur.

2.1.8.12 If we hold franchisee conferences as described in Section 1.5.8, we may charge you a fee sufficient to cover the reasonable costs of such conferences.

2.1.9  *Inflation.*  Fees stated in this Section 2.1 as dollar amounts may be increased from time to time to reflect increases in the Metropolitan Area Consumer Price Index for All Urban Consumers from the date of this Agreement, as published by the U.S. Department of Labor, or a successor index.

2.1.10  *Reports.*  You will submit to us an electronic report within three days after the end of each Accounting Period setting forth your true and correct Gross Sales for such Accounting Period in such detail and in such manner as we require from time to time. We have the right, upon notice to you, to require you to submit to us, in digital format, (i) monthly and annual balance sheets and income statements for the Franchised Business, prepared in accordance with generally accepted accounting principles consistently applied, in the format we prescribe, and verified as correct in the manner we prescribe from time to time; and (ii) reviewed financial statements prepared annually.

– 17 –

2.1.11  *Payment.*  You will pay us the Royalty and Marketing Fee for each Accounting Period at the time you submit each report to us in accordance with Section 2.1.10, based on Gross Sales during the most recent Accounting Period, along with the technology fee described in Section 2.1.7. You will pay us for all other amounts upon your receipt of our invoice, including but not limited to reimbursements to us for amounts we spend on your behalf, amounts you incur for training, and purchases we make at your request or on your behalf. Time is of the essence with respect to all payments you are to make to us. You will pay all sums you owe to us or to any of our affiliates electronically through one or more depository transfer accounts or using such methods as we may designate in the Manual or otherwise in writing. At our request, you agree to execute such documents as we determine are necessary for us to process electronic funds transfers from your designated bank account for payment of the fees you owe to us. You will bear all costs to establish and maintain the required electronic payment system, and all bank service charges. You will comply with our procedures for electronic payment, which we may modify from time to time, including the maintenance of such minimum bank account balance as we specify from time to time.

2.1.12  *Interest on Late Payments.*  Any payment that is not made by the date it is due will be subject to interest at the rate of 1.5% per month or the highest rate allowed by law, whichever is less. If no due date is stated, interest begins to run 10 days after billing. Your failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Section 5.2.2.4. Interest will accrue whether or not we exercise our right to terminate. You acknowledge that this subsection does not constitute our agreement to accept any delay in payments or our commitment to extend credit to you or otherwise finance your operation of the Franchised Business.

2.1.13  *No Setoff.*  Your obligations to make payments in accordance with this Agreement and any other agreement with us or any of our affiliates with respect to the Franchised Business are not subject to any abatement, reduction, setoff, defense or counterclaim due or alleged to be due for any past, present or future claim that you have or may have against us or any of our affiliates.

2.1.14  *Application of Payments.*  All payments you make to us will be applied in such order as we may designate from time to time, regardless of any designation you may make with respect to the application of such payments, even if you specifically make payment conditional on our acceptance of your designated application or instructions.

2.1.15  *Taxes.*  In the event that we are required to collect and pay any sales or use tax from you for payment to any tax authority based on your purchase of the franchise or any items relating to the franchise, or based on any continuing payments you make to us under this Agreement, you will pay such amounts to us upon receipt of our invoice.

2.1.16  *Failure to Report.* If you fail to report your Gross Sales for any period, we may debit your account for 120% of the Royalty and Marketing Fee based on your Gross Sales that you last reported to us, for each late report and for each week or portion of a week past the due date. After we have determined the correct Gross Sales for such period, we will debit your account for any shortfall or credit your account against future payments if the amount paid exceeds the amount owed.

Section 2.2 – ***Records; Inspection***

2.2.1  *Records.*  You agree to maintain at the Shop Premises full, complete and accurate records of the Franchised Business. You will maintain bookkeeping, accounting and records retention systems conforming to the requirements that we prescribe from time to time, and such other records as we prescribe from time to time relating to the operations of the Franchised Business. You agree to maintain and to furnish to us upon request complete copies of all income, sales, value added, use and service tax returns, and employee withholding, workers' compensation and similar reports filed by you reflecting activities of the Franchised Business. You agree to preserve all records described in this Section 2.2.1 for a period of at

– 18 –

least five years after their creation, or such longer period as may be required by law, during both the term and each renewal term of this Agreement and following the expiration or termination of this Agreement.

2.2.2 *Access to Systems.* We may use the computer and point-of-sale systems described in Section 1.3.7 to collect electronically the reports referred to in Section 2.1.10 and the records referred to in Section 2.2.1. We may use the content and data generated by the surveillance system described in Section 1.3.7 for any purpose, including to monitor customer service and the operation of the Franchised Business. We have the right to establish requirements that will permit us, as often as we deem appropriate, to access all cash registers, surveillance and computer terminals and your computer system and to retrieve all information relating to the Franchised Business.

2.2.3 *Right to Inspect.* During the term of this Agreement, we or our designated representatives will also have the right, at any time during your regular business hours, without prior notice to you, to enter upon the Shop Premises to inspect the books and records of the Franchised Business and take excerpts. You agree to cooperate fully with us and our representatives during all such inspections.

2.2.4 *Right to Audit.* We have the right at any time during your regular business hours, without prior notice to you, to inspect and audit the records of the Franchised Business, or to cause such records to be inspected and audited. This right includes the right to access your computer systems.

2.2.5 *Discrepancies.* If any inspection or audit demonstrates an understatement of Gross Sales, you will pay the deficiency to us within 15 days after you receive the inspection or audit report.

2.2.6 *Cost.* All inspections and audits will be at our expense; but if an inspection or audit is made necessary by your failure to furnish, or your delay in furnishing, reports, supporting records, other information or financial statements we require, or if an understatement of Gross Sales for the period of any audit or inspection is determined by any such audit or inspection to be greater than 2%, you agree, within 15 days after our request, to reimburse us for the cost of such inspection or audit, including, without limitation, legal and accounting fees, and the travel expenses, including lodging, meals and per diem charges of the inspecting or auditing personnel. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

2.2.7 *Survival of Inspection and Audit Rights.* Our rights to inspect the books and records of the Franchised Business and to take excerpts, and to audit the Franchised Business, will continue for a period of six months following the expiration or termination of this Agreement; but we may only inspect such books and records or perform any such audit following the expiration or termination of this Agreement upon at least 24 hours' prior notice to you.

2.2.8 *Disclosure of Your Financial Information.* We have the right to disclose data we receive from you regarding the Franchised Business without identifying you. If we are required by law to disclose any data we receive from you regarding the Franchised Business and such disclosure will identify you, we will notify you of the disclosure to be made and, if you request, endeavor to obtain legally binding assurance that those who receive such disclosure will be bound by an obligation of confidentiality. We also have the right to disclose data regarding the Franchised Business to any prospective transferee of the Franchised Business you identify to us.

Section 2.3 – ***Security Interest***

2.3.1 *Grant of Security Interest.* As security for the payment of all amounts you owe us from time to time under this Agreement and all other agreements between you and us, and your performance of all of your obligations under such agreements, you hereby grant to us a security interest in all of the assets of the Franchised Business, including, without limitation, all inventory, equipment, furniture and fixtures, as well as all proceeds from their sale and the related insurance (the "Collateral"). You warrant and represent

– 19 –

that the security interest granted hereby is prior to all other security interests in the Collateral except bona fide purchase money security interests, or security interests held by financial institutions, if any, each of which is subject to our prior approval. Our security interest will be subordinate to any security interest held by a bank pursuant to Small Business Administration (SBA) financing of the Franchised Business. You agree not to remove the Collateral, or any portion of the Collateral, from the Shop Premises without our prior written consent.

2.3.2 *Collateral Assignment of Lease*.  In addition to granting us a security interest in the Collateral, pursuant to Section 2.3.1 above, you hereby grant to us a security interest in and to the Lease ("Collateral Assignment of Lease"), and all of your rights, title and interests in and to the Lease, as further security for the payment of all amounts you owe us from time to time under this Agreement and all other agreements between you and us. In the event of a breach or default by you under the terms of the Lease, or, in the event we make any payment to the landlord under the Lease as a result of your breach of the Lease, then such payment by us, or such breach or default by you, will at our option be deemed to be an immediate default under this Agreement, and we will be entitled to take possession of the Shop Premises and to assume all of your rights, title and interests in and to the Lease and to all other remedies described in this Agreement or at law or in equity, without prejudice to any other rights or remedies we might have under any other agreements or under other applicable law. This Collateral Assignment of Lease will constitute a lien on your interest in and to the Lease until satisfaction in full of all amounts owed by you to us. You agree to obtain the landlord's consent to this Collateral Assignment of Lease by having the landlord execute a lease addendum in the form contained in our franchise disclosure document.

2.3.3 *Remedies*.

2.3.3.1  Upon the occurrence of any event entitling us to terminate this Agreement or any other agreement between you and us, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the state in which the Franchised Business is located, including, without limitation, the right to take possession of the Collateral.

2.3.3.2 In addition to the remedies set forth in Section 2.3.3.1 above, in the event of a default by you under the terms of the Lease or under this Agreement, we will be entitled to exercise any one or more of the following additional remedies in our sole discretion:

(i)   without notice and with or without process of law, to enter upon and take and maintain possession of the Shop Premises, together with all Collateral and all of your books, records, papers and accounts and to assume all of your rights, title and interests in and to the Lease;

(ii)  as your attorney-in-fact, or in our own name, to hold, operate, manage and control the Franchised Business with full power to use such measures as we deem proper or necessary to cure such default;

(iii) to cancel, terminate or disaffirm any unauthorized agreement, sublease or subordinated lien, to make all necessary or proper repairs, replacements, alterations, additions, and improvements to the Shop Premises;

(iv)  to insure and reinsure the same for all risks incidental to our possession, operation and management thereof; and

(v)   to terminate this Agreement as of the date of your default under the Lease.

2.3.4  *Filings*.  You authorize us, without further notice to or consent by you, to file any records or other documents as we reasonably deem necessary to perfect, continue, amend or terminate our security interest in the Collateral. In connection with our security interest in the Lease, you agree to obtain the landlord's consent to the Collateral Assignment of Lease by having the landlord execute a Kung Fu Tea Lease Addendum in a form satisfactory to us.

– 20 –

2.3.5   *Election of Remedies*.  The remedies set forth in this Section 2.3 do not exclude any of our other remedies under this Agreement or any other agreement between you and us. No exercise by us of any of our rights under this Section 2.3 will cure, waive or affect any default under this Agreement or any other agreement between you and us. No inaction or partial exercise by us of our rights will be construed as a waiver of any of our rights and remedies and no waiver by us of any such rights and remedies shall be construed as a waiver by us of any future rights and remedies.

2.3.6  *Grants of Security Interests to Others*.  We must approve in advance and in writing any grant you make to any third party of a security interest in or encumbrance of any assets of the Franchised Business, including without limitation the Collateral or the Lease. We will not unreasonably withhold our consent to any such grant made in connection with financing for the development or operation of the Franchised Business or equipment leasing, if such financing satisfies our requirements, which may include execution of agreements by us, you and the secured creditor, in a form satisfactory to us, making any such security interest subordinate to the one you have granted to us pursuant to this Section 2.3.

2.3.7  *Survival*.  The security interest created by this Section 2.3 will survive the termination or the expiration and nonrenewal of this Agreement and remain in effect until all of your monetary obligations to us are satisfied in full.

ARTICLE III - **PROPRIETARY RIGHTS; CONFIDENTIALITY; NONCOMPETITION**

Section 3.1 – ***Our Copyrights, Design Patents and Trademarks***

3.1.1  *Our Copyrights and Design Patents*.  We and our affiliates are the sole owners of all copyrights in the Manual and all supplemental materials, all logos or other materials that are the subject of design patents, and other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us. You may not copy any such materials, nor create derivative works of any such materials, except as we specifically authorize or permit.

3.1.2  *Our Trademarks*.  Your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Franchised Business at and from the Shop Premises pursuant to and in compliance with this Agreement and all System Standards. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your use of the Marks and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the Franchised Business in compliance with this Agreement). You will not contest or assist others in contesting our right to use the Marks.

3.1.3  *Proper Use of the Marks*.  You may not use the Marks except as authorized under this Agreement. You understand that any use of the Marks other than as expressly authorized by this Agreement, without our prior written consent, may constitute infringement and that your right to use the Marks does not extend beyond the expiration or termination of this Agreement. You agree to use the Marks as the sole identification of the Franchised Business, except that you agree to identify yourself as the independent owner of the Franchised Business in the manner we prescribe. You may not use any of the Marks or any word similar to any of the Marks as part of any corporate or legal business name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you under this Agreement), or in any modified form, nor may you use any Mark in connection with the performance or sale of any unauthorized products or services or in any other manner we have not expressly authorized in writing. You may not use any Mark as part of a domain name or electronic address of a website. You agree to display the Marks prominently in the manner we prescribe at the Franchised Business and on business forms and advertising materials. You agree to give such notices of trademark registrations and our ownership of the Marks as we specify from time to time and to obtain any fictitious or assumed business name registrations required under applicable law.

– 21 –

3.1.4 *Modifying the Marks.*  We will have the right to modify or change the Marks from time to time upon written notice to you specifically referring to this Agreement and describing such modification or change. Such right will include the right to use a trademark that is entirely different from "Kung Fu Tea shop" and the right to require you to use one or more additional logos and marks; but we will make all such changes in the Marks only for good faith marketing, trademark or other reasons on a uniform basis for all Kung Fu Tea franchisees in the U.S. You agree, upon notice from us, to regard each such modified, changed, new or additional trademark as being within the definition of "Marks" under this Agreement, and to adopt and use each such trademark at your expense in accordance with the terms and conditions of this Agreement. We will not be obligated to reimburse you for any loss of revenue or expenses caused by any such modification or change.

3.1.5 *Infringement.*  You agree to notify us of any apparent infringement of any Mark or of any of our copyrights or design patents, by any third party, as soon as such apparent infringement comes to your attention, and to notify us immediately of any challenge to your use of any Mark or of any of our copyrights or design patents and of any claim by any person of any rights in any Mark or any of our copyrights or design patents, and you agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have sole discretion to take such action as we deem appropriate with respect to such apparent infringement, challenge or claim and the right to control exclusively any litigation, U.S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark, our design patents or our copyrights. You agree not to initiate any such action or proceeding, but to cooperate with us in any such action or proceeding and sign any and all instruments and documents, render such assistance and do such acts and things as may be necessary or advisable, in the opinion of our attorneys, to protect and maintain our interests in any litigation or any proceeding at the Patent and Trademark Office, or otherwise to protect and maintain our interests in the Marks, design patents or copyrights. In the event any sum is recovered based on our claim of infringement, we will have the exclusive right to such recovery.

Section 3.2 – *Confidentiality of Our Information*

3.2.1 *Confidential Information.*  We possess and will continue to develop and acquire certain confidential information relating to the development and operation of Kung Fu Tea shops ("Confidential Information"). Confidential Information means information that is not generally available to the public and that has commercial value to us or to the Franchised Business, or that is personally identifiable information of customers. "Confidential Information" includes, without limitation:

   3.2.1.1  product recipes, mixes and formulas;

   3.2.1.2  the contents of the Manual and all supplemental materials;

   3.2.1.3  the content of our training and assistance;

   3.2.1.4  site selection criteria;

   3.2.1.5  sales and marketing techniques;

   3.2.1.6  customer lists;

   3.2.1.7  planned advertising and marketing programs;

   3.2.1.8  current, past and planned research, development and test programs for products, services and operations;

– 22 –

3.2.1.9  specifications for and suppliers of certain equipment, fixtures, furnishings, signs, materials and supplies;

3.2.1.10  the operating results and financial performance of Kung Fu Tea shops other than the Franchised Business;

3.2.1.11  the videos and images recorded by the surveillance system (except to the extent necessary to prove wrongful acts);

3.2.1.12  usernames and passwords allowing access to protected areas on our website or computer network; and

3.2.1.13  all improvements and modifications to the System Standards or in the Franchised Business developed by you or your personnel.

You will not acquire any interest in any Confidential Information other than the right to use Confidential Information disclosed to you to enable you to operate the Franchised Business during the term of this Agreement.

3.2.2  *Nondisclosure and Non-Use.*  At all times both during the term and after the expiration or termination of this Agreement, (i) you will keep all Confidential Information in the strictest confidence and you will not disclose any Confidential Information to any person other than your employees, agents or representatives who have a legitimate need to know such information and who are informed of this obligation of confidentiality and have signed either a Guaranty as described in Section 1.1.7 or a written confidentiality agreement with your company in a form acceptable to us, and (ii) you will not use any Confidential Information except for the purpose of fulfilling your obligations under this Agreement. You will immediately notify us upon discovering any loss or unauthorized disclosure by any of your owners, managers, employees, contractors, agents or representatives of any Confidential Information.

3.2.3  *Isolated Disclosures.*  Notwithstanding the foregoing, we will not deem you to be in default of this Agreement as a result of isolated incidents of disclosure of Confidential Information by an employee other than an owner, provided that you have taken reasonable steps to prevent such disclosure, including but not limited to the steps a reasonable and prudent owner of confidential and proprietary information would take to prevent disclosure of such information by his or her employees, and further provided that you pursue all reasonable legal and equitable remedies against such employee for such disclosure of Confidential information.

3.2.4  *Exceptions.*  The obligations of confidentiality and non-use described above will not apply to information that:  (i) you can clearly show was known to you on a non-confidential basis prior to its disclosure to you by us; (ii) is or becomes generally known among Competitive Businesses (as defined in Section 3.3.1) in the U.S. other than through disclosure by you or any of your employees, contractors, agents or representatives; or (iii) you can clearly show was received by you on a nonconfidential basis from a third party that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

3.2.5  *Disclosures Required by Law.*  In the event that you become legally compelled to disclose any Confidential Information, you will (i) promptly notify us that such information is required to be disclosed, (ii) use your best efforts to obtain legally binding assurance that all those who receive disclosure of such information are bound by an obligation of confidentiality, and (iii) disclose only that portion of the Confidential Information that your legal counsel advises is legally required to be disclosed.

– 23 –

3.2.6 *Return of Information.*  Upon our request, you will promptly return to us all Confidential Information and all copies in your possession or under your control, and you will destroy all copies on your computers and other digital storage devices.

Section 3.3 – **Noncompetition**

3.3.1 *Definition of Competitive Business.* As used in this Agreement, the term "Competitive Business" means any business that sells, or grants franchises or licenses to others to operate, a retail business that sells, brew tea, bubble tea and other hot and cold nonalcoholic beverages to consumers for on-site consumption or carry-out or delivery that derives 5% of more of its revenues from such business (other than a Kung Fu Tea shop operated under a franchise agreement with us or our affiliate). The restrictions of this section will not apply to the ownership, solely as an investment, of publicly traded securities that constitute less than 1% of a class of ownership interests of the issuing company.

3.3.2 *Noncompetition During the Term.*  You agree that during the term of this Agreement and any renewal of this Agreement, you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect interest in a Competitive Business located or operating anywhere in the U.S. or in any other country in which a Kung Fu Tea shop operates; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located or operating; or (iii) divert or attempt to divert any business or customer of the Franchised Business to any Competitive Business in any manner.

3.3.3 *Noncompetition After Termination.*  Upon the expiration and nonrenewal of this Agreement, your termination of this Agreement without cause, our termination of this Agreement in accordance with its terms and conditions, or your Transfer (as defined in Section 4.2.2), you and your company's owners agree for a period of two years following such expiration, termination or Transfer, that you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect ownership interest in a Competitive Business located or operating within 5 miles of the Site or of any Kung Fu Tea shop anywhere in the world at the time of such expiration, termination or Transfer; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for any such Competitive Business; or (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner.

3.3.4 *Reasonableness of Restrictions.*  You acknowledge that the time and geographical limitations in Sections 3.3.2 and 3.3.3 are reasonable and do not impose a greater restraint than is necessary to protect our goodwill or other business interests. If any of the limitation in such sections is held unreasonable or unenforceable by a court or governmental agency, then such limitation will be deemed to be reduced as necessary to enable the court or agency to enforce such limitation to the fullest extent permitted under applicable law.

ARTICLE IV - **TRANSFER**

Section 4.1 – **Transfer by Us**

We may sell, assign or transfer our rights and obligations under this Agreement to any party, without your approval and without prior notice to you, provided that the buyer, assignee or transferee agrees in writing to assume all of our obligations under this Agreement. We will not be liable for obligations of the transferee arising after the date of transfer.

– 24 –

Section 4.2 – *Transfer by You*

4.2.1 *No Transfer Without Our Approval.*  This Agreement is personal to you. We have granted the franchise to you in reliance upon our perceptions of your (or your company's owners') individual or collective character, skill, aptitude, business ability and financial capacity. Accordingly, you may make no Transfer (as defined below) without our prior written approval. Any purported Transfer without such approval will be a breach of this Agreement and will entitle us to terminate this Agreement as provided below. Our consent to a Transfer does not constitute a representation as to the fairness of the terms of any contract between you or your company's owners and the transferee, a guaranty of the successful operation of the Franchised Business by the transferee or a waiver of any claims we may have against you or your company's owners or of our right to demand the transferee's compliance with any of the terms or conditions of this Agreement.

4.2.2 *Definition of Transfer.*  As used in this Agreement, the term "Transfer" means your (or your company's owners') voluntary, involuntary, direct or indirect assignment, sale, gift, pledge or other disposition of: (i) any legal or beneficial ownership or voting interest in your company: (ii) this Agreement, (iii) any material asset of the Franchised Business; or (iv) the lease or ownership of the Shop Premises (unless we agree to a relocation or unless the transfer of ownership does not affect your leasehold rights and obligations). "Transfer" also includes (v) the merger or consolidation of your company; (vi) the issuance of additional securities or other ownership or voting interests of your company, and (vii) the admission or departure of a partner or owner; (viii) transfers resulting from proceedings under the U.S. Bankruptcy Code or any similar law; (ix) transfers resulting from divorce; and (x) any grant of a security interest to a third party without our approval.

4.2.3 *Notice of Transfer.*  You agree to notify us of any planned Transfer, and to provide us with any information we may reasonably request in order to permit us to evaluate the planned Transfer. If we do not exercise our right of first refusal under Section 4.3, we agree not to unreasonably withhold our approval of a Transfer. If we approve the Transfer, then you will be free, for 90 days following such approval, to effect the Transfer to the person or persons approved by us.

4.2.4 *Conditions to Transfer.*  The following conditions will apply with respect to any Transfer except as described in Section 4.2.5:

4.2.4.1  The proposed transferee, its managers, directors, officers and owners, must be individuals of good character with sufficient business experience, aptitude, and financial resources to operate the Franchised Business and otherwise meet our then applicable standards for a new Kung Fu Tea franchisee.

4.2.4.2  The proposed transferee may not be or be owned directly or indirectly by a Competitive Business, nor may any of the proposed transferee's managers, directors, officers or owners perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business.

4.2.4.3  You will cure any default under this Agreement that we will have notified to you.

4.2.4.4  You will pay all fees and any other amounts then owed to us or our affiliates.

4.2.4.5  If the Lease requires it, the landlord must consent to the assignment of the Lease to the transferee.

4.2.4.6  You or the transferee will pay us a nonrefundable transfer fee described in Section 2.1.8.6.

– 25 –

A148

4.2.4.7  We may require that the transferee or your company under ownership by the transferee, at the time of closing, enter into our then current form of franchise agreement amended to shorten the initial term to conform to the remaining term of this Agreement and to remove the requirement to pay the initial fee, and each Guarantor under the new franchise agreement will have signed our then-current form of guaranty.

4.2.4.8  You and we will execute a written Consent to Transfer Agreement terminating this Agreement or an amendment to this Agreement acknowledging a change in ownership. Any such agreement or amendment must be in a form satisfactory to us and may include a general release of any claims against us and our affiliates and an acknowledgment of your obligations following the Transfer.

4.2.4.9  You will upgrade and remodel the Shop Premises as we may require to conform to the then-current standards and specifications of a new franchised business then being established, and you will complete the upgrading and remodeling within the time specified by us.

4.2.4.10  We will have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the Franchised Business.

4.2.4.11  If you or your owners finance any part of the sale price of the transferred interest, you or your owners will have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests are subordinate to the transferee's obligation to pay Royalties, Marketing Fees and other amounts due to us.

4.2.4.12  After our authorization of the Transfer and your compliance with all of the requirements listed above, you will give us not less than five business days' written notice of the date, time and place of the closing of such Transfer, and you will give us an opportunity to have a representative present at the closing.

4.2.4.13  If the transaction is brokered by a third-party or by one of our authorized sales representatives, you or the proposed transferee will be responsible for paying broker fees at the same commission rate that we pay such broker or sales representatives.

4.2.4.14 If the transaction is a securities offering as described in Section 4.2.9, you must pay us the greater of: (i) 50% of our then-current initial franchise fee; or (ii) our reasonable costs and expenses associated with reviewing the proposed offering.

4.2.5  *Transfer to a Company you Control*.  Upon prior notice to us and the signing by the relevant parties of assignment documents acceptable to us, you may transfer this Agreement to an entity that conducts no business other than the Franchised Business in which you maintain management control and of which you or all of the owners of your company own and control 100% of the equity and voting power, provided that all assets of the Franchised Business are owned, and the entire Franchised Business is conducted by, a single entity. The requirements of Sections 4.2.4.6 through 4.2.4.13 will not apply to any such transfer. You will remain personally liable under this Agreement after such Transfer by signing a Guaranty as described in Section 1.1.7.

4.2.6  *Transfer Upon Death or Disability*.  You or your executor or other personal representative must promptly notify us in the event of the death or disability of the Managing Owner. Any transfer upon death or disability will be subject to the same terms and conditions as those that apply to other transfers, as described in Sections 4.2.1 through 4.2.4; but you or your executor or other personal representative will have a period of 12 months in which to effect a transfer acceptable to us in the event of death, and six months in the event of disability. The Managing Owner must be replaced with a new Managing Owner

– 26 –

acceptable to us. As used in this Agreement, the term "disability" means a mental, emotional or physical injury, illness, incapacity, disability or impairment that is reasonably expected to prevent or actually does prevent a person from performing the obligations set forth in this Agreement for more than 30 days. A person's disability for purposes of this section will be determined by a licensed practicing physician selected by us upon examination of such person or, if such person refuses to be examined, then such person will automatically be deemed disabled for purposes of this section as of the date of refusal. We will pay the cost of the examination to the extent it is not covered by insurance.

4.2.7  *Operation of the Franchised Business Upon Death or Disability.*  Upon the death or disability of the Managing Owner, you or such deceased or disabled owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed 30 days from the date of death or disability, appoint a Managing Owner to operate the Franchised Business. Such Managing Owner will be required to complete our training at your expense. Pending the appointment and training of a Managing Owner or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to manage the Franchised Business ourselves or through another franchisee. You will pay us or such other franchisee for such services in accordance with our or such other franchisee's then current fees.

4.2.8  *Transitional Management Costs.*  In the event that we appoint a manager for the Franchised Business pursuant to Section 4.2.7 or Section 1.5.6, all funds from the operation of the Franchised Business during the management by our appointed manager will be kept in a separate account, and all expenses of the Franchised Business, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We will also have the right to charge a reasonable management fee (in addition to the Royalty and Marketing Fee and other fees payable under this Agreement) during the period that our appointed manager manages the Franchised Business. Operation of the Franchised Business during any such period will be on your behalf. We will not be liable to you or your company's owners for any debts, losses or obligations incurred by the Franchised Business or to any of your suppliers for any products, materials, supplies or services the Franchised Business purchased during any period it is managed by our appointed manager.

4.2.9  *Securities Offerings.*  You agree to submit to us, for our review, all materials for an offering or exempt private placement of stock or partnership or other interests in your company or any of your affiliates that are required by federal or state law before such materials are filed with any government agency and before they are used. We may require that such materials contain a written statement, prescribed by us, indicating that we are not participating in such offering in any way. You and all other participants in the offering must fully indemnify us and our subsidiaries, affiliates, successors and assigns, and our and their respective members, managers, directors, officers, shareholders, partners, agents and representatives in connection with the offering. For each proposed offering, you will reimburse us for our reasonable costs and expenses (including legal and accounting fees) of reviewing the proposed offering. You will give us written notice at least 30 days before the date that any offering or other transaction described in this Section 4.2.9 commences. Any such offering will be subject to all of the other provisions of this Section 4.2.

Section 4.3 – **Our Right of First Refusal**

4.3.1  *Notice of Third Party Offer.*  If you or any of your company's owners at any time desire to sell, assign or transfer for consideration this Agreement and the other assets of the Franchised Business or the ownership of your company to anyone other than as described in Section 4.3.4, you will obtain and immediately submit to us a true and complete copy of a bona fide written offer from the third party that desires to acquire your company or its assets (the "Third Party Offer"). The Third Party Offer must include the names of all owners of any entity offeror and the names of all partners of any partnership offeror or, in the case of a publicly-held entity, copies of the most current quarterly report and Form 10K. The Third Party Offer must contain details of the payment terms of the proposed sale and the source and terms of any

– 27 –

financing of the proposed purchase price, and may not include or be contingent upon the purchase of assets other than those related to the Franchised Business.

4.3.2 *Exercise of Our Right of First Refusal.* We will have the right, exercisable by notice delivered to you or your company's selling owner or owners within 30 days after the date of our receipt of a copy of the Third Party Offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in the Third Party Offer, provided that (i) we may substitute cash for any form of payment proposed in such offer; and (ii) we will have at least 60 days after giving notice of our election to prepare for closing. If we exercise our right of first refusal, the seller and we will execute a written agreement, in a form satisfactory to us, acknowledging the seller's continuing obligations. We may require the seller to sign a general release of any claims against us and our affiliates. If you own the Shop Premises, we or our assignee or affiliate will only have a right to lease the Shop Premises for the remaining term of the Franchise Agreement, excluding renewals, at fair market value.

4.3.3 *Consequence of Nonexercise of Our Right of First Refusal.* If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Section 4.2; but if the sale to such purchaser is not completed within 120 days after delivery of the Third Party Offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the thirty day period following either the expiration of such 120-day period or the notice to us of the material changes in the terms of the sale, either on the terms originally offered (following such 120-day period) or the modified terms (following notice to us of material changes in the terms of the sale), at our option.

4.3.4 *Exceptions.* Our right of first refusal will not apply to transfers from one current owner of your company to another current owner unless the Managing Owner is transferring his or her ownership. In addition, our right of first refusal will not apply to any partial sale of your company or its assets. We will not have the right to become a partial owner of your company. You must nevertheless notify us before any transfer between owners or any partial transfer of ownership interest takes place.

ARTICLE V - **TERM AND TERMINATION**

Section 5.1 - *Term and Renewal*

5.1.1 *Initial Term.* This Agreement will be effective as of the date set forth in the opening paragraph of this Agreement. The initial term of this Agreement will expire on the date specified in Schedule A, but if no expiration date appears in Schedule A, then the initial term of this Agreement will expire 10 years after the date set forth in the opening paragraph of this Agreement, or in the case of a transfer from a prior Kung Fu Tea franchisee, the initial term will expire upon the expiration date of the transferor's franchise agreement. If a current lease or sublease will expire before the expiration of this Agreement, you may attempt to obtain a replacement lease or sublease. We will have the right to approve any proposed replacement lease or sublease as otherwise provided in Section 1.2.5. If you are unable to obtain a replacement lease or sublease that meets our approval before the current lease or sublease expires, (i) you have the right to terminate this Agreement, subject to your compliance with all notice provisions and post-term obligations set forth in this Agreement, or (ii) we have the right to terminate this Agreement in accordance with Section 5.2. In addition, if the current lease or sublease is terminated for any reason before it expires, we have the right to terminate this Agreement in accordance with Section 5.2.

5.1.2 *Renewal.* You will have the right to acquire a successor franchise for a term of 10 years, provided that you comply with the following conditions:

– 28 –

5.1.2.1 you will have given us notice of your desire to acquire a successor franchise ("Renewal Notice") not less than twelve months nor more than eighteen months before the end of the then-current term;

5.1.2.2 you and your affiliated companies must not be in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, or if you are in default, you have cured such default in the manner described below;

5.1.2.3 you comply with our then-current financial qualifications and training requirements for new Kung Fu Tea franchisees;

5.1.2.4 you must not have received more than three notices of default during any 24 month period during the term of this Agreement, whether or not such defaults have been cured;

5.1.2.5 you present evidence to us that you have the right to remain in possession of the Shop Premises for the duration of the term of the successor franchise agreement, or you obtain our approval of a new location for the Franchised Business for the duration of the successor franchise term;

5.1.2.6 to comply with our then-current standards in effect for new Kung Fu Tea franchises, at your cost and expense, you remodel and refurbish the Shop Premises, and you repair or replace equipment (including electronic cash register or computer hardware or software systems), signs, interior and exterior decor items, fixtures, furnishings, catering or delivery vehicles, if applicable, supplies and other products and materials required for the operation of the Franchised Business as we may reasonably require, and you obtain any new or additional equipment, fixtures, supplies and other products and materials that we may reasonably require;

5.1.2.7 if we require, you execute a general release, in a form prescribed by us, of any and all claims against us and our affiliates and their respective members, managers, officers, directors, shareholders, partners, agents and employees; and

5.1.2.8 you execute our then-current standard form of franchise agreement, which agreement will supersede this Agreement in all respects; but you will not be required to pay the initial fee stated in the successor franchise agreement. Instead, you will pay us the renewal fee referred to in Section 2.1.8.8. You understand that the successor franchise agreement may contain materially different terms than this Agreement, including, but not limited to, increased fees.

If you or any of your affiliated companies are in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, we will give you notice, not more than 30 days after receipt by us of your Renewal Notice, of such default, and we will give you 30 days to cure. In the event that you fail to cure in that period, or in the event that any other condition set forth in this Section 5.1.2 is not satisfied, your right to renew will terminate. Nothing in this Section 5.1.2 will limit our right to terminate this Agreement in accordance with Section 5.2.2 or 5.2.3.

5.1.3 *Hold Over.* If you do not sign a new franchise agreement before the term of this Agreement expires and you continue to accept the benefits of this Agreement after this Agreement expires, then at our option, we may treat this Agreement either as: (i) expired as of the date of expiration, with you then being deemed to be operating without a franchise in violation of our rights; or (ii) continued on a month-to-month basis (the "Interim Period") until either (A) both you and we sign a new franchise agreement or (B) either you or we give at least 30 days' prior written notice to the other party of your or our intention to terminate the Interim Period, in which case the Interim Period and this Agreement will terminate on the date specified in the notice, which will not be more than 60 days following the date of the notice unless both parties so

– 29 –

agree. All of your obligations will remain in full force and effect during the Interim Period as if this Agreement had not expired.

Section 5.2 - *Termination*

5.2.1  *Termination by You.* You may terminate this Agreement upon at least 90 days' notice to us without cause, provided that you comply fully with your obligations under this Agreement during such 90-day period, you pay all amounts owing to us and our affiliates, including the payment of liquidated damages pursuant to Section 5.3.5, and you comply with your post-term obligations under Article III. In the event that you claim that we have materially breached this Agreement, you will provide us with written notice of such claim within twelve months of its occurrence, specifically enumerating all alleged deficiencies and providing us with an opportunity to cure, which will in no event be less than 90 days from the date of our receipt of the notice. Your failure to give such notice will constitute a waiver of your right to terminate on the basis of such breach.

5.2.2  *Termination by Us Upon Notice.*  We may terminate this Agreement upon written notice to you with immediate effect if:

5.2.2.1 you or any of your company's owners have made any material misrepresentation or omission in connection with your application for and purchase of the franchise;

5.2.2.2 your Managing Owner fails to complete the initial training to our satisfaction in accordance with Section 1.5.3;

5.2.2.3 you fail to find a Site for the Franchised Business acceptable to us within the time required by Section 1.2.1 or you fail to commence operation of the Franchised Business within the time required by Section 1.2.10;

5.2.2.4 you are more than five days late in your payment of any amount due to us under this Agreement or to any of the suppliers of the Franchised Business and you fail to make such payment within five days after we will have notified you that such payment is past due;

5.2.2.5 you or any of your affiliates default under the Lease and fail to cure such default within the time required under the Lease, or you lose the right to possession of the Shop Premises and have not relocated to another site approved by us;

5.2.2.6 you no longer have a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards;

5.2.2.7 you or any of your company's owners use or disclose any Confidential Information in violation of the requirements of Section 3.2;

5.2.2.8 you or any of your company's owners make any unauthorized use of the Marks or challenge or seek to challenge the validity of any of the Marks;

5.2.2.9 you fail to maintain the insurance we require and do not correct the failure within ten days after we deliver written notice of that failure to you;

5.2.2.10 you refuse to permit us or our agent to enter upon the Shop Premises to conduct any periodic inspection in accordance with Section 1.6.15;

5.2.2.11  you fail to maintain the highest rating possible for the Franchised Business in accordance with the terms of Section 1.6.5, or you fail to notify us as required under Section 1.6.5,

– 30 –

or you fail to correct in a timely manner any condition described in any inspection report or any warning, citation, certificate or notice relating to the Franchised Business;

5.2.2.12 a threat or danger to public health or safety results from the construction or mainte-nance of the Shop Premises or from the operation of the Franchised Business, or you violate any health, safety or sanitation law, ordinance or regulation and do not begin to correct such noncom-pliance or violation immediately, and completely correct such noncompliance or violation within 72 hours after written notice of such threat, danger, noncompliance or violation is delivered to you;

5.2.2.13 you fail to remove any objectionable content posted to a social media website within 12 hours after we request you to remove it pursuant to Section 1.7.12;

5.2.2.14 you knowingly maintain false books or records or submit to us a report that under-states the Gross Sales of the Franchised Business three or more times during the term of this Agreement or by more than five percent on any one occasion;

5.2.2.15 you fail for a period of 15 days after notification by appropriate authority to comply with any other law or regulation applicable to the operation of the Franchised Business;

5.2.2.16 you or any of your company's owners effect or attempt to effect a Transfer without our approval and contrary to the provisions of Article IV;

5.2.2.17 you fail to meet the requirements of Section 1.6.11 including demonstrating full PCI/DSS compliance through means that we request in our reasonable discretion;

5.2.2.18 in the event of your death or disability or the death or disability of an owner of your company, this Agreement or such owner's interest is not assigned as required by Article IV;

5.2.2.19 you or any of your company's owners are or have been convicted of, or plead or have pleaded guilty or no contest to, a felony or any other crime or offense, or engage in any dishonest, deceptive or unethical conduct that may, in our opinion, adversely affect the reputation of the Franchised Business, other Kung Fu Tea shops or the goodwill associated with the Marks;

5.2.2.20 you fail to operate the Franchised Business for three consecutive business days, unless the Franchised Business has been closed for a purpose we have approved or because of casualty;

5.2.2.21 you fail to pay when due any federal or state income, service, sales, withholding or other taxes due in connection with the operation of the Franchised Business, unless you are contesting your liability for such taxes in good faith or you have received an extension from the applicable government agency of the time within which to make such payments;

5.2.2.22 you commit two or more defaults under this Agreement in any period of 12 con-secutive months, whether or not each such default has been cured after notice was delivered to you;

5.2.2.23 your assets, property or interests or those of any of your owners are blocked un-der any law, rule or regulation relating to terrorist activities;

5.2.2.24 you become insolvent or make a general assignment for the benefit of creditors; or, unless prohibited by law, if a petition in bankruptcy is filed by you or filed against and consented to by you or not dismissed within 30 days; or if a proceeding for the appointment of a receiver or other custodian of your company, business or assets is filed and consented to by you; or if a

– 31 –

receiver or other custodian (permanent or temporary) of all or any part of your business or assets is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against you; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless a bond is filed or other steps are taken to effectively stay enforcement); or if execution is levied against your property or business; or if suit to foreclose any lien or mortgage against the Shop Premises or equipment of the Franchised Business developed hereunder is instituted against you and not dismissed within 30 days; or if the real or personal property of any restaurant developed under this Agreement is levied and sold at public auction by a sheriff or marshal; or if your company is dissolved;

5.2.2.25 you or any of your affiliates default under any financing agreement or arrangement with any party advancing funds to you in connection with the operation of the Franchised Business or the operation of another business under a franchise agreement with us;

5.2.2.26 any other Kung Fu Tea franchise agreement now or hereafter in effect between us and you or any of your affiliates is terminated due to a breach by you or your affiliate; or

5.2.2.27 any TKK Fried Chicken franchise agreement now or hereafter in effect between TKK Franchising LLC and you or any of your affiliates is terminated due to a breach by you or your affiliate.

5.2.3 *Termination After Cure Period.* Except as set forth in Section 5.2.2, you will have 30 days after receipt of written notice from us of a material default in which to remedy the default and provide evidence of that remedy to us. If any such default is not cured within that time, this Agreement will terminate without further notice to you effective immediately upon expiration of that time unless we notify you otherwise in writing.

5.2.4 *Relationship Laws.* Notwithstanding the provisions described in this Section 5.2, if any valid, applicable law or regulation limits our right to terminate this Agreement or requires different or longer notice periods than those set forth in this Agreement, this Section 5.2 is deemed amended to conform to the minimum notice periods or restrictions upon termination required by such law or regulation. We will not however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination of this Agreement.

Section 5.3 - *Consequences of Termination*

5.3.1 *General Consequences.* Upon the expiration of this Agreement or its termination for any reason:

5.3.1.1 all rights and licenses granted to you under this Agreement will immediately terminate;

5.3.1.2 you will remit to us, within 15 days of such expiration or termination, or on such later date that the amounts due to us are determined, such Royalties and Marketing Fees, amounts owed for purchases from us, interest due and all other amounts owed to us that are then unpaid, and you will submit to us any reports and other information you may be required to submit to us with respect to the operation of the Franchised Business up to the date of expiration or termination;

5.3.1.3 you will deliver to us, within 15 days of such expiration or termination, a complete list of all customers in your possession or under your control, current as of the effective date of termination or expiration, including the name, address, telephone number and email address of each customer;

– 32 –

A155

5.3.1.4 you will cease to use the Marks in any way, cease referring to or identifying yourself as a Kung Fu Tea franchisee and remove all such identifying materials from the Shop Premises, unless we instruct you otherwise;

5.3.1.5 you will take such action as may be required to cancel all fictitious or assumed name or equivalent registrations or domain name registrations relating to your use of any Marks;

5.3.1.6 you will promptly return to us or deliver to us or otherwise dispose of as we may instruct, the Manual, and all supplemental materials, amendments, revisions and copies of the Manual (including copies stored electronically), as well as all other Confidential Information and all copies of such information in your possession or under your control, and all printed materials containing any Mark, and you will remove and destroy all copies from your computers and other electronic storage media, and you will allow us, without liability to you or to third parties, to remove all such items from the Franchised Business; and

5.3.1.7 you will assign to us or our designee all of your right, title and interest in and to your telephone numbers, websites, domain names and meta tags associated with the Mark (the "Listings") and you will notify the telephone company and all listing agencies of the termination or expiration of your right to use any of the Listings, and that you authorize the transfer of the Listings to us or our designee.

5.3.2   *Right to Purchase Assets.*   Upon the expiration of this Agreement or its termination for any reason, if we elect not to offer or you elect not to accept, a successor franchise, we will have the right, but not the obligation, to purchase some or all of the assets of the Franchised Business, including any furnishings, fixtures, equipment, signs, inventory, supplies and marketing materials and all other items, including the leasehold rights (subject to any rights of approval retained by the owner of the Shop Premises) to or ownership of the Shop Premises. The purchase price for such assets will be their fair market value as agreed by you and us or, if we are unable to agree, as determined in the manner described in Section 5.3.4. Before exercising our purchase right under this section, we will have the right to enter the Shop Premises during reasonable hours to inspect the assets. If we elect to exercise our purchase right under this section, we will give you written notice of our intent to do so within 30 days after the expiration or termination of this Agreement. We will have the right to offset all amounts you owe to us or our affiliates against any payment due to you under this section. We have the unrestricted right to assign this option to purchase the Franchised Business. We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise. This provision will also apply in the event of death or disability under Section 4.2.6.

5.3.3   *Leasehold Rights.*   If we exercise our right to assume your lease, you agree at our election, (i) to assign your leasehold interest in the Shop Premises to us or (ii) if you are unable to assign your leasehold interest, to enter into a sublease at a fair market rental for the remainder of the lease term on the same terms (including renewal option) as the prime lease; or (iii) if you own the Shop Premises, to lease the premises to us at a reasonable commercial rent and according to terms comparable with rental terms for similar leased property in the marketplace where the Site is located.

5.3.4   *Purchase Price and Closing.*   If we exercise our right to purchase substantially all of the assets of the Franchised Business:

5.3.4.1 the purchase price will be the fair market value of the assets of the Franchised Business, determined in a manner consistent with reasonable depreciation of the leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies. The fair market value of the Franchised Business will include the goodwill you have developed in the market that is

– 33 –

**A156**

independent of the goodwill of the Marks and the franchise system. The length of the remaining term of the lease or sublease of the Shop Premises, if any, and the age and condition of the improvements, equipment, fixtures, furnishings, décor and signs will also be considered in determining the fair market value. We may exclude from the assets purchased cash or its equivalent and any leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies that are not necessary or appropriate to the operation of the Franchised Business or that we have not approved as meeting our standards, and the purchase price will reflect such exclusions.

5.3.4.2  If we and you are unable to agree on the fair market value of the assets of the Franchised Business or the Site, or the fair rental value of the Shop Premises, such fair market value or fair rental value will be determined by one independent appraiser agreed to by you and us. If we fail to agree on an appraiser within 30 days after our notice to you of our intent to purchase such assets, then each party will name its own reputable appraiser within seven days thereafter, and the average of their determinations will be binding. If one appraiser is chosen, then the parties will share the cost of the appraiser equally. If two appraisers are used, each party will pay its own appraisal fees. You and we will instruct the appraiser or appraisers to complete their appraisal within 30 days after their appointment.

5.3.4.3  The closing of the purchase described in this section will take place not later than 90 days after the determination of the purchase price. We will pay the purchase price at the closing, but we have the right to set off against the purchase price any and all amounts you or your company's owners owe to us. At the closing, you agree to deliver instruments transferring to us (i) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances, with all sales and other transfer taxes paid by you; (ii) all licenses and permits of the Franchised Business that are assignable; and (iii) a leasehold interest in (or unencumbered title to) the Shop Premises and the improvements to such premises.

5.3.5  *Liquidated Damages*.  The following provisions will apply if this Agreement is terminated before it expires pursuant to Section 5.2.1, 5.2.2 or 5.2.3 and we do not exercise our right to purchase substantially all of the assets of the Franchised Business pursuant to Section 5.3.4:

5.3.5.1  You agree that your termination of this Agreement before it expires pursuant to Section 5.2.1, or our termination based on your material breach pursuant to Section 5.2.2 or 5.2.3, will deprive us of the benefit of the bargain we are entitled to receive under this Agreement. As a result, if this Agreement is terminated after the Franchised Business opens, you must pay us, as liquidated damages and not as a penalty, a lump-sum equal to the average monthly Royalty you owed us during the 24 months before the termination date multiplied by the lesser of 36 or the number of months in the remainder of the term. If less than 24 months have lapsed between the date the Franchised Business opened and the effective date of termination, the liquidated damages will be the average monthly Royalty during the time between the opening date and the termination date, multiplied by 36 or such lesser number of months that remain in the term. If the termination occurs before the opening date, you will forfeit the initial fee paid and you will not owe us any liquidated damages.

5.3.5.2  You will pay all amounts stated in Section 5.3.5.1 within 30 days after the effective date of termination of this Agreement. You agree, and you direct any party construing this Agreement to conclusively presume, that the damages stated in Section 5.3.5.1: (i) are true liquidated damages; (ii) are intended to compensate us for the harm we will suffer; (iii) are not a penalty; (iv) are a reasonable estimate of our probable loss resulting from your default, viewed as of the termination date; and (v) will be in addition to all other rights we have to obtain legal or equitable relief.

– 34 –

ARTICLE VI - **REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION**

Section 6.1 - *Representations and Warranties*

6.1.1 *Your Representations.*  You represent and warrant as follows:

6.1.1.1  ALL STATEMENTS YOU HAVE MADE AND ALL MATERIALS YOU HAVE SUBMITTED TO US IN CONNECTION WITH YOUR APPLICATION FOR AND PURCHASE OF THE FRANCHISE ARE ACCURATE AND COMPLETE AND, IN THAT CONNECTION, YOU HAVE MADE NO MISREPRESENTATIONS TO US OR OMITTED DISCLOSING ANY MATERIAL INFORMATION TO US.

6.1.1.2  YOU ARE UNDER NO OBLIGATION OR RESTRICTION, NOR WILL YOU ASSUME ANY OBLIGATION OR RESTRICTION, THAT WOULD IN ANY WAY INTERFERE OR BE INCONSISTENT WITH, OR PRESENT A CONFLICT OF INTEREST CONCERNING, YOUR RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

6.1.1.3  SCHEDULE A COMPLETELY AND ACCURATELY DESCRIBES ALL OF YOUR COMPANY'S OWNERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND MANAGERS AND THEIR OWNERSHIP INTERESTS AND MANAGEMENT POSITIONS IN YOUR COMPANY.

6.1.1.4  YOUR COMPANY HAS THE POWER AND AUTHORITY TO ENTER INTO THIS AGREEMENT AND TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT AND IS NOT RESTRICTED FROM DOING SO BY ANY AGREEMENT WITH ANY OTHER PARTY, AND THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF YOUR COMPANY HAS THE POWER AND AUTHORITY TO BIND YOUR COMPANY.

6.1.2 *Your Compliance with Laws.* You represent and warrant that neither you nor any person holding any ownership interest in your company or a company controlled by or under common control with your company, (i) is identified on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control, (ii) is designated under Executive Order 13224 as a person with whom we may not transact business, (iii) is affiliated with or supports any individual or entity engaged in, contemplating or supporting terrorist activity, or (iv) has violated any law prohibiting corrupt business practices or money laundering.

Section 6.2 - *Indemnification*

6.2.1 *Your Indemnity.*  You will indemnify and hold us and our affiliates, and the members, managers, stockholders, directors, officers, employees and agents of our company and our affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to:  (i) the failure of any of your representations, warranties or covenants set forth in this Agreement, or (ii) any act or omission of yours or anyone associated with or employed by or affiliated with you, except as described in Section 6.2.2. We will have the right to participate in the defense, with counsel of our own choice and at our own expense, of any action that may give rise to your obligation to indemnify, and to reject any settlement that might adversely affect us.

6.2.2 *Our Indemnity.*  We will defend and indemnify and hold you and your affiliates, and the members, managers, stockholders, directors, officers, employees and agents of your company and its affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to:  (i) your use of the Marks or any copyrights or design patents owned by us or our affiliate in full compliance with the terms and conditions of this Agreement; or (ii) advertising or promotion carried out by us or by agencies or media engaged by us relating to the Kung Fu Tea brand, provided that you have timely notified us of each such claim or proceeding, have given us sole control of the defense and settlement, and have otherwise complied with this Agreement.

– 35 –

6.2.3 *Notice of Claim; Survival.*  Each party will give the other notice of any claim that may require indemnification promptly after such party learns of such claim. The rights and obligations of the parties under this Section 6.2 will survive the expiration or termination of this Agreement.

Section 6.3 – **Insurance**

6.3.1 *Insuring the Franchised Business.*  During the term of this Agreement and any renewal, you will obtain and maintain, at your own expense, an insurance policy or policies protecting you against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense arising or occurring upon or in connection with the operation of the Franchised Business. Such policy or policies must

6.3.1.1  be written by an insurer licensed and admitted to write coverage the state in which the Franchised Business is located and with a rating of "A" or better as set forth in the most recent edition of Best's Key Rating Guide;

6.3.1.2  be primary coverage without right of contribution from any general liability policy or auto liability policy or from any insurance of ours;

6.3.1.3  name KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc. as additional insureds;

6.3.1.4  be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 (or an endorsement form with comparable wording acceptable to us; and

6.3.1.5  comply with our written requirements at the time such policies are obtained, and provide at least the types and minimum amounts of coverage specified below or as described in our written notice to you.

Your obligation to obtain and maintain such insurance will not be limited in any way by reason of any insurance that we may maintain.

6.3.2 *Minimum Coverage.*  The policies referred to in Section 6.3.1 must include at least the following:

6.3.2.1  "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance;

6.3.2.2  comprehensive general liability insurance, including products and completed operations, in an amount of not less than the following combined single limits: $2,000,000 per occurrence, $2,000,000 personal and advertising injury, $2,000,000 completed operations/products aggregate, $2,000,000 aggregate per location;

6.3.2.3  employment practices liability coverage with a limited $100,000 per occurrence and in the aggregate;

6.3.2.4  automobile liability coverage, including coverage of owned, non-owned, rented or hired vehicles with coverage in amounts not less than $1,000,000 combined single limit; and

6.3.2.5  workers' compensation insurance for statutory limits and employer's liability insurance in an amount not less than $1,000,000.

– 36 –

**A159**

6.3.3 *Waiver of Subrogation*. You and your insurers must agree to waive their rights of subrogation against us in connection with any and all insurance that you are required to maintain under this Section 6.3.

6.3.4 *Changes in Coverage Requirements*.  Each year we may unilaterally modify the insurance minimum coverage requirements by delivery to you of written notice of the change, which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.

6.3.5 *Negligence*.  All public liability and property damage policies must contain a provision that KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc., although named as an additional insureds, will nevertheless be entitled to recover under such policies on any loss occasioned to any such company by reason of your negligence.

6.3.6 *Certificates of Insurance*.  At least ten days before you are first required to carry insurance, and thereafter at least thirty days before the expiration of any policy, you will deliver to us a certificate of insurance evidencing your compliance with this Section 6.3. Each certificate of insurance must expressly provide that we must receive at least thirty days' prior written notice in the event of material alteration to or cancellation or non-renewal of any coverage evidenced by the certificate.

6.3.7 *Our Remedies*.  If you fail to obtain or maintain the required insurance in accordance with this Section 6.3, we or our designee will each have the right and authority (but not the obligation) to obtain such insurance on your behalf. Such right will be in addition to and not in lieu of any other rights or remedies available to us. If we obtain such insurance on your behalf, we may require you to pay us the charges described in Section 2.1.7.2.

6.3.8 *No Effect on Indemnity*.  Nothing in this Section 6.3 will relieve you of liability under the indemnity provisions in Section 6.2.

ARTICLE VII - **MISCELLANEOUS**

Section 7.1 – ***Relationship of the Parties.***  You are an independent contractor and not an agent of ours. You will have no power or authority to make any commitment or enter into any contract or agreement obligating or purporting to obligate us, and you will not hold yourself out as having such power or authority. Nothing in this Agreement imposes a fiduciary duty upon us. You agree to conspicuously identify yourself in all dealings with customers, suppliers, public officials, your employees and others as the owner of an independent business under a franchise from us and to place such notices of independent ownership on such forms, business cards, stationery, advertising and other materials as we require from time to time.

Section 7.2 – ***Reasonable Business Judgment.***  You acknowledge that the long-term interests of the network of Kung Fu Tea shops, and our company and its owners, taken together, require that we have the latitude to make business decisions with respect to the franchise system. The ultimate responsibility to make decisions with respect to the franchise system and the System Standards is vested in us because we, you and all Kung Fu Tea franchisees have a collective interest in working within a franchise system that can quickly adjust to changing business conditions, including changes in the competitive environment, new laws and regulations, and emerging business opportunities. We have this right even if, at times, a particular decision adversely affects you. We will not be required to consider your particular economic or other circumstances or to disregard our own economic or other business interest when making decisions under this Agreement.

Section 7.3 – ***Injunctive Relief.***  You understand that your covenants set forth in Article III constitute essential elements of this Agreement. If you fail to comply strictly with any such covenants, we will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against you in a court of competent jurisdiction.

– 37 –

Section 7.4 – **Severability.**  If any restrictive covenant in this Agreement is held to be invalid or unenforceable because its duration is too long or its scope is too broad, you and we agree that the court making such determination will have the power to reduce the duration or scope in such a manner that the remaining revised covenant will be valid and enforceable. Each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Agreement is prohibited by or invalid under applicable law, such prohibition or invalidity will not invalidate the remainder of such provision as long as the resulting provision remains consistent with the parties' original intent. If it is impossible to so modify the provision, such provision will be deleted from this Agreement. If any provision of this Agreement is declared invalid by a court of competent jurisdiction for any reason, the parties will continue to be bound by the remainder of this Agreement; provided, that if any provision of the Agreement that we, in our sole discretion, determine to be material, is declared invalid by a court of competent jurisdiction, we reserve the right to terminate this Agreement.

Section 7.5 – **No Waiver of Rights.**  No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy. No waiver will be binding unless contained in a writing signed by the party waiving its rights. Any waiver is limited to the specific situation in which it is given and no waiver of any breach or default under this Agreement will be construed as a waiver of any earlier or succeeding breach or default.

Section 7.6 – **Notices.**  All notices, requests, consents and other communications required or permitted by this Agreement (except oral or email notices for the purchase or sale of unauthorized products under Sections 1.1.4, 1.3.4 or 1.6.15) will be in writing and will be delivered by hand, overnight delivery service, or registered or certified first class mail, to the following address, or such other address as either party, by like notice, designates with respect to its own address:

| | |
|---|---|
| If to us: | KF Tea Franchising LLC |
| | 589 8th Ave., 17th Floor |
| | New York, NY 10018 |
| | |
| If to you: | The address indicated in Schedule A either in the manner described above in this Section 7.6 or by email or other method indicated in Schedule A which shall include electronic confirmation of delivery. |

Any such notice, request, consent or other communication will be deemed given and be effective upon receipt at such address.

Section 7.7 – **Affiliates.**  As used in this Agreement, the term "affiliate" of party means a company directly or indirectly controlling, controlled by or under common control with such party. "Control" of another company, as used in this Agreement, means the ownership of or the power to vote, directly or indirectly through majority-owned companies, more than 50% of the voting stock or voting rights of such other company.

Section 7.8 – **Limitation of Actions.**  Except as otherwise stated in this Section 7.8, any and all claims and actions arising out of or relating to this Agreement brought by either party against the other must be brought or asserted before the expiration of the earlier of (i) the time period for bringing an action under any applicable statute of limitations; (ii) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to the claim; or (iii) two years after the first act or omission giving rise to the alleged claim. Claims and actions not brought within such time period will be irrevocably barred.

– 38 –

Claims by us of your underreporting of sales, claims for your failure to pay monies owed or for indemnification, and claims for your infringement of any Marks will be subject only to the applicable statute of limitations.

Section 7.9 – *Waiver of Punitive Damages and Jury Trial.*  Except for your obligation to indemnify us for third party claims under Section 6.2, we and you each waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other party, and we and you agree that any recovery in a dispute between us will be limited to equitable relief and to the recovery of actual damages sustained. We and you irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either of us.

Section 7.10 – *No Class Actions*.  Any litigation and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. No such proceeding will be consolidated with any other proceeding involving any other person, except for disputes involving affiliates of the parties.

Section 7.11 – *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

Section 7.12 – *Jurisdiction and Venue.*  You irrevocably consent to the non-exclusive jurisdiction of the federal and state courts located in the city in which our principal office is located at the time suit is filed (or a city within 25 miles of such office). If we assign or otherwise transfer this Agreement, all legal actions between the parties will be venued exclusively in a state or federal court in the judicial district in which the assignee's or transferee's principal offices are located at the time the suit is filed. You hereby waive, to the full extent permitted by law, defenses based on jurisdiction, venue and forum *non conveniens*. You further consent to service of process in any action by registered mail, return receipt requested, or by any other means permitted by law.

Section 7.13 – *Costs and Expenses.*  In any legal action arising out of or pursuant to this Agreement or otherwise in connection with the relationship between us, the prevailing party will be entitled to recover its reasonable costs and expenses (including reasonable attorneys' fees). Attorneys' fees include, without limitation, reasonable legal fees charged by attorneys, paralegal fees, and costs and disbursements, whether incurred in preparation for or in contemplation of the filing of a written demand or claim, or in the course of an action, hearing or proceeding to enforce the obligations of the parties under this Agreement.

Section 7.14 – *Entire Agreement.*  This Agreement and all related agreements executed simultaneously with this Agreement constitute the entire understanding of the parties and supersede any and all prior oral or written agreements between you and us on the matters contained in this Agreement; but nothing in this or any related agreement is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. Except for changes permitted under this Agreement to be made unilaterally by us, no amendment to this Agreement will be binding unless such amendment is in writing and executed by the parties.

[Signatures on next page]

Version 4/20/2023

**A162**

The parties have signed this Agreement on the dates set forth below, with effect as of the date stated in the opening paragraph of this Agreement.

KF TEA FRANCHISING LLC            [Franchisee]

By _____       By _____

Title _____       Title _____

Date _____      Date _____

– 40 –

**SCHEDULE A**

**FRANCHISEE INFORMATION**

See Sections 1.1.1, 1.1.2, 1.1.7, 1.5.1, 5.1.1, 6.1.1.7 and 7.6 of the Franchise Agreement

1.  Approved location (the Site): _____

2.  Territory: _____

3.  Agreement expiration date: _____

4.  Initial fee: _____

5.  Managing Owner: _____

    Operating Manager: _____

6.  Type of shop (indicate one):  Standard Unit _____
                                   Non-Traditional Unit _____

7.  Address for notices: _____
    [Cannot be a post office box address]

8.  Ownership and management of the franchisee.

    The franchisee is a _____ [state] _____ [limited liability company] [corporation].

    The following persons are the [members and managers] [shareholders, officers and directors] of the franchisee:

| Name and Home Address | Positions | Percentage Ownership |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**KUNG FU TEA**

**Guaranty and Assumption of Obligations**

**[for one guarantor]**

In order to induce KF TEA FRANCHISING LLC, a Delaware limited liability company (the "Franchisor"), to enter into a Kung Fu Tea franchise agreement dated as of _____ (the "Franchise Agreement") with _____, a _____ (the "Franchisee") for a Kung Fu Tea shop located at _____, the undersigned person (the "Guarantor"), hereby agrees as follows:

1. *Guaranty of Payment*

1.1    *Personal Guaranty*. The Guarantor personally and unconditionally guarantees to the Franchisor and the Franchisor's successors and assigns the due, punctual and complete payment of all amounts that the Franchisee is obligated to pay to the Franchisor under the Franchise Agreement and under any modification of, amendment to or renewal of the Franchise Agreement.

1.2    *Waiver of Defenses*. The Guarantor waives to the fullest extent permitted by law (a) any defense based upon any (i) legal disability or lack of authority of the Franchisee, (ii) legal or equitable discharge or limitation of the liability of the Franchisee, whether consensual or arising by operation of law, (iii) bankruptcy, insolvency, reorganization or other similar proceeding affecting the Guarantor or the Franchisee, or (iv) invalidity, irregularity or unenforceability of any or all of the provisions of this Guaranty or the Franchise Agreement; (b) presentment, demand, protest or notice of any other kind; (c) notice of acceptance of this Guaranty; (d) other defenses available to the Guarantor under applicable law; and (e) any requirement of diligence on the part of the Franchisor or any right the Guarantor may have to require the Franchisor to proceed first against the Franchisee.

1.3    *Guaranty of Payment*. This is a guaranty of payment and not of collection. The Franchisor may require payment from the Guarantor of any obligation of the Franchisee under the Franchise Agreement and may sue the Guarantor for damages without first seeking or taking any action against the Franchisee.

1.4    *No Modification or Release*. The liability of the Guarantor is unaffected by (a) any modification, amendment, termination or variation in or addition to the Franchise Agreement; (b) any extension of time for performance or any waiver of performance or any delay of the Franchisor in enforcing any right, remedy, power or privilege that the Franchisor may have against the Franchisee or any other person; (c) the release of the Franchisee, in whole or in part, from performance or observance of any of the agreements, covenants, terms or conditions contained in the Franchise Agreement, whether made with or without notice to the Guarantor; or (d) any other guaranty now or hereafter executed by anyone else in connection with the transactions contemplated by the Franchise Agreement.

2. *Proprietary Rights; Confidentiality; Noncompetition*

2.1    *Improvements*. The Guarantor agrees that if he or she makes an improvement to the Franchisor's business system or method, such improvement will be the property of the Franchisor pursuant to the terms of Section 1.4.3 of the Franchise Agreement and the Guarantor will promptly disclose such improvement to the Franchisee and to the Franchisor with reference to this undertaking. The Guarantor hereby assigns all rights in such improvements to the Franchisor and agrees to sign any documents that the Franchisor may reasonably request from time to time to evidence such assignment.

2.2    *Copyrights and Trademarks*. The Guarantor acknowledges that the Franchisor's copyrights and trademarks may only be used by the Franchisee in accordance with Section 3.1 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under

Section 3.1 and not to use any of the Franchisor's copyrights or trademarks except on behalf of the Franchisee in furtherance of the Franchisee's business, and the Guarantor agrees that any such use will be in compliance with the Franchisee's obligations under the Franchise Agreement as if the Guarantor were the Franchisee under the Franchise Agreement.

2.3   *Confidentiality.* The Guarantor acknowledges the Franchisee's obligations of confidentiality under Section 3.2 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.2 and not to disclose or use any Confidential Information (as defined in Section 3.2.1 of the Franchise Agreement) except on behalf of the Franchisee in furtherance of the Franchisee's business in compliance with the Franchisee's obligations under the Franchise Agreement, and only to the extent that the Franchisee is permitted under the Franchise Agreement to disclose and use Confidential Information. Upon the request of the Franchisor, the Guarantor will promptly return to the Franchisor all Confidential Information and all copies in the Guarantor's possession or under the Guarantor's control, and the Guarantor will destroy all copies on the Guarantor's computers, disks and other digital storage devices.

2.4   *Noncompetition.* The Guarantor acknowledges the Franchisee's obligations under Section 3.3 of the Franchise Agreement not to compete with the Franchisor. The Guarantor personally agrees to comply with and be bound by all of the Franchisee's obligations under Section 3.3 to the same extent that the Franchisee is bound by the obligations of Section 3.3, both during and after the term of the Franchise Agreement.

2.5   *Remedies.* If the Guarantor fails to comply strictly with any of the undertakings in Sections 2.1 through 2.4 above, the Franchisor will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against such Guarantor in a court of competent jurisdiction. In the event this Guaranty and Assumption of Obligations is placed in the hands of an attorney for enforcement and the Franchisor is the prevailing party, the Guarantor will reimburse the Franchisor for all reasonable expenses incurred in the enforcement of the Franchisor's rights, including reasonable attorneys' fees and expenses.

3. **Transfer**

3.1   *Transfer by the Franchisor.* If the Franchisor transfers its rights and obligations under the Franchise Agreement pursuant to Section 4.1 of the Franchise Agreement, this Guaranty will be deemed to be transferred automatically to the transferee who, upon such transfer, will have all of the rights granted to the Franchisor under this Guaranty vis-a-vis the Guarantor, and the obligations of the Guarantor will then accrue to the benefit of the transferee.

3.2   *Transfer by the Franchisee.* The Guarantor acknowledges the Franchisee's transfer restrictions under Sections 4.2 and 4.3 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under Sections 4.2 and 4.3.

4. **Miscellaneous**

4.1   *Waiver.* No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.

4.2   *Governing Law.* This Guaranty and Assumption of Obligations will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to that state's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

4.3   *Severability.* In the event that any one or more provisions of this Guaranty and Assumption of Obligations are deemed unenforceable or void, the remaining provisions will continue to be valid and enforceable.

Version 4/20/2023

- 2 -

**A166**

4.4 *Amendments*. This Guaranty and Assumption of Obligations may not be modified or amended except in writing signed by the Franchisor and the Guarantor to be bound by such modification or amendment.

IN WITNESS WHEREOF, the Guarantor has signed this Guaranty as of the date of the Franchise Agreement.

_____
[Insert name and home address
of the Guarantor below the line]

Acknowledged and agreed:

KF TEA FRANCHISING LLC

By _____

Title _____

Date _____

STATE OF                                                )
                                                               )          ss.:
COUNTY OF                                             )

On the _____ day of _____, before me personally came _____, to me known to be the individual described in and who executed the foregoing guaranty, and he/she acknowledged that he/she executed the same.

_____
Notary Public

Version 4/20/2023

**A167**

**KUNG FU TEA**

**Guaranty and Assumption of Obligations**

**[for two or more guarantors]**

In order to induce KF TEA FRANCHISING LLC, a Delaware limited liability company (the "Franchisor"), to enter into a Kung Fu Tea franchise agreement dated as of _____ (the "Franchise Agreement") with _____, a _____ (the "Franchisee") for a Kung Fu Tea shop located at _____, each of the undersigned persons (the "Guarantors"), jointly, individually and severally, hereby agree as follows:

1. **Guaranty of Payment**

    1.1   *Personal Guaranty.* Each Guarantor personally and unconditionally guarantees to the Franchisor and the Franchisor's successors and assigns the due, punctual and complete payment of all amounts that the Franchisee is obligated to pay to the Franchisor under the Franchise Agreement and under any modification of, amendment to or renewal of the Franchise Agreement.

    1.2   *Waiver of Defenses.* Each Guarantor waives to the fullest extent permitted by law (a) any defense based upon any (i) legal disability or lack of authority of the Franchisee, (ii) legal or equitable discharge or limitation of the liability of the Franchisee, whether consensual or arising by operation of law, (iii) bankruptcy, insolvency, reorganization or other similar proceeding affecting a Guarantor or the Franchisee, or (iv) invalidity, irregularity or unenforceability of any or all of the provisions of this Guaranty or the Franchise Agreement; (b) presentment, demand, protest or notice of any other kind; (c) notice of acceptance of this Guaranty; (d) other defenses available to a Guarantor under applicable law; and (e) any requirement of diligence on the part of the Franchisor or any right a Guarantor may have to require the Franchisor to proceed first against the Franchisee.

    1.3   *Guaranty of Payment.* This is a guaranty of payment and not of collection. The Franchisor may require payment from each Guarantor of any obligation of the Franchisee under the Franchise Agreement and may sue each Guarantor for damages without first seeking or taking any action against the Franchisee.

    1.4   *No Modification or Release.* The liability of each Guarantor is unaffected by (a) any modification, amendment, termination or variation in or addition to the Franchise Agreement; (b) any extension of time for performance or any waiver of performance or any delay of the Franchisor in enforcing any right, remedy, power or privilege that the Franchisor may have against the Franchisee or any other person; (c) the release of the Franchisee, in whole or in part, from performance or observance of any of the agreements, covenants, terms or conditions contained in the Franchise Agreement, whether made with or without notice to the Guarantors; or (d) any other guaranty now or hereafter executed by anyone else in connection with the transactions contemplated by the Franchise Agreement.

2. **Proprietary Rights; Confidentiality; Noncompetition**

    2.1   *Improvements.* Each Guarantor agrees that if a Guarantor makes an improvement to the Franchisor's business system or method, such improvement will be the property of the Franchisor pursuant to the terms of Section 1.4.3 of the Franchise Agreement and the Guarantor will promptly disclose such improvement to the Franchisee and to the Franchisor with reference to this undertaking. The Guarantor hereby assigns all rights in such improvements to the Franchisor and agrees to sign any documents that the Franchisor may reasonably request from time to time to evidence such assignment.

    2.2   *Copyrights and Trademarks.* Each Guarantor acknowledges that the Franchisor's copyrights and trademarks may only be used by the Franchisee in accordance with Section 3.1 of the Franchise Agreement. Each Guarantor personally agrees to comply with all of the Franchisee's obligations under

Section 3.1 and not to use any of the Franchisor's copyrights or trademarks except on behalf of the Franchisee in furtherance of the Franchisee's business, and each Guarantor agrees that any such use will be in compliance with the Franchisee's obligations under the Franchise Agreement as if the Guarantor were the Franchisee under the Franchise Agreement.

2.3   *Confidentiality.* Each Guarantor acknowledges the Franchisee's obligations of confidentiality under Section 3.2 of the Franchise Agreement. Each Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.2 and not to disclose or use any Confidential Information (as defined in Section 3.2.1 of the Franchise Agreement) except on behalf of the Franchisee in furtherance of the Franchisee's business in compliance with the Franchisee's obligations under the Franchise Agreement, and only to the extent that the Franchisee is permitted under the Franchise Agreement to disclose and use Confidential Information. Upon the request of the Franchisor, each Guarantor will promptly return to the Franchisor all Confidential Information and all copies in the Guarantor's possession or under the Guarantor's control, and the Guarantor will destroy all copies on the Guarantor's computers, disks and other digital storage devices.

2.4   *Noncompetition.* Each Guarantor acknowledges the Franchisee's obligations under Section 3.3 of the Franchise Agreement not to compete with the Franchisor. Each Guarantor personally agrees to comply with and be bound by all of the Franchisee's obligations under Section 3.3 to the same extent that the Franchisee is bound by the obligations of Section 3.3, both during and after the term of the Franchise Agreement.

2.5   *Remedies.* If any Guarantor fails to comply strictly with any of the undertakings in Sections 2.1 through 2.4, the Franchisor will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against such Guarantor in a court of competent jurisdiction. In the event this Guaranty and Assumption of Obligations is placed in the hands of an attorney for enforcement and the Franchisor is the prevailing party, the Guarantors will reimburse the Franchisor for all reasonable expenses incurred in the enforcement of the Franchisor's rights, including reasonable attorneys' fees and expenses.

3. **Transfer**

3.1   *Transfer by the Franchisor.* If the Franchisor transfers its rights and obligations under the Franchise Agreement pursuant to Section 4.1 of the Franchise Agreement, this Guaranty will be deemed to be transferred automatically to the transferee who, upon such transfer, will have all of the rights granted to the Franchisor under this Guaranty vis-a-vis the Guarantors, and the obligations of the Guarantors will then accrue to the benefit of the transferee.

3.2   *Transfer by the Franchisee.* Each Guarantor acknowledges the Franchisee's transfer restrictions under Sections 4.2 and 4.3 of the Franchise Agreement. Each Guarantor personally agrees to comply with all of the Franchisee's obligations under Sections 4.2 and 4.3.

4. **Miscellaneous**

4.1   *Waiver.* No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.

4.2   *Governing Law.* This Guaranty and Assumption of Obligations will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to that state's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

4.3  *Severability*. In the event that any one or more provisions of this Guaranty and Assumption of Obligations are deemed unenforceable or void, the remaining provisions will continue to be valid and enforceable.

4.4  *Amendments*. This Guaranty and Assumption of Obligations may not be modified or amended except in writing signed by the Franchisor and the Guarantor to be bound by such modification or amendment.

IN WITNESS WHEREOF, each Guarantor has signed this Guaranty as of the date of the Franchise Agreement.


_____          _____
[Insert name and home address                      [Insert name and home address
of the Guarantor below the line]                   of the Guarantor below the line]


Acknowledged and agreed:

KF TEA FRANCHISING LLC

By _____

Title _____

Date _____

STATE OF                              )
                                     )      ss.:
COUNTY OF                            )

On the \_\_\_\_ day of _____, before me personally came _____ and _____, to me known to be the individuals described in and who executed the foregoing guaranty, and they acknowledged that they executed the same.


_____
Notary Public

**A170**

**KUNG FU TEA**

**Guaranty and Assumption of Obligations**

**[for a partial transfer of ownership]**

In order to induce KF TEA FRANCHISING LLC, a Delaware limited liability company (the "Franchisor"), to approve the transfer to the undersigned person (the "Guarantor") of a ___% ownership interest in _____, a _____, the franchisee of a Kung Fu Tea shop located at _____ (the "Franchisee") pursuant to a Kung Fu Tea franchise agreement dated as of _____ (the "Franchise Agreement"), the Guarantor hereby agrees as follows, jointly and severally with the co-owners of the Franchisee, each of whom entered into unconditional personal guarantees with the Franchisor upon the execution of the Franchise Agreement:

1. *Guaranty of Payment*

1.1   *Personal Guaranty*. The Guarantor personally and unconditionally guarantees to the Franchisor and the Franchisor's successors and assigns the due, punctual and complete payment of all amounts that the Franchisee is obligated to pay to the Franchisor under the Franchise Agreement and under any modification of, amendment to or renewal of the Franchise Agreement.

1.2   *Waiver of Defenses*. The Guarantor waives to the fullest extent permitted by law (a) any defense based upon any (i) legal disability or lack of authority of the Franchisee, (ii) legal or equitable discharge or limitation of the liability of the Franchisee, whether consensual or arising by operation of law, (iii) bankruptcy, insolvency, reorganization or other similar proceeding affecting the Guarantor or the Franchisee, or (iv) invalidity, irregularity or unenforceability of any or all of the provisions of this Guaranty or the Franchise Agreement; (b) presentment, demand, protest or notice of any other kind; (c) notice of acceptance of this Guaranty; (d) other defenses available to the Guarantor under applicable law; and (e) any requirement of diligence on the part of the Franchisor or any right the Guarantor may have to require the Franchisor to proceed first against the Franchisee.

1.3   *Guaranty of Payment*. This is a guaranty of payment and not of collection. The Franchisor may require payment from the Guarantor of any obligation of the Franchisee under the Franchise Agreement and may sue the Guarantor for damages without first seeking or taking any action against the Franchisee.

1.4   *No Modification or Release*. The liability of the Guarantor is unaffected by (a) any modification, amendment, termination or variation in or addition to the Franchise Agreement; (b) any extension of time for performance or any waiver of performance or any delay of the Franchisor in enforcing any right, remedy, power or privilege that the Franchisor may have against the Franchisee or any other person; (c) the release of the Franchisee, in whole or in part, from performance or observance of any of the agreements, covenants, terms or conditions contained in the Franchise Agreement, whether made with or without notice to the Guarantor; or (d) any other guaranty now or hereafter executed by anyone else in connection with the transactions contemplated by the Franchise Agreement.

2. *Proprietary Rights; Confidentiality; Noncompetition*

2.1   *Improvements*. The Guarantor agrees that if he or she makes an improvement to the Franchisor's business system or method, such improvement will be the property of the Franchisor pursuant to the terms of Section 1.4.3 of the Franchise Agreement and the Guarantor will promptly disclose such improvement to the Franchisee and to the Franchisor with reference to this undertaking. The Guarantor hereby assigns all rights in such improvements to the Franchisor and agrees to sign any documents that the Franchisor may reasonably request from time to time to evidence such assignment.

2.2 *Copyrights and Trademarks.* The Guarantor acknowledges that the Franchisee's copyrights and trademarks may only be used by the Franchisee in accordance with Section 3.1 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.1 and not to use any of the Franchisor's copyrights or trademarks except on behalf of the Franchisee in furtherance of the Franchisee's business, and the Guarantor agrees that any such use will be in compliance with the Franchisee's obligations under the Franchise Agreement as if the Guarantor were the Franchisee under the Franchise Agreement.

2.3 *Confidentiality.* The Guarantor acknowledges the Franchisee's obligations of confidentiality under Section 3.2 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.2 and not to disclose or use any Confidential Information (as defined in Section 3.2.1 of the Franchise Agreement) except on behalf of the Franchisee in furtherance of the Franchisee's business in compliance with the Franchisee's obligations under the Franchise Agreement, and only to the extent that the Franchisee is permitted under the Franchise Agreement to disclose and use Confidential Information. Upon the request of the Franchisor, the Guarantor will promptly return to the Franchisor all Confidential Information and all copies in the Guarantor's possession or under the Guarantor's control, and the Guarantor will destroy all copies on the Guarantor's computers, disks and other digital storage devices.

2.4 *Noncompetition.* The Guarantor acknowledges the Franchisee's obligations under Section 3.3 of the Franchise Agreement not to compete with the Franchisor. The Guarantor personally agrees to comply with and be bound by all of the Franchisee's obligations under Section 3.3 to the same extent that the Franchisee is bound by the obligations of Section 3.3, both during and after the term of the Franchise Agreement.

2.5 *Remedies.* The Guarantor acknowledges that if the Guarantor fails to comply strictly with any of the undertakings in Sections 2.1 through 2.4 above, the Franchisor will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against such Guarantor in a court of competent jurisdiction. In the event this Guaranty and Assumption of Obligations is placed in the hands of an attorney for enforcement and the Franchisor is the prevailing party, the Guarantor will reimburse the Franchisor for all reasonable expenses incurred in the enforcement of the Franchisor's rights, including reasonable attorneys' fees and expenses.

3. **Transfer**

3.1 *Transfer by the Franchisor.* If the Franchisor transfers its rights and obligations under the Franchise Agreement pursuant to Section 4.1 of the Franchise Agreement, this Guaranty will be deemed to be transferred automatically to the transferee who, upon such transfer, will have all of the rights granted to the Franchisor under this Guaranty vis-a-vis the Guarantor, and the obligations of the Guarantor will then accrue to the benefit of the transferee.

3.2 *Transfer by the Franchisee.* The Guarantor acknowledges the Franchisee's transfer restrictions under Sections 4.2 and 4.3 of the Franchise Agreement. The Guarantor personally agrees to comply with all of the Franchisee's obligations under Sections 4.2 and 4.3.

4. **Miscellaneous**

4.1 *Waiver.* No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.

4.2 *Governing Law.* This Guaranty and Assumption of Obligations will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to that state's conflict of laws principles; but

nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

4.3 *Severability*. In the event that any one or more provisions of this Guaranty and Assumption of Obligations are deemed unenforceable or void, the remaining provisions will continue to be valid and enforceable.

4.4 *Amendments*. This Guaranty and Assumption of Obligations may not be modified or amended except in writing signed by the Franchisor and the Guarantor to be bound by such modification or amendment.

IN WITNESS WHEREOF, the Guarantor has signed this Guaranty as of the date of the Franchise Agreement.


_____
[Insert name and home address
of the Guarantor below the line]

Acknowledged and agreed:

KF TEA FRANCHISING LLC

By _____

Title _____

Date _____

STATE OF                              )
                                     )        ss.:
COUNTY OF                            )

On the _____ day of _____, before me personally came _____, to me known to be the individual described in and who executed the foregoing guaranty, and he/she acknowledged that he/she executed the same.

_____
Notary Public

**KF TEA FRANCHISING**
**LEASE ADDENDUM**

This Addendum to the lease dated as of _____ ("Lease") between _____ ("Landlord") and _____ ("Tenant") is entered into together with KF TEA FRANCHISING LLC, a Delaware limited liability company ("Franchisor"), as of the effective date of the Lease.

Pursuant to the Lease, Landlord will lease or has leased to Tenant certain real property and improvements located at _____ ("Leased Premises") for the operation of a franchised Kung Fu Tea shop.

Tenant will develop and operate the Kung Fu Tea shop pursuant to the terms of a Franchise Agreement dated as of _____ (the "Franchise Agreement") with Franchisor, which Franchise Agreement, among other things, authorizes Tenant to use the Kung Fu Tea shop system and trademarks in operating a Kung Fu Tea shop franchise (the "Franchised Business").

The Franchise Agreement requires, among other things, that the Lease contain certain provisions. The parties desire to supplement the Lease pursuant to the provisions set forth below.

Therefore, notwithstanding anything to the contrary in the Lease, Landlord, Tenant and Franchisor agree as follows:

1.  **Signage**.  So long as Tenant complies with the terms of the Lease and applicable law, Landlord consents to Tenant's use of the proprietary signs, distinctive exterior and interior designs, colors and layouts, and the trademarks prescribed by Franchisor, and upon expiration or the earlier termination of the Lease, consents to permit Tenant, at Tenant's expense, to remove all such items, so long as Tenant makes repairs to the Leased Premises caused by such removal.

2.  **Consent to Collateral Assignment & Assumption of Lease by Franchisor**. Landlord consents to the collateral assignment of the Lease from Tenant to Franchisor. Landlord acknowledges that the Franchise Agreement grants Franchisor the right, but not the obligation, to assume the Lease in the event of a default by Tenant under the terms of the Lease or under the Franchise Agreement. Upon any such assumption of the Lease by Franchisor, Franchisor will give Landlord notice of the assumption of the Lease and Franchisor will thereafter be bound by all of the terms and conditions in the Lease. Upon receipt of such notice, Landlord agrees to recognize Franchisor as the new tenant under the Lease, without the signing by Tenant of an assignment and assumption agreement. Unless and until Franchisor exercises its rights under the Franchise Agreement and the provisions of this Addendum and agrees in writing to assume the Lease, Franchisor will have no liability or obligation under the Lease.

3.  **Notice**.  Landlord will deliver to Franchisor copies of any and all default notices or notice of termination sent to Tenant relating to the Leased Premises at the same time that such letters or notices are sent to Tenant. Franchisor's address for any such notice is as follows:

    KF Tea Franchising LLC
    589 8th Ave., 17th Floor
    New York, NY 10018

In the event that the notice is a default notice and Tenant fails to timely cure the default described in the notice, Franchisor shall have a fifteen day period to cure Tenant's default. Franchisor shall have the option, but not the obligation, to effect a cure before Landlord exercises any remedies; provided, however, that Landlord shall have the right to exercise any rights and remedies available

at law, in equity, or under the Lease, if Franchisor fails to cure such default within such fifteen day period. Franchisor's election to cure shall not be deemed an election to assume the Lease, unless and until Franchisor expressly does so in writing. If Franchisor elects not to cure the breach or default or fails to cure such default within the time periods prescribed herein, Landlord may proceed directly against Tenant in the manner provided in the Lease but will have no remedy against Franchisor.

4.     **Refranchising**.  At any time following Franchisor's election to take an assignment of Tenant's rights under the Lease, Franchisor may, upon written notice to Landlord, assign the Lease or sublet the Leased Premises to an affiliate of Franchisor approved by Landlord or to a franchisee approved by Franchisor and Landlord, without charge or penalty, so long as Landlord approves of such affiliate or franchisee in writing in advance. Landlord's consent will not be unreasonably withheld, conditioned or delayed. Upon an assignment, Franchisor shall be released from any further obligations under the Lease. Landlord agrees to execute written documentation confirming any such assignment and release in a form reasonably acceptable to Landlord.

5.     **Additional Covenants**.  Tenant and Landlord agree that they will not amend, modify, or alter any other Lease term without Franchisor's prior written consent.  Tenant may not assign its interest in the Lease, nor sublet all or any portion of the Leased Premises, without Franchisor's prior written consent.

6.     **De-Identification**.  Upon the expiration or termination of the Franchise Agreement, Franchisor will have the right to cause a de-identification of the Leased Premises by entering to make any modifications and to remove signs and fixtures to protect the franchise system, as determined by Franchisor in its sole discretion, without being guilty of trespass or liable for any tort; provided, however, in no event shall Franchisor have the right to make any alterations to the Leased Premises which affect the structure or the building systems serving the Leased Premises, and provided further, that prior to the commencement of any such work, Franchisor shall deliver to Landlord plans for such work, which plans shall be subject to the prior, written approval of Landlord. Franchisor agrees to repair any damage to the Leased Premises or the property of which it is a part caused by such entry, modifications and removals.

7.     **Effect**.  This Addendum supplements the Lease and shall apply during the entire term of the Lease, including any renewal terms.  In the event of a conflict between the terms of the Lease and the terms set forth in this Addendum, the terms set forth in this Addendum will govern and control as between Landlord and Franchisor, but the Lease shall control as between Landlord and Tenant. This Addendum will be binding upon, and will inure to the benefit of, the parties and their successors, assigns, heirs and personal representatives.

8.     **Counterparts & Execution**.  This Addendum may be executed in counterparts, and each copy so executed and delivered shall be deemed to be an original.  Each of the persons executing this Addendum on behalf of each party represents and warrants that such party has the full right, power and authority to execute and deliver this Addendum and that each person signing on such party's behalf is authorized to do so.

[Signatures on next page]

Landlord and Tenant have executed this Addendum as of the dates written below their respective signatures to be effective as of the effective date of the Lease.


LANDLORD                                              TENANT


By _____                      By _____

Title _____                     Title _____

Date _____                      Date _____


KF TEA FRANCHISING LLC


By _____

Title _____

Date _____

- 3 -

**A176**

**ARMS GLOBAL INC.**

**KF TEA SUPPLY AGREEMENT**

AGREEMENT dated as of _____, between ARMS GLOBAL INC., a New York corporation ("Arms Global"), and _____, a _____ ("Franchisee").

Franchisee is entering into or has entered into one or more franchise agreements (each referred to as the "Franchise Agreement") with Arms Global's affiliate, KF Tea Franchising LLC, a Delaware limited liability company. Under each Franchise Agreement, KF Tea Franchising LLC grants to Franchisee the right and license to open and operate a KUNG FU TEA shop at a specified location, selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks (the "Franchised Shop"). The Franchise Agreement provides that Arms Global will supply certain equipment to Franchisee (the "Equipment") and that Arms Global will be Franchisee's sole source of supply of tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise that Franchisee will use in the franchised business (the "Products").

Therefore, the parties agree as follows:

1.     SUPPLY OF PRODUCTS AND EQUIPMENT

1.1   *Sole Supplier.* Franchisee will purchase the Products solely from Arms Global or such other source as KF Tea Franchising LLC may specify or approve in writing. Franchisee will purchase solely from Arms Global such Equipment as KF Tea Franchising LLC may specify in writing.

1.2   *Orders.* Franchisee will place orders for Products and Equipment by fax, telephone or e-mail, or such other method as Arms Global permits. Franchisee will place no individual Product order for less than such minimum amount that Arms Global specifies from time to time in writing. Orders will be for no more than a reasonable quantity of Products for resale at the Franchised Shop or Shops, as determined by Arms Global. Each order will constitute a separate contract of sale.

1.3   *Prices.* The prices to Franchisee for all Equipment and Products will be those listed in Arms Global's price list as issued by Arms Global from time to time. Arms Global may change its prices at any time upon prior notice to Franchisee. The prices applicable to any specific order will be those in effect at the time the order is placed. Prices do not include the cost of delivery and insurance to Franchisee from an Arms Global warehouse in the U.S. or, if applicable, from a U.S. port of entry. Prices for delivery and insurance from an Arms Global warehouse in the U.S. or from a U.S. port of entry will be stated separately upon Arms Global's confirmation of each order. Arms Global will endeavor to source the Equipment and Products in a manner that is the most economical to Franchisee and allows for the fastest delivery. When appropriate, an Arms Global representative will offer Franchisee choices in this regard.

1.4   *Payment.* Franchisee will pay Arms Global for each order in full in advance in such manner as Arms Global designates. Franchisee will bear the cost of all bank processing fees. Arms Global has the right at any time, upon reasonable notice to Franchisee, to require that Franchisee pay all sums owed to Arms Global or to any of its affiliates electronically through one or more depository transfer accounts or using such methods as Arms Global may designate in writing. At the request of Arms Global, Franchisee agrees to execute such documents as Arms Global determines are necessary for Arms Global to process electronic funds transfers from Franchisee's designated bank account for payment of the fees Franchisee owes to Arms Global. Franchisee will bear all costs to establish and maintain the required electronic payment system, and all bank service charges. Franchisee will comply with Arms Global's procedures for electronic payment, which Arms Global may modify from time to time, including the maintenance of such minimum bank account balance as Arms Global specify from time to time.

1.5 **Delivery.** Arms Global will make all arrangements for shipping Equipment and Products to Franchisee either from the Arms Global facility in the U.S. or from a port of entry in the U.S., as determined by Arms Global. Unless Franchisee requests a specific carrier, shipments will be made by a carrier selected by Arms Global. Shipments sourced from abroad may take six to eight weeks to deliver to Franchisee from the date ordered. Arms Global will use commercially reasonable efforts to ensure the timely delivery of the quantities of Equipment and Products ordered by Franchisee from time to time; provided, however, that Arms Global will not be liable for any delay or default in any shipment. In addition to the cost of the Equipment and Products referred to in Section 1.3, Franchisee will bear the cost of freight, insurance, taxes and any other costs that may be incurred from an Arms Global warehouse in the U.S. or from the port of entry to Franchisee.

1.6 **Interest on Late Payments.** If any payment Franchisee makes to Arms Global is rejected by Franchisee's bank because of insufficient funds, Franchisee will pay Arms Global $50 for each occurrence. In addition, Franchisee will pay interest at the rate of one and one-half (1½ %) percent per month or the highest rate allowed by law, whichever is less, on all unpaid balances.

2. **Use of Equipment and Products**

2.1 **Resale at the Franchised Shop.** Franchisee agrees that all Equipment and Products purchased by Franchisee from Arms Global will be used by Franchisee only in its franchised KUNG FU TEA business at the Franchised Shop or Shops designated in the purchase order.

2.2 **Non-Diversion.** Franchisee will not sell any of the Equipment or Products to any other person or entity if Franchisee knows or has reason to believe that the purchaser intends to resell such Equipment or Products.

2.3 **Personnel.** Franchisee will inform Franchisee's employees of the restrictions contained in Sections 2.1 and 2.2 and will inform its new employees of such restrictions from time to time as long as this Agreement continues in effect.

3. **Warranties**

3.1 **Limited Warranty.** Arms Global extends the manufacturer's warranty on all Equipment it sells to Franchisee. In the absence of a manufacturer's warranty, Arms Global warrants to Franchisee that all Products sold pursuant to this Agreement will be free from defects in manufacture.

3.2 **Defective Products.** If Franchisee receives an order that is defective, damaged or incomplete, Franchisee will notify Arms Global within 48 hours after Franchisee's receipt of the Equipment or Products. Upon verification, Arms Global will send replacement Equipment or Products to Franchisee at no charge. Arms Global will not accept the return of any Equipment or Products without Arms Global's prior written approval. The remedies set forth in this Section 3.2 constitute the sole and exclusive remedies available to Franchisee for breach of warranty or for shortage or damaged Equipment or Products.

3.3 **No Consequential Damages.** EXCEPT FOR THE EXPRESS WARRANTY SET FORTH ABOVE, ARMS GLOBAL MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OR OTHERWISE. IN NO EVENT WILL ARMS GLOBAL BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES FOR BREACH OF WARRANTY. IN NO EVENT WILL THE LIABILITY OF ARMS GLOBAL FOR ANY DAMAGES EXCEED THE PRICE PAID BY FRANCHISEE, REGARDLESS OF THE CLAIM.

4. **Term and Termination**

4.1 **Term and Termination.** This Agreement will become effective as of the date first above written and will continue in effect with respect to each Franchised Shop for so long as the Franchise Agreement for such Franchised Shop remains in effect unless this Agreement is sooner terminated by mutual consent

– 2 –

or pursuant to Section 4.2. This Agreement will terminate automatically with respect to each Franchised Shop upon the expiration or termination of the Franchise Agreement for such Franchised Shop.

4.2 **Termination by Either Party.** Either party may terminate this Agreement upon written notice to the other party with immediate effect in the event that the other party (i) breaches a material provision of this Agreement and fails to cure such breach within thirty days after notice from the nonbreaching party, which notice will specifically refer to this provision, or (ii) becomes insolvent or is unable to pay its debts as they become due, is adjudicated a bankrupt, or a petition in bankruptcy or reorganization is filed by or against it and any such petition is not discharged within sixty days after it is filed, or a permanent or temporary receiver or trustee for all or substantially all of such party's property is appointed by any court, or if such party makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law.

4.3 **Consequences of Termination.** Upon the termination of this Agreement for any reason, Franchisee will tender to Arms Global all unsold and unused inventory of Products and all Equipment purchased by Franchisee from Arms Global. Arms Global will reimburse Franchisee for all Products that are in good and usable condition at the purchase price minus a 20% restocking fee. Arms Global will have the right, but not the obligation, to purchase some or all of the Equipment. The purchase price for such equipment will be its fair market value as agreed by the parties or, if they are unable to agree, as determined by one independent appraiser agreed to by the parties. The parties will share the cost of the appraiser equally. Before exercising its purchase right under this section, Arms Global will have the right to enter the premises of the Franchised Business during reasonable hours to inspect the Equipment. If Arms Global elects to exercise its purchase right under this section, Arms Global will give Franchisee written notice of its intent to do so within 30 days after the expiration or termination of this Agreement. Arms Global will have the right to offset all amounts Franchisee owes to Arms Global or its affiliates against any payment due to Franchisee under this section.

5. **Miscellaneous**

5.1 **Assignment.** This Agreement is personal to Franchisee. Franchisee may not assign or transfer this Agreement except in conjunction with a Transfer in accordance with the terms of the Franchise Agreement. Arms Global may assign this Agreement to any party upon written notice to Franchisee.

5.2 **Franchise Agreement.** As a condition to Arms Global's obligations under this Agreement, Franchisee will enter into at least one Franchise Agreement. Arms Global will not be obligated to supply any Products pursuant to this Agreement until the Franchise Agreement has been signed by both parties to such agreement.

5.3 **Compliance.** Franchisee will comply with each Franchise Agreement and with all applicable local, state and federal laws.

5.4 **Independent Contractor.** This Agreement does not appoint either party as the agent or legal representative of the other party for any purpose whatsoever. Neither party is granted any right or authority to assume or to create any obligation or responsibility, express or implied, on behalf of or in the name of the other party, unless otherwise specifically agreed to in writing.

5.5 **Severability.** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision is prohibited by or is declared invalid under applicable law, such prohibition or invalidity will not invalidate the remainder of such provision or the other provisions of this Agreement.

5.6 **No Waiver of Rights.** No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy. No waiver will be binding unless contained in a writing signed by the party waiving

– 3 –

its rights. Any waiver is limited to the specific situation in which it is given and no waiver of any breach or default under this Agreement will be construed as a waiver of any earlier or succeeding breach or default.

5.7   ***Notices.*** All notices, requests, consents and other communications required or permitted by this Agreement will be in writing and will be delivered by hand or by a reputable courier service to the following address, or such other address as either party, by like notice, designates with respect to its own address:

If to Arms Global:   Arms Global Inc.        If to Franchisee:   [insert address for notice]
                     151 Fulton Ave.
                     New Hyde Park, NY
                     11040

Any such notice, request, consent or other communication will be deemed given and be effective upon receipt at such address.

5.8   ***Limitation of Actions.*** Any and all claims and actions arising out of or relating to this Agreement brought by either party against the other must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable statute of limitations; (b) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to the claim; or (c) two years after the first act or omission giving rise to the alleged claim. Claims and actions not brought within such time period will be irrevocably barred.

5.9   ***Waiver of Punitive Damages and Jury Trial.*** Each party waives to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other party and agrees that any recovery in a dispute between the parties will be limited to equitable relief and to the recovery of actual damages sustained. Each party irrevocably waives trial by jury in any action, proceeding or counterclaim brought by either party.

5.10   ***Governing Law.*** This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles.

5.11   ***Entire Agreement.*** This Agreement constitutes the entire understanding of the parties and supersedes any and all prior oral or written agreements between the parties on the matters contained in this Agreement. No amendment to this Agreement will be binding unless such amendment is in writing and executed by the parties.

The parties have signed this Agreement on the dates set forth below, with effect as of the date stated in the opening paragraph of this Agreement.

ARMS GLOBAL INC.                        [Franchisee]


By _____        By _____

Title _____       Title _____

Date _____        Date _____

– 4 –

DUAL CONCEPT ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT

between

KF TEA FRANCHISING LLC

and

[Franchisee]

_____

This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____ (the "Franchise Agreement"), between KF TEA FRANCHISING LLC, a Delaware limited liability company (referred to in this Agreement as "we" or "us"), and "), and _____, a _____ (referred to in this Agreement as "you"), for a franchised Kung Fu Tea shop at _____ (the "Site").

1. The Franchised Business will be a dual-branded restaurant combining the TKK Fried Chicken and Kung Fu Tea concepts. You will sign a separate TKK Fried Chicken franchise agreement with TKK Franchising LLC simultaneously with your signing of the Franchise Agreement.

2. The Territory will be contiguous with the territory granted to you under your TKK Fried Chicken franchise agreement at the Site. We may reduce the boundaries of the Territory upon notice to you at any time if the population of the Territory exceeds 50,000 people.

3. Section 5.2.2.26 or the Franchise Agreement is amended to read as follows:

"any other Kung Fu Tea franchise agreement now or hereafter in effect between us and you or any of your affiliates, or any TKK Fried Chicken franchise agreement between TKK Franchising LLC and you or any of your affiliates, is terminated due to a breach by you or your affiliate."

4. In all other respects, the Franchise Agreement is unchanged.

You and we have signed this Addendum on the dates set forth below with effect as of the date of the Franchise Agreement.

KF TEA FRANCHISING LLC                    [Franchisee]


By _____           By _____

Title _____          Title _____

Date _____           Date _____

Version 4/20/2023

**A181**



## KF TEA FRANCHISING LLC

## MULTI-UNIT AGREEMENT

**DEVELOPER:**

**TERRITORY:**

**DATE OF AGREEMENT:**

# KF TEA FRANCHISING LLC

## MULTI-UNIT AGREEMENT

### TABLE OF CONTENTS

| | Page |
|---|---|
| Preamble | 1 |
| | |
| Article I – Grant of Rights to You | 1 |
| | |
| Section 1.1 – Grant of Rights | 1 |
| Section 1.2 – Development Schedule | 1 |
| Section 1.3 – Franchise Agreements | 1 |
| Section 1.4 – Affiliates | 1 |
| Section 1.5 – Exclusivity | 2 |
| Section 1.6 – No Trademark License | 2 |
| Section 1.7 – Business Entity | 2 |
| Section 1.8 – Rights We Reserve | 2 |
| Section 1.9 – Personal Undertaking | 2 |
| | |
| Article II – Fees | 3 |
| | |
| Section 2.1 – Development Fee | 3 |
| Section 2.2 – Initial Fees for Franchise Agreements | 3 |
| | |
| Article III – Confidentiality; Noncompetition | 3 |
| | |
| Section 3.1 – Confidentiality of Our Information | 3 |
| 3.1.1  Confidential Information | 3 |
| 3.1.2  Nondisclosure and Non-Use | 4 |
| 3.1.3  Isolated Disclosures | 4 |
| 3.1.4  Exceptions | 4 |
| 3.1.5  Disclosures Required by Law | 4 |
| 3.1.6  Return of Information | 4 |
| Section 3.2 – Noncompetition | 5 |
| 3.2.1  Definition of Competitive Business | 5 |
| 3.2.2  Agreement Not to Compete | 5 |
| 3.2.3  Noncompetition After Termination | 5 |
| 3.2.4  Reasonableness of Restrictions | 5 |
| | |
| Article IV – Transfer | 5 |
| | |
| Section 4.1 – Transfer by Us | 5 |
| Section 4.2 – Transfer by You | 5 |
| 4.2.1  No Transfer Without Our Approval | 5 |
| 4.2.2  Definition of Transfer | 6 |
| 4.2.3  Notice of Transfer | 6 |
| 4.2.4  Conditions to Transfer | 6 |
| 4.2.5  Transfer to a Company you Control | 7 |
| 4.2.6  Transfer Upon Death | 7 |

    4.2.7 Securities Offerings  7
  Section 4.3 – Our Right of First Refusal  7
    4.3.1 Notice of Third Party Offer  7
    4.3.2 Exercise of Our Right of First Refusal  8
    4.3.3 Consequence of Nonexercise of Our Right of First Refusal  8
    4.3.4 Exceptions  8

Article V – Term and Termination  8

  Section 5.1 – Term  8
  Section 5.2 – Termination  8
    5.2.1 Termination by Us Upon Notice  8
    5.2.2 Termination After Cure Period  9
    5.2.3 Relationship Laws  9
  Section 5.3 – Consequences of and Alternatives to Termination  9
    5.3.1 Consequences of Termination  9
    5.3.2 Other Remedies  9

Article VI – Representations and Warranties; Indemnification  9

  Section 6.1 – Representations and Warranties  9
    6.1.1 Accuracy  9
    6.1.2 No Conflicts  9
    6.1.3 Good Standing  10
    6.1.4 Authority  10
    6.1.5 Owners and Managers  10

  Section 6.2 – Indemnification  10
    6.2.1 Indemnification  10
    6.2.2 Notice of Claim; Survival  10

Article VII – Miscellaneous  10

  Section 7.1 – Injunctive Relief  10
  Section 7.2 – Severability  10
  Section 7.3 – No Waiver of Rights  10
  Section 7.4 – Notices  11
  Section 7.5 – Limitation of Actions  11
  Section 7.6 – Waiver of Punitive Damages and Jury Trial  11
  Section 7.7 – Governing Law  11
  Section 7.8 – Jurisdiction and Venue  11
  Section 7.9 – Costs and Expenses  11
  Section 7.10 – Entire Agreement  12

Schedule A – Territory
Schedule B – Development Schedule
Schedule C – Entity Information of Developer
Schedule D – Personal Undertaking

Version 4/20/2023

**A184**

**KF TEA FRANCHISING LLC**

**MULTI-UNIT AGREEMENT**

AGREEMENT effective as of _____, between KF TEA FRANCHISING LLC, a Delaware limited liability company (referred to in this Agreement as "we" or "us"), and _____, a _____ *[if entity, indicate type and state of formation]* (referred to in this Agreement as "you" or "your company" or "Developer").

We and our affiliated companies have developed an integrated system (the "System") for the operation of retail shops selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks (the "Kung Fu Tea shops"). Kung Fu Tea shops operate under the trademark KUNG FU TEA and other trademarks described in our franchise disclosure document, and we may create, use and license additional trademarks or substitute different trademarks in the future in conjunction with the operation of Kung Fu Tea shops (collectively, the "Marks").

You desire to open and operate an agreed number of Kung Fu Tea shops in an agreed geographic area under an agreed timetable, and we desire to grant to you the right to do so on the terms and conditions set forth below.

Accordingly, you and we agree as follows:

ARTICLE I – **GRANT OF RIGHTS TO YOU**

Section 1.1 – *Grant of Rights.* We grant to you the right, and you undertake the obligation, under the terms and conditions contained in this Agreement, to open and operate Kung Fu Tea shops in the geographic area described in Schedule A (the "Territory") in accordance with the development schedule contained in Schedule B (the "Development Schedule"). The rights granted by this Agreement are limited to the Territory. This Agreement does not confer any rights outside of the Territory.

Section 1.2 – *Development Schedule.* You or your Affiliate will open the first Kung Fu Tea shop under the Development Schedule no later than nine months after the date of this Agreement. You agree to open or arrange for the opening of subsequent Kung Fu Tea shops in accordance with the Development Schedule. In this connection, you acknowledge that time is of the essence.

Section 1.3 – *Franchise Agreements.* Before you begin to develop a Kung Fu Tea shop at any specific location, you or your Affiliate (as defined below) will enter into our then-current standard form of franchise agreement setting forth the terms and conditions under which you or your Affiliate will open and operate the Kung Fu Tea shop. This standard form may vary from the form we currently use, except that the initial fee for franchise agreements to be signed by you or your Affiliate will be the amount set forth Schedule B of this Agreement.

Section 1.4 – *Affiliates.* At your request, we will permit the franchise agreement for any Kung Fu Tea shop in the Territory to be executed by an entity formed by you to develop and operate the Kung Fu Tea shop ("Affiliate"), provided all of the following conditions are met: (a) you or your owners have management control of the Affiliate; (b) you or your owners own (i) more than 50% of the voting securities of an Affiliate that is a corporation, (ii) more than a 50% membership interest in an Affiliate that is a limited liability company, or (iii) all of the general partnership interests of an Affiliate that is a partnership; (c) the Affiliate conducts no business other than the operation of the Kung Fu Tea shop; (d) you and your owners agree to assume full and unconditional liability for, and agree to perform all obligations contained in the franchise agreement; and (e) all owners of the entity possess a good moral character, as determined by us, and you provide us all reasonably requested information to permit us to make such a determination.

Section 1.5 – **Exclusivity.** Because we reserve certain rights in the Territory as described in, Section 1.8, your rights in the Territory are not exclusive. However, except as provided in Section 1.8 and unless we have modified your rights in accordance with Section 5.3.2, during the term of this Agreement, neither we nor any of our affiliates will (a) open or operate a Kung Fu Tea shop in the Territory, or (b) grant to any other person or entity the right to open or operate a Kung Fu Tea shop located in the Territory or the right to grant franchises to open and operate Kung Fu Tea shops located in the Territory.

Section 1.6 – **No Trademark License**. This grant of multi-unit rights is not a trademark license. This Agreement by itself does not permit you to own or operate a Kung Fu Tea shop. The right to own and operate a Kung Fu Tea shop is only granted pursuant to a signed franchise agreement. This Agreement also does not give you the right to offer, sell or negotiate the sale of Kung Fu Tea franchises to any third party.

Section 1.7 – **Business Entity.** If you are a business entity, or if this Agreement is assigned to a business entity, such entity will conduct no business other than the business contemplated by this Agreement and under any executed franchise agreement. All owners of such business entity will represent and warrant their percentage ownership interest in the entity. The articles of incorporation, articles of organization, partnership agreement and other organizational documents of such business entity shall recite that the issuance and transfer of any interest in such entity is subject to the restrictions set forth in this Agreement. All issued and outstanding stock, share or membership certificates, if any, of such entity shall bear a legend referring to the restrictions in this Agreement. You will not conduct any public offering of such entity's securities unless we consent in writing to such offering.

Section 1.8 – **Rights We Reserve.** We retain all rights not specifically granted to you under this Agreement. These rights include the right:

1.8.1  to establish Kung Fu Tea shops, whether franchised or company owned, anywhere outside the Territory;

1.8.2  to establish Kung Fu Tea shops in non-traditional venues such as airports, hotels and resorts, military installations, school and university campuses, casinos, theme parks and sports stadiums and enclosed shopping malls, within or outside the Territory (but not in a non-traditional venue in which a Kung Fu Tea shop of yours is located);

1.8.3  to sell any products, including tea, coffee, juices and other hot and cold drinks, under the Marks and any other trademarks to grocery stores, supermarkets or other channels of distribution at any time, and directly to customers anywhere through our website; and

1.8.4  to acquire and operate any business under a different trademark at any location and to continue to operate that business under trademarks other than the Marks.

Section 1.9 – **Personal Undertaking**. Our grant of rights under this Agreement is made in reliance on the personal attributes of your company's owners and managers named in Schedule C. If your company is a legal entity such as a corporation or limited liability company rather than a sole proprietorship or general partnership, then our grant of rights under this Agreement is made on the condition that each person who now or later owns or acquires, either legally or beneficially, any equity or voting interest in your company (the "Guarantor" or "Guarantors") must execute and deliver to us a personal undertaking in the form attached as Schedule D (the "Guaranty"). We may require the spouse of any or all Guarantors to sign the Guaranty in our discretion. Transfers of interest are restricted in accordance with Article VI. Upon our request at any time, you will furnish us with a list of all holders of legal and beneficial interests in your company, together with descriptions of the type of interests owned and the percentage ownership, and the names, addresses and telephone numbers of the owners, certified as correct in the manner we specify. If

any of your company's general partners, managers, officers or directors ceases to serve as such or if any new person becomes a general partner, manager, officer or director after the date of this Agreement, you will notify us of such change within 10 days. Any breach of a Guaranty will be deemed to be a breach of this Agreement.

<div align="center">ARTICLE II – <b>FEES</b></div>

Section 2.1 – *Development Fee.* You will pay us a development fee (the "Development Fee"). The amount of the Development Fee is equal to the initial fee for three franchises. For Non-Traditional Units, it is $75,000 ($25,000 multiplied by 3). For Standard Units, it is $87,000 ($37,000 for the first unit and $25,000 for each of the next two units). The Development Fee is an advance payment of the Initial Fee payable upon execution of each of the first three franchise agreements you execute pursuant to this Agreement. This fee is payable in full by certified check or wire transfer upon your execution of this Agreement. The Development Fee is fully earned when received by us and is not refundable under any circumstances. It compensates us for our expenses and administrative costs, and for our lost or deferred opportunity to grant rights to others for the Territory.

Section 2.2 – *Initial Fees for Franchise Agreements.* The initial fee for each franchise agreement that you enter into for a Kung Fu Tea franchise in the Territory under this Agreement after the first three units will be the then-current initial fee payable by any multi-unit franchise owner.

<div align="center">ARTICLE III – <b>CONFIDENTIALITY; NONCOMPETITION</b></div>

Section 3.1 – *Confidentiality of Our Information*

3.1.1  *Confidential Information.* We possess and will continue to develop and acquire certain confidential information relating to the development and operation of Kung Fu Tea shops ("Confidential Information"). Confidential Information means information that is not generally available to the public and that has commercial value to us or to the Franchised Business, or that is personally identifiable information of customers. Confidential Information includes, without limitation:

3.1.1.1  product recipes, mixes and formulas;

3.1.1.2  the contents of our operating manuals;

3.1.1.3  the content of our training and assistance;

3.1.1.4  site selection criteria;

3.1.1.5  sales and marketing techniques;

3.1.1.6  customer lists;

3.1.1.7  planned advertising and marketing  programs;

3.1.1.8  current, past and planned research, development and test programs for products, services and operations;

3.1.1.9  specifications for and suppliers of certain equipment, fixtures, furnishings, signs, materials and supplies;

3.1.1.10  the operating results and financial performance of Kung Fu Tea shops other than those owned by you or your affiliates;

<div align="center">- 3 -</div>

3.1.1.11  the videos and images recorded by the surveillance system (except to the extent necessary to prove wrongful acts);

3.1.1.12  user names and passwords allowing access to protected areas on our website or computer network; and

3.1.1.13  all improvements and modifications to the franchise system developed by you or your personnel.

You acknowledge and agree that you will not acquire any interest in any Confidential Information other than the right to use Confidential Information disclosed to you to enable you to operate your franchise business during the term of this Agreement.

3.1.2  *Nondisclosure and Non-Use.* At all times both during the term and after the expiration or termination of this Agreement, (i) you will keep all Confidential Information in the strictest confidence and you will not disclose any Confidential Information to any person other than your owners and managers who have signed and delivered to us the Guaranty or your employees, agents or representatives who have a legitimate need to know such information and who are informed of this obligation of confidentiality and have signed a comparable written agreement with your company, and (ii) you will not use any Confidential Information except for the purpose of fulfilling your obligations under this Agreement. You will immediately notify us upon discovering any loss or unauthorized disclosure by any of your owners, managers, employees, contractors, agents or representatives of any Confidential Information.

3.1.3  *Isolated Disclosures.* Notwithstanding the foregoing, we will not deem you to be in default of this Agreement as a result of isolated incidents of disclosure of Confidential Information by an employee other than an owner, provided that you have taken reasonable steps to prevent such disclosure, including but not limited to the steps a reasonable and prudent owner of confidential and proprietary information would take to prevent disclosure of such information by his employees, and further provided that you pursue all reasonable legal and equitable remedies against such employee for such disclosure of such Confidential information.

3.1.4  *Exceptions.* The obligations of confidentiality and non-use described above will not apply to information that:  (i) you can clearly show was known to you on a non-confidential basis prior to its disclosure to you by us; (ii) is or becomes generally known among Competitive Businesses (as defined in Section 3.2.1 in the Territory other than through disclosure by you or any of your  employees, contractors, agents or representatives; or (iii) you can clearly show was received by you on a nonconfidential basis from a third party that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

3.1.5  *Disclosures Required by Law.* In the event that you become legally compelled to disclose any Confidential Information, you will (i) promptly notify us that such information is required to be disclosed, (ii) use your best efforts to obtain legally binding assurance that all those who receive disclosure of such information are bound by an obligation of confidentiality, and (iii) disclose only that portion of the Confidential Information that your legal counsel advises is legally required to be disclosed.

3.1.6  *Return of Information.* Upon our request, you will promptly return to us all Confidential Information and all copies thereof in your possession or under your control, and you will destroy all copies thereof on your computers, disks and other digital storage devices.

- 4 -

A188

Section 3.2 – *Noncompetition*

3.2.1 *Definition of Competitive Business.* As used in this Agreement, the term "Competitive Business" means any business that operates, or grants franchises or licenses to others to operate, a retail business that sells brew tea, bubble tea and other hot and cold drinks to consumers for on-site consumption or carry-out or delivery that derives 5% or more of it revenues from such sales (other than a Kung Fu Tea shop operated under a franchise agreement with us or our affiliate). The restrictions of this section will not apply to the ownership, solely as an investment, of publicly traded securities that constitute less than 1% of a class of ownership interests of the issuing company.

3.2.2 *Agreement Not to Compete.* You agree that during the term of this Agreement (and thereafter pursuant to Section 3.2.3), you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect interest in a Competitive Business located or operating anywhere in the U.S. or in any other country in which a Kung Fu Tea shop operates; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located or operating; or (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner.

3.2.3 *Noncompetition After Termination.* Upon the expiration and nonrenewal of this Agreement, your termination of this Agreement without cause, our termination of this Agreement in accordance with its terms and conditions, or your transfer in accordance with Article IV, you and your company's owners agree for a period of two years following such expiration, termination or transfer, that you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect ownership interest in a Competitive Business located or operating within 5 miles of any Kung Fu Tea shop anywhere in the world at the time of such expiration, termination or transfer; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for any such Competitive Business; or (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner.

3.2.4 *Reasonableness of Restrictions*. You acknowledge that the time and geographical limitations in Sections 3.2.2 and 3.2.3 are reasonable and do not impose a greater restraint than is necessary to protect our goodwill or other business interests. If any of the limitation in such sections is held unreasonable or unenforceable by a court or governmental agency, then such limitation will be deemed to be reduced as necessary to enable the court or agency to enforce such limitation to the fullest extent permitted under applicable law.

ARTICLE IV – **TRANSFER**

Section 4.1 – *Transfer by Us.* We may sell, assign or transfer our rights and obligations under this Agreement to any party, without the approval of or prior notice to you, provided that the buyer, assignee or transferee agrees in writing to assume all of our obligations under this Agreement. We will not be liable for obligations of the transferee arising after the date of transfer.

Section 4.2 – *Transfer by You*

4.2.1 *No Transfer Without Our Approval.* This Agreement is personal to you. We have entered into this Agreement in reliance upon our perception of your (or your company's owners') individual or collective character, skill, aptitude, business ability and financial capacity. Accordingly, you may only transfer your rights and obligations under this Agreement if (i) at least 50% of the total number of Kung Fu Tea shops to be opened under this Agreement are open and operating at the time of the proposed transfer, (ii) you obtain our prior written consent, and (iii) in the case of an asset transfer, (A) you transfer all of your rights and interests under all franchise agreements for Kung Fu Tea shops in the Territory in accordance with the terms of those agreements, and (B) the transferee, at our election, must sign the then-current franchise

- 5 -

agreement for all transferred Kung Fu Tea shops. Our consent to a Transfer does not constitute a representation as to the fairness of the terms of any contract between you or your company's owners and the transferee, a guaranty of the success by the transferee or a waiver of any claims we may have against you or your company's owners or of our right to demand the transferee's compliance with any of the terms or conditions of this Agreement.

4.2.2  *Definition of Transfer.* As used in this Agreement, the term "Transfer" means your (or your company's owners') voluntary, involuntary, direct or indirect assignment, sale, gift, pledge or other disposition of any legal or beneficial interest in: (i) this Agreement, (ii) your company, whether in the form of equity or a voting interest, or (iii) franchise agreements for Kung Fu Tea shops in the Territory. "Transfer" also includes (i) the merger or consolidation of your company; (ii) the issuance of additional securities or other ownership interests of your company, and (iii) the admission or departure of a partner or owner. It includes transfers resulting from proceedings under the U.S. Bankruptcy Code or any similar law, and transfers resulting from divorce.

4.2.3  *Notice of Transfer.* You agree to notify us of any planned Transfer, and to provide us with any information we may reasonably request in order to permit us to evaluate the planned Transfer. If we do not exercise our right of first refusal under Section 4.3, we agree not to unreasonably withhold our approval of a Transfer. If we approve the Transfer, then you will be free, for 90 days following such approval, to effect the Transfer to the person or persons approved by us.

4.2.4  *Conditions to Transfer.* The following conditions will apply with respect to any Transfer other than a Transfer described in Section 4.2.5:

4.2.4.1  The proposed transferee, its managers, directors, officers and owners, must be individuals of good character with sufficient business experience, aptitude, and financial resources to operate the Franchised Business and otherwise meet our then applicable standards for a new Kung Fu Tea developer.

4.2.4.2  The proposed transferee may not be or be owned directly or indirectly by a Competitive Business, nor may any of the proposed transferee's managers, directors, officers or owners perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business.

4.2.4.3  You will cure any default under this Agreement and each franchise agreement entered into pursuant to this Agreement that we will have notified to you.

4.2.4.4  You will pay all fees and any other amounts then owed to us and our affiliates under this Agreement and each franchise agreement entered into pursuant to this Agreement.

4.2.4.5  You or the transferee will pay us a nonrefundable transfer fee of $10,000.

4.2.4.6  The transferee or its designated personnel will have completed such training as we may require, to our satisfaction.

4.2.4.7  Each transferor will sign an agreement, in a form acceptable to us, acknowledging a continuing obligation after such transfer to comply with the requirements of Section 3.2.3.

4.2.4.8  We will have approved the material terms and conditions of such transfer, and we may require you to sign a general release of any claims against us and our affiliates.

4.2.4.9  After our authorization of the Transfer and your compliance with all of the requirements listed above, you will give us not less than five business days' written notice of the date, time

- 6 -

and place of the closing of such Transfer, and you will give us an opportunity to have a representative present.

4.2.4.10  If the transaction is brokered by a third-party or by one of our authorized sales representatives, you or the proposed transferee will be responsible for paying broker fees at the same commission rate that we pay such broker or sales representatives.

4.2.4.11 If the transaction is a securities offering as described in Section 4.2.7, you must pay us the greater of: (i) 50% of our then-current initial franchise fee; or (ii) our reasonable costs and expenses associated with reviewing the proposed offering.

4.2.5  *Transfer to a Company you Control.* Upon prior notice to us and the signing by the relevant parties of assignment documents acceptable to us, you may transfer this Agreement to an entity (i) that conducts no business other than the business described in this Agreement and (ii) in which you maintain management control and (iii) of which you own and control 100% of the equity and voting power. The requirements of Sections 4.2.4(v) through 4.2.4(viii) will not apply to any such transfer. You will remain personally liable under this Agreement after such Transfer by signing a Guaranty as described in Section 1.9.

4.2.6  *Transfer Upon Death or Disability.* You or your executor or other personal representative must promptly notify us in the event of your death or disability or, if your company is an entity, the death or disability of the owner of a 10% or greater interest in your company. Any transfer upon death or disability will be subject to the same terms and conditions as those that apply to other transfers, as described in Sections 4.2.1 through 4.2.4; but you or your executor or other personal representative will have a period of 12 months in which to effect a transfer acceptable to us in the event of death, and six months in the event of disability. As used in this Agreement, the term "disability" means a mental, emotional or physical injury, illness, incapacity, disability or impairment that is reasonably expected to prevent or actually does prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months. A person's disability for purposes of this section will be determined by a licensed practicing physician selected by us upon examination of such person or, if such person refuses to be examined, then such person will automatically be deemed disabled for purposes of this section as of the date of refusal. We will pay the cost of the examination.

4.2.7  *Securities Offerings.* You agree to submit to us, for our review, all materials for an offering or exempt private placement of stock or partnership or other interests in your company or any of your affiliates that are required by federal or state law before such materials are filed with any government agency and before they are used. We may require such materials to contain a written statement, prescribed by us, indicating that we are not participating in such offering in any way. You and all other participants in the offering must fully indemnify us and our subsidiaries, affiliates, successors and assigns, and our and their respective directors, officers, shareholders, partners, agents and representatives in connection with the offering. For each proposed offering, you will reimburse us for our reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering. You will give us written notice at least 30 days before the date that any offering or other transaction described in this Section 4.2.7 commences. Any such offering will be subject to all of the other provisions of this Section 4.2.

Section 4.3 – **Our Right of First Refusal.**

4.3.1  *Notice of Third Party Offer.* If you or any of your company's owners at any time desire to sell, assign or transfer for consideration this Agreement or the ownership of your company to anyone other than as described in Section 4.3.4, you will obtain and immediately submit to us a true and complete copy of a bona fide written offer from the third party that desires to acquire your company or its assets (the "Third Party Offer"). The Third Party Offer must include lists of the record and beneficial owners of any entity offeror and all partners of any partnership offeror and, in the case of a publicly-held entity, copies of the

- 7 -

most current annual and quarterly reports and Form 10K. The Third Party Offer must contain details of the payment terms of the proposed sale and the source and terms of any financing of the proposed purchase price, and may not include or be contingent upon the purchase of assets of yours or your company's owner other than those related to the business described in this Agreement.

4.3.2 *Exercise of Our Right of First Refusal.* We will have the right, exercisable by notice delivered to you or your company's selling owner or owners within 30 days after the date of our receipt of a copy of the Third Party Offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in the Third Party Offer, provided that (i) we may substitute cash for any form of payment proposed in such offer; and (ii) we will have at least 60 days after giving notice of our election to prepare for closing. If we exercise our right of first refusal, the seller and we will execute a written agreement, in a form satisfactory to us, acknowledging the seller's continuing obligations. We may require the seller to sign a general release of any claims against us and our affiliates.

4.3.3 *Consequence of Nonexercise of Our Right of First Refusal.* If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Section 4.2; but if the sale to such purchaser is not completed within 120 days after delivery of the Third Party Offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the thirty day period following either the expiration of such 120-day period or the notice to us of the material changes in the terms of the sale, either on the terms originally offered or the modified terms, at our option.

4.3.4 *Exceptions.* Our right of first refusal will not apply to transfers from one current owner of your company to another current owner. In addition, our right of first refusal will not apply to any partial sale of your company or its assets. We will not have the right to become a partial owner of your company.

ARTICLE V – **TERM AND TERMINATION**

Section 5.1 – ***Term.*** This Agreement will be effective as of the date first above written and, unless sooner terminated as provided in this Agreement, will continue in effect for a term of ten years. This Agreement has no renewal term.

Section 5.2 – ***Termination.***

5.2.1 *Termination by Us Upon Notice.* We may terminate this Agreement and your right to develop Kung Fu Tea shops in the Territory, effective upon notice to you with immediate effect, if:

5.2.1.1 you or any of your company's owners have made any material misrepresentation or omission in connection with your application to enter into this Agreement;

5.2.1.2 you fail to meet your obligations under the Development Schedule;

5.2.1.3  you or any of your company's owners or Affiliates or their owners materially breaches any obligation under Articles III or IV;

5.2.1.4  you or your Affiliate remains in default beyond the applicable cure period under any franchise agreement for a Kung Fu Tea shop or any such agreement is terminated for any reason;

5.2.1.5 you or your Affiliate or the owners of your company or your Affiliate are or have been convicted by a trial court of, or plead guilty or have pleaded no contest to, a felony or any other crime or offense, or engage in any dishonest or unethical conduct, that may adversely affect

the reputation of the business, the Kung Fu Tea shops or the goodwill associated with our trademarks; or

5.2.1.6  you or any of your Affiliates make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of your property; or any order appointing a receiver, trustee or liquidator of your company is not vacated within 30 days following the entry of such order.

5.2.2  *Termination After Cure Period.* Except as set forth in Section 5.2.1, you will have 30 days after receipt of written notice of default from us in which to remedy the default and provide evidence of that remedy to us. If any such default is not cured within that time, this Agreement will terminate without further notice to you effective immediately upon expiration of that time unless we notify you otherwise in writing.

5.2.3  *Relationship Laws.* Notwithstanding the provisions described in this Section 5.2, if any valid, applicable law or regulation limits our right to terminate this Agreement or requires different or longer notice periods than those set forth herein, Section 5.2 is deemed amended to conform to the minimum notice periods or restrictions upon termination required by such rules and regulations. We will not however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination of this Agreement.

Section 5.3 – ***Consequences of and Alternatives to Termination.***

5.3.1  *Consequences of Termination*. Upon the expiration of this Agreement or its termination for any reason, all rights granted to you under this Agreement will immediately terminate; and you will have no further right to develop or open Kung Fu Tea shops in the Territory. A default under this Agreement is not a default under any individual Kung Fu Tea franchise agreement.

5.3.2. *Other Remedies.* If we are entitled to terminate this Agreement in accordance with Section 5.2, we will have the unrestricted right, in our discretion, to undertake any one or more of the following actions upon notice to you with immediate effect instead of terminating this Agreement:

5.3.2.1 we may reduce the size of the Territory in a manner determined solely by us; and

5.3.2.2 we may modify the Development Schedule by reducing the number of Kung Fu Tea shops to be opened or changing the time periods for opening, or both, as determined solely by us.

Any such action will be without prejudice to our right to terminate this Agreement in accordance with Section 5.2.

ARTICLE VI - **REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION**

Section 6.1 – ***Representations and Warranties***. You represent and warrant as follows:

6.1.1  *Accuracy.* All statements you have made and all materials you have submitted to us in connection with your application to become a franchisee are accurate and you have made no misrepresentations or material omissions.

6.1.2  *No Conflicts.* You are under no obligation or restriction, nor will you assume any obligation or restriction, that would in any way interfere or be inconsistent with, or present a conflict of interest concerning, the services that are the subject of this Agreement or the rights and obligations of the parties.

- 9 -

Version 4/20/2023

**A193**

6.1.3 *Good Standing.* Your company is duly incorporated, organized or formed and in good standing under the laws of the jurisdiction of its formation.

6.1.4 *Authority.* Your company has the power and authority to enter into this Agreement and to perform its obligations under this Agreement.

6.1.5 *Owners and Managers.* Schedule C completely and accurately describes all of your company's owners, directors, officers, partners and managers and their ownership interests and management positions in your company.

Section 6.2 - *Indemnification*

6.2.1 *Indemnification.* You will indemnify and hold us and our affiliates, and the members, managers, stockholders, directors, officers, employees and agents of us and our affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to:  (i) the failure of any of your representations, warranties or covenants set forth in this Agreement and in the schedules; (ii) any act or conduct of yours that is not in compliance with any of your requirements under this Agreement; or (iii) any act or omission of yours or anyone associated with or employed by or affiliated with you. We will have the right to participate in the defense, with counsel of our own choice and at our own expense, of any action that may give rise to your obligation to indemnify, and to reject any settlement that might adversely affect us.

6.2.2 *Notice of Claim; Survival.* We will give you notice of any claim that may require indemnification promptly after we learn of such claim. The rights and obligations of the parties under this Section 6.2 will survive the expiration or termination of this Agreement and remain in effect for a period of three years thereafter.

ARTICLE VII - **MISCELLANEOUS**

Section 7.1 – *Injunctive Relief.* You understand that your covenants set forth in Article III constitute essential elements of this Agreement. If you fail to comply strictly with any such covenants, we will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against you in a court of competent jurisdiction.

Section 7.2 – *Severability.* If any restrictive covenant in this Agreement is held to be invalid or unenforceable because its duration is too long or its scope is too broad, you and we agree that the court making such determination will have the power to reduce the duration or scope in such a manner that the remaining revised covenant will be valid and enforceable. Each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Agreement is prohibited by or invalid under applicable law, such prohibition or invalidity will not invalidate the remainder of such provision as long as the resulting provision remains consistent with the parties' original intent. If it is impossible to so modify the provision, such provision will be deleted from this Agreement. If any provision of this Agreement is declared invalid by a court of competent jurisdiction for any reason, the parties will continue to be bound by the remainder of this Agreement; provided, that if any provision of the Agreement that we, in our sole discretion, determine to be material, is declared invalid by a court of competent jurisdiction, we reserve the right to terminate this Agreement.

Section 7.3 – *No Waiver of Rights.* No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy. No waiver will be binding unless contained in a writing signed by the party waiving its rights. Any waiver is limited to the specific situation in which it is given and no waiver of

- 10 -

any breach or default under this Agreement will be construed as a waiver of any earlier or succeeding breach or default.

Section 7.4 – **Notices.** All notices, requests, consents and other communications required or per-mitted by this Agreement will be in writing and will be delivered by hand or overnight delivery service to the following address, or such other address as either party, by like notice, designates with respect to its own address:

If to us:        KF Tea Franchising LLC
                 589 8th Ave., 17th Floor
                 New York, NY 10018

If to you:       The address indicated in Schedule C either in the
                 manner described above in this Section 7.4 or by
                 email or other method indicated in Schedule A which
                 shall include electronic confirmation of delivery.

Any such notice, request, consent or other communication will be deemed given and be effective upon receipt at such address.

Section 7.5 – **Limitation of Actions.** Any and all claims and actions arising out of or relating to this Agreement brought by either party against the other must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable statute of limitations; (b) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to the claim; or (c) two years after the first act or omission giving rise to the alleged claim. Claims and actions not brought within such time period will be irrevocably barred.

Section 7.6 – **Waiver of Punitive Damages and Jury Trial.** Except for your obligation to indemnify us for third party claims under Section 6.2, we and you each waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other party, and agree that any recovery in a dispute between us will be limited to equitable relief and to the recovery of actual damages sustained. We and you irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either of us.

Section 7.7 – **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

Section 7.8 – **Jurisdiction and Venue.** You irrevocably consent to the non-exclusive jurisdiction of the federal and state courts located in the city in which our principal office is located at the time suit is filed (or a city within 25 miles of such office). If we assign or otherwise transfer this Agreement, all legal actions between the parties will be venued exclusively in a state or federal court in the judicial district in which the assignee's or transferee's principal offices are located at the time the suit is filed. You hereby waive, to the full extent permitted by law, defenses based on jurisdiction, venue and forum *non conveniens*. You further consent to service of process in any action by any means permitted by law.

Section 7.9 – **Costs and Expenses.** In any legal action arising out of or pursuant to this Agreement or otherwise in connection with the relationship between us, the prevailing party will be entitled to recover its reasonable costs and expenses (including reasonable attorneys' fees). Attorneys' fees include, without limitation, reasonable legal fees charged by attorneys, paralegal fees, and costs and disbursements,

- 11 -

whether incurred in preparation for or in contemplation of the filing of a written demand or claim, or in the course of an action, hearing or proceeding to enforce the obligations of the parties under this Agreement.

Section 7.10 – **_Entire Agreement._** This Agreement and all ancillary agreements executed simultaneously with this Agreement, constitute the entire understanding of the parties and supersede any and all prior oral or written agreements between you and us on the matters contained in this Agreement; but nothing in this or any related agreement is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. Except for changes permitted under this Agreement to be made unilaterally by us, no amendment to this Agreement will be binding unless such amendment is in writing and executed by the parties.

The parties have signed this Agreement on the dates set forth below, with effect as of the effective date as stated in the opening paragraph of this Agreement.

KF TEA FRANCHISING LLC                              [Developer]


By _____              By _____

Title _____            Title _____

Date _____            Date _____

- 12 -

**A196**

**SCHEDULE A**

**TERRITORY**

**SCHEDULE B**

**DEVELOPMENT SCHEDULE**

You agree to open and operate Kung Fu Tea shops in the Territory in accordance with the following development schedule:

| Time periods following the date of this Agreement | Minimum number of Kung Fu Tea shops to be opened in the Territory during each period | Minimum cumulative number of Kung Fu Tea shops to be open and operating in the Territory in good standing at the end of each period |
|---|---|---|
| First 8-month period | | |
| Second 8-month period | | |
| Third 8-month period | | |

Any Kung Fu Tea shops opened in excess of minimum in any period will be counted toward the minimum commitment for the next period.

Version 4/20/2023

**A198**

**SCHEDULE C**

**ENTITY INFORMATION OF THE DEVELOPER**
Sections 1.9, 6.1.5 and 7.4

1. Ownership and management of the Developer:

The Developer is a _____ [state] _____ [limited liability company] [corporation].

The following persons are the [members and managers] [shareholders, officers and directors] of the Developer:

| Name and Home Address | Positions | Percentage Ownership |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

2. Address for notices (Section 7.4):

**SCHEDULE D**

<span style="font-variant:small-caps">See Section 1.9 of the Multi-Unit Agreement</span>

## KUNG FU TEA

### Personal Undertaking

In order to induce KF TEA FRANCHISING LLC, a Delaware limited liability company (the "Franchisor") to enter into a Kung Fu Tea Multi-Unit Agreement dated as of _____ (the "Multi-Unit Agreement") with _____ _____, a _____ _____ (the "Developer") for the development of Kung Fu Tea franchises in a territory encompassing _____, each of the undersigned persons (the "Guarantors"), jointly, individually and severally, hereby agrees as follows

1. ***Confidentiality.*** Each Guarantor acknowledges the Developer's obligations of confidentiality under Section 3.1 of the Multi-Unit Agreement. Each Guarantor personally agrees to comply with all of the Developer's obligations under Section 3.1 and not to disclose or use any Confidential Information (as defined in Section 3.1.1 of the Multi-Unit Agreement except on behalf of the Developer in furtherance of the Developer's business in compliance the Developer's obligations under the Multi-Unit Agreement, and only to the extent that the Developer is permitted under the Multi-Unit Agreement to disclose and use Confidential Information. Upon the request of the Franchisor, the Guarantor will promptly return to the Franchisor all Confidential Information and all copies in the Guarantor's possession or under the Guarantor's control, and the Guarantor will destroy all copies on the Guarantor's computers, disks and other digital storage devices.

2. ***Noncompetition.*** Each Guarantor acknowledges the Developer's obligations under Section 3.2 of the Multi-Unit Agreement not to compete with the Franchisor. Each Guarantor personally agrees to comply with and be bound by all of the Developer's obligations under Section 3.2 to the same extent that the Developer is bound by the obligations of Section 3.2 both during and after the term of the Multi-Unit Agreement.

3. ***Remedies.*** Each Guarantor acknowledges that if such Guarantor fails to comply strictly with any of the undertakings in Sections 1 or 2, the Franchisor will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against such Guarantor in a court of competent jurisdiction. In the event that the Franchisor prevails in any such litigation, the Guarantor will reimburse the Franchisor for all costs, attorneys' fees and other expenses incurred by the Franchisor in connection with such litigation.

4. ***Transfer by the Franchisor.*** If the Franchisor transfers its rights and obligations under the Multi-Unit Agreement pursuant to Section 4.1 of the Multi-Unit Agreement, this Agreement will be deemed to be transferred automatically to the transferee who, upon such transfer, will have all of the rights granted to the Franchisor under this Agreement vis-a-vis the Guarantors, and the obligations of the Guarantors will then accrue to the benefit of the transferee.

5. ***Notices.*** All notices and other communications required or permitted by this Agreement will be in writing and will be delivered by hand, fax, overnight delivery service, or registered or certified first class mail, to the then-current address of the Guarantor known by the sender. Any such notice or other communication will be deemed given and be effective upon receipt at such address.

6. ***Waiver.*** No delay, omission or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.

Version 4/20/2023

**A200**

7. ***Governing Law.*** This Agreement will be construed and enforced in accordance with the laws of the state in which the Territory under the Multi-Unit Agreement is located, without regard to that state's conflict of laws principles.

8. ***Amendments.*** This Agreement may not be modified or amended except in writing signed by the Franchisor and the Guarantor to be bound by such modification or amendment. No waiver or discharge will be valid unless in writing and approved by the Franchisor.

IN WITNESS WHEREOF, each Guarantor has signed this Agreement as of the date of the Multi-Unit Agreement.


_____
Signature                                                      Print Name

_____
Signature                                                      Print Name

_____
Signature                                                      Print Name


Acknowledged and agreed:

KF TEA FRANCHISING LLC


By _____

Title _____

Date _____

**KF TEA FRANCHISING LLC**

**CONSENT TO TRANSFER AGREEMENT**

[Sale of Assets – Before or at Closing]

AGREEMENT dated as of _____, by and among _____, a _____ [limited liability company] [corporation] ("Buyer"); _____ [limited liability company][corporation] ("Seller"); _____, residing at _____ and _____, residing at _____, the members of Seller (collectively "Seller's Owners"); and KF TEA FRANCHISING LLC, a Delaware limited liability company ("we" or "us").

1. ***Purpose of this Agreement.*** Buyer entered into an agreement with Seller dated _____ (the "Purchase Agreement") to purchase from Seller the franchise rights and other assets of Seller's Kung Fu Tea franchised business located at _____ (the "Site"). Buyer and Seller understand that any transfer of the franchise rights requires our prior consent pursuant to the franchise agreement between us and Seller dated as of _____ (the "Original Franchise Agreement"), which agreement states additional conditions to a transfer in Section 4.2.4. This Agreement is being signed at or before the closing described in the Purchase Agreement (the "Closing").

2. ***Conditional Consent to Transfer.*** We consent to the transfer of the franchise rights and other assets from Seller to Buyer pursuant to the Purchase Agreement provided that (i) all of the conditions described in Section 4.2.4 of the Original Franchise Agreement are satisfied, (ii) Buyer signs a new franchise agreement with us (the "New Franchise Agreement") to replace the Original Franchise Agreement, (iii) the[each] owner[s] of Buyer signs a personal guarantee of Buyer's obligations under the New Franchise Agreement, (iv) we receive payment of the $5,000 transfer fee referred to in Section 2.1.6.7 of the Original Franchise Agreement, (v) Buyer signs a new supply agreement with our affiliate, Arms Global Inc., (vi) the Closing occurs within 90 days from the date of this Agreement, and (vii) the landlord consents to Buyer as a new tenant at the Site. If the Closing does not take place within this 90-day period, then any subsequent transfer will require a new consent from us.

3. ***Successor Franchise Agreement.*** Upon the signing of the New Franchise Agreement, a new guaranty from Buyer's owner or owners, and a new supply agreement, the Original Franchise Agreement will terminate and all of Seller's rights under the Original Franchise Agreement will end.

4. ***Release.*** Seller and Seller's Owners hereby release, discharge and hold harmless us and our past and present affiliated companies, successors, assignees and each of our and their past and present members, managers, directors, officers employees, agents, attorneys, owners, shareholders, partners, designees and representatives, from any and all debts, losses, damages, expenses, claims, demands, actions, causes of action, liabilities, costs or obligations arising from or in any way connected with the ownership or operation of the Franchised Business at the Site before the date of this Agreement, which Seller may have had, now has or may hereafter discover, whether known or unknown, foreseen or unforeseen.

5. ***Continuing Obligations.*** After the Closing and provided that Seller has complied with its obligations under Paragraph 2 above, Seller and Seller's Owners will be relieved of all of their in-term obligations under their personal guaranties with the exception of any unfulfilled in-term obligations that we have not yet discovered; provided, however, that Seller and Seller's Owners acknowledge that the transfer of the assets of the franchised business from Seller to Buyer will not terminate their post-term obligations under the Original Franchise Agreement. The post-term obligations include the obligations not to disclose any of our confidential information and not to compete with us, as set forth in Sections 3.2 and 3.3 of the Original Franchise Agreement.

6. ***We Make No Representations.*** Buyer acknowledges that the transfer of the Franchise Agreement has not been effected by or through any of our efforts. In entering into the Purchase Agreement, Buyer acknowledges that Buyer has not relied on any representation from us or any of our representatives other than the content of the current Kung Fu Tea franchise disclosure document, that Buyer has had the opportunity to consult with Buyer's own financial, accounting and legal advisors, and that Buyer has independently satisfied itself that all of the terms and conditions of the sale and purchase, including, without limitation, the purchase price, are satisfactory and acceptable to Buyer.

7. ***Entire Agreement.*** This Agreement constitutes the entire understanding of the parties and supersedes any prior oral or written agreements between the parties with respect to its subject matter.

8. ***Governing Law.*** This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Sales Act to the sale of franchises outside of the State of New York.

The parties have signed this Agreement on the dates set forth below.

[Buyer]                                             [Seller]


By _____          By _____

Title _____          Title _____

Date _____          Date _____


[Seller's Owner 1]                              [Seller's Owner 2]


_____          _____

Date _____          Date _____


KF TEA FRANCHISING LLC


By _____

Title _____

Date _____

- 2 -

**AMENDMENT TO THE KUNG FU TEA FRANCHISE AGREEMENT**

**between**

**KF TEA FRANCHISING LLC**

**and**

**[Franchisee]**

[Transfer of Partial Ownership Interest]

This Agreement of Amendment dated as of _____, by and among KF TEA FRANCHISING LLC, a Delaware limited liability company ("we" or "us"), and _____, a _____ [limited liability company] [corporation] ("you" or "your" or "Franchisee").

You and we entered into an agreement dated as of _____ (the "Franchise Agreement"), pursuant to which we granted to you the right to establish and operate a franchised Kung Fu Tea shop located at _____.

[Describe the transaction.]

The Franchise Agreement states certain conditions to a transfer of ownership of Franchisee in Section 4.2.4.

Accordingly, you and we agree as follows:

1. At the closing described above (the "Closing"), Schedule A of the Franchise Agreement will be deleted, and Schedule A attached to this Agreement of Amendment will be inserted in its place.

2. We consent to the transfer described above with the new ownership described in the attached Schedule A, on the condition that: (a) _____ [the buyer] executes a personal guaranty of your obligations under the Franchise Agreement in a form acceptable to us at the Closing; (b) we receive the $5,000 transfer fee referred to in Section 2.1.6.7 of the Franchise Agreement; and (c) each of the continuing owners of Franchisee, which includes the buyer or buyers of an ownership interest in Franchisee, and the sellers of their ownership interests in Franchisee, sign this document where indicated below.

3. [Amend the Franchise Agreement to remove any no poaching obligation.]

4. In all other respects, the Franchise Agreement is unchanged.

The parties have signed this Agreement on the dates set forth below.

KF TEA FRANCHISING LLC                          [FRANCHISEE]

By _____           By _____

Title _____          Title _____

Date _____          Date _____

Version 4/20/2023

**A204**

Each of the undersigned continuing owners of Franchisee acknowledges the above amendment and confirms that his/her guaranty of Franchisee's obligations under the Franchise Agreement will remain in full force and effect after the Closing.

_____        _____
[Owner 1]                                [Owner 2]

_____        _____
Name and home address                    Name and home address

Date _____          Date _____


Each of the undersigned buyers of an ownership interest in Franchisee acknowledges that his or her purchase of such ownership interest was not effected by or through any of our efforts, that they have not relied on any representation of ours, that they have had the opportunity to consult with their own financial, accounting and legal advisors, and that they have independently satisfied themselves that all of the terms and conditions of the sale and purchase, including, without limitation, the purchase price, are satisfactory and acceptable to them.

_____        _____
[Buyer 1]                                [Buyer 2]

_____        _____
Name and home address                    Name and home address

Date _____          Date _____


Each of the undersigned sellers of his or her ownership interest in Franchisee, hereby releases, discharges and holds harmless us and our past and present affiliated companies, successors, assignees and each of our and their past and present members, managers, directors, officers employees, agents, attorneys, owners, shareholders, partners, designees and representatives, from any and all debts, losses, damages, expenses, claims, demands, actions, causes of action, liabilities, costs or obligations arising from or in any way connected with the ownership or operation of the Franchisee's franchised business at any time before or during the period when the undersigned sellers held an ownership interest in Franchisee which such seller may have had or may have now or in the future, whether known or unknown, foreseen or unforeseen.

Each of the undersigned sellers acknowledges that the transfer of his or her membership interest in Franchisee does not terminate his or her post-term obligations under the Franchise Agreement. These post-term obligations include the obligations not to disclose any of our confidential information and not to compete with us, as set forth in Sections 3.2 and 3.3 of the Franchise Agreement.

_____        _____
[Seller 1]                               [Seller 2]

_____        _____
Name and home address                    Name and home address

Date _____          Date _____

Version 4/20/2023

**SCHEDULE A**

**FRANCHISEE INFORMATION**

See Sections 1.1.1, 1.1.2, 1.1.7, 1.5.1, 5.1.1, 6.1.1.7 and 7.6 of the Franchise Agreement

1.      Approved location (the Site):

2.      Territory:

3.      Agreement expiration date:

4.      Managing Owner:

        Operating Manager: _____

5.      Type of shop (indicate one):      Standard Unit _____
                                          Non-Traditional Unit: _____

5.      Address for notices:
        [Cannot be a post office box address]

6.      Ownership and management of the franchisee:

        The franchisee is a _____ [state] _____ [limited liability company] [corporation].

        The following persons are the owners and managers of the franchisee:

| Name and Home Address | Positions | Percentage Ownership |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

RENEWAL ADDENDUM TO KUNG FU TEA FRANCHISE AGREEMENT

between

**KF TEA FRANCHISING LLC**

and

**[insert name of franchisee]**

_____

This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____ (the "Renewal Franchise Agreement"), between KF TEA FRANCHISING LLC ("we" or "us") and _____ [insert name of franchisee] ("you").

1.   ***Purpose of this Agreement.***  You and we entered into a Kung Fu Tea franchise agreement dated as of _____ (the "Original Franchise Agreement").  You desire to renew the Original Franchise Agreement by entering into the Renewal Franchise Agreement, as modified by this Addendum, and by complying with the other renewal requirements under the Original Franchise Agreement.  This Addendum is being signed simultaneously with the Renewal Franchise Agreement.

2.   ***Renewal Fee.***  In accordance with Sections 2.1.7.9 and 5.1.2.8 of the Original Franchise Agreement, you will not be required to pay the initial franchise fee stated in the Renewal Franchise Agreement.  Instead, you will pay us a renewal fee in an amount equal to_____.

3.   ***Release.***  You hereby release, discharge and hold harmless us and our past and present affiliated companies, successors, assignees and each of our and their past and present members, managers, directors, officers employees, agents, attorneys, owners, shareholders, partners, designees and representatives, from any and all debts, losses, damages, expenses, claims, demands, actions, causes of action, liabilities, costs or obligations arising from or in any way connected with the sale or operation of your franchise up to the date of this Agreement, which you may have had, now have or may hereafter discover, whether known or unknown, foreseen or unforeseen, to the extent permitted by law.

KF TEA FRANCHISING LLC                          [Franchisee]


By _____          By _____

Title _____          Title _____

Date _____          Date _____

**A207**

*Arms Global Inc./KF Tea Franchising LLC*

## ACH DEBIT APPLICATION

Arms Global Inc./ KF Tea Franchising LLC Automated Clearing House Daily Statement Payment Program
(This application will be used to communicate account information to Signature Bank)

|  | ☐ | Add New, please choose ☐ *Arms Global Inc.* ☐ *KF Tea Franchising LLC.* |
|---|---|---|
| Action to be Taken: | ☐ | Change | Effective Date: _____ (Effective date should be at least 3 business days in the future) |
|  | ☐ | Delete | Effective Date: _____ |

### *Payer Information*

Payer Sales Tax ID Number: _____

Payer Company Name: _____

Payer Company Address: _____

Payer City, State Zip: _____

Payer Contact Name: _____

Payer Email Address: _____

Payer Telephone: _____ FAX: _____
(Enter country code if applicable)                                    (Enter country code if applicable)

Name of Authorizing Company Official (Please type or print)        Signature of Authorizing Company Official

### *Banking Information*

### *Bank must be a National Automated Clearinghouse Association (NACHA) participant.*

Bank Name: _____ Address: _____

ACH Bank Transit
Routing Number: _____

ACH Bank
Account Number: _____

To ensure the accuracy of the account information, it is requested that written verification (obtained from your bank) be completed and accompany this application. The ACH payer will be responsible for defaults, which result from incomplete or erroneous account information when written verification is not submitted and certified by bank personnel. Please ensure that the bank transit routing and account numbers on the ACH application have been verified by your bank before sending to Arms Global Inc./ KF Tea Franchising LLC.

This application may be faxed, mailed or e-mailed to the ACH Coordinator at:

Kung Fu Tea
Financial Department
589 8th Ave, 17th Fl

New York, NY 10018

Telephone: (718) 728-8833
FAX:        (718)728-8866

Email:  billing@kfteausa.com

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify ARMS GLOBAL INC./KF TEA FRANCHISING LLC  in writing of any changes in my account information or termination of this authorization at least 15 days prior to the next billing date. If the above noted periodic payment dates fall on a weekend or holiday, I understand that the payment may be executed on the next business day. I understand that because this is an electronic transaction, these funds may be withdrawn from my account as soon as the above noted periodic transaction dates. In the case of an ACH Transaction being rejected for Non Sufficient Funds (NSF) I understand that ARMS GLOBAL INC./ KF TEA FRANCHISING LLC may at its discretion attempt to process the charge again within 30 days, and agree to an additional $40 charge for each attempt returned NSF which will be initiated as a separate transaction from the authorized recurring payment. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I agree not to dispute this recurring billing with my bank so long as the transactions correspond to the terms indicated in this authorization form

**A208**

**EXHIBIT G**

**STATE ADDENDA**

## CALIFORNIA ADDENDUM

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTEC-
TION & INNOVATION. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE
CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION & INNOVATION AT HTTPS://DFPI.CA.GOV.

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELAT-
ING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

Section 31125 of the Franchise Investment Law requires us to give to you a disclosure document in a form
containing the information that the commissioner may by rule or order require.

### Item 3 – LITIGATION

Neither the franchisor nor any person listed in Item 2 of the FDD is subject to any currently effec-
tive order of any national securities association or national securities exchange, as defined in the Securi-
ties Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling such persons from member-
ship in that association or exchange.

### Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

California Business and Professions Code Sections 20000 through 20043 provide rights to the
franchisee concerning termination, transfer or non-renewal of a franchise. If the Franchise Agreement con-
tains a provision that is inconsistent with the law, the law will control.

According to Item 17r, the Franchise Agreement requires you not to compete with us for a period
of two years after the agreement is terminated or expires. This provision may not be enforceable under
California law.

According to Item 17v, the Franchise Agreement and Multi-Unit Agreement provide that litigation
must take place in New York, NY. Prospective franchisees are encouraged to consult private legal counsel
to determine the applicability of California and federal laws (such as Business and Professions Code Sec-
tion 20040.5) to any provisions of a franchise agreement restricting venue to a forum outside the State of
California.

According to Item 17w, the Franchise Agreement and Multi-Unit Agreement provide that New York
law applies. This provision may not be enforceable under California law.

You must sign a general release of claims if you renew or transfer your franchise. California Cor-
porations Code Section 31512 voids a waiver of your rights under the Franchise Investment Law (California
Corporations Code Sections 31000 through 31516). Business and Professions Code Section 20010 voids
a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000
through 20043).

California's Franchise Investment Law (Corporations Code sections 31512 and 31512,1) states
that any provision of a franchise agreement or related document requiring the franchisee to waive specific
provisions of the law is contrary to public policy and is void and unenforceable. The law also prohibits a
franchisor from disclaiming or denying (i) representations it, its employees, or its agents make to you, (ii)
your ability to rely on any representations it makes to you, or (iii) any violations of the law.

Version 4/20/2023 rev 7/22/2023

Section 5.2.2.22 of the Franchise Agreement and Section 5.2.1.6 of the Multi-Unit Agreement allow us to terminate if you become insolvent or if a petition in bankruptcy is filed by you or filed against and consented to by you or not dismissed within 30 days. These provisions may not be enforceable under federal bankruptcy law. (11 U.S.C.A. § 101 et seq.)

**REGISTRATION OF THIS FRANCHISE DISCLOSURE DOCUMENT DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE COMMISSIONER.**

The pages that follow constitute additions to the Franchise Agreement and the Multi-Unit Agreement for California.

Version 4/20/2023 rev 7/22/2023

**A211**

**CALIFORNIA ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

    This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Franchise Agreement").

    1. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in con-nection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise. See NASAA STATEMENT OF POLICY REGARDING THE USE OF FRANCHISE QUESTIONNAIRES AND ACKNOWLEDGMENTS. https://www.nasaa.org/wp-content/uploads/2022/11/sop-franchise-questionnaires.pdf.

    2. In all other respects, the Franchise Agreement is unchanged.

KF TEA FRANCHISING LLC               [Franchisee]

By _____      By _____

Title _____      Title _____

Date _____      Date _____

**CALIFORNIA ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

    This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

    1. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in con-nection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise. See NASAA STATEMENT OF POLICY REGARDING THE USE OF FRANCHISE QUESTIONNAIRES AND ACKNOWLEDGMENTS. https://www.nasaa.org/wp-content/uploads/2022/11/sop-franchise-questionnaires.pdf.

    2. In all other respects, the Multi-Unit Agreement is unchanged.

KF TEA FRANCHISING LLC                 [Developer]

By _____         By _____

Title _____         Title _____

Date _____         Date _____

**HAWAII ADDENDUM**

**Item 5 – INITIAL FRANCHISE FEE**

The Hawaii Department of Commerce and Consumer Affairs requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees to the franchisor until the franchisor has completed its pre-opening obligations under the franchise agreement and the franchise is open for business. If a multi-unit agreement is signed for Hawaii, then the total Development Fee and initial fees to be collected under the Multi-Unit Agreement and the franchise agreements will be prorated and collected by the franchisor after the pre-opening obligations for each location are satisfied and as each location is opened for business. Because of this deferral of all initial fees and payments, the franchise deposit agreement will not be used for franchises to be located in Hawaii.

The pages that follow constitute additions to the Franchise Agreement and the Multi-Unit Agreement for Hawaii.

Hawaii addendum modified 8/25/2023

Version 4/20/2023 rev 7/22/2023

**A214**

**HAWAII ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

     This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Franchise Agreement").

     1. Based upon the franchisor's financial condition, the Hawaii Department of Commerce and Consumer Affairs has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement and the franchise is open for business.

     2. In all other respects, the Franchise Agreement is unchanged.

KF TEA FRANCHISING LLC          [Franchisee]

By _____     By _____

Title _____     Title _____

Date _____     Date _____

**HAWAII ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

     This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

     1. Based upon the franchisor's financial condition, the Hawaii Department of Commerce and Consumer Affairs has required a financial assurance. Therefore, the total Development Fee and initial fees to be collected under the Multi-Unit Agreement and the franchise agreements will be prorated and collected by the franchisor after the pre-opening obligations for each location are satisfied and as each location is opened for business.

     2. In all other respects, the Multi-Unit Agreement is unchanged.

KF TEA FRANCHISING LLC              [Developer]

By _____     By _____

Title _____     Title _____

Date _____     Date _____

## ILLINOIS ADDENDUM

Illinois law governs the franchise agreement and the multi-unit agreement.

Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration in a venue outside of Illinois.

Section 41 of that Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of Illinois is void.

**Item 5 – INITIAL FRANCHISE FEE**

All initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement and the franchisee commences doing business. The Illinois Attorney General's Office imposed this deferral requirement due to the franchisor's financial condition.

**Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

The following subsection of Item 17 will apply to Illinois franchises:

| | | |
|---|---|---|
| v. Choice of forum | FA: Section 7.11<br>MUA: Section 7.8 | FA: Litigation will be in Illinois.<br>MUA:  Litigation will be in Illinois. |

The pages that follow constitute additions to the Franchise Agreement and the Multi-Unit Agreement for Illinois.

**ILLINOIS ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

**between**

**KF TEA FRANCHISING LLC**

**and**

_____

      This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF TEA FRANCHSING LLC and _____ (the "Franchise Agreement").

      All initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement and the franchisee commences doing business. The Illinois Attorney General's Office imposed this deferral requirement due to the franchisor's financial condition.

      Illinois law governs the Franchise Agreement.

      Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration in a venue outside of Illinois.

      Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of Illinois is void.

      Your rights upon termination and non-renewal of a Franchise Agreement are set forth in Sections 19 and 20 of the Illinois Franchise Disclosure Act.

      No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

      The parties have signed this Addendum on the dates set forth below with effect as of the date of the Franchise Agreement.

KF TEA FRANCHISING LLC               [Franchisee]

By _____      By _____

Title _____      Title _____

Date _____      Date _____

**ILLINOIS ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

**between**

**KF TEA FRANCHISING LLC**

**and**

_____

This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

All initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement and the franchisee commences doing business. The Illinois Attorney General's Office imposed this deferral requirement due to the franchisor's financial condition.

Illinois law governs the Multi-Unit Agreement.

Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration in a venue outside of Illinois.

Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of Illinois is void.

Your rights upon termination and non-renewal of a Franchise Agreement are set forth in Sections 19 and 20 of the Illinois Franchise Disclosure Act.

No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

The parties have signed this Addendum on the dates set forth below with effect as of the date of the Multi-Unit Agreement.

KF TEA FRANCHISING LLC                    [Developer]


By _____        By _____

Title _____       Title _____

Date _____        Date _____

# MARYLAND ADDENDUM

**Item 5 – INITIAL FRANCHISE FEE**

Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers will be deferred until the first franchise under the development agreement opens. Because of this deferral of all initial fees and payments, the franchise deposit agreement will not be used for franchises to be located in Maryland.

**Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

No release required as a condition of renewal, sale, assignment or transfer will apply to any liability under the Maryland Franchise Registration and Disclosure Law.

Claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three years after the grant of the franchise.

No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

The pages that follow constitute additions to the Franchise Agreement and the Multi-Unit Agreement for Maryland.

**MARYLAND ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

  This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Franchise Agreement").

  1. Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement.

  2. Notwithstanding anything to the contrary contained in the Franchise Agreement, you may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law within three years after the grant of the franchise.

  3. The general release required as a condition of renewal, sale, assignment or other transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

  4. No provision in the Franchise Agreement or any Franchisee Certification is intended nor shall it act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

  5. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

  6. In all other respects, the Franchise Agreement is unchanged.


KF TEA FRANCHISING LLC      [Franchisee]


By _____   By _____

Title _____   Title _____

Date _____   Date _____

Version 4/20/2023 rev 7/222023

**A221**

**MARYLAND ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

      This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

      1. Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

      2. No provision in the Multi-Unit Agreement is intended nor shall it act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

      3. Notwithstanding anything to the contrary contained in the Multi-Unit Agreement, you may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law within three years after the grant of the franchise.

      4. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

      5. In all other respects, the Multi-Unit Agreement is unchanged.

KF TEA FRANCHISING LLC           [Developer]

By _____     By _____

Title _____     Title _____

Date _____     Date _____

## MICHIGAN ADDENDUM

**THE FOLLOWING PROVISIONS APPLY ONLY TO TRANSACTIONS GOVERNED BY THE MICHIGAN FRANCHISE INVESTMENT LAW**

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.

(a) A prohibition on the right of a franchisee to join an association of franchisees.

(b) A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c) A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d) A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e) A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f) A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g) A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i) The failure of the proposed franchisee to meet the franchisor's then current reasonable qualifications or standards.

(ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h) A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i) A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to:

State of Michigan Consumer Protection Division
Attention: Franchise
670 G. Mennen Williams Building
525 West Ottawa
Lansing, Michigan 48933
Telephone: (517) 373-7117

## MINNESOTA ADDENDUM

**Cover Page and Item 17**

MINNESOTA STATUTES, SECTION 80C.21 AND MINNESOTA RULE 2860.4400(J) PROHIBIT US FROM REQUIRING LITIGATION TO BE CONDUCTED OUTSIDE MINNESOTA, REQUIRING WAIVER OF A JURY TRIAL, OR REQUIRING THE FRANCHISEE TO CONSENT TO LIQUIDATED DAMAGES, TERMINATION PENALTIES OR JUDGMENT NOTES. IN ADDITION, NOTHING IN THE FRANCHISE DISCLOSURE DOCUMENT OR AGREEMENT(S) CAN ABROGATE OR REDUCE ANY OF YOUR RIGHTS AS PROVIDED FOR IN MINNESOTA STATUTES, CHAPTER 80C, OR YOUR RIGHTS TO ANY PROCEDURE, FORUM, OR REMEDIES PROVIDED FOR BY THE LAWS OF THE JURISDICTION.

**Item 5 – INITIAL FRANCHISE FEE**

The Securities Section of the Minnesota Department of Commerce requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees to the franchisor until the franchisor has completed its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

The franchise deposit agreement will not be used in Minnesota because of this requirement to defer all initial payments.

**Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

With respect to franchises governed by Minnesota law, the franchisor will comply with MINNESOTA STATUTES, SECTION 80C.14, Subds. 3, 4, and 5 which require (except in certain specified cases) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

The Consent to Transfer Agreement and the Renewal Addendum (Exhibits F3 and F4), referred to in Items 17c and 17m, each contains a general release. Minnesota Rule 2860.4400D prohibits a franchisor from requiring a franchisee to assent to a general release. Accordingly, this requirement will not apply in Minnesota.

The agreements you sign give us the right to obtain injunctive relief in certain cases. (Section 7.3 of the Franchise Agreement and Section 4.2 of the Confidentiality and Non-Competition Agreement.)  Under Minnesota Rule 2860.4400J, a franchisee cannot consent to the franchisor obtaining injunctive relief. Accordingly, these provisions are understood to mean that we have the right to seek injunctive relief.

The pages that follow constitute additions to the Franchise Agreement and the Consent to Transfer Agreement for Minnesota, and a new renewal addendum.

**MINNESOTA ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**
between
**KF TEA FRANCHISING LLC**
and
_____

This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF Tea Franchising LLC and _____ (the "Franchise Agreement").

1. Based upon the franchisor's financial condition, the Securities Section of the Minnesota Department of Commerce has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

2. Nothing in this agreement will abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, your rights under Minnesota Rule 2860.4400(D), or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction. We will not have the right to require you to litigate outside Minnesota, waive a jury trial or consent to liquidated damages, termination penalties or judgment notes. No provision in the Franchise Agreement is intended to nor shall it act as a release, estoppel or waiver of any liability incurred under the Minnesota Statutes, Chapter 80C.

3. We will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4, and 5, which require (except in certain specified cases) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

4. Section 7.3 of the Franchise Agreement and Section 4.2 of the Confidentiality and Non-Competition Agreement give us the right to obtain injunctive relief in certain cases. Under Minnesota Rule 2860.4400J, a franchisee cannot consent to the franchisor obtaining injunctive relief. Accordingly, these provisions are understood to mean that we have the right to seek injunctive relief.

5. Section 7.8 of the Franchise Agreement limits the time period in which you may bring certain actions. The provisions of Section 7.8 will not affect your right under Minnesota Statues Section 80C.17. Subd. 5, to bring an action pursuant to Section 80C.17 at any time during the three-year period after the cause of action accrues.

6. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

The parties have signed this Addendum on the dates set forth below with effect as of the date of the Franchise Agreement.

KF TEA FRANCHISING LLC                    [Franchisee]

By _____          By _____

Title _____         Title _____

Date _____          Date _____

**MINNESOTA ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**
between
**KF TEA FRANCHISING LLC**
and

_____

This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF Tea Franchising LLC and _____ (the "Multi-Unit Agreement").

1. Based upon the franchisor's financial condition, the Securities Section of the Minnesota Department of Commerce has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

2. Nothing in this agreement will abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, your rights under Minnesota Rule 2860.4400(D), or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction. We will not have the right to require you to litigate outside Minnesota, waive a jury trial or consent to liquidated damages, termination penalties or judgment notes. No provision in the Multi-Unit Agreement is intended to nor shall it act as a release, estoppel or waiver of any liability incurred under the Minnesota Statutes, Chapter 80C.

3. We will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4, and 5, which require (except in certain specified cases) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

4. Section 7.1 of the Multi-Unit Agreement gives us the right to obtain injunctive relief in certain cases. Under Minnesota Rule 2860.4400J, a franchisee cannot consent to the franchisor obtaining injunctive relief. Accordingly, this provision is understood to mean that we have the right to seek injunctive relief.

5. Section 7.5 of the Multi-Unit Agreement limits the time period in which you may bring certain actions. The provisions of Section 7.5 will not affect your right under Minnesota Statues Section 80C.17. Subd. 5, to bring an action pursuant to Section 80C.17 at any time during the three-year period after the cause of action accrues.

6. No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

The parties have signed this Addendum on the dates set forth below with effect as of the date of the Multi-Unit Agreement.

KF TEA FRANCHISING LLC                     [Developer]


By _____          By _____

Title _____          Title _____

Date _____          Date _____


Version 4/20/2023 rev 7/22/2023

**A227**

## NEW YORK ADDENDUM

### THE STATE OF NEW YORK REQUIRES US TO DISCLOSE THE FOLLOWING INFORMATION:

INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRA-TORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SERVICES OR INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THIS FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND THE APPROPRIATE STATE OR PROVINCIAL AUTHORITY.

THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.

### Item 3 - LITIGATION

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A. No such party has an administrative, criminal or civil action pending against that person alleging: a felony; a violation of a franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices or comparable civil or misdemeanor allegations.

B. No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C. No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the ten-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging:  violation of a franchise, antifraud or securities law; fraud, embezzlement, fraudulent conversion or misappropriation of property, or unfair or deceptive practices or comparable allegations.

D. No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise or under a Federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunction or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

### Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

The following is added to the end of the "Summary" sections of Item 17(c) (entitled "Requirements for franchisee to renew or extend") and 17(m) (entitled "Conditions for franchisor approval of transfer"):

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this

proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be sat-isfied.

The following language replaces the "Summary" section of Item 17(d) (titled "Termination by fran-chisee"):

You may terminate the agreement on any grounds available by law.

The following is added to the end of the "Summary" sections of Item 17(v) (titled "Choice of Forum") and 17(w) (titled "Choice of Law"):

The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

# VIRGINIA ADDENDUM

**Item 5 – INITIAL FRANCHISE FEE**

The Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees to the franchisor until the franchisor has completed its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

**Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

The following statement is added to Item 17(h):

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any ground for default or termination stated in the franchise agreement does not constitute "reasonable cause" as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

**Item 21 – FINANCIAL STATEMENTS**

The franchisor has no fixed assets (*i.e.*, furniture, equipment, property, etc.) with which to support the franchise system.

The pages that follow constitute additions to the Franchise Agreement and the Multi-Unit Agreement for Virginia.

**VIRGINIA ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

This Addendum modifies and amends the Kung Fu Tea Franchise Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Franchise Agreement").

1. Based upon the franchisor's financial condition, the Virginia State Corporation Commission's Division of Securities and Retail Franchising has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement.

2. In all other respects, the Franchise Agreement is unchanged.

KF TEA FRANCHISING LLC                    [Franchisee]

By _____           By _____

Title _____           Title _____

Date _____           Date _____

**A231**

**VIRGINIA ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

between

**KF TEA FRANCHISING LLC**

and

_____

This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

1. Based upon the franchisor's financial condition, the Virginia State Corporation Commission's Division of Securities and Retail Franchising has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

2. In all other respects, the Multi-Unit Agreement is unchanged.

KF TEA FRANCHISING LLC                          [Developer]

By _____          By _____

Title _____          Title _____

Date _____          Date _____

## WASHINGTON ADDENDUM

**Item 3 – LITIGATION**

On September 20, 2019, the franchisor voluntarily entered into an agreement with the State of Washington not to include "no-poaching" provisions in future franchise agreements and not to enforce no-poaching provisions in its signed franchise agreements. Assurance of Discontinuance (AOD) No. 19-2-24770-3. This AOD was part of the Attorney General's investigation of the franchise agreements of a number of franchisors in the State of Washington with respect to "no poaching" provisions. The franchisor was one of 237 franchisors that signed similar AODs. "No-poaching" provisions had been common in franchise agreements. But in recent years, some economists have concluded that these provisions reduce opportunities for low-wage workers and stagnate wages, harming workers. The Washington Attorney General's office concluded that these provisions were contrary to state's Consumer Protection Act. The AOD signed by the franchisor acknowledged that the franchisor removed the no-poaching provisions from its standard franchise agreement in April 2019, months before the Attorney General's Office contacted the franchisor, that the franchisor has never sought to enforce the no-poaching provisions of any of its franchise agreements, and that the franchisor denied that these provisions constituted a contract in restraint of trade in violation of Washington law. Although the Washington Attorney General's Office conducted an investigation, no state court action was necessary to activate the AOD.

**Item 5 – INITIAL FRANCHISE FEE**

The State of Washington has imposed a financial condition under which the initial franchise fees due will be deferred until the franchisor has fulfilled its initial pre-opening obligations under the Franchise Agreement and the franchise is open for business. Because the Franchisor has material pre-opening obligations with respect to each franchised business the Franchisee opens under the Multi-Unit Agreement, the State of Washington will require that the franchise fees be released proportionally with respect to each franchised business.

The franchise deposit agreement will not be used in Washington because of this requirement to defer all initial payments.

**Item 17 – RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a

negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

**WASHINGTON ADDENDUM TO THE KUNG FU TEA FRANCHISE AGREEMENT**

**between**

**KF TEA FRANCHISING LLC**

**and**

_____

This Addendum modifies and amends the KF Tea Franchise Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Franchise Agreement").

1. Based upon the franchisor's financial condition, the Washington Department of Financial Institutions has required a financial assurance. Therefore, all initial fees and payments owed by franchisees will be deferred until the franchisor completes its pre-opening obligations under the Franchise Agreement.

2, In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

3. RCW 19.100.180 which may supersede the Franchise Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

4. In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

5. A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

6. Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

7. Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

8. RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

9. In all other respects, the Franchise Agreement is unchanged.

The parties have signed this Addendum on the dates set forth below with effect as of the date of the Franchise Agreement.

KF TEA FRANCHISING LLC                              [Franchisee]


By _____                 By _____

Title _____                Title _____

Date _____                 Date _____

**WASHINGTON ADDENDUM TO THE KUNG FU TEA MULTI-UNIT AGREEMENT**

**between**

**KF TEA FRANCHISING LLC**

**and**

_____

This Addendum modifies and amends the Kung Fu Tea Multi-Unit Agreement dated as of _____, between KF TEA FRANCHISING LLC and _____ (the "Multi-Unit Agreement").

1. The State of Washington has imposed a financial condition under which the initial franchise fees due will be deferred until the franchisor has fulfilled its initial pre-opening obligations under the Franchise Agreement and the franchise is open for business. Because the Franchisor has material pre-opening obligations with respect to each franchised business the Franchisee opens under the Multi-Unit Agreement, the State of Washington will require that the franchise fees be released proportionally with respect to each franchised business.

2. In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

3. RCW 19.100.180 which may supersede the Multi-Unit Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Multi-Unit Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

4. In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

5. A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

6. Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

7. Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted

annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

8. RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

9. In all other respects, the Multi-Unit Agreement is unchanged.

The parties have signed this Addendum on the dates set forth below with effect as of the date of the Multi-Unit Agreement.

KF TEA FRANCHISING LLC                    [Developer]


By _____           By _____

Title _____          Title _____

Date _____           Date _____

**EXHIBIT H**

## STATE EFFECTIVE DATES

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|-------|----------------|
| California | 8/25/2023 |
| Hawaii | 5/5/2023 |
| Illinois | 4/25/2023 |
| Indiana | 4/30/2023 |
| Maryland | 8/3/2023 |
| Michigan | 5/14/2023 |
| Minnesota | 6/13/2023 |
| New York | 6/13/2023 |
| Rhode Island | 4/23/2023 |
| Virginia | 5/16/2023 |
| Washington | 7/10/2023 |
| Wisconsin | 4/29/2023 |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

Version 4/20/2023 rev 7/22/2023

**A239**

**EXHIBIT I**

**RECEIPTS**

When you receive this Franchise Disclosure Document, please sign and return one copy of the receipt page to our headquarters office. We cannot process your application until we receive a properly signed receipt.

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully. If KF Tea Franchising LLC offers you a franchise, it must provide this disclosure document to you at least 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

New York requires that we give you this disclosure document at the earlier of the first personal meeting to discuss the sale of a franchise or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If KF Tea Franchising LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the applicable state agency listed in Exhibit A, which also includes a list of our agents authorized to receive service of process.

The name, principal business address and telephone number of each seller offering the franchise is indicated below:

| *Name* | *Address* | *Telephone Number* |
|---|---|---|
| Michael Wen | KF Tea Franchising LLC | 1-855-KFT(538)-9888 |
| Darren Chen | 589 8th Ave., 17th Fl. | |
| | New York, NY 10018 | |

Other:  _____          _____

Date of Issuance:  4/20/2023 revised 7/22/2023

I have received the Kung Fu Tea franchise disclosure document dated 4/20/2023 revised 7/22/2023. This disclosure document includes the following Exhibits:

|   |   |   |   |
|---|---|---|---|
| A | State Administrators and Agents for Service of Process | | Lease Addendum |
| | | | Supply Agreement |
| B | List of Franchisees | | Dual Concept Addendum |
| C | Franchisee Organizations | | Multi-Unit Agreement |
| D | Financial Statements | | Consent to Transfer |
| E | Table of Contents of Manual | | Renewal Addendum |
| F | Agreements and Forms | | ACH Debit Application |
| | Franchise Deposit Agreement | G | State Addenda |
| | Franchise Agreement | H | State Effective Dates |
| | Guaranty | | |

Proposed location:

_____          _____
                                          Company Name

_____          By _____
                                             Signature & Title
Return this signed receipt by email to:
     sales@kfteausa.com                   Date _____

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully. If KF Tea Franchising LLC offers you a franchise, it must provide this disclosure document to you at least 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

New York requires that we give you this disclosure document at the earlier of the first personal meeting to discuss the sale of a franchise or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If KF Tea Franchising LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the applicable state agency listed in Exhibit A, which also includes a list of our agents authorized to receive service of process.

The name, principal business address and telephone number of each seller offering the franchise is indicated below:

| *Name* | *Address* | *Telephone Number* |
|---|---|---|
| Michael Wen | KF Tea Franchising LLC | 1-855-KFT(538)-9888 |
| Darren Chen | 589 8th Ave., 17th Fl. | |
| | New York, NY 10018 | |

Other: _____       _____

Date of Issuance:  4/20/2023 revised 7/22/2023

I have received the Kung Fu Tea franchise disclosure document dated 4/20/2023 revised 7/22/2023. This disclosure document includes the following Exhibits:

| | | | |
|---|---|---|---|
| A | State Administrators and Agents for Service of Process | | Lease Addendum |
| | | | Supply Agreement |
| B | List of Franchisees | | Dual Concept Addendum |
| C | Franchisee Organizations | | Multi-Unit Agreement |
| D | Financial Statements | | Consent to Transfer |
| E | Table of Contents of Manual | | Renewal Addendum |
| F | Agreements and Forms | | ACH Debit Application |
| | Franchise Deposit Agreement | G | State Addenda |
| | Franchise Agreement | H | State Effective Dates |
| | Guaranty | | |

Proposed location:                                    _____
                                                         Company Name

_____
                                                  By _____
Return this signed receipt by email to:                Signature & Title
   sales@kfteausa.com
                                                  Date _____

Version 4/20/2023 rev 7/22/2023

**A242**

# Exhibit 2

A244





AVAILABLE ONLINE

Kung Fu Tea
KUNGFUTEA.THELEVELUP.COM

NEAREST LOCATIONS

**ABINGTON**
1129 Old York Road Abington PA 19001

215 885 1037

**ALAMO HEIGHTS**
5231 Broadway Street, Suite 101 San Antonio, TX 78209

210-455-0092

**ALBANY**
2801 Old Dawson Rd STE 130 Albany GA 31707

# Exhibit 3

# ABOUT KUNG FU TEA

KUNG FU, IN ITS PUREST ESSENCE, IS THE DESIRE FOR SELF-IMPROVEMENT AND TO EXPAND ONE'S CAPABILITIES BEYOND ALL LIMITATIONS.

HERE AT KUNG FU TEA, WE BELIEVE THAT IT'S OUR MISSION TO NOT ONLY CONTINUOUSLY IMPROVE OUR BRAND AND BEVERAGES AND THE LIVES OF OUR CUSTOMERS THROUGH PROVIDING ONLY THE MOST DELICIOUS, HIGH-QUALITY FLAVORS BUT ALSO TO INSPIRE THE COMMUNITY TO DREAM BIG AND LIVE FEARLESSLY.

FOUNDED IN QUEENS, NY ON APRIL 30, 2010, WE'RE AMERICA'S LARGEST BUBBLE TEA BRAND WITH OVER 350+ LOCATIONS ACROSS THE U.S. AS ONE OF THE OGS OF BUBBLE TEA, WE MAINTAIN UNCOMPROMISINGLY HIGH STANDARDS. LET'S BE REAL, MAKING TEA THAT LOOKS GOOD ISN'T THE HARD PART. THE ACTUAL CHALLENGE IS MAKING TEA THAT TASTES GOOD AND PRESENTING IT IN AN INNOVATIVE WAY. MADE WITH THE ART OF '3T' KUNG FU, EVERY CUP OF TEA IS FRESHLY BREWED AT THE PERFECT TEMPERATURE USING PREMIUM TEA LEAVES. THE BEVERAGES WE BRING TO THE TABLE ARE STRONG INSIDE-OUT — PERFECT FOR YOUR TASTE BUDS AND YOUR INSTAGRAM STORIES.

OH YEAH, WHAT'S OUR DREAM? TO ELEVATE THE WORLD OF MADE-TO-ORDER BEVERAGES WITH A 'FRESH — INNOVATIVE — FEARLESS' APPROACH AND BE PRESENT WHEREVER YOU ARE (NOT IN A JOE GOLDBERG TYPE OF WAY).

ON APRIL 30, 2018 (OUR 8TH BIRTHDAY), WE FOUNDED NATIONAL BUBBLE TEA DAY TO HONOR THE GROWING COMMUNITY OF PEOPLE WHO LIVE AND BREATHE BUBBLE TEA WHILE CELEBRATING THE BEVERAGE THAT HAS MADE OUR LIVES BUBBLIER.

# Exhibit 4

🕐 This article was published more than **6 years ago**

# The Washington Post

*Democracy Dies in Darkness*

# A guide to the best bubble tea shops in the D.C. area

 By <u>Winyan Soo Hoo</u>

June 14, 2017 at 12:15 p.m. EDT

Move beyond the milkshakes and Frappuccinos: Cool down with bubble tea instead. The popular Asian dessert drink comes with a base of tea, flavored syrups or fruit smoothies. Originating in Taiwan in the '80s, its name refers to the foam that appears at the top when shaken and for its tapioca mix-ins.

Derived from cassava root, tapioca balls — also called "boba," bubbles or pearls — are usually dark brown and have a sticky, playful chewiness resembling that of gummy candy. The best kind achieves a "QQ" texture, a Taiwanese phrase describing the al dente bounce and resistance of food that's neither over nor totally undercooked. It often takes about one to two hours to boil the tapioca balls, with constant stirring to ensure consistency. Use a wide straw to drink up their sweetness, amplified from being steeped in brown sugar and honey.

These independent shops and chains — most of which have opened up in the last few years — offer a range of flavors, cream infusions and mix-in ingredients (sometimes labeled as toppings) that can please connoisseurs as much as newbies. Drinks are often customizable, so order yours hot if you prefer, and control the amount of ice and sweetness to your liking.

**TeaDM Lounge**

Beats by DJs Hardwell and Tiesto pulse inside this bubble tea lounge owned by EDM fan Jay Tran, who got his start serving home-brewed teas at Dupont Circle's Mimosa nail salon. Last year, he opened his own space, shared with a pho noodle shop, at the Eden Center in Falls Church; now he's plotting to open a Dupont Circle outpost in late summer. Some of the shop's most popular drinks, such as rose milk tea and OMG (orange, mango and grapefruit), began as customer suggestions. Try the frosty, sweet and subtly bitter Winter melon oolong and sea salt matcha green tea. (The delicate winter melon flavor, inspired by the Asian gourd, tastes like vanilla when blended with cream.) The menu evolves almost weekly with experimental flavors and add-ins that include chia seed, aloe gelatin and crystal boba.

*6765 Wilson Blvd., Falls Church. $3.25-$4.50.*

**Kung Fu Tea**

Think of Kung Fu Tea as the Starbucks of bubble tea. The Taiwanese-style chain from Flushing, Queens, N.Y., which has more than 100 locations nationwide, opened in 2015 in Rockville and soon had lines out the door. Two years later, several more Kung Fu Teas have opened in Maryland and Virginia, with a Georgetown

A guide to the best bubble tea shops in the D.C. area - The W...          https://www.washingtonpost.com/goingoutguide/your-new...

location set to open Monday. (Even Hillary Clinton made a stop on the campaign trail for a drink in Queens.) The chain's set menu comes with such standbys as passion fruit, winter melon milk green tea, purple taro, Oreo milk tea, sweet red-bean slush and yogurt-based flavors made from the Japanese Yakult drink, a tart yogurtlike beverage.

*Various locations around Maryland, Virginia and D.C. kungfutea.com. $2.75-$6.25.*

**Chill Zone**

The quiet and picturesque Chill Zone features a white brick backdrop and a distressed shiplap interior with miniature terrariums and vintage cameras on display. The cafe was the brainchild of local photographer Daniel Bui and his partners; their attention to detail and artistic bent resulted in a menu of high-quality, layered ingredients — think bubble tea flavors like bittersweet Vietnamese coffee, frosty mango (fresh mango and milk foam), as well as matcha drinks made with ceremonial-grade green tea, which is also dusted on top as a garnish. Savory pan-fried rice cakes, chicken wings and banh mi sandwiches offer another nod to the cafe's Vietnamese background.

*2442 N. Harrison St., Arlington. chill-zone.us. $3.75-$5.75.*

**Jumbo Jumbo**

One bite of the spicy food served at this longtime fast-casual Rockville Pike staple, and you'll be transported to Taipei's Shilin Night Market, an unparalleled destination for hustle and bustle and Taiwanese street-food delicacies. Dishes include a Taiwanese fried popcorn chicken, with spiced salt and basil, and a spicy beef noodle soup that can require some cooling. To fight the heat, wash down your meal with a nutty almond milk tea, litchi fruit smoothie or an understated floral jasmine milk tea.

*Rockville: 765 Rockville Pike and 15192 Frederick Rd. jumbojumbocafe.com. $3.25-$6.*

**Ocha Tea**

The modest, three-month old Ocha Tea — manned by engineer-by-day Tom Vuong, his wife and three kids — is miles ahead of its peers in terms of fine tea offerings. Unlike drinks at other shops, Ocha's aren't overpowered by sugar. Its diverse roster includes fragrant black, jasmine and green teas. Order the Moonlight Mango green tea with peach; jasmine and house-blend milk teas; and the off-menu avocado smoothie, a mild and creamy special order made with an entire avocado fruit for each glass.

*6653 Little River Turnpike, Annandale. $1.99-$4.95.*

**Teas 'n You**

From the Happy Endings Hospitality restaurant group (Chasin' Tails, Roll Play Grill) comes this hotly anticipated bubble tea shop with cool drinks that feel luxe, thanks to the premium ingredient list and finely crafted teas. Try the fresh-brewed Flower Bomb, made with real chrysanthemum blooms, the pistachio

**A250**

milk or the cucumber winter melon. The shop also serves macarons in flavors including Ferrero Rocher, unicorn cake batter and cookies-and-cream. You can sit outside on their front patio or inside the chic cafe room, amid burnished gold garlands and sequined pillows.

*8032 Leesburg Pike, Vienna. [teasnyou.com](teasnyou.com). $3.95-$4.75.*

# Exhibit 5



# United States of America

## United States Patent and Trademark Office

# KUNG FU TEA

**Reg. No. 4,497,687**

**Registered Mar. 18, 2014**

KF TEA USA INC. (NEW YORK CORPORATION)
34-36 56TH STREET
WOODSIDE, NY 11377

**Int. Cl.: 43**

FOR: RESTAURANT SERVICES FEATURING NON-ALCOHOLIC DRINKS, BEVERAGES, PASTRIES, AND CONFECTIONS, IN CLASS 43 (U.S. CLS. 100 AND 101).

**SERVICE MARK**

FIRST USE 4-30-2010; IN COMMERCE 4-30-2010.

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 3,961,011.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "TEA", APART FROM THE MARK AS SHOWN.

SER. NO. 86-029,382, FILED 8-5-2013.

BARNEY CHARLON, EXAMINING ATTORNEY



**Deputy Director of the United States**
**Patent and Trademark Office**

**A253**

> **REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**
>
> **WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

> **The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:   Fees and requirements for maintaining registrations are subject to change.   Please check the USPTO website for further information.   With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**Generated on:** This page was generated by TSDR on 2023-12-12 11:01:01 EST

**Mark:** KUNG FU TEA

KUNG FU TEA

| | | | |
|---|---|---|---|
| **US Serial Number:** | 86029382 | **Application Filing Date:** | Aug. 05, 2013 |
| **US Registration Number:** | 4497687 | **Registration Date:** | Mar. 18, 2014 |
| **Filed as TEAS Plus:** | Yes | **Currently TEAS Plus:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** Nov. 11, 2020

**Publication Date:** Dec. 31, 2013

## Mark Information

**Mark Literal Elements:** KUNG FU TEA

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Disclaimer:** "TEA"

## Related Properties Information

**Claimed Ownership of US Registrations:** 3961011

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Restaurant services featuring non-alcoholic drinks, beverages, pastries, and confections

| | | | |
|---|---|---|---|
| **International Class(es):** | 043 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Apr. 30, 2010 | **Use in Commerce:** | Apr. 30, 2010 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF Tea USA Inc. |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |
| **State or Country Where Organized:** | NEW YORK |

## Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.12 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |

| | | | |
|---|---|---|---|
| **Phone:** | 9294760048 | **Fax:** | 212.545.1656 |
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@off itkurman.com alison.pratt@offitkurman.com tom.pi tegoff@offitkurman.com | **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Mar. 18, 2023 | COURTESY REMINDER - SEC. 8 (10-YR)/SEC. 9 E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Nov. 11, 2020 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Nov. 11, 2020 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | 67723 |
| Nov. 11, 2020 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 67723 |
| Sep. 18, 2020 | TEAS SECTION 8 & 15 RECEIVED | |
| Mar. 18, 2019 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Nov. 17, 2017 | COUNTERCLAIM OPP. NO. 999999 | 236933 |
| Mar. 18, 2014 | REGISTERED-PRINCIPAL REGISTER | |
| Dec. 31, 2013 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Dec. 31, 2013 | PUBLISHED FOR OPPOSITION | |
| Dec. 11, 2013 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Nov. 22, 2013 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Nov. 18, 2013 | ASSIGNED TO EXAMINER | 71994 |
| Aug. 13, 2013 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Aug. 08, 2013 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

| TM Staff Information - None | |
| --- | --- |
| **File Location** | |
| Current Location:  TMEG LAW OFFICE 104 | Date in Location:  Nov. 11, 2020 |

# Proceedings

| Summary | |
| --- | --- |
| Number of Proceedings: | 1 |

## Type of Proceeding: Opposition

| Proceeding Number: | 91236933 | Filing Date: | Sep 28, 2017 |
| --- | --- | --- | --- |
| Status: | Terminated | Status Date: | Jun 03, 2018 |
| Interlocutory Attorney: | MARY CATHERINE FAINT | | |

### Defendant

| Name: | Wing-Yu Ng |
| --- | --- |
| Correspondent Address: | PATRICK R COLSHER<br>SHEARMAN & STERLING LLP<br>599 LEXINGTON AVE<br>FLUSHING NY UNITED STATES , 10022 |
| Correspondent e-mail: | andrewmalaw@gmail.com , ndrwma@gmail.com |

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
| --- | --- | --- | --- |
| KUNG FU CHEF | | 87406993 | |

### Plaintiff(s)

| Name: | KF Tea USA Inc. |
| --- | --- |
| Correspondent Address: | CHIA-YU CHANG<br>CHIA-YU CHANG @ LAW PC<br>315 W 70TH ST #12L<br>NEW YORK NY UNITED STATES , 10023 |
| Correspondent e-mail: | cychang@cychanglaw.com |

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
| --- | --- | --- | --- |
| KUNG FU TEA | | 85075650 | 3961011 |
| KUNG FU TEA | | 86029382 | 4497687 |
| KUNG FU TEA | | 86029401 | 4510162 |
| KUNG FU TEA | | 86060777 | 4857505 |
| KUNG FU TEA | | 86060792 | 4857506 |
| KUNG FU TEA | | 86060831 | 4857507 |

### Prosecution History

| Entry Number | History Text | Date | Due Date |
| --- | --- | --- | --- |
| 19 | P PROOF OF SERVICE | Jun 04, 2018 | |
| 18 | TERMINATED | Jun 03, 2018 | |
| 17 | BD DECISION: DISMISSED W/O PREJ | Jun 03, 2018 | |
| 16 | W/DRAW OF APPLICATION | Jun 01, 2018 | |
| 15 | W/DRAW OF COUNTERCLAIM | Jun 01, 2018 | |
| 14 | STIP ABANDONMENT OF APP/WD OF CC/WD OF OPP | Jun 01, 2018 | |
| 13 | SUSPENDED | May 03, 2018 | |
| 12 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Apr 30, 2018 | |
| 11 | SUSPENDED | Mar 07, 2018 | |
| 10 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Mar 05, 2018 | |

**A257**

| 9 | EXTENSION OF TIME GRANTED | Jan 19, 2018 | |
| 8 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Jan 02, 2018 | |
| 7 | EXTENSION OF TIME GRANTED | Dec 07, 2017 | |
| 6 | P MOT FOR EXT W/ CONSENT | Dec 07, 2017 | |
| 5 | TRIAL DATES RESET | Nov 09, 2017 | |
| 4 | ANSWER AND COUNTERCLAIM (FEE) | Nov 07, 2017 | |
| 3 | PENDING, INSTITUTED | Sep 28, 2017 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Sep 28, 2017 | Nov 07, 2017 |
| 1 | FILED AND FEE | Sep 28, 2017 | |

# Exhibit 6



## United States of America
### United States Patent and Trademark Office

# KUNG FU TEA

**Reg. No. 4,857,505**
**Registered Nov. 24, 2015**

**Int. Cls.: 30 and 32**

**TRADEMARK**

**PRINCIPAL REGISTER**

KF TEA USA INC. (NEW YORK CORPORATION)
34-36 56TH STREET
WOODSIDE, NY 11377

FOR: TEA; TEA-BASED FLAVORED DRINKS AND BEVERAGES; TEA-BASED SLUSH-TYPE DRINKS; PASTRIES CONTAINING TEA, TEA-BASED SMOOTHIES, IN CLASS 30 (U.S. CL. 46).

FIRST USE 4-30-2010; IN COMMERCE 4-30-2010.

FOR: FRUIT-FLAVORED SMOOTHIES CONTAINING TEA; FRUIT-FLAVORED SLUSH-TYPE DRINKS CONTAINING TEA, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

FIRST USE 4-30-2010; IN COMMERCE 4-30-2010.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 3,961,011.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "TEA", APART FROM THE MARK AS SHOWN.

SER. NO. 86-060,777, FILED 9-10-2013.

BARNEY CHARLON, EXAMINING ATTORNEY

Director of the United States
Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

*First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

*Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
*See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

**Generated on:** This page was generated by TSDR on 2023-12-12 11:03:46 EST

**Mark:** KUNG FU TEA

# KUNG FU TEA

| | | | |
|---|---|---|---|
| **US Serial Number:** | 86060777 | **Application Filing Date:** | Sep. 10, 2013 |
| **US Registration Number:** | 4857505 | **Registration Date:** | Nov. 24, 2015 |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** May 14, 2022

**Publication Date:** Sep. 08, 2015

## Mark Information

**Mark Literal Elements:** KUNG FU TEA

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Disclaimer:** "TEA"

## Related Properties Information

**Claimed Ownership of US Registrations:** 3961011

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea, Tea-based smoothies

| | | | |
|---|---|---|---|
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** | 046 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Apr. 30, 2010 | **Use in Commerce:** | Apr. 30, 2010 |

**For:** fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea

| | | | |
|---|---|---|---|
| **International Class(es):** | 032 - Primary Class | **U.S Class(es):** | 045, 046, 048 |
| **Class Status:** | ACTIVE | | |

**A262**

**Basis:** 1(a)

**First Use:** Apr. 30, 2010      **Use in Commerce:** Apr. 30, 2010

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

**Owner Name:** KF Tea USA Inc.

**Owner Address:** 589 Eighth Avenue, 17th Floor
New York, NEW YORK UNITED STATES 10018

**Legal Entity Type:** CORPORATION      **State or Country Where Organized:** NEW YORK

## Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** Matthew D. Asbell      **Docket Number:** 0565-26.09

**Attorney Primary Email Address:** trademarks@offitkurman.com      **Attorney Email Authorized:** Yes

**Correspondent**

**Correspondent Name/Address:** Matthew D. Asbell
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, NEW YORK UNITED STATES 10022

**Phone:** 9294760048      **Fax:** 212.545.1656

**Correspondent e-mail:** trademarks@offitkurman.com matthew.asbell@offitkurman.com alison.pratt@offitkurman.com tom.pittegoff@offitkurman.com      **Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| May 14, 2022 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| May 14, 2022 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | 75184 |
| May 13, 2022 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 75184 |
| Nov. 20, 2021 | TEAS SECTION 8 & 15 RECEIVED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Nov. 24, 2020 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Nov. 17, 2017 | COUNTERCLAIM OPP. NO. 999999 | 236933 |
| Nov. 24, 2015 | REGISTERED-PRINCIPAL REGISTER | |
| Sep. 08, 2015 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Sep. 08, 2015 | PUBLISHED FOR OPPOSITION | |
| Aug. 19, 2015 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Aug. 03, 2015 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 68171 |
| Jul. 31, 2015 | APPROVED FOR PUB - PRINCIPAL REGISTER | |

**A263**

| | | |
|---|---|---|
| Jul. 31, 2015 | EXAMINER'S AMENDMENT ENTERED | 88888 |
| Jul. 31, 2015 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 6328 |
| Jul. 31, 2015 | EXAMINERS AMENDMENT E-MAILED | 6328 |
| Jul. 31, 2015 | EXAMINERS AMENDMENT -WRITTEN | 71994 |
| Jul. 31, 2015 | PREVIOUS ALLOWANCE COUNT WITHDRAWN | |
| Jul. 14, 2015 | WITHDRAWN FROM PUB - OG REVIEW QUERY | 99910 |
| Jun. 29, 2015 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 68171 |
| Jun. 25, 2015 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jan. 05, 2015 | REPORT COMPLETED SUSPENSION CHECK CASE STILL SUSPENDED | 68171 |
| Jun. 28, 2014 | NOTIFICATION OF LETTER OF SUSPENSION E-MAILED | 6332 |
| Jun. 28, 2014 | LETTER OF SUSPENSION E-MAILED | 6332 |
| Jun. 28, 2014 | SUSPENSION LETTER WRITTEN | 71994 |
| Jun. 06, 2014 | TEAS/EMAIL CORRESPONDENCE ENTERED | 68171 |
| Jun. 06, 2014 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 68171 |
| Jun. 05, 2014 | ASSIGNED TO LIE | 68171 |
| May 22, 2014 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Nov. 25, 2013 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Nov. 25, 2013 | NON-FINAL ACTION E-MAILED | 6325 |
| Nov. 25, 2013 | NON-FINAL ACTION WRITTEN | 71994 |
| Nov. 18, 2013 | ASSIGNED TO EXAMINER | 71994 |
| Sep. 18, 2013 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Sep. 13, 2013 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

Current Location: TMEG LAW OFFICE 104          Date in Location: May 14, 2022

# Proceedings

**Summary**

Number of Proceedings: 2

**Type of Proceeding: Opposition**

Proceeding Number: 91236933          **Filing Date:** Sep 28, 2017

**Status:** Terminated          **Status Date:** Jun 03, 2018

Interlocutory Attorney: MARY CATHERINE FAINT

**Defendant**

**Name:** Wing-Yu Ng

Correspondent Address: PATRICK R COLSHER
SHEARMAN & STERLING LLP
599 LEXINGTON AVE
FLUSHING NY UNITED STATES , 10022

Correspondent e-mail: andrewmalaw@gmail.com , ndrwma@gmail.com

Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| KUNG FU CHEF | | 87406993 | |

**Plaintiff(s)**

**Name:** KF Tea USA Inc.

Correspondent Address: CHIA-YU CHANG
CHIA-YU CHANG @ LAW PC
315 W 70TH ST #12L

NEW YORK NY UNITED STATES , 10023

**Correspondent e-mail:** cychang@cychanglaw.com

## Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|------|--------------------|--------------|--------------------|
| KUNG FU TEA | | 85075650 | 3961011 |
| KUNG FU TEA | | 86029382 | 4497687 |
| KUNG FU TEA | | 86029401 | 4510162 |
| KUNG FU TEA | | 86060777 | 4857505 |
| KUNG FU TEA | | 86060792 | 4857506 |
| KUNG FU TEA | | 86060831 | 4857507 |

| | Prosecution History | | |
|---|---|---|---|
| **Entry Number** | **History Text** | **Date** | **Due Date** |
| 19 | P PROOF OF SERVICE | Jun 04, 2018 | |
| 18 | TERMINATED | Jun 03, 2018 | |
| 17 | BD DECISION: DISMISSED W/O PREJ | Jun 03, 2018 | |
| 16 | W/DRAW OF APPLICATION | Jun 01, 2018 | |
| 15 | W/DRAW OF COUNTERCLAIM | Jun 01, 2018 | |
| 14 | STIP ABANDONMENT OF APP/WD OF CC/WD OF OPP | Jun 01, 2018 | |
| 13 | SUSPENDED | May 03, 2018 | |
| 12 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Apr 30, 2018 | |
| 11 | SUSPENDED | Mar 07, 2018 | |
| 10 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Mar 05, 2018 | |
| 9 | EXTENSION OF TIME GRANTED | Jan 19, 2018 | |
| 8 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Jan 02, 2018 | |
| 7 | EXTENSION OF TIME GRANTED | Dec 07, 2017 | |
| 6 | P MOT FOR EXT W/ CONSENT | Dec 07, 2017 | |
| 5 | TRIAL DATES RESET | Nov 09, 2017 | |
| 4 | ANSWER AND COUNTERCLAIM (FEE) | Nov 07, 2017 | |
| 3 | PENDING, INSTITUTED | Sep 28, 2017 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Sep 28, 2017 | Nov 07, 2017 |
| 1 | FILED AND FEE | Sep 28, 2017 | |

## Type of Proceeding: Cancellation

**Proceeding Number:** 92058876

**Filing Date:** Mar 18, 2014

**Status:** Terminated

**Status Date:** Jun 11, 2015

**Interlocutory Attorney:** BENJAMIN U OKEKE

### Defendant

**Name:** Jane Zheng and Ted Chao

**Correspondent Address:** JEFF LEBLANC
ANDERSON LEBLANC APLC
1365 W FOOTHILL BLVD, SUITE 2
UPLAND CA UNITED STATES , 91786

**Correspondent e-mail:** JLeBlanc@andersonleblanc.com

### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|------|--------------------|--------------|--------------------|
| KUNG FU ENERGY | | 85279186 | 4019619 |

### Plaintiff(s)

**Name:** KF Tea USA Inc.

**Correspondent Address:** CHIA YU CHANG
CHIA YU CHANG @ LAW PC
315 W 70TH ST, STE 12L

**A265**

NEW YORK NY UNITED STATES , 10023

**Correspondent e-mail:** cychang@cychanglaw.com

## Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|------|-------------------|---------------|---------------------|
| KUNG FU TEA | | 86060777 | |
| KUNG FU TEA | | 86060792 | |
| KUNG FU TEA | | 86060831 | |

## Prosecution History

| Entry Number | History Text | Date | Due Date |
|--------------|--------------|------|----------|
| 18 | TERMINATED | Jun 11, 2015 | |
| 17 | BD DECISION: DISMISSED W/O PREJ | Jun 11, 2015 | |
| 16 | W/DRAW OF PET FOR CANCELLATION | Jun 08, 2015 | |
| 15 | TRIAL DATES RESET | Apr 02, 2015 | |
| 14 | P MOT FOR SANCTIONS | Jan 02, 2015 | |
| 13 | D OPP/RESP TO MOTION | Dec 13, 2014 | |
| 12 | SUSP PEND DISP OF OUTSTNDNG MOT | Dec 02, 2014 | |
| 11 | P MOT TO COMPEL DISCOVERY | Nov 26, 2014 | |
| 10 | TRIAL DATES RESET | Nov 14, 2014 | |
| 9 | SUSP PEND DISP OF OUTSTNDNG MOT | Oct 03, 2014 | |
| 8 | P MOT TO COMPEL DISCOVERY | Sep 27, 2014 | |
| 7 | D COMMUNICATION | Jul 08, 2014 | |
| 6 | TRIAL DATES REMAIN AS SET | May 29, 2014 | |
| 5 | BOARD'S ORDER | Apr 25, 2014 | |
| 4 | ANSWER | Apr 23, 2014 | |
| 3 | PENDING, INSTITUTED | Mar 20, 2014 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Mar 20, 2014 | Apr 29, 2014 |
| 1 | FILED AND FEE | Mar 18, 2014 | |

**A266**

# Exhibit 7

# United States of America
## United States Patent and Trademark Office



**Reg. No. 5,438,824**

**Registered Apr. 03, 2018**

**Int. Cl.: 30**

**Trademark**

**Principal Register**

KF Tea USA Inc. (NEW YORK CORPORATION)
Suite 404
31-19 Newton Avenue
Astoria, NEW YORK 11102

CLASS 30: Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea; tea-based smoothies

FIRST USE 1-1-2016; IN COMMERCE 1-1-2016

The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle, and with an abstract dragon design wrapping around the top right and bottom left of the large circle.

OWNER OF U.S. REG. NO. 4857507, 4857506, 4857505

No claim is made to the exclusive right to use the following apart from the mark as shown: TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English.

SER. NO. 87-009,326, FILED 04-21-2016



Director of the United States
Patent and Trademark Office

**A268**

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse)  and an  Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

Generated on: This page was generated by TSDR on 2023-12-12 11:06:10 EST

Mark: KUNG FU TEA



| | | | |
|---|---|---|---|
| US Serial Number: | 87009326 | Application Filing Date: | Apr. 21, 2016 |
| US Registration Number: | 5438824 | Registration Date: | Apr. 03, 2018 |
| Filed as TEAS RF: | Yes | Currently TEAS RF: | Yes |
| Register: | Principal | | |
| Mark Type: | Trademark | | |

TM5 Common Status Descriptor:



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

Status: Registered. The registration date is used to determine when post-registration maintenance documents are due.

Status Date: Apr. 03, 2018

**Publication Date:** Apr. 25, 2017 **Notice of Allowance Date:** Jun. 20, 2017

# Mark Information

| | |
|---|---|
| Mark Literal Elements: | KUNG FU TEA |
| Standard Character Claim: | No |
| Mark Drawing Type: | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S) |
| Description of Mark: | The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle, and with an abstract dragon design wrapping around the top right and bottom left of the large circle. |
| Color(s) Claimed: | Color is not claimed as a feature of the mark. |
| Disclaimer: | TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING" |
| Transliteration: | The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English. |
| Design Search Code(s): | 04.05.01 - Griffons; Dragons |
| | 26.01.20 - Circles within a circle |
| | 26.01.21 - Circles that are totally or partially shaded. |
| | 26.17.03 - Lines, dotted; Dotted line(s) |
| | 26.17.09 - Lines, curved; Bands, curved; Bars, curved; Curved line(s), band(s) or bar(s) |
| | 28.01.03 - Japanese characters; Chinese characters; Japanese and Chinese characters |

# Related Properties Information

| | |
|---|---|
| Claimed Ownership of US Registrations: | 4857505, 4857506, 4857507 and others |

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea; tea-based smoothies

| | | | |
|---|---|---|---|
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** | 046 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Jan. 01, 2016 | **Use in Commerce:** | Jan. 01, 2016 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF Tea USA Inc. |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |
| **State or Country Where Organized:** | NEW YORK |

## Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.13 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

### Correspondent

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell Offit Kurman, P.A. 590 Madison Avenue, 6th Floor New York, NEW YORK UNITED STATES 10022 |
| **Phone:** | 9294760048 |
| **Fax:** | 212.545.1656 |
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@offitkurman.com alison.pratt@offitkurman.com tom.pitegoff@offitkurman.com |
| **Correspondent e-mail Authorized:** | Yes |

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 03, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 03, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 28, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Feb. 27, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 17, 2018 | TEAS/EMAIL CORRESPONDENCE ENTERED | 76568 |
| Feb. 17, 2018 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 76568 |
| Feb. 15, 2018 | ASSIGNED TO LIE | 76568 |
| Feb. 11, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |

| Jan. 23, 2018 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Jan. 23, 2018 | NON-FINAL ACTION E-MAILED | |
| Jan. 23, 2018 | SU - NON-FINAL ACTION - WRITTEN | 77301 |
| Jan. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |
| Dec. 20, 2017 | USE AMENDMENT FILED | 66530 |
| Jan. 09, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Dec. 20, 2017 | TEAS STATEMENT OF USE RECEIVED | |
| Jun. 20, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Apr. 25, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Apr. 25, 2017 | PUBLISHED FOR OPPOSITION | |
| Apr. 05, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Mar. 20, 2017 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 70884 |
| Mar. 16, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Feb. 24, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70884 |
| Feb. 24, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70884 |
| Feb. 12, 2017 | ASSIGNED TO LIE | 70884 |
| Jan. 31, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 13, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 13, 2016 | NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 13, 2016 | NON-FINAL ACTION WRITTEN | 77301 |
| Aug. 05, 2016 | ASSIGNED TO EXAMINER | 77301 |
| Apr. 28, 2016 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Apr. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 25, 2016 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** PUBLICATION AND ISSUE SECTION          **Date in Location:** Feb. 27, 2018

**A272**

# Exhibit 8

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,438,825**

**Registered Apr. 03, 2018**

**Int. Cl.: 32**

**Trademark**

**Principal Register**

KF Tea USA Inc. (NEW YORK CORPORATION)
Suite 404
31-19 Newton Avenue
Astoria, NEW YORK 11102

CLASS 32: Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea

FIRST USE 1-1-2016; IN COMMERCE 1-1-2016

The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle, and with an abstract dragon design wrapping around the top right and bottom left of the large circle.

OWNER OF U.S. REG. NO. 4857507, 4857506, 4857505

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English.

SER. NO. 87-009,354, FILED 04-21-2016



Director of the United States
Patent and Trademark Office

**A274**

REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse)  and  an  Application  for  Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do  not  file  renewal  applications  at  the  USPTO.  Instead,  the  holder  must  file  a  renewal  of  the  underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**Generated on:** This page was generated by TSDR on 2023-12-12 11:08:02 EST

**Mark:** KUNG FU TEA



| | | | |
|---|---|---|---|
| **US Serial Number:** | 87009354 | **Application Filing Date:** | Apr. 21, 2016 |
| **US Registration Number:** | 5438825 | **Registration Date:** | Apr. 03, 2018 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Apr. 03, 2018

**Publication Date:** Apr. 25, 2017 **Notice of Allowance Date:** Jun. 20, 2017

# Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | KUNG FU TEA |
| **Standard Character Claim:** | No |
| **Mark Drawing Type:** | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S) |
| **Description of Mark:** | The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle, and with an abstract dragon design wrapping around the top right and bottom left of the large circle. |
| **Color(s) Claimed:** | Color is not claimed as a feature of the mark. |
| **Disclaimer:** | "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING" |
| **Transliteration:** | The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English. |
| **Design Search Code(s):** | 04.05.01 - Griffons; Dragons<br>05.03.08 - More than one leaf, including scattered leaves, bunches of leaves not attached to branches<br>26.17.03 - Lines, dotted; Dotted line(s)<br>26.17.09 - Lines, curved; Bands, curved; Bars, curved; Curved line(s), band(s) or bar(s)<br>28.01.03 - Japanese characters; Chinese characters; Japanese and Chinese characters |

# Related Properties Information

| | |
|---|---|
| **Claimed Ownership of US Registrations:** | 4857505, 4857506, 4857507 |

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**A276**

**For:** Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea

| | | | |
|---|---|---|---|
| **International Class(es):** | 032 - Primary Class | **U.S Class(es):** | 045, 046, 048 |

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Jan. 01, 2016          **Use in Commerce:** Jan. 01, 2016

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

**Owner Name:** KF Tea USA Inc.

**Owner Address:** 589 Eighth Avenue, 17th Floor
New York, NEW YORK UNITED STATES 10018

**Legal Entity Type:** CORPORATION      **State or Country Where Organized:** NEW YORK

## Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** Matthew D. Asbell      **Docket Number:** 0565-26.14

**Attorney Primary Email Address:** trademarks@offitkurman.com      **Attorney Email Authorized:** Yes

**Correspondent**

**Correspondent Name/Address:** Matthew D. Asbell
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, NEW YORK UNITED STATES 10022

**Phone:** 9294760048      **Fax:** 212.545.1656

**Correspondent e-mail:** trademarks@offitkurman.com matthew.asbell@offitkurman.com alison.pratt@offitkurman.com tom.pitegoff@offitkurman.com      **Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 03, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 03, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 28, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Feb. 27, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 21, 2018 | PRELIMINARY/VOLUNTARY AMENDMENT - ENTERED | 76568 |
| Feb. 15, 2018 | ASSIGNED TO LIE | 76568 |
| Feb. 11, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Jan. 25, 2018 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |

**A277**

| Jan. 25, 2018 | NON-FINAL ACTION E-MAILED | |
| Jan. 25, 2018 | SU - NON-FINAL ACTION - WRITTEN | 77301 |
| Jan. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |
| Dec. 20, 2017 | USE AMENDMENT FILED | 66530 |
| Jan. 09, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Dec. 20, 2017 | TEAS STATEMENT OF USE RECEIVED | |
| Jun. 20, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Apr. 25, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Apr. 25, 2017 | PUBLISHED FOR OPPOSITION | |
| Apr. 05, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Mar. 20, 2017 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 70884 |
| Mar. 16, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Feb. 24, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70884 |
| Feb. 24, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70884 |
| Feb. 12, 2017 | ASSIGNED TO LIE | 70884 |
| Jan. 31, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 13, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 13, 2016 | NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 13, 2016 | NON-FINAL ACTION WRITTEN | 77301 |
| Aug. 05, 2016 | ASSIGNED TO EXAMINER | 77301 |
| Apr. 28, 2016 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Apr. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 25, 2016 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** PUBLICATION AND ISSUE SECTION          **Date in Location:** Feb. 27, 2018

**A278**

# Exhibit 9

# United States of America
## United States Patent and Trademark Office



**Reg. No. 5,443,929**

**Registered Apr. 10, 2018**

**Int. Cl.: 30**

**Trademark**

**Principal Register**

KF Tea USA Inc. (NEW YORK CORPORATION)
Suite 404
31-19 Newton Avenue
Astoria, NEW YORK 11102

CLASS 30: Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; tea-based smoothies

FIRST USE 1-1-2016; IN COMMERCE 1-1-2016

The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle.

OWNER OF U.S. REG. NO. 4857507, 4857506, 4857505

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English.

SER. NO. 87-011,077, FILED 04-22-2016



Director of the United States
Patent and Trademark Office

**A280**

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years  after  the  registration  date.  See 15  U.S.C. §§1058, 1141k.  If  the  declaration  is  accepted,  the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You  must  file  a  Declaration  of  Use  (or  Excusable  Nonuse)  and  an  Application  for  Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO.  To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

Generated on: This page was generated by TSDR on 2023-12-12 11:09:07 EST

Mark: KUNG FU TEA



| | | | |
|---|---|---|---|
| **US Serial Number:** | 87011077 | **Application Filing Date:** | Apr. 22, 2016 |
| **US Registration Number:** | 5443929 | **Registration Date:** | Apr. 10, 2018 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Apr. 10, 2018

**Publication Date:** Apr. 04, 2017 **Notice of Allowance Date:** May 30, 2017

## Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | KUNG FU TEA |
| **Standard Character Claim:** | No |
| **Mark Drawing Type:** | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S) |
| **Description of Mark:** | The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle. |
| **Color(s) Claimed:** | Color is not claimed as a feature of the mark. |
| **Disclaimer:** | "TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING" |
| **Transliteration:** | The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English. |
| **Design Search Code(s):** | 26.01.13 - Two circles; Circles, two (not concentric)<br>26.01.21 - Circles that are totally or partially shaded.<br>28.01.03 - Japanese characters; Chinese characters; Japanese and Chinese characters |

## Related Properties Information

| | |
|---|---|
| **Claimed Ownership of US Registrations:** | 4857505, 4857506, 4857507 and others |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | |
|---|---|
| **For:** | Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; tea-based smoothies |
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** 046 |

**A282**

| | |
|---|---|
| **Class Status:** | ACTIVE |
| **Basis:** | 1(a) |
| **First Use:** | Jan. 01, 2016 |

**Use in Commerce:** Jan. 01, 2016

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF Tea USA Inc. |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |

**State or Country Where Organized:** NEW YORK

## Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.16 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |
| **Phone:** | 9294760048 |

**Fax:** 212.545.1656

| | |
|---|---|
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@off itkurman.com alison.pratt@offitkurman.com tom.pi tegoff@offitkurman.com |

**Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 10, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 10, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Mar. 03, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Mar. 02, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 13, 2018 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70997 |
| Feb. 13, 2018 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70997 |
| Feb. 12, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Jan. 31, 2018 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | SU - NON-FINAL ACTION - WRITTEN | 77301 |
| Jan. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |

**A283**

| Dec. 20, 2017 | USE AMENDMENT FILED | 66530 |
| Jan. 09, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Dec. 20, 2017 | TEAS STATEMENT OF USE RECEIVED | |
| Dec. 02, 2017 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Nov. 30, 2017 | SOU EXTENSION 1 GRANTED | 98765 |
| Nov. 30, 2017 | SOU EXTENSION 1 FILED | 98765 |
| Nov. 30, 2017 | SOU TEAS EXTENSION RECEIVED | |
| May 30, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Apr. 04, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Apr. 04, 2017 | PUBLISHED FOR OPPOSITION | |
| Mar. 15, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Feb. 28, 2017 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 70997 |
| Feb. 16, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Feb. 16, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70997 |
| Feb. 16, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70997 |
| Feb. 12, 2017 | ASSIGNED TO LIE | 70997 |
| Jan. 31, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 12, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION WRITTEN | 77301 |
| Aug. 05, 2016 | ASSIGNED TO EXAMINER | 77301 |
| Apr. 28, 2016 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Apr. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 26, 2016 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** PUBLICATION AND ISSUE SECTION          **Date in Location:** Mar. 02, 2018

# Exhibit 10

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,443,930**

**Registered Apr. 10, 2018**

**Int. Cl.: 32**

**Trademark**

**Principal Register**

KF Tea USA Inc. (NEW YORK CORPORATION)
Suite 404
31-19 Newton Avenue
Astoria, NEW YORK 11102

CLASS 32: Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea

FIRST USE 1-1-2016; IN COMMERCE 1-1-2016

The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle.

OWNER OF U.S. REG. NO. 4857507, 4857506, 4857505

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English.

SER. NO. 87-011,096, FILED 04-22-2016



Director of the United States
Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years  after  the  registration  date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You  must  file  a  Declaration  of  Use  (or  Excusable  Nonuse)  and  an  Application  for  Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do  not  file  renewal  applications  at  the  USPTO.  Instead,  the  holder  must  file  a  renewal  of  the  underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.



Generated on: This page was generated by TSDR on 2023-12-12 11:10:01 EST

Mark: KUNG FU TEA

| | | | |
|---|---|---|---|
| US Serial Number: | 87011096 | Application Filing Date: | Apr. 22, 2016 |
| US Registration Number: | 5443930 | Registration Date: | Apr. 10, 2018 |
| Filed as TEAS RF: | Yes | Currently TEAS RF: | Yes |
| Register: | Principal | | |
| Mark Type: | Trademark | | |
| TM5 Common Status Descriptor: |  | LIVE/REGISTRATION/Issued and Active | |
| | | The trademark application has been registered with the Office. | |

Status: Registered. The registration date is used to determine when post-registration maintenance documents are due.

Status Date: Apr. 10, 2018

**Publication Date:** Apr. 04, 2017 **Notice of Allowance Date:** May 30, 2017

## Mark Information

| | |
|---|---|
| Mark Literal Elements: | KUNG FU TEA |
| Standard Character Claim: | No |
| Mark Drawing Type: | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S) |
| Description of Mark: | The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle. |
| Color(s) Claimed: | Color is not claimed as a feature of the mark. |
| Disclaimer: | "TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING" |
| Transliteration: | The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English. |
| Design Search Code(s): | 26.01.13 - Two circles; Circles, two (not concentric)<br>26.01.16 - Circles touching or intersecting<br>26.01.21 - Circles that are totally or partially shaded. |

## Related Properties Information

| | |
|---|---|
| Claimed Ownership of US Registrations: | 4857505, 4857506, 4857507 and others |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | |
|---|---|
| For: | Fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea |
| International Class(es): | 032 - Primary Class |
| U.S Class(es): | 045, 046, 048 |

**A288**

| | |
|---|---|
| **Class Status:** | ACTIVE |
| **Basis:** | 1(a) |
| **First Use:** | Jan. 01, 2016 |

**Use in Commerce:** Jan. 01, 2016

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF Tea USA Inc. |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |

**State or Country Where Organized:** NEW YORK

## Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.17 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

### Correspondent

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |
| **Phone:** | 9294760048 |

**Fax:** 212.545.1656

| | |
|---|---|
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@off itkurman.com alison.pratt@offitkurman.com tom.pi tegoff@offitkurman.com |

**Correspondent e-mail Authorized:** Yes

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 10, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 10, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Mar. 03, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Mar. 02, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 13, 2018 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70997 |
| Feb. 13, 2018 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70997 |
| Feb. 11, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Jan. 31, 2018 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | SU - NON-FINAL ACTION - WRITTEN | 77301 |
| Jan. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |

**A289**

| | | |
|---|---|---|
| Dec. 20, 2017 | USE AMENDMENT FILED | 66530 |
| Jan. 09, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Dec. 20, 2017 | TEAS STATEMENT OF USE RECEIVED | |
| Dec. 02, 2017 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Nov. 30, 2017 | SOU EXTENSION 1 GRANTED | 98765 |
| Nov. 30, 2017 | SOU EXTENSION 1 FILED | 98765 |
| Nov. 30, 2017 | SOU TEAS EXTENSION RECEIVED | |
| May 30, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Apr. 04, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Apr. 04, 2017 | PUBLISHED FOR OPPOSITION | |
| Mar. 15, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Feb. 28, 2017 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 70997 |
| Feb. 16, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Feb. 16, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70997 |
| Feb. 16, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70997 |
| Feb. 12, 2017 | ASSIGNED TO LIE | 70997 |
| Jan. 31, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 12, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION WRITTEN | 77301 |
| Aug. 05, 2016 | ASSIGNED TO EXAMINER | 77301 |
| Apr. 28, 2016 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Apr. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 26, 2016 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

| TM Staff Information - None |
|---|
| **File Location** |

**Current Location:** PUBLICATION AND ISSUE SECTION     **Date in Location:** Mar. 02, 2018

**A290**

# Exhibit 11

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,443,931**

**Registered Apr. 10, 2018**

**Int. Cl.: 43**

**Service Mark**

**Principal Register**

KF Tea USA Inc. (NEW YORK CORPORATION)
Suite 404
31-19 Newton Avenue
Astoria, NEW YORK 11102

CLASS 43: Restaurant services featuring non-alcoholic drinks, beverages and confections

FIRST USE 1-1-2016; IN COMMERCE 1-1-2016

The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle.

OWNER OF U.S. REG. NO. 4857507, 4857506, 4857505

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English.

SER. NO. 87-011,120, FILED 04-22-2016

Director of the United States
Patent and Trademark Office

**A292**

---

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

---

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You  must  file  a  Declaration  of  Use  (or  Excusable  Nonuse)  and  an  Application  for  Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**Generated on:** This page was generated by TSDR on 2023-12-12 11:10:56 EST

**Mark:** KUNG FU TEA



| | | | |
|---|---|---|---|
| **US Serial Number:** | 87011120 | **Application Filing Date:** | Apr. 22, 2016 |
| **US Registration Number:** | 5443931 | **Registration Date:** | Apr. 10, 2018 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Apr. 10, 2018

**Publication Date:** May 09, 2017 **Notice of Allowance Date:** Jul. 04, 2017

# Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | KUNG FU TEA |
| **Standard Character Claim:** | No |
| **Mark Drawing Type:** | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S) |
| **Description of Mark:** | The mark consists of the words "KUNG FU TEA" written in a black circle, with Chinese lettering written in a smaller black circle overlapping the lower right corner of the larger circle. |
| **Color(s) Claimed:** | Color is not claimed as a feature of the mark. |
| **Disclaimer:** | "TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA" AND "GEE PING" |
| **Transliteration:** | The non-Latin characters in the mark transliterate to "Kung Fu Cha" and "Gee Ping" and this means "Masterly Tea" and "Consummate Product" in English. |
| **Design Search Code(s):** | 26.01.13 - Two circles; Circles, two (not concentric)<br>26.01.16 - Circles touching or intersecting<br>26.01.21 - Circles that are totally or partially shaded. |

# Related Properties Information

| | |
|---|---|
| **Claimed Ownership of US Registrations:** | 4857505, 4857506, 4857507 and others |

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | |
|---|---|
| **For:** | Restaurant services featuring non-alcoholic drinks, beverages and confections |
| **International Class(es):** | 043 - Primary Class |
| **U.S Class(es):** | 100, 101 |

**A294**

| | |
|---|---|
| **Class Status:** | ACTIVE |
| **Basis:** | 1(a) |
| **First Use:** | Jan. 01, 2016 |

**Use in Commerce:** Jan. 01, 2016

# Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

# Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF Tea USA Inc. |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |

**State or Country Where Organized:** NEW YORK

# Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.18 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |
| **Phone:** | 9294760048 |

**Fax:** 212.545.1656

| | |
|---|---|
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@off itkurman.com alison.pratt@offitkurman.com tom.pi tegoff@offitkurman.com |

**Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 10, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 10, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Mar. 03, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Mar. 02, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 14, 2018 | TEAS/EMAIL CORRESPONDENCE ENTERED | 68552 |
| Feb. 14, 2018 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 68552 |
| Feb. 12, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Jan. 31, 2018 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | NON-FINAL ACTION E-MAILED | |
| Jan. 31, 2018 | SU - NON-FINAL ACTION - WRITTEN | 77301 |
| Jan. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |

**A295**

| | | |
|---|---|---|
| Dec. 20, 2017 | USE AMENDMENT FILED | 66530 |
| Jan. 09, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Dec. 20, 2017 | TEAS STATEMENT OF USE RECEIVED | |
| Jul. 04, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| May 09, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| May 09, 2017 | PUBLISHED FOR OPPOSITION | |
| Apr. 19, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Apr. 03, 2017 | LAW OFFICE PUBLICATION REVIEW COMPLETED | 68552 |
| Mar. 21, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Mar. 15, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 88889 |
| Mar. 14, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 88889 |
| Mar. 14, 2017 | TEAS REQUEST FOR RECONSIDERATION RECEIVED | |
| Mar. 09, 2017 | NOTIFICATION OF FINAL REFUSAL EMAILED | |
| Mar. 09, 2017 | FINAL REFUSAL E-MAILED | |
| Mar. 09, 2017 | FINAL REFUSAL WRITTEN | 77301 |
| Feb. 16, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED | 68552 |
| Feb. 16, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 68552 |
| Feb. 12, 2017 | ASSIGNED TO LIE | 68552 |
| Jan. 31, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Aug. 12, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION E-MAILED | 6325 |
| Aug. 12, 2016 | NON-FINAL ACTION WRITTEN | 77301 |
| Aug. 05, 2016 | ASSIGNED TO EXAMINER | 77301 |
| Apr. 28, 2016 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Apr. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 26, 2016 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:**  PUBLICATION AND ISSUE SECTION          **Date in Location:**  Mar. 02, 2018

# Exhibit 12

# United States of America

## United States Patent and Trademark Office

# KUNG FU TEA

**Reg. No. 5,588,198**

**Registered Oct. 16, 2018**

**Int. Cl.: 9, 16, 18, 21, 25, 30**

**Trademark**

**Principal Register**

KF TEA USA INC  (NEW YORK CORPORATION)
589 Eighth Avenue, 17th Floor
New York, NEW YORK 10018

CLASS 9: Cell phone cases; Cases for mobile phones

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 16: Stickers

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 18: Tote bags

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 21: Mugs; Plastic cups; Tea canisters; Water bottles sold empty

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 25: Headwear, namely, caps and hats; Hoodies; T-shirts

FIRST USE 12-1-2016; IN COMMERCE 11-30-2017

CLASS 30: Tea bags

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 4510162, 3961011, 4497687

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA"

SER. NO. 87-978,365, FILED 07-28-2017



Director of the United States
Patent and Trademark Office

**A298**

REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse)  and an  Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**Generated on:** This page was generated by TSDR on 2023-12-12 11:11:55 EST

**Mark:** KUNG FU TEA

KUNG FU TEA

| | | | |
|---|---|---|---|
| **US Serial Number:** | 87978365 | **Application Filing Date:** | Jul. 28, 2017 |
| **US Registration Number:** | 5588198 | **Registration Date:** | Oct. 16, 2018 |
| **Filed as TEAS Plus:** | Yes | **Currently TEAS Plus:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |
| **TM5 Common Status Descriptor:** | | LIVE/REGISTRATION/Issued and Active | |
| | | The trademark application has been registered with the Office. | |
| **Status:** | Registered. The registration date is used to determine when post-registration maintenance documents are due. | | |
| **Status Date:** | Oct. 16, 2018 | | |

**Publication Date:** Dec. 12, 2017 **Notice of Allowance Date:** Feb. 06, 2018

## Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | KUNG FU TEA |
| **Standard Character Claim:** | Yes. The mark consists of standard characters without claim to any particular font style, size, or color. |
| **Mark Drawing Type:** | 4 - STANDARD CHARACTER MARK |
| **Disclaimer:** | "TEA" |

## Related Properties Information

| | |
|---|---|
| **Claimed Ownership of US Registrations:** | 3961011, 4497687, 4510162 and others |
| **Child Of:** | 87546827 |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | | | |
|---|---|---|---|
| **For:** | Cell phone cases; Cases for mobile phones | | |
| **International Class(es):** | 009 - Primary Class | **U.S Class(es):** | 021, 023, 026, 036, 038 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

| | |
|---|---|
| **For:** | Stickers |

**A300**

|  |  |  |  |
|---|---|---|---|
| **International Class(es):** | 016 - Primary Class | **U.S Class(es):** | 002, 005, 022, 023, 029, 037, 038, 050 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

|  |  |  |  |
|---|---|---|---|
| **For:** | Tote bags | | |
| **International Class(es):** | 018 - Primary Class | **U.S Class(es):** | 001, 002, 003, 022, 041 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

|  |  |  |  |
|---|---|---|---|
| **For:** | Mugs; Plastic cups; Tea canisters; Water bottles sold empty | | |
| **International Class(es):** | 021 - Primary Class | **U.S Class(es):** | 002, 013, 023, 029, 030, 033, 040, 050 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

|  |  |  |  |
|---|---|---|---|
| **For:** | Headwear, namely, caps and hats; Hoodies; T-shirts | | |
| **International Class(es):** | 025 - Primary Class | **U.S Class(es):** | 022, 039 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Dec. 01, 2016 | **Use in Commerce:** | Nov. 30, 2017 |

|  |  |  |  |
|---|---|---|---|
| **For:** | Tea bags | | |
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** | 046 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

## Basis Information (Case Level)

|  |  |  |  |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

|  |  |  |  |
|---|---|---|---|
| **Owner Name:** | KF TEA USA INC | | |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 | | |
| **Legal Entity Type:** | CORPORATION | **State or Country Where Organized:** | NEW YORK |

## Attorney/Correspondence Information

### Attorney of Record

|  |  |  |  |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.19 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

**A301**

| | Correspondent |
|---|---|

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |
| **Phone:** | 9294760048 |
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@offitkurman.com alison.pratt@offitkurman.com tom.pitegoff@offitkurman.com |

| | |
|---|---|
| **Fax:** | 212.545.1656 |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Oct. 16, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Oct. 16, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Sep. 12, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Sep. 11, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Aug. 21, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66154 |
| Aug. 01, 2018 | USE AMENDMENT FILED | 66154 |
| Aug. 21, 2018 | DIVISIONAL PROCESSING COMPLETE | |
| Aug. 01, 2018 | DIVISIONAL REQUEST RECEIVED | |
| Aug. 21, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66154 |
| Aug. 01, 2018 | TEAS REQUEST TO DIVIDE RECEIVED | |
| Aug. 01, 2018 | TEAS STATEMENT OF USE RECEIVED | |
| Feb. 06, 2018 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Dec. 12, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Dec. 12, 2017 | PUBLISHED FOR OPPOSITION | |
| Nov. 22, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Nov. 06, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Oct. 30, 2017 | ASSIGNED TO EXAMINER | 72152 |
| Aug. 02, 2017 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Aug. 01, 2017 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

| | |
|---|---|
| | **TM Staff Information - None** |
| | **File Location** |
| **Current Location:** PUBLICATION AND ISSUE SECTION | **Date in Location:** Sep. 11, 2018 |

**A302**

# Exhibit 13

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,639,864**

**Registered Dec. 25, 2018**

**Int. Cl.: 9, 16, 18, 21, 25, 30**

**Trademark**

**Principal Register**

KF TEA USA INC  (NEW YORK CORPORATION)
589 Eighth Avenue, 17th Floor
New York, NEW YORK 10018

CLASS 9: Cell phone cases; Cases for mobile phones

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 16: Stickers

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 18: Tote bags

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 21: Mugs; Plastic cups; Tea canisters; Water bottles sold empty

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

CLASS 25: Headwear, namely, caps and hats; Hoodies; T-shirts

FIRST USE 12-1-2016; IN COMMERCE 11-30-2017

CLASS 30: Tea bags

FIRST USE 11-30-2017; IN COMMERCE 11-30-2017

The mark consists of the letters "KUNG" placed above the letters "FU", which is placed above the letters "TEA", and all the letters are placed inside a large circle, and where a graphical element comprising three stylized Chinese characters placed inside a small circle framed onto the lower right margin of the large circle.

OWNER OF U.S. REG. NO. 4510162, 4497687, 3961011

No claim is made to the exclusive right to use the following apart from the mark as shown: "TEA" AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA"

The non-Latin characters in the mark transliterate to "Kung Fu Cha" and this means "Masterly Tea" in English.



Director of the United States
Patent and Trademark Office

SER. NO. 87-979,039, FILED 07-28-2017

**A305**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

- **First Filing Deadline:** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- **Second Filing Deadline:** You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

Generated on: This page was generated by TSDR on 2023-12-12 15:56:27 EST

Mark: KUNG FU TEA



| US Serial Number: | 87979039 | Application Filing Date: | Jul. 28, 2017 |
|---|---|---|---|
| US Registration Number: | 5639864 | Registration Date: | Dec. 25, 2018 |
| Filed as TEAS Plus: | Yes | Currently TEAS Plus: | Yes |
| Register: | Principal | | |
| Mark Type: | Trademark | | |

TM5 Common Status Descriptor:



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

Status: Registered. The registration date is used to determine when post-registration maintenance documents are due.

Status Date: Dec. 25, 2018

**Publication Date:** Jan. 16, 2018 **Notice of Allowance Date:** Mar. 13, 2018

# Mark Information

Mark Literal Elements: KUNG FU TEA

Standard Character Claim: No

Mark Drawing Type: 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S)

Description of Mark: The mark consists of the letters "KUNG" placed above the letters "FU", which is placed above the letters "TEA", and all the letters are placed inside a large circle, and where a graphical element comprising three stylized Chinese characters placed inside a small circle framed onto the lower right margin of the large circle.

Color(s) Claimed: Color is not claimed as a feature of the mark.

Disclaimer: "TEA AND THE NON-LATIN CHARACTERS THAT TRANSLITERATE TO "CHA"

Transliteration: The non-Latin characters in the mark transliterate to "Kung Fu Cha" and this means "Masterly Tea" in English.

Design Search Code(s): 26.01.16 - Circles touching or intersecting
26.01.21 - Circles that are totally or partially shaded.
28.01.03 - Chinese characters; Japanese and Chinese characters; Japanese characters

# Related Properties Information

Claimed Ownership of US Registrations: 3961011, 4497687, 4510162 and others

Child Of: 87546956

# Goods and Services

Note:
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

For: Cell phone cases; Cases for mobile phones

| | | | |
|---|---|---|---|
| **International Class(es):** | 009 - Primary Class | **U.S Class(es):** | 021, 023, 026, 036, 038 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

| | | | |
|---|---|---|---|
| **For:** | Stickers | | |
| **International Class(es):** | 016 - Primary Class | **U.S Class(es):** | 002, 005, 022, 023, 029, 037, 038, 050 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

| | | | |
|---|---|---|---|
| **For:** | Tote bags | | |
| **International Class(es):** | 018 - Primary Class | **U.S Class(es):** | 001, 002, 003, 022, 041 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

| | | | |
|---|---|---|---|
| **For:** | Mugs; Plastic cups; Tea canisters; Water bottles sold empty | | |
| **International Class(es):** | 021 - Primary Class | **U.S Class(es):** | 002, 013, 023, 029, 030, 033, 040, 050 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

| | | | |
|---|---|---|---|
| **For:** | Headwear, namely, caps and hats; Hoodies; T-shirts | | |
| **International Class(es):** | 025 - Primary Class | **U.S Class(es):** | 022, 039 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Dec. 01, 2016 | **Use in Commerce:** | Nov. 30, 2017 |

| | | | |
|---|---|---|---|
| **For:** | Tea bags | | |
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** | 046 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 30, 2017 | **Use in Commerce:** | Nov. 30, 2017 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KF TEA USA INC |
| **Owner Address:** | 589 Eighth Avenue, 17th Floor<br>New York, NEW YORK UNITED STATES 10018 |
| **Legal Entity Type:** | CORPORATION |

**State or Country Where Organized:** NEW YORK

**A308**

# Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| **Attorney Name:** | Matthew D. Asbell | **Docket Number:** | 0565-26.20 |
| **Attorney Primary Email Address:** | trademarks@offitkurman.com | **Attorney Email Authorized:** | Yes |

### Correspondent

| | |
|---|---|
| **Correspondent Name/Address:** | Matthew D. Asbell<br>Offit Kurman, P.A.<br>590 Madison Avenue, 6th Floor<br>New York, NEW YORK UNITED STATES 10022 |

| | | | |
|---|---|---|---|
| **Phone:** | 9294760048 | **Fax:** | 212.545.1656 |
| **Correspondent e-mail:** | trademarks@offitkurman.com matthew.asbell@offitkurman.com alison.pratt@offitkurman.com tom.pitegoff@offitkurman.com | **Correspondent e-mail Authorized:** | Yes |

### Domestic Representative - Not Found

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Apr. 14, 2021 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 14, 2021 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Apr. 14, 2021 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Apr. 14, 2021 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Apr. 14, 2021 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Dec. 25, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Nov. 21, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Nov. 20, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Nov. 10, 2018 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Nov. 09, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66530 |
| Sep. 10, 2018 | USE AMENDMENT FILED | 66530 |
| Nov. 09, 2018 | DIVISIONAL PROCESSING COMPLETE | |
| Sep. 10, 2018 | DIVISIONAL REQUEST RECEIVED | |
| Sep. 10, 2018 | TEAS REQUEST TO DIVIDE RECEIVED | |
| Sep. 20, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66530 |
| Sep. 10, 2018 | TEAS STATEMENT OF USE RECEIVED | |
| Mar. 13, 2018 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Jan. 16, 2018 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Jan. 16, 2018 | PUBLISHED FOR OPPOSITION | |
| Dec. 27, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Dec. 06, 2017 | ASSIGNED TO LIE | 70633 |
| Nov. 27, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Nov. 06, 2017 | EXAMINER'S AMENDMENT ENTERED | 88888 |
| Nov. 06, 2017 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 6328 |
| Nov. 06, 2017 | EXAMINERS AMENDMENT E-MAILED | 6328 |
| Nov. 06, 2017 | EXAMINERS AMENDMENT -WRITTEN | 72152 |
| Oct. 30, 2017 | ASSIGNED TO EXAMINER | 72152 |
| Aug. 03, 2017 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Aug. 02, 2017 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Aug. 01, 2017 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

### TM Staff Information - None

### File Location

| | | | |
|---|---|---|---|
| **Current Location:** | PUBLICATION AND ISSUE SECTION | **Date in Location:** | Nov. 20, 2018 |

# Exhibit 14

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 10/31/2021)

# Combined Declaration of Use and Incontestability under Sections 8 & 15

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 4497687 |
| **REGISTRATION DATE** | 03/18/2014 |
| **SERIAL NUMBER** | 86029382 |
| **MARK SECTION** | |
| MARK | KUNG FU TEA (see, mark) |
| **ATTORNEY INFORMATION (current)** | |
| NAME | Chia-Yu Chang |
| ATTORNEY BAR MEMBERSHIP NUMBER | NOT SPECIFIED |
| YEAR OF ADMISSION | NOT SPECIFIED |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | NOT SPECIFIED |
| FIRM NAME | CHIA-YU CHANG @ LAW, P.C. |
| STREET | 315 W 70TH ST APT 12L |
| CITY | NEW YORK |
| STATE | New York |
| POSTAL CODE | 10023-3576 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| PHONE | 212-769-1756 |
| EMAIL | cychang@cychanglaw.com |
| **ATTORNEY INFORMATION (proposed)** | |
| NAME | Chia-Yu Chang |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | CHIA-YU CHANG @ LAW, P.C. |
| STREET | 315 W 70TH ST APT 12L |
| CITY | NEW YORK |
| STATE | New York |
| POSTAL CODE | 10023-3576 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| PHONE | 212-769-1756 |

**A311**

| EMAIL | cychang@cychanglaw.com |
|---|---|

**CORRESPONDENCE INFORMATION (current)**

| NAME | CHIA-YU CHANG |
|---|---|
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | cychang@cychanglaw.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | NOT PROVIDED |

**GOODS AND/OR SERVICES SECTION**

| INTERNATIONAL CLASS | 043 |
|---|---|
| GOODS OR SERVICES | Restaurant services featuring non-alcoholic drinks, beverages, pastries, and confections |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT18\IMAGEOUT 18\860\293\86029382\xml1 \ 8150002.JPG |
| SPECIMEN DESCRIPTION | image showing the mark displayed on the exterior facade of one of the multi-state restaurants using such mark |

**OWNER SECTION (current)**

| NAME | KF Tea USA Inc. |
|---|---|
| MAILING ADDRESS | 34-36 56th Street |
| CITY | Woodside |
| STATE | New York |
| ZIP/POSTAL CODE | 11377 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |

**OWNER SECTION (proposed)**

| NAME | KF Tea USA Inc. |
|---|---|
| MAILING ADDRESS | 589 Eighth Avenue, 17th Floor |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10018 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| EMAIL | XXXX |

**LEGAL ENTITY SECTION (current)**

| TYPE | corporation |
|---|---|
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY OF INCORPORATION | New York |

**PAYMENT SECTION**

| NUMBER OF CLASSES | 1 |
|---|---|
| NUMBER OF CLASSES PAID | 1 |
| COMBINED §§ 8 & 15 FILING FEE PER CLASS | 325 |
| GRACE PERIOD FEE FOR §8 | 100 |
| TOTAL FEE PAID | 425 |

**A312**

| SIGNATURE SECTION | |
|---|---|
| SIGNATURE | /Chia-Yu Chang/ |
| SIGNATORY'S NAME | Chia-Yu Chang |
| SIGNATORY'S POSITION | Attorney of record, NY Bar member |
| DATE SIGNED | 09/18/2020 |
| SIGNATORY'S PHONE NUMBER | 212-769-1756 |
| PAYMENT METHOD | CC |
| **FILING INFORMATION** | |
| SUBMIT DATE | Fri Sep 18 15:12:07 ET 2020 |
| TEAS STAMP | USPTO/S08N15-XX.XX.XX.XX-20200918151207379987-4497687-750e556a864a38d54d4e04bfc8043121c935dcca5cfc6918dc1766e97cea2684aa-CC-12057272-20200918143552906455 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 10/31/2021)

## Combined Declaration of Use and Incontestability under Sections 8 & 15
## To the Commissioner for Trademarks:

**REGISTRATION NUMBER:** 4497687
**REGISTRATION DATE:** 03/18/2014

**MARK:** KUNG FU TEA

**Current:** The owner, KF Tea USA Inc., a corporation of New York, having an address of
   34-36 56th Street
   Woodside, New York 11377
   United States

**Proposed:** The owner, KF Tea USA Inc., a corporation of New York, having an address of
   589 Eighth Avenue, 17th Floor
   New York, New York 10018
   United States
   XXXX
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 043, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Restaurant services featuring non-alcoholic drinks, beverages, pastries, and confections; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) image showing the mark displayed on the exterior facade of one of the multi-state restaurants using such mark.
Specimen File1

The owner's/holder's current attorney information: Chia-Yu Chang. Chia-Yu Chang of CHIA-YU CHANG @ LAW, P.C., is located at

   315 W 70TH ST APT 12L
   NEW YORK, New York 10023-3576
   United States

The phone number is 212-769-1756.

The email address is cychang@cychanglaw.com

The owner's/holder's proposed attorney information: Chia-Yu Chang. Chia-Yu Chang of CHIA-YU CHANG @ LAW, P.C., is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, is located at

   315 W 70TH ST APT 12L
   NEW YORK, New York 10023-3576
   United States

The phone number is 212-769-1756.

The email address is cychang@cychanglaw.com

Chia-Yu Chang submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**A314**

**Correspondence Information (current):**
   CHIA-YU CHANG
   PRIMARY EMAIL FOR CORRESPONDENCE: cychang@cychanglaw.com
   SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): NOT PROVIDED

A fee payment in the amount of $425 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.

## Declaration

☑   Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

☑   Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

☑   The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

☑   There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

☑   There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

☑   To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑   The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Chia-Yu Chang/    Date: 09/18/2020
Signatory's Name: Chia-Yu Chang
Signatory's Position: Attorney of record, NY Bar member
Signatory's Phone: 212-769-1756

Mailing Address **(current):**
   CHIA-YU CHANG @ LAW, P.C.
   315 W 70TH ST APT 12L
   NEW YORK, New York 10023-3576

Mailing Address **(proposed):**
   CHIA-YU CHANG @ LAW, P.C.
   315 W 70TH ST APT 12L
   NEW YORK, New York 10023-3576

Serial Number: 86029382
Internet Transmission Date: Fri Sep 18 15:12:07 ET 2020
TEAS Stamp: USPTO/S08N15-XX.XX.XX.XX-202009181512073
79987-4497687-750e556a864a38d54d4e04bfc8
043121c935dcca5cfc6918dc1766e97cea2684aa
-CC-12057272-20200918143552906455



**ROUTING SHEET TO POST REGISTRATION (PRU)**     **Registration Number:**   4497687

**Serial Number:**   86029382

**RAM Sale Number:  4497687**

**RAM Accounting Date:  20200918**     **Total Fees:**     $425

Note:  Process in accordance with Post Registration Standard Operating Procedure (SOP)

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Number of Classes Paid | Total Fee |
|---|---|---|---|---|---|---|
| §8 affidavit | 7205 | 20200918 | $125 | 1 | 1 | $125 |
| §15 affidavit | 7208 | 20200918 | $200 | 1 | 1 | $200 |
| Grace period combined §8 & 15 | 7206 | 20200918 | $100 | 1 | 1 | $100 |

Physical Location: MADCD- NO PHYSICAL FILE

Lost Case Flag: False

In TICRS (AM-FLG-IN-TICRS): True

**Transaction Date:**   20200918



**A317**

# Exhibit 15

PTO- 1583
Approved for use through 10/31/2021. OMB 0651-0055
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Combined Declaration of Use and Incontestability under Sections 8 & 15

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 4857505 |
| **REGISTRATION DATE** | 11/24/2015 |
| **SERIAL NUMBER** | 86060777 |
| **MARK SECTION** | |
| MARK | KUNG FU TEA (see, mark) |
| **ATTORNEY INFORMATION (current)** | |
| NAME | Matthew D. Asbell |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | Offit Kurman, P.A. |
| STREET | 590 Madison Avenue, 6th Floor |
| CITY | New York |
| STATE | New York |
| POSTAL CODE | 10022 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| PHONE | 9294760048 |
| FAX | 212.545.1656 |
| EMAIL | trademarks@offitkurman.com |
| DOCKET/REFERENCE NUMBER | 0565-26.09 |
| **ATTORNEY INFORMATION (proposed)** | |
| NAME | Matthew D. Asbell |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | Offit Kurman, P.A. |
| STREET | 590 Madison Avenue, 6th Floor |
| CITY | New York |
| STATE | New York |
| POSTAL CODE | 10022 |

| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
|---|---|
| PHONE | 9294760048 |
| FAX | 212.545.1656 |
| EMAIL | trademarks@offitkurman.com |
| DOCKET/REFERENCE NUMBER | 0565-26.09 |

### CORRESPONDENCE INFORMATION (current)

| NAME | Matthew D. Asbell |
|---|---|
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | trademarks@offitkurman.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | matthew.asbell@offitkurman.com; alison.pratt@offitkurman.com; tom.pitegoff@offitkurman.com |
| DOCKET/REFERENCE NUMBER | 0565-26.09 |

### CORRESPONDENCE INFORMATION (proposed)

| NAME | Matthew D. Asbell |
|---|---|
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | trademarks@offitkurman.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | matthew.asbell@offitkurman.com; alison.pratt@offitkurman.com; tom.pitegoff@offitkurman.com |
| DOCKET/REFERENCE NUMBER | 0565-26.09 |

### GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 030 |
|---|---|
| GOODS OR SERVICES | Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea, Tea-based smoothies |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3 \8150002.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3 \8150003.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3 \8150004.JPG |
| SPECIMEN DESCRIPTION | photos showing the mark on the product |
| WEBPAGE URL | None Provided |
| WEBPAGE DATE OF ACCESS | None Provided |
| INTERNATIONAL CLASS | 032 |
| GOODS OR SERVICES | fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3 \8150005.JPG |
| SPECIMEN DESCRIPTION | photo of the mark on the product |
| WEBPAGE URL | None Provided |
| WEBPAGE DATE OF ACCESS | None Provided |

### OWNER SECTION (current)

| NAME | KF Tea USA Inc. |
|---|---|
| MAILING ADDRESS | 589 Eighth Avenue, 17th Floor |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10018 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| EMAIL | XXXX |

**OWNER SECTION (proposed)**

| NAME | KF Tea USA Inc. |
|---|---|
| MAILING ADDRESS | 589 Eighth Avenue, 17th Floor |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10018 |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| EMAIL | XXXX |

**LEGAL ENTITY SECTION (current)**

| TYPE | corporation |
|---|---|
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY OF INCORPORATION | New York |

**PAYMENT SECTION**

| NUMBER OF CLASSES | 2 |
|---|---|
| NUMBER OF CLASSES PAID | 2 |
| COMBINED §§ 8 & 15 FILING FEE PER CLASS | 850 |
| TOTAL FEE PAID | 850 |

**SIGNATURE SECTION**

| ORIGINAL PDF FILE | hw_1003624134-112115449_._KFT_affidavit_signed_11-19-21.pdf |
|---|---|
| CONVERTED PDF FILE(S) (2 pages) | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3\8150006.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\860\607\86060777\xml3\8150007.JPG |
| SIGNATORY'S NAME | Michael Wen |
| SIGNATORY'S POSITION | CEO |
| SIGNATURE METHOD | Handwritten |
| PAYMENT METHOD | DA |

**FILING INFORMATION**

| SUBMIT DATE | Sat Nov 20 11:30:06 ET 2021 |
|---|---|
| | USPTO/S08N15-XXX.XX.XXX.X X-20211120113006958815-48 57505-781171b09de36924e66 |

| TEAS STAMP | 19e517a41c65627b4eb707e78<br>6bd6e84f4bc3b3d71e643-DA-<br>30040005-2021112011211544<br>9752 |

PTO- 1583
Approved for use through 10/31/2021. OMB 0651-0055

U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

### Combined Declaration of Use and Incontestability under Sections 8 & 15

**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 4857505
**REGISTRATION DATE:** 11/24/2015

**MARK:** KUNG FU TEA

**Current:** The owner, KF Tea USA Inc., a corporation of New York, having an address of
    589 Eighth Avenue, 17th Floor
    New York, New York 10018
    United States
    XXXX

**Proposed:** The owner, KF Tea USA Inc., a corporation of New York, having an address of
    589 Eighth Avenue, 17th Floor
    New York, New York 10018
    United States
    XXXX

is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 030, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Tea; tea-based flavored drinks and beverages; tea-based slush-type drinks; pastries containing tea, Tea-based smoothies; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) photos showing the mark on the product.
Specimen File1
Specimen File2
Specimen File3

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 032, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: fruit-flavored smoothies containing tea; fruit-flavored slush-type drinks containing tea; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) photo of the mark on the product.
Specimen File1

Webpage URL: None Provided
Webpage Date of Access: None Provided
The owner's/holder's current attorney information: Matthew D. Asbell. Matthew D. Asbell of Offit Kurman, P.A., is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, is located at

**A323**

590 Madison Avenue, 6th Floor
New York, New York 10022
United States
The docket/reference number is 0565-26.09.

The phone number is 9294760048.

The fax number is 212.545.1656.

The email address is trademarks@offitkurman.com

The owner's/holder's proposed attorney information: Matthew D. Asbell. Matthew D. Asbell of Offit Kurman, P.A., is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, is located at

590 Madison Avenue, 6th Floor
New York, New York 10022
United States
The docket/reference number is 0565-26.09.

The phone number is 9294760048.

The fax number is 212.545.1656.

The email address is trademarks@offitkurman.com

Matthew D. Asbell submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Information (current):**
Matthew D. Asbell
PRIMARY EMAIL FOR CORRESPONDENCE: trademarks@offitkurman.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): matthew.asbell@offitkurman.com; alison.pratt@offitkurman.com; tom.pitegoff@offitkurman.com

The docket/reference number is 0565-26.09.

**Correspondence Information (proposed):**
Matthew D. Asbell
PRIMARY EMAIL FOR CORRESPONDENCE: trademarks@offitkurman.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): matthew.asbell@offitkurman.com; alison.pratt@offitkurman.com; tom.pitegoff@offitkurman.com

The docket/reference number is 0565-26.09.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $850 will be submitted with the form, representing payment for 2 class(es), plus any additional grace period fee, if necessary.

### Declaration

**Original PDF file:**
hw_1003624134-112115449_._KFT_affidavit_signed_11- 19-21.pdf
**Converted PDF file(s)** (2 pages)
Signature File1
Signature File2
Signatory's Name: Michael Wen

Signatory's Position: CEO
Signature method: Handwritten


Mailing Address **(current):**
  Offit Kurman, P.A.
  590 Madison Avenue, 6th Floor
  New York, New York 10022

Mailing Address **(proposed):**
  Offit Kurman, P.A.
  590 Madison Avenue, 6th Floor
  New York, New York 10022


Serial Number: 86060777
Internet Transmission Date: Sat Nov 20 11:30:06 ET 2021
TEAS Stamp: USPTO/S08N15-XXX.XX.XXX.XX-2021112011300
6958815-4857505-781171b09de36924e6619e51
7a41c65627b4eb707e786bd6e84f4bc3b3d71e64
3-DA-30040005-20211120112115449752











IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Registrant:          KF TEA USA INC.

Registration No.:    4857505

Trademark:           KUNG FU TEA

BOX ITU -- FEE
Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA  22202-3513

**AFFIDAVIT OF USE UNDER 37 C.F.R. 2.160, 15 U.S.C. 1058(d)**

Registrant requests that the above-identified trademark/service mark registration in the United States Patent and Trademark Office be maintained in full force and effect.  At least one (1) specimen per class showing the mark as used in commerce is submitted with this affidavit.

☑  Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

Registrant is using the mark in commerce on or in connection with the **all** of the goods/services identified in the registration, **except** the following, which shall be deleted from the registration:

_____
_____
_____

☑  Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.
☑  To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that he/she is properly authorized to execute this Affidavit of Use on

OK Ref: 05650026.00009

**A330**



behalf of the registrant and that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

KF TEA USA INC.

Signature

Name: Yifan Wu
Title: CEO

Date: 11/18/2021

4813-4071-0129, v. 1

OK Ref: 05650026.00009

**A331**

**ROUTING SHEET TO POST REGISTRATION (PRU)**     **Registration Number:**   4857505

**Serial Number:**   86060777

**RAM Sale Number:  4857505**

**RAM Accounting Date:  20211122**     **Total Fees:**     $850

Note:  Process in accordance with Post Registration Standard Operating Procedure (SOP)

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Number of Classes Paid | Total Fee |
|---|---|---|---|---|---|---|
| §8 affidavit | 7205 | 20211120 | $225 | 2 | 2 | $450 |
| §15 affidavit | 7208 | 20211120 | $200 | 2 | 2 | $400 |

Physical Location: MADCD- NO PHYSICAL FILE

Lost Case Flag: False

In TICRS (AM-FLG-IN-TICRS): True

**Transaction Date:**     20211120



**A332**

# Exhibit 16



# Exhibit 17

FREE SHIPPING ON ALL ONLINE MERCHANDISE ORDERS OVER $25!

ABOUT | MENU | APP | FRANCHISE | KFT FAMILY | LOCATIONS | MERCH | ORDER NOW

GET REWARDS ×

# MENU

AT KUNG FU TEA, EVERY BEVERAGE IS MADE-TO-ORDER WITH REAL KUNG FU. OUR TEA IS FRESHLY BREWED EVERY 3 HOURS USING PREMIUM TEA LEAVES.



**CLASSIC**
AVAILABLE
HOT
COLD

**MILK TEA**
AVAILABLE
HOT
COLD

**PUNCH**

**MILK CAP**

**YOGURT**

**SLUSH**

**MILK STRIKE**

**ESPRESSO**
AVAILABLE

WE VALUE YOUR PRIVACY

WE USE COOKIES TO ENHANCE YOUR BROWSING EXPERIENCE. SERVE PERSONALIZED ADS OR CONTENT. AND ANALYZE OUR TRAFFIC. BY CLICKING "ACCEPT ALL". YOU CONSENT TO OUR USE OF COOKIES. COOKIE POLICY

CUSTOMIZE   REJECT ALL   ACCEPT ALL

# Exhibit 18



## KF TEA FRANCHISING LLC

## FRANCHISE AGREEMENT

FRANCHISEE:               VTVC ENTERPRISES, INC.

FRANCHISE LOCATION:       3910 WAYNE AVE, #102
                          WICHITA FALLS, TX 76308

DATE OF AGREEMENT:        AUGUST 16, 2017

Version 4/17/2017

**A338**

# KF TEA FRANCHISING LLC

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Preamble | 1 |
| Article I – Grant and Operation of the Franchise | 1 |
| Section 1.1 – Territory Rights | 1 |
| 1.1.1 Grant of Rights | 1 |
| 1.1.2 Territorial Exclusivity | 1 |
| 1.1.3 No Marketing Outside the Territory | 1 |
| 1.1.4 Single Location | 1 |
| 1.1.5 Products and Services Offered | 1 |
| 1.1.6 Types of Sales | 2 |
| 1.1.7 Rights We Reserve | 2 |
| 1.1.8 Guaranty | 2 |
| Section 1.2 – Site Selection and Development; Opening | 2 |
| 1.2.1 Site Selection | 2 |
| 1.2.2 No Assurance | 2 |
| 1.2.3 Lease | 3 |
| 1.2.4 Site Development | 3 |
| 1.2.5 Conditions to Opening | 4 |
| 1.2.6 Time of Opening | 4 |
| 1.2.7 Relocation | 4 |
| Section 1.3 – Supplies; Computer System | 5 |
| 1.3.1 Equipment | 5 |
| 1.3.2 Exclusive Supplies | 5 |
| 1.3.3 Other Suppliers | 5 |
| 1.3.4 Compensation from Suppliers | 5 |
| 1.3.5 Approval of Supplies and Suppliers | 6 |
| 1.3.6 Purchasing or Distribution Cooperatives | 6 |
| 1.3.7 Point of Sale, Surveillance and Computer Systems | 6 |
| 1.3.8 Electronic Communications | 6 |
| 1.3.9 Operations Data | 6 |
| Section 1.4 – Manual; System Modifications | 7 |
| 1.4.1 Manual | 7 |
| 1.4.2 System Modifications by Us | 7 |
| 1.4.3 System Modifications by You | 7 |
| Section 1.5 – Personnel; Training and Support | 7 |
| 1.5.1 Managing Owner | 7 |
| 1.5.2 Initial Training | 8 |
| 1.5.3 Opening Assistance | 8 |
| 1.5.4 Ongoing Training | 8 |

Version 4/17/2017

| | |
|---|---|
| 1.5.5  Replacement Managers | 8 |
| 1.5.6  Ongoing Support | 8 |
| 1.5.7  Undertakings by Your Personnel | 8 |
| 1.5.8  Employer Obligations | 9 |
| | |
| Section 1.6 – Operation of the Franchised Business | 9 |
| 1.6.1  System Standards | 9 |
| 1.6.2  Customer Service | 9 |
| 1.6.3  Staff | 9 |
| 1.6.4  Maintaining Goodwill | 9 |
| 1.6.5  Compliance with Laws | 9 |
| 1.6.6  Health and Safety Standards | 9 |
| 1.6.7  Maintaining the Premises | 10 |
| 1.6.8  Remedial Work | 10 |
| 1.6.9  Remodeling | 10 |
| 1.6.10  Use of the Premises | 10 |
| 1.6.11  Hours of Operation | 10 |
| 1.6.12  No Vending Machines | 10 |
| 1.6.13  Entity Requirements | 10 |
| 1.6.14  Franchisee Advisory Council | 10 |
| 1.6.15  Customer Evaluations | 11 |
| 1.6.16  Inspections | 11 |
| 1.6.17  Prices | 11 |
| 1.6.18  Payments to Suppliers | 11 |
| 1.6.19  Coupons, Customer Loyalty and Gift Cards and Apps | 11 |
| | |
| Section 1.7 - Advertising, Promotion and Marketing | 11 |
| 1.7.1  Signage | 11 |
| 1.7.2  Local Advertising | 12 |
| 1.7.3  National and Regional Advertising | 12 |
| 1.7.4  Marketing Fund | 12 |
| 1.7.5  Use of the Marketing Fund | 12 |
| 1.7.6  Accounting for the Marketing Fund | 13 |
| 1.7.7  Marketing Fund Entity | 13 |
| 1.7.8  Distribution of Advertising Expenditures | 13 |
| 1.7.9  Termination of Marketing Fund | 13 |
| 1.7.10  Cooperative Advertising | 13 |
| 1.7.11  Internet Advertising | 13 |
| 1.7.12  Social Media | 13 |
| | |
| Section 1.8 – Website | 13 |
| 1.8.1  System Website | 13 |
| 1.8.2  Promotion of the System Website | 14 |
| 1.8.3  Franchisee Extranet | 14 |
| | |
| Article II – Fees; Payments; Records; Inspections | 14 |
| | |
| Section 2.1 – Fees and Reports | 14 |
| 2.1.1  Initial Fee | 14 |
| 2.1.2  Training Fee | 14 |
| 2.1.3  Royalty | 14 |
| 2.1.4  Definition of Gross Sales | 14 |
| 2.1.5  Marketing Fee | 15 |

– ii –

2.1.6  Other Fees                                                    15
2.1.7  Inflation                                                     16
2.1.8  Accounting Period                                            16
2.1.9  Reports                                                      16
2.1.10 Payment                                                      16
2.1.11 Interest on Late Payments                                   16
2.1.12 No Setoff                                                    16
2.1.13 Application of Payments                                      16
2.1.14 Taxes                                                        17

Section 2.2 – Records; Inspection                                  17
2.2.1  Records                                                      17
2.2.2  Access to Systems                                           17
2.2.3  Right to Inspect                                            17
2.2.4  Right to Audit                                              17
2.2.5  Discrepancies                                               17
2.2.6  Cost                                                        17
2.2.7  Survival of Inspection and Audit Rights                     17
2.2.8  Disclosure of Your Financial Information                    18

Section 2.3 – Security Interest                                    18
2.3.1  Grant of Security Interest                                  18
2.3.2  Default                                                     18
2.3.3  Filings                                                     18
2.3.4  Grants of Security Interests to Others                      18
2.3.5  Survival                                                    18

Article III – Proprietary Rights; Confidentiality; Noncompetition  18

Section 3.1 – Our Copyrights and Trademarks                        18
3.1.1  Our Copyrights                                              18
3.1.2  Our Trademarks                                              18
3.1.3  Proper Use of Marks                                         19
3.1.4  Modifying the Marks                                         19
3.1.5  Infringement                                                19

Section 3.2 – Confidentiality of Our Information                   20
3.2.1  Confidential Information                                    20
3.2.2  Nondisclosure and Non-Use                                   20
3.2.3  Isolated Disclosures                                        21
3.2.4  Exceptions                                                  21
3.2.5  Disclosures Required by Law                                 21
3.2.6  Return of Information                                       21
3.2.7  Your Rights Under Federal Law                               21

Section 3.3 – Noncompetition                                       21
3.3.1  Definition of Competitive Business                          21
3.3.2  Agreement Not to Compete                                    21
3.3.3  Noncompetition After Termination                            22

Article IV – Transfer                                              22

Section 4.1 – Transfer by Us                                       22

– iii –

A341

Section 4.2 – Transfer by You ........................................................................ 22
    4.2.1  No Transfer Without Our Approval ........................................ 22
    4.2.2  Definition of Transfer ............................................................ 22
    4.2.3  Notice of Transfer .................................................................. 23
    4.2.4  Conditions to Transfer ........................................................... 23
    4.2.5  Transfer to a Company You Control ...................................... 24
    4.2.6  Transfer Upon Death or Disability ......................................... 24
    4.2.7  Operation of the Franchised Business Upon Death or Disability ... 24
    4.2.8  Transitional Management Costs ............................................. 25
    4.2.9  Stock Offerings ...................................................................... 25

Section 4.3 – Our Right of First Refusal ....................................................... 25
    4.3.1  Notice of Third Party Offer ..................................................... 25
    4.3.2  Exercise of Our Right of First Refusal ................................... 25
    4.3.3  Consequence of Nonexercise of Our Right of First Refusal ... 25
    4.3.4  Exceptions ............................................................................. 26

Article V – Term and Termination .................................................................... 26

Section 5.1 - Term and Renewal .................................................................. 26
    5.1.1  Initial Term ............................................................................. 26
    5.1.2  Renewal ................................................................................. 26
    5.1.3  Hold Over ............................................................................... 27

Section 5.2 – Termination ............................................................................ 27
    5.2.1  Termination by You ................................................................ 27
    5.2.2  Termination by Us Upon Notice ............................................. 27
    5.2.3  Termination After Cure Period ............................................... 29
    5.2.4  Relationship Laws .................................................................. 29

Section 5.3 - Consequences of Termination ................................................ 30
    5.3.1  General Consequences .......................................................... 30
    5.3.2  Right to Buy Equipment ......................................................... 30

Section 5.4 – Our Option to Purchase Upon Termination ............................ 31
    5.4.1  Exercise of Option .................................................................. 31
    5.4.2  Leasehold Rights ................................................................... 31
    5.4.3  Purchase Price ....................................................................... 31
    5.4.4  Appraisal ................................................................................ 31
    5.4.5  Closing ................................................................................... 31

Article VI – Representations and Warranties; Indemnification; Insurance ....... 32

Section 6.1 – Representations and Warranties ............................................ 32
    6.1.1  Your Representations ............................................................. 32
    6.1.2  Your Representations as an Entity ......................................... 32

Section 6.2 – Indemnification ...................................................................... 33
    6.2.1  Your Indemnity ....................................................................... 33
    6.2.2  Our Indemnity ........................................................................ 33
    6.2.3  Notice of Claim; Survival ....................................................... 33

– iv –

**A342**

Section 6.3 – Insurance                                                           33
    6.3.1  Insuring the Franchised Business                       33
    6.3.2  Minimum Coverage                                      34
    6.3.3  Waiver of Subrogation                                 34
    6.3.4  Changes in Coverage Requirements                       34
    6.3.5  Negligence                                          34
    6.3.6  Certificates of Insurance                           34
    6.3.7  Our Remedies                                        35
    6.3.8  No Effect on Indemnity                               35

Article VII – Miscellaneous                                                       35

Section 7.1 – Relationship of the Parties                                         35
Section 7.2 – Reasonable Business Judgment                                        35
Section 7.3 – Injunctive Relief                                                   35
Section 7.4 – Severability                                                        35
Section 7.5 – No Waiver of Rights                                                 35
Section 7.6 – Notices                                                             35
Section 7.7 – Affiliates                                                          36
Section 7.8 – Limitation of Actions                                              36
Section 7.9 – Waiver of Punitive Damages and Jury Trial                           36
Section 7.10 – Governing Law                                                      36
Section 7.11 – Jurisdiction                                                       36
Section 7.12 – Costs and Expenses                                                 36
Section 7.13 – Entire Agreement                                                   37

Schedule A – Franchisee Information
Schedule B –Confidentiality and Noncompetition Agreement

Version 4/17/2017

**A343**

**KF TEA FRANCHISING LLC**

**FRANCHISE AGREEMENT**

AGREEMENT effective as of August 16, 2017, between KF TEA FRANCHISING LLC, a Delaware limited liability company (referred to in this Agreement as "we" or "us"), and VTVC ENTERPRISES, INC., a Texas corporation (referred to in this Agreement as "you" or "your company").

We and our affiliated companies have developed an integrated system (the "System") for the operation of retail shops selling a variety of oriental style brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks (the "Kung Fu Tea shops").  Kung Fu Tea shops operate under the trademark KUNG FU TEA and other trademarks, and we may create, use and license additional trademarks or substitute different trademarks in the future in conjunction with the operation of Kung Fu Tea shops (collectively, the "Marks").

You have applied for a franchise to own and operate a Kung Fu Tea shop in a defined territory (the "Franchised Business"), and we are pleased to grant such franchise to you on the terms and conditions set forth below.

Accordingly, you and we agree as follows:

ARTICLE I – **GRANT AND OPERATION OF THE FRANCHISE**

Section 1.1 – *Territory Rights*

1.1.1  *Grant of Rights.*  We grant to you the right, and you undertake the obligation, to operate a franchised Kung Fu Tea shop in the geographic area described in Schedule A (the "Territory") in accordance with the System Standards (as defined in Section 1.4.1 below) and the terms and conditions contained in this Agreement.

1.1.2  *Territorial Exclusivity.*  Because we reserve certain rights in the Territory as described in, Section 1.1.7, your rights in the Territory are not exclusive.  However, so long as you are not in default under this Agreement, we may not operate or grant others the right to operate a Kung Fu Tea shop within the Territory during the Term of this Agreement, except as set forth in Section 1.1.7.

1.1.3  *No Marketing Outside the Territory.*  You may not market or sell the Franchised Business outside of the Territory without our prior written approval, which we may withhold in our discretion.

1.1.4  *Single Location.*  You must operate your franchised Kung Fu Tea shop (the "Franchised Business") only at the location described in Schedule A (the "Site"), or if such location is not described in Schedule A, then at a location approved by us that is within the Territory.  You may not relocate the Franchised Business or operate the Franchised Business from any location other than the Site without our prior written approval in accordance with Section 1.2.7.  You do not have the right to grant subfranchises of the rights granted under this Agreement.  The grant of this franchise does not give you the right to receive additional franchises from us.

1.1.5 *Products and Services Offered.*  You must offer and sell at retail in the Franchised Business all of the products we specify.  You may not sell under the Marks or in the Franchised Business any products or offer any services we do not specify or approve.  If you desire to sell any items that we have not specified or approved, you must request our approval in accordance with Section 1.3.5, and you may not sell any such item without our written approval.  Upon notice from us given at any time, you must discontinue offering for sale any products or offering any services we may disapprove or discontinue.  In addition to our right to terminate this Agreement, we have the right to assess our then current prohibited prod-

Version 4/17/2017

**A344**

uct fee in the event you continue offering unapproved products or services after your receipt of verbal or written notice from us advising you to cease sales of such product or service.

1.1.6  *Types of Sales.*  The primary business of Kung Fu Tea shops is the retail sale of oriental style brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks at the shop premises. You may also accept local orders in person or via e-mail, telephone, fax or similar means provided that you deliver the product so that each customer receives it fresh.  You may not sell any products from the shop premises in any manner to food wholesalers or retailers, such as convenience shops, grocery shops or others for resale.  You may not cater to parties, supply product to charities for resale or discount the sale of unsold product that is not fresh.

1.1.7  *Rights We Reserve.*  We and our affiliates retain all rights not specifically granted to you under this Agreement.  These rights include, without limitation, the right:

1.1.7.1  to establish Kung Fu Tea shops, whether franchised or company owned, anywhere outside the Territory;

1.1.7.2  to establish Kung Fu Tea shops in non-traditional venues such as airports, hotels and resorts, military installations, school and university campuses, train stations and subway stations, casinos, theme parks, sports stadiums and enclosed shopping malls, within or outside the Territory (unless your Territory is in a non-traditional venue);

1.1.7.3  to sell any products, including tea, coffee, juices and other hot and cold drinks, under the Marks and any other trademarks at grocery stores, supermarkets or other channels of distribution at any time, and directly to customers through our website; and

1.1.7.4  to acquire and operate any business under a different trademark at any location and to continue to operate that business under trademarks other than the Marks.

1.1.8  *Guaranty.*  Our grant of this franchise is made in reliance on the personal attributes of your company's owners and managers named in Schedule A.  If your company is a legal entity such as a corporation or limited liability company rather than a sole proprietorship or general partnership, then our grant of this franchise is made on the condition that each person who now or later owns or acquires, either legally or beneficially, any equity or voting interest in your company (the "Guarantor" or "Guarantors"), must execute and deliver to us a guaranty and assumption agreement in a form acceptable to us (the "Guaranty").  We may require the spouse of any or all Guarantors to sign the Guaranty in our discretion. Transfers of interest are restricted in accordance with Article IV.  Upon our request at any time, you will furnish us with a list of all holders of legal and beneficial interests in your company, together with descriptions of the type of interests owned and percentage amounts, and the names, addresses, email addresses and telephone numbers of the owners, certified as correct in the manner we specify.  If any of your company's general partners, managers, officers or directors ceases to serve as such or if any new person becomes a general partner, manager, officer or director after the date of this Agreement, you will notify us of such change within 10 days.  Any breach of a Guaranty will be deemed to be a breach of this Agreement.

Section 1.2 – **Site Selection and Development; Opening**

1.2.1  *Site Selection*.  You are solely responsible for selecting the Site for the Franchised Business.  We merely approve the Site if it is acceptable to us.

1.2.2  *No Assurance*.  You acknowledge that neither our recommendation or approval of the Site nor any information regarding the Site we communicate to you constitutes a guarantee, assurance, representation or warranty of any kind, express or implied, as to the suitability of the Site for a Kung Fu Tea

– 2 –

shop or of the successful operation or profitability of a Kung Fu Tea shop at the Site. You acknowledge that your acceptance of the franchise is based on your own independent investigation of the suitability of the Site.

1.2.3 *Lease.* You must submit your proposed lease for the premises of your Kung Fu Tea shop to us for our prior written approval as to its form. We may require that the lease or any renewal lease contain certain provisions, including the following:

1.2.3.1. The permitted use of the premises of the Franchised Business will be limited to the operation of a Kung Fu Tea shop.

1.2.3.2. You are permitted to use and install the trademarks, trade dress, signage and related features associated with the Kung Fu Tea franchise system that we may prescribe.

1.2.3.3. The landlord will provide us with copies of any written notice of default under the lease sent to you concurrently with the landlord's delivery of such notice to you. Such notice must grant to us the right (but not the obligation) to cure any default under the lease (should you fail to do so) within 15 days after the expiration of the period in which you may cure the default.

1.2.3.4. You and the landlord will, at our request, enter into a conditional assignment of the lease, granting to us or our assignee the right to succeed to your rights and obligations under the lease in the event that this Agreement is terminated for any reason or it expires without a renewal agreement, or if you commit any breach of the lease that could lead to termination of the lease.

1.2.3.5. We have the right (but not the obligation), to assume the lease upon the expiration of this Agreement or its termination for any reason. In such event, we will give the landlord notice of our assumption of the lease, the landlord will agree to recognize us as the new tenant under the lease, and we will thereafter be bound by the terms or the lease. We will have the right to assign our interest in the lease to an approved franchisee and we will have no further liability or obligation under the lease after such assignment. Unless and until we agree in writing to assume the lease, we will have no liability or obligation under the lease. In any event, you will be solely responsible to the landlord for all debts, payments and performance under the lease that were incurred before we or another franchisee actually takes possession of the leased premises.

1.2.3.6. The landlord will not accept your voluntary surrender of the Lease without prior notice to us. You and the landlord will not renew or extend the term of the lease, nor amend, modify or alter the lease, without our written consent. You may not assign your interest in the lease, nor sublet all or any portion of the leased premises, without our written consent.

We are not responsible for review of the lease. You acknowledge that we have advised you to have an attorney review and evaluate the lease. If we do not have a copy of the signed lease, you must deliver such copy to us within 14 days after it is signed by you and the lessor. If you sublease the premises from us or our affiliate, you agree to execute our then current form of sublease and if you are an entity, have each of your owners execute our then current form of guaranty. If we or one of our affiliates elects to assign an existing lease to you and you desire to obtain an assignment of the existing lease, unless we otherwise agree, you agree to arrange for the release of our affiliate from all obligations under the assigned lease as of the date of the assignment.

1.2.4 *Site Development*. Within 45 days after the date of this Agreement, you must, at your expense, complete the arrangements to lease or purchase the approved premises for the Franchised Business. You are solely responsible, at your own expense, for obtaining any necessary financing and all required building, utility, sign, business and other permits and licenses required to operate the Franchised

– 3 –

Business, and for constructing all required improvements to the Site and decorating the premises of the Franchised Business in compliance with plans and specifications we have approved. We will furnish you with mandatory and suggested specifications and layouts for a Kung Fu Tea shop, including requirements for dimensions, design, image, interior layout, décor, equipment, fixtures, furnishings and signs, which items will be supplied either by us or by suppliers we specify or approve. You (or your lessor on your behalf) must engage an architect to prepare all required construction plans and specifications to comply with all applicable ordinances, building codes and permit requirements and with all lease or sublease requirements and restrictions, if any. You must submit construction plans and specifications to us for approval before construction of improvements to the Site commences. You understand that you may modify our mandatory specifications only to the extent required to comply with applicable ordinances, building codes and permit requirements, and only with our prior written approval. In addition, you must engage a qualified interior designer and you must submit all design plans to us for our approval in advance, unless, in our discretion, we decide to supply to you our own design package for your purchase. You must also submit to us proofs of all signage for your franchised business for our approval in accordance with Section 1.7.1 before you produce such signage.

     1.2.5 *Conditions to Opening.* You may not begin commercial operations at the Franchised Business until:

          1.2.5.1 all of your obligations pursuant to Sections 1.2.3 and 1.2.4 are fulfilled;

          1.2.5.2 we determine that the premises have been constructed, furnished, equipped and decorated in accordance with our requirements;

          1.2.5.3 your Managing Owner has completed the initial training to our satisfaction;

          1.2.5.4 the initial franchise fee and all other amounts due to us and our affiliates have been paid in full;

          1.2.5.5 you have furnished us with certificates of insurance and copies of all insurance policies or such other evidence of insurance coverage as we reasonably request, as well as with copies of all bonds that may be required under state or local law; and

          1.2.5.6 we have given your our written approval of the opening. We may grant or withhold such approval in our sole discretion.

     1.2.6 *Time of Opening.* You agree to open your franchised Kung Fu Tea shop for business no later than nine months after the date of this Agreement. You acknowledge that time is of the essence.

     1.2.7 *Relocation.* If you need to relocate the Site, you must submit to us a written proposal identifying for our approval at least one potential Site in the Territory, in the format indicated in the Manual (as defined in Section 1.4.1), together with any other information that we request. Following receipt of your written site proposal, we may make an on-site visit to the proposed Site at our expense if we believe that such a visit is necessary or desirable, although we are not required to make an on-site visit. We do not charge for the initial on-site evaluation, but we may charge for each additional on-site evaluation a reasonable fee plus our reasonable costs. In evaluating potential sites, you agree to consider our site selection criteria, which we will provide to you at your request. We will not unreasonably withhold or delay our approval of any site that meets our standards. Relocation will require a new build-out, renovation to the then current standards and design, lease modification, franchise agreement changes and a fee (as stated in Section 2.1.6.1) to cover our costs and expenses.

<div align="center">– 4 –</div>

Version 4/17/2017

**A347**

Section 1.3 – *Equipment; Supplies; Computer System*

1.3.1   *Equipment.*   You agree to purchase from our affiliate, Arms Global Inc., and to use and maintain in the Franchised Business the following equipment, most of which is branded with our logo:

Shaker machine
Cup sealing machine (for the plastic tops of the cups for cold drinks)
Fructose dispenser (sugar machine)
Point of Sale (POS) system
Smallwares kit

The smallwares kit consists of the following:

| | | |
|---|---|---|
| 3M Scrub Pad (Roll) | Jigger (Large/Small) | Squeeze Bottle (600/700 cc) |
| Bamboo Stir Stick (Large/Small) | Measuring Cup (100/200/5000cc) | Stainless Steel Strainer |
| Hot Pot Strainer | Microfiber Cloth | Stainless Steel Tea Filter |
| Cocktail Shaker | Mop | Stirring Spoon |
| Coffee Pot | Pitcher (2.18/2.5/5L) | Stock Pot (20qt/226 cm) |
| Colander | Plastic Container (1000/3200 cc) | Syrup Dispenser |
| Digital Timer | Powder Spoon (Large/Small) | Tea Bucket (10/12L) |
| Food Storage Container (12/22 qt) | Rice Cooker Inner Pot | Tea Cooling Bag |
| Ice Scoop | Salt and Pepper Shaker | Tea Cooling Bucket w/Cover |
| Ice Tong | Scale | Tea Filter Bag |
| Jelly Ladle | Spoon for Slush | Uniform |

You must purchase our specified model of espresso machine from our designated supplier.  You must purchase your blender and juicer from suppliers we specify.  We provide specifications for other equipment, including under-the-counter refrigerator, ice-maker and freezer, which you may purchase from any supplier.

1.3.2   *Exclusive Supplies.*   You will sign an agreement acceptable to us with our affiliate, Arms Global Inc., simultaneously with your signing of this Agreement.  You agree to purchase from our affiliate or other authorized supplier all of the tea, coffee, concentrates and flavoring ingredients, as well as packaging materials, cups, menu boards, signs and other logoed merchandise.  In addition to our right to terminate this Agreement, we have the right to assess our then current prohibited product fee in the event you continue to purchase unapproved products after your receipt of verbal or written notice from us advising you to cease your purchase of such products.

1.3.3   *Other Suppliers.*   You may buy perishables from local suppliers you select.  However, we specify your supplier of milk and fruit (to maintain our uniform quality and taste).  You must buy a reasonable variety of all of these products to meet the demands of your customers.  You agree to use in the operation of the Franchised Business only those brands and models or types of equipment, supplies, furniture, signs and other products and services that we have designated or approved for Kung Fu Tea shops.  We may require that you obtain equipment, fixtures, supplies, furniture, signs and other products and services only from our designated or approved suppliers.  We may negotiate purchase agreements with suppliers for the benefit of franchisees, but we are under no obligation to do so.  We are not obligated to pass on to you any discounts we receive from suppliers.

1.3.4   *Compensation from Suppliers.*   We reserve the right to receive rebates, credits and other compensation from suppliers we designate or approve to provide goods or services to you based upon the purchases by you and other franchisees of goods and services from such suppliers.  We may use such compensation for any purpose we deem appropriate, including to subsidize our operating costs.

– 5 –

Version 4/17/2017

1.3.5  *Approval of Supplies and Suppliers.*  If you propose to purchase any brand or model of equipment, supplies, furniture, signs or other products or services that are not then designated or approved by us, or to purchase from any supplier that is not then designated or approved by us, you must first notify us and submit to us sufficient written specifications, photographs, drawings, samples and other information we request to enable us to determine whether the proposed brand, model or supplier complies with our specifications and standards.  We will have the right to require that our representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered either to us or to a third party designated by us for review and testing.  We will use reasonable efforts to begin an investigation of the proposed supplier or product within 30 days of your request.  We will notify you within 10 days after we complete our investigation whether we approve the proposed supplier or product.  We are under no obligation to investigate or approve any supplies or supplier you request.  If we do not approve the supplies or supplier within 60 days after your request, we will be deemed to have denied your request.  We reserve the right, at our option, to re-inspect the facilities and products of any approved supplier and to revoke our approval upon the supplier's failure to continue to meet any of our then-current criteria.  We will not be required to approve any particular supplier nor to make available to you or to any prospective supplier any of our standards or specifications.

1.3.6  *Purchasing or Distribution Cooperatives.*  We may establish national or regional purchasing or distribution programs for the purchase or distribution of certain goods, materials or supplies at reduced prices.  You agree to participate in any purchasing or distribution cooperatives that we may establish for the region where your Franchised Business is located.

1.3.7  *Point of Sale, Surveillance and Computer Systems.*  You agree to install, maintain and use in the Franchised Business such computer hardware, software, point-of-sale, cash register and surveillance systems as we specify from time to time, using suppliers we specify or approve from time to time.  We may require you to incur costs to purchase, lease and license computer hardware and software and to obtain service and support, and to maintain such systems and to upgrade and make such changes to such systems as we may specify in writing.  We will manage the license with the point-of-sale provider we select for the system of Kung Fu Tea shops nationally, and you agree to pay such provider's fee for such license.  We may change the point-of-sale provider in our discretion.  You must also be equipped to accept electronic payments wirelessly from customers using their cell phones and such app as we may require, which may allow customers to accumulate reward points each time they make a purchase.  You acknowledge that we cannot estimate the future costs that other providers may charge for the computer hardware, software, or surveillance systems or their maintenance or upgrades, or additions or modifications to these systems, and that these costs may not be fully amortizable over the remaining term of this Agreement.

1.3.8  *Electronic Communications.*  You agree to maintain adequate telephone service for the Franchised Business, including a dedicated telephone line with voicemail dedicated to the Franchised Business, and a high speed Internet connection.  You agree to use in the Franchised Business only such email addresses as we authorize and you will comply with such policies as we prescribe from time to time for email use.  We have the right to establish requirements that will permit us, as often as we deem appropriate, to access your computer system and to retrieve all information relating to the Franchised Business.

1.3.9  *Operations Data.*  We will have continuing access to and use of all operations data, including specific products sold and other sales data, customer lists (including the name, address, telephone number and email address of each customer), surveillance video and all other content and data you collect or shop on your computer and surveillance system.  We will periodically establish policies with respect to the use of such content and data, and you agree to comply with such policies.

– 6 –

A349

Section 1.4 – **Manual; System Modifications**

1.4.1 *Manual.* During the term of this Agreement, we will give you access to the confidential operations manual, training and supplemental materials that we generally furnish to franchisees from time to time for use in operating a Kung Fu Tea shop (the "Manual"), in such media as we select, whether hard copy, DVD, through the Web or otherwise. The Manual and the bulletins and other written materials we provide to you contain mandatory and suggested specifications, standards, operating procedures, policies, methods and rules ("System Standards") that we prescribe from time to time for the operation of a Kung Fu Tea shop and information relating to your other obligations under this Agreement. The Manual is and will remain at all times our sole property. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Manual except as we may specifically authorize. You further agree to keep any copy of the Manual current at all times with all updates and modifications we furnish to you, and to store each copy of the Manual in a secure location at the premises of the Franchised Business. In the event of a dispute relating to its contents, the master copy of the Manual we maintain at our principal office will control. If a copy of the Manual in your possession or under your control, or any portion of such Manual, is lost, stolen, destroyed or significantly damaged, you agree to report such loss, theft, destruction or damage immediately to us.

1.4.2 *System Modifications by Us.* We may modify or change the System Standards from time to time, and upon notice to you, we may make additions to, deletions from or revisions in the Manual to reflect such modifications or changes. Such modifications or changes may include, for example, the addition or discontinuation of products and services that you are required to sell at the Franchised Business, and may obligate you to invest additional capital in the Franchised Business ("Capital Modifications"). No modification or change that we make will alter your fundamental status and rights under this Agreement. We will not obligate you to make any Capital Modification that you cannot reasonably amortize during the remaining term of this Agreement and with respect to leasehold improvements over the remaining term of your lease, unless we agree to extend the term of this Agreement or unless such investment is necessary in order to comply with applicable laws. You agree to adopt or comply with each new or changed procedure, policy, method and requirement as promptly as practicable after notice from us, and in any event within the time period we reasonably require.

1.4.3 *System Modifications by You.* You agree not to implement any modification or change in the System Standards or in the Franchised Business without our prior written approval, which we may withhold in our discretion. If you or any of your employees makes an improvement to the System Standards or in the Franchised Business, such improvement will be our property. We will have the right to use such improvements and to offer them to our affiliates and other franchisees for their use. Any new product or technique you develop will be an improvement owned by us that we may use at our company and affiliate Kung Fu Tea shops and that we and our affiliates may authorize other franchisees to use. You assign to us all rights to such improvements and you agree to sign any documents and to require that your employees sign any documents that we may reasonably request from time to time to evidence such assignment.

Section 1.5 – **Personnel; Training and Support**

1.5.1 *Managing Owner.* If you are a sole proprietorship, we may refer to you as the "Managing Owner". If your company is a corporation, a limited liability company or a partnership, then you agree to appoint and maintain throughout the term of this Agreement a shareholder, member or partner to serve as your "Managing Owner." The Managing Owner is responsible for overseeing and supervising the operation of the Franchised Business. The Managing Owner must be an owner of an equity or voting interest in your business whom we approve. You will ensure that the Franchised Business is always actively managed by a Managing Owner who has attended and successfully completed such training as we may require from time to time. The Managing Owner will actively devote his or her full time, attention and effort to the Franchised Business and provide direct, day-to-day supervision of the operation of the Fran-

– 7 –

chised Business.  The Managing Owner will ensure at all times the proper levels of customer service in accordance with the Manual and this Agreement.  You may not replace the Managing Owner without our prior written approval, which we may condition on, among other things, attendance and satisfactory completion by the prospective new Managing Owner of our initial training program at your expense.

     1.5.2  *Initial Training.*  Before you begin operating the Franchised Business, we will train your Managing Owner and a second person from your company in the operation of a Kung Fu Tea shop.  We charge for this training in accordance with Section 2.1.2.  At your request and if space is available, we will train additional personnel of your company at our then-current rate, which is $180 per day for each additional trainee as of the date of this Agreement.  You must pay the compensation and travel and living expenses of all of your personnel who attend our training, regardless of whether we charge you a fee for such training.  The training program consists of approximately 120 hours of training at our headquarters in New York City.  We will endeavor to time the commencement of your training program so that it is completed at least 10 days before the scheduled opening of the Franchised Business.

     1.5.3  *Opening Assistance.*  We will provide pre-opening and opening training, supervision and assistance at your Franchised Business by one of our trained representatives for a period in our discretion of approximately 80 hours.

     1.5.4  *Ongoing Training.*  At your request, and if we agree, we will furnish additional training.  We may charge our then-current fees and expenses for additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards.  We do not charge for other mandatory training.  Our fees and expenses will vary based on the staff, location, and type of training.  If any inspection of the Franchised Business indicates noncompliance with any System Standards or if we receive negative customer feedback, we may require previously trained and experienced managers and employees to attend refresher training courses at such times and locations as we designate, and we may send our personnel to your Franchised Business for training.  In such event, you agree to pay our then current fees for training and travel and living expenses for our personnel.

     1.5.5  *Replacement Manager.*  If the Managing Owner does not satisfactorily complete the initial training program or if we determine that such person cannot satisfactorily complete the training program, or if the Managing Owner ceases active management of the Franchised Business ceases to act as such, then we must train, at your expense, a qualified replacement (who must be reasonably acceptable to us) within 30 days.  Pending the appointment and training of a Managing Owner or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to appoint a manager for the Franchised Business and require you to pay in the manner described in Section 4.2.8.

     1.5.6  *Ongoing Support.*  We will provide support and guidance from time to time, either in person, by telephone, by email or in writing, regarding the operation of the Franchised Business.  We will provide regular operational reviews and advise you from time to time regarding the operation of the Franchised Business based on reports you submit to us and inspections we make, to ensure compliance with the System Standards and to recommend improvements.  At your request, and if we agree, we will furnish additional on-site guidance and assistance and, in such case, we may require you to pay our then-current fees and expenses.

     1.5.7  *Undertakings by Your Personnel.*  You agree to take appropriate steps to advise all of your employees and contractors of your obligations under this Agreement and to ensure compliance by all of your employees and contractors.  Each manager of your Franchised Business and each person who receives training from us or otherwise has access to Confidential Information (as defined in Section 3.2.1) who has not signed the Guaranty described in Section 1.1.7 must sign a written agreement with your company substantially in the form of Schedule B to this Agreement before performing any work for the Franchised Business or otherwise having access to the Confidential Information.  At our request, you will submit to us a copy of any or all such written agreements.  You will ensure that each such person com-

plies with the terms of such agreement during the period that he or she is employed by you.  Any breach of such agreement by any such person will be deemed a breach of this Agreement.

1.5.8  *Employer Obligations*.  You will have sole authority and control over the day-to-day operations of the Franchised Business and its employees.  You will be solely responsible for recruiting and hiring the persons you employ to operate the Franchised Business.  You will also be responsible for their training, wages, taxes, benefits, safety, work schedules, work conditions, assignments, discipline and termination. You specifically agree to comply with all workplace related laws.  At no time will you or your employees be deemed to be employees of ours or of any or out affiliates.  We will have no right or obligation to direct your employees.

Section 1.6 – *Operation of the Franchised Business*

1.6.1  *System Standards*.  You agree to operate the Franchised Business in strict accordance with all System Standards in effect from time to time.  You understand and acknowledge that every detail of the Franchised Business is important to you, to us and to other Kung Fu Tea shop franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect the reputation and goodwill of the Kung Fu Tea shop brand.

1.6.2  *Customer Service*.  You will provide prompt, courteous and efficient service to all customers and treat all customers with respect.  You will give prompt attention to all complaints from dissatisfied customers, if any.

1.6.3  *Staff*.  You will maintain a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards.

1.6.4  *Maintaining Goodwill*.  You will do nothing that, in our reasonable opinion, tends to discredit the Marks or the System or to bring either into disrepute, or that might diminish or affect adversely our reputation or goodwill.

1.6.5  *Compliance with Laws*.  You will comply with all applicable laws, rules and regulations in the operation of the Franchised Business and pay all taxes when due.

1.6.6  *Health and Safety Standards*. You will meet and maintain a high degree of sanitation and safety at the premises of the Franchised Business and the highest health standards and ratings applicable to the operation of the Franchised Business.  In this connection you agree as follows:

1.6.6.1  If the municipality in which the Franchised Business is located maintains a rating system for or relating to the sanitary conditions of food establishments, you must maintain the highest rating possible for the Franchised Business.  If you receive an inspection report or a warning, citation or notice that results in or may result in a lowering of such rating, you must provide us with a copy of such report, warning, citation or notice within 24 hours after you receive it. You agree to take immediate steps to restore the highest rating for the Franchised Business and to seek a reinspection or appeal as soon as possible in order to restore such rating.

1.6.6.2  If you receive an inspection report or a warning, citation, certificate or notice that requires you to repair, replace or further sanitize any item at the premises of the Franchised Business within 72 hours, you must provide us with a copy of such report, warning, citation, certificate or notice within 24 hours after you receive it.

1.6.6.3  In all cases not described in Sections 1.6.6.1 or 1.6.6.2, you will furnish us, within five days after you receive it, a copy of each inspection report, warning, citation, certificate, no-

– 9 –

tice and rating resulting from an inspection conducted by any federal, state, county or municipal agency with jurisdiction over the Franchised Business.

1.6.6.4  You will notify us within 48 hours of the occurrence of any accident or injury that may adversely affect the operation of the Franchised Business or your financial condition, or that may give rise to liability or a claim against you or us.

1.6.7  *Maintaining the Premises.*  You will at all times maintain the premises of the Franchised Business in excellent repair and condition.  You will make such additions, alterations, repairs and replacements as may be required for that purpose, including, without limitation, such periodic repainting and replacement of obsolete signs, furnishings, equipment and décor as we may reasonably direct.

1.6.8  *Remedial Work.*  If we notify you of remedial work that is necessary to correct an unhealthy or unsafe condition and you fail to commence such work in good faith or to complete such work within the period specified in our notice, we will have the right, in addition to all other remedies, but not the obligation, to enter the premises of the Franchised Business and complete the required repair or corrective work on your behalf.  We will have no liability to you for any work performed.  If we perform such work, we may require that you pay us in accordance with Section 2.1.7.5.

1.6.9  *Remodeling.*  In addition to the requirements of Sections 1.6.7 and 1.6.8, we will require you periodically to make reasonable capital expenditures to remodel, modernize and redecorate the premises of the Franchised Business so that such premises reflect the then-current image of Kung Fu Tea shops.  All remodeling, modernization and redecoration will be deemed to be Capital Modifications as defined in Section 1.4.2, and they must be done in accordance with our standards as modified from time to time and with our prior written approval.  We may require you to make additional Capital Modifications as a condition to renewal pursuant to Section 5.1.2.6.  You will complete all required Capital Modifications within the time period we reasonably require in our written notice.

1.6.10  *Use of the Premises.*  You will use the premises of the Franchised Business solely for the operation of the Franchised Business and for no other purpose or activity.

1.6.11  *Hours of Operation.*  You agree to keep the Franchised Business operating during such hours and days as we may specify from time to time or, if different, during such hours as the lease of the premises may require.

1.6.12  *No Vending Machines.*  You will refrain from installing or permitting to be installed any vending machine, game, coin-operated or similar device, unless specifically approved by us in writing in advance.

1.6.13  *Entity Requirements.*  If you are a corporation or limited liability company, such entity must be newly organized and its charter, certificate of incorporation or operating agreement must at all times provide that its activities are confined solely to operating the Franchised Business.  All certificates representing stock or other ownership interests in your company must contain a legend stating that transfer of such stock or ownership interest is limited by the provisions of this Agreement.  Upon our request, you will deliver to us copies of all organizational documents of your company, including articles of incorporation, by-laws, shareholders' agreement, limited liability company articles and operating agreement, and any certificates we may request certifying any resolution of directors.  If your company is a partnership, its activities must also be confined solely to operating the Franchised Business, which requirement must be included in your partnership agreement, if any, and you agree, upon our request, to deliver to us a copy of your partnership agreement.

1.6.14  *Franchisee Advisory Council.*  We reserve the right to create one or more "Franchisee Advisory Councils" for the purpose of fostering communication among and between franchisees and us,

– 10 –

and to advise us in establishing, modifying or discussing various policies applicable to Kung Fu Tea shop franchisees. If and when a Franchisee Advisory Council is created, we may require you to participate in its meetings and programs. A Franchisee Advisory Council may advise and make recommendations, but will not act as a policy-making board and will have no authority whatsoever. We will determine or approve the rules under which any Franchisee Advisory Council functions. We may change the rules at any time and we may dissolve any Franchisee Advisory Council at any time. We may require you to pay dues to a Franchisee Advisory Council and you will pay all costs and expenses incurred by you in connection with participation in any Franchisee Advisory Council, including the costs of transportation, lodging and meals.

1.6.15   *Customer Evaluations.*  We reserve the right to institute programs for auditing customer satisfaction and other quality control measures, and to require you to pay the cost of such programs. You agree to present to your customers such evaluation forms as we periodically prescribe and to participate and request your customers to participate in any surveys performed by us or on our behalf.

1.6.16   *Inspections.*  During the term of this Agreement, we or our designated representatives will also have the right, at any time during your regular business hours, without prior notice to you, to enter upon the premises of the Franchised Business to inspect the premises; observe, photograph and videotape the operations of the Franchised Business for such periods as we deem necessary; remove samples of any products, materials or supplies for review and analysis; and to interview your personnel and customers. You agree to cooperate fully with us and our representatives during all inspections, observations, photographing, videotaping, product sample removal and interviews; and to take all steps reasonably necessary to correct any deficiencies in your compliance with System Standards or this Agreement within the time we specify. Your failure to implement any corrective action we require will constitute a material breach of this Agreement and may result in termination pursuant to Section 5.2. In addition to our right to terminate this Agreement, we have the right to assess a fee equal to our then current prohibited product fee in the event you continue to be out of compliance with the System Standards after your receipt of verbal or written notice from us advising you of the nature of your default and requesting you to comply.

1.6.17   *Prices.*  We reserve the right to require you to comply with reasonable and lawful restrictions on prices of specific goods or services offered and sold by the Franchised Business as required in the Manual or as we otherwise reasonably direct in writing from time to time.

1.6.18   *Payments to Suppliers.*  You agree to pay all of your suppliers promptly in accordance with their payment terms and to comply in all other respect with your contractual obligations to third parties.

1.6.19   *Coupons, Customer Loyalty and Gift Cards and Apps.*  You agree to honor all coupons, customer loyalty rewards and gift cards and mobile apps and similar electronic credits you receive from customers that are in a form designated or approved by us. You will not initiate any such program yourself without our prior written approval, which we may withhold in our discretion. You will distribute customer loyalty cards and sell and issue gift cards and redeem (without an offset against Royalty payments) coupons, customer loyalty cards and gift cards in accordance with procedures and policies we specify in the Manual or otherwise in writing. We will manage any customer loyalty mobile app program with the provider we select for the system of Kung Fu Tea shops nationally. Once the mobile app program is launched, you agree to pay the provider's fee for such service.

Section 1.7 - *Advertising, Promotion and Marketing*

1.7.1   *Signage.*  You will post prominent signage relating to the Franchised Business in easily-seen locations both inside and outside the premises of the Franchised Business. We will prescribe or approve from time to time in writing the size, form, color scheme, content and location of all such signage.

– 11 –

Version 4/17/2017

**A354**

You agree to display and maintain signs reflecting the current image of Kung Fu Tea shops. You also agree to post any signs we designate to reflect the fact that you are a franchisee and the fact that franchise opportunities are available to others. You agree to discontinue the use of and destroy such signs as we declare to be obsolete within the reasonable time that we specify for such destruction, which will not be less than 30 days. Because of the importance of the Kung Fu Tea shop image, you grant to us the right to enter the premises of the Franchised Business to remove and destroy unapproved or obsolete signs in the event that you have failed to do so within the time we specify.

1.7.2   *Local Advertising.*   We do not require you to engage in any local advertising or to spend any minimum amount of money on local advertising or grand opening advertising. All local advertising, marketing and public relations programs and activities that you do provide must and all materials you use in programs and activities must conform to such standards and requirements as we may specify from time to time. All such materials must be clear, factual and not misleading. You agree to submit to us, before you use them, samples of all materials you intend to use that we have not prepared or previously approved. We will endeavor to deliver to you our written approval or disapproval within 15 days after our receipt of such materials, but we will not be liable for any delay. If we have not notified you of disapproval within 15 days after your submission for approval, the materials will be considered approved. We may withdraw our approval at any time. If we withdraw our approval, you will immediately cease the use, distribution and dissemination of such material. Any advertising, marketing or sales concepts, programs or materials that you propose or develop for the Franchised Business and we approve may be used by us and by our affiliates and other franchisees without any compensation to you. You agree to use all point of sale materials that we may supply to you from time to time, in the manner we prescribe.

1.7.3   *National and Regional Advertising.*   We or our designee will exclusively maintain and administer any national and regional advertising, public relations and marketing programs and market research, including without limitation the System Website described in Section 1.8.1 and all programs financed by the Marketing Fund, as described below. We have the right to form, change or dissolve Franchisee Advisory Councils in accordance with Section 1.6.14 to advise us with respect to advertising, public relations and marketing programs.

1.7.4   *Marketing Fund.*   We have established a public relations and advertising fund (the "Marketing Fund"), subsidized by fees paid both by Kung Fu Tea shop franchisees and by company and affiliate-owned Kung Fu Tea shops, for such advertising, promotion, marketing and public relations programs and materials as we deem necessary or appropriate. You agree to contribute to the Marketing Fund in accordance with Section 2.1.5. Kung Fu Tea shops that we or our affiliate own will not be required to contribute to the Marketing Fund.

1.7.5   *Use of the Marketing Fund.*   The Marketing Fund will be used to enhance the recognition of the Marks and the patronage of Kung Fu Tea shops nationally or regionally. We or our designee will have sole discretion over all matters relating to the Marketing Fund, including without limitation the creative concepts, materials and endorsements used, and the geographic, market and media placement and allocation. The Marketing Fund may be used to pay the costs of preparing and producing video, audio and written advertising materials; administering national and regional advertising programs, and engaging advertising, promotion and marketing agencies to assist us; website development and maintenance; toll-free telephone costs; and supporting public relations, market research and other advertising, promotion and marketing activities. The Marketing Fund will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the Marketing Fund and its programs, including, without limitation, conducting market research, preparing advertising, promotion and marketing materials and collecting and accounting for contributions to the Marketing Fund. The source of the advertising may be our in-house advertising department or an outside advertising agency. If we or our affiliates provide in-house advertising department services, we or our affiliates may be compensated from the Marketing Fund provided that any compensation is reasonable.

– 12 –

1.7.6 *Accounting for the Marketing Fund.* We will separately account for the Marketing Fund monies, but we may commingle such monies with our other monies or maintain the Marketing Fund monies in one or more separate accounts, in our discretion. We may spend, on behalf of the Marketing Fund, in any fiscal year, an amount greater or less than the aggregate contribution of all Kung Fu Tea shops to the Marketing Fund in that year, and the Marketing Fund may borrow from us or others at reasonable interest rates to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs before other assets of the Marketing Fund are expended. We will prepare annually, or cause to be prepared, a report or reports of the operations of the Marketing Fund. We will furnish such report to you for the most recent year upon your written request.

1.7.7 *Marketing Fund Entity.* We have the right, but not the obligation, to establish a separate entity to operate the Marketing Fund at any time. Any such entity will have all of the rights and duties with respect to the Marketing Fund that we have under this section. The Marketing Fund will not be deemed a trust, and we will have no fiduciary obligation to you in connection with the collection or administration of the Marketing Fund.

1.7.8 *Distribution of Advertising Expenditures.* Although we will endeavor to use the Marketing Fund to develop advertising and marketing materials and programs and to place advertising that will benefit all Kung Fu Tea shops, we undertake no obligation to ensure that expenditures by the Marketing Fund will benefit all Kung Fu Tea shops equally nor in proportion to contributions.

1.7.9 *Termination of Marketing Fund.* We reserve the right to defer, reduce or suspend contributions to the Marketing Fund, and, upon 30 days' prior notice to you, to suspend operations of the Marketing Fund for one or more periods of any length, and to terminate (and, if terminated, to reinstate) the Marketing Fund (and, if suspended, deferred or reduced, to reinstate such contributions). If the Marketing Fund is terminated, all unspent monies, if any, on the date of termination will be distributed to Kung Fu Tea shops in proportion to their respective contributions to the Marketing Fund during the preceding twelve month period.

1.7.10 *Cooperative Advertising.* We may establish and coordinate from time to time cooperative advertising, marketing and sales programs, customer satisfaction programs and other programs or activities among Kung Fu Tea shop franchisees. These programs or activities may be on a local, regional or national basis. You will participate in such programs and activities as we may prescribe. Such programs and activities may (at our option) be paid for on any equitable basis by the participants.

1.7.11 *Internet Advertising.* Any Internet advertising you do must be submitted to us in advance for our approval in the manner described in Section 1.7.2. We may withhold our approval in our discretion. You may not own an Internet domain name that includes any of the Marks or variations of any of the Marks.

1.7.12 *Social Media.* You may promote the Franchised Business through social media and similar means provided that such promotion is consistent with the Manual including all guidelines we issue from time to time. If any objectionable content is posted to a social media website, you will have 12 hours after notice from us to remove such content provided that it is capable of removal. If you fail to remove the objectionable content within this 12 hour period, we will have the right to terminate this Agreement. You agree to check for social media postings of your employees from time to time to be sure that any comments they write are permitted and are consistent with our policies.

Version 4/17/2017

Section 1.8 – *Website*

1.8.1  *System Website.*  We maintain one or more websites to advertise, market and promote Kung Fu Tea shops, the products sold at Kung Fu Tea shops and the Kung Fu Tea shop franchise opportunity (the "System Website").  The System Website lists the locations of Kung Fu Tea shops.  We own all intellectual property and other rights in the System Website and all information it contains.  We may at any time and in our sole discretion discontinue using the System Website.  If we discontinue using the System Website, we may at any time and in our sole discretion resume using it.

1.8.2  *Promotion of the System Website.*  All advertising, marketing and promotional materials that you develop for the Franchised Business must contain notices of the System Website's domain name in the manner we designate.

1.8.3  *Franchisee Extranet.*  In addition to the System Website, we may (but we will not be obligated to) maintain a web portal, extranet or other system for all Kung Fu Tea shop franchisees that can be accessed only by means of user names and passwords and that will not be available to the general public.  We may use this portal, extranet or system to provide support for franchisees and to allow for online franchise discussion groups.  You agree both during and after the term of this Agreement not to disclose your user name or password to any person or entity who is not under your direct supervision and who does not have a need to know such password.  You agree to inform all persons under your supervision who may have access to such password of this obligation of confidentiality.  You further agree to comply with all guidelines and policies we establish from time to time for the use of this portal, extranet or system.

ARTICLE II – **FEES; PAYMENTS; RECORDS; INSPECTIONS**

Section 2.1 – *Fees and Reports*

2.1.1  *Initial Fee.*  Upon your signing of this Agreement, you will pay us an initial fee of $37,000 for a standard Kung Fu Tea shop (a "Standard Unit").  If you already own a Kung Fu Tea franchise, or if you will own a Kung Fu Tea shop in a non-traditional venue as described in Section 1.1.7.2 (a "Non-Traditional Unit"), then you will pay us an initial fee of $25,000.  If you have signed a multi-unit agreement, your initial fee may be covered by the initial amount you paid under that agreement.  The amount of any deposit already paid will be deducted from the initial fee.  The initial fee is fully earned at the time we grant the franchise and is not refundable under any circumstances.

2.1.2  *Training Fee.*  Before you begin initial training, you will pay us a training fee of $10,000.  We require this fee and the initial training only for your first franchise location.

2.1.3  *Royalty.*  You agree to pay us a royalty ("Royalty") in the amount of 3% of the Gross Sales (as defined below) of the Franchised Business each Accounting Period (defined below) for a Standard Unit; and 4% of such Gross Sales for a Non-Traditional Unit.

2.1.4  *Definition of Gross Sales.*  As used in this Agreement, the term "Gross Sales" or "Gross Sales of the Franchised Business" means all sales made in the operation of the Franchised Business, whether collected or not, including, but not limited to, all amounts you receive at or away from the premises of the Franchised Business, whether from cash, check, credit card or credit transactions (with no deduction for credit card charges), including proceeds of any business interruption insurance policies, but excluding all federal, state or municipal sales or use taxes collected from customers for payment to the appropriate taxing authorities, and excluding actual customer refunds, adjustments and credits.

– 14 –

Version 4/17/2017

2.1.5  *Marketing Fee.*  You agree to pay us a marketing fee in the amount of 2% of the Gross Sales of the Franchised Business each Accounting Period (the "Marketing Fee").  The Marketing Fee finances the Marketing Fund described in Section 1.7.4.

2.1.6  *Other Fees.*  You agree to pay us the following fees upon the occurrence of the following events:

2.1.6.1  If you relocate the Franchised Business with our approval pursuant to Section 1.2.7, we may charge you a relocation fee of $5,000 plus any reasonable expenses we incur.

2.1.6.2  If we obtain insurance on your behalf in accordance with Section 1.3.10, you will pay us an amount equal to the premiums and related costs for the required insurance in full upon receipt of the invoice, plus a 25% service charge.

2.1.6.3  If we provide additional or remedial training that is not mandatory or that we require because your personnel are not meeting our standards in accordance with Section 1.5.5, we may charge our then-current fees and expenses or, where appropriate, the additional fee described in Section 1.5.2.

2.1.6.4  If you request and we agree to furnish additional on-site guidance or assistance in accordance with Section 1.5.6, we may require you to pay our then current fees and expenses.

2.1.6.5  If we perform work to correct an unhealthy or unsafe condition at your Kung Fu Tea shop because you fail to perform the work after we notify you pursuant to Section 1.6.8, we may require you to pay for labor and materials plus a 25% service charge and an amount sufficient to reimburse us for our actual direct costs to supervise, perform and inspect the work and procure any replacement items, including labor, materials, transportation, lodging, meals, contractor fees and other direct expenses, all of which will be due and payable upon your receipt of our invoice.

2.1.6.6  If we perform an inspection or audit that is made necessary by your failure to furnish any information we require or if an audit or inspection reveals an understatement of Gross Sales greater than 2%, then we may require you to reimburse us for the reasonable cost of such inspection or audit in accordance with Section 2.2.6.

2.1.6.7  If you transfer the Franchised Business with our consent pursuant to Section 4.2, you agree to pay us a transfer fee of $5,000.

2.1.6.8  If the Managing Owner ceases active management of the Franchised Business or if the business is not being managed properly, then pending the appointment and training of a new Managing Owner, we may appoint a manager until you appoint a trained replacement manager and we may require you to pay in the manner described in Section 4.2.8.

2.1.6.9  If you renew the franchise pursuant to Section 5.1.2, you agree to pay us our then-current renewal fee, which will not exceed the greater of $10,000 or 25% of the then-current initial franchise fee.

2.1.6.10  If any required payment you make to us is rejected by your bank because of insufficient funds, you will pay us $50 for each occurrence.

2.1.6.11  If you continue to sell or purchase an unauthorized product or service or you continue to be out of compliance with the System Standards after we have notified you to cease

– 15 –

such sales or purchase or otherwise to be in compliance with the System Standards, you will pay us our then current fee pursuant to Section 1.1.5, 1.3.2 or 1.6.16. Such fee as of the date of this Agreement is $300 per day. You acknowledge and agree that your continued sale or purchase of unauthorized products or services or your continued noncompliance with System Standards after we have notified you to cease will cause us to incur damages, the actual amount of which would be speculative and difficult to calculate. You acknowledge that $300 per day is a fair and reasonable estimate of the foreseeable damages that we are likely to incur.

2.1.7   *Inflation.*   Fees stated in Section 2.1.6 as dollar amounts may be increased from time to time to reflect increases in the Metropolitan Area Consumer Price Index for All Urban Consumers from the date of this Agreement, as published by the U.S. Department of Labor, or a successor index.

2.1.8   *Accounting Period.*   "Accounting Period" means the specific period that we designate from time to time in the Manual or otherwise in writing for purposes of your financial reporting and payment obligations described in this Agreement. The Accounting Period may be a calendar month or a shorter or longer time period that we select, but not shorter than one week. We may designate different Accounting Periods for different purposes.

2.1.9   *Reports.*   You will submit a report to us within three days after the end of each Accounting Period setting forth your true and correct Gross Sales for such Accounting Period in such detail and in such manner as we require from time to time. We will have the right, upon notice to you: (i) to require you to submit to us quarterly and annual balance sheets and income statements for the Franchised Business, prepared in accordance with generally accepted accounting principles consistently applied, in the format we prescribe, and verified as correct in the manner we prescribe from time to time; and (ii) to require you to supply us with reviewed financial statements prepared annually.

2.1.10   *Payment.*   At the time you submit each report to us after each Accounting Period, you will pay to us the amount of the Royalty owed to us based on such Gross Sales. You will pay us for all other amounts upon your receipt of our invoice. Time is of the essence with respect to all payments you are to make to us. We have the right at any time, upon reasonable notice to you, to require that you pay all sums owed to us or to any of our affiliates electronically through one or more depository transfer accounts or using such methods as we may designate in the Manual or otherwise in writing. At our request, you agree to execute such documents as we determine are necessary for us to process electronic funds transfers from your designated bank account for payment of the fees you owe to us. You will bear all costs to establish and maintain the required electronic payment system, and all bank service charges. You will comply with our procedures for electronic payment, which we may modify from time to time, including the maintenance of such minimum bank account balance as we specify from time to time.

2.1.11   *Interest on Late Payments.*   Any payment that is not made by the date it is due will be subject to interest at the rate of 1.5% per month or the highest rate allowed by law, whichever is less. If no due date is stated, interest begins to run 10 days after billing. Your failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Section 5.2.2.4. Interest will accrue whether or not we exercise our right to terminate. You acknowledge that this subsection does not constitute our agreement to accept any payments after they are due or our commitment to extend credit to you or otherwise finance your operation of the Franchised Business.

2.1.12   *No Setoff.*   Your obligations to make payments in accordance with this Agreement and any other agreement with us or any of our affiliates with respect to the Franchised Business are not subject to any abatement, reduction, setoff, defense or counterclaim due or alleged to be due for any past, present or future claim that you have or may have against us or any of our affiliates.

2.1.13   *Application of Payments.*   All payments you make to us will be applied in such order as we may designate from time to time, regardless of any designation you may make with respect to the appli-

– 16 –

cation of such payments, even if you specifically make payment conditional on our acceptance of your designated application or instructions.

2.1.14   *Taxes.*  In the event that we are required to collect and pay any sales or use tax from you for payment to any tax authority based on your purchase of the franchise or any items relating to the franchise, or based on any continuing payments you make to us under this Agreement, you will pay such amounts to us upon receipt of our invoice.

Section 2.2 – *Records; Inspection*

2.2.1   *Records.*  You agree to maintain at your Kung Fu Tea shop full, complete and accurate records of the Franchised Business.  You will maintain bookkeeping, accounting and records retention systems conforming to the requirements that we prescribe from time to time, and records relating to Franchised Business operations, employee turnover and such other records that we prescribe from time to time.  You agree to maintain and to furnish to us upon request complete copies of all income, sales, value added, use and service tax returns, and employee withholding, workers' compensation and similar reports filed by you reflecting activities of the Franchised Business.  You agree to preserve all records described in this Section 2.2.1 for a period of at least five years after their creation, or such longer period as may be required by law, during both the term and each renewal term of this Agreement and following the expiration or termination of this Agreement.

2.2.2   *Access to Systems.*  We may use the computer and point of sale systems described in Section 1.3.7 to collect electronically the reports referred to in Section 2.1.9 and the records referred to in Section 2.2.1.  We may use the content and data generated by the surveillance system described in Section 1.3.7 for any purpose, including to monitor customer service and the operation of the Franchised Business.  We have the right to establish requirements that will permit us, as often as we deem appropriate, to access all cash registers, surveillance and computer terminals and your computer system and to retrieve all information relating to the Franchised Business.

2.2.3   *Right to Inspect.*  During the term of this Agreement, we or our designated representatives will also have the right, at any time during your regular business hours, without prior notice to you, to enter upon the premises of the Franchised Business to inspect the books and records of the Franchised Business and take excerpts.  You agree to cooperate fully with us and our representatives during all such inspections.

2.2.4   *Right to Audit.*  We have the right at any time during your regular business hours, without prior notice to you, to inspect and audit the records of the Franchised Business, or to cause such records to be inspected and audited.  This right includes the right to access your computer systems.

2.2.5   *Discrepancies.*  If any inspection or audit demonstrates an understatement of Gross Sales, you will pay the deficiency to us within 15 days after you receive the inspection or audit report.

2.2.6   *Cost.*  All inspections and audits will be at our expense; but if an inspection or audit is made necessary by your failure to furnish, or your delay in furnishing, reports, supporting records, other information or financial statements we require, or if an understatement of Gross Sales for the period of any audit or inspection is determined by any such audit or inspection to be greater than 2%, you agree, within 15 days after our request, to reimburse us for the cost of such inspection or audit, including, without limitation, legal and accounting fees, and the travel expenses, including lodging, meals and per diem charges of the inspecting or auditing personnel.  These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

2.2.7   *Survival of Inspection and Audit Rights.*  Our rights to inspect the books and records of the Franchised Business and to take excerpts, and to audit the Franchised Business, will continue for a peri-

– 17 –

od of six months following the expiration or termination of this Agreement; but we may only inspect such books and records or perform any such audit following the expiration or termination of this Agreement upon at least 24 hours' prior notice to you.

2.2.8  *Disclosure of Your Financial Information.*  We have the right to disclose data we receive from you regarding the Franchised Business without identifying you.  If we are required by law to disclose any data we receive from you regarding the Franchised Business and such disclosure will identify you, we will notify you of the disclosure to be made and, if you request, endeavor to obtain legally binding assurance that those who receive such disclosure will be bound by an obligation of confidentiality.

Section 2.3 – *Security Interest*

2.3.1  *Grant of Security Interest.*  As security for the payment of all amounts you owe us from time to time under this Agreement and all other agreements between you and us, and your performance of all of your obligations under such agreements, you hereby grant to us a security interest in all of the assets of the Franchised Business, including, without limitation, all inventory, equipment, furniture and fixtures, as well as all proceeds from their sale and the related insurance (the "Collateral").  You warrant and represent that the security interest granted hereby is prior to all other security interests in the Collateral except bona fide purchase money security interests, or security interests held by financial institutions, if any, each of which is subject to our prior approval.  You agree not to remove the Collateral, or any portion of the Collateral, from the premises of the Franchised Business without our prior written consent.

2.3.2  *Default.*  Upon the occurrence of any event entitling us to terminate this Agreement or any other agreement between you and us, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the state in which the Franchised Business is located, including, without limitation, the right to take possession of the Collateral.

2.3.3  *Filings.*  You authorize us, without further notice to or consent by you, to file any records or other documents as we reasonably deem necessary to perfect, continue, amend (upon the assignment of this Agreement or otherwise) or terminate our security interest in the Collateral.

2.3.4  *Grants of Security Interests to Others.*  We must approve in advance and in writing any grant you make to any third party of a security interest in or encumbrance of any assets of the Franchised Business.  We will not unreasonably withhold our consent to any such grant made in connection with financing for the development or operation of the Franchised Business or equipment leasing, if such financing satisfies our requirements, which may include execution of agreements by us, you and the secured creditor, in a form satisfactory to us, making any such security interest subordinate to the one you have granted to us pursuant to this Section 2.3.

2.3.5  *Survival.*  The security interest created by this Section 2.3 will survive any termination of this Agreement and remain in effect until all of your monetary obligations to us are satisfied in full.

ARTICLE III - **PROPRIETARY RIGHTS; CONFIDENTIALITY; NONCOMPETITION**

Section 3.1 – *Our Copyrights and Trademarks*

3.1.1  *Our Copyrights.*  We and our affiliates are the sole owners of all copyrights in the Manual and all supplemental materials, and other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us.  You may not copy any such materials, nor create derivative works of any such materials, except as specifically authorized or permitted by us.

3.1.2  *Our Trademarks.*  Your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Franchised Business at and from the premises of your Kung Fu Tea shop

– 18 –

A361

pursuant to and in compliance with this Agreement and all System Standards. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your use of the Marks and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the Franchised Business in compliance with this Agreement). You will not contest or assist others in contesting our right to use the Marks.

3.1.3 *Proper Use of the Marks.* You may not use the Marks except as authorized under this Agreement. You understand that any use of the Marks other than as expressly authorized by this Agreement, without our prior written consent, may constitute infringement and that your right to use the Marks does not extend beyond the expiration or termination of this Agreement. You agree to use the Marks as the sole identification of the Franchised Business, except that you agree to identify yourself as the independent owner of the Franchised Business in the manner we prescribe. You may not use any Mark or any word similar to any of the Marks as part of any corporate or legal business name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you under this Agreement), or in any modified form, nor may you use any Mark in connection with the performance or sale of any unauthorized products or services or in any other manner we have not expressly authorized in writing. You may not use any Mark as part of a domain name or electronic address of a website. You agree to display the Marks prominently in the manner we prescribe at the Franchised Business and on business forms and advertising materials. You agree to give such notices of trademark registrations and our ownership of the Marks as we specify from time to time and to obtain any fictitious or assumed business name registrations required under applicable law.

3.1.4 *Modifying the Marks.* We will have the right to modify or change the Marks from time to time upon written notice to you specifically referring to this Agreement and describing such modification or change. Such right will include the right to use a trademark that is entirely different from "Kung Fu Tea shop" and the right to require you to use one or more additional logos and marks; but we will make all such changes in the Marks only for good faith marketing, trademark or other reasons on a uniform basis for all Kung Fu Tea shop franchisees in the U.S. You agree, upon notice from us, to regard each such modified, changed, new or additional trademark as being within the definition of "Marks" under this Agreement, and to adopt and use each such trademark at your expense in accordance with the terms and conditions of this Agreement. We will not be obligated to reimburse you for any loss of revenue or expenses caused by any such modification or change.

3.1.5 *Infringement.* You agree to notify us of any apparent infringement of any Mark or of any of our copyrights, by any third party, as soon as such apparent infringement comes to your attention, and to notify us immediately of any challenge to your use of any Mark and of any claim by any person of any rights in any Mark, and you agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have sole discretion to take such action as we deem appropriate with respect to such apparent infringement, challenge or claim and the right to control exclusively any litigation, U.S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark or our copyrights. You agree not to initiate any such action or proceeding, but to cooperate with us in any such action or proceeding and sign any and all instruments and documents, render such assistance and do such acts and things as may be necessary or advisable, in the opinion of our attorneys, to protect and maintain our interests in any litigation or any proceeding at the Patent and Trademark Office, or otherwise to protect and maintain our interests in the Marks or copyrights. In the event any sum is recovered based on our claim of infringement, we will have the exclusive right to such recovery.

– 19 –

A362

Section 3.2 – *Confidentiality of Our Information*

3.2.1 *Confidential Information.* We possess and will continue to develop and acquire certain confidential information relating to the development and operation of Kung Fu Tea shops ("Confidential Information"). Confidential Information means information that is not generally available to the public and that has commercial value to us or to the Franchised Business, or that is personally identifiable information of customers. "Confidential Information" includes, without limitation:

3.2.1.1 product recipes, mixes and formulas;

3.2.1.2 the contents of the Manual and all supplemental materials;

3.2.1.3 the content of our training and assistance;

3.2.1.4 the System Software, its documentation and the data generated by the use of the System Software;

3.2.1.5 site selection criteria;

3.2.1.6 sales and marketing techniques;

3.2.1.7 customer lists;

3.2.1.8 planned advertising and marketing programs;

3.2.1.9 current, past and planned research, development and test programs for products, services and operations;

3.2.1.10 specifications for and suppliers of certain equipment, fixtures, furnishings, signs, materials and supplies;

3.2.1.11 the operating results and financial performance of Kung Fu Tea shops other than the Franchised Business;

3.2.1.12 the videos and images recorded by the surveillance system;

3.2.1.13 user names and passwords allowing access to protected areas on our website or computer network; and

3.2.1.14 all improvements and modifications to the System developed by you or your personnel.

You acknowledge and agree that you will not acquire any interest in any Confidential Information other than the right to use Confidential Information disclosed to you in operating the Franchised Business during the term of this Agreement.

3.2.2 *Nondisclosure and Non-Use.* At all times both during the term and after the expiration or termination of this Agreement, (i) you will keep all Confidential Information in the strictest confidence and you will not disclose any Confidential Information to any person other than your employees, agents or representatives who have a legitimate need to know such information and who are informed of this obligation of confidentiality and have signed either a Guaranty as described in Section 1.1.8 or a written agreement with your company substantially in the form of Schedule B, and (ii) you will not use any Confidential Information except for the purpose of fulfilling your obligations under this Agreement.

– 20 –

A363

3.2.3  *Isolated Disclosures.*  Notwithstanding the foregoing, we will not deem you to be in default of this Agreement as a result of isolated incidents of disclosure of Confidential Information by an employee other than an owner, provided that you have taken reasonable steps to prevent such disclosure, including but not limited to the steps a reasonable and prudent owner of confidential and proprietary information would take to prevent disclosure of such information by his employees, and further provided that you pursue all reasonable legal and equitable remedies against such employee for such disclosure of such Confidential information.

3.2.4  *Exceptions.*  The obligations of confidentiality and non-use described above will not apply to information that:  (i) you can clearly show was known to you on a non-confidential basis prior to its disclosure to you by us; (ii) is or becomes generally known among Competitive Businesses (as defined in Section 3.3.1) in the U.S. other than through disclosure by you or any of your  employees, contractors, agents or representatives; or (iii) you can clearly show was received by you on a nonconfidential basis from a third party that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

3.2.5  *Disclosures Required by Law.*  In the event that you become legally compelled to disclose any Confidential Information, you will (i) promptly notify us that such information is required to be disclosed, (ii) use your best efforts to obtain legally binding assurance that all those who receive disclosure of such information are bound by an obligation of confidentiality, and (iii) disclose only that portion of the Confidential Information that your legal counsel advises is legally required to be disclosed.

3.2.6  *Return of Information.*  Upon our request, you will promptly return to us all Confidential Information and all copies in your possession or under your control, and you will destroy all copies on your computers, disks and other digital storage devices.

3.2.7  *Your Rights Under Federal Law.*  Nothing in this Agreement is intended to prohibit you from exercising your rights under the Defending Trade Secrets Act of 2016.  You have the right to disclose our trade secrets in each of the following circumstances without incurring criminal or civil liability:

3.2.7.1  You may disclose our trade secrets (i) in confidence to a federal, state or local government entity, or to an attorney, solely for the purpose of reporting a suspected violation of law or in an investigation of a suspected violation of law, or (ii) in a legal proceeding under seal.

3.2.7.2  You may disclose our trade secrets in a complaint or other document filed in a lawsuit or other proceeding as long as the filing is made under seal.  This includes a lawsuit you may file for retaliation by us for your reporting a suspected violation of law to a government entity.  You may not otherwise disclose any trade secret or confidential information except pursuant to a court order.

Section 3.3 – *Noncompetition*

3.3.1  *Definition of Competitive Business.*  As used in this Agreement, the term "Competitive Business" means any business that sells, or grants franchises or licenses to others to operate, a retail business that sells, oriental style teas and other drinks to consumers for consumption and such sales comprise five percent or more of such business's revenues (other than a Kung Fu Tea shop operated under a franchise agreement with us or our affiliate).  The restrictions of this section will not apply to the ownership of publicly traded securities that constitute less than 1% of a class of ownership interests of the issuing company.

3.3.2  *Agreement Not to Compete.*  You agree that during the term of this Agreement and any renewal of this Agreement (and thereafter pursuant to Section 3.3.3), you will not, directly or indirectly

– 21 –

A364

(through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect interest in a Competitive Business located or operating anywhere in the U.S. or in any other country in which a Kung Fu Tea shop operates; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located or operating; (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner; or (iv) recruit or hire any person who is our employee or the employee of any Kung Fu Tea shop (whether company or affiliate-owned or franchised) or who has been our employee or the employee of any Kung Fu Tea shop within the six-month period before such recruiting or hiring without the prior written permission of that person's employer.

3.3.3 *Noncompetition After Termination.*  Upon the expiration of this Agreement, your termination of this Agreement without cause, our termination of this Agreement in accordance with its terms and conditions, or your transfer in accordance with Article IV, you and your company's owners agree for a period of two years following such expiration, termination or transfer, that you will not, directly or indirectly (through one of your company's affiliates or owners or a member of the immediate family of any owner), either (i) have a direct or indirect ownership interest in a Competitive Business located or operating within 5 miles of the Site or of any Kung Fu Tea shop anywhere in the world at the time of such expiration, termination or transfer; (ii) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for any such Competitive Business; (iii) divert or attempt to divert any business or customer of the Franchised Business to any competitor in any manner; or (iv) recruit or hire any person who is our employee or the employee of any Kung Fu Tea shop (whether company or affiliate-owned or franchised) or who has been our employee or the employee of any Kung Fu Tea shop within the six-month period before such recruiting or hiring without the prior written permission of that person's employer.

ARTICLE IV - **TRANSFER**

Section 4.1 – *Transfer by Us*

We may sell, assign or transfer our rights and obligations under this Agreement to any party, without the approval of or prior notice to you, provided that the buyer, assignee or transferee agrees in writing to assume all of our obligations under this Agreement.  We will not be liable for obligations of the transferee arising after the date of transfer.

Section 4.2 – *Transfer by You*

4.2.1 *No Transfer Without Our Approval.*  This Agreement is personal to you.  We have granted the franchise to you in reliance upon our perceptions of your (or your company's owner's) individual or collective character, skill, aptitude, business ability and financial capacity.  Accordingly, you may make no Transfer (as defined below) without our prior written approval.  Any purported Transfer without such approval will be a breach of this Agreement and will entitle us to terminate this Agreement as provided below.  Our consent to a Transfer does not constitute a representation as to the fairness of the terms of any contract between you or your company's owners and the transferee, a guaranty of the successful operation of the Franchised Business by the transferee or a waiver of any claims we may have against you or your company's owners or of our right to demand the transferee's compliance with any of the terms or conditions of this Agreement.

4.2.2 *Definition of Transfer.*  As used in this Agreement, the term "Transfer" means your (or your company's owner's) voluntary, involuntary, direct or indirect assignment, sale, gift, pledge or other disposition of: (i) any legal or beneficial ownership or voting interest in your company: (ii) this Agreement, (iii) any material asset of the Franchised Business; or (iv) the lease or ownership of the premises of the Franchised Business (unless we agree to a relocation or unless the transfer of ownership does not affect your leasehold rights and obligations).  "Transfer" also includes (i) the merger or consolidation of your compa-

– 22 –

ny; (ii) the issuance of additional securities or other ownership or voting interests of your company, and (iii) the admission or departure of a partner or owner.  It includes transfers resulting from proceedings under the U.S. Bankruptcy Code or any similar law, and transfers resulting from divorce.  It also includes any grant of a security interest to a third party without our approval.

4.2.3  *Notice of Transfer*.  You agree to notify us of any planned Transfer, and to provide us with any information we may reasonably request in order to permit us to evaluate the planned Transfer.  If we do not exercise our right of first refusal under Section 4.3, we agree not to unreasonably withhold our approval of a Transfer.  If we approve the Transfer, then you will be free, for 90 days following such approval, to effect the Transfer to the person or persons approved by us.

4.2.4  *Conditions to Transfer*.  The following conditions will apply with respect to any Transfer except as described in Section 4.2.3:

4.2.4.1  The proposed transferee, its management and owners, must be individuals of good character with sufficient business experience, aptitude, and financial resources to operate the Franchised Business and otherwise meet our then applicable standards for a new Kung Fu Tea shop franchisee.

4.2.4.2  Neither the proposed transferee nor any of its management or owners may be a Competitive Business or perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business.

4.2.4.3  You will cure any default under this Agreement that we will have notified to you.

4.2.4.4  You will pay all fees and any other amounts then owed to us and our affiliates.

4.2.4.5  If any lease for the premises used in the business requires it, the lessor must consent to the assignment of the lease to the transferee.

4.2.4.6  You or the transferee will pay us a nonrefundable transfer fee described in Section 2.1.6.7.

4.2.4.7  We may require that the transferee or your company under ownership by the transferee, at the time of closing, enter into our then current form of franchise agreement amended to shorten the initial term to conform to the remaining term of this Agreement and to remove the requirement to pay the initial fee, and each Guarantor under the new franchise agreement will have signed our then-current form of guaranty.

4.2.4.8  You and we will execute a written agreement, in a form satisfactory to us, terminating this Agreement and acknowledging your obligations following the Transfer.  We may require that the termination agreement include a general release of any claims against us and our affiliates.

4.2.4.9  You will upgrade and remodel the premises of the Franchised Business as we may require to conform to the then-current standards and specifications of a new franchised business then being established, and you will complete the upgrading and remodeling within the time specified by us.

4.2.4.10  The transferee or its designated personnel will have completed such training as we may require, to our satisfaction.

– 23 –

**A366**

4.2.4.11  Each transferor will sign an agreement (in a form satisfactory to us) acknowledging a continuing obligation after such transfer to comply with the requirements of Section 3.3.3.

4.2.4.12  We will have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the Franchised Business.

4.2.4.13  If you or your owners finance any part of the sale price of the transferred interest, you or your owners will have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests are subordinate to the transferee's obligation to pay Royalties, Marketing Fees and other amounts due to us.

4.2.4.14  After our authorization of the Transfer and your compliance with all of the requirements listed above, you will give us not less than five business days' written notice of the date, time and place of the closing of such Transfer, and you will give us an opportunity to have a representative present.

4.2.4.15  If the transaction is brokered by a third-party or by one of our authorized sales representatives, you or the proposed transferee will be responsible for paying broker fees at the same commission rate that we pay such broker or sales representatives.

4.2.5  *Transfer to a Company you Control.*  Upon prior notice to us and the signing by the relevant parties of assignment documents acceptable to us, you may transfer this Agreement to an entity that conducts no business other than the Franchised Business in which you maintain management control and of which you or all of the owners of your company own and control 100% of the equity and voting power, provided that all assets of the Franchised Business are owned, and the entire Franchised Business is conducted by, a single entity.  The requirements of Sections 4.2.4.6 through 4.2.4.13 will not apply to any such transfer.  You will remain personally liable under this Agreement after such Transfer by signing a Guaranty as described in Section 1.1.7.

4.2.6  *Transfer Upon Death or Disability.*  You or your executor or other personal representative must promptly notify us in the event of your death or disability or, if your company is an entity or a partnership, the death or disability of the Managing Owner.  Any transfer upon death or disability will be subject to the same terms and conditions as those that apply to other transfers, as described in Sections 4.2.1 through 4.2.4; but you or your executor or other personal representative will have a period of 12 months in which to effect a transfer acceptable to us in the event of death, and six months in the event of disability.  The Managing Owner must be replaced in the manner described in Section 1.5.5.  As used in this Agreement, the term "disability" means a mental, emotional or physical injury, illness, incapacity, disability or impairment that is reasonably expected to prevent or actually does prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, or more than 30 days in the case of a Managing Owner.  A person's disability for purposes of this section will be determined by a licensed practicing physician selected by us upon examination of such person or, if such person refuses to be examined, then such person will automatically be deemed disabled for purposes of this section as of the date of refusal.  We will pay the cost of the examination.

4.2.7  *Operation of the Franchised Business Upon Death or Disability.*  If upon your death or disability or, if your company is an entity, the death or disability of the owner of a controlling interest in your company, the Franchised Business is not being actively managed by a Managing Owner who has attended and successfully completed such training as we may require, you or such deceased or disabled owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed 30 days from the date of death or disability, appoint a Managing Owner to operate the Franchised Business.  Such Managing Owner will be required to complete our training at your ex-

– 24 –

pense.  Pending the appointment and training of a Managing Owner or if, in our judgment, the Franchised Business is not being managed properly, we have the right, but not the obligation, to appoint a manager for the Franchised Business.

4.2.8  *Transitional Management Costs.*  In the event that we appoint a manager for the Franchised Business pursuant to Section 4.2.7 or Section 1.5.5, all funds from the operation of the Franchised Business during the management by our appointed manager will be kept in a separate account, and all expenses of the Franchised Business, including compensation, other costs and travel and living expenses of our manager, will be charged to this account.  We will also have the right to charge a reasonable management fee (in addition to the Royalty and Marketing Fee payable under this Agreement) during the period that our appointed manager manages the Franchised Business.  Operation of the Franchised Business during any such period will be on your behalf.  We will not be liable to you or your company's owners for any debts, losses or obligations incurred by the Franchised Business or to any of your suppliers for any products, materials, supplies or services the Franchised Business purchased during any period it is managed by our appointed manager.

4.2.9  *Stock Offerings.*  You agree to submit to us, for our review, all materials for an offering or exempt private placement of stock or partnership or other interests in your company or any of your affiliates that are required by federal or state law before such materials are filed with any government agency and before they are used.  We may require such materials to contain a written statement, prescribed by us, indicating that we are not participating in such offering in any way.  You and all other participants in the offering must fully indemnify us and our subsidiaries, affiliates, successors and assigns, and our and their respective members, managers, directors, officers, shareholders, partners, agents and representatives in connection with the offering.  For each proposed offering, you will reimburse us for our reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.  You will give us written notice at least 30 days before the date that any offering or other transaction described in this Section 4.2.9 commences.  Any such offering will be subject to all of the other provisions of this Section 4.2.

Section 4.3 – **Our Right of First Refusal**

4.3.1  *Notice of Third Party Offer.*  If you or any of your company's owners at any time desire to sell, assign or transfer for consideration an interest in this Agreement and the Franchised Business or an ownership interest in your company to anyone other than as described in Section 4.3.4, you will obtain and immediately submit to us a true and complete copy of a bona fide written offer from the third party that desires to acquire such interest (the "Third Party Offer").  The Third Party Offer must include the names of all owners of any entity offeror and the names of all partners of any partnership offeror or, in the case of a publicly-held entity, copies of the most current quarterly report and Form 10K.  The Third Party Offer must contain details of the payment terms of the proposed sale and the source and terms of any financing of the proposed purchase price, and may not include or be contingent upon the purchase of assets other than those related to the Franchised Business.

4.3.2  *Exercise of Our Right of First Refusal.*  We will have the right, exercisable by notice delivered to you or your company's selling owner or owners within 30 days after the date of our receipt of a copy of the Third Party Offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in the Third Party Offer, provided that (i) we may substitute cash for any form of payment proposed in such offer; and (ii) we will have at least 60 days after giving notice of our election to prepare for closing.  If we exercise our right of first refusal, you and we will execute a written agreement, in a form satisfactory to us, acknowledging the seller's continuing obligations.  We may require the seller to sign a general release of any claims against us and our affiliates.

4.3.3  *Consequence of Nonexercise of Our Right of First Refusal.*  If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact

– 25 –

terms of such offer, subject to our approval of the transfer as provided in Section 4.2; but if the sale to such purchaser is not completed within 120 days after delivery of the Third Party Offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the thirty day period following either the expiration of such 120-day period or the notice to us of the material changes in the terms of the sale, either on the terms original-ly offered (following such 120-day period) or the modified terms (following notice to us of material chang-es in the terms of the sale).

    4.3.4  *Exceptions.*  Our right of first refusal will not apply to transfers among the current owners of your company unless the Managing Owner is transferring his or her ownership.

<div align="center">ARTICLE V - **TERM AND TERMINATION**</div>

Section 5.1 - *Term and Renewal*

    5.1.1  *Initial Term.*  This Agreement will be effective as of the date set forth in the opening para-graph of this Agreement.  The initial term of this Agreement will expire on the date specified in Schedule A, but if no expiration date appears in Schedule A, then the initial term of this Agreement will expire 10 years after the date of this Agreement.  If a current lease or sublease will expire before the expiration of this Agreement, you may attempt to obtain a replacement lease or sublease.  We will have the right to approve any proposed replacement lease or sublease as otherwise provided in Section 1.2.3.  If you are unable to obtain a replacement lease or sublease that meets our approval before the current lease or sublease expires, (i) you have the right to terminate this Agreement, subject to your observation of all no-tice provisions and post-term obligations set forth in this Agreement, or (ii) we have the right to terminate this Agreement in accordance with Section 5.2.  In addition, if the current lease or sublease is terminated for any reason before it expires, we have the right to terminate this Agreement in accordance with Section 5.2.

    5.1.2  *Renewal.*  You will have the right to acquire a successor franchise for a term of 10 years, provided:

        5.1.2.1 you will have given us notice of your desire to acquire a successor franchise ("Renewal Notice") not less than twelve months nor more than eighteen months before the end of the then-current term;

        5.1.2.2 you and your affiliated companies must not be in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, or if you are in default, you have cured such default in the manner described below;

        5.1.2.3 you comply with our then-current financial qualifications and training requirements for new Kung Fu Tea shop franchises;

        5.1.2.4 you must not have received more than three notices of default during any 24 month period during the term of this Agreement, whether or not such defaults have been cured;

        5.1.2.5 you present evidence to us that you have the right to remain in possession of the premises of the Franchised Business for the duration of the  term of the successor franchise, or you obtain our approval of a new location for the Franchised Business for the duration of the suc-cessor franchise term;

        5.1.2.6 to comply with our then-current standards in effect for new Kung Fu Tea shop franchises, at your cost and expense, you remodel and refurbish the premises of the Franchised Business, and you repair or replace equipment (including electronic cash register or computer

<div align="center">– 26 –</div>

hardware or software systems), signs, interior and exterior decor items, fixtures, furnishings, catering or delivery vehicles, if applicable, supplies and other products and materials required for the operation of the Franchised Business as we may reasonably require, and you obtain any new or additional equipment, fixtures, supplies and other products and materials that we may reasonably require;

5.1.2.7 if we require, you execute a general release, in a form prescribed by us, of any and all claims against us and our affiliates and their respective members, managers, officers, directors, shareholders, partners, agents and employees; and

5.1.2.8 you execute our then-current standard form of franchise agreement, which agreement will supersede this Agreement in all respects; but you will not be required to pay the initial fee stated in the successor franchise agreement. Instead, you will pay us the renewal fee referred to in Section 2.1.6.9. You understand that the successor franchise agreement may contain materially different terms than this Agreement, including, but not limited to, increased fees.

If you or any of your affiliated companies is in default under this Agreement or any other agreement with us or any of our affiliates at the time you give your Renewal Notice, we will give you notice, not more than 30 days after receipt by us of your Renewal Notice, of such default, and we will give you 30 days to cure. In the event that you fail to cure in that period, or in the event that any other condition set forth in this Section 5.1(b) is not satisfied, your right to renew will terminate.

5.1.3 *Hold Over.* If you do not sign a new franchise agreement before the term of this Agreement expires and you continue to accept the benefits of this Agreement after this Agreement expires, then at our option, we may treat this Agreement either as: (i) expired as of the date of expiration, with you then being deemed to be operating without a franchise in violation of our rights; or (ii) continued on a month-to-month basis (the "Interim Period") until either (A) both you and we sign a new franchise agreement or (B) either you or we give at least 30 days' prior written notice to the other party of your or our intention to terminate the Interim Period, in which case the Interim Period and this Agreement will terminate on the date specified in the notice. All of your obligations will remain in full force and effect during the Interim Period as if this Agreement had not expired.

Section 5.2 - *Termination*

5.2.1 *Termination by You.* You may not terminate this Agreement except in the event of our material breach of this Agreement. In the event that you claim that we have materially breached this Agreement, you will provide us with written notice of such claim within twelve months of its occurrence, specifically enumerating all alleged deficiencies and providing us with an opportunity to cure, which will in no event be less than 90 days from the date of our receipt of the notice. Your failure to give such notice will constitute a waiver of your right to terminate on the basis of such breach.

5.2.2 *Termination by Us Upon Notice.* We may terminate this Agreement upon written notice to you with immediate effect if:

5.2.2.1 you or any of your company's owners have made any material misrepresentation or omission in connection with your application for and purchase of the franchise;

5.2.2.2 your Managing Owner fails to complete the initial training to our satisfaction in accordance with Section 1.5.2;

5.2.2.3 you fail to commence operation of the Franchised Business within the time required by Section 1.2.6;

– 27 –

5.2.2.4 you are more than five days late in your payment of any amount due to us under this Agreement or to any of the suppliers of the Franchised Business and you fail to make such payment within five days after we will have notified you that such payment is past due;

5.2.2.5 you or any of your affiliates default under your lease for the premises of the Franchised Business and have not cured such default within the time required under the lease, or you lose the right to possession of the premises of the Franchised Business and have not relocated to another site approved by us;

5.2.2.6 you no longer have a competent, conscientious, trained staff in numbers sufficient to promptly service customers in accordance with the System Standards;

5.2.2.7 you or any of your company's owners use or disclose any Confidential Information in violation of the requirements of Section 3.2;

5.2.2.8 you or any of your company's owners make any unauthorized use of the Marks or challenge or seek to challenge the validity of any of the Marks;

5.2.2.9 you fail to maintain the insurance we require and do not correct the failure within ten days after we deliver written notice of that failure to you;

5.2.2.10  you fail to maintain the highest rating possible for the Franchised Business in accordance with the terms of Section 1.6.6, or you fail to notify us in as required under Section 1.6.6, or you fail to correct in a timely manner any condition described in any inspection report or any warning, citation, certificate or notice relating to the Franchised Business;

5.2.2.11  you fail to remove any objectionable content posted to a social media website within 12 hours after we request you to remove it pursuant to Section 1.7.12;

5.2.2.12 you knowingly maintain false books or records or submit to us a report that understates the Gross Revenue of the Franchised Business three or more times during the term of this Agreement or by more than five percent on any one occasion;

5.2.2.13 a threat or danger to public health or safety results from the construction or maintenance of the premises or from the operation of the Franchised Business, or you violate any health, safety or sanitation law, ordinance or regulation and do not begin to correct such noncompliance or violation immediately, and completely correct such noncompliance or violation within 72 hours after written notice of such threat, danger, noncompliance or violation is delivered to you;

5.2.2.14 you fail for a period of 15 days after notification by appropriate authority to comply with any other law or regulation applicable to the operation of the Franchised Business;

5.2.2.15 you or any of your company's owners effect or attempt to effect a Transfer without our approval and contrary to the provisions of Article IV;

5.2.2.16 in the event of your death or disability or the death or disability of an owner of your company, this Agreement or such owner's interest is not assigned as required by Article IV;

5.2.2.17 you or any of your company's owners are or have been convicted of, or plead or have pleaded guilty or no contest to, a felony or any other crime or offense, or engage in any dishonest, deceptive or unethical conduct that may, in our opinion, adversely affect the reputation of the Franchised Business, other Kung Fu Tea shops or the goodwill associated with the Marks;

– 28 –

A371

5.2.2.18 you fail to operate the Franchised Business for three consecutive business days, unless the Franchised Business has been closed for a purpose we have approved or because of casualty;

5.2.2.19 you fail to pay when due any federal or state income, service, sales, withholding or other taxes due in connection with the operation of the Franchised Business, unless you are contesting your liability for such taxes in good faith or you have received an extension from the applicable government agency of the time within which to make such payments;

5.2.2.20 you commit three or more defaults under this Agreement in any period of 12 consecutive months, whether or not each such default has been cured after notice was delivered to you;

5.2.2.21 your assets, property or interests or those of any of your owners are blocked under any law, rule or regulation relating to terrorist activities;

5.2.2.22 you become insolvent or make a general assignment for the benefit of creditors; or, unless prohibited by law, if a petition in bankruptcy is filed by you or filed against and consented to by you or not dismissed within 30 days; or if a proceeding for the appointment of a receiver or other custodian of your company, business or assets is filed and consented to by you; or if a receiver or other custodian (permanent or temporary) of all or any part of your business or assets is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against you; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless a bond is filed or other steps are taken to effectively stay enforcement); or if your company is dissolved;

5.2.2.23 you or any of your affiliates default under any financing agreement or arrangement with any party advancing funds to you in connection with the operation of the Franchised Business or the operation of another business under a franchise agreement with us; or

5.2.2.24 any other Kung Fu Tea shop franchise agreement now or hereafter in effect between us and you or any of your affiliates is terminated due to a breach by you or your affiliate.

5.2.3 *Termination After Cure Period.* Except as set forth in Section 5.2.2, you will have 30 days after receipt of written notice from us of a material default in which to remedy the default and provide evidence of that remedy to us. If any such default is not cured within that time, this Agreement will terminate without further notice to you effective immediately upon expiration of that time unless we notify you otherwise in writing.

5.2.4 *Relationship Laws.* Notwithstanding the provisions described in this Section 5.2, if any valid, applicable law or regulation limits our right to terminate this Agreement or requires different or longer notice periods than those set forth in this Agreement, this Section 5.2 is deemed amended to conform to the minimum notice periods or restrictions upon termination required by such law or regulation. We will not however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination of this Agreement.

Version 4/17/2017

**A372**

Section 5.3 - *Consequences of Termination*

5.3.1   *General Consequences.*  Upon the expiration of this Agreement or its termination for any reason:

5.3.1.1 all rights and licenses granted to you under this Agreement will immediately terminate;

5.3.1.2 you will remit to us, within 15 days of such expiration or termination, or on such later date that the amounts due to us are determined, such Royalties and Marketing Fees, amounts owed for purchases from us, interest due and all other amounts owed to us that are then unpaid, and you will submit to us any reports and other information you may be required to submit to us with respect to the operation of the Franchised Business up to the date of expiration or termination;

5.3.1.3 you will deliver to us, within 15 days of such expiration or termination, a complete list of all customers in your possession or under your control, current as of the effective date of termination or expiration, including the name, address, telephone number and email address of each customer;

5.3.1.4 you will cease to use the Marks and the System in any way, cease referring to or identifying yourself as a Kung Fu Tea shop franchisee and remove all such identifying materials from the premises of the Franchised Business, unless we instruct you otherwise;

5.3.1.5 you will take such action as may be required to cancel all fictitious or assumed name or equivalent registrations or domain name registrations relating to your use of any Marks;

5.3.1.6 you will promptly return to us or deliver to us or otherwise dispose of as we may instruct, the Manual, and all supplemental materials, amendments, revisions and copies of the Manual (including copies stored electronically), as well as all other Confidential Information and all copies of such information in your possession or under your control, and all printed materials containing any Mark, and you will remove and destroy all copies from your computers and other electronic storage media, and you will allow us, without liability to you or to third parties, to remove all such items from the Franchised Business; and

5.3.1.7 you will assign to us or our designee all of your right, title and interest in and to your telephone numbers, websites, domain names and meta tags associated with the Mark (the "Listings") and you will notify the telephone company and all listing agencies of the termination or expiration of your right to use any of the Listings, and that you authorize the transfer of the Listings to us or our designee.

5.3.2   *Right to Buy Equipment.*  Upon the expiration of this Agreement or its termination for any reason, if we do not exercise our right to purchase the assets of the Franchised Business in accordance with Section 5.4, we will have the right, but not the obligation, to purchase some or all of the assets of the Franchised Business, including any furnishings, fixtures, equipment, signs, inventory, supplies and marketing materials and all other items bearing any Mark.   The purchase price for such fixtures and equipment will be their fair market value as agreed by you and us or, if we are unable to agree, as determined in the manner described in Section 5.4.4.  Before exercising our purchase right under this section, we will have the right to enter the premises of the Franchised Business during reasonable hours to inspect the assets.   If we elect to exercise our purchase right under this section, we will give you written notice of our intent to do so within 30 days after the expiration or termination of this Agreement.  We will have the right

– 30 –

to offset all amounts you owe to us or our affiliates against any payment due to you under this section. This provision will also apply in the event of death or disability under Section 4.2.6.

### Section 5.4 – *Our Option to Purchase Upon Termination*

5.4.1 *Exercise of Option.*  Upon our termination of this Agreement in accordance with its terms or your termination of this Agreement without cause, or upon the expiration of this Agreement, if we elect not to offer or you elect not to accept, a successor franchise, we have the option, exercisable by giving written notice to you within 60 days from the date of such termination, expiration or the expiration of our offer to you of a successor franchise, whichever is applicable, to purchase the assets of the Franchised Business from you, including the leasehold rights (subject to any rights of approval retained by the owner of the leasehold) to or ownership of the Site.  The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "Notification Date".  We have the unrestricted right to assign this option to purchase the Franchised Business.  We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise.

5.4.2 *Leasehold Rights.*  If we exercise the option described in Section 5.4.1, you agree at our election, (i) to assign your leasehold interest in the premises of the Franchised Business to us or (ii) if you are unable to assign your leasehold interest, to enter into a sublease at a fair market rental for the remainder of the lease term on the same terms (including renewal option) as the prime lease; or (iii) if you own the premises, to lease the premises to us at a reasonable commercial rent and according to terms comparable with rental terms for similar leased property in the marketplace where the Site is located.

5.4.3 *Purchase Price.*  If we exercise the option described in Section 5.4.1, the purchase price for the assets of the Franchised Business will be the fair market value of the Franchised Business, determined in a manner consistent with reasonable depreciation of the leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies.  The fair market value of the Franchised Business will include the goodwill you have developed in the market that is independent of the goodwill of the Marks and the System.  The length of the remaining term of the lease or sublease of the premises of the Franchised Business, if any, and the age and condition of the improvements, equipment, fixtures, furnishings, décor and signs will also be considered in determining the fair market value.  We may exclude from the assets purchased cash or its equivalent and any leasehold improvements, equipment, fixtures, furnishings, signs, materials and supplies that are not necessary or appropriate to the operation of the Franchised Business or that we have not approved as meeting our standards, and the purchase price will reflect such exclusions.

5.4.4 *Appraisal.*  If we and you are unable to agree on the fair market value of the Franchised Business or the Site, or the fair rental value of the premises of the Franchised Business, such fair market value or fair rental value will be determined by one independent appraiser agreed to by you and us.  If we fail to agree on an appraiser within 15 days after we exercise the option described in Section 5.4.1, then each party will name its own reputable appraiser within seven days thereafter, and the average of their determinations will be binding.  If one appraiser is chosen, then the parties will share the cost of the appraiser equally.  If two appraisers are used, each party will pay its own appraisal fees.  You and we will instruct the appraiser or appraisers to complete their appraisal within 30 days after their appointment.

5.4.5 *Closing.*  The closing of the purchase described in this section will take place not later than 90 days after the determination of the purchase price. We will pay the purchase price at the closing, but we have the right to set off against the purchase price any and all amounts you or your company's owners owe to us.  At the closing, you agree to deliver instruments transferring to us (i) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances, with all sales and other transfer taxes paid by you; (ii) all licenses and permits of the Franchised Business that are assignable;

– 31 –

and (iii) a leasehold interest in (or unencumbered title to) the premises of the Franchised Business and the improvements to such premises.

<div align="center">ARTICLE VI - **REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION**</div>

Section 6.1 - *Representations and Warranties*

6.1.1  *Your Representations.*  You represent and warrant as follows:

6.1.1.1  YOU HAVE NOT RELIED ON ANY PROMISES, REPRESENTATIONS OR AGREEMENTS NOT EXPRESSLY CONTAINED IN THIS AGREEMENT OR THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT IN MAKING YOUR DECISION TO SIGN THIS AGREEMENT.  YOU HAVE NOT RECEIVED FROM US OR OUR REPRESENTATIVES ANY PROMISES, REPRESENTATIONS OR WARRANTIES, ORAL OR WRITTEN, OTHER THAN THOSE THAT ARE EXPRESSLY CONTAINED IN THIS AGREEMENT AND THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT.  WE EXPRESSLY DISCLAIM THE MAKING OF ANY REPRESENTATION OR WARRANTY THAT IS CONTRARY TO THE CONTENTS OF THIS AGREEMENT OR THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT.

6.1.1.2  YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT, AND YOU RECOGNIZE THAT, LIKE ANY OTHER BUSINESS, AN INVESTMENT IN A KUNG FU TEA SHOP FRANCHISE INVOLVES BUSINESS RISKS AND THAT YOUR ABILITIES AND EFFORTS ARE VITAL TO THE SUCCESS OF THE VENTURE.

6.1.1.3  YOU RECEIVED THE KUNG FU TEA SHOP FRANCHISE DISCLOSURE DOCUMENT AT LEAST 14 DAYS (AND 10 BUSINESS DAYS) BEFORE THE EARLIER OF THE DATE ON WHICH YOU (I) SIGNED THIS AGREEMENT OR ANY RELATED AGREEMENT OR (II) PAID ANY CONSIDERATION IN CONNECTION WITH THE SALE OR PROPOSED SALE OF A KUNG FU TEA SHOP FRANCHISE.

6.1.1.4  YOU RECEIVED A COPY OF THIS AGREEMENT AND ANY RELATED AGREEMENTS AT LEAST SEVEN DAYS BEFORE THE DAY YOU SIGNED SUCH AGREEMENTS.

6.1.1.5  YOU HAVE READ AND UNDERSTOOD THIS AGREEMENT AND HAVE HAD AMPLE OPPORTUNITY TO CONSULT WITH AN ATTORNEY AND OTHER ADVISORS OF YOUR OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.  YOU ACKNOWLEDGE THAT WE HAVE ADVISED YOU TO HAVE THIS AGREEMENT REVIEWED AND EXPLAINED TO YOU BY AN ATTORNEY.

6.1.1.6  ALL STATEMENTS YOU HAVE MADE AND ALL MATERIALS YOU HAVE SUBMITTED TO US IN CONNECTION WITH YOUR APPLICATION FOR AND PURCHASE OF THE FRANCHISE ARE ACCURATE AND COMPLETE AND, IN THAT CONNECTION, YOU HAVE MADE NO MISREPRESENTATIONS TO US OR OMITTED DISCLOSING ANY MATERIAL INFORMATION TO US.

6.1.1.7  YOU ARE UNDER NO OBLIGATION OR RESTRICTION, NOR WILL YOU ASSUME ANY OBLIGATION OR RESTRICTION, THAT WOULD IN ANY WAY INTERFERE OR BE INCONSISTENT WITH, OR PRESENT A CONFLICT OF INTEREST CONCERNING, YOUR RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

6.1.1.8  SCHEDULE A COMPLETELY AND ACCURATELY DESCRIBES ALL OF YOUR COMPANY'S OWNERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND MANAGERS AND THEIR OWNERSHIP INTERESTS AND MANAGEMENT POSITIONS IN YOUR COMPANY.

6.1.2  *Your Representations as an Entity.*  If your company is a corporation or limited liability company, you further represent and warrant as follows:

<div align="center">– 32 –</div>

6.1.2.1  Your company is duly organized or formed and in good standing under the laws of the state of its formation.

6.1.2.2  Your company has the power and authority to enter into this Agreement and to perform its obligations under this Agreement.

6.1.2.3  Your company's organizational documents, operating agreement or shareholders agreement will recite that the issuance and transfer of your company's ownership interests are restricted by the terms of this Agreement, and all certificates and other documents representing your company's ownership interests will bear a legend referring to the restrictions of this Agreement.

Section 6.2 - *Indemnification*

6.2.1  *Your Indemnity.*  You will indemnify and hold us and our affiliates, and the members, managers, stockholders, directors, officers, employees and agents of our company and our affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to:  (i) the failure of any of your representations, warranties or covenants set forth in this Agreement, or (ii) any act or omission of yours or anyone associated with or employed by or affiliated with you, except as described in Section 6.2.2.  We will have the right to participate in the defense, with counsel of our own choice and at our own expense, of any action that may give rise to your obligation to indemnify, and to reject any settlement that might adversely affect us.

6.2.2  *Our Indemnity.*  We will defend and indemnify and hold you and your affiliates, and the members, managers, stockholders, directors, officers, employees and agents of your company and its affiliates, harmless from and against all costs, expenses, liabilities and losses, including reasonable attorneys' fees and disbursements, directly or indirectly relating to:  (i) your use of the System or any of the Marks in full compliance with the terms and conditions of this Agreement; or (ii) advertising or promotion carried out by us or by agencies or media engaged by us relating to the Kung Fu Tea shop brand, provided that you have timely notified us of each such claim or proceeding, have given us sole control of the defense and settlement, and have otherwise complied with this Agreement.

6.2.3  *Notice of Claim; Survival.*  Each party will give the other notice of any claim that may require indemnification promptly after such party learns of such claim.  The rights and obligations of the parties under this Section 6.2 will survive the expiration or termination of this Agreement.

6.3 – *Insurance*

6.3.1  *Insuring the Franchised Business.*  During the term of this Agreement and any renewal, you will obtain and maintain, at your own expense, an insurance policy or policies protecting you against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense arising or occurring upon or in connection with the operation of the Franchised Business. Such policy or policies must

6.3.1.1  be written by an insurer licensed and admitted to write coverage the state in which the Franchised Business is located and with a rating of "A" or better as set forth in the most recent edition of Best's Key Rating Guide;

6.3.1.2  be primary coverage without right of contribution from any general liability policy or auto liability policy or from any insurance of ours;

6.3.1.3  name KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc. as additional insureds;

– 33 –

**A376**

6.3.1.4   be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 (or an endorsement form with comparable wording acceptable to us; and

6.3.1.5   comply with our written requirements at the time such policies are obtained, and provide at least the types and minimum amounts of coverage specified below or as described in our written notice to you.

Your obligation to obtain and maintain such insurance will not be limited in any way by reason of any insurance we may maintain.

6.3.2   *Minimum Coverage.*   The policies referred to in Section 6.3.1 must include at least the following:

6.3.2.1   "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance;

6.3.2.2   comprehensive general liability insurance, including products and completed operations, in an amount of not less than the following combined single limits: $2,000,000 per occurrence, $2,000,000 personal and advertising injury, $2,000,000 completed operations/products aggregate, $2,000,000 aggregate per location;

6.3.2.3   employment practices liability coverage with a limited $100,000 per occurrence and in the aggregate;

6.3.2.4   automobile liability coverage, including coverage of owned, non-owned, rented or hired vehicles with coverage in amounts not less than $1,000,000 combined single limit; and

6.3.2.5   workers' compensation insurance for statutory limits and employer's liability insurance in an amount not less than $1,000,000.

6.3.3   *Waiver of Subrogation.* You and your insurers must agree to waive their rights of subrogation against us in connection with any and all insurance that you are required to maintain under this Section 6.3.

6.3.4   *Changes in Coverage Requirements.*   Each year we may unilaterally modify the insurance minimum coverage requirements by delivery to you of written notice of the change, which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.

6.3.5   *Negligence.*   All public liability and property damage policies must contain a provision that KF Tea Franchising LLC, KF Tea USA Inc. and Arms Global Inc., although named as an additional insureds, will nevertheless be entitled to recover under such policies on any loss occasioned to any such company by reason of your negligence.

6.3.6   *Certificates of Insurance.*   At least ten days before you are first required to carry insurance, and thereafter at least thirty days before the expiration of any policy, you will deliver to us a certificate of insurance evidencing your compliance with this Section 6.3. Each certificate of insurance must expressly provide that we must receive at least thirty days' prior written notice in the event of material alteration to or cancellation or non-renewal of any coverage evidenced by the certificate.

– 34 –

6.3.7  *Our Remedies.*  If you fail to obtain or maintain the required insurance in accordance with this Section 6.3, we or our designee will each have the right and authority (but not the obligation) to obtain such insurance on your behalf.  Such right will be in addition to and not in lieu of any other rights or remedies available to us.  If we obtain such insurance on your behalf, we may require you to pay us the charges described in Section 2.1.7.2.

6.3.8  *No Effect on Indemnity.*  Nothing in this Section 6.3 will relieve you of liability under the indemnity provisions in Section 6.2.

## ARTICLE VII - MISCELLANEOUS

Section 7.1 – *Relationship of the Parties.*  You are an independent contractor and not an agent of ours.  You will have no power or authority to make any commitment or enter into any contract or agreement obligating or purporting to obligate us, and you will not hold yourself out as having such power or authority.  Nothing in this Agreement creates a fiduciary relationship between the parties.  You agree to conspicuously identify yourself in all dealings with customers, suppliers, public officials, your employees and others as the owner of an independent business under a franchise from us and to place such notices of independent ownership on such forms, business cards, stationery, advertising and other materials as we require from time to time.

Section 7.2 – *Reasonable Business Judgment.*  You acknowledge that the long-term interests of the network of Kung Fu Tea shops, and our company and its owners, taken together, require that we have the latitude to make business decisions with respect to the franchise system.  The ultimate responsibility to make decisions with respect to the System and the System Standards is vested in us because we, you and all Kung Fu Tea shop franchisees have a collective interest in working within a franchise system that can quickly adjust to changing business conditions, including changes in the competitive environment, new laws and regulations, and emerging business opportunities.  We have this right even if, at times, a particular decision adversely affects you.  We will not be required to consider your particular economic or other circumstances or to disregard our own economic or other business interest when making decisions under this Agreement.

Section 7.3 – *Injunctive Relief.*  You understand that your covenants set forth in Article III constitute essential elements of this Agreement.  If you fail to comply strictly with any such covenants, we will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against you in a court of competent jurisdiction.

Section 7.4 – *Severability.*  If any restrictive covenant in this Agreement is held to be invalid or unenforceable because its duration is too long or its scope is too broad, you and we agree that the court making such determination will have the power to reduce the duration or scope in such a manner that the remaining revised covenant will be valid and enforceable.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is prohibited by or invalid under applicable law, such prohibition or invalidity will not invalidate the remainder of such provision or the other provisions of this Agreement.

Section 7.5 – *No Waiver of Rights.*  No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.  No waiver will be binding unless contained in a writing signed by the party waiving its rights.  Any waiver is limited to the specific situation in which it is given and no waiver of any breach or default under this Agreement will be construed as a waiver of any earlier or succeeding breach or default.

Section 7.6 – *Notices.*  All notices, requests, consents and other communications required or permitted by this Agreement will be in writing and will be delivered by hand, overnight delivery service, or

– 35 –

**A378**

registered or certified first class mail, to the following address, or such other address as either party, by like notice, designates with respect to its own address:

| If to us: | KF Tea Franchising LLC |
| | 589 8th Ave., 17th Floor |
| | New York, NY 10018 |
| If to you: | The address indicated in Schedule A |

Any such notice, request, consent or other communication will be deemed given and be effective upon receipt at such address.

Section 7.7 – **Affiliates.**  As used in this Agreement, the term "affiliate" of party means a company directly or indirectly controlling, controlled by or under common control with such party.  "Control" of another company, as used in this Agreement, means the ownership of or the power to vote, directly or indirectly through majority-owned companies, more than 50% of the voting stock or voting rights of such other company.

Section 7.8 – **Limitation of Actions.**  Any and all claims and actions arising out of or relating to this Agreement brought by either party against the other must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable statute of limitations; (b) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to the claim; or (c) two years after the first act or omission giving rise to the alleged claim.  Claims and actions not brought within such time period will be irrevocably barred.  Claims by us of your underreporting of sales, and claims for failure to pay monies owed or for indemnification will be subject only to the applicable statute of limitations.

Section 7.9 – **Waiver of Punitive Damages and Jury Trial.**  Except for your obligation to indemnify us for third party claims under Section 6.2, we and you each waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other party, and we and you agree that any recovery in a dispute between us will be limited to equitable relief and to the recovery of actual damages sustained.  We and you irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either of us.

Section 7.10 – **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to New York's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

Section 7.11 – **Jurisdiction.**  The parties irrevocably consent to the non-exclusive jurisdiction of the federal and state courts located in the city in which our principal office is located at the time suit is filed (or a city within 25 miles of such office).  If we assign or otherwise transfer this Agreement, all legal actions between the parties will be venued exclusively in a state or federal court in the judicial district in which the assignee's or transferee's principal offices are located at the time the suit is filed.  The parties hereby waive, to the full extent permitted by law, defenses based on jurisdiction, venue and forum *non conveniens*.  The parties further consent to service of process in any action by registered mail, return receipt requested, or by any other means permitted by law.

Section 7.12 – **Costs and Expenses.**  In any legal action arising out of or pursuant to this Agreement or otherwise in connection with the relationship between us, the prevailing party will be entitled to recover its reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with the claims on which it prevailed.

– 36 –

A379

Section 7.13 – **Entire Agreement.**  This Agreement and all related agreements executed simultaneously with this Agreement constitute the entire understanding of the parties and supersede any and all prior oral or written agreements between you and us on the matters contained in this Agreement; but nothing in this or any related agreement is intended to disclaim the representations we made in the latest franchise disclosure document that we furnished to you.  Except for changes permitted under this Agreement to be made unilaterally by us, no amendment to this Agreement will be binding unless such amendment is in writing and executed by the parties.

The parties have signed this Agreement on the dates set forth below, with effect as of the effective date as stated in the opening paragraph of this Agreement.

KF TEA FRANCHISING LLC                      VTVC ENTERPRISES, INC.

By _____                By _VAN NGUYEN_____

Title _____CEO_____                Title ___owner_____

Date ___9/18/2017_____                  Date __9-06 - 2017_____

– 37 –

Version 4/17/2017

**A380**

**SCHEDULE A**

**FRANCHISEE INFORMATION**

See Sections 1.1.2, 1.1.8, 5.1.1, 6.1.1.8 and 7.6 of the Franchise Agreement

1.   Approved location (the Site):  3910 Wayne Ave, #102, Wichita Falls, TX 76308

2.   Territory:  a radius of one-half mile from the Site

3.   Agreement expiration date:  August 16, 2027

4.   Type of shop (indicate one):        Standard Unit __✓___
                                          Non-Traditional Unit: _____

5.   Address for notices (if different than 1):  VTVC Enterprises, Inc.
                                                 c/o Mr. Van Nguyen
                                                 8 Park Place Ct.
                                                 Wichita Falls, TX 76302

6.   Ownership and management of the franchisee.

     The franchisee is a Texas corporation

     The following persons are the officers, directors and officers of the Franchisee:

| Name and Address | Positions | Percentage Ownership |
|---|---|---|
| Mr. Van Nguyen<br>8 Park Place Ct.<br>Wichita Falls, TX 76302 | Director and President | 100% |

Version 4/17/2017

**A381**

# Exhibit 19

**KUNG FU TEA SHOP**

**Guaranty and Assumption of Obligations**

In order to induce KF TEA FRANCHISING LLC, a Delaware limited liability company (the "Franchisor") to enter into a Kung Fu Tea shop franchise agreement dated as of August 16, 2017 (the "Franchise Agreement") with VTVC ENTERPRISES, INC., a Texas corporation (the "Franchisee") for a Kung Fu Tea shop located at 3910 Wayne Ave, #102, Wichita Falls, TX 76308, the undersigned person (the "Guarantor"), hereby agrees as follows:

1. *Guaranty of Payment*

1.1   *Personal Guaranty.*   The Guarantor personally and unconditionally guarantees to the Franchisor and the Franchisor's successors and assigns the due, punctual and complete payment of all amounts that the Franchisee is obligated to pay to the Franchisor under the Franchise Agreement and under any modification of, amendment to or renewal of the Franchise Agreement.

1.2   *Waiver of Defenses.*   The Guarantor waives to the fullest extent permitted by law (a) any defense based upon any (i) legal disability or lack of authority of the Franchisee, (ii) legal or equitable discharge or limitation of the liability of the Franchisee, whether consensual or arising by operation of law, (iii) bankruptcy, insolvency, reorganization or other similar proceeding affecting a Guarantor or the Franchisee, or (iv) invalidity, irregularity or unenforceability of any or all of the provisions of this Guaranty or the Franchise Agreement; (b) presentment, demand, protest or notice of any other kind; (c) notice of acceptance of this Guaranty; (d) other defenses available to a Guarantor under applicable law; or (e) any requirement of diligence on the part of the Franchisor or any right the Guarantor may have to require the Franchisor to proceed first against the Franchisee.

1.3   *Guaranty of Payment.*   This is a guaranty of payment and not of collection.  The Franchisor may require payment from the Guarantor of any obligation of the Franchisee under the Franchise Agreement and may sue the Guarantor for damages without first seeking or taking any action against the Franchisee.

1.4   *No Modification or Release.*   The liability of the Guarantor is unaffected by (a) any modification, amendment, termination or variation in or addition to the Franchise Agreement; (b) any extension of time for performance or any waiver of performance or any delay of the Franchisor in enforcing any right, remedy, power or privilege that the Franchisor may have against the Franchisee or any other person; (c) the release of the Franchisee, in whole or in part, from performance or observance of any of the agreements, covenants, terms or conditions contained in the Franchise Agreement, whether made with or without notice to the Guarantor; or (d) any other guaranty now or hereafter executed by anyone else in connection with the transactions contemplated by the Franchise Agreement.

1.5   *Costs.*   In the event this Guaranty is placed in the hands of an attorney for enforcement and the Franchisor is the prevailing party, the Guarantor will reimburse the Franchisor for all reasonable expenses incurred in the enforcement of the Franchisor's rights hereunder, including reasonable attorneys' fees and expenses.

2. *Proprietary Rights; Confidentiality; Noncompetition*

2.1   *Improvements.*   The Guarantor agrees that if he or she makes an improvement to the Franchisor's business system or method, such improvement will be the property of the Franchisor pursuant to the terms of Section 1.4.3 of the Franchise Agreement and the Guarantor will promptly disclose such improvement to the Franchisee and to the Franchisor with reference to this undertaking. The Guarantor hereby assigns all rights in such improvements to the Franchisor and agrees to sign any documents that the Franchisor may reasonably request from time to time to evidence such assignment.

Version 4/17/2017

**A383**

2.2   *Copyrights and Trademarks.*  The Guarantor acknowledges that the Franchisor's copyrights and trademarks may only be used by the Franchisee in accordance with Section 3.1 of the Franchise Agreement.  The Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.1 and not to use any of the Franchisor's copyrights or trademarks except on behalf of the Franchisee in furtherance of the Franchisee's business, and the Guarantor agrees that any such use will be in compliance the Franchisee's obligations under the Franchise Agreement as if the Guarantor were the Franchisee under the Franchise Agreement.

2.3   *Confidentiality.*  The Guarantor acknowledges the Franchisee's obligations of confidentiality under Section 3.2 of the Franchise Agreement.  The Guarantor personally agrees to comply with all of the Franchisee's obligations under Section 3.2 and not to disclose or use any Confidential Information (as defined in Section 3.2.1 of the Franchise Agreement) except on behalf of the Franchisee in furtherance of the Franchisee's business in compliance the Franchisee's obligations under the Franchise Agreement, and only to the extent that the Franchisee is permitted under the Franchise Agreement to disclose and use Confidential Information.  Upon the request of the Franchisor, the Guarantor will promptly return to the Franchisor all Confidential Information and all copies in the Guarantor's possession or under the Guarantor's control, and the Guarantor will destroy all copies on the Guarantor's computers, disks and other digital storage devices.

2.4   *Noncompetition.*  The Guarantor acknowledges the Franchisee's obligations under Section 3.3 of the Franchise Agreement not to compete with the Franchisor.  The Guarantor personally agrees to comply with and be bound by all of the Franchisee's obligations under Section 3.3 to the same extent that the Franchisee is bound by the obligations of Section 3.3, both during and after the term of the Franchise Agreement.

2.5   *Remedies.*  The Guarantor acknowledges that if the Guarantor fails to comply strictly with any of the undertakings in Sections 2.1 through 2.4 above, the Franchisor will suffer irreparable harm and will have a cause of action for damages or injunctive relief or both against such Guarantor in a court of competent jurisdiction.  In the event that the Franchisor prevails in any such litigation, the Guarantor will reimburse the Franchisor for all costs, attorneys' fees and other expenses incurred by the Franchisor in connection with such litigation.

3. **Transfer**

3.1   *Transfer by the Franchisor.*  If the Franchisor transfers its rights and obligations under the Franchise Agreement pursuant to Section 4.1 of the Franchise Agreement, this Guaranty will be deemed to be transferred automatically to the transferee who, upon such transfer, will have all of the rights granted to the Franchisor under this Guaranty vis-a-vis the Guarantor, and the obligations of the Guarantor will then accrue to the benefit of the transferee.

3.2   *Transfer by the Franchisee.*  The Guarantor acknowledges the Franchisee's transfer restrictions under Sections 4.2 and 4.3 of the Franchise Agreement.  The Guarantor personally agrees to comply with all of the Franchisee's obligations under Sections 4.2 and 4.3.

4. **Miscellaneous**

4.1   *Notices.*  All notices and other communications required or permitted by this Agreement will be in writing and will be delivered by hand, fax, overnight delivery service, or registered or certified first class mail, to the then-current address of the Guarantor known by the sender.  Any such notice or other communication will be deemed given and be effective upon receipt at such address.

4.2   *Waiver.*  No delay or failure to exercise any right or remedy provided for in this Agreement will be deemed to be a waiver of such right or remedy or acquiescence in the event giving rise to such right or remedy.

Version 4/17/2017

- 2 -

**A384**

4.3   *Governing Law.*   This Guaranty and Assumption of Obligations will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to that state's conflict of laws principles; but nothing in this Agreement will be deemed to extend the application of the New York Franchise Act to the sale of franchises outside of the State of New York.

4.4   *Amendments.*   This Guaranty and Assumption of Obligations may not be modified or amended except in writing signed by the Franchisor and the Guarantor to be bound by such modification or amendment.  No waiver or discharge will be valid unless in writing and approved by the Franchisor.

IN WITNESS WHEREOF, the Guarantor has signed this Guaranty as of the date of the Franchise Agreement.

Van Nguyen
8 Park Place Ct.
Wichita Falls, TX 76302

Acknowledged and agreed:

KF TEA FRANCHISING LLC

By _____

Title _____

Date _____

STATE OF *Texas*            )
                                              )   ss.:
COUNTY OF *Wichita*      )

On the _7_ day of ~~August~~ *September* 2017, before me personally came Van Nguyen, to me known to be the individual described in and who executed the foregoing guaranty, and he acknowledged that he executed the same.



_____
Notary Public

Version 4/17/2017

- 3 -

**A385**

# Exhibit 20



Offit | Kurman®
Attorneys At Law

Trust. Knowledge. Confidence.

Tony V. Pezzano
929.476.0045 (Direct Dial)
631.255.3035 (Mobile)
212.545.1656 (Facsimile)
Tony.Pezzano@offitkurman.com

March 21, 2023

**VIA PRIORITY US FIRST CLASS MAIL**

VTVC Enterprises, Inc.
3910 Wayne Avenue, #102
Wichita Falls, Texas 76308

VTVC Enterprises, Inc.
c/o Mr. Van Nguyen
Director and President
8 Park Place Ct.
Wichita Falls, TX 76302

Mr. Toan Van Nguyen
8 Park Place Ct.
Wichita Falls, Texas 76302

**Re: Notice of Termination of KF Tea Franchising LLC Franchise
Agreement and Objection to VTVC Enterprise's Infringing Use of KF
Tea Franchising LLC's Trademarks**

Dear Mr. Nguyen:

This firm represents KF Tea Franchising LLC ("KFTF"), which you are aware is the franchisor of KUNG FU TEA® shops.  KUNG FU TEA® is an international brand with the trademark registered in numerous jurisdictions throughout the world, including in the United States, where KFTF has more than 300 franchised locations.  KFTF began its operation in New York City in 2010.

**A387**



Trust. Knowledge. Confidence.

Page 2

Since 2013, KFTF has offered its franchisees the right to own and operate KUNG FU TEA® shops at approved locations. VTVC Enterprises, Inc. and Mr. Toan Van Nguyen (collectively "VTVC") entered into a franchise agreement with KFTF with an effective date of August 16, 2017, to open and operate a KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308 (the "Franchise Agreement"). As you know as the owner of VTVC, a party to the Franchise Agreement, and a guarantor of the Franchise Agreement yourself, each KUNG FU TEA® shop is a retail shop selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks. All of the teas and other drinks are prepared in accordance with recipes using KFTF's ingredients and other specified or authorized ingredients, using equipment KFTF supplies or specifies.

We understand based on an agreement reached between KFTF and VTVC on August 19, 2022 that VTVC agreed to close its franchised store as a result of VTVC's violations of the Franchise Agreement, subject to VTVC's completion of all store closing tasks on or before September 18, 2022, with which deadline VTVC did not comply. We also understand that in or about October 2022, VTVC started operating another store at the approved location under the name Kung Fu Boba selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks. and other products and services using the names Kung Fu Boba and Kung Fu Tea without authorization from KFTF. In view of the foregoing, I write to provide written notice to VTVC of the immediate termination of the Franchise Agreement and concerning KFTF's objections to VTVC's unauthorized and infringing use of KFTF's trademarks.

Specifically, Article V Section 5.2.2, provides that KFTF can terminate the Franchise Agreement upon notice with immediate effect based on a material breach by VTVC. VTVC has committed a material breach of at least the following sections of the Franchise Agreement:

- 5.2.2.8 - you or any of your company's owners make any unauthorized use of the Marks or challenge or seek to challenge the validity of any of the Marks;
- 5.2.2.7 - you or any of your company's owners use or disclose any Confidential Information in violation of the requirements of Section 3.2;

**A388**



- **5.2.2.10** - you fail to maintain the highest rating possible for the Franchised Business in accordance with the terms of Section 1.6.6, or you fail to notify us in as required under Section 1.6.6, or you fail to correct in a timely manner any condition described in any inspection report or any warning, citation, certificate or notice relating to the Franchised Business;
- **5.2.2.12** - you knowingly maintain false books or records or submit to us a report that understates the Gross Revenue of the Franchised Business three or more times during the term of this Agreement or by more than five percent on any one occasion;
- **5.2.2.15** - you or any of your company's owners effect or attempt to effect a Transfer without our approval and contrary to the provisions of Article IV.

VTVC has further committed a material breach of Article III, Sections 3.1.1 and 3.1.2 of the Franchise Agreement which provide:

3.1.1 *Our Copyrights.* We and our affiliates are the sole owners of all copyrights in the Manual and all supplemental materials, and other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us. You may not copy any such materials, nor create derivative works of any such materials, except as specifically authorized or permitted by us.

3.1.2 *Our Trademarks.* Your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Franchised Business at and from the premises of your Kung Fu Tea shop pursuant to and in compliance with this Agreement and all System Standards. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks.

KFTF is the exclusive licensee in and to the incontestably federally registered trademark KUNG FU TEA®. The KUNG FU TEA® mark is protected under at least U.S. Trademark Registration Nos. 3,961,011; 4,497,687; 4,510,162;

**A389**



4,857,505; 5,438,1824; 5,438,825; 5,443,929; 5,443,930; 5,443,931; 5,588,198; and 5,639,864.

The KUNG FU TEA® mark is registered for the following goods and services: restaurant services featuring non-alcoholic drinks, beverages and confections; tea, tea-based flavored drinks and beverages, tea-based slush-type drinks, pastries containing tea, tea-based smoothies; fruit-flavored smoothies containing tea, fruit flavored slush-type drinks containing tea; cellphone cases, cases for mobile phones, stickers, tote bags, mugs, plastic cups, tea canisters, water bottles sold empty, headwear, namely, caps and hats, hoodies, t-shirts, tea bags.

KFTF has made extensive and continuous use of the KUNG FU TEA® mark in U.S. Commerce through its authorized franchisees since at least as early as 2013, with rights accruing to it in connection with KUNG FU TEA® shops selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks. Our affiliate, KF Tea USA Inc., began using the mark in 2010. As a result of KFTF's authorized franchisees' long use, significant advertising and promotional efforts, extensive sales, and the high and consistent quality of the goods and services under the KUNG FU TEA® mark, the mark has obtained national recognition and fame and become an indicator of the source of KFTF's goods and services and a symbol of substantial and valuable goodwill. In view of this, KFTF vigorously enforces its KUNG FU TEA® mark and protects its goodwill and brand.

VTVC's infringement of the KUNG FU TEA® mark comprises at least its use of the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark in connection with the name of its store and the goods and services of its store selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks, and other products and services without authorization from KFTF. VTVC also uses the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark in connection with the advertisement and promotion of its shop and the goods and services of its shop on, for example, its Google website (*see, e.g.,* webpage https://goo.gl/maps/VTXLdxkmuWJvMjCK6). VTVC's shop, using the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark without authorization by KFTF, offers the very same goods and services protected



by the KUNG FU TEA® trademarks.  Moreover, VTVC's agreement to close its franchise store as a result of VTVC's violations of the Franchise Agreement, and its subsequent opening of another store selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks, as well as other products and services using the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA without informing KFTF and obtaining its authorization constitutes willful infringement.  The prominent use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA in VTVC's shop and the promotions and advertisements of its shop appears to be made with the intent to trade on the goodwill associated with KFTF's KUNG FU TEA® mark.  Damages for willful trademark infringement are severe and can involve disgorgement of profits along with payment of attorney's fees.

For at least these reasons, VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA in VTVC's shop and the promotions and advertisements of its shop is undoubtedly creating confusion, mistake and deception as to the source or origin of your goods and services, conveying the impression that VTVC's KUNG FU BOBA store is sponsored or endorsed by, or a franchisee of KFTF, when this is not the case.  Moreover, VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA are diluting the reputation and good will of KFTF's KUNG FU TEA® mark.  Your use already has and likely will continue to cause consumer confusion and damage to KFTF's valuable trademark rights under the Lanham Act, 15 U.S.C §1114 and 15 U.S.C. §1125(a) and (c).  Your actions also have and likely will continue to give rise to separate claims under state common law trademark infringement and unfair competition laws.  VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA is irreparably damaging KFTF and its reputation and goodwill, and the use of these marks, including on your website and the use of KUNG FU BOBA as your company name, must stop.

Under U.S. trademark law, KFTF must diligently enforce its rights or risk losing distinctiveness of its trademark. *See Freecyle Network, Inc. v. Oey,* 505 F.3d 898, 905 (9th Cir. 2007) ("Trademark owners are free (and perhaps wise) to take action to prevent their marks from becoming generic … e.g. through active policing of the mark's use"); *Fortunoff Silver Sales, Inc. v. Norman Press, Inc.,*

**A391**



225 U.S.P.Q. 863, 868-69 (T.T.A.B. 1985).  While KFTF is prepared to enforce its registered exclusive rights, the primary purpose of this letter is to seek an amicable resolution to this matter without the need for legal action, if possible.

To this end, KFTF requires that you agree to the following terms:

- Permanently cease and desist any and all current or future use of KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.  This includes, but is not limited to any efforts or activities to promote, license, or advertise any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States under KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.

- Refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on all social media platforms.

- Provide KFTF with sufficient information to determine the full amount of your revenues and profits derived from your use of KUNG FU TEA® and KUNG FU BOBA following the August 2022 agreement.

- Confirm in writing that you will refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on your website and all social media platforms.

- Place a notice on your website that informs any prospective customers that your company has no affiliation with KUNG FU TEA® stores.



- Confirm in writing that you will inform any prospective customers that you have reason to suspect approach your store by mistake when looking for a KUNG FU TEA® store that your company has no affiliation with KUNG FU TEA® stores.

In addition to the violation of KFTF's intellectual property rights detailed above, VTVC materially breached the Franchise Agreement because it failed to comply with brand standards, failed to complete the action plan provided by KFTF by its July 1, 2022 compliance deadline, and through VTVC's use and sale of unauthorized inventory. VTVC's failure to comply with brand standards and use and sale of unauthorized inventory was discovered during a June 6, 2022 Store Performance Visit. VTVC was subsequently placed on an action plan to remediate those failures, but failed to comply with the plan. On August 19, 2022, KFTF advised you of VTVC's failures and noncompliance. At that time, the parties mutually agreed to the closure of the store, subject to the completion of all store closing tasks by VTVC on or before September 18, 2022. VTVC failed to timely comply with the store closing tasks. Although KFTF believed that the tasks were completed on September 30, 2022, it is evident by VTVC's ongoing using of the KUNG FU TEA® marks that the tasks remain incomplete. Therefore, the $300 daily fee under Section 2.1.6.11 for the use of unauthorized product is now in the amount of $64,500.

As a reminder, under the personal guaranty executed by VTVC in connection with the Franchise Agreement, VTVC is personally obligated to pay to KFTF all amounts that VTVC owes to KFTF, upon demand. We further remind VTVC of your ongoing obligation of confidentiality under Section 3.2 of the Franchise Agreement.

Due to the urgency of this matter, please provide a response to this letter within **TEN (10) DAYS** of the above-noted date to indicate in writing whether you will comply with the terms as stated herein. KFTF is prepared to take further action as and when needed to protect its contract and intellectual property rights. If you elect to disregard the demands contained herein and, in violation of federal and state law, you continue use of KUNG FU TEA® and KUNG FU BOBA or any variation of these terms, our client may



Trust. Knowledge. Confidence.

Page 8

initiate legal action against you without further notice. We trust, however, that such enforcement measures will not be necessary and that we will be able to settle this matter amicably in due course.

Please note that nothing contained in this letter, nor any act or omission by KFTF, its staff, or representatives is intended or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any rights or remedies which KFTF may have regarding this matter, and all rights and remedies, whether at law or in equity, are hereby expressly reserved.

We look forward to receiving your response soon, but in no event later than **ten (10) days** after the date hereof.

Sincerely,

/Tony V. Pezzano/

Tony V. Pezzano

TP/

4876-6108-5016, v. 2

**A394**

# Exhibit 21



# Exhibit 22



Trust. Knowledge. Confidence.

**Tony V. Pezzano**
**929.476.0045 (Direct Dial)**
**631.255.3035 (Mobile)**
**212.545.1656 (Facsimile)**
**Tony.Pezzano@offitkurman.com**

April 1, 2023

**VIA EMAIL AND PRIORITY US FIRST CLASS MAIL**

VTVC Enterprises, Inc.
3910 Wayne Avenue, #102
Wichita Falls, Texas 76308

VTVC Enterprises, Inc.
c/o Mr. Nguyen
Director and President
8 Park Place Ct.
Wichita Falls, TX 76302

Mr. Toan Nguyen
8 Park Place Ct.
Wichita Falls, Texas 76302
toan_nguyen506@yahoo.com

**Re: Termination of KFTF Franchise Agreement And Toan Nguyen/VTVC**
**Enterprise's Agreement To Close VTVC Enterprises, Inc., Kung Fu**
**Boba And Not Use KF Tea Franchising LLC's Trademarks**

Dear Mr. Toan Nguyen:

I am writing to memorialize our discussion earlier this week and your
agreement to the following terms in response to the Termination and Cease and
Desist Letter sent to you and VTVC Enterprises, Inc. (collectively "You") on

**A398**


Attorneys At Law

Trust. Knowledge. Confidence.

Page 2

March 21 on behalf of KF Tea Franchising LLC ("KFTF").  You have agreed as follows:

     1.    You will take all necessary steps to completely close the Kung Fu Boba shop located in Wichita Falls, Texas and your involvement in the business of a retail shop, and any website related thereto, selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks on or about March 31, 2023, and no later than April 20, 2023.  You will send to my attention an email once the business is closed, and you will include photos showing the closed location.

     2.    You confirmed that in August 2022 you closed the KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308. That shop was operating pursuant to your franchise agreement with KFTF of August 16, 2017 (the "Franchise Agreement").   You also confirmed that the Franchise Agreement is terminated and that you agreed to pay off the $30,000 in penalties that you owe to KFTF pursuant to the Franchise Agreement on a payment schedule of $500 per week, such that the total payment of $30,000 is completed within fifteen months beginning April 1, 2023.

     3.    Once the balance is fully paid, you will have no further obligations under the Franchise Agreement other than your obligations not to compete under Section 3.3.3 and not to disclose any confidential information of KFTF pursuant to Section 3.2.

     4.    Once the Kung Fu Boba shop is closed, you will permanently cease and desist any and all current or future use of the KUNG FU TEA trademarks, and any similar marks, such as KUNG FU BOBA.  This includes, but is not limited to any efforts or activities to promote, license, or advertise any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States under KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.

     5.    Upon the closure of the Kung Fu Boba shop, you will refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on any website and any social media platform.

**A399**



Attorneys At Law

Trust. Knowledge. Confidence.

Page 3

Due to the urgency of this matter, please countersign below your agreement to the terms of this letter by close of business (5:00pm Central) April 3, 2023.

Please note that nothing contained in this letter, nor any act or omission by KFTF, its staff, or representatives is intended or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any rights or remedies which KFTF may have regarding this matter, and all rights and remedies, whether at law or in equity, are hereby expressly reserved.

We look forward to receiving your countersignature soon, but in no event later than close of business on April 3, 2023.

Sincerely,

/Tony V. Pezzano/

Tony V. Pezzano

Date: April 2, 2023

Toan Nguyen
Director and President
VTVC Enterprises, Inc.
8 Park Place Ct.
Wichita Falls, TX 76302

**A400**

# Exhibit 23



# Exhibit 24



# Exhibit 25



# Exhibit 26



# Exhibit 27



Google | kung fu tea wichita falls

Maps · Images · Menu · Shopping · Perspectives · Prices · Videos · News · Books · All filters · Tools · SafeSearch

About 1,590,000 results (0.67 seconds)

Results for **Wichita Falls, TX** · Choose area

Kung Fu Tea
https://www.kungfutea.com › menu

### Menu — Kung Fu Tea | Fresh - Innovative

At **Kung Fu Tea**, every beverage is made-to-order with real Kung Fu. Our tea is freshly brewed every 3 hours using premium tea leaves.
Milk Tea Series · What Is Bubble Tea (Boba)? · Pumpkin oolong milk tea · Nutrition

Yelp
https://www.yelp.com › ... › Coffee & Tea › Kung Fu Tea

### KUNG FU TEA - CLOSED - 79 Photos & 34 Reviews

**Kung Fu Tea** · Map · 3910 Wayne Ave. Ste 102. **Wichita Falls**, TX 76308. Directions · (940) 882-3537. Call Now · Full menu · Known For. Yes. Offers Takeout. Accepts ...
Rating: 4.3 · 34 reviews · Price range: $

Kung Fu Tea
https://www.kungfutea.com

### Kung Fu Tea | Fresh - Innovative - Fearless leading tea brand

Welcome to **Kung Fu Tea's** Fresh - Innovative - Fearless world of bubble tea (boba) and other tasty, refreshing beverages. All drinks are made with fresh, ...
What Is Bubble Tea (Boba)? · Kung Fu Tea News · Menu · App

Discover Wichita Falls
https://discoverwichitafalls.com › destination-item › k...

### Kung Fu Tea

**Kung Fu Tea**. 3910 Wayne Ave **Wichita Falls** TX 76308 | 940-882-3537 | website. Restaurant chain that specializes in bubble tea with a selection of other hot ...

Tripadvisor
https://www.tripadvisor.com › ... › Wichita Falls

### KUNG FU TEA, Wichita Falls - Restaurant Reviews, ...

**Kung Fu Tea**, **Wichita Falls**: See unbiased reviews of Kung Fu Tea, one of 247 Wichita Falls restaurants listed on Tripadvisor.

MapQuest
https://www.mapquest.com › ... › Texas › Wichita Falls

### Kung Fu Tea - 3910 Wayne Ave

Get directions, reviews and information for **Kung Fu Tea** in **Wichita Falls**, TX ... **Kung Fu Tea**. 3910 Wayne Ave **Wichita Falls** TX 76308. (940) 882-3537. Claim this ...

Restaurantji
https://www.restaurantji.com › wichita-falls › kung-fu-...

### Kung Fu Tea Wichita Falls, TX 76308 - Menu, 118 Reviews ...

Latest reviews, photos and ratings for **Kung Fu Tea** at 3910 Wayne Ave #102 in **Wichita Falls** - view the ✓menu, ⏰hours, ☎phone number, ☝address and ...

Restaurant Guru
https://restaurantguru.com › Kung-Fu-Tea-Wichita-Fal...

### Kung Fu Tea in Wichita Falls - Restaurant menu and reviews

Nov 20, 2023 — All info on **Kung Fu Tea** in **Wichita Falls** - Call to book a table. View the menu, check prices, find on the map, see photos and ratings.

See photos

## Kung Fu Tea

4.4 261 Google reviews
$ · Bubble tea store

Directions · Save · Call

Bubble tea specialist with a selection of other hot & cold c coffee & slushes.

**Address:** 3910 Wayne Ave #102, Wichita Falls, TX 7630

**Hours:** Closed · Opens 11 AM

**Phone:** (940) 882-3537

**Menu:** kungfuboba.app.infi.us

Suggest an edit

### Add missing information

Add website

### Reviews

Google reviews · Write a review

"No other **place** in **town** have I found offer such a teas."

"Tasty and good **selection** of **drinks** plus some **de** munch on."

"Super friendly **staff**, clean, and amazing **atmospl**

View all Google reviews

### Popular Times

MON TUE WED THU FRI S

6 PM: Usually as busy as

People typically spend **15 min** here

12/8/23, 11:04 AM                                      kung fu tea wichita falls - Google Search



Facebook · Kung Fu Kitchen WF
2K+ followers

**Kung Fu Kitchen WF | Wichita Falls TX**

We will be bringing **Kung Fu Tea** WF to our **Wichita Falls** community right next to
chipotle. We will be serving a wide variety of cool and refreshing drinks ...

Rating: 4.4 · 53 votes



Sirved
https://www.sirved.com › Wichita Falls, Texas ⋮

**Menu for Kung Fu Boba in Wichita Falls, TX**

Menu for **Kung Fu** Boba in **Wichita Falls**, TX ; Friday, 11:00 AM - 9:30 PM ; Saturday,
11:00 AM - 9:30 PM ; Sunday, 11:00 AM - 9:30 PM ; Monday, 11:00 AM - 8:30 PM.

## Related searches ⋮

Kung fu tea wichita falls menu                    kung fu tea **near me**

Kung fu tea wichita falls prices                  kung fu tea **pikmin**

kung fu tea **menu**                              kung fu tea **food**

kung fu tea **locations**                         kung fu tea **hours**

More results ⌄

**From Kung Fu Tea**

"Specializes in made-to-order tea, milk & fruit-based beve
wide selection of drink toppings including bubbles, beans,
pudding."

**Send to your phone**

## Questions & Answers

See all questions (3)

## Updates from Kung Fu Tea

View previous updates on Google

## People also search for

| Kung Fu Kitchen Chinese | fun noodle bar Asian | The Duck Coffee Company Cafe | Pho Viet Vietnam... | Sta Cof sho |

# Exhibit 28



## Kung Fu Tea

3910 Wayne Ave #102, Wichita Falls, TX

Write a review

### 4.4

261 reviews ⓘ

**Cody Dodson**
Local Guide · 12 reviews · 32 photos

⋮

a month ago

Take out  |  Other  |  $1–10

Went here as a first timer. All I can say is wow I was stunned with the waterfall art as soon as you walk through the door. Plenty of seating in lobby,they had a cool swing chair in lobby that I was able to relax in upon my drinks being made. I ordered two drinks per recommendation it was the coca cream wow. All I can say is wow I'm a fan of boba smoothies and never did a milk tea and I'm sold now, definitely a new favorite spot when in the area thank you to your team and establishment for a great time quick delivery on drinks and keeping your customers first and making sure we leave pleased.

Parking: I went on a Monday afternoon the golf facility and chipotle had customers at their locations,yet still had at least six open spots to park at.

Kid-friendliness: Greeted at entry from front counter. Was my first time so employees helped to guide me through menu on what would best fit my liking.

**Service**: 5/5  |  **Atmosphere**: 5/5

**Recommended dishes**
Honey Milk Tea, Kung Fu Milk Tea, Original

**Parking space**
Plenty of parking

**Parking options**
Free parking lot



## Kung Fu Tea

3910 Wayne Ave #102, Wichita Falls, TX

**4.4**                        261 reviews ⓘ              [ Write a review ]

**Cody Dodson**
Local Guide · 12 reviews · 32 photos                                              ⋮

a month ago

Take out  |  Other  |  $1–10

Went here as a first timer. All I can say is wow I was stunned with the waterfall art as soon as you walk through the door. Plenty of seating in lobby,they had a cool swing chair in lobby that I was able to relax in upon my drinks being made. I ordered two drinks per recommendation it was the coca cream wow. All I can say is wow I'm a fan of boba smoothies and never did a milk tea and I'm sold now, definitely a new favorite spot when in the area thank you to your team and establishment for a great time quick delivery on drinks and keeping your customers first and making sure we leave pleased.

Parking: I went on a Monday afternoon the golf facility and chipotle had customers at their locations,yet still had at least six open spots to park at.

Kid-friendliness: Greeted at entry from front counter. Was my first time so employees helped to guide me through menu on what would best fit my liking.

**Service**: 5/5  |  **Atmosphere**: 5/5

**Recommended dishes**
Honey Milk Tea, Kung Fu Milk Tea, Original

**Parking space**
Plenty of parking

**Parking options**
Free parking lot

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

KF TEA USA INC. and KF TEA FRANCHISING LLC,

Plaintiffs,

-against-

TEA N' BOBA ENTERPRISES LLC, TOAN VAN NGUYEN and VY NGUYEN,

Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

**DECLARATION OF TONY V. PEZZANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C § 1746, I, Tony V. Pezzano, Esq., under penalty of perjury, declares to be true and accurate the following statements:

1.      I am an attorney licensed to practice law in the State of New York, and am a principal of the law firm Offit Kurman, P.A., attorneys for Plaintiffs KF Tea USA Inc. and KF Tea Franchising LLC (collectively "Plaintiffs"). I am a member in good standing of the State Bar of New York.

2.      I submit this Declaration in support of Plaintiffs' Motion For Temporary Restraining Order ("TRO") And Preliminary Injunction ("PI") against Defendants Tea N' Boba Enterprises LLC, Mr. Toan Van Nguyen and Ms. Vy Nguyen (collectively "Defendants").

**A415**

3.      Attached hereto as **Exhibit 1** is a true and correct copy of a Notice of Termination of Franchise Agreement and  Cease and Desist letter that I sent on March 21, 2023 to VTC Enterprises, Inc. and Defendant Toan Van Nguyen by Priority U.S. First Class Mail and by email to toan_nguyen506@yahoo.com.

4.      Attached hereto as  **Exhibit 2** is a true and correct copy of a Closing Agreement that I sent to VTC Enterprises, Inc. and Defendant Toan Van Nguyen by email to toan_nguyen506@yahoo.com on April 1, 2023 that was signed by Mr. Nguyen on April 3, 2023.

5.      Attached hereto as  **Exhibit 3** is a true and correct copy of an email that I received from Defendant Toan Van Nguyen on April 19, 2023.

6.      Attached hereto as  **Exhibit 4** is a true and correct copy of an email that I received from Defendant Toan Van Nguyen on May 8, 2023, including a Certificate of Termination from the State of Texas of VTC Enterprises, Inc.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of an email that my colleague Stephen Forte of Offit Kurman, P.A. sent to Defendant Toan Van Nguyen on May 15, 2023.

8.      Attached hereto as **Exhibit 6** are true and correct copies of emails exchanged between my colleague Stephen Forte of Offit Kurman, P.A. and Defendant Toan Van Nguyen during the period June 26 through November 15, 2023.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Taxable Entity Search Results showing that Defendant Tea N'Boba Enterprises LLC was registered as a business in Texas on June 5, 2023, with Mailing Address at 8 Park Place CT, Wichita Falls, Texas 76302-1960.

10.      I declare under penalty of perjury that the foregoing is true and accurate.

2

**A416**

Executed on this 14th day of December 2023.

/s/Tony V. Pezzano
Tony V. Pezzano

4894-3193-8966, v. 1

3

# Exhibit 1


Attorneys At Law

Trust. Knowledge. Confidence.

**Tony V. Pezzano**
**929.476.0045 (Direct Dial)**
**631.255.3035 (Mobile)**
**212.545.1656 (Facsimile)**
**Tony.Pezzano@offitkurman.com**

March 21, 2023

**VIA PRIORITY US FIRST CLASS MAIL**

VTVC Enterprises, Inc.
3910 Wayne Avenue, #102
Wichita Falls, Texas 76308

VTVC Enterprises, Inc.
c/o Mr. Van Nguyen
Director and President
8 Park Place Ct.
Wichita Falls, TX 76302

Mr. Toan Van Nguyen
8 Park Place Ct.
Wichita Falls, Texas 76302

**Re: Notice of Termination of KF Tea Franchising LLC Franchise Agreement and Objection to VTVC Enterprise's Infringing Use of KF Tea Franchising LLC's Trademarks**

Dear Mr. Nguyen:

    This firm represents KF Tea Franchising LLC ("KFTF"), which you are aware is the franchisor of KUNG FU TEA® shops.  KUNG FU TEA® is an international brand with the trademark registered in numerous jurisdictions throughout the world, including in the United States, where KFTF has more than 300 franchised locations.  KFTF began its operation in New York City in 2010.

**A419**



Attorneys At Law

Trust. Knowledge. Confidence.

Page 2

Since 2013, KFTF has offered its franchisees the right to own and operate KUNG FU TEA® shops at approved locations. VTVC Enterprises, Inc. and Mr. Toan Van Nguyen (collectively "VTVC") entered into a franchise agreement with KFTF with an effective date of August 16, 2017, to open and operate a KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308 (the "Franchise Agreement"). As you know as the owner of VTVC, a party to the Franchise Agreement, and a guarantor of the Franchise Agreement yourself, each KUNG FU TEA® shop is a retail shop selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks. All of the teas and other drinks are prepared in accordance with recipes using KFTF's ingredients and other specified or authorized ingredients, using equipment KFTF supplies or specifies.

We understand based on an agreement reached between KFTF and VTVC on August 19, 2022 that VTVC agreed to close its franchised store as a result of VTVC's violations of the Franchise Agreement, subject to VTVC's completion of all store closing tasks on or before September 18, 2022, with which deadline VTVC did not comply. We also understand that in or about October 2022, VTVC started operating another store at the approved location under the name Kung Fu Boba selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks. and other products and services using the names Kung Fu Boba and Kung Fu Tea without authorization from KFTF. In view of the foregoing, I write to provide written notice to VTVC of the immediate termination of the Franchise Agreement and concerning KFTF's objections to VTVC's unauthorized and infringing use of KFTF's trademarks.

Specifically, Article V Section 5.2.2, provides that KFTF can terminate the Franchise Agreement upon notice with immediate effect based on a material breach by VTVC. VTVC has committed a material breach of at least the following sections of the Franchise Agreement:

- 5.2.2.8 - you or any of your company's owners make any unauthorized use of the Marks or challenge or seek to challenge the validity of any of the Marks;
- 5.2.2.7 - you or any of your company's owners use or disclose any Confidential Information in violation of the requirements of Section 3.2;



Trust. Knowledge. Confidence.

Page 3

- **5.2.2.10** - you fail to maintain the highest rating possible for the Franchised Business in accordance with the terms of Section 1.6.6, or you fail to notify us in as required under Section 1.6.6, or you fail to correct in a timely manner any condition described in any inspection report or any warning, citation, certificate or notice relating to the Franchised Business;
- **5.2.2.12** - you knowingly maintain false books or records or submit to us a report that understates the Gross Revenue of the Franchised Business three or more times during the term of this Agreement or by more than five percent on any one occasion;
- **5.2.2.15** - you or any of your company's owners effect or attempt to effect a Transfer without our approval and contrary to the provisions of Article IV.

VTVC has further committed a material breach of Article III, Sections 3.1.1 and 3.1.2 of the Franchise Agreement which provide:

3.1.1    *Our Copyrights.*  We and our affiliates are the sole owners of all copyrights in the Manual and all supplemental materials, and other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us.  You may not copy any such materials, nor create derivative works of any such materials, except as specifically authorized or permitted by us.

3.1.2    *Our Trademarks.*  Your right to use the Marks is derived solely from this Agreement and is limited to your operation of the Franchised Business at and from the premises of your Kung Fu Tea shop pursuant to and in compliance with this Agreement and all System Standards.  Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks.

KFTF is the exclusive licensee in and to the incontestably federally registered trademark KUNG FU TEA®.  The KUNG FU TEA® mark is protected under at least U.S. Trademark Registration Nos. 3,961,011; 4,497,687; 4,510,162;

**A421**



4,857,505; 5,438,1824; 5,438,825; 5,443,929; 5,443,930; 5,443,931; 5,588,198; and 5,639,864.

The KUNG FU TEA® mark is registered for the following goods and services:  restaurant services featuring non-alcoholic drinks, beverages and confections; tea, tea-based flavored drinks and beverages, tea-based slush-type drinks, pastries containing tea, tea-based smoothies; fruit-flavored smoothies containing tea, fruit flavored slush-type drinks containing tea; cellphone cases, cases for mobile phones, stickers, tote bags, mugs, plastic cups, tea canisters, water bottles sold empty, headwear, namely, caps and hats, hoodies, t-shirts, tea bags.

KFTF has made extensive and continuous use of the KUNG FU TEA® mark in U.S. Commerce through its authorized franchisees since at least as early as 2013, with rights accruing to it in connection with KUNG FU TEA® shops selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks.  Our affiliate, KF Tea USA Inc., began using the mark in 2010. As a result of KFTF's authorized franchisees' long use, significant advertising and promotional efforts, extensive sales, and the high and consistent quality of the goods and services under the KUNG FU TEA® mark, the mark has obtained national recognition and fame and become an indicator of the source of KFTF's goods and services and a symbol of substantial and valuable goodwill.  In view of this, KFTF vigorously enforces its KUNG FU TEA® mark and protects its goodwill and brand.

VTVC's infringement of the KUNG FU TEA® mark comprises at least its use of the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark in connection with the name of its store and the goods and services of its store selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks, and other products and services without authorization from KFTF.  VTVC also uses the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark in connection with the advertisement and promotion of its shop and the goods and services of its shop on, for example, its Google website (*see, e.g.,* webpage https://goo.gl/maps/VTXLdxkmuWJvMjCK6).  VTVC's shop, using the identical KUNG FU TEA® mark and the substantially similar KUNG FU BOBA mark without authorization by KFTF, offers the very same goods and services protected



by the KUNG FU TEA® trademarks.  Moreover, VTVC's agreement to close its franchise store as a result of VTVC's violations of the Franchise Agreement, and its subsequent opening of another store selling bubble tea, brew tea, coffee, juices, smoothies and a variety of other hot and cold drinks, as well as other products and services using the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA without informing KFTF and obtaining its authorization constitutes willful infringement.  The prominent use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA in VTVC's shop and the promotions and advertisements of its shop appears to be made with the intent to trade on the goodwill associated with KFTF's KUNG FU TEA® mark.  Damages for willful trademark infringement are severe and can involve disgorgement of profits along with payment of attorney's fees.

For at least these reasons, VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA in VTVC's shop and the promotions and advertisements of its shop is undoubtedly creating confusion, mistake and deception as to the source or origin of your goods and services, conveying the impression that VTVC's KUNG FU BOBA store is sponsored or endorsed by, or a franchisee of KFTF, when this is not the case.  Moreover, VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA are diluting the reputation and good will of KFTF's KUNG FU TEA® mark.  Your use already has and likely will continue to cause consumer confusion and damage to KFTF's valuable trademark rights under the Lanham Act, 15 U.S.C §1114 and 15 U.S.C. §1125(a) and (c).  Your actions also have and likely will continue to give rise to separate claims under state common law trademark infringement and unfair competition laws.  VTVC's use of the identical name KUNG FU TEA® and substantially similar name KUNG FU BOBA is irreparably damaging KFTF and its reputation and goodwill, and the use of these marks, including on your website and the use of KUNG FU BOBA as your company name, must stop.

Under U.S. trademark law, KFTF must diligently enforce its rights or risk losing distinctiveness of its trademark. *See Freecyle Network, Inc. v. Oey,* 505 F.3d 898, 905 (9th Cir. 2007) ("Trademark owners are free (and perhaps wise) to take action to prevent their marks from becoming generic … e.g. through active policing of the mark's use"); *Fortunoff Silver Sales, Inc. v. Norman Press, Inc.,*



**Attorneys At Law**

*Trust. Knowledge. Confidence.*

Page 6

225 U.S.P.Q. 863, 868-69 (T.T.A.B. 1985). While KFTF is prepared to enforce its registered exclusive rights, the primary purpose of this letter is to seek an amicable resolution to this matter without the need for legal action, if possible.

To this end, KFTF requires that you agree to the following terms:

- Permanently cease and desist any and all current or future use of KUNG FU TEA®, KUNG FU BOBA or any variation of these terms. This includes, but is not limited to any efforts or activities to promote, license, or advertise any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States under KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.

- Refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on all social media platforms.

- Provide KFTF with sufficient information to determine the full amount of your revenues and profits derived from your use of KUNG FU TEA® and KUNG FU BOBA following the August 2022 agreement.

- Confirm in writing that you will refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on your website and all social media platforms.

- Place a notice on your website that informs any prospective customers that your company has no affiliation with KUNG FU TEA® stores.

**A424**



- Confirm in writing that you will inform any prospective customers that you have reason to suspect approach your store by mistake when looking for a KUNG FU TEA® store that your company has no affiliation with KUNG FU TEA® stores.

In addition to the violation of KFTF's intellectual property rights detailed above, VTVC materially breached the Franchise Agreement because it failed to comply with brand standards, failed to complete the action plan provided by KFTF by its July 1, 2022 compliance deadline, and through VTVC's use and sale of unauthorized inventory. VTVC's failure to comply with brand standards and use and sale of unauthorized inventory was discovered during a June 6, 2022 Store Performance Visit. VTVC was subsequently placed on an action plan to remediate those failures, but failed to comply with the plan. On August 19, 2022, KFTF advised you of VTVC's failures and noncompliance. At that time, the parties mutually agreed to the closure of the store, subject to the completion of all store closing tasks by VTVC on or before September 18, 2022. VTVC failed to timely comply with the store closing tasks. Although KFTF believed that the tasks were completed on September 30, 2022, it is evident by VTVC's ongoing using of the KUNG FU TEA® marks that the tasks remain incomplete. Therefore, the $300 daily fee under Section 2.1.6.11 for the use of unauthorized product is now in the amount of $64,500.

As a reminder, under the personal guaranty executed by VTVC in connection with the Franchise Agreement, VTVC is personally obligated to pay to KFTF all amounts that VTVC owes to KFTF, upon demand. We further remind VTVC of your ongoing obligation of confidentiality under Section 3.2 of the Franchise Agreement.

Due to the urgency of this matter, please provide a response to this letter within **TEN (10) DAYS** of the above-noted date to indicate in writing whether you will comply with the terms as stated herein. KFTF is prepared to take further action as and when needed to protect its contract and intellectual property rights. If you elect to disregard the demands contained herein and, in violation of federal and state law, you continue use of KUNG FU TEA® and KUNG FU BOBA or any variation of these terms, our client may

**A425**



Attorneys At Law

Trust. Knowledge. Confidence.

Page 8

initiate legal action against you without further notice. We trust, however, that such enforcement measures will not be necessary and that we will be able to settle this matter amicably in due course.

Please note that nothing contained in this letter, nor any act or omission by KFTF, its staff, or representatives is intended or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any rights or remedies which KFTF may have regarding this matter, and all rights and remedies, whether at law or in equity, are hereby expressly reserved.

We look forward to receiving your response soon, but in no event later than **ten (10) days** after the date hereof.

Sincerely,

/Tony V. Pezzano/

Tony V. Pezzano

TP/

4876-6108-5016, v. 2

**A426**

# Exhibit 2



Attorneys At Law

Trust. Knowledge. Confidence.

**Tony V. Pezzano**
**929.476.0045 (Direct Dial)**
**631.255.3035 (Mobile)**
**212.545.1656 (Facsimile)**
**Tony.Pezzano@offitkurman.com**

April 1, 2023

**VIA EMAIL AND PRIORITY US FIRST CLASS MAIL**

VTVC Enterprises, Inc.
3910 Wayne Avenue, #102
Wichita Falls, Texas 76308

VTVC Enterprises, Inc.
c/o Mr. Nguyen
Director and President
8 Park Place Ct.
Wichita Falls, TX 76302

Mr. Toan Nguyen
8 Park Place Ct.
Wichita Falls, Texas 76302
toan_nguyen506@yahoo.com

**Re: Termination of KFTF Franchise Agreement And Toan Nguyen/VTVC**
**Enterprise's Agreement To Close VTVC Enterprises, Inc., Kung Fu**
**Boba And Not Use KF Tea Franchising LLC's Trademarks**

Dear Mr. Toan Nguyen:

I am writing to memorialize our discussion earlier this week and your agreement to the following terms in response to the Termination and Cease and Desist Letter sent to you and VTVC Enterprises, Inc. (collectively "You") on

**A428**



Trust. Knowledge. Confidence.

Page 2

March 21 on behalf of KF Tea Franchising LLC ("KFTF").  You have agreed as follows:

     1.     You will take all necessary steps to completely close the Kung Fu Boba shop located in Wichita Falls, Texas and your involvement in the business of a retail shop, and any website related thereto, selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks on or about March 31, 2023, and no later than April 20, 2023.  You will send to my attention an email once the business is closed, and you will include photos showing the closed location.

     2.     You confirmed that in August 2022 you closed the KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308. That shop was operating pursuant to your franchise agreement with KFTF of August 16, 2017 (the "Franchise Agreement").  You also confirmed that the Franchise Agreement is terminated and that you agreed to pay off the $30,000 in penalties that you owe to KFTF pursuant to the Franchise Agreement on a payment schedule of $500 per week, such that the total payment of $30,000 is completed within fifteen months beginning April 1, 2023.

     3.     Once the balance is fully paid, you will have no further obligations under the Franchise Agreement other than your obligations not to compete under Section 3.3.3 and not to disclose any confidential information of KFTF pursuant to Section 3.2.

     4.     Once the Kung Fu Boba shop is closed, you will permanently cease and desist any and all current or future use of the KUNG FU TEA trademarks, and any similar marks, such as KUNG FU BOBA.  This includes, but is not limited to any efforts or activities to promote, license, or advertise any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States under KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.

     5.     Upon the closure of the Kung Fu Boba shop, you will refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on any website and any social media platform.

**A429**



Offit | Kurman®
Attorneys At Law

Trust. Knowledge. Confidence.

Page 3

Due to the urgency of this matter, please countersign below your agreement to the terms of this letter by close of business (5:00pm Central) April 3, 2023.

Please note that nothing contained in this letter, nor any act or omission by KFTF, its staff, or representatives is intended or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any rights or remedies which KFTF may have regarding this matter, and all rights and remedies, whether at law or in equity, are hereby expressly reserved.

We look forward to receiving your countersignature soon, but in no event later than close of business on April 3, 2023.

Sincerely,

/Tony V. Pezzano/

Tony V. Pezzano

Date: April 2, 2023

Toan Nguyen
Director and President
VTVC Enterprises, Inc.
8 Park Place Ct.
Wichita Falls, TX 76302

**A430**

# Exhibit 3

**From:**        toan nguyen <toan_nguyen506@yahoo.com>
**Sent:**        Wednesday, April 19, 2023 9:35 AM
**To:**          Pezzano, Tony
**Subject:**     Closing store

Hi, I just want to give you some update on the progress.  I started on closing the company and it's in the process.  The Google page which controls by kung fu tea which I can't do anything on that., same thing with yelp. My actual location is now permanently closed business.  All my employees is no longer working there. I will send you a proof of dissvole company once I receive from secretary of state. I will continually updated the progress to you next couple weeks. Thanks

Sent from Yahoo Mail on Android

# Exhibit 4

**From:**          toan nguyen <toan_nguyen506@yahoo.com>
**Sent:**          Monday, May 8, 2023 9:58 PM
**To:**            Pezzano, Tony
**Subject:**       Store closing

Hi Tony, I got my company terminated.  I've attached a proof for you. Thanks.

**A434**

**Form 651**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

**Filing Fee: $40**



**Certificate of Termination
of a
Domestic Entity**

---

**Entity Information**

The name of the domestic entity is:

VTVC ENTERPRISES, INC.

The entity is organized as a : Domestic For-Profit Corporation under the laws of Texas.

The date of formation of the entity is: July 31, 2017

The file number issued to the entity by the secretary of state is: 802780706

**Governing Persons**

The names and addresses of each of the filing entity's governing person are:

NAME OF GOVERNING PERSON :
IF INDIVIDUAL

Toan Nguyen

OR
IF ORGANIZATION

ADDRESS OF GOVERNING PERSON :
8 park place ct    Wichita falls  TX, USA  76302

**Event Requiring Winding Up**

The nature of the event requiring winding up is:

A voluntary decision to wind up the entity has been approved in the manner

required by the Texas Business Organizations Code and by the governing documents

of the entity.

**Completion of Winding Up**

The filing entity has complied with the provisions of the Texas Business Organizations Code governing its wind
up.

**Effectiveness of Filing**

2

**A435**

Sent from Yahoo Mail on Android

A436

# Exhibit 5

**From:**          Forte, Stephen <stephen.forte@offitkurman.com>
**Sent:**          Monday, May 15, 2023 3:41 PM
**To:**            toan_nguyen506@yahoo.com
**Cc:**            Pezzano, Tony
**Subject:**       Nguyen/VTC Enterprises Closing Agreement - Payments
**Attachments:**   VTVC Closing Agreement - Fully Executed.pdf

Toan,

Under the terms of the Closing Agreement dated April 1, 2023, a fully executed copy of which is attached, you agreed to a payment schedule of $500 per week beginning April 1, 2023, until the payment of the amount of $30,000 is completed. This is the seventh week for which payment would be due and our client has advised that no payments have been received to date. As such, payments in the amount of $3,500 are past due and must be made in order for you to be in compliance with the Closing Agreement.

Please arrange for payment to be made immediately and on a weekly basis until completed, as agreed upon.  We suggest that an ACH or other form of automatic withdrawal be set up to ensure timely payments going forward.

Thank you.

Steve



**Stephen Forte**

Principal
D  929.476.0042
stephen.forte@offitkurman.com


franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656
offitkurman.com



1

**A438**



Trust. Knowledge. Confidence.

**Tony V. Pezzano**
**929.476.0045 (Direct Dial)**
**631.255.3035 (Mobile)**
**212.545.1656 (Facsimile)**
**Tony.Pezzano@offitkurman.com**

April 1, 2023

**VIA EMAIL AND PRIORITY US FIRST CLASS MAIL**

VTVC Enterprises, Inc.
3910 Wayne Avenue, #102
Wichita Falls, Texas 76308

VTVC Enterprises, Inc.
c/o Mr. Nguyen
Director and President
8 Park Place Ct.
Wichita Falls, TX 76302

Mr. Toan Nguyen
8 Park Place Ct.
Wichita Falls, Texas 76302
toan_nguyen506@yahoo.com

**Re: Termination of KFTF Franchise Agreement And Toan Nguyen/VTVC**
**Enterprise's Agreement To Close VTVC Enterprises, Inc., Kung Fu**
**Boba And Not Use KF Tea Franchising LLC's Trademarks**

Dear Mr. Toan Nguyen:

I am writing to memorialize our discussion earlier this week and your
agreement to the following terms in response to the Termination and Cease and
Desist Letter sent to you and VTVC Enterprises, Inc. (collectively "You") on

**A439**



Trust. Knowledge. Confidence.

Page 2

March 21 on behalf of KF Tea Franchising LLC ("KFTF").  You have agreed as follows:

1.     You will take all necessary steps to completely close the Kung Fu Boba shop located in Wichita Falls, Texas and your involvement in the business of a retail shop, and any website related thereto, selling a variety of brew tea, bubble tea, coffee, juices, smoothies and other hot and cold drinks on or about March 31, 2023, and no later than April 20, 2023.  You will send to my attention an email once the business is closed, and you will include photos showing the closed location.

2.     You confirmed that in August 2022 you closed the KUNG FU TEA® shop located at 3910 Wayne Avenue, #102, Wichita Falls, Texas 76308. That shop was operating pursuant to your franchise agreement with KFTF of August 16, 2017 (the "Franchise Agreement").   You also confirmed that the Franchise Agreement is terminated and that you agreed to pay off the $30,000 in penalties that you owe to KFTF pursuant to the Franchise Agreement on a payment schedule of $500 per week, such that the total payment of $30,000 is completed within fifteen months beginning April 1, 2023.

3.     Once the balance is fully paid, you will have no further obligations under the Franchise Agreement other than your obligations not to compete under Section 3.3.3 and not to disclose any confidential information of KFTF pursuant to Section 3.2.

4.     Once the Kung Fu Boba shop is closed, you will permanently cease and desist any and all current or future use of the KUNG FU TEA trademarks, and any similar marks, such as KUNG FU BOBA.  This includes, but is not limited to any efforts or activities to promote, license, or advertise any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States under KUNG FU TEA®, KUNG FU BOBA or any variation of these terms.

5.     Upon the closure of the Kung Fu Boba shop, you will refrain from using any trade name or trademark comprising terms identical or highly similar to KUNG FU TEA®, KUNG FU BOBA or any variation of these terms in connection with any store selling bubble tea, brew tea, coffee, juices, smoothies or variety of other hot and cold drinks in the United States and in any future advertising or rendering of services and programs, including on any website and any social media platform.

**A440**



Attorneys At Law

Trust. Knowledge. Confidence.

Page 3

Due to the urgency of this matter, please countersign below your agreement to the terms of this letter by close of business (5:00pm Central) April 3, 2023.

Please note that nothing contained in this letter, nor any act or omission by KFTF, its staff, or representatives is intended or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any rights or remedies which KFTF may have regarding this matter, and all rights and remedies, whether at law or in equity, are hereby expressly reserved.

We look forward to receiving your countersignature soon, but in no event later than close of business on April 3, 2023.

Sincerely,

/Tony V. Pezzano/

Tony V. Pezzano

Date:  April 2, 2023

Toan Nguyen
Director and President
VTVC Enterprises, Inc.
8 Park Place Ct.
Wichita Falls, TX 76302

**A441**

# Exhibit 6

| | |
|---|---|
| **From:** | toan nguyen |
| **To:** | Forte, Stephen |
| **Cc:** | Piteooff, Thomas |
| **Subject:** | RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY |
| **Date:** | Wednesday, November 15, 2023 10:28:34 AM |
| **Attachments:** | Screenshot_20231115-222740.png |
| | image749442.png |
| | image004.png |
| | image650539.png |
| | image001.png |
| | image030083.png |
| | image181847.png |
| | image002.png |
| | image003.png |

Hi, I will send you a form ACH on December 4th when Im back in state. Here are the proof my return date. Thanks for understanding.



Sent from Yahoo Mail on Android

On Tue, Nov 14, 2023 at 9:05 AM, Forte, Stephen

**A443**

&lt;stephen.forte@offitkurman.com&gt; wrote:

Toan,

Please confirm status.

Thank you.

**Stephen Forte**

Principal

D  929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY  10022
T  212.545.1900
F  212.545.1656
offitkurman.com

---

**From:** toan nguyen &lt;toan_nguyen506@yahoo.com&gt;
**Sent:** Saturday, November 4, 2023 11:21 PM
**To:** Forte, Stephen &lt;stephen.forte@offitkurman.com&gt;
**Cc:** Pitegoff, Thomas &lt;tom.pitegoff@offitkurman.com&gt;
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

**A444**

Yes. I did receive the forms. I'm currently in Vietnam right now. I will be back in state next week and I will take care the forms for you. I'm sorry for any inconvenience.

Sent from Yahoo Mail on Android


On Sat, Nov 4, 2023 at 8:31 AM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

Toan,


Please confirm that has been addressed. If we do not have confirmation payment has been made in the correct amount, we will have no choice but to proceed with a lawsuit against you. You executed an agreement months ago that you would make timely payments on a weekly basis starting in April and have failed to do so. Additionally, we require that you execute the settlement agreement provided to you on October 16 and again on October 20. Failure to do so, and failure to make past due and future payments thereunder, will result in an action based upon your default from April of this year, in addition to all other legal remedies that our client may have against you.


Steve



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

---

**From:** Forte, Stephen <stephen.forte@offitkurman.com>
**Sent:** Tuesday, October 31, 2023 4:30 PM
**To:** toan nguyen <toan_nguyen506@yahoo.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY


If that is the case, then we will need your account information. You can use this form to provide the basis information.



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Tuesday, October 31, 2023 4:26 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

I went to my bank to set up ACH weekly, but my Banker told me to be able to set up ACH, Kung fu tea have to request ACH from my bank which I will give you my bank info and their bank need to do it instead of me. Bc the money transfer from my bank to their bank, their bank need to set it up in their end. Thanks.

Sent from Yahoo Mail on Android

On Tue, Oct 31, 2023 at 3:20 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

> Toan,
>
> Can you clarify why you mean? Are you saying that your bank informed you that the ACH instructions provided to you in this email chain are incorrect?
>
> Best,
>
> Steve

590 Madison Ave

**A446**

**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656

offitkurman.com

franchisealchemy.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Tuesday, October 31, 2023 10:48 AM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Hi,I came to my bank to setup ACH and my Banker told me Kung fu tea would have to set up ACH from their bank . I will give them my bank info and their bank have to request ACH. Please advise.

Sent from Yahoo Mail on Android

On Mon, Oct 30, 2023 at 2:26 PM, toan nguyen

<toan_nguyen506@yahoo.com> wrote:

> I'm sorry. I will process with ACH with my bank today. I will come up with writing as requested.  Sorry for any inconvenience
>
> Sent from Yahoo Mail on Android
>
>
> On Mon, Oct 30, 2023 at 2:08 PM, Forte, Stephen
>
> <stephen.forte@offitkurman.com> wrote:
>
>> Toan,
>>
>>
>> Please advise with respect to the below. In the event payment is not received, and confirmed, by our client, we will have no choice but to commence legal action against you.
>>
>>
>> Best,
>>
>>
>> Steve

**A447**



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

---

**From:** Forte, Stephen <stephen.forte@offitkurman.com>
**Sent:** Tuesday, October 24, 2023 2:49 PM
**To:** toan nguyen <toan_nguyen506@yahoo.com>
**Cc:** Pitegoff, Thomas <tom.pitegoff@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Toan,

ACH information is below. Please confirm with us in writing when payments are made. We do, however, require that the agreement provided to you be executed and will deem the tendering of any payment as acceptance of the terms of the settlement agreement.

Bank Name: Flagstar Bank

Account Name: KF Tea Franchising LLC

Routing Number: 026013576

Account Number: 1502749931

Best,

Steve

**Stephen Forte**

Principal
D 929.476.0042

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656

**A448**

stephen.forte@offitkurman.com                    offitkurman.com

franchisealchemy.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Monday, October 23, 2023 2:58 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Hi. I got your message,  I will go ahead set up ACH now. Thanks

Sent from Yahoo Mail on Android

On Fri, Oct 20, 2023 at 3:21 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

Toan,

We have not received a response from you. Please advise in order to avoid the need for legal action.

Best,

Steve

**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

**A449**

**From:** Forte, Stephen <stephen.forte@offitkurman.com>
**Sent:** Monday, October 16, 2023 9:55 PM
**To:** toan nguyen <toan_nguyen506@yahoo.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Toan,

In light of your statement that you could pay $3,000 as of September 13 and $500 weekly thereafter, see attached Settlement Agreement. I will have the information for the blank for ACH payment upon your execution of the agreement. As you will note, the Settlement Agreement contemplates payment of $5,000 on or before October 23, 2023. The increase from $3,000 to $5,000 is the passage of approximately four additional weeks at $500/week for an additional $2,000.

Please provide back a signed and executed agreement and arrange for timely payment of the initial payment.

Thank you.

Steve



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com


franchisealchemy.com

| 590 Madison Ave |
| 6th Floor |
| New York, NY 10022 |
| T 212.545.1900 |
| F 212.545.1656 |
| offitkurman.com |



**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Wednesday, September 13, 2023 5:08 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Hi. I'm sorry but I can't afford $10000 right now. All I can do is 3000 now and start pay $500 every week start this week. Please provide me your info on ACH. Thanks for understanding.

**A450**

Sent from Yahoo Mail on Android

On Wed, Sep 13, 2023 at 3:44 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

Mr. Nguyen,

Given the amount of time that has passed, my client is seeking the full amount that it would have received if weekly payments were made commencing on April 1, as originally agreed, which, as of today, is in the amount of $12,000, with weekly payments of $500 thereafter. Our client rejected your last offer to pay $3,000 in August as an initial payment, and then to make payments thereafter of $1,500 a month from October until all monies were paid, which you stated is all you can afford.

Notwithstanding the foregoing, I have been authorized to propose a revised payment scheduled with $10,000 to be paid on or before September 29 with monthly payments to be made thereafter in the amount of $1,500 until the full $30,000 has been paid. In the event of a default, the full amount of the balance will become due and payable, in addition to our client's ability to assert any additional claims it may have. Payment can either be made via certified check or via ACH. The address for payment and ACH payment instructions can be confirmed upon finalizing revised terms.

Please advise by the close of business **Friday, September 15, 2023**, whether this is agreeable.



**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656
offitkurman.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Wednesday, September 13, 2023 2:55 PM

**A451**

**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Hi, I'm sorry I didn't see you last email,  how much are kung fu tea required for the first payment? Thanks. And where can I send the check to?

Sent from Yahoo Mail on Android

On Wed, Sep 13, 2023 at 1:53 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

> Mr. Nguyen,
>
> We have not heard from you in response to our below email from August 30. In light of the fact that an agreement has not been reached to modify payment terms previously agreed upon by you, and that no payments have been made by you under the executed Closing Agreement, a copy of which is attached, our client intends to proceed with legal action to, among other things, seek the full amount owed by you under the Closing Agreement, unless all unpaid amounts under the Closing Agreement are paid by you on or before September 29, 2023 .
>
> Pursuant to Paragraph 2 of the Closing Agreement, you were required, and agreed, to make payments beginning on April 1, 2023 in the amount of $500 per week for a period of fifteen months until the sum of $30,000 was paid.  Since that time, twenty-four weeks have passed, totaling $12,000 that came due and is currently unpaid under the Closing Agreement. Additional amounts continue to come due each week.
>
> Our client reserves all rights and remedies under the law.



**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656
offitkurman.com



franchisealchemy.com

**A452**

**From:** Forte, Stephen <stephen.forte@offitkurman.com>
**Sent:** Wednesday, August 30, 2023 5:50 PM
**To:** toan nguyen <toan_nguyen506@yahoo.com>
**Subject:** RE: Payment -- Kung Fu Tea: FOR SETTLEMENT PURPOSES ONLY

Mr. Nguyen,

My client is seeking a larger up-front payment. Please advise if this is possible.

Thank you.

Steve



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Thursday, July 27, 2023 1:23 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

Hi. Thank you for taking time talk with me

Here are my proposal on the payment plans. I'm willing to pay up front 3k in August and start on 1st October,  I can make 1500 a month till I pay off 30k. Due to my current job issue,  that's all I can afford.  In the future,  I will make any extra payments to pay it off as soon as possible.  Thank you for understanding.

Sent from Yahoo Mail on Android

**A453**

On Fri, Jul 21, 2023 at 5:19 PM, toan nguyen

<toan_nguyen506@yahoo.com> wrote:

3 pm please. Thanks

Sent from Yahoo Mail on Android

On Fri, Jul 21, 2023 at 3:58 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

What time?



**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656

offitkurman.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Friday, July 21, 2023 4:57 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

Yes. Of course. Thanks

Sent from Yahoo Mail on Android

On Fri, Jul 21, 2023 at 3:54 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

Can we schedule the call for Monday?



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Friday, July 21, 2023 4:52 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

Hi. I'm sorry I didn't see your last email I'm available tomorrow at 3pm. Please let me know.  Thanks

Sent from Yahoo Mail on Android

On Thu, Jul 13, 2023 at 4:42 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

> Toan,
>
> When are you available to speak again on this issue? My client is willing to consider alternatives other than what is in the signed agreement; however, it would likely require a partial lump sum payment up front.
>
> Best,
>
> Steve

**Stephen Forte**

590 Madison Ave
6th Floor
New York, NY 10022



Principal
D  929.476.0042

stephen.forte@offitkurman.com


franchisealchemy.com

T  212.545.1900
F  212.545.1656
offitkurman.com

---

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Tuesday, June 27, 2023 7:43 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

Hi, it's ok sir. We can do tomorrow at 3 . Thanks

Sent from Yahoo Mail on Android

On Tue, Jun 27, 2023 at 5:06 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

Toan,

My apologies, something unexpectedly came up and I was not able to call. What is your availability tomorrow?

Best,

Steve

**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656
offitkurman.com

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Monday, June 26, 2023 4:17 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

It's 9407829291. Thanks

Sent from Yahoo Mail on Android

On Mon, Jun 26, 2023 at 2:44 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

That works. What is the best number to reach you?



**Stephen Forte**

Principal
D  929.476.0042

stephen.forte@offitkurman.com

franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T  212.545.1900
F  212.545.1656
offitkurman.com

**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Monday, June 26, 2023 2:26 PM
**To:** Forte, Stephen <stephen.forte@offitkurman.com>
**Subject:** RE: Payment -- Kung Fu Tea

Hi, i can speak tomorrow at 3pm central. Thanks

Sent from Yahoo Mail on Android

On Mon, Jun 26, 2023 at 12:03 PM, Forte, Stephen

<stephen.forte@offitkurman.com> wrote:

**A457**

Mr. Nguyen,

Tony forwarded your below message to me. When are you available to speak?

Best,

Steve



**Stephen Forte**

Principal
D 929.476.0042

stephen.forte@offitkurman.com



franchisealchemy.com

590 Madison Ave
6th Floor
New York, NY 10022
T 212.545.1900
F 212.545.1656
offitkurman.com



**From:** toan nguyen <toan_nguyen506@yahoo.com>
**Sent:** Monday, June 19, 2023 9:20 AM
**To:** Pezzano, Tony <Tony.Pezzano@offitkurman.com>
**Subject:** Payment

Hi Tony, can I set up a meeting with you to discuss about payment plan. Thanks

Sent from Yahoo Mail on Android

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

# Exhibit 7

# Taxable Entity Search Results

for the search string : Tea N' Boba

...ions about the search results, send an email to tax.help@cpa.texas.gov. or call 1-800-252-1386.

## Franchise Tax Account Status
As of : 11/30/2023 18:57:15

### Results

This page is valid for most business transactions but is not sufficient for filings with the Secretary of State

| Name | Taxpayers ID# | Zip |
|------|---------------|-----|
| TEA N' BOBA ENTERPRISES LLC | 32090189104 | 76302 |

### TEA N' BOBA ENTERPRISES LLC

| | |
|---|---|
| Texas Taxpayer Number | 32090189104 |
| Mailing Address | 8 PARK PLACE CT WICHITA FALLS, TX 76302-1960 |
| ❓ Right to Transact Business in Texas | ACTIVE |
| State of Formation | TX |
| Effective SOS Registration Date | 06/05/2023 |
| Texas SOS File Number | 0805088480 |
| Registered Agent Name | UNITED STATES CORPORATION AGENTS, INC. |
| Registered Office Street Address | 9900 SPECTRUM DRIVE AUSTIN, TX 78717 |

11/30/23, 7:57 PM                              Taxable Entity Search Results





# Franchise Tax Account Status

As of : 11/30/2023 18:57:15

---

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

---

| | |
|---|---|
| **TEA N' BOBA ENTERPRISES LLC** | |
| **Texas Taxpayer Number** | 32090189104 |
| **Mailing Address** | 8 PARK PLACE CT WICHITA FALLS, TX 76302-1960 |
| ❓ **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 06/05/2023 |
| **Texas SOS File Number** | 0805088480 |
| **Registered Agent Name** | UNITED STATES CORPORATION AGENTS, INC. |
| **Registered Office Street Address** | 9900 SPECTRUM DRIVE AUSTIN, TX 78717 |